UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

PRECISION ASSOCIATES, INC.;
JAMES BARNES; and ANYTHING
GOES LLC d/b/a MAIL BOXES ETC., on
behalf of themselves and all others
similarly situated,

        Plaintiffs,

    vs.

PANALPINA WORLD TRANSPORT
(HOLDING) LTD.; PANALPINA, INC.;
KÜHNE + NAGEL INTERNATIONAL
AG; KUEHNE + NAGEL, INC.;
EXPEDITORS INTERNATIONAL OF
WASHINGTON, INC.; EGL, INC.; EGL
EAGLE GLOBAL LOGISTICS, LP;
DEUTSCHE BAHN AG; SCHENKER
AG; SCHENKER, INC.; DEUTSCHE
POST AG; DHL EXPRESS (USA), INC.;
UTI WORLDWIDE INC.; AND
SPEDLOGSWISS, AKA THE
ASSOCIATION OF SWISS
FORWARDERS,

        Defendants.

Case No.:

CV 08 0042

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

GLEESON, J.

POHORELSKY, M.J.

Plaintiffs Precision Associates, Inc.; James Barnes; and Anything Goes LLC

d/b/a Mail Boxes Etc., individually and on behalf of a Class (as defined below) of all those

similarly situated direct purchasers of Freight Forwarding Services as defined herein, bring

this action against:  Panalpina World Transport (Holding) Ltd.; Panalpina, Inc.; Kühne +

Nagel International AG; Kuehne + Nagel, Inc.; Expeditors International of Washington, Inc.;

EGL, Inc.; EGL Eagle Global Logistics, LP; Deutsche Bahn AG; Schenker AG; Schenker,

Inc.; Deutsche Post AG; DHL Express (USA), Inc.; UTi Worldwide Inc.; and Spedlogswiss,

aka The Association Of Swiss Forwarders, (collectively, "Defendants") for damages and

89424.1

injunctive relief under the antitrust laws of the United States. Plaintiffs respectfully demand a trial by jury, and complain and allege on information and belief as follows:

## JURISDICTION AND VENUE

1.     The claims in this Class Action Complaint ("Complaint") are brought under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations of Section 1 of the Sherman Act (15 U.S.C. §1) as alleged herein.

2.     In addition, this action is instituted to secure injunctive relief against Defendants to prevent them from further violating Section 1 of the Sherman Act as alleged in this Complaint.

3.     Jurisdiction is conferred upon this Court by 28 U.S.C. §1331 and §1337, and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

4.     Venue is proper in this Judicial District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c), and (d).

5.     Defendants maintain offices, have agents, transact business, or are found within this Judicial District. Plaintiffs' claims alleged in this Complaint arise in part within this District. The interstate trade and commerce described herein is and has been carried out in part within this District. Defendants have sent products in the stream of commerce that have reached this District.

## DEFINITIONS

6.     The term "Freight Forwarding Services" includes services relating to the organization of transportation of items via air, ship, rail, and truck, both nationally and internationally, and can include related activities such as customs clearance, warehousing and ground services. The providers of this package of services are sometimes referred to as "third party logistics providers."

7.     The term "Class Period" means the period from at least as early as January 1, 2001 to the present.

8.     "Person" means any individual, partnership, corporation, association, or other business or legal entity.

## PARTIES

9.     Plaintiff Precision Associates, Inc. is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Plaintiff Precision Associates, Inc. purchased Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

10.     Plaintiff James Barnes is an individual residing in San Francisco, California.  During the Class Period, Plaintiff James Barnes purchased Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

11.     Plaintiff Anything Goes LLC d/b/a Mail Boxes Etc. is a California corporation with its principal place of business in Tarzana, California.  During the Class Period, Plaintiff Anything Goes LLC d/b/a Mail Boxes Etc. purchased Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

12.     Defendant Panalpina World Transport (Holding) Ltd. is organized under the laws of Switzerland, with its headquarters located at Viaduktstrasse 42 / P.O. Box CH – 4002 Basel, Switzerland.  Panalpina World Transport (Holding) Ltd. is the parent of Defendant Panalpina, Inc.  During the Class Period, Panalpina World Transport (Holding) Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

13.     Defendant Panalpina, Inc. is a corporation organized under the laws of New York, with its headquarters located at 1776 On-The-Green, 67 Park Place, Morristown,

New Jersey 07960-7103.  Panalpina, Inc. is a subsidiary of Defendant Panalpina World Transport (Holding) Ltd.  During the Class Period, Panalpina, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States. Defendants Panalpina World Transport (Holding) Ltd. and Panalpina, Inc. are collectively referred to herein as "Panalpina."  Panalpina has offices in this District located at 152-81 Rockaway Blvd., Jamaica, New York 11434.

14.     Defendant Kühne + Nagel International AG is a corporation organized under the laws of Switzerland with its headquarters located at Dorfstrasse 50, Schindellegi, Switzerland 8834.  Kühne + Nagel International AG is the parent company of Defendant Kuehne + Nagel, Inc.  During the Class Period, Kühne + Nagel International AG, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

15.     Defendant Kuehne + Nagel, Inc. is a corporation organized under the laws of New York, with its headquarters located at 10 Exchange Place, 19th Floor, Jersey City, New Jersey 07302.  Kuehne + Nagel, Inc. is a subsidiary of Defendant Kühne + Nagel International AG.  During the Class Period, Kuehne + Nagel, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States. Defendants Kühne + Nagel International AG and Kuehne + Nagel, Inc. are collectively referred to herein as "Kuehne + Nagel."  Kuehne + Nagel has offices in this District located at 156-15 146th Avenue, 3rd Floor, Jamaica, New York 11434.

16.     Defendant Expeditors International of Washington, Inc. is a publicly traded corporation (NASDAQ:  EXPD) organized under the laws of the State of Washington with its headquarters located at 1015 Third Avenue, 12th Floor, Seattle, Washington 98104. During the Class Period, Expeditors International of Washington, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States. Expeditors International of Washington, Inc. ("Expeditors") has offices in this District located at 245 Roger Avenue, Inwood, New York 10096.

17.    Defendant EGL, Inc. is a corporation organized under the laws of Texas, with its principal place of business located at 15350 Vickery Drive, Houston, Texas 77032. On August 2, 2007, CEVA Group plc ("CEVA") announced the completion of its merger with EGL, Inc., which is now a wholly owned indirect subsidiary of CEVA. CEVA, a leading global logistics company, is a U.K. public limited company owned by affiliates of Apollo Management VI, L.P. During the Class Period, EGL, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District. EGL, Inc. has offices in this District located at 55 Johnson Road, Lawrence, NY 11559.

18.    Defendant EGL Eagle Global Logistics, LP is a corporation organized under the laws of Delaware, with its principal place of business located at 15350 Vickery Drive, Houston, Texas 77032. Defendant EGL Eagle Global Logistics, LP is a subsidiary of Defendant EGL, Inc. During the Class Period, EGL Eagle Global Logistics, LP, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District. Defendants EGL, Inc. and EGL Eagle Global Logistics, LP are collectively referred to herein as "EGL."

19.    Defendant Deutsche Bahn AG is a corporation organized under the laws of Germany, with its principal place of business located at Potsdamer Platz 2, D-10785 Berlin, Germany. Defendant Deutsche Bahn AG is the parent of Defendants Schenker AG and Schenker, Inc. During the Class Period, Deutsche Bahn AG, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

20.    Defendant Schenker AG is a corporation organized under the laws of Germany, with it principal place of business located at Alfredstrasse 81, 45130 Essen, Germany. Defendant Schenker AG is a subsidiary of Defendant Deutsche Bahn AG. During the Class Period, Schenker AG, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

21.     Defendant Schenker, Inc. is a corporation organized under the laws of New York, with its principal place of business located at 150 Albany Avenue, Freeport, New York 11520. Defendant Schenker, Inc. is a subsidiary of Defendant Deutsche Bahn AG. During the Class Period, Schenker, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District. Schenker, Inc. has an office located in this District at 182-21 150th Avenue, Jamaica, New York 11413. Defendants Deutsche Bahn AG, Schenker AG, and Schenker, Inc. are collectively referred to herein as "Schenker."

22.     Defendant Deutsche Post AG is a corporation organized under the laws of Germany with its headquarters located at Charles-de-Gaulle-Str. 20, 53113 Bonn, Germany. Defendant Deutsche Post AG is the parent of Defendant DHL Express (USA), Inc. During the Class Period, Deutsche Post AG, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

23.     Defendant DHL Express (USA), Inc. is a corporation organized under the laws of Ohio, with its principal place of business located at 1200 South Pine Island Road, Suite 600, Plantation, Florida 33324. Defendant DHL Express (USA), Inc. is a subsidiary of Defendant Deutsche Post AG. During the Class Period, DHL Express (USA), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District. Defendants Deutsche Post AG and DHL Express (USA), Inc. are collectively referred to herein as "DHL."

24.     Defendant UTi Worldwide Inc. is a corporation organized under the laws of the British Virgin Islands, with its principal place of business located at 9 Columbus Centre, Pelican Drive, Road Town, Tortola, British Virgin Islands, and c/o UTi, Services, Inc., 100 Oceangate Boulevard, Suite 1500, Long Beach, California 90802. During the Class Period, UTi Worldwide Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District. UTi Worldwide

Inc. has offices in this District located at Suite 1000, 230-39, International Airport Center Blvd., Springfield Gardens, New York 11413.

25.     Defendant Spedlogswiss, aka the Association of Swiss Forwarders, is a trade association with its principal place of business located at Elisabethenstrasse 44, CH-4051 / PO Box CH-4002, Basel, Switzerland.

26.     The acts alleged against the corporate Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs.

27.     Various individuals, partnerships, corporations, and associations, the identities of which are presently unknown, and which are not named as Defendants in this Complaint, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  When and if Plaintiffs learn the identities of such co-conspirators, Plaintiffs may seek leave to amend this complaint to add such co-conspirators as defendants.

28.     The acts that this Complaint alleges were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives or each co-conspirator while actively engaged in the management, direction, or control of its affairs.

## CLASS ACTION ALLEGATIONS

29.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> **All persons (excluding governmental entities, Defendants, their subsidiaries and affiliates, and their co-conspirators) who directly purchased Freight Forwarding Services in the United States from any of the Defendants or any subsidiary or affiliate thereof, or any co-conspirator, at any time during the period from January 1, 2001 to the present (the "Class").**

30.     Plaintiffs do not know the exact size of the Class because such information is in the exclusive control of the Defendants.  Nevertheless, there are thousands of class members geographically dispersed throughout the United States.  Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members are so numerous that joinder of all Class members in this action is impracticable.

31.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all Class members are all direct purchasers of Freight Forwarding Services who paid artificially inflated prices for Freight Forwarding Services due to Defendants' contract, conspiracy or combination alleged herein.

32.     Plaintiffs will fairly and adequately protect the interests of the Class as the interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.  In addition, Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

33.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

34.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members.  Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

      a.     whether Defendants and their co-conspirators engaged in a contract, conspiracy or combination to raise, fix, stabilize, or maintain the prices of Freight Forwarding Services sold in the United States;

      b.     whether the alleged contract, conspiracy or combination violated Section 1 of the Sherman Act;

      c.     the duration and extent of the contract, conspiracy or combination alleged herein;

d.     whether the Defendants and their co-conspirators took affirmative steps to conceal the contract, conspiracy or combination;

e.     whether each of the Defendants was a participant in the contract, conspiracy or combination alleged herein;

f.     whether the Defendants' conduct caused the prices of Freight Forwarding Services to be set at an artificially high and non-competitive level;

g.     the effect of Defendants' contract, conspiracy or combination upon interstate commerce;

h.     the appropriate measure of damages; and

i.     whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief.

35.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Class is readily ascertainable from the Defendants' records.

36.     Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

## TRADE AND COMMERCE

37.     Beginning at least as early as January 1, 2001, and continuing until the present, the exact dates unknown to Plaintiffs at this time, Defendants engaged in a continuing contract, conspiracy or combination in restraint of trade in violation of the Sherman Act.

38.     During the Class Period herein alleged, Defendants sold substantial quantities of Freight Forwarding Services in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which the Defendants produced Freight Forwarding Services.

39.     The Defendants' business activities that are the subject of this Complaint were within the flow of and substantially affected interstate trade and commerce.

40.     During the Class Period herein alleged, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained the interstate commerce of the United States.

## DEFENDANTS AND THE MARKET FOR FREIGHT FORWARDING SERVICES

### A.      Freight Forwarding Services

41.     Defendants and other freight-forwarders broker and organize the transport of products, commodities and other goods, by all modes of transportation, including air, ground (rail and truck) and ship, on behalf of customers such as Plaintiffs and members of the Class. In some instances, Defendants also transport the goods themselves, in addition to coordinating their transport.

42.     As an agent for the shipper, a Freight Forwarder assists in all aspects of cargo transport, from pick up to drop off, and thus provides a wide variety of services. The Freight Forwarder may advise on exporting costs, including freight costs, port charges, consular fees, costs of special documentation, insurance costs and freight handling fees. The Freight Forwarder may also prepare and file required export documentation such as the bill of lading and routing appropriate documents to the seller, the buyer or a paying bank. Further,

the Freight Forwarder may advise on the most appropriate mode of cargo transport and making arrangements to pack and load the cargo. The Freight Forwarder may reserve the necessary cargo space on a vessel, aircraft, train, or truck. Finally, a Freight Forwarder may arrange with overseas customs brokers to ensure that the goods and documents comply with customs regulations.

43.     International Freight Forwarders are licensed by the International Air Transport Association (IATA) to handle airfreight and the Federal Maritime Commission to handle ocean freight.

44.     Plaintiffs and other Class members use Freight Forwarding Services to assist in the transport of freight, generally over long distances. While some Freight Forwarders also provide services for the actual transport of the goods, the majority of Freight Forwarders are brokers for Freight Forwarding. Using a Freight Forwarder is often the fastest and most efficient means for a shipper or receiver to organize the transportation of freight.

### B.     Market for Freight Forwarding Services

45.     In 2007 alone, the total value of global trade in consumer goods for the freight forwarding industry has been estimated to be over $500 billion. As long ago as 2002, the most recent information available for the U.S. Census Bureau, the Freight Forwarding services industry in the United States alone reported revenues of $27.7 billion. See U.S. Census Bureau's 2002 Economic Census for Transportation and Warehousing, available at http://www.census.gov/epcd/ec97/industry/E488510.HTM (visited 10/16/07).

46.     Internationally, the freight forwarding industry has experienced significant year-on-year growth as a result of increased international trade volumes. Freight Forwarders' revenue and profits have surged in recent years.

47.     According to Philip Damas, director of research for London-based Drewry Shipping Consulting, a leading provider of economic, marketing and technical information to the international shipping industry, the forwarding industry controlled about 20

percent of the global container market in 2006 and earned revenue of $50 billion (not counting customs services). In comparison, forwarders earned $30 billion from the airfreight market where they control 95 percent of the market. According to Damas, the ocean freight forwarder market is growing at near double-digit rates. The very large forwarders, including Defendants Kuehne + Nagel, DHL, Panalpina, Schenker, and more recently UPS, are gaining market share even faster. For example, Kuehne + Nagel sea freight volume increased 19.4 percent in 2005.

48.    The May 2007 edition of *Global Logistics & Supply Chain Strategies* ("*GL&SCS*") provides the following overview regarding the demand for, and growth of, the freight forwarding services industry:

> "The cravings of the world's largest manufacturers and retailers for outsourced logistics services seems to know no end. In 2006, Fortune's Global 500 companies spent $170 [billion] on third-party logistics. In the U.S. alone, [third party logistics] revenues exceeded $110 [billion]. The menu, however, is still meat and potatoes.
>
> More than three quarters of [third party logistics services] purchased were for everyday tactical functions such as transportation management, warehousing and similar value-added services."

49.    The structure of the Freight Forwarding industry facilitates the implementation and promulgation of the price-fixing practices of which Plaintiffs complain. For example:

a.    Freight Forwarding services are commodity-like and are highly fungible. That is, Freight Forwarding services provided by one Freight Forwarder are readily substitutable for the Freight Forwarding services provided by another Freight Forwarder, and therefore sales are driven primarily by price. This commodity-like nature of these services is demonstrated by the fact that Freight Forwarders routinely provide Freight Forwarding services for each other.

b.    The principal competitors for Defendants in this freight forwarding industry are one another.

c.      Freight Forwarding Services are highly concentrated, which facilitates coordination of prices among its major providers, including Defendants.  Indeed, the industry has experienced increasing concentration.  The industry has experienced an unprecedented level of mergers and acquisitions, resulting in a small number of global players, including the Defendants.  Indeed, during the Class Period and as detailed more specifically below, Defendants accounted for a substantial portion of Freight Forwarding Services.

d.      The Freight Forwarding industry has substantial barriers to entry.  To enter and maintain a viable competitive presence in the Freight Forwarding industry requires an expenditure of capital investment and other resources over a long period of time. Specifically, a viable entry requires not only significant capital and overhead expenditures, but also requires that a new provider capture a significant share of market from existing providers. New entry is thus both expensive and risky.  Due to the increasing globalization of the world's economy, freight forwarders, to survive, must also have global operations, as do Defendants. For example, Defendants have thousands of warehouses in dozens of countries.  Defendant DHL has 1,600 warehouses around the world, and air freight forwarding operations in more than 150 countries, and Defendant Kuehne + Nagel have operations in more than 100 countries.  The other Defendants are similarly diversified.  New entrants simply cannot succeed on a global level.

## C.      Defendants' Significant Market Share

50.      Defendants are among the largest and leading providers of Freight Forwarding services in the United States and worldwide.  During the class period, Defendants handled a substantial percentage of Freight Forwarding business.  Among the named Defendants are, according to the May 2007 edition of *Global Logistics & Supply Chain Strategies*, the world's three largest third-party logistics providers based on 2006 revenues (DHL, $31 billion; Kuehne + Nagel, $14.9 billion; and Schenker / BAX Global $14 billion). Defendant Panalpina ranked fifth ($7.2 billion), Defendant Expeditors International ranked

ninth ($4.6 billion), Defendant UTi ranked 11th ($3.5 billion), and Defendant EGL ranked

13th ($3.2 billion).

51.     Defendants possess significant market share.  As noted in more detail

below in the Trade Association portion of this Complaint, five of the Defendants here (DHL,

Kuehne + Nagel, Panalpina, Schenker and UTi), along with Agility and ABX Logistics,

constitute the trade association known as Freight Forward International ("FFI").  FFI's

website notes that its seven members alone had a 2006 market share of more than 25% in air

freight forwarding, and nearly 30% in ocean freight forwarding.

52.     *GL&SCS* further provides the following additional information regarding

the enormous revenues generated by the leading freight forwarders, including the Defendants,

and rapid consolidation in the industry:

> "The *GL&SCS* Top 25 Global [third party logistics providers] for
> 2006 continued to bulk up with gross revenues of $131.5
> [billion], up more than 20 percent over 2005.  These
> heavyweights are increasing their market share each year, both
> by swallowing each other and by expanding their own global
> reach, physical handling abilities and the quality of their
> information technology."

53.     *GL&SCS* additionally details large customers' increasing reliance on a

concentrated number of freight forwarders including Defendants, and the resulting explosive

revenue growth, as follows:

> "While large customers are reticent to put all their business with
> one logistics provider, they are more and more inclined to limit
> the number of core [third party logistics providers].  As a
> consequence, the large players will continue to capture more of
> the strategic relationships going forward.  For example, the top
> five [third party logistics providers] [including Defendants DHL,
> Kuehne + Nagel, Schenker/BAX Global, and Panalpina] grew
> their revenue by 37 percent last year while world [gross domestic
> product] grew by five percent.  [Defendant] Kuehne + Nagel
> leads this growth wave with a 39.3 percent revenue increase."

54.     *GL&SCS* further details the specific, and leading, role that freight

forwarding services played in the dramatic revenue growth describe in part above, as follows:

> "As companies extend their supply chains around the world, it is
> not surprising that the greatest area of revenue growth for [third

party logistics providers] was global transportation and forwarding. The revenue growth was also reflected in unit volume increases. For example, ocean freight leader [Defendant] Kuehne + Nagel handled 2.3 million TEU's [twenty foot equivalent units – twenty foot containers] last year. Other leading ocean forwarders all handling more than one million TEU's included:

- [Defendant] DHL          1.9 million
- [Defendant] Schenker      1.3 million
- [Defendant] Expeditors    1.2 million
- [Defendant] Panalpina     1.2 million"

55.    Defendant DHL was the world's largest air-freight forwarder in 2006, according to *GL&SCS*, handling 2.4 million tons of cargo and generating $6.4 billion in airfreight revenue. Defendants Schenker, Panalpina, Kuehne + Nagel, and EGL were the next four largest in terms of air-freight forwarding revenue.

56.    *GL&SCS* further noted the following with respect to DHL:

"DHL Logistics is by far the world's largest [third party logistics provider] with annual revenue nearly twice that of its nearest rival. Its gross revenue take is:  DHL Excel Supply Chain [$16.2 billion], DHL Global Forwarding [$12.6 billion] and DHL Freight [$2.7 billion].  In fact, DHL Logistics now exceeds the revenues of its better-known sister division, DHL Express, and even the postal division of its parent company, Deutsche Post World Net . . . DHL Logistics achieved its growth rapidly through acquisitions . . . just a few years ago it purchased Danzas/AEI, then the world's largest freight forwarder."

57.    In 2005, it was estimated that the top ten freight forwarders, including many of the Defendants, controlled more than 45% of the market.

58.    The largest freight-forwarders, including Defendants, count as their key customers virtually a who's who of the world's largest and best known companies across the entire spectrum of manufactured goods. Therefore, the actions of Defendants complained of herein have touched virtually every American business and household in some way. According to *GL&SCS*, the following is a list of some the "key customers" of the Defendants:

**DHL:**  Apple Computer; Compaq; Ford Motor Co.; Hewlett Packard; Home Depot; Honda; Intel; International Paper; Kodak; Miller Brewing; Mitsubishi Corp.; Motorola; Nissan; Owens Corning; Pepsi Americas; Procter & Gamble; Shell; Sony; Sun Microsystems; Unilever; Wal-Mart; Xerox

**Kuehne + Nagel:** DuPont; Memorex; Nortel; Siemens

**Schenker:** BMW; Cisco; Fujitsu; Microsoft; NEC; Porsche; Samsung; Siemens; Sony; VW; Xerox

**Expeditors International:** Ace Hardware; Cisco; General Electric; Merck; Motorola; Philips; Toyota

**UTi:** Dell Computer; Dow Corning; Gap; Home Depot; International Paper; Wal-Mart

**EGL:** Dell Computer; Target; Avon; Harley Davidson; Daimler Chrysler; Fujitsu; Medtronic; Proctor & Gamble; 3M; Tyco; IBM

## THE FREIGHT FORWARDING INDUSTRY AND GOVERNMENT INVESTIGATIONS

### A.   The World-Wide Antitrust Agency Raids on the Defendants' Operations.

59.    In October of 2007, various governmental antitrust enforcers around the world, including in the United States and Europe, raided the offices of numerous defendants named herein in connection with suspected anticompetitive practices in the freight forwarding services sector.  For example, on October 11, 2007, the European Commission publicly announced the following:

> "The European Commission can confirm that on 10th October 2007 Commission officials carried out unannounced inspections at the premises of various providers of international freight forwarding services.  Freight forwarding is the organisation of transportation of items along with related activities such as customs clearance, warehousing and ground services. The Commission has reason to believe that the companies concerned may have violated EC Treaty rules that outlaw restrictive business practices (Article 81).
>
> The Commission officials were accompanied by their counterparts from the relevant national competition authorities.
> Surprise inspections are a preliminary step in investigations into suspected cartels . . ."

60.    Similarly, on October 10, 2007, a spokeswoman for the U. S. Department of Justice confirmed its antitrust division's investigation into "the possibility of anticompetitive practices in the international freight forwarding industry" and that it was

"coordinating with the EU and other foreign competition authorities." See U.S. Probing
Freight Forwarding Industry, available at
www.reuters.com/article/governmentFilingsNews/idUSN1027773220071010 (dated Oct. 10,
2007; visited Oct. 23, 2007).

61.    One or more Defendants may have already conceded that price-fixing
occurred. For example, on October 15, 2007, e-Cargonews Asia, a publicly available on-line
version of the Asian cargo industry newspaper Cargonews Asia, reported that "Deutsche Bahn
won't rule out that its logistics unit Schenker could have participated in illegal price-fixing.
Deutsche Bahn Logistics chief Nobert Bensel said there are certain reasons to suspect that the
EC Treaty's anti-trust rules may have been violated. Deutsche Bahn last week said the offices
of its Zurich-based Schenker transport unit were searched in South Africa, Switzerland and the
US."

62.    One of the Defendants or their co-conspirators appears to have sought
conditional immunity from multiple antitrust enforcers around the world in exchange for
cooperating against the other co-conspirators. Specifically, on October 11, 2007, the
Bloomberg news agency reported that the world-wide "probe began when a company turned
itself in to antitrust regulators in Switzerland, the U.S. and the EU for possible violations,
[Patrick] Durcey of [Swiss competition authority] Weko said." On that same day, the
Associated Press news agency reported that "[d]ocuments provided by the company aroused
sufficient suspicion to trigger the international investigation."

63.    The world-wide raids extended to South Africa. On October 15, 2007,
Creamer Media, a South African news agency, publicly reported the following:

> "The South African Competition Commission conducted a raid
> on October 10 on three freight forwarding companies – two
> international operations and one local company – following a
> complaint, senior legal analyst Nandi Mokoena said.
>
> The companies are suspected to have engaged in practices which
> might contravene the Competition Act, and information has
> indicated that they may be part of an international price-fixing
> cartel.

Mokoena said that the information received indicated that three companies were engaged in price-fixing on war-risk surcharges (surcharges imposed for security following the attacks on September 11, 2001), security charges and the fee charged for the automated manifest system, which is a data system used to input, for example, the contents of cargo, its country of departure and its destination.

The commission conducted the raids in coordination with its counterparts from the European Commission and the US Department of Justice.

'The raids were conducted simultaneously between the three competition jurisdictions for maximum impact on a cartel activity whose reach is believe to be international . . . ,' the commission noted in a statement."

64.    The worldwide investigation into Defendants' conduct included raids in the United States, the United Kingdom, and Switzerland.  On October 10, 2007, Defendant Kuehne + Nagel stated in a press release that, on that day, "various competition authorities have carried out an unannounced inspection at a number of international freight forwarding companies.  The inspection encompassed amongst others Kuehne + Nagel in Switzerland, in the USA, and in the UK."

65.    The investigations extend to Defendant Spedlogwiss, a trade association. In antitrust cases, trade association meetings frequently are found to have served as the situs for collusive conduct, as they provide an ostensibly legal reason to meet, thus providing "cover" for illegal conspiratorial activity.   On October 10, 2007, Defendant Panalpina stated the following:

"In connection with alleged concerted practices in the area of transportation services, on 10 October 2007 the Swiss Federal Competition Commission (Weko) conducted a search also of the premises of Panalpina in Basel.  A similar investigation by US anti-trust authorities has been conducted in the company's headquarters in the USA.

The investigation of Weko is aimed at the Association of Swiss Forwarders (Spedlogswiss) and several forwarding companies, among them Panalpina."

On October 11, 2007, a spokesman for Defendant Panalpina, Martin Spohn, confirmed that the raid in the United States occurred at Panalpina's offices in Morristown, New Jersey.

66.     On October 11, 2007, the Dow Jones Newswires news agency reported that "[t]he probe includes the Swiss logistics trade body." Additionally, Dow Jones reported that "Dora Naumann, a spokeswoman for Spedswisslog [sic], confirmed the raids on its Basel office . . ."

67.     On October 10, 2007, Defendant Expeditors issued the following press release, which it restated in an SEC Form 8-K issued that day:

> "Expeditors International of Washington, Inc., the international
> freight forwarding and logistics company, said today they were
> the recipient of a subpoena issued by the U.S. Department of
> Justice (DOJ) ordering the company to produce certain
> information and records relating to an investigation of air cargo
> freight forwarders."

68.     On October 10, 2007, the Reuters news agency reported that United States "Department of Justice spokeswoman Gina Talamona said the DOJ antitrust division was investigating possible anti-competitive practices in the international freight forwarding industry. She also confirmed that the department was 'coordinating with EU and other foreign competition authorities.'"

69.     On October 10, 2007, the *Houston Chronicle* reported that government investigators raided the Houston and London offices of Defendant EGL, and that a spokesman for EGL stated that EGL "believes the investigation is related to surcharge practices in the global freight industry." The article further noted that "Pat Villafranca, a spokeswoman for the FBI, said agents raided an EGL office near Bush Intercontinental Airport."

70.     On October 10, 2007, Defendant UTi Worldwide, Inc. filed an SEC Form 8-K and stated the following:

> "[the United States Department of Justice] executed a search
> warrant on a subsidiary of the company on October 10, 2007 . . .
> On the same day, UTi received a notice from the Canadian
> Competition Bureau that the Bureau has commenced an
> investigation with respect to alleged anti-competitive activity of
> persons involved in the provision of international freight

forwarding services to and from Canada and requesting that UTi preserve any records relevant to such investigation."

71.    On October 11, 2007, Defendant Deutsche Bahn AG issued a press release from Dr. Peter Sauer, spokesman for Defendant Schenker AG, and stated the following:

> "Within the framework of an inspection ordered by the Commission of the European Communities in Brussels, representatives of the General Directorate for Competition and of the German Federal Antitrust Authority, Bundeskartellamt, have been carrying out an investigation into Schenker AG in Essen. Similar investigations have been conducted at Schenker's offices in South Africa, Switzerland and the US by the competent authorities of the various countries."

72.    On October 11, 2007, the Bloomberg news agency reported that "Deutsche Post AG, Europe's biggest mail service, was 'contacted' by Swiss, EU and U.S. authorities seeking information," according to Nicole Mommsen, a spokeswoman for the company.  On that same day, the Dow Jones Newswires news agency reported that "DHL, an international shipping unit of Deutsche Post AG, also said European authorities had contacted the company . . . ."  On October 12, 2007, AmericanShipper.com, an on-line publication reporting on the international logistics industry, publicly reported that "DHL spokeswoman Silje Skogstad confirmed that her company's global forwarding division had received requests for information from the Swiss, EU, and U.S. authorities . . . ."

73.    On October 11, 2007, the Dow Jones Newswires news agency stated that Defendant "Kuehne & Nagel's CFO [Gerald] van Kesteren said that the investigation is a spill-over from an earlier probe into price fixing of fuel surcharges by the airline industry. Earlier this year, British Airways and Korean Airlines pleaded guilty to charges of price-fixing."  On October 12, 2007, the *Wall Street Journal* online edition reported that "[t]he investigation centers on whether the freight forwarders fixed prices for fuel and other charges, Kuehne & Nagel Chief Financial Officer Gerard van Kesteren said Wednesday."  On October 12, 2007, AmericanShipper.com reported that "Rolf Altorfer, chief executive officer for the

89424.1                                -20-

U.S. operations of Swiss forwarder Kuehne + Nagel, said his company's offices had been visited by investigators who removed some files and mirrored hard drives on computers."

74.     On October 12, 2007, AmericanShipper.com reported that worldwide competition authorities were "looking into activities of more than a dozen [freight forwarding] companies, including some of the largest in the world.  An executive with one of the companies involved, gave *American Shipper* the names of 15 firms that he said were listed on the subpoena served on his company."  In 2006, it was estimated that the top 15 freight forwarders controlled approximately 45% of the total air freight moved worldwide.

75.     On October 22, 2007, the Thomson Financial News agency reported that "Kuehne & Nagel International AG said it has launched an internal investigation after competition authorities have searched the logistics group's premises in Switzerland, the US and the UK . . . ."  The article further noted that Kuehne + Nagel's deputy Chief Executive Officer Reinhard Lange "said that all business units apart from contract logistics were affected by the investigation."  According to its 2006 "Report of the Business Units," Kuehne + Nagel's business units include the following:  Airfreight; Seafreight; and Rail and Road Logistics.  Previously, on October 11, 2007, the Thomson Financial News agency reported that Kuehne + Nagel's "Lange said it was unlikely that there were any irregularities at group level, even though he did not rule out incidents of malpractice in individual units."

### B.     Defendants' Trade Association Memberships.

76.     As noted above, Defendant Spedlogswiss, aka The Association of Swiss Forwarders, is a trade association whose offices in Basel were raided by competition authorities.  Its members include Defendants Kuehne + Nagel; Panalpina; EGL; Schenker; DHL; and UTi.  There are various subsections of Spedlogswiss—for example, the Basel section.  One of the stated purposes of the Basel section, as stated on Spedlogswiss' website and translated, is to "promote solidarity among the member companies."  The Basel section further notes that "[i]t is a unity, and acts as such."

77.     Moreover, Defendants constitute five of the seven members of the trade association Freight Forward International ("FFI"), headquartered in England. Its website states that FFI is "an interest grouping of seven of the leading global forwarders and logistics providers" and identifies Defendants DHL; Kuehne + Nagel; Panalpina; Schenker; and UTi as members, along with Agility and ABX Logistics. FFI's website further states that "[t]he seven participating companies in FFI employ more that 324,000 people with a consolidated turnover for 2006 of 60.98 billion euro and a total market share of more than 25% in the airfreight and nearly 30% in ocean freight." FFI additionally notes that it "seeks to reinforce the common interests of the whole forwarding and logistics industry" and "[c]asting itself as a bridgehead for the industry, the actions of FFI are in support of the existing national and international associations of freight forwarders."

78.     FFI's website continues that "FFI is governed by the CEO's of the participating companies. The CEO's will meet twice a year focusing on the issue of strategic interest for the industry." Additionally, "[w]orking committees have been established in the following areas: Air; Customs; Overland; Security," and "[a]ll companies are represented in the Working Committees on Management Board level or equivalent." The Working Committees "meet 2-3 times per year."

79.     FFI's "CEO Committee" is currently headed by FFI's President, John Allan, of DHL Logistics. The Chairman of the Air Freight Committee is Eddy Raes of Schenker. The Chairman of the Customs Committee is Jack Stevens of DHL. The Chairman of the Overland Committee is Eric Peigne of Kuehne + Nagel. The Chairman of the Security Committee is Robert Larson of DHL, and the Vice-Chairmen are Steve Bernstein of UTi, and Rob Bekking of Schenker. These "working committees are issue driven and meet as needed."

80.     FFI states that its "vision" is to provide its members "with a knowledge-sharing platform," and that one of its "goals" is to "provide invaluable advise [sic] and facilitate information exchange between members."

89424.1                                   -22-

81.     Defendants' memberships in trade associations, such as those described above, gave them ample opportunities to meet, and engage in collusive conduct under the pretext of engaging in lawful activity.

C.     **Defendants' Unlawful Contract, Conspiracy or Combination.**

82.     Beginning at least as early as January 1, 2001, and continuing until at least the date of the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the price of Freight Forwarding Services in the United States.

83.     In formulating and effectuating the alleged contract, conspiracy or combination, Defendants and their co-conspirators engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain or stabilize the price of Freight Forwarding Services in the United States.  These activities included the following:

   a.     Defendants agreed to charge prices at specified levels and otherwise to increase and/or maintain the price of Freight Forwarding Services in the United States and elsewhere;

   b.     Defendants issued price announcements and price quotations in accordance with the agreements reached; and

   c.     Defendants sold Freight Forwarding Services in the United States at non-competitive prices.

84.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

85.     During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Class purchased Freight Forwarding Services from Defendants (or their subsidiaries or controlled affiliates) or their co-conspirators at inflated and supracompetitive prices.

86.   In formulating and effectuating the contract, conspiracy or combination, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain and/or stabilize the price of Freight Forwarding Services sold in the United States.  These activities included the following:

    a.    Defendants participated in meetings and/or conversations, including through various trade organizations and conventions, to discuss the price of Freight Forwarding Services in the United States;

    b.    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Freight Forwarding Services sold in the United States;

    c.    Defendants agreed during those meetings and conversations to fix the price of Freight Forwarding Services; and

    d.    Defendants issued price announcements and price quotations in accordance with the agreements reached.

87.   Defendants' contract, conspiracy or combination constitutes an unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act.

88.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their business and property in that they have paid more for Freight Forwarding Services than they would have paid in a competitive market.

89.   The unlawful contract, conspiracy and/or combination has had the following effects, among others:

    a.    price competition in the markets for Freight Forwarding Services has been artificially restrained;

    b.    prices for Freight Forwarding Services sold by the Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

c.      purchasers of Freight Forwarding Services from the Defendants have been deprived of the benefit of free and open competition in the markets for Freight Forwarding Services.

90.     As a direct and proximate result of the illegal contract, conspiracy or combination, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they paid more for Freight Forwarding Services than they would have paid in the absence of the illegal contract, conspiracy or combination.  Plaintiffs and members of the Class thus have suffered damages in an amount presently undetermined.

## FRAUDULENT CONCEALMENT

91.     Plaintiffs and Class members had no knowledge of this contract, conspiracy or combination, or of any fact that might have led to the discovery of it prior to the first report by news agencies on October 10, 2007, and various Defendants' press releases issued on that same day concerning the international antitrust raids on certain Defendants' operations.

92.     Defendants engaged in a successful, illegal price-fixing conspiracy that, by its nature, was inherently self-concealing.

93.     Plaintiffs and the Class members could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers concerning the reason for price increases, and surreptitious communications between the Defendants by the use of the telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records.

94.     The affirmative actions of the Defendants herein alleged were wrongfully concealed and carried out in a manner that precluded detection.

95.     Defendants also fraudulently concealed their contract, conspiracy or combination in other ways.  For example, Defendants falsely represented to their customers that Freight Forwarding Services price increases were due to increases in the cost and supply of fuel when, in fact, these price increases were the direct result of collusive activity among Defendants as alleged herein.

96.     By virtue of the fraudulent concealment by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiffs and the other Class members have as a result of the unlawful contract, conspiracy or combination alleged in this Complaint.

## INJURY TO PLAINTIFFS AND CLASS MEMBERS

97.     During the period covered by this Complaint, Plaintiffs and members of the Class purchased substantial quantities of Freight Forwarding Services from the Defendants.

98.     As a direct result of the contract, conspiracy or combination of Defendants and their co-conspirators, Plaintiffs and members of the Class member paid substantially more for Freight Forwarding Services than they would have paid in the absence of Defendants' illegal contract, conspiracy or combination.

99.     By reason of the alleged violations of the antitrust laws, Plaintiffs and members of the Class have been injured in their business and property and have suffered damages in an amount presently undetermined.

100.     The contract, conspiracy or combination complained of herein will continue (and to the extent temporarily and only partially abandoned, will resume) absent an injunction.  Plaintiffs and members of the Class are likely to buy Freight Forwarding Services in the future and will be repeatedly injured unless the continuation of this contract, conspiracy or combination is enjoined.

## VIOLATION OF THE SHERMAN ACT:  HORIZONTAL PRICE-FIXING
## (AGAINST ALL DEFENDANTS)

101.   Plaintiffs reallege and incorporate by reference each and every allegation set forth above.

102.   Beginning at least as early as January 1, 2001, the exact date being unknown to Plaintiffs, and continuing to the present, Defendants and their co-conspirators have engaged in a continuing contract, conspiracy or combination in unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act.

103.   The contract, conspiracy or combination alleged herein consisted of a continuing agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to raise, fix, stabilize, and maintain at artificially high and non-competitive levels the prices at which they sold Freight Forwarding Services throughout the United States.

104.   For the purpose of forming and effectuating the contract, conspiracy, or combination, the Defendants and their co-conspirators engaged in the conduct which they contracted, conspired and combined to do, including meeting to discuss and agree upon future price increases, sharing actual transactional prices, and other activities designed to implement the illegal price-fixing conspiracy.

105.   This contract, conspiracy or combination had the following effects, among others:

    a.    Defendants' prices charged for Freight Forwarding Services were raised, fixed, and maintained at artificially high and non-competitive levels;

    b.    Plaintiffs and the other members of the Class were deprived of the benefits of free and open competition in the purchase of Freight Forwarding Services; and

    c.    price competition in the sale of Freight Forwarding Services was restrained, suppressed, and/or eliminated.

106.    During the Class Period, Plaintiffs and the other members of the Class purchased substantial quantities of Freight Forwarding Services from the Defendants.  By reason of the violations of Sections 1 and 3 of the Sherman Act alleged herein, Plaintiffs and the other members of the Class paid more for Freight Forwarding Services than they would have in the absence of the illegal contract, conspiracy or combination and, as a result, have been injured in their business and property.

107.    Defendants have participated in one or more overt acts in furtherance of the contract, conspiracy or combination alleged herein and have participated in conspiratorial activities described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

1.      That the Court determine that the Sherman Act claim contained herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2.      That the unlawful contract, conspiracy or combination alleged herein be adjudged and decreed to be a per se restraint of trade or commerce in violation of Section 1 of the Sherman Act;

3.      That Plaintiffs and the Class recover damages, as provided by law, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws;

4.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or

effect; and (2) communicating or causing to be communicated to any other person engaged in the distribution or sale of Freight Forwarding Services, information concerning prices or other terms or conditions of sale of any such products except to the extent necessary in connection with *bona fide* sale transactions between the parties to such communication;

     5.     That Plaintiffs and members of the Class be awarded pre- and post-judgment interest and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

     6.     That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

     7.     That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed.R.Civ.P. 38(b), Plaintiffs demand a trial by jury for all issues

so triable.

Dated:  January 3, 2008

By: _____

Christopher Lovell (CL-2595)
Craig M. Essenmacher
Imtiaz A. Siddiqui (IS-4090)
LOVELL STEWART HALEBIAN LLP
500 Fifth Avenue, Floor 58
New York, NY 10110
Telephone:     (212) 608-1900
Facsimile:     (212) 719-4677

Henry A. Cirillo
Thomas P. Dove
Jonathan Watkins
Jon T. King
THE FURTH FIRM LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104-4249
Telephone:     (415) 433-2070
Facsimile:     (415) 982-2076

W. Joseph Bruckner
Heidi M. Silton
Lisa M. Pollard
R. Reid LeBeau II
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone:     (612) 339-6900
Facsimile:     (612) 339-0981

Steven N. Williams
COTCHETT, PITRE & MCCARTHY
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:     (650) 697-6000
Facsimile:     (650) 697-0577

Daniel E. Gustafson
Daniel C. Hedlund
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone:    (612) 333-8844
Facsimile:    (612) 339-6622

Francis O. Scarpulla
Craig C. Corbitt
ZELLE HOFMANN VOELBEL MASON &
GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone:    (415) 693-0700
Facsimile:    (415) 693-0770

Bruce L. Simon
Esther L. Klisura
PEARSON, SIMON, SOTER, WARSHAW &
PENNY, LLP
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:    (415) 433-9000
Facsimile:    (415) 433-9008

Lori E. Andrus
Micha Star Liberty
Jennie Lee Anderson
ANDRUS LIBERTY & ANDERSON LLP
1438 Market Street
San Francisco, CA 94102
Telephone:    (415) 896-1000
Facsimile:    (415) 896-2249

William F. Flahavan
FLAHAVAN LAW OFFICES
19528 Ventura Boulevard, Suite 568
Tarzana, CA 91356
Telephone:    (818) 708-7894
Facsimile:    (818) 344-8007

James A. Thompson
JAMES A. THOMPSON, ATTORNEY AT
LAW, A PROFESSIONAL CORPORATION
101 Wikiup Drive, Suite A
Santa Rosa, CA 95403
Telephone:    (707) 575-7799
Facsimile:    (707) 575-9924

89424.1

Rudy Gonzales, Jr.
Catherine D. Tobin
GONZALES HOBLIT FERGUSON LLP
802 North Carancahua, Suite 2000
Corpus Christi, TX 78470
Telephone:     (361) 888-9392
Facsimile:     (361) 888-9187

Attorneys for Plaintiffs

89424.1