2009 Case No.5 (So)

# CEASE-AND-DESIST ORDER

Addressees: as listed in Schedule 1

The Japan Fair Trade Commission (the *JFTC*) hereby issues this cease-and-desist order as against the above parties pursuant to Article 7, Paragraph 2 of the Anti-monopoly Act (the *Act*).

## MAIN TEXT

1.  Of the twelve companies listed in Schedule 1 (the *Twelve Companies*), each of the eleven companies except for Hankyu Hanshin Express Holdings Corporation (*HHEH*) (the *Eleven Companies*), must resolve the matters set out in (1) and (2) below at a meeting of the board of directors (or, with respect to Vantec World Transport Co., Ltd., at a general meeting of shareholders), and HHEH must resolve the matters set out in (1) and (3) below at a meeting of the board of directors:

    (1)  to confirm that, with respect to the tariffs and surcharges in respect of the transport business as specified in the attachment (the *International Freight Forwarding Business*), there no longer exists any of the following agreements: (A) the agreement reached on 18 September 2002 among the Twelve Companies and the two companies set out in Schedules 4 and 5 respectively, (together, the *Fourteen Companies*) to the effect that the Fourteen Companies would additionally charge customers (including both shippers and receivers (the *Customers*)) a fuel surcharge in the amount corresponding to the fuel surcharge charged to the Fourteen Companies by the relevant international air transport business operators in respect of the freight loaded on aircrafts departing from Japan (or, with respect to Nippon Express Co., Ltd. (*NEC*) and DHL Global Forwarding Japan K.K. (*DHLJ*), the agreement joined by each of them from no later than 8 November 2002); (B) the agreement reached on 22 November 2004 among the thirteen companies consisting of the Twelve Companies and the company set out in Schedule 4 (together, the *Thirteen Companies* ) to the effect that the Thirteen Companies would additionally charge the Customers an "AMS charge" (i.e. a new surcharge designed to cover the costs arising in relation to the flight information advance notification system introduced and adopted by the US customs authorities system) at a rate no lower than the agreed minimum rate; and (C) the agreement reached on 20 February 2006 among the Thirteen Companies to the effect that the Thirteen Companies would additionally charge the Customers a "security charge" (i.e. a new surcharge designed to cover the costs arising as a result of dealing with

the air transport security measures implemented by the Transport Ministry) and an "explosives examination fee" (i.e. a new surcharge designed to cover the costs arising as a result of conducting the explosives examination (by using explosive test machines or by opening freight to ensure the security of freight) in dealing with the air transport security measures implemented by the Transport Ministry), each at a rate no lower than the agreed minimum rate.

(2) to ensure that, in the future, the tariffs and surcharges in respect of the International Freight Forwarding Business will be determined, not by any agreement among themselves or in a concerted manner with other companies, but independently by each company; and

(3) (a) to ensure that the company set out in Schedule 6 will not determine the tariffs and surcharges in respect of the International Freight Forwarding Business by any agreement with the Eleven Companies or in a concerted manner with other companies, and (b) to instruct the company set out in Schedule 6 to resolve at a meeting of the board of directors that it will determine the tariffs and surcharges in respect of the International Freight Forwarding Business, not by any agreement with the Eleven Companies or in a concerted manner with other companies, but independently.

2.   Each of the Eleven Companies must notify the other members of the Eleven Companies and the company set out in Schedule 6 of the measures taken by it pursuant to the preceding paragraph and ensure that the Customers are made aware of such measures, and must also keep its employees informed of such measures.  Furthermore, HHEH must notify the Eleven Companies of the measures taken by it pursuant to the preceding paragraph and ensure that the Customers are made aware of such measures, and must also instruct the company set out in Schedule 6 to keep its employees informed of such measures.  The JFTC's approval must be obtained in advance with respect to the method to be taken in giving notice, providing information and giving instructions to the relevant persons.

3.   Each of the Eleven Companies must, in the future, refrain from determining the tariffs and surcharges in respect of the International Freight Forwarding Business by any agreement among themselves or in a concerted manner with other companies.  Furthermore, HHEH must, in the future, refrain from causing the company set out in Schedule 6 to determine the tariffs and surcharges in respect of the International Freight Forwarding Business by any agreement with the Eleven Companies or in a concerted manner with other companies.

4.   Each of the Eleven Companies must take the measures necessary for the matters set forth in (1) through (4) below, and HHEH must instruct the company set out in Schedule 6 to take the measures necessary for the matters set forth in (1) through (4) below.  Such measures and instructions must be

sufficient in content so as to prevent the above-mentioned acts from occurring in the future, and the JFTC's approval must be obtained in advance for such measures.

Relevant matters:

(1) the preparation or review of action guidelines to ensure compliance with the Act in relation to the International Freight Forwarding Business;

(2) with respect to ensuring compliance with the Act in relation to the International Freight Forwarding Business, the implementation of regular training for officers and employees who are in charge of work relating to the International Freight Forwarding Business and the conducting of regular audits by an employee or employees in charge of legal or compliance matters;

(3) the establishment or review of internal rules regarding sanctions to be imposed upon officers and employees who violate the Act; and

(4) the establishment or review of an internal informing system which is made effective by releasing the informer or certain persons being investigated from his/her liability for the relevant violation of the Act etc.

5. Each of the Twelve Companies must promptly notify the JFTC of the measures taken by it pursuant to paragraphs 1, 2 and 4 above.

## REASONS

### I. Facts

**1**(1) A. (a) Of the Twelve Companies listed in Schedule 1, the Eleven Companies with the exception of HHEH are forwarders engaged in the transport business as specified in the attachment (***International Freight Forwarding*** or the ***Business***) with a license granted by, or registration with, the Transport Minister pursuant to the Forwarding Business Act (1989 Act No.82) (the ***Forwarding Act***), having their respective head offices as set out in the section entitled "Location of Head Office" in Schedule 1.

(b) Of the Twelve Companies, Vantec World Transport Co., Ltd. does not have a board of directors.

(c) Of the Twelve Companies, HHEH used to be engaged in International Freight Forwarding with a license granted by the Transport Minister, having its head office set out in Schedule 1, but it transferred its business by way of demerger as of the date as stated in the section "Date" of Schedule 2 to the company stated in Schedule 6 which is wholly-owned by HHEH, after which HHEH has not been engaged in the Business.

(d) Of the Twelve Companies, the companies listed in Schedule 3 have changed their respective names as stated in the section entitled "Status of Changes" in Schedule 3.

B. DHLJ in Schedule 4, who is not included among the addressees of this Order, is engaged in the Business with a license by the Transport Minister pursuant to the Forwarding Act, having its head office as stated in the section entitled "Location of Head Office" in Schedule 4.

C. Airborne Express KK (***ABE***) in Schedule 5 used to be engaged in the Business with a license issued by the Transport Minister pursuant to the Forwarding Act, having its head office as stated in the section entitled "Location of Head Office" in Schedule 5, but it has terminated the Business as of the date stated in the section entitled "Date" in Schedule 5, after which it has not been engaged in the Business.

(2) A. The Eleven Companies and DHLJ are regular members of the Japan Aircargo Forwarders Association (the ***JAFA***), while HHEH and ABE used to be a regular member of the JAFA.

The Eleven Companies and DHLJ are members of an organisation within the JAFA called "the Executive Board of International Committee" (the ***EBIC***), whilst HHEH and ABE used to be members of the EBIC.

B. The Fourteen Companies attended EBIC meetings which were usually held every 2 months.

(3) In principle, when the Fourteen Companies introduced new tariffs and surcharges for their Business or made changes to them, they implemented such new tariffs and surcharges or changes to them, and notified them to the Transport Minister, pursuant to the Regulations (Transport Ministry Regulations No.32, 1990) for the Forwarding Act.

(4) The Fourteen Companies set the tariffs and surcharges to be imposed on the Customers, and actually charged the Customers such tariffs and surcharges by themselves or via other parties (including agents).

(5) A. The gross freight volume handled by the Fourteen Companies through their International Freight Forwarding business constituted the majority of the total freight volume handled by the whole Business in Japan.

B. Aggregated freight volume handled by Nippon Express Co., Ltd. (*NEC*), Kintetsu World Express, Inc. and Yusen Air & Sea Service Co., Ltd. (together, the *Three Major Companies*) constituted the majority of the total freight volume handled by the Fourteen Companies.

2(1)A. Around August 2002, air fuel price started to rise, and companies engaged in the international air transport business (the *Airlines*) decided to impose a fuel surcharge which corresponds to the fluctuations of air fuel price, and is charged in addition to a base tariff only at the time of surging air fuel price with respect to freight loaded on aircrafts departing from Japan (aircrafts used for international flights departing from an airport located in Japan). The Airlines, one after another started to charge international freight forwarders (companies engaged in the International Freight Forwarding (the *Forwarders*)) fuel surcharges after 16 October 2002, with the approval of the Transport Minister.

B. (a) The Three Major Companies received an explanation from the Airlines that air fuel price had been rising and that the Airlines were intending to introduce a fuel surcharge to be imposed on freight loaded on aircrafts departing from Japan after 16 October 2002.

(b) The explanation as described in paragraph (a) above increased the prospect of the Forwarders being charged a fuel surcharge by the Airlines. To deal with such a situation, the Fourteen Companies, except for NEC and DHLJ, attended an EBIC meeting held on 18 September 2002 and reached an agreement as to tariffs and surcharges related to the Business to introduce a fuel surcharge (the *Fuel Surcharge passed on to the Customer*) in the amount corresponding to the surcharge charged by the Airlines with respect to freight for which a house airway bill (an airway bill that is issued and agreed between Forwarders and Customers to certify that a forwarding contract has been executed regarding the particular freight (the *HAWB*)) was issued after 16 October 2002.

(c) NEC and DHLJ joined the agreement described in paragraph (b) above by 8 November 2002 at the latest.

(2) A. (a)    The United States Customs Authorities, as part of their security measures regarding air transport, decided to introduce, in a phased manner after 13 August 2004, a system (the *Advance Notification System*) where the Airlines electrically notify to the authorities prior to the flight information related to the freight to be loaded on an aircraft departing from an airport outside the United States and landing in an airport inside the United States by way of a customs clearance system called "the Automated Manifest System"(the *AMS*), and to implement the Advance Notification System regarding freight loaded on aircrafts landing in all airports in the United States after 13 December 2004.

(b)    In response to the introduction of the Advance Notification System, the Airlines decided to notify, to the United States Customs, information stated in a HAWB (*HAWB information*) with respect to freight commissioned by the Forwarders by electrically sending such information forwarded by the Forwarders via the AMS.

(c)    In addition, the Airlines decided to charge the Forwarders a certain pre-set fee to send HAWB information (a fee charged for the service to electrically send HAWB information via AMS (the *HAWB Fee*)) after 13 August 2004, and provided Kintetsu World Express, Inc. with an explanation to this effect.

B.    In order to cover the cost arising out of the introduction of the Advance Notification System including the HAWB Fee, the Thirteen companies took the opportunity of the EBIC meeting held on 22 November 2004 and agreed, in relation to the Business tariffs and surcharges, to introduce a new surcharge called "AMS charge" to the Customers on the following conditions:

(a)    to be imposed on freight regarding which the HAWB was issued in principle after 13 December 2004, or at the latest after 1 January 2005;

(b)    to be imposed on freight delivered to the United States (as a final destination) or through the United States to a third country except for Europe

(c)    to be imposed at the rate of at least JPY500 per HAWB

(3) A.(a)    As part of the security measures regarding air transport, the Transport Ministry decided to require the Forwarders after 1 April 2006 in principle to conduct an explosives examination (examination by using explosive test machines or by opening freight to ensure the security of freight (the *Explosives Examination*)) in respect of all freight to be loaded on aircrafts operated by the Airlines, and to introduce a new system whereby the Ministry acknowledges a Forwarder as a special Forwarder (the *Regulated Agent*) if the Forward is applying appropriate security measures including

security education and training, management of facilities and handling of cargo, and in principle exempts such Regulated Agents from the obligation of Explosives Examination, provided that the freight is commissioned by a party who, among its Customers, such Regulated Agent acknowledges as applying appropriate security measures (the ***Regulated Customers***) and the freight is handled by such Regulated Agent alone from the shipping by the Regulated Customer until delivery to the Airline.

(b) The Thirteen Companies obtained the status of Regulated Agent by 1 April 2006, decided to conduct the Explosives Examination by themselves or by commissioning to an agent with respect to freight that is subject to such examination, and established systems that are necessary for it.

B. The Thirteen Companies took the opportunity of the EBIC meeting held on 20 February 2006 and reached an agreement, with respect to the tariffs and surcharges related to the Business, as applicable to freight of which the HAWB was issued after 1 April 2006, with the following contents:

(a) to additionally charge the Customers as a "security charge" at least JPY300 per HAWB in order to cover the necessary cost to maintain the security measures as required for Regulated Agents; and

(b) to additionally charge the Customers, if an Explosives Examination is conducted, an "Explosives Examination fee" of at least JPY1,500 per HAWB in addition to a security charge described in paragraph (a) above in order to cover the necessary cost to implement the Explosives Examination.

**3.** In order to ensure the effective implementation of the agreements as described in section 2 above, the Fourteen Companies mutually disclosed information as to the collection of Fuel Surcharge passed on the Customer, AMS charge, security charge and Explosives Examination fee, at EBIC meetings.

**4.** Based on the agreements above, the Fourteen Companies invoiced to the Customers, Fuel Surcharges passed on to the Customers, AMS charge, security charge and Explosives Examination fee. The collection of such fees was largely successful.

**5.** Upon receiving information that the United States Department of Justice, the EC Commission and other authorities were starting to investigate the Forwarders based in the United States, Europe and other regions, the Three Major Companies held a meeting on 12 November 2007 between executives of these companies at a conference room in NEC's head office located in Minato-ku Tokyo, and agreed not to hold any EBIC meetings in the future. After this, no EBIC meeting were held. On this basis, after such date, the agreements as described in section 2 above was terminated.

## II. Application of law

According to the facts stated above, with respect to the tariffs and surcharges for the International Freight Forwarding Business, the Fourteen Companies determined in a concerted manner that they would additionally charge to the Customers the Fuel Surcharge passed on to the Customers as well as the AMS charge, the security charge and the explosives examination fee, each at a rate no lower than the agreed minimum rate, by which they substantively restricted competition in the field of the International Freight Forwarding Business. Such acts fall under "unfair restriction of trade" in Paragraph 6, Article 2 of the Act and constitutes a violation of Article 3 of the Act. Furthermore, upon considering in a comprehensive manner the various circumstances surrounding this case, including the fact that the violations had existed for a long period of time, we find it especially necessary to order a cease and desist order against the Twelve Companies.

Accordingly, we hereby issue against the Twelve Companies this cease-and-desist order as set forth in the main text, pursuant to Paragraph 2, Article 7 of the Act.

18 March 2009

Japan Fair Trade Commission

[Names of JFTC officers are omitted for the purpose of this translation.]

Attachment

Outbound transportation service of freight, upon demand of customers, by using transport service of air career companies (including, where applicable, collection and delivery of the freight by automobile made prior to and following air transport).

Schedule 1     List of addressees

| Number | Location of Head Office | Name of Company | Representative |
|---|---|---|---|
| 1 | 1-9-3 Higashi-shinbashi, Minato-ku, Tokyo | Nippon Express Co., Ltd | Masanori Kawai, President |
| 2 | 30-1 Nihonbashi Hakozaki-cho, Chuo-ku, Tokyo | Yusen Air & Sea Service Co., Ltd. | Shunichi Yano, President |
| 3 | 1-6-1 Otemachi, Chiyoda-ku, Tokyo | Kintetsu World Express Inc. | Hirokazu Tsujimoto, President and Chief Executive Officer |
| 4 | 1-11-17 Tenjin, Chuo-ku, Fukuoka | Nishi-Nippon Railroad Co., Ltd. | Kazuyuki Takeshima, President |
| 5 | 6-4-18 Nishi-tenman, Kita-ku, Osaka | Hankyu Hanshin Express Holdings Corporation | Hiroshi Ojima, President |
| 6 | 6-84 Onoe-cho, Naka-ku, Yokohama | Nissin Corporation | Masahiro Tsutsui, President |
| 7 | 4-9-11 Nihonbashi-honcho, Chuo-ku, Tokyo | Vantec World Transport Co., Ltd. | Hiroshi Kimura, President |
| 8 | 3-7-9 Sibaura, Minato-ku, Tokyo | "K" line Logistics, Ltd. | Mamoru Shozui, President |
| 9 | 1-10-14 Sinkawa, Chuo-ku, Tokyo | Yamato Global Logistics Japan Co., Ltd. | Jun Tsunoda, President & Chief Executive Officer |
| 10 | 2-5-1 Kouraku, Bunkyo-ku, Tokyo | MOL Logistics (Japan) Co., Ltd. | Toshifumi Kato, President |
| 11 | 1-9 Kanda Sakuma-cho, Chiyoda-ku, Tokyo | Hanshin Air Cargo Co., Ltd. | Yutaka Yamada, President |

| 12 | 5-5-5 Kounan, Minato-ku, Tokyo | United Aircargo Consolidators, Inc | Yoshinori Yuasa, President |
|----|-------------------------------|----------------------------------|---------------------------|

Schedule 2      Company which terminated its international freight forwarding business among addressees

| Number | Name of Company | Date | Notes |
|--------|-----------------|------|-------|
| 5 | Hankyu Hanshin Express Holdings Corporation | 1 April 2008 | Hankyu Travel International Co., Ltd transferred by way of demerger the International Freight Forwarding Business to Hankyu Express International Co., LTd. on 1 April 2008, and changed its trade name to the current trade name on the same day. |

Note: The number shown in the "Number" corresponds to the number in the section "Number" of Schedule 1.

Schedule 3      Companies which changed its trade names among addressees

| Number | Name of Company | Status of Changes |
|--------|-----------------|-------------------|
| 7 | Vantec World Transport Co., Ltd. | Tokyu Air Cargo KK changed its trade name to current trade name on 1 February 2005. |
| 8 | "K" line Logistics, Ltd. | "K" Line Air Service, Ltd. changed its trade name to the current trade name on 1 July 2006. |

| 9 | Yamato Global Logistics Japan Co., Ltd. | Yamato UPS International Aircargo KK changed its trade name to Yamato Global Freight KK on 1 October 2002, and Yamato Global Freight KK changed its trade name to Yamato Logistics KK on 1 October 2004, and Yamato Logistics KK changed its trade name to the current trade name. |

Note: The number shown in the section "Number" corresponds to the number in the "Number" of Schedule 1.

Schedule 4    Company which engages in the International Freight Forwarding Business other than Addressees

| Name of Company | Location of Head Office |
|---|---|
| DHL Global Forwarding Japan K.K. | 1-19-9 Tsutsumi-dori, Sumida-ku, Tokyo |

Schedule 5    Company which discontinued the International Freight Forwarding Business other than Addressees

| Name of Company | Address of Head Office | Date | Notes |
|---|---|---|---|
| Airbourn Express, Inc. | 1-37-8 Higashi-shinagawa, Shinagawa-ku, Tokyo | 31 December 2003 | Reported to Minister of the Transport Ministry that it would terminate the International Freight Forwarding Business effective 31 December 2003 |

Schedule 6    Company which succeeded the International Freight Forwarding

Business other than addressees

| Name of Company | Location of Head Office | Date | Notes |
|---|---|---|---|
| Hankyu Express KK | 6-4-18 Nishi Tenman, Kita-ku, Osaka | 1 April 2008 | Succeeded the International Freight Forwarding Business from Hankyu Travel International Co., Ltd by way of merger on 1 April 2008. |