**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

PRECISION ASSOCIATES, INC.;
ANYTHING GOES LLC d/b/a MAIL
BOXES ETC., and JCK INDUSTRIES,
INC., on behalf of themselves and all others
similarly situated,

        Plaintiffs,

   _vs_.

PANALPINA WORLD TRANSPORT
(HOLDING) LTD.; PANALPINA, INC.;
KÜHNE + NAGEL INTERNATIONAL
AG; KUEHNE + NAGEL, INC.;
EXPEDITORS INTERNATIONAL OF
WASHINGTON, INC.; EGL, INC.; EGL
EAGLE GLOBAL LOGISTICS, LP;
DEUTSCHE BAHN AG; SCHENKER AG;
SCHENKER, INC.; BAX GLOBAL, INC.;
DB SCHENKER; DEUTSCHE POST AG;
DHL DANZAS; DHL GLOBAL
FORWARDING; DHL EXPRESS (USA),
INC.; DHL GLOBAL FORWARDING
JAPAN K.K.; AIRBORNE EXPRESS,
INC.; AIR EXPRESS INTERNATIONAL
USA, INC.; UTI WORLDWIDE INC.;
SPEDLOGSWISS, AKA THE
ASSOCIATION OF SWISS
FORWARDERS; UNITED PARCEL
SERVICE, INC., UPS SUPPLY CHAIN
SOLUTIONS, INC.; ABX LOGISITCS
GROUP; DSV A/S; DSV SOLUTIONS
HOLDING A/S; DSV AIR & SEA LTD.;
SDV INTERNATIONAL LOGISITCS;
DACHSER INTELLIGENT LOGISITCS;
DACHSER TRANSPORT OF AMERICA,
INC.; GEO-LOGISITCS; BALTRANS
LOGISTICS, INC.; TOLL GLOBAL
FORWARDING (USA), INC.;
HELLMANN WORLDWIDE LOGISTICS,
INC.; GEODIS GROUP; GEODIS
WILSON USA, INC.; CON-WAY, INC.;
EXEL GLOBAL LOGISTICS, INC.; JET

**Case No.: 08-CV-00042 (JG) (VVP)**

**SECOND AMENDED CLASS ACTION**
**COMPLAINT**

JURY TRIAL DEMANDED

SPEED LOGISTICS, LTD.; JET SPEED
AIR CARGO FORWARDERS (USA),
INC.; JET SPEED LOGISITCS (USA),
LLC; MORRISON EXPRESS LOGISTICS
PTE LTD.; MORRISON EXPRESS
CORPORATION (USA); NIPPON
EXPRESS CO., LTD.; NIPPON EXPRESS
USA, INC.; YUSEN AIR & SEA SERVICE
CO., LTD.; YUSEN AIR & SEA SERVICE
(U.S.A.), INC.; KINTETSU WORLD
EXPRESS, INC.; KINTETSU WORLD
EXPRESS (U.S.A.), INC.; NISHI-NIPPON
RAILROAD CO., LTD.; HANKYU
HANSHIN EXPRESS HOLDINGS
CORPORATION; NISSIN
CORPORATION; NISSIN
INTERNATIONAL TRANSPORT U.S.A.,
INC.; VANTEC WORLD TRANSPORT
CO., LTD.; VANTEC WORLD
TRANPORT (USA), INC.; "K" LINE
LOGISTICS, LTD.; "K" LINE LOGISTICS
(U.S.A.), INC.; YAMATO GLOBAL
LOGISTICS JAPAN CO.; YAMATO
TRANSPORT U.S.A., INC.; MOL
LOGISTICS (JAPAN) CO., LTD.; MOL
LOGISTICS (U.S.A.), INC.; HANSHIN
AIR CARGO CO., LTD.; HANSHIN AIR
CARGO USA, INC.; UNITED AIRCARGO
CONSOLIDATORS, INC.; JAPAN
AIRCARGO FORWARDERS
ASSOCIATION; AND JOHN DOE
DEFENDANTS 1-10,

              Defendants.

       Plaintiffs Precision Associates, Inc.; Anything Goes LLC d/b/a Mail Boxes Etc., and JCK

Industries, Inc., individually and on behalf of the Class defined below of all those similarly

situated direct purchasers of Freight Forwarding Services as defined herein, bring this action

against:  Panalpina World Transport (Holding) Ltd.; Panalpina, Inc.; Kühne + Nagel

International AG; Kuehne + Nagel, Inc.; Expeditors International of Washington, Inc.; EGL,

Inc.; EGL Eagle Global Logistics, LP; Deutsche Bahn AG; Schenker AG; Schenker, Inc.; BAX

-2-

Global, Inc.; DB Schenker; Deutsche Post AG; DHL Danzas; DHL Global Forwarding; DHL Express (USA), Inc.; DHL Global Forwarding Japan K.K.; Airborne Express, Inc.; Air Express International USA, Inc.; UTi Worldwide Inc.; Spedlogswiss, aka The Association Of Swiss Forwarders; United Parcel Service, Inc., UPS Supply Chain Solutions, Inc.; ABX Logistics Group; DSV A/S; DSV Solutions Holding A/S; DSV Air & Sea Ltd.; SDV International Logistics; Dachser Intelligent Logistics; Dachser Transport of America, Inc.; Geo-Logistics; Baltrans Logistics, Inc.; Toll Global Forwarding (USA), Inc.; Hellmann Worldwide Logistics, Inc.; Geodis Group; Geodis Wilson USA, Inc.; Con-way, Inc.; Exel Global Logistics, Inc.; Jet Speed Logistics, Ltd.; Jet Speed Air Cargo Forwarders (USA), Inc.; Jet Speed Logistics (USA), LLC; Morrison Express Logistics PTE Ltd.; Morrison Express Corporation (USA); Nippon Express Co., Ltd.; Nippon Express USA, Inc.; Yusen Air & Sea Service Co., Ltd.; Yusen Air & Sea Service (U.S.A.), Inc.; Kintetsu World Express, Inc.; Kintetsu World Express (U.S.A.), Inc.; Nishi-Nippon Railroad Co., Ltd.; Hankyu Hanshin Express Holdings Corporation; Nissin Corporation; Nissin International Transport U.S.A., Inc.; Vantec World Transport Co., Ltd.; Vantec World Transport (USA), Inc.; "K" Line Logistics, Ltd.; "K" Line Logistics (U.S.A.), Inc.; Yamato Global Logistics Japan Co.; Yamato Transport U.S.A., Inc.; MOL Logistics (Japan) Co., Ltd.; MOL Logistics (U.S.A.), Inc.; Hanshin Air Cargo Co., Ltd.; Hanshin Air Cargo USA, Inc.; United Aircargo Consolidators, Inc.; and Japan Aircargo Forwarders Association (collectively, "Defendants") for damages and injunctive relief under the antitrust laws of the United States.

Plaintiffs respectfully demand a trial by jury, and complain and allege on information and belief as follows:

## NATURE OF THE ACTION

1.      Between at least as early as September 2001 and the present, Defendants have combined, conspired and agreed with at least the DHL Defendants (defined in ¶37 below) and others to fix, inflate and maintain new charges or prices for U.S. Freight Forwarding

Services (defined in ¶¶16-17 below) in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

2.      (a) Defendants have implemented their combination, conspiracy and agreement through many mechanisms.

(b)      These mechanisms have included multiple meetings, telephone calls, specially established e-mail accounts, the creation and exchange of various documents (including suggested pricing letters to be sent to their customers), and the use of code words.

(c)      These mechanisms have also invariably taken the form of the following. Freight Forwarding Services are fungible and very price sensitive.  Thus, any Defendant that attempted to impose a new charge therefor faced the very real risk of loss of business to certain other Defendants who did not impose such new charge. Therefore, certain Defendants' CEOs and other top officers made the 2001 Security Surcharge Agreement alleged in ¶¶182-194.

(d)      Based on the tone at the top of the Company that this established, the parties to this agreement repeatedly made other agreements to impose new charges or prices for Freight Forwarding Services.  These include but are not limited to the specific agreements alleged hereafter.

(e)      Each of these specific agreements to make new charges also constitutes a separate, stand alone violation of Section 1 of the Sherman Antitrust Act by the Defendants participating therein.  And such specific agreements also implemented and are part and parcel of Defendants' overarching agreements including their overarching agreement with at least the DHL Defendants to fix new charges or prices.  *See* Eleventh – Fourteenth Claims below.

3.      (a)  Such specific and repeated agreements include but are by no means limited to:

    i.   the 2001 Security Surcharge Agreement (¶¶182-194);

    ii.   the 2002 Fuel Surcharges Agreement (¶¶195-203);

    iii.   the 2002 New Export System Fee Agreement (¶¶204-213);

    iv.   the 2004 U.S. Customs "AMS" Charge Agreement (¶¶214-221);

    v.   the 2005 Chinese Currency Adjustment Factor Agreement (¶¶222-249);

    vi.   the 2005 CAF-Shanghai Freight Forwarders Association Agreement(¶¶250-257);

    vii.   the 2005 Peak Season Surcharge Agreement (¶¶258-273);

    viii.   the 2006 Peak Season Surcharge Agreement (¶¶274-285);

    ix.   the 2007 Peak Season Surcharge Agreement (¶¶286-291); and

    x.   the 2006 Security and Explosives Examination Surcharges Agreement (¶¶291-298).

(b)    Defendants' specific agreements to fix new charges or prices also include many other agreements the details of which are presently unknown to Plaintiffs, including other "AMS" Charge price-fixing agreements relating to freight forwarding services on air and ocean cargo shipments into the U.S.

4.    The U.S. Department of Justice ("DOJ") as well as the Japan Fair Trade Commission and competition authorities in Europe, South Africa, Brazil and elsewhere have been investigating various Defendants' activities. *See* Cease and Desist Order and Surcharge Payment Order Against Freight Forwarders" dated March 18, 2009 (available at http://www.iftc.go.jp/e-page/pressreleases/2009;March 090318.pdf).  The non-U.S. investigations relate, at the very least, to substantial volumes of imports into and exports out of the United States.

5.      The last fifteen years have witnessed dramatic increases in globalization and world trade.  United States commerce has been particularly affected.  This is because, among other things, the United States has been the world's leading importer.

6.      Such increases in world trade have helped the Defendants achieve very substantial gains in sales volumes and revenues from their U.S. Freight Forwarding Services business.  This includes gains in imports into and exports out of the U.S.

7.      Not content with this substantial growth, and concerned about the loss of business if mere unilateral or even delayed collusive action were taken to implement a new charge, Defendants (a) have made their overarching agreement in violation of the United States antitrust laws alleged in par. 1 above, and (b) have consistently and repeatedly acted expeditiously pursuant to this overarching agreement to make the specific further agreements to implement the specific new charges alleged in par. 3 above.

8.      Defendants have done so in order to increase Defendants' revenues and sales.  Thereby, Defendants have denied the benefits of competition to their customers and U.S. trade and commerce, including U.S. import and export commerce.  Defendants' unlawful overarching agreement, combination and conspiracy has, and each of the specific separate agreements individually also have, substantially burdened U.S. commerce.  This includes U.S. trade and commerce in imports into the United States.

9.      As a direct result of Defendants' conspiratorial conduct in violation of Section 1 of the Sherman Antitrust Act, Defendants' new charges, surcharges, fees and prices for U.S. Freight Forwarding Services, which were the subjects of the specific agreements among Defendants and their co-conspirators as alleged in this Complaint, have been fixed, inflated and maintained at supra-competitive levels that have been paid by Plaintiffs and the members of the

proposed class.  Moreover, as a result of Defendants' conspiratorial conduct as alleged in this

Complaint, Defendants' prices and rates overall for U.S. Freight Forwarding Services have been

fixed, inflated and maintained at supra-competitive levels that have been paid by Plaintiffs and

the members of the proposed class.

10.     Plaintiffs bring this action for Defendants' violations of Section 1 of the

Sherman Act, 15 U.S.C. § 1.  Pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15

and 26), Plaintiffs seek to recover treble damages and costs of suit, including reasonable

attorneys' fees.  Plaintiffs also seek appropriate injunctive relief against Defendants in order to

compel them to implement antitrust compliance measures and to prevent the continuation or

revival of (a) the overarching agreement alleged in par. 1 (b) each of the specific or renewal of

agreements alleged in par. 3 above, (c) each additional agreement that Plaintiffs may discover

and prove in this action to exist and (d) other anticompetitive conduct.

## JURISDICTION AND VENUE

11.     Plaintiffs bring this Class Action Complaint ("Complaint") under Sections

4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), to recover treble damages and costs of suit,

including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs

and the members of the Class by reason of the violations of Section 1 of the Sherman Act (15

U.S.C. §1) as alleged herein.

12.     In addition, Plaintiffs institute this action to secure injunctive relief against

Defendants to prevent them from further violating Section 1 of the Sherman Act as alleged in

this Complaint.  Plaintiffs continue to use U.S. Freight Forwarding Services.  Absent injunctive

relief, the agreements and industry structure alleged herein will continue to violate or threaten

violations of U.S. antitrust laws.

13.     This Court has subject matter jurisdiction of this case under 28 U.S.C. §1331 and §1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

14.     Venue is proper in this Judicial District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c), and (d).

15.     Defendants maintain offices, have agents, transact business, or are found within this Judicial District.  Plaintiffs' claims alleged in this Complaint arise in part within this District.  The interstate trade and commerce described herein is and has been carried out in part within this District.  Defendants have shipped products in the stream of commerce that have reached this District.

## DEFINITIONS

16.     As used in this Complaint, the term "Freight Forwarding Services" includes services relating to the organization of transportation of items via air, ship, rail, and truck, both nationally and internationally, and can include related activities such as customs clearance, warehousing and ground services.  The providers of this package of services are sometimes referred to as "third party logistics providers," and are referred to in this Complaint as "Freight Forwarders."

17.     The term "U.S. Freight Forwarding Services" means (a)  Freight Forwarding Services purchased or sold in the United States regardless of the location of shipment or (b) Freight Forwarding Services in respect of shipments into, out of, or within the United States

18.     The term "Class Period" or "Conspiracy Period" means the period from at least as early as January 1, 2001 to the present.

19.     "Person" means any individual, partnership, corporation, association, or other business or legal entity.

## PARTIES

20.     Plaintiff Precision Associates, Inc. is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Plaintiff Precision Associates, Inc. purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

21.     Plaintiff Anything Goes LLC d/b/a Mail Boxes Etc. is a California corporation with its principal place of business in Tarzana, California.  During the Class Period, Plaintiff Anything Goes LLC d/b/a Mail Boxes Etc. purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

22.     Plaintiff JCK Industries, Inc. is an Ohio corporation with its principal place of business in Huron, Ohio.  During the Class Period, Plaintiff JCK Industries purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

23.     Defendant Panalpina World Transport (Holding) Ltd. is organized under the laws of Switzerland, with its principal place of business at Viaduktstrasse 42 / P.O. Box CH – 4002 Basel, Switzerland.  Panalpina World Transport (Holding) Ltd. is the parent of Defendant Panalpina, Inc.  During the Class Period, Panalpina World Transport (Holding) Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

24.     Defendant Panalpina, Inc. is a New York corporation with its principal place of business at 1776 On-The-Green, 67 Park Place, Morristown, New Jersey 07960-7103.

Panalpina, Inc. is a subsidiary of Defendant Panalpina World Transport (Holding) Ltd.  During the Class Period, Panalpina, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.  Defendants Panalpina World Transport (Holding) Ltd. and Panalpina, Inc. are collectively referred to herein as "Panalpina."  Panalpina has offices in this District at 152-81 Rockaway Blvd., Jamaica, New York 11434.

25.    Defendant Kühne + Nagel International AG is a Swiss corporation with its principal place of business at Dorfstrasse 50, Schindellegi, Switzerland 8834.  During the Class Period, Kühne + Nagel International AG, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

26.    Defendant Kuehne + Nagel, Inc. is a New York corporation with its principal place of business at 10 Exchange Place, 19th Floor, Jersey City, New Jersey 07302.  Kuehne + Nagel, Inc. is a subsidiary of Defendant Kühne + Nagel International AG.  During the Class Period, Kuehne + Nagel, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.  Defendants Kühne + Nagel International AG and Kuehne + Nagel, Inc. are collectively referred to herein as "Kuehne + Nagel."  Kuehne + Nagel has offices in this District at 156-15 146th Avenue, 3rd Floor, Jamaica, New York 11434.

27.    Defendant Expeditors International of Washington, Inc. is a Washington corporation with its principal place of business at 1015 Third Avenue, 12th Floor, Seattle, Washington 98104.  During the Class Period, Expeditors International, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.  Expeditors International has offices in this District at 245 Roger Avenue, Inwood, New York 10096.

28.    Defendant EGL, Inc. is a Texas corporation with its principal place of business at 15350 Vickery Drive, Houston, Texas 77032.  On August 2, 2007, CEVA Group plc ("CEVA") announced the completion of its merger with EGL, Inc., which is now a wholly owned indirect subsidiary of CEVA.  CEVA, a leading global logistics company, is a U.K.

public limited company owned by affiliates of Apollo Management VI, L.P. During the Class Period, EGL, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District. EGL, Inc. has offices in this District at 55 Johnson Road, Lawrence, NY 11559.

29.    Defendant EGL Eagle Global Logistics, LP is a Delaware corporation with its principal place of business at 15350 Vickery Drive, Houston, Texas 77032. EGL Eagle Global Logistics, LP is a subsidiary of Defendant EGL, Inc. During the Class Period, EGL Eagle Global Logistics, LP, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District. Defendants EGL, Inc. and EGL Eagle Global Logistics, LP are collectively referred to herein as "EGL."

30.    Defendant Deutsche Bahn AG is a German corporation with its principal place of business at Potsdamer Platz 2, D-10785 Berlin, Germany. Defendant Deutsche Bahn AG is the parent of Defendants Schenker AG and Schenker, Inc. During the Class Period, Deutsche Bahn AG, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

31.    Defendant Schenker AG is a German corporation with it principal place of business at Alfredstrasse 81, 45130 Essen, Germany. Schenker AG is a subsidiary of Defendant Deutsche Bahn AG. During the Class Period, Schenker AG, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

32.    Defendant Schenker, Inc. is a New York corporation with its principal place of business at 150 Albany Avenue, Freeport, New York 11520. Schenker, Inc. is a subsidiary of Defendant Deutsche Bahn AG. During the Class Period, Schenker, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District. Schenker, Inc. has an office in this District at 182-21 150th Avenue, Jamaica, New York 11413. Defendants Deutsche Bahn AG, Schenker AG, and Schenker, Inc. are collectively referred to herein as "Schenker."

33.     Defendant BAX Global, Inc. is a Delaware corporation with its principal place of business at 440 Exchange, Irvine, California 92602. BAX Global, Inc. and Schenker, Inc. merged to form Defendant DB Schenker. During the Class Period, BAX Global, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

34.     Defendant DB Schenker is organized under the laws of Germany with its principal place of business at Leipziger Platz 9, D-10117, Berlin, Germany.  DB Schenker has two U.S. based subsidiaries, Schenker Logistics, Inc. and Schenker, Inc.  Schenker Logistics, Inc. is a North Carolina corporation with its principal place of business at 111 Eighth Avenue, New York, New York 10011.  During the Class Period, DB Schenker, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

35.     Defendant Deutsche Post AG is a German corporation with its principal place of business at Charles-de-Gaulle-Str. 20, 53113 Bonn, Germany.  During the Class Period, Deutsche Post AG, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

36.     Defendant DHL Global Forwarding is a Florida corporation with its principal place of business at 1200 South Pine Island Road, Suite 140-145, Plantation, Florida 33324. DHL Global Forwarding is a subsidiary of Defendant DHL Danzas. During the class period, DHL Global Forwarding, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

37.     Defendant DHL Express (USA), Inc. is an Ohio corporation with its principal place of business at 1200 South Pine Island Road, Suite 600, Plantation, Florida 33324. DHL Express (USA), Inc. is a subsidiary of Defendant Deutsche Post AG.  During the Class Period, DHL Express (USA), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.  Defendants Deutsche Post AG, DHL Danzas, DHL Global Forwarding and DHL Express (USA), Inc. are collectively referred to herein as "DHL" or the "DHL Defendants".

38.     Defendant DHL Global Forwarding Japan K.K. is a Japanese corporation with its principal place of business at 1-19-9 Tsutsumi-dori, Sumida-ku, Tokyo 131-0034. During the Class Period, DHL Global Forwarding Japan K.K., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

39.     Defendant Airborne Express, Inc. is a Japanese corporation with its principal place of business at 1-37-8 Higashi-shinagawa, Shinagawa-ku, Tokyo, Japan.  Airborne Express, Inc. terminated its international freight forwarding business effective December 31, 2003.  During the Class Period, Airborne Express, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

40.     Defendant Air Express International USA, Inc. is an Ohio corporation with its principal place of business at 1200 South Pine Island Road, Suite 600, Plantation, Florida 33324. Air Express International USA, Inc. is a subsidiary of Deutsche Post DHL. During the Class Period, Air Express International USA, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

41.     Defendant UTi Worldwide Inc. is a British Virgin Islands corporation with its principal place of business at 9 Columbus Centre, Pelican Drive, Road Town, Tortola, British Virgin Islands, and c/o UTi, Services, Inc., 100 Oceangate Boulevard, Suite 1500, Long Beach, California 90802.  During the Class Period, UTi Worldwide Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.  UTi Worldwide Inc. has offices in this District at Suite 1000, 230-39, International Airport Center Blvd., Springfield Gardens, New York 11413.

42.     Defendant Spedlogswiss, aka the Association of Swiss Forwarders, is a trade association with its principal place of business at Elisabethenstrasse 44, CH-4051 / PO Box CH-4002, Basel, Switzerland.

43.    Defendant United Parcel Service, Inc. is a Delaware corporation with its World Headquarters located at 55 Glenlake Parkway, NE, Atlanta, GA 30328.  During the Class Period, UPS, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

44.    UPS Supply Chain Solutions, Inc. is a subsidiary or business unit of United Parcel Service, Inc. with its principal place of business at 12380 Morris Road, Alpharetta, Georgia 30005.  During the Class Period, UPS Supply Chain Solutions, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

45.    Defendant ABX Logistics Group was acquired by Defendant DSV A/S in September 2008. DSV is organized under the laws of Denmark, with its principal place of business at Banemarksvej 58, 2605 Brondby, Denmark. During the Class Period, ABX Logistics Group, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

46.    Defendant DSV A/S is organized under the laws of Denmark with its principal place of business at Banemarksvej 58, DK-2605 Brøndby, Denmark. During the Class Period, DSV A/S, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

47.    Defendant DSV Solutions Holding A/S is organized under the laws of Denmark with its principal place of business at Banemarksvej 58, DK-2605 Brøndby, Denmark. Defendant DSV Solutions Holding A/S is a subsidiary of Defendant DSV A/S. During the Class Period, DSV Solutions Holding A/S, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

48.    Defendant DSV Air & Sea Ltd. f/n/a DFDS Transport (HK) Ltd. is organized under the laws of Hong Kong SAR, China with its principal place of business at 3rd Floor, MassMutual Tower, 38 Gloucester Road, Wanchai, Hong Kong SAR, China.  Defendant DSV Air & Sea Ltd. is a subsidiary of Defendant DSV A/S.  During the Class Period, DSV Air

& Sea Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

49.    Defendant SDV International Logistics is French corporation with its principal place of business at Toure Bollore, 31-32, quai de Dion-Bouton, 92811 Puteaux Cedex, France. During the Class Period, SDV International Logistics, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including this District. SDV International Logistics has offices in this District at 150-10 132nd Ave., Jamaica, New York 11434.

50.    Defendant Dachser Intelligent Logistics is a German corporation with its principal place of business at Memminger Straße 140, 87439 Kempten, Germany. During the Class Period, Dachser Intelligent Logistics, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

51.    Defendant Dachser Transport of America, Inc. is a New York corporation with its principal place of business at 2829 Paces Ferry Rd., Suite 300, Atlanta, Georgia 30339. Dachser Transport of America, Inc. is a subsidiary of Defendant Dachser Intelligent Logistics. During the Class Period, Dascher Transport of America, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States. Defendants Dachser Intelligent Logistics and Dachser Transport of America, Inc. are collectively referred to herein as "Dachser."

52.    Defendant Geo-Logistics was acquired by Agility Logistics in July 2008. Agility Logistics is a Delaware corporation with its principal place of business at 1251 Dyer Road, Suite 200, Santa Ana, CA 92705.  During the Class Period, Geo-Logistics, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

53.    Defendant Baltrans Logistics, Inc. is a subsidiary of Toll Global Forwarding Ltd.  Toll Global Forwarding Ltd. is a Hong Kong SAR, China corporation with its principal place of business at 12/F Tower II Enterprise Square, 9 Sheung Yuet Road, Kowloon

Bay, Kowloon, Hong Kong SAR, China. During the Class Period, Baltrans Logistics, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

54.     Defendant Toll Global Forwarding (USA), Inc. is a New York corporation with its principal place of business at One Cross Island Plaza, Suite 203, Rosedale, New York, 11422.  During the Class Period, Toll Global Forwarding (USA), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States. Defendants Baltrans Logistics, Inc. and Toll Global Forwarding (USA), Inc.are collectively referred to herein as "Baltrans."

55.     Defendant Hellmann Worldwide Logistics, Inc. is a Delaware corporation with its principal place of business at 10450 Doral Blvd., Miami, Florida 33178. During the Class Period, Hellmann Worldwide Logistics, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

56.     Defendant Geodis Group is a French with its principal place of business at Cap West, 7/9 allées de l'Europe, 92110 CLICHY, France.  During the Class Period, Geodis Group, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

57.     Defendant Geodis Wilson USA, Inc. is a New York corporation with its principal place of business at 485C US Route 1 S, Iselin, New Jersey, 08830. Geodis Wilson USA, Inc. operates as the freight forwarding division of Geodis Group. During the Class Period, Geodis Wilson USA, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States. .  Defendants Geodis Group and Geodis Wilson USA, Inc. are collectively referred to herein as "Geodis."

58.     Defendant Con-way, Inc. f/n/a CNF Transportation, Inc. is a Delaware corporation with its principal place of business at 2855 Campus Drive, Suite 300, San Mateo, CA 94403-2512.  Emery Worldwide was a wholly owned subsidiary of CNF Transportation, Inc. CNF Transportation, Inc. rolled three Emery units into a new company Menlo Worldwide

Forwarding, which was in turn acquired by UPS in December 2004. During the Class Period, Con-way, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

59.    Defendant Exel Global Logistics, Inc. is a New York corporation with its principal place of business at 570 Polaris Park Way, Westerville, Ohio, 43082. Exel is a wholly owned entity of Deutsche Post DHL. During the Class Period, Exel, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

60.    Defendant Jet Speed Logistics, Ltd. is a Hong Kong SAR, China corporation with its principal place of business at 15 Wang Chiu Road, 11th Floor, Kowloon Bay, Hong Kong SAR, China. During the Class Period, Jet Speed Logistics, Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

61.    Defendant Jet Speed Air Cargo Forwarders (USA) Inc. is a New York corporation with its principal place of business at 153-66 Rockaway Blvd., Jamaica, New York 11434. Jet-Speed Air Cargo Forwarders (USA) Inc. Defendant  Jet-Speed Air Cargo Forwarders (USA) Inc. is a subsidiary of Defendant Jet Speed Logistics, Ltd. During the Class Period, Jet-Speed Air Cargo Forwarders (USA) Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States.

62.    Defendant Jet Speed Logistics (USA), LLC is an Illinois corporation with its principal place of business at 1555 Mittel Blvd., Suite J, Wood Dale, Illinois 60191. Jet Speed Logistics (USA), LLC is the parent company of Defendant Jet Speed Air Cargo Forwarders (USA) Inc. During the Class Period Jet Speed Logistics (USA), LLC, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States. Defendants Jet Speed Logistics, Ltd, Jet Speed Air Cargo Forwarders (USA) Inc., and Jet Speed Logistics (USA), LLC are collectively referred to herein as "Jet Speed Logisitcs."

63.    Defendant Morrison Express Logistics PTE Ltd. is a Taiwan, China corporation with its principal place of business at 7F, 360 Rueiguang Road, Taipei 114, Taiwan,

China.  During the Class Period, Morrison Express Logistics PTE Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States. Morrison Express Logistics PTE Ltd. has offices in this District at 151-06 132nd Ave., 2nd Floor, Jamaica, New York, 11434.

64.     Defendant  Morrison Express Corporation (USA) is a California corporation with its principal place of business at 2000 Hughes Way, El Segundo, California 90245.  Defendant  Morrison Express Corporation (USA) is a subsidiary of Defendant Morrison Express Logisitcs PTE Ltd. During the Class Period, Morrison Express Corporation (USA), directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States. Defendants Morrison Express Logistics PTE Ltd. and Morrison Express Corporation (USA) are collectively referred to herein as "Morrison Express."

65.     Defendant Nippon Express Co., Ltd. is a Japanese corporation with its principal place of business at 1-9-3 Higashi-shimbashi, Minato-ku, Tokyo 105-8322, Japan. During the Class Period, Nippon Express Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

66.     Defendant Nippon Express USA, Inc. is a New York corporation with its principal place of business at 590 Madison Avenue, Suite 2401, New York, New York 10022. Nippon Express USA, Inc. is a subsidiary of Defendant Nippon Express Co., Ltd.  During the Class Period, Nippon Express USA, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District. Defendants Nippon Express Co., Ltd. and Nippon Express USA, Inc. are collectively referred to herein as "Nippon."

67.     Defendant Yusen Air & Sea Service Co., Ltd. is a Japanese corporation with its principal place of business at 30-1 Nihonbashi Hakozaki-cho, Chuo-ku, Tokyo 103-0015, Japan.  During the Class Period, Yusen Air & Sea Service Co., Ltd., directly or through its

subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

68.     Defendant Yusen Air & Sea Service (U.S.A.), Inc. is a New York corporation with its principal place of business at 377 Oak Street, Suite 302, Garden City, NY 11530.  Yusen Air & Sea Service (U.S.A.), Inc. is a subsidiary of Defendant Yusen Air & Sea Service Co., Ltd.  During the Class Period, Yusen Air & Sea Service (U.S.A.), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.  Defendants Yusen Air & Sea Service Co., Ltd. and Yusen Air & Sea Service (U.S.A.), Inc. are collectively referred to herein as "Yusen."

69.     Defendant Kintetsu World Express, Inc. is a Japanese corporation with its principal place of business at 1-6-1 Ohtemachi, Chiyoda-Ku, Tokyo 100-0004, Japan.  During the Class Period, Kintetsu World Express, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

70.     Defendant Kintetsu World Express (U.S.A.), Inc. is a California corporation with its principal place of business at 100 Jericho Quadrangle, Suite 326, Jericho, NY 11753.  Kintetsu World Express (U.S.A.), Inc. is a subsidiary of Defendant Kintetsu World Express, Inc.  During the Class Period, Kintetsu World Express (U.S.A.), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.  Defendants Kintetsu World Express, Inc. and Kintetsu World Express (U.S.A.), Inc. are collectively referred to herein as "Kintetsu."

71.     Defendant Nishi-Nippon Railroad Co., Ltd. is a Japanese corporation with its principal place of business at 1-11-7 Tenjin, Chuo-ku, Fukuoka 810-8570, Japan.  During the Class Period, Nishi-Nippon Railroad Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

72.   Defendant Hankyu Hanshin Express Holdings Corporation f/n/a Hankyu Travel International Co., Ltd. is a Japanese corporation with its principal place of business at 6-4-18 Nishi-tenma, Kita-ku, Osaka, Japan.  On April 1, 2008, Hankyu Travel International Co., Ltd. transferred its international freight forwarding business by way of demerger to Hankyu Express International, Co. and changed its name to its current trade name, Hankyu Hanshin Express Holdings Corporation.  During the Class Period, Hankyu Hanshin Express Holdings Corporation, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

73.   Defendant Nissin Corporation is a Japanese corporation with its principal place of business at 6-84 Onoe-cho, Naka-ku, Yokohama, Japan.  During the Class Period, Nissin Corporation, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

74.   Defendant Nissin International Transport U.S.A., Inc. is a California corporation with its principal place of business at 1540 W. 190th Street, Torrance, California 90501-1121.  Nissin International Transport U.S.A., Inc. is a subsidiary of Defendant Nissin Corporation.  During the Class Period, Nissin International Transport U.S.A., Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.  Defendants Nissin Corporation and Nissin International Transport U.S.A., Inc. are collectively referred to herein as "Nissin."

75.   Defendant Vantec World Transport Co., Ltd. f/n/a Tokyu Air Cargo KK is a Japanese corporation with its principal place of business at 4-9-11 Nihonbashi-honcho, Chuo-ku, Tokyo 103-0023, Japan.  On April 1, 2009, Vantec Group Holdings Corporation merged its consolidated subsidiaries, Vantec Corporation and Defendant Vantec World Transport Co., Ltd., which were operating its two core businesses, automotive contract logistics and air/sea Freight Forwarding Services, and renamed itself Vantec Corporation.  During the Class Period, Vantec World Transport Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

76.     Defendant Vantec World Transport (USA), Inc. is a California corporation with its principal place of business at 991 Francisco Street, Torrance, California 90502.  Vantec World Transport (USA), Inc. is a subsidiary of Defendant Vantec World Transport Co., Ltd.  During the Class Period, Vantec World Transport (USA), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.  Defendants Vantec Corporation and Vantec World Transport (USA), Inc. are collectively referred to herein as "Vantec."

77.     Defendant "K" Line Logistics, Ltd. f/n/a "K" Line Air Services, Ltd. is a Japanese corporation with its principal place of business at 3-7-9 Shibaura, Minato-ku, Tokyo 108-0023, Japan.  During the Class Period, "K" Line Logistics, Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

78.     Defendant "K" Line Logistics (U.S.A.), Inc. is a New York corporation with its principal place of business at 145 Hook Creek Blvd. Bldg. #C5B, Valley Stream, New York 11581.  "K" Line Logistics (U.S.A.), Inc. is a subsidiary of Defendant "K" Line Logistics, Ltd.  During the Class Period, "K" Line Logistics (U.S.A.), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.  Defendants "K" Line Logistics, Ltd. and "K" Line Logistics (U.S.A.), Inc. are collectively referred to herein as "'K' Line Logistics."

79.     Defendant Yamato Global Logistics Japan Co., Ltd.[1] is a Japanese corporation with its principal place of business at 1-10-14 Shinkawa, Chuo-ku, Tokyo 104-0033, Japan.  During the Class Period, Yamato Global Logistics Japan Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

---

[1] Yamato Global Logistics Japan Co., Ltd. has changed its name multiple times during the Class Period.  On October 1, 2002, Yamato UPS International Aircargo KK changed its name to Yamato Global Freight KK.  On October 1, 2004, Yamato Global Freight KK changed its name to Yamato Logistics KK.  Finally, Yamato Logistics KK changed its name to Yamato Global Logistics Japan Co., Ltd.

80.     Defendant Yamato Transport U.S.A., Inc. is a New York corporation with its principal place of business at 80 Seaview Drive, Secaucus, New Jersey 07094.  Yamato Transport U.S.A., Inc. is a subsidiary of Defendant Yamato Global Logistics Japan Co., Ltd.  During the Class Period, Yamato Transport U.S.A., Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.  Defendants Yamato Global Logistics Japan Co., Ltd. and Yamato Transport U.S.A., Inc. are collectively referred to herein as "Yamato."

81.     Defendant MOL Logistics (Japan) Co., Ltd. is a Japanese corporation with its principal place of business at 2-5-1 Koraku, Bunkyo-ku, Tokyo 112-8582, Japan.  During the Class Period, MOL Logistics (Japan) Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

82.     Defendant MOL Logistics (U.S.A.), Inc. is a California corporation with its principal place of business at 4 Expressway Plaza, Suite 120, Roslyn Heights, New York 11577.  MOL Logistics (U.S.A.), Inc. is a subsidiary of Defendant MOL Logistics (Japan) Co., Ltd.  During the Class Period, MOL Logistics (U.S.A.), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.  Defendants MOL Logistics (Japan) Co., Ltd. and MOL Logistics (U.S.A.), Inc. are collectively referred to herein as "MOL Logistics."

83.     Defendant Hanshin Air Cargo Co., Ltd. is a Japanese corporation with its principal place of business at 1-9 Kanda Sakuma-cho, Chiyoda-ku, Tokyo 101-0025, Japan.  In 2008, Defendant Hankyu Hanshin Express Holdings Corporation acquired an 85% interest in Hanshin Air Cargo Co., Ltd.  During the Class Period, Hanshin Air Cargo Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States, including in this District.

84.     Defendant Hanshin Air Cargo USA, Inc. is a New York corporation with its principal place of business at147-08 183rd Street, Jamaica, New York 11413.  Hanshin Air

Cargo USA, Inc. is a subsidiary of Defendant Hanshin Air Cargo Co., Ltd.  During the Class

Period, Hanshin Air Cargo USA, Inc., directly or through its subsidiaries and/or affiliates, sold

Freight Forwarding Services throughout the United States, including in this District.  Defendants

Hanshin Air Cargo Co., Ltd. and Hanshin Air Cargo USA, Inc. are collectively referred to herein

as "Hanshin Air Cargo."

85.    Defendant United Aircargo Consolidators, Inc. is a Japanese corporation

with its principal place of business at 5-5-5 Konan, Minato-ku, Tokyo 108-0075, Japan.  During

the Class Period, United Aircargo Consolidators, Inc., directly or through its subsidiaries and/or

affiliates, sold Freight Forwarding Services throughout the United States, including in this

District.

86.    Defendant Japan Aircargo Forwarders Association is a trade association

with its principal place of business at 6-5 Nihonbashi-Ohdenmacho, Chuo-ku, Tokyo 103-0011,

Japan.

87.    John Doe Defendants 1-10 include various individuals, partnerships,

corporations, and associations, the identities of which are presently unknown to Plaintiffs, and

have participated in the violations alleged herein and have performed acts and made statements

in furtherance thereof.  When and if Plaintiffs learn the identities of such co-conspirators,

Plaintiffs may seek leave to amend this complaint to add such co-conspirators as defendants.

88.    The acts alleged against the corporate Defendants in this Complaint were

authorized, ordered, or done by their officers, agents, employees, or representatives, while

actively engaged in the management of Defendants' businesses or affairs.

89.    All averments herein against any named Defendant are also averred

against these unnamed co-conspirators as though set forth at length.

90.    The acts that this Complaint alleges were done by each of the co-

conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly

authorized officers, agents, employees, or representatives or each co-conspirator while actively

engaged in the management, direction, or control of its affairs.

## **CLASS ACTION ALLEGATIONS**

91.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All persons (excluding governmental entities, Defendants, their subsidiaries and affiliates, and their co-conspirators) who directly purchased U.S. Freight Forwarding Services from any of the Defendants or any subsidiary or affiliate thereof, at any time during the period from January 1, 2001 to the present (the "Class")

Plaintiffs reserve their right to amend in their class motion the Class definition to include separate classes or sub-classes or in other respects.

92.     Plaintiffs do not know the exact size of the Class because such information is in the exclusive control of the Defendants.  Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members number at least in the thousands.  Plaintiffs do know that members of the Class are geographically dispersed, including at opposite ends of the United States and in the middle.  Joinder of all Class members in this action is impracticable.

93.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all Class members are all direct purchasers of Freight Forwarding Services who paid artificially inflated prices for Freight Forwarding Services due to Defendants' conspiracy or combination alleged herein.

94.     Plaintiffs will fairly and adequately protect the interests of the Class as the interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.  In addition, Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

95.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

96.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members.  Among the questions of law and fact common to the Class are:

a.    whether Defendants and their co-conspirators combined, conspired or agreed to fix, inflate or maintain prices;

b.    the extent and duration of such agreement(s), combination(s) or conspiracy(ies);

c.    the methods and mechanisms by which Defendants effectuated same;

d.    the role of each Defendant therein;

e.    whether Defendants' conspiratorial conduct violated Section 1 of the Sherman Act;

f.    whether Defendants and their co-conspirators took affirmative steps to conceal their agreement(s);

g.    whether Defendants' conspiratorial conduct caused the prices of U.S. Freight Forwarding Services to be inflated;

h.    the appropriate measure of monetary relief, including the appropriate measure of damages; and

i.    whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief.

97.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.  No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior

alternative exists for the fair and efficient adjudication of this controversy.  The Class is readily ascertainable from the Defendants' records.

98.   Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.  Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

### TRADE AND COMMERCE

99.   Beginning at least as early as January 1, 2001, and continuing until the present, the exact dates unknown to Plaintiffs at this time, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act.

100.   During the Class Period, Defendants sold substantial quantities of U.S. Freight Forwarding Services in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where Defendants produced their Freight Forwarding Services.

101.   Defendants' business activities that are the subject of this Complaint were within the flow of and substantially affected interstate trade and commerce. The collusive behavior alleged in this Complaint has a direct, substantial and foreseeable adverse effect on U.S. commerce, including on U.S. import trade and commerce and U.S. export trade and commerce.

102.   Freight forwarder services for air freight on imports into and exports out of the US have a substantial effect on US commerce.  During the years 2001 to 2006, the amounts of air freight charges for imports into and exports out of the US were as follows:   $9.4 billion in 2001; $10.7 billion in 2002; $11.9 billion in 2003; $13.7 billion in 2004; $15.4 billion in 2005; and $16.3 billion in 2006.

103.   Charges for air freight between Asia and the United States amounted to $6.5 billion in 2004; $ 7.2 billion in 2005; $7.3 billion in 2006; and $7.4 billion in 2007.

104.   Charges for air freight on imports into U.S. from the U.K. during the years 2001 to 2007 were as follows:  $386 million in 2001; $493 million in 2002; $412 million in 2003; $431 million in 2004; $393 million in 2005; $402 million in 2006; and $397 million in 2007.  The majority of imports from the U.K. into the U.S. originated from London's Heathrow Airport:  58.8% in 2007, 59.8% in 2006, 60.6% in 2005, 59.2% in 2004, 58.3% in 2003, 56.8% in 2002 and 52.9% in 2001.

## THE FREIGHT FORWARDING SERVICES INDUSTRY

### A.      The Market for Freight Forwarding Services

105.   Defendants and other Freight Forwarders organize the transport of products, commodities and other goods, by all modes of transportation, including air, ground (rail and truck) and ship, on behalf of customers such as Plaintiffs and members of the Class.  In some instances, Defendants also transport the goods themselves, in addition to coordinating their transport.

106.   Acting for the shipper, a Freight Forwarder may assist in all aspects of cargo transport, from pick up to drop off, and thus provides a wide variety of services.  The Freight Forwarder may advise on exporting costs, including freight costs, port charges, consular fees, costs of special documentation, insurance costs and freight handling fees.  The Freight Forwarder may also prepare and file required export documentation such as the bill of lading and routing appropriate documents to the seller, the buyer or a paying bank.  Further, the Freight Forwarder may advise on the most appropriate mode of cargo transport and making arrangements to pack and load the cargo.  The Freight Forwarder may reserve the necessary cargo space on a vessel, aircraft, train, or truck.  Finally, a Freight Forwarder may arrange with overseas customs brokers to ensure that the goods and documents comply with customs regulations.

107.   International Freight Forwarders are licensed by the International Air Transport Association (IATA) to handle airfreight and the Federal Maritime Commission to handle ocean freight.

108.   Plaintiffs and other Class members use Freight Forwarding Services to assist in the transport of freight, generally over long distances.  While some Freight Forwarders also provide services for the actual transport of the goods, the majority of Freight Forwarders are brokers for Freight Forwarding Services.  Using a Freight Forwarder is often the fastest and most efficient means for a shipper or receiver to organize the transportation of freight.

109.   In 2007 alone, the total value of global trade in consumer goods for the freight forwarding industry has been estimated to be over $500 billion.  As long ago as 2002, the most recent information available from the U.S. Census Bureau, the Freight Forwarding Services industry in the United States alone reported revenues of $27.7 billion.  *See* U.S. Census Bureau's 2002 Economic Census for Transportation and Warehousing, available at http://www.census.gov/econ/census02/data/us/US000_48.HTM#N488 (last visited 07/10/09).

110.   Internationally, the freight forwarding industry has experienced significant year-on-year growth as a result of increased international trade volumes.  Freight Forwarders' revenue and profits have surged in recent years.

111.   According to Philip Damas, director of research for London-based Drewry Shipping Consulting, a leading provider of economic, marketing and technical information to the international shipping industry, the freight forwarding industry controlled about 20 percent of the global container market in 2006 and earned revenue of $50 billion (not counting customs services).  In comparison, Freight Forwarders earned $30 billion from the airfreight market where they control 95 percent of the market.  According to Damas, the ocean Freight Forwarder market was growing at near double-digit rates through 2007.  The very large forwarders, including Defendants Kuehne + Nagel, DHL, Panalpina, Schenker, and more recently UPS, are gaining market share even faster.  For example, Kuehne + Nagel sea freight volume increased 19.4 percent in 2005.

112.   The May 2007 edition of *Global Logistics & Supply Chain Strategies* ("*GL&SCS*") provides the following overview regarding the demand for, and growth of, the Freight Forwarding Services industry:

The cravings of the world's largest manufacturers and retailers for outsourced logistics services seems to know no end.  In 2006, Fortune's Global 500 companies spent $170 [billion] on third-party logistics.  In the U.S. alone, [third party logistics] revenues exceeded $110 [billion].  The menu, however, is still meat and potatoes.

More than three quarters of [third party logistics services] purchased were for everyday tactical functions such as transportation management, warehousing and similar value-added services.

113.  The structure of the Freight Forwarding industry facilitated the implementation and promulgation of the price-fixing practices of which Plaintiffs complain.  For example:

a.      Freight Forwarding Services are commodity-like and are highly fungible.  That is, Freight Forwarding Services provided by one Freight Forwarder are readily substitutable for the Freight Forwarding Services provided by another Freight Forwarder, and therefore sales are driven primarily by price.  This commodity-like nature of these services is demonstrated by the fact that Freight Forwarders routinely provide Freight Forwarding Services for each other.

b.      The principal competitors for Defendants in this freight forwarding industry are each other and other Freight Forwarders.

c.      Freight Forwarding Services are highly concentrated, which facilitates coordination of prices among its major providers, including Defendants.  Indeed, the industry has experienced increasing concentration.  The industry has experienced an unprecedented level of mergers and acquisitions, resulting in a small number of global players, including the Defendants.  Indeed, during the Class Period and as detailed more specifically below, Defendants accounted for a substantial portion of Freight Forwarding Services.

d.      The Freight Forwarding industry has substantial barriers to entry.  To enter and maintain a viable competitive presence in the Freight Forwarding industry requires an

expenditure of capital investment and other resources over a long period of time.  Specifically, a viable entry requires not only significant capital and overhead expenditures, but also requires that a new provider capture a significant share of market from existing providers.  New entry is thus both expensive and risky.  Due to the increasing globalization of the world's economy, Freight Forwarders, to survive, must also have global operations, as do Defendants.  Defendants have thousands of warehouses in dozens of countries.  For example, Defendant DHL has 1,600 warehouses around the world, and air freight forwarding operations in more than 150 countries, and Defendant Kuehne + Nagel has operations in more than 100 countries.  The other Defendants have similar resources.

### B.    Defendants Have Significant Market Share

114.    Defendants are among the largest and leading providers of Freight Forwarding Services in the United States and worldwide.  During the Class Period, Defendants handled a substantial percentage of Freight Forwarding business.  According to the May 2007 edition of Global Logistics & Supply Chain Strategies ("GL&SCS"), Defendants include the world's three largest third-party logistics providers based on 2006 revenues (DHL, $31 billion; Kuehne + Nagel, $14.9 billion; and Schenker / BAX Global $14 billion).  Other Defendants on the list of the top 25 global third party-logistic providers include: UPS ranked 4th ($8 billion), Panalpina ranked 5th ($7.2 billion), Agility (f/k/a Geo-Logistics) ranked 7th ($4.9 billion), Expeditors ranked 9th ($4.6 billion), UTi ranked 11th ($3.5 billion), Nippon ranked 12th ($3.4 billion), EGL ranked 13th ($3.2 billion), Hellmann Worldwide Logistics ranked 16th ($2.6 billion), Kintetsu ranked 18th ($2.3 billion), Menlo Worldwide (a/k/a UPS) ranked 20th ($4.2 billion), and Toll ranked 22nd ($1.1 billion).

115.    Defendants possess significant market share.  As noted in more detail below in part C of "The Freight Forwarding Industry and Government Investigations" section of this Complaint, seven of the Defendants DHL, Kuehne + Nagel, Panalpina, Schenker, UTi,

Agility (f/k/a Geo Logistics) and ABX Logistics, constitute the trade association known as Freight Forward International ("FFI"). FFI's website notes that its seven members alone had a 2006 market share of more than 25% in air freight forwarding, and nearly 30% in ocean freight forwarding. Moreover, the Japanese Defendants (defined below) control approximately 75% of the Japanese market for international Freight Forwarding Services, with Defendants Nippon, Kintetsu, and Yusen holding a combined market share of nearly 50%.

116.  *GL&SCS* noted the following information regarding the enormous revenues generated by the leading Freight Forwarders, including the Defendants, and rapid consolidation in the industry:

> The *GL&SCS* Top 25 Global [third party logistics providers] for 2006 continued to bulk up with gross revenues of $131.5 [billion], up more than 20 percent over 2005. These heavyweights are increasing their market share each year, both by swallowing each other and by expanding their own global reach, physical handling abilities and the quality of their information technology.

117.  *GL&SCS* also described large customers' increasing reliance on a concentrated number of Freight Forwarders including Defendants, and Freight Forwarders' resulting explosive revenue growth:

> While large customers are reticent to put all their business with one logistics provider, they are more and more inclined to limit the number of core [third party logistics providers]. As a consequence, the large players will continue to capture more of the strategic relationships going forward. For example, the top five [third party logistics providers] [including Defendants DHL, Kuehne + Nagel, Schenker/BAX Global, and Panalpina] grew their revenue by 37 percent last year while world [gross domestic product] grew by five percent. [Defendant] Kuehne + Nagel leads this growth wave with a 39.3 percent revenue increase.

118.  *GL&SCS* also detailed the leading role that Freight Forwarding Services played in the dramatic revenue growth described above:

> As companies extend their supply chains around the world, it is not surprising that the greatest area of revenue growth for [third party logistics providers] was global transportation and forwarding. The revenue growth was also reflected in unit volume increases. For

example, ocean freight leader [Defendant] Kuehne + Nagel
handled 2.3 million TEU's [twenty foot equivalent units – twenty
foot containers] last year.  Other leading ocean forwarders all
handling more than one million TEU's included:

- [Defendant] DHL                   1.9 million

- [Defendant] Schenker          1.3 million

- [Defendant] Expeditors       1.2 million

- [Defendant] Panalpina          1.2 million

119.  Defendant DHL was the world's largest air-freight forwarder in 2006,
according *to GL&SCS*, handling 2.4 million tons of cargo and generating $6.4 billion in
airfreight revenue.  Defendants Schenker, Panalpina, Kuehne + Nagel, and EGL were the next
four largest in terms of air-freight forwarding revenue.

120.  GL&SCS further noted the following with respect to DHL:

121.  DHL Logistics is by far the world's largest [third party logistics *provider*]
with annual revenue nearly twice that of its nearest rival.  Its gross revenue take is:  DHL Exel
Supply *Chain* [$16.2 billion], DHL Global Forwarding [$12.6 billion] and DHL Freight [$2.7
billion].  In fact, DHL Logistics now exceeds the revenues of its better-known sister division,
DHL Express, and even the postal division of its parent company, Deutsche Post World Net . . .
DHL Logistics achieved its growth rapidly through acquisitions . . . just a few years ago it
purchased Danzas/AEI, then the world's largest freight forwarder.

122.  In 2005, it was estimated that the top ten Freight Forwarders, including
many of the Defendants, controlled more than 45% of the market.

123.  The largest freight-forwarders, including Defendants, count as their key
customers virtually a who's who of the world's largest and best known companies across the
entire spectrum of manufactured goods.  Therefore, the actions of Defendants complained of

herein have touched virtually every American business and household in some way.  According to *GL&SCS*, "key customers" of the Defendants include:

**DHL:**  Apple Computer; Compaq; Ford Motor Co.; Hewlett Packard; Home Depot; Honda; Intel; International Paper; Kodak; Miller Brewing; Mitsubishi Corp.; Motorola; Nissan; Owens Corning; Pepsi Americas; Procter & Gamble; Shell; Sony; Sun Microsystems; Unilever; Wal-Mart; Xerox

**Kuehne + Nagel:**  DuPont; Memorex; Nortel; Siemens

**Schenker:**  BMW; Cisco; Fujitsu; Microsoft; NEC; Porsche; Samsung; Siemens; Sony; VW; Xerox

**Expeditors International:**  Ace Hardware; Cisco; General Electric; Merck; Motorola; Philips; Toyota

**UTi:**  Dell Computer; Dow Corning; Gap; Home Depot; International Paper; Wal-Mart

**Nippon:**  Canon; GE; Johnson & Johnson; Panasonic; Siemens; Sony; Tyco Healthcare

**EGL:**  Dell Computer; Target; Avon; Harley Davidson; Daimler Chrysler; Fujitsu; Medtronic; Proctor & Gamble; 3M; Tyco; IBM

**Kintetsu:**  Daewoo; Dong Yang Mechatronics; Manco

**UPS:**  Abbott; DaimlerChrysler; Hitachi; Nestle; Honeywell; Royal Phillips; Seagate; Sony Ericsson; Toshiba

**Agility:**  Samsonite; Siemens; U.S. Defense Logistics Agency; U.S. Navy; Wal-Mart

**Menlo:**  Bobcat; Cisco; Dow Chemical; Electroiux; General Motors; HP; IBM; Nike; Ricoh; Sears

**Hellmann:**  Abercrombie & Fitch; Bacardi Martini; Caterpillar; Dana Corp.; Norwegian Cruise Line; Sony

### C.       World-Wide Antitrust Agency Raids on Defendants' Operations

124.  In October 2007, governmental antitrust enforcers in the United States, Europe and elsewhere subpoenaed or raided the offices of numerous Defendants in connection with suspected anticompetitive practices in the Freight Forwarding Services industry.  For example, on October 11, 2007, the European Commission publicly announced:

> The European Commission can confirm that on 10th October 2007 Commission officials carried out unannounced inspections at the premises of various providers of international freight forwarding services.  Freight forwarding is the organisation of transportation of items along with related activities such as customs clearance, warehousing and ground services. The Commission has reason to believe that the companies concerned may have violated EC Treaty rules that outlaw restrictive business practices (Article 81).
>
> The Commission officials were accompanied by their counterparts from the relevant national competition authorities.
> Surprise inspections are a preliminary step in investigations into suspected cartels . . .

125.  Similarly, on October 10, 2007, a spokeswoman for the U. S. Department of Justice confirmed its Antitrust Division's investigation into "the possibility of *anticompetitive* practices in the international freight forwarding industry" and that it was "coordinating with the EU and other foreign competition authorities." *See* U.S. Probing Freight Forwarding Industry, available at www.reuters.com/article/governmentFilingsNews/idUSN1027773220071010 (dated Oct. 10, 2007; visited Oct. 23, 2007).

126.  One or more Defendants may have already conceded that price-fixing occurred.  For example, on October 15, 2007, e-Cargonews Asia, a publicly available on-line version of the Asian cargo industry newspaper Cargonews Asia, reported that "Deutsche Bahn won't rule out that its logistics unit Schenker could have participated in illegal price-fixing. Deutsche Bahn Logistics chief Nobert Bensel said there are certain reasons to suspect that the EC Treaty's anti-trust rules may have been violated.  Deutsche Bahn last week said the offices of its Zurich-based Schenker transport unit were searched in South Africa, Switzerland and the US."

127.   One of the Defendants or their co-conspirators appears to have sought conditional immunity from multiple antitrust enforcers around the world in exchange for cooperating against the other co-conspirators.  Specifically, on October 11, 2007, the Bloomberg news agency reported that the world-wide "probe began when a company turned itself in to antitrust regulators in Switzerland, the U.S. and the EU for possible violations, [Patrick] Durcey of [Swiss competition authority] Weko said."  On that same day, the Associated Press news agency reported that "[d]ocuments provided by the company aroused sufficient suspicion to trigger the international investigation."

128.   The world-wide raids extended to South Africa.  On October 15, 2007, Creamer Media, a South African news agency, publicly reported:

> The South African Competition Commission conducted a raid on October 10 on three freight forwarding companies – two international operations and one local company – following a complaint, senior legal analyst Nandi Mokoena said.

> The companies are suspected to have engaged in practices which might contravene the Competition Act, and information has indicated that they may be part of an international price-fixing cartel.

> Mokoena said that the information received indicated that three companies were engaged in price-fixing on war-risk surcharges (surcharges imposed for security following the attacks on September 11, 2001), security charges and the fee charged for the automated manifest system, which is a data system used to input, for example, the contents of cargo, its country of departure and its destination.

> The commission conducted the raids in coordination with its counterparts from the European Commission and the US Department of Justice.

> "The raids were conducted simultaneously between the three competition jurisdictions for maximum impact on a cartel activity whose reach is believe to be international . . . ," the commission noted in a statement.

129.   The worldwide investigation into Defendants' conduct included raids in the United States, the United Kingdom, and Switzerland.  On October 10, 2007, Defendant Kuehne + Nagel stated in a press release that, on that day, "various competition authorities have carried out an unannounced inspection at a number of international freight forwarding companies.  The inspection encompassed amongst others Kuehne + Nagel in Switzerland, in the USA, and in the UK."

130.   The investigations extend to Defendant Spedlogswiss, a trade association. In antitrust cases, trade association meetings frequently are found to have *served* as the situs for collusive conduct, as they provide an ostensibly legal reason to meet, thus providing "cover" for illegal conspiratorial activity.  On October 10, 2007, Defendant Panalpina stated:

> In connection with alleged concerted practices in the area of transportation services, on 10 October 2007 the Swiss Federal Competition Commission (Weko) conducted a search also of the premises of Panalpina in Basel.  A similar investigation by US anti-trust authorities has been conducted in the company's headquarters in the USA.
>
> The investigation of Weko is aimed at the Association of Swiss Forwarders (Spedlogswiss) and several forwarding companies, among them Panalpina.

On October 11, 2007, a spokesman for Defendant Panalpina, Martin Spohn, confirmed that the raid in the United States occurred at Panalpina's offices in Morristown, New Jersey.

131.   On October 11, 2007, the Dow Jones Newswires news agency reported that "[t]he *probe* includes the Swiss logistics trade body."  Additionally, Dow Jones reported that "Dora Naumann, a spokeswoman for Spedswisslog [sic], confirmed the raids on its Basel office . . ."

132.   On *October* 10, 2007, Defendant Expeditors revealed the following in a press release, which it restated in an SEC Form 8-K issued that day:

> Expeditors International of Washington, Inc., the international freight forwarding and logistics company, said today they were the recipient of a subpoena issued by the U.S. Department of Justice

(DOJ) ordering the company to produce certain information and
records relating to an investigation of air cargo freight forwarders.

133.   On October 10, 2007, the Reuters news agency reported that United States
"Department of Justice spokeswoman Gina Talamona said the DOJ antitrust division was
*investigating* possible anti-competitive practices in the international freight forwarding industry.
She also confirmed that the department was 'coordinating with EU and other foreign competition
authorities.'"

134.   On October 10, 2007, the *Houston Chronicle* reported that government
investigators raided the Houston and London offices of Defendant EGL, and that a spokesman
for EGL stated that EGL "believes the investigation is related to surcharge practices in the global
freight industry."  The article further noted that "Pat Villafranca, a spokeswoman for the FBI,
said agents raided an EGL office near Bush Intercontinental Airport."

135.   On October 10, 2007, Defendant UTi Worldwide, Inc. filed an SEC Form
8-K and stated:

> [The United States Department of Justice] executed a search
> warrant on a subsidiary of the company on October 10, 2007 . . .
> On the same day, UTi received a notice from the Canadian
> Competition Bureau that the Bureau has commenced an
> investigation with respect to alleged anti-competitive activity of
> persons involved in the provision of international freight
> forwarding services to and from Canada and requesting that UTi
> preserve any records relevant to such investigation.

136.   On *October* 11, 2007, Defendant Deutsche Bahn AG issued a press release
from Dr. Peter Sauer, spokesman for Defendant Schenker AG, and stated:

> Within the framework of an inspection ordered by the Commission
> of the European Communities in Brussels, representatives of the
> General Directorate for Competition and of the German Federal
> Antitrust Authority, Bundeskartellamt, have been carrying out an
> investigation into Schenker AG in Essen.  Similar investigations
> have been conducted at Schenker's offices in South Africa,
> Switzerland and the US by the competent authorities of the various
> countries.

-37-

137.  On October 11, 2007, the Bloomberg news agency reported that "Deutsche Post AG, Europe's biggest mail service, was 'contacted' by Swiss, EU and U.S. authorities seeking information," according to Nicole Mommsen, a spokeswoman for the company.  On that same day, the Dow Jones Newswires news agency reported that "DHL, an international shipping unit of Deutsche Post AG, also said European authorities had contacted the company . . . ."  On October 12, 2007, AmericanShipper.com, an on-line publication reporting on the international logistics industry, publicly reported that "DHL spokeswoman Silje Skogstad confirmed that her company's global forwarding division had received requests for information from the Swiss, EU, and U.S. authorities . . . ."

138.  On October 11, 2007, the Dow Jones Newswires news agency stated that Defendant "Kuehne & Nagel's CFO [Gerald] van Kesteren said that the investigation is a spill-over from an earlier probe into price fixing of fuel surcharges by the airline industry.  Earlier this year, British Airways and Korean Airlines pleaded guilty to charges of price-fixing."  On October 12, 2007, the *Wall Street Journal* online edition reported that "[t]he investigation centers on whether the freight forwarders fixed prices for fuel and other charges, Kuehne & Nagel Chief Financial Officer Gerard van Kesteren said Wednesday."  On October 12, 2007, AmericanShipper.com reported that "Rolf Altorfer, chief executive officer for the U.S. operations of Swiss forwarder Kuehne + Nagel, said his company's offices had been visited by investigators who removed some files and mirrored hard drives on computers."

139.  On October 12, 2007, AmericanShipper.com reported that worldwide competition authorities were "looking into activities of more than a dozen [freight forwarding] companies, including some of the largest in the world.  An executive with one of the companies involved gave American Shipper the names of 15 firms that he said were listed on the subpoena served on his company."

140.  On October 22, 2007, the Thomson Financial News agency reported that "Kuehne & Nagel International AG said it has launched an internal investigation after competition authorities have searched the logistics group's premises in Switzerland, the US and

-38-

the UK . . ..."  The article further noted that Kuehne + Nagel's deputy Chief Executive Officer Reinhard Lange "said that all business units apart from contract logistics were affected by the investigation."  According to its 2006 "Report of the Business Units," Kuehne + Nagel's business units include the following:  Airfreight; Seafreight; and Rail and Road Logistics. Previously, on October 11, 2007, the Thomson Financial News agency reported that Kuehne + Nagel's "Lange said it was unlikely that there were any irregularities at group level, even though he did not rule out incidents of malpractice in individual units."

> **D.** **The Japan Fair Trade Commission Finds Several Defendants Guilty of Antitrust Violations**

141.  On April 16, 2008, several news outlets reported that the Japanese antitrust authority, the Japan Fair Trade Commission ("JFTC"), had raided at least 12 Freight Forwarders and one industry trade association as part of an antitrust investigation into whether the Freight Forwarders had formed an illegal cartel to fix prices on air cargo charges.

142.  After several months of investigation, the JFTC found and determined that the Freight Forwarders had violated antitrust laws.  On March 18, 2009, the JFTC issued a cease-and-desist order and levied $94.7 million in fines against a number of international Freight Forwarders for forming an illegal cartel to raise air cargo charges. See translation of JFTC Order attached as Exhibit A hereto.

143.  The JFTC held that the following 14 Defendants conspired to restrict competition by fixing prices on four separate surcharges, thereby "substantively restrict[ing] competition in the field of the International Freight Forwarding Business": (1) Nippon Express Co., Ltd.; (2) Yusen Air & Sea Service Co., Ltd.; (3) Kintetsu World Express, Inc.; (4) Nishi-Nippon Railroad Co., Ltd.; (5) Hankyu Hanshin Express Holdings Corporation; (6) Nissin Corporation; (7) Vantec World Transport Co., Ltd.; (8) "K" Line Logistics, Ltd.; (9) Yamato Global Logistics Japan Co., Ltd.; (10) MOL Logistics (Japan) Co., Ltd.; (11) Hanshin Air Cargo Co., Ltd.; (12) United Aircargo Consolidators, Inc.; (13) DHL Global Forwarding Japan K.K.; and (14) Airborne Express, Inc. (collectively the "Japanese Defendants").

144.  The JFTC fined the Japanese Defendants (except for DHL Global Forwarding Japan K.K. and Airborne Express, Inc.) for their participation in the conspiracy.  The largest fines were imposed on Defendants Nippon ($26.1 million), Yusen ($18.1 million), and Kintetsu ($15.6 million).

145.  The JFTC also ordered that the Japanese Defendants that still participated in the international freight forwarding industry adopt resolutions at meetings of their respective boards of directors (or, with respect to Defendant Vantec World Tranport Co., Ltd., at a general meeting of shareholders) confirming that the illegal agreements described in detail below had terminated and ensuring "that, in the future, the tariffs and surcharges in respect of the International Freight Forwarding Business will be determined, not by any agreement among themselves or in a concerted manner with other companies, but independently by each company."In addition, each company was ordered to notify its co-conspirators, customers, and employees of the measures it was taking to comply with said resolutions, and to institute guidelines, training and auditing procedures to ensure that their employees were aware of and in compliance with the antitrust laws.

146.  According to news reports, immediately following the issuance of the JFTC's order Defendants Nippon, Yusen, and Kintetsu all pledged to strive to prevent a recurrence of a similar incident.  Defendant Hanshin Air Cargo announced that "although it has some differences of opinion" with the JFTC, it had decided to accept the JFTC's cease-and-desist order and fine; whereas several of the other Japanese Defendants have announced that they intend to challenge the JFTC's findings.

147.  The details of the Japanese Defendants' anticompetitive agreements and conduct are contained in the JFTC's cease-and-desist order attached hereto as Exhibit A.

148.  According to the JFTC, around August 2002 the "Airlines" (*i.e.*, companies engaged in the international air transport business) decided to begin imposing a fuel surcharge on Freight Forwarders, including the Japanese Defendants, with respect to all freight loaded on aircrafts departing from Japan.  Soon thereafter, the Airlines informed Defendants

Nippon, Kintetsu, and Yusen of their intent to begin imposing the new fuel surcharge after October 16, 2002.

149.  In response, on September 18, 2002, the Japanese Defendants (except DHL Global Forwarding Japan K.K. and Nippon) agreed among themselves that when they were charged a fuel surcharge by the Airlines they in turn would charge their customers a corresponding fuel surcharge.  In October 2002, the Airlines began imposing the new fuel surcharge.  No later than November 8, 2002, Defendants DHL Global Forwarding Japan K.K. and Nippon joined the other Japanese Defendants' fuel surcharge agreement.

150.  On or about August 13, 2004, the Airlines began phasing in a new fee, which they charged the Japanese Defendants and other Freight Forwarders.  The new fee was supposedly designed to cover costs arising in relation to the new Advanced Notification System employed by the United States Customs and Border Protection with regard to all freight that was delivered to, or traveled through, the United States.  Under this new system, prior to flight, Airlines were required to electronically provide U.S. customs authorities with information related to the freight to be loaded on an aircraft departing from an airport outside the United States and landing in an airport inside the United States by way of a customs clearance system called the Automated Manifest System ("AMS").  The Airlines decided to charge the Freight Forwarders a certain preset fee to send the required information to the customs authorities and provided defendant Kintetsu with an explanation to this effect on August 13, 2004.

151.  In response to the Airline's new fee, the Japanese Defendants again agreed among themselves to pass on this new fee to their customers.  On November 22, 2004, the Japanese Defendants (except for Airborne Express, Inc., which was no longer in the freight forwarding business) agreed that they would institute an additional charge, the "AMS charge," which would be set at a rate no lower than the agreed minimum rate of 500 yen.  The Japanese Defendants agreed to implement this AMS charge by December 13, 2004, or at the very latest January 1, 2005.

152.  On February 20, 2006, the Japanese Defendants (except for Airborne Express, Inc.) agreed that they would institute two new surcharges, a "security charge" and an "explosives examination charge," at rates no lower than the agreed minimum rates of 300 yen and 1,500 yen, respectively.  These new surcharges were allegedly implemented to cover costs arising as a result of complying with new security regulations imposed by the Transport Ministry.

153.  The Japanese Defendants imposed the fuel, AMS, security, and explosives examination surcharges on their customers, either directly or via other parties (including agents), at rates no lower than the agreed minimum rates, thereby substantively restricting competition in the field of international Freight Forwarding Services.  According to the JFTC, the collection of these surcharges was largely successful.

154.  The Japanese Defendants reached the agreements discussed above at EBIC meetings of the Japan Aircargo Forwarders Association ("JAFA").  The EBIC, or Executive Board of International Committee, is an organization within JAFA.  The Japanese Defendants used EBIC meetings to exchange information regarding the status of the receipt of the fuel, AMS, security, and explosives examination surcharges in order to implement and monitor their conspiracy.

155.  Upon receiving information that the U.S. Department of Justice and other antitrust authorities were investigating Freight Forwarders, Defendants Nippon, Kintetsu, and Yusen held a meeting at Nippon's head office in Minato-ku Tokyo and agreed not to hold any more EBIC meetings.  No more EBIC meetings were held.

156.  Based on JAFA's role in the conspiracy, the JFTC requested that JAFA "take preventative measures so that the activities such as described in 1-(2) above [outlining the illegal agreements regarding the fuel, AMS, security, and explosives examination surcharges reached at EBIC meetings of JAFA] shall not be reiterated at any meetings of the Association."

E.      **Defendants' Trade Association Memberships**

157.  As noted above, Defendant Spedlogswiss, aka The Association of Swiss Forwarders, is a trade association whose offices in Basel were raided by competition authorities. Its members include Defendants Kuehne + Nagel; Panalpina; EGL; Schenker; DHL; and UTi. There are various subsections of Spedlogswiss—for example, the Basel section.  One of the stated purposes of the Basel section, as stated on Spedlogswiss' website and translated, is to "promote solidarity among the member companies."  The Basel section further notes that "[i]t is a unity, and acts as such."

158.  Moreover, Defendants constitute all of the seven members of the trade association FFI headquartered in England**.**  Its website states that FFI is "an interest grouping of seven of the leading global forwarders and *logistics* providers" and identifies its members as Defendants DHL, Kuehne + Nagel, Panalpina, Schenker, and UTi, Agility (f/k/a Geo Logistics) and ABX Logistics .  FFI's website further states that "[t]he seven participating companies in FFI employ more that 324,000 people with a consolidated turnover for 2006 of 60.98 billion euro and a total market share of more than 25% in the airfreight and nearly 30% in ocean freight." FFI additionally notes that it "seeks to reinforce the common interests of the whole forwarding and logistics industry" and "[c]asting itself as a bridgehead for the industry, the actions of FFI are in support of the existing national and international associations of freight forwarders."

159.  FFI's website continues that "FFI is governed by the CEO's of the participating companies.  The CEO's will meet twice a year focusing on the issue of strategic interest for the industry."  Additionally, "[w]orking committees have been established in the following areas:  Air; Customs; Overland; Security," and "[a]ll companies are represented in the Working Committees on Management Board level or equivalent."  The Working Committees "meet 2-3 times per year."

160.  FFI's "CEO Committee" is currently headed by FFI's President, John Allan of DHL Logistics.  The Chairman of the Air Freight Committee is Eddy Raes of Schenker.

The Chairman of the Customs Committee is Jack Stevens of DHL.  The Chairman of the

Overland Committee is Eric Peigne of Kuehne + Nagel.  The Chairman of the Security

Committee is Robert Larson of DHL, and the Vice-Chairmen are Steve Bernstein of UTi, and

Rob Bekking of Schenker.  These "working committees are issue driven and meet as needed."

161.  FFI states that its "vision" is to provide its members "with a knowledge-

sharing platform," and that one of its "goals" is to "provide invaluable advise [sic] and facilitate

information exchange between members."

162.  The Japanese Defendants are or were regular members of the trade

organization JAFA.  They were also members of an organization within JAFA, the EBIC.  The

Japanese Defendants attended EBIC meetings, which were usually held every two months.

163.  On its website JAFA describes itself "[a]s the unique organization to

represent the interests of air freight forwarding industry in Japan, [our] members are composed

of air cargo forwarders, consolidators, express carriers and/or air cargo agents, either they are

domestic or foreign companies."

164.  Several high-level executives of the Japanese Defendants and their related

companies are listed as JAFA board members, including: Toshifumi Kato (President, Defendant

MOL Logistics (Japan) Co., Ltd.); Mamoru Shozui (President, Defendant "K" Line Logistics,

Ltd.); Hiroshi Kimura (President & COO, Defendant Vantec World Transport Co., Ltd.);

Kazufumi Yamaguchi (Senior Managing Director Executive Officer, Defendant Nissin

Corporation); Yutaka Yamada (President, Defendant Hanshin Air Cargo Co., Ltd.); Yoshiki

Fujita (Operating Officer Administration, Defendant DHL Global Forwarding Japan K.K.);

Toshinori Yuasa (President, Defendant United Aircargo Consolidators, Inc.); Junichi Sasahara

(Vice President, Operations, DHL Japan, Inc.); Yasuo Ito (Chairman, Nippon Courier Service

Co., Ltd.); Takanori Tada (Vice President, Hankyu Express Intenational Co., Ltd.); Katsuji Inoue

(President, Hankyu Cargo Service Co., Ltd.); and Etsuo Ogawa (Chairman, Yamato Logistics

Co., Ltd.).  JAFA's Chairman is listed as Keiichi Nakatani (Executive Vice President, Defendant

Nippon Express Co., Ltd.).  Vice Chairmen include: Satoshi Ishizaki (Senior Managing Director,

Defendant Kintesu World Express, Inc.); Shunichi Yano (President, Defendant Yusen Air & Sea

Service Co., Ltd.); and Osamu Okada (President, Yamato Global Express Co., Ltd.).

165.  As alleged in this Complaint, these Defendants reached their wrongful

agreements on the fuel, AMS, 2006 security and explosives examination surcharges, among

other ways, during EBIC meetings of JAFA.  Defendants used EBIC meetings to exchange

information regarding the status of the receipt of the fuel, AMS, security, and explosives

examination surcharges in order to implement and monitor their conspiracy.

166.  According to the JFTC's cease-and-desist order, the Japanese Defendants

"mutually disclosed information as to the collection of [the] Fuel Surcharge passed on [to] the

Customer, AMS charge, security charge and Explosives Examination fee, at EBIC meetings."

167.  The order further states that "[u]pon receiving information that the United

States Department of Justice, the EC Commission and other authorities were starting to

investigate the Forwarders based in the United States, Europe and other regions, [Defendants

Nippon, Kintetsu, and Yusen] agreed not to hold any EBIC meetings in the future."

168.  Several Defendants also are members of the Shanghai International

Freight Forwarder Association (SIFFA), another trade association.

169.  As described in detail below, Defendants' collusive behavior in

connection with the Chinese Currency Adjustment Factor Surcharge included an agreement with

the SIFFA.

170.   The collusive behavior alleged in this Complaint in connection with these charges for Freight Forwarding Services has a direct, substantial and foreseeable adverse effect on U.S. commerce, including on U.S. import trade and U.S. import commerce.

171.   Defendants' memberships in trade associations, such as those described above, gave them ample opportunities to meet and secretly engage in collusive conduct under the pretext of engaging in lawful activity.

## TOLLING OF STATUTE OF LIMITATIONS AND CONCEALMENT

172.   Defendants engaged in successful conspiratorial conduct that, by its nature, was inherently self-concealing.  On or about October 10, 2007, various Defendants' press releases were issued concerning international antitrust raids on certain Defendants' operations. But even these press releases and subsequent events still have given Plaintiffs no information about some of Defendants' specific conspiracies which remain undiscovered and have not been pled in this Amended Complaint.

173.   Plaintiffs and the Class members could not have discovered Defendants' conspiratorial conduct at an earlier date by the exercise of reasonable diligence.  This is because of the inherently self-concealing nature of a conspiracy as well as deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, such conspiratorial conduct.

174.   The agreements of the Defendants herein alleged were wrongfully concealed and carried out in a manner that precluded detection.  For one example, as alleged in detail below, Defendants created fictitious names – for example, the "Heathrow Garden Club" -- and related code words to hide their clearly illegal activities.

175.  For another example, certain Defendants used home email addresses instead of work email accounts to send messages to their co-conspirators, in an effort to help avoid detection.

176.  By virtue of such conduct by Defendants and their co-conspirators, and for other reasons, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiffs and the other Class members have as a result of the unlawful conspiracy violations and conspiratorial conduct alleged in this Complaint.

**EFFECTS ON U.S. COMMERCE AND INJURY TO PLAINTIFFS AND
CLASS MEMBERS**

177.  During the period covered by this Complaint, Plaintiffs and members of the Class purchased substantial quantities of U.S. Freight Forwarding Services from the Defendants.

178.  As a direct result of Defendants' conspiratorial conduct in violation of Section 1 of the Sherman Antitrust Act, Defendants' new charges, surcharges, fees and prices for US. Freight Forwarding Services – which were the subjects of the specific agreements among Defendants and their co-conspirators as alleged in this Complaint -- have been fixed, inflated and maintained at supra-competitive levels that have been paid by Plaintiffs and the members of the proposed class.  Moreover, as a result of Defendants' conspiratorial conduct, Defendants' prices and rates overall for U.S. Freight Forwarding Services have been fixed, inflated and maintained at supra-competitive levels that have been paid by Plaintiffs and the members of the proposed class.

179.  Defendants' conspiratorial conduct as alleged in this amended Complaint not only led to the fixing and inflation of the new charges, surcharges, fees and prices for U.S. Freight Forwarding Services which were the subjects of the specific agreements among

Defendants and their co-conspirators as alleged in this amended Complaint, but also to the wrongful inflation of prices and rates overall for U.S. Freight Forwarding Services.

180.  By reason of the alleged violations of the antitrust laws, Plaintiffs and members of the Class have been injured in their business and property and have suffered damages in an amount presently undetermined.

181.  The anticompetitive conduct complained of herein will continue (and to the extent temporarily and only partially abandoned, will resume) absent an injunction.  Plaintiffs and members of the Class are likely to buy U.S. Freight Forwarding Services in the future and will be repeatedly injured unless the continuation of this anticompetitive conduct is enjoined.

## AS AND FOR A FIRST CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**The 2001 Security Surcharge Agreement Made By Defendants ABX Logistics, Dachser, DHL, Excel, Geodix (Geodix Wilson); Geo Logistics (Agility); Kuehne + Nagel; Panalpina; and Schenker (the "Security Surcharge Defendants")**

182.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

183.  Between at least October 1, 2001 and continuing until a time unknown to Plaintiffs, the Security Surcharge Defendants (and co-conspirators) combined, conspired and agreed, to fix, maintain, and impose on their customers (including members of the Class) a security surcharge fee for their Freight Forwarding Services on all air cargo shipped around the world, including within, from and to the United States.

184.  Defendants made and implemented this agreement through the following meetings and communications, including through their trade association, Freight Forwarders Europe ("FFE"), later known as FFI starting in 2004.

185.  FFE is a freight forwarder trade group formed in 1994 by the eight largest Freight Forwarders in operation at the time:  ABX Logistics, Dachser, DHL, Ecxel, Geodix (Geodix Wilson); Geo Logistics (Agility); Kuehne + Nagel; Panalpina; and Schenker.

**The October 1, 2001 Conference Call Meeting**

186.  On or about October 1, 2001 a conference call was held by the members of the Air Freight Committee of the FFE.  This call lasted approximately 2 hours and 20 minutes.

187.  The FFE Air Freight Committee members on the call included at least the following Security Surcharge Defendants: Francesco Campironi of ABX, Tony Widmer and Holger Bilz of Danzas, Ole Ringheim of Exel, Dermot Leeper of Geo Logistics, Werner Blaser of Kuehne + Nagel, and Robert Frei of Panalpina.  Robert Frei of Panalpina was Chair of the FFE Air Freight Committee.  Ole Ringheim of Exel was Vice Chair of the FFE Air Freight Committee.

188.  During the October 1, 2001 conference call, the participating Security Surcharge Defendants agreed to impose on their customers a security surcharge of EURO 0.15 per kilo (or U.S. $0.13 per kilo) for air freight shipments anywhere including shipments into, out of, and within the U.S.  The exchange rate then was $0.13 for EURO 0.15.

189.  Pursuant to this agreement, the Security Surcharge Defendants and others did impose, and Plaintiffs and class members did pay, a security surcharge on such air freight shipments including shipments into, out of and within the United States.  The amount of such security surcharge was at least EURO 0.15 per kilo (approximately U.S. $0.13 per kilo).

190.  The Security Surcharge Defendants' illegal combination, conspiracy and agreement to fix, inflate and maintain security surcharges had a direct, substantial and foreseeable effect on United States commerce.  It resulted in inflated prices for U.S. Freight

Forwarding Services in the United States including on air cargo shipments into, from and within the United States.

**The October 3, 2001 Conference Call Meeting**

191.  On or about October 3, 2001, a conference call took place among members of the FFE CEO Committee.  This call lasted approximately 95 minutes.  Participants in this call included at least the following: two FFE secretariats (Alfons Westgeest and Marie Teresa Scardigli) as well as Wolfgang Suess of ABX, Peter Wagner of Danzas, John Allan of Exel, Steve Finch of Geo Logistics, Reinhard Lange of Kuehne + Nagel, and Bruno Sidler and Robert Frei of Panalpina.

192.  During the October 3, 2001 conference call meeting, the members of the FFE CEO Committee agreed that they should jointly offer to enter an agreement with various airlines to impose an increased security surcharge that would pay more revenues to the Security Surcharge Defendants.

**The October 4, 2001 Meeting**

193.  Pursuant to such agreement, on or about October 4, 2001, Robert Frei of Panalpina, representing the FFE Air Freight Committee, met in Frankfurt, Germany with Marc Boudier of Air France and Andreas Otto of Lufthansa.  Others whose identities presently are unknown to Plaintiffs also participated in this meeting.  At the Frankfurt meeting, the Security Surcharge Defendants jointly offered, in violation of U.S. antitrust laws, to enter an agreement with the foregoing airlines and others to increase the security surcharge on air freight, including air freight on shipments into, out of, and within the U.S.  This joint offer was subject to the proviso that part of such increase would be paid to the Security Surcharge Defendants.

194.  (a) The Security Surcharge Defendants' combination, conspiracy and agreement to fix, inflate and maintain prices for security surcharge fees on all air cargo shipped around the world, including within, from and to the United States violated Section 1 of the Sherman Antitrust Act.

(b)    Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c)    Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

## AS AND FOR A SECOND CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2002 Fuel Surcharges Agreement Made By Defendants Yusen Air & Sea Service Co., Ltd., Kintetsu World Express, Inc., Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin Express Holdings Corporation, Nissin Corporation, Vantec World Transport Co., Ltd., "K" Line Logistics, Ltd., Yamato Global Logistics Japan Co., Ltd., MOL Logistics (Japan) Co., Ltd., Hanshin Air Cargo Co., Ltd., United Aircargo Consolidators, Inc., and Airborne Express, Inc. (the "2002 Fuel Surcharges Agreement Defendants")**

195.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

196.  In August 2002 various airlines engaged in the international air transport business, decided to impose a fuel surcharge with respect to all freight loaded on aircraft departing from Japan.

197.  (a) Beginning at least as early as September 18, 2002 and continuing until a date unknown to plaintiffs, Defendants Yusen Air & Sea Service Co., Ltd., Kintetsu World Express, Inc., Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin Express Holdings Corporation, Nissin Corporation, Vantec World Transport Co., Ltd., "K" Line Logistics, Ltd., Yamato Global Logistics Japan Co., Ltd., MOL Logistics (Japan) Co., Ltd., Hanshin Air Cargo Co., Ltd., United

Aircargo Consolidators, Inc., and Airborne Express, Inc. combined, conspired and agreed to impose air freight fuel surcharges on their customers, including on flights between Japan and the U.S., whenever such Defendants were assessed such a fuel surcharge by an airline.

198.        (b)        In October 2002, various airlines began imposing the new fuel surcharge. Pursuant to their agreement alleged above, the Defendants alleged in the preceding sub-paragraph began charging their customers a corresponding fuel surcharge.

199.  No later than November 8, 2002, Defendants DHL Global Forwarding Japan K.K. and Nippon Express Co., Ltd. joined the agreement of the Defendants alleged in the preceding paragraph to impose such fuel surcharges.

200.  Pursuant to such agreement, the Fuel Surcharge Defendants imposed these fuel surcharges on their customers, including the Class herein, at rates no lower than the agreed minimum rate.

201.  Such Defendants made and implemented this agreement through, among other things:  (1) their membership in JAFA, and, more specifically JAFA's Executive Board of International Committee ("EBIC"); (2) attending an EBIC meeting on s September 18, 2008 at which such Defendants joined and engaged in a combination and conspiracy with the intent of suppressing and eliminating competition regarding fuel surcharges that were charged to customers in respect of freight loaded on aircrafts departing from Japan; (3) in order to ensure the effective implementation of the foregoing agreement, such Defendants mutually disclosed and exchanged information as to the collection of the fuel surcharge.

202.  The foregoing allegations are each based on and supported by the specific findings of the JFTC Cease and Desist Order which have been consented to or not contested by

all Fuel Surcharge Defendants except Yusen, K Line, Nishi-Nippon Rail and Vantec.

(Defendant Nissin is contesting only the amount of the JFTC's fine and not the findings.)

203.   (a) The Fuel Defendants' combination, conspiracy and agreement to fix, inflate and maintain the prices paid for U.S. Freight Forwarding Services on air cargo shipped from Japan to locations around the world, including within, from and to the United States violated Section 1 of the Sherman Antitrust Act.

(b)      Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c)      Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

### AS AND FOR A THIRD CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2002 New Export System Fee Agreement Made By Defendants DHL, Exel, Kuehne + Nagel, Eagle, Hellmann, Emery, UPS (a/k/a Menlo Worldwide), Geo Logistics, Walker Freight, and Bax (the "NES Defendants")**

204.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

205.   Beginning at least as early as October 1, 2002 and continuing until a date unknown to Plaintiffs, the NES Defendants and others combined, conspired and agreed to impose a New Export System ("NES") fee for air freight  shipments from Heathrow Airport in the United Kingdom to anywhere in the world, including flights to the United States.

206.   Such Defendants made and implemented this agreement through the use of code words and meetings held on or about October 1, 2002, in June 2004, and in October 2004 as alleged below.

207.  In 2002, the United Kingdom introduced the New Export System ("NES").  NES required shippers to electronically submit declarations to Her Majesty's Revenue and Customs ("HMRC").  NES applied to air and ocean shipments of exports out of the United Kingdom to anywhere in the world, including the United States.  HMRC required that the data contained in the declarations be filed therewith before freight could be shipped.

**The October 1, 2002 Meeting**

208.  In order to attempt to levy a fee on their customers in respect of this declaration, the following Defendants, together with others whose identities presently are not known to Plaintiffs, were invited to and participated in meetings on October 1, 2002:  DHL (Mark Warden), Exel (Douglas Overett), Kuehne + Nagel (Chris Edwards), Eagle (David Lara), Hellmann (Peter Cochrane), Emery (David Harrison), UPS (a/k/a Menlo Worldwide), Geo Logistics (Tony Russell), Walker Freight, and Bax.

209.  This meeting took place at Mama Mia, an Italian restaurant outside of London, in Staines, Middlesex, United Kingdom.  During the meeting, the NES Defendants agreed to implement an NES fee on their customers.  The participants also discussed how they would monitor each others' compliance with their agreement.  In order to monitor such compliance and otherwise, the participants alleged above in the October 1st meeting were invited to and attended meetings in June and November 2004.

210.  Because the NES Defendants and other participants knew that their meetings and activities were unlawful, they created code words to use for themselves, their meetings, the agreed upon charge, etc.

211.  For example, they referred to themselves interchangeably as the "Heathrow Garden Club," the "Heathrow Club" or the "Garden Club."  They referred to the NES

fee as "asparagus" or "marrow." They referred to the conspirators as members of the "Club"; "planters" or "gardeners." They referred to their companies participating in the conspiracy as "greenhouses." They referred to their meetings as "horticultural reviews."

212. Pursuant to the NES Defendants' foregoing agreement, they imposed NES fees on their customers, including members of the Class herein, which inflated prices for U.S. Freight Forwarding Services for imports from Heathrow airport into the United States.

213. (a) The NES Defendants' combination, conspiracy and agreement to fix, inflate and maintain prices for NES fees on air cargo shipments from Heathrow to the United States and other countries violated Section 1 of the Sherman Antitrust Act.

(b) Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c) Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

**AS AND FOR A FOURTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT**

**2004 U.S. Customs "AMS" Charge Agreement Made By Defendants Nippon Express Co., Ltd., Yusen Air & Sea Service Co., Ltd., Kintetsu World Express, Inc., Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin Express Holdings Corporation, Nissin Corporation, Vantec World Transport Co., Ltd., "K" Line Logistics, Ltd., Yamato Global Logistics Japan Co., Ltd., MOL Logistics (Japan) Co., Ltd., Hanshin Air Cargo Co., Ltd., United Aircargo Consolidators, Inc., and DHL Global Forwarding Japan K.K. (the "AMS Defendants")**

214. Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

215. Beginning on or about November 22, 2004 and continuing until a date unknown to Plaintiffs, the AMS Defendants combined, conspired or agreed to fix, inflate and

maintain an AMS charge of at least 500 yen on flights for U.S. Freight Forwarding Services on air cargo flights between Japan and the United States.

216.   The AMS Defendants made and implemented this agreement through the following meetings and communications, including through:  (1) their membership in JAFA, and, more specifically JAFA's Executive Board of International Committee ("EBIC"); (2) attending an EBIC meeting on November 22, 2004 (see ¶218 below); and (3) in order to ensure the effective implementation of the foregoing agreement, such Defendants mutually disclosed and exchanged information as to the collection of the AMS charge.

**The November 22, 2004 Meeting**

217.   In or around August 2004, various airlines began phasing in a new fee supposedly designed to cover U.S. customs costs.

218.   On or about November 22, 2004, an EBIC meeting took place and was attended by representatives from the AMS Defendants.  During this meeting, the AMS Defendants agreed among themselves to impose on their customers an additional charge, the "AMS charge."  They further agreed that this charge was to be set at a rate no lower than the agreed minimum rate of 500 yen and would (at the very least) pass on to their customers the airlines' charge.

219.   The AMS Defendants imposed these agreed upon AMS surcharges on their customers, at rates no lower than the agreed minimum rate, by December 13, 2004 or, at the very latest, January 1, 2005.  This substantially restricted U.S. import commerce on air cargo flights between Japan and the United States.

220.   The foregoing allegations are each based on and supported by the specific findings of the JFTC Cease and Desist Order which have been consented to or not contested by

all AMS Defendants except Yusen, K Line, Nishi-Nippon Rail and Vantec.  (Defendant Nissin is contesting only the amount of the JFTC's fine and not the JFTC's findings.)

221.  (a) The AMS Defendants' combination, conspiracy and agreement to fix, inflate and maintain prices for AMS fees on air cargo shipments between Japan and the United States violated Section 1 of the Sherman Antitrust Act.

(b)       Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c)       Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

## AS AND FOR A FIFTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2005 Chinese Currency Adjustment Factor ("CAF") Surcharges Agreement Made By Defendants Exel, DHL, Eagle, Expeditors, Kuehne + Nagel, Panalpina, UPS, Kintetsu World Express, Yusen, Nippon Express, SDV, Dachser, Schenker, and Bax Global (the "CAF Surcharge Defendants")**

222.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

223.  Beginning in July 2005 and continuing until a date unknown to Plaintiffs, the CAF Surcharge Defendants and others not presently known to Plaintiffs, combined, conspired and agreed to fix and maintain the Chinese Currency Adjustment Factor ("CAF") Surcharge for air cargo shipments between Asia, including China, and worldwide locations, including the United States.

224.  The CAF Surcharge Defendants made and implemented this agreement through the following meetings and communications.

225.  The official currency of the People's Republic of China ("PRC") is the Renminbi ("RMB").  The People's Bank of China, the PRC's monetary authority, issues the Chinese currency.  Until July 2005 the RMB was pegged to the U.S. Dollar at 8.28 RMB.

226.  On July 21, 2005 the People's Bank of China announced that the RMB was no longer pegged to the U.S. Dollar and instead was revalued at 8.11 RMB per U.S. Dollar. From that point on the People's Bank of China pegged the RMB to a basket of foreign currencies, rather than only to the U.S. Dollar.

227.  In July 2005 Sebastian Chan, a Sales Director of Defendant Exel, contacted a colleague at Defendant Bax Global and suggested that Defendants meet to discuss this development and address how best to respond to the change in currency valuation.

**The July 27, 2005 Meeting**

228.  On or about July 27, 2005 at the Renaissance Yangtze Hotel in Shanghai, representatives of at least Exel, DHL, Eagle, Kuehne + Nagel, Panalpina, Nippon Express, Kintetsu World Express, UPS, Yusen and Bax Global met for approximately two hours.

229.  The meeting focused on planned collusive actions that the CAF Surcharge Defendants would take to inflate their Chinese currency adjustment.  The CAF Surcharge Defendants agreed during this meeting to establish and impose a CAF Surcharge.  In particular, the CAF Surcharge Defendants agreed that:

a.      Business subject to existing long-term contracts will be subject to a CAF Surcharge of 2.1%;

b.      As of August 1, 2005 all new air freight business will be quoted in RMB, not U.S. dollars; and

c.      When existing contracts came up for renewal and/or negotiations, future

quotes would be made in RMB instead of U.S. dollars.
Each of the CAF Surcharge Defendants agreed to notify their customers by letter of these new
terms.

230.  The CAF Surcharge Defendants also agreed to communicate with one
another and report their progress and success in implementing these agreements.

231.  One method by which they implemented their agreement and reported to
one another was to establish a special, joint email address, rmb_rates_china@yahoo.com.

232.  The CAF Surcharge Defendants' email distribution list for this matter was
named "logisticscommunity."  The address book of "logisticscommunity" included at least the
following Defendants:  Holger Beyer and Jochen Thewes of Kuehne + Nagel; Sebastian Chan,
Kenneth Mak and Steven Wong of Exel; Th Chiu of Expeditors; Damon Wong of UPS; Linda
Yang of Eagle; Xie Simon of ABS Logistics; Toshiaki Enokido and Jerry Liu of Yusen; Thomas
Gronen of Panalpina; Steve Huang, Maxwell Huang and Richard Huang of DHL; Sam Chen and
Rong Mo of Kintetsu; Berry Lin of SDV; Shinya Suto of Nippon Express; James Gagne and
Chaminda Gunasekera of Bax Global; and Gerhard Blumensaat of Schenker (the "Yahoo
Group").

233.  In furtherance of their agreement, the CAF Surcharge Defendants
circulated among themselves a draft letter to customers which included the components of the
agreements set forth above.

234.  Starting in late July 2005 the CAF Surcharge Defendants began sending
essentially identical letters to their customers.  For instance, on July 29, 2005, Kuehne + Nagel
sent such a letter to its customers, and on August 1, 2005, Holger Bayer of Kuehne + Nagel
emailed several Defendants who had attended the July 27 meeting to assure them that Kuehne +

Nagel had sent the agreed upon letter to its clients.  Beyer's email confirmation was sent to Soren Poulsen at Kuehne + Nagel; Shinya Suto of Nippon Express; Sebastian Chan and Kenneth Mak of Exel; Linda Yang of Eagle; Maxwell Huang and Steve Huang of DHL; Damon Wong of UPS; Jerry Liu of Yusen; Thomas Gronen of Panalpina; and to the aforementioned Yahoo Group.

235.  For another example, on August 4, 2005, Defendant Panalpina sent a similar letter to its customers.  Thereafter, Thomas Gronen of Panalpina emailed other Freight Forwarders to assure them that Panalpina had sent its customers the agreed-upon letter.  Mr. Gronen's confirmatory email was sent at least to the following Defendants, and possibly others: Sam Chen of Kintetsu; Sebastian Chan, Steve Wong and Kenneth Mak of Exel; Shinya Suto of Nippon Express; Steve Huang of DHL; Damon Wong of UPS; Linda Yang of Eagle; Berry Lin of SDV; Toshiaki Enokido and Jerry Liu of Yusen; Jochen Thewes and Holger Beyer of Kuehne + Nagel; and the aforementioned Yahoo Group.

236.  For yet another example, on August 9, 2005 Berry Lin of SDV emailed the other CAF Surcharge Defendants to inform them that two of SDV's customers had accepted the CAF Surcharge.  Lin's email was sent to at least the following Defendants:  Lin Zhihong of Panalpina; Kenneth Mak of Exel; Holger Beyer and Jochen Thewes of Kuehne + Nagel; Toshiaki Enokido and Jerry Liu of Yusen; Linda Yang of Eagle; Steven Wong and Sebastian Chan of Exel; Thomas Gronen of Panalpina; Sam Chen of Kintetsu; Damon Wong of UPS; Shinya Suto of Nippon Express; and Steve Huang and Maxwell Huang of DHL.

**The August 12, 2005 Meeting**

237.  On or about August 12, 2005 CAF Surcharge Defendants met again, this time at the Radisson New World Hotel in Shanghai.  In attendance were, among others, the following: Holger Beyer and Jochen Thewes of Kuehne + Nagel; Sebastian Chan, Kenneth Mak

and Steve Wong of Exel; Gerhard Blumensaat of Schenker; Sam Chen of Kintetsu; Steve Huang

and Maxwell Huang of DHL; Toshiaki Enokido and Jerry Liu of Yusen; Xie Simon of ABX;

Damon Wong of UPS; Linda Yang of Eagle; Shinya Suto of Nippon Express; and James Gagne

of Bax Global.

238.  At this meeting, the representatives from such CAF Surcharge Defendants

shared progress reports confirming the implementation of their agreements regarding the CAF

Surcharge.

239.  They discussed reactions of their respective customers to Defendants'

letters referenced above.

**The September 15, 2005 Meeting**

240.  On or about September 15, 2005, CAF Surcharge Defendants met again,

this time at the Howard Johnson Plaza Hotel in Shanghai, to confirm and discuss their adherence

to and implementation of the CAF Surcharge and related issues.  This meeting was sponsored by

DHL and Kuehne + Nagel.

241.  Defendants' representatives invited to and in attendance at this meeting

included at least:  Berry Lin of SDV, Holger Beyer and Soren Poulsen of Kuehne + Nagel;

Connie Xu, James Sung, Kenneth Mak and Sam Wong of Exel; Rong Mo, Sam Chen, Toru

Katayama, Toshimichi Inamura and Yoshihiro Shirai of Kintetsu; Steve Huang and Maxwell

Huang of DHL; Jerry Liu, Toshi Okita, T. Anda and T. Takahashi of Yusen; Damon Wong of

UPS; Linda Yang of Eagle; Thomas Gronen of Panalpina; Christophe Vincent of Dachser;

Gerhard Blumensaat of Schenker; James Gagne of Bax Global; and Kobayashi Matsuo and

Shinya Suto of Nippon Express.

242.  At this meeting, the companies shared progress reports concerning the implementation of their agreements regarding the CAF Surcharge.

**The November 18, 2005 Meeting**

243.  On or about November 18, 2005, CAF Surcharge Defendants met again, this time at the Shanghai Marriott Hotel Hongqiao, to discuss implementation of their CAF Surcharge agreement.  Representatives from at least DHL, Bax Global, Exel, Eagle, Kuehne + Nagel, Dachser and Kintetsu attended this meeting.  Once again, the CAF Surcharge Defendants shared progress reports concerning the implementation of their agreements regarding the CAF Surcharge.

244.  After this meeting, Maxwell Huang of DHL circulated minutes of this meeting.  Mr. Huang distributed the meeting minutes from his hotmail e-mail address, not his DHL e-mail address.

245.  The meeting minutes confirmed that the CAF Surcharge Defendants had been successful in implementing their agreement regarding the CAF Surcharges with respect to small and medium clients.  But such Defendants wanted to formulate a uniform approach in order to increase their success in forcing more of their largest customers to submit to CAF Surcharges.

**The November 21, 2005 Conference Call**

246.  On or about November 21, 2005, CAF Surcharge Defendants held a conference call to follow up on the November 18 meetings.  Invited to participate in this call were representatives of at least the following Defendants: DHL, Schenker, Bax, Exel, Kintetsu, Eagle and Kuehne + Nagel.  Many did participate in this November 25 conference call.  Once

again, the companies confirmed and discussed their implementation of their agreements regarding the CAF Surcharge.

**The March 13, 2006 Meeting**

247.  On or about March 13, 2006 the CAF Surcharge Defendants met again, this time at the Hotel Inter-Continental Pudong in Shanghai to discuss the status of their agreements and to follow up on implementation.  Defendants invited to the meeting included J. Sung of Exel; Steve Huang of DHL; Sven Koethe and Gerhard Blumensaat of Schenker; Rong Mo of Kintetsu; Thomas Li of Eagle; Thomas Gronen of Panalpina, C. Sebastian of UPS; and Soren Poulsen of Kuehne + Nagel.

248.  At this meeting, Defendants discussed the implementation of their agreement regarding the CAF Surcharge, the further appreciation of the RMB against the U.S. Dollar, and increasing the agreed-upon CAF Surcharge.  During and shortly after this meeting, the CAF Surcharge Defendants agreed to increase the CAF surcharge to 3%.

249.  (a) The CAF Defendants' combination, conspiracy and agreement to fix, inflate and maintain prices for CAF fees for air cargo shipments between Asia, including China, and worldwide locations, including the United States violated Section 1 of the Sherman Antitrust Act.

(b)     Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c)     Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

**AS AND FOR A SIXTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT**

**2005 CAF Factor Surcharge - Shanghai International Freight Forwarders Association ("SIFFA") Agreement Made By Defendants Kuehne + Nagel; Exel; Expeditors; UPS; Eagle; ABS Logistics; Yusen; Panalpina; DHL; Kintetsu; SDV; Nippon Express; Bax Global and SIFFA (the "CAF Surcharge – SIFFA Defendants")**

250.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

251.  The Shanghai International Freight Forwarder Association ("SIFFA") includes as members the CAF Surcharge Defendants plus many other members.

252.  Between October 2005 and a date unknown to Plaintiffs, the CAF Surcharges – SIFFA Defendants combined, conspired and agreed with one another to impose a CAF Surcharge.

253.  Pursuant to this agreement, SIFFA issued to its members two circulars recommending that all SIFFA members implement such currency adjustments.

254.  On or about October 15, 2005, SIFFA issued a circular suggesting to its members to implement a 2.1% CAF Surcharge.

255.  On or about March 29, 2006, SIFFA issued a second circular suggesting to its members to implement a CAF Surcharge increase from 2.1% to 3.0%.  It also advised its members that further increases may be necessary.

256.  In each instance, pursuant to such unlawful agreement, many SIFFA members did implement such charges.

257.  (a) The CAF Surcharge – SIFFA Defendants combination, conspiracy and agreement to fix, inflate and maintain prices for CAF fees for air cargo shipments between Asia, including China, and worldwide locations, including the United States violated Section 1 of the Sherman Antitrust Act.

-64-

(b)      Such unlawful agreement had a direct, substantial and foreseeable effect on U.S.

trade and commerce, including U.S. import trade and commerce.

(c)      Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding

Services by Plaintiffs and Class members.

### AS AND FOR A SEVENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2005 Peak Season Surcharge Agreement Made By Defendants Baltrans, DHL Danzas, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, UPS, Hellmann, SDV, ABX Logistics, Jet Speed, DFDS Transport, Morrison Express, and UTi (the "Peak Season  Surcharge Defendants")**

258.  Plaintiffs re-allege and incorporate by reference each and every allegation

set forth above.

259.  Beginning at least as early as August 2005 and continuing until at least to

May 2007, the Peak Season Surcharge Defendants combined, conspired and agreed to impose a

peak season surcharge on air cargo shipments during specified times.

260.  Such Defendants formed, implemented, and monitored their conspiracy

during a series of meetings, including meetings sometimes known as "Breakfast Meetings."

261.   Invitations to these meetings were typically sent via electronic mail by an

employee of DHL, Maria Lee, on behalf of DHL executive, Kelvin Leung.

### 1.      The August 9, 2005 Meeting

262.  On August 3, 2005, Mr. Leung, via Maria Lee, sent electronic mail

invitations for a meeting on August 9, 2005, to Baltrans (Kelly King), DHL Danzas (Roland

Wong), Expeditors (Ronald Wong),[2] Exel (Michael Yuen), Geo Logistics (Ricky Lam), Kuehne

---

[2] It is presently unknown to Plaintiffs whether Ronald Wong was still employed by Defendant Expeditors during the time Defendants and others met and agreed upon peak season

+ Nagel (Joerg Bull),  Panalpina (Markus Muecke), Schenker (Andreas Becker), Bax Global

(Danny Chan) and UPS (Josef Ko)

263.  On August 9, 2005, such representatives from Defendants Baltrans, DHL

Danzas, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, UPS and

other Defendants whose identities are not known to Plaintiffs Defendants met at a coffee shop in

the Grand Hyatt Hotel in Wan Chai, Hong Kong SAR, China.

264.  Such Defendants agreed during their meeting to implement a peak season

surcharge on air cargo shipments beginning in September 2005.

### 2.      The September 21, 2005 Meeting

265.  On September 13, 2005, Mr. Leung, via Maria Lee sent electronic mail

invitations for another meeting, this time on September 21, 2005, to Baltrans (Kelly King), DHL

Danzas (Roland Wong), Expeditors (Ronald Wong), Exel (Michael Yuen), Geo Logistics (Ricky

Lamb), Kuehne + Nagel (Joerg Bull),  Panalpina (Markus Muecke), Bax (Danny Chan),

Schenker (Andreas Becker), and UPS (Josef Ko).

266.  On September 21, 2005, these Defendants and other parties whose

identities presently are not known to Plaintiffs met again at a coffee shop in the Grand Hyatt

Hotel in Wan Chai, Hong Kong SAR, China.

267.  At a minimum, representatives from Baltrans, DHL Danzas, Exel,

Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, and UPS participated in

the meeting.

268.  The meeting participants again discussed and agreed upon the peak season

surcharge, and updated one another on their respective progress in implementing the surcharge.

surcharges, as alleged in this Complaint, or whether Mr. Wong had commenced employment

### 3.    The December 6, 2005 Meeting

269.  On November 28, 2005, Mr. Leung, via Maria Lee, sent electronic mail invitations for another meeting, this time on December 6, 2005, to Baltrans (Kelly King), DHL Danzas (Roland Wong), Expeditors (Ronald Wong), Exel (Michael Yuen), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull),  Panalpina (Markus Muecke), Bax (Danny Chan), Schenker (Andreas Becker), and UPS (Josef Ko).

270.  On December 6, 2005, these Defendants and other parties whose identities presently are not known to Plaintiffs met again at a coffee shop located in the Grand Hyatt Hotel in Wan Chai, Hong Kong SAR, China.

271.  At a minimum, representatives from Baltrans, DHL Danzas, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, and UPS participated in the meeting.

272.  At the meeting, Defendants and the other participants discussed and agreed to extend and continue charging their customers the peak season surcharge.

273.    (a) The Peak Season Surcharge Defendants combination, conspiracy and agreement to fix, inflate and maintain prices for peak season surcharges on air cargo shipments during specified times, including shipments into, out of, or within the United States violated Section 1 of the Sherman Antitrust Act.

(b)    Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c)    Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

with Defendant DHL Danzas.

## AS AND FOR A EIGHTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2006 Peak Season Surcharge Agreement Made By Defendants Baltrans, DHL Danzas, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, UPS, Hellmann, SDV, ABX Logistics, Jet Speed, DFDS Transport, Morrison Express, and UTi (the "Peak Season Surcharge Defendants")**

274.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

### 1.      January 4, 2006 Meeting

275.  On January 4, 2006, Mr. Leung, via Maria Lee, again sent electronic mail invitations for a meeting on January 13, 2006 to Baltrans (Kelly King), DHL Danzas (Roland Wong), Exel (Michael Yuen), Expeditors (Ronald Wong), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull),  Panalpina (Markus Muecke), Bax (Danny Chan), Schenker (Andreas Becker), and UPS (Josef Ko).  In addition, electronic mail invitations were also sent to Hellmann (Andy Poon, Mark Hellman, and Nelson Lai), SDV (an individual using an email address with the name "i.fok") and ABX Logistics (Michael Groebosch).

276.  On January 13, 2006, representatives from Defendants Baltrans, DHL Danzas, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, UPS, Hellmann, SDV, ABX Logistics and other parties whose identities presently are not known to Plaintiffs met again, this time at the China Club on the 13th Floor of the Bank of China building in Central Hong Kong SAR, China.

277.  The participants discussed and provided each other with a regular update of their extension and implementation of the peak season surcharge.

### 2.      The February 3, 2006 Meeting

278.  On January 17, 2006, Mr. Leung, via Maria Lee, sent electronic mail invitations for another meeting, this time on February 3, 2006 to Baltrans (Kelly King), DHL Danzas (Roland Wong), Exel (Michael Yuen), Expeditors (Ronald Wong), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull),  Panalpina (Markus Muecke), Bax (Danny Chan), Schenker (Andreas Becker), UPS (Josef Ko), ABX Logistics (Michael Groebosch), Hellmann (Andy Poon, Mark Hellman, and Nelson Lai), and SDV (again to the "i.fok" email address).

279.  On February 3, 2006, representatives from Baltrans, DHL Danzas, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, UPS, ABX Logistics, Hellmann, and SDV and other parties whose identities presently are not known to Plaintiffs, met again at the China Club on the 13th Floor of the Bank of China building in Central Hong Kong SAR, China.

280.  The participants discussed and provided each other with a regular update of their extension and implementation of the peak season surcharge.

**3.      The June 23, 2006 Meeting**

281.  On June 12, 2006, Mr. Leung, via Maria Lee, sent electronic mail invitations for a meeting on June 23, 2006 to Baltrans (Kelly King), DHL Danzas (Roland Wong), Exel (Michael Yuen), Expeditors (Ronald Wong), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull),  Panalpina (Markus Muecke), Bax (Danny Chan), Schenker (Andreas Becker), UPS (Josef Ko), ABX Logistics (Michael Groebosch), Hellmann (Andy Poon, Mark Hellman, and Nelson Lai), and SDV (again to the "i.fok" email address).  This time Mr. Leung also invited Jet Speed (Antonio M. da Silva), DFDS Transport (P. Minor), Morrison Express (Nelson Wong) and UTi (Mabel Wong).

282.  On June 23, 2006, representatives from Defendants Baltrans, DHL Danzas, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, UPS, ABX Logistics, Hellmann, SDV, Jet Speed, DFDS Transport, Morrison Express, UTi and other parties whose identities presently are not known to Plaintiffs met again at the China Club on the 13th Floor of the Bank of China building in Central Hong Kong SAR, China.

283.  Once again, the participants discussed and agreed upon the peak season surcharge.  The topics of discussion also included market information exchanges and the further schedule for continued implementation of the peak season surcharge.  The participants agreed to institute the peak season surcharge beginning in August 2006.  The participants expressly agreed to implement their agreed upon peak season surcharge on air cargo flights from Hong Kong SAR, China to the United States.

284.  Pursuant to this agreement, the 2006 Peak Season Surcharge Defendants did impose such a 2006 surcharge on air cargo shipments on August 1, 2006.

285.  (a) The Peak Season Surcharge Defendants combination, conspiracy and agreement to fix, inflate and maintain prices for peak season surcharges on air cargo shipments during specified times, including shipments into, out of, or within the United States violated Section 1 of the Sherman Antitrust Act.

(b)  Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c)  Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

**AS AND FOR A NINTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT**

**2007 Peak Season Surcharge Agreement Made By Defendants Baltrans, DHL Danzas, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, UPS, Hellmann, SDV, ABX Logistics, Jet Speed, DFDS Transport, Morrison Express, and UTi (the "Peak Season Surcharge Defendants")**

286.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

### 1.        The May 21, 2007 Meeting

287.  On May 3, 2007, Mr. Leung sent electronic mail invitations for a meeting on May 21, 2007, to Baltrans (Kelly King), DHL Danzas (Roland Wong), Exel (Michael Yuen), Expeditors (Ronald Wong), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull), Panalpina (Markus Muecke), Bax (Danny Chan), Schenker (Andreas Becker), UPS (Josef Ko), ABX Logistics (Michael Groebosch), Hellmann (Andy Poon, Mark Hellman, and Nelson Lai), SDV ( again to the "i.fok" email address), Jet Speed (Antonio M. da Silva), DFDS Transport (P. Minor), Morrison Express (Nelson Wong) and UTi (Mabel Wong).

288.  On May 21, 2007, these Defendants and other parties whose identities presently are not known to Plaintiffs met again at the China Club located in the Bank of China building in Central Hong Kong SAR, China.  This time apparently the meeting took place on the 15th rather than the 13th Floor of the Bank of China building.

289.  Once again, the participants discussed and agreed upon the peak season surcharge for 2007.  The topics of discussion also included market information exchanges.

290.  Pursuant to this agreement, such Defendants implemented peak season surcharges for U.S. Freight Forwarding Services on air cargo shipments during specified times.

291.  (a) The Peak Season Surcharge Defendants combination, conspiracy and agreement to fix, inflate and maintain prices for peak season surcharges on air cargo shipments

during specified times, including shipments into, out of, or within the United States violated

Section 1 of the Sherman Antitrust Act.

(b)     Such unlawful agreement had a direct, substantial and foreseeable effect on U.S.

trade and commerce, including U.S. import trade and commerce.

(c)     Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding

Services by Plaintiffs and Class members.

### AS AND FOR A TENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2006 Surcharges Agreement Made By Nippon Express Co., Ltd., Yusen Air & Sea Service Co., Ltd., Kintetsu World Express, Inc., Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin Express Holdings Corporation, Nissin Corporation, Vantec World Transport Co., Ltd., "K" Line Logistics, Ltd., Yamato Global Logistics Japan Co., Ltd., MOL Logistics (Japan) Co., Ltd., Hanshin Air Cargo Co., Ltd., United Aircargo Consolidators, Inc., and DHL Global Forwarding Japan K.K. (the "2006 Surcharge Defendants")**

292.   Plaintiffs re-allege and incorporate by reference each and every allegation

set forth above.

293.   Beginning prior to February 20, 2006 and continuing until a date unknown

to Plaintiffs, Defendants Nippon Express Co., Ltd., Yusen Air & Sea Service Co., Ltd., Kintetsu

World Express, Inc., Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin Express Holdings

Corporation, Nissin Corporation, Vantec World Transport Co., Ltd., "K" Line Logistics, Ltd.,

Yamato Global Logistics Japan Co., Ltd., MOL Logistics (Japan) Co., Ltd., Hanshin Air Cargo

Co., Ltd., United Aircargo Consolidators, Inc., and DHL Global Forwarding Japan K.K.

combined, conspired and agreed to fix, impose and maintain two new surcharges, a "security

charge" and an "explosives examination charge," at rates no lower than the agreed minimum

rates of 300 yen and 1,500 yen, respectively, on air cargo flights between Japan and the U.S.

294.  The 2006 Surcharge Defendants reached such agreement, among other ways, during EBIC meetings of the Japan Aircargo Forwarders Association held prior to February 20, 2006.

295.  Pursuant to such agreement, each of such Defendants imposed the above alleged security and explosives examination surcharges on their customers, including the Class herein, at rates no lower than the agreed minimum rate.  This substantially restricted competition.

296.  Defendants also used EBIC meetings after February 20, 2006 to exchange information regarding the status of the security and explosives examination surcharges, and otherwise to implement and monitor their conspiracy.

297.  The foregoing allegations are each based on and supported by the specific findings of the JFTC Cease and Desist Order which have been consented to or not contested by all these Defendants except Yusen, K Line, Nishi-Nippon Rail and Vantec.  (Defendant Nissin is contesting only the amount of the JFTC's fine and not the JFTC's findings.)

298.  (a) The 2006 Surcharge Defendants combination, conspiracy and agreement to fix, inflate and maintain prices for "security charges" and "explosives examination charges" on air cargo flights between Japan and the U.S and violated Section 1 of the Sherman Antitrust Act.

(b)	Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c)	Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

## AS AND FOR AN ELEVENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

299.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

300.  Between at least as early as October 2001 and continuing until at least October 2004, Defendants ABX Logistics, Dachser, DHL, Exel, Geodix (Geodix Wilson); Geo Logistics (n/k/a Agility); Kuehne + Nagel; Panalpina; Hellmann; Emery; UPS (a/k/a Menlo Wordwide), Walker Freight; Bax Global; and Schenker combined, conspired or agreed to fix, inflate and impose new charges for Freight Forwarding Services, including U.S. Freight Forwarding Services, on air cargo routes between Europe and the U.S.

301.  Such Defendants formed and implemented this overarching agreement through, among other steps:

  i.  the 2001 Security Surcharge Agreement(¶¶182-194); and

  ii.  the 2002 New Export System Fee Agreement (¶¶195-203).

302.  This overarching agreement, conspiracy or combination to impose new charges had the following effects, among others:

  a.  The foregoing Defendants' charges and  prices for U.S. Freight Forwarding Services on such routes were raised, fixed, and maintained;

  b.  Plaintiffs and the other members of the Class were deprived of the benefits of free and open competition in the purchase of U.S. Freight Forwarding Services on such routes; and

  c.  Price competition in the sale of U.S. Freight Forwarding Services for such routes was restrained, suppressed, and/or eliminated.

303.  (a) Defendants combined, conspired or agreed to fix, inflate and impose new charges for Freight Forwarding Services, including U.S. Freight Forwarding Services, on air cargo routes between Europe and the U.S. and violated Section 1 of the Sherman Antitrust Act.

(b)      Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c)      Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

### AS AND FOR A TWELFTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

304.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

305.  In the alternative or additionally Plaintiffs allege the following three per se violations of Section 1 of the Sherman Antitrust Act.

306.   Between at least as early as August 2002 and continuing until at least November 2007, Defendants Nippon Express Co., Ltd.; Yusen Air & Sea Service Co., Ltd.; Kintetsu World Express, Inc.; Nishi-Nippon Railroad Co., Ltd.; Hankyu Hanshin Express Holdings Corporation; Nissin Corporation; Vantec Corporation Co., Ltd.; "K" Line Logistics, Ltd.; Yamato Global Logistics Japan Co., Ltd.; MOL Logistics (Japan) Co., Ltd.; Hanshin Air Cargo Co., Ltd.; United Aircargo Consolidators, Inc.; DHL Global Forwarding Japan K.K.; and Airbourn Express, Inc. combined, conspired or agreed to fix, inflate and impose new charges for Freight Forwarding Services, including U.S. Freight Forwarding Services, on air cargo routes between Japan and the U.S.

307.  Such Defendants formed and implemented this overarching agreement through, among other steps:

  i. meetings at the Japanese Freight Forwarder Association  during which Defendants discussed and agreed upon multiple types of co-operation;

  ii. the 2002 Fuel Surcharges Agreement (¶¶204-213);

  iii. the 2004 U.S. Customs "AMS" Charge Agreement (¶¶214-221); and

  iv. the 2006 Security and Explosives Examination Surcharges Agreement (¶¶291-298).

308.  This overarching agreement, conspiracy or combination to impose new charges for Freight Forwarding Services on U.S. Japan air cargo routes, had the following effects, among others:

a. The foregoing Defendants' charges and prices for U.S. Freight Forwarding Services on the U.S.-Japan air cargo routes were raised, fixed, and maintained;

b. Plaintiffs and the other members of the Class were deprived of the benefits of free and open competition in the purchase of U.S. Freight Forwarding Services on such routes; and

c. Price competition in the sale of U.S. Freight Forwarding Services for such routes was restrained, suppressed, and/or eliminated.

309.  (a) Defendants combined, conspired or agreed to fix, inflate and impose new charges for Freight Forwarding Services, including U.S. Freight Forwarding Services, on air cargo routes between Japan and the U.S. and violated Section 1 of the Sherman Antitrust Act.

(b) Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

(c) Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

-76-

## AS AND FOR A THIRTEENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

310.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

311.  Between at least as early as May 2005 and continuing until a date unknown to Plaintiffs, Defendants Baltrans; DHL Danzas; Kuehne + Nagel; Exel; Expeditors; UPS; Eagle; ABS Logistics; Yusen; Panalpina; DHL; Kintetsu; SDV; Nippon Express; Bax Global; Geo Logistics; Bax; Schenker; Hellmann; SDV; ABX Logistics; Jet Speed, DFDS Transport; Morrison Express; and UTi combined, conspired or agreed to fix, inflate and impose new charges for U.S. Freight Forwarding Services on air cargo routes between the U.S. and Asia, including between the U.S. and Hong Kong SAR, China and other points in China.

312.  The foregoing Defendants formed and implemented this overarching agreement through, among other steps:

    i.   meetings to agree to fix prices;

    ii.   the 2005 Chinese Currency Adjustment Factor Agreement (¶¶222-249);

    iii.   the 2005 CAF-Shanghai Freight Forwarders Association Agreement(¶¶250-257);

    iv.   the 2005 Peak Season Surcharge Agreement (¶¶258-273);

    v.   the 2006 Peak Season Surcharge Agreement (¶¶274-285); and

    vi.   the 2007 Peak Season Surcharge Agreement (¶¶286-291).

313.  This overarching agreement, conspiracy or combination to impose new charges had the following effects, among others:

a.      The foregoing Defendants' charges and prices charged for U.S. Freight

Forwarding Services for air cargo routes between Asia and the U.S. were raised, fixed,

and maintained;

b.      Plaintiffs and the other members of the Class were deprived of the benefits

of free and open competition in the purchase of U.S. Freight Forwarding Services on

such routes; and

c.      Price competition in the sale of U.S. Freight Forwarding Services for such

routes was restrained, suppressed, and/or eliminated.

314.  (a) Defendants combined, conspired or agreed to fix, inflate and impose

new charges for Freight Forwarding Services, including U.S. Freight Forwarding Services, on air

cargo routes between the U.S. and Hong Kong SAR, China and other points in China. and

violated Section 1 of the Sherman Antitrust Act.

(b)      Such unlawful agreement had a direct, substantial and foreseeable effect on U.S.

trade and commerce, including U.S. import trade and commerce.

(c)      Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding

Services by Plaintiffs and Class members.

**AS AND FOR A FOURTEENTH CLAIM FOR *PER SE* VIOLATIONS OF
SECTION 1 OF THE SHERMAN ACT**

315.  Plaintiffs re-allege and incorporate by reference each and every allegation

set forth above.

316.  During the dates previously alleged, the Defendants previously alleged

have made at least the agreements, conspiracies or combinations previously alleged and taken at

least those overt acts previously alleged, each in unreasonable restraint of interstate trade and

commerce and per se violation of Sections 1 and 3 of the Sherman Antitrust Act:

    i.  the 2001 Security Surcharge Agreement (¶¶182-194);

    ii.  the 2002 Fuel Surcharges Agreement (¶¶195-203);

    iii.  the 2002 New Export System Fee Agreement (¶¶204-213);

    iv.  the 2004 U.S. Customs "AMS" Charge Agreement (¶¶214-221);

    v.  the 2005 Chinese Currency Adjustment Factor Agreement (¶¶222-249);

    vi.  the 2005 CAF-Shanghai Freight Forwarders Association Agreement(¶¶250-257);

    vii.  the 2005 Peak Season Surcharge Agreement (¶¶258-273);

    viii.  the 2006 Peak Season Surcharge Agreement (¶¶274-285);

    ix.  the 2007 Peak Season Surcharge Agreement (¶¶286-291);

    x.  the 2006 Security and Explosives Examination Surcharges Agreement (¶¶291-298); and

    xi.  the other unlawful agreements previously alleged herein.

317.  Plaintiffs have not had discovery and do not know either (a) all of the (alleged) agreements by which Defendants have fixed prices for freight forwarding services on air or ocean cargo routes (see ¶ 3(b) *supra*) nor (b) all the reasons why Defendants engaged in so many (alleged) agreements to fix prices from late 2001 until the competition authorities began to investigate in 2007.

318.  However:

(a)    Each Defendant engaged in the same highly unusual parallel omissions consisting of the failures to employ or enforce proper antitrust compliance procedures, and to employ proper antitrust compliance personnel.

(b)     Moreover, the legal compliance culture of the operating personnel of a company is usually set by the top of the company through the priorities of the directions, other acts, and omissions of the CEO.

(c)     Here, the CEOs of the Defendants omitted to insure antitrust compliance.

(d)     Moreover, the CEOs of the Defendants in the Security Surcharge Agreement actively participated in and/or furthered the making of such unlawful agreement.

(e)     Apparently, the first such agreement among any Defendants to fix a new charge was the 2001 Security Surcharge Agreement.

(f)     This agreement involved a meeting of the highest level executives (the Chief Executives) the highest companies within certain Defendants.

(g)     This meeting was called for by the CEO of the DHL Defendants' parent company, who presided at such meeting.

(h)     Moreover, the minutes of the FFE CEO Committee meeting held on October 13, 2001 reflect that they were sent to Mr. Maurits Dolmans of Cleary Gottlieb Steen & Hamilton, LLP, who were DHL's attorneys.

(i)     After these minutes were circulated, however, the minutes of a subsequent meeting of the FEE CEO Committee did not explicitly refer to any agreement to fix a new charge.

(j)     Worse, by the time that the Defendant family companies who participated in the 2001 Security Surcharge Agreement participated in the 2002 New Export Fee Agreement, each such Defendant was affirmatively and consistently using code words in their communication to hide their conspiracy.

(k)     As yet another connection with the original Security Surcharge Agreement, the Defendants in the three price-fixing agreements prosecuted by the Japan Fair Trade Commission each abused the cover of freight forwarder association meeting to make and help with the implementation of each such agreement.

(l)     Similarly, the Defendants in the currency exchange factor agreement also abused their membership in the freight forwarder association in Shanghai to agree with such association that it would recommend to even the smaller members that they act in conformity with the agreement in at least two separate written recommendations.

(m)     Furthermore, DHL Defendants are another the "common denominator" in all of the price fixing agreements alleged herein.  That is, at least one DHL Defendant allegedly participated in each and every price-fixing agreement alleged herein.

(n)     The DHL Defendant companies had a culture that repeatedly, consistently, and habitually made agreements to fix prices for new freight forwarder services between at least late 2001 and October 2007 when U.S. competition authorities began to investigate.

(o)     Although more agreements among various Defendants to fix prices were made than just the thirteen prior already agreements alleged herein, even on the limited allegations herein, only the following families of Defendant companies were involved in less than agreements to fix prices.  Dachser, Geodis, Airborne Express, Inc., Emery Worldwide Airlines, Inc., Walker Freight, SIFFA

319.    In all the circumstances, Plaintiffs allege that Defendants' numerous price fixing conspiracies (a) reflect or constitute an overall agreement between at least the DHL Defendants and all other Defendants to fix and inflate, and that had the direct effect of fixing and inflating the prices for U.S.  Freight Forwarding services generally of Defendants.

320.    Between at least as early as September 2001 and the present, Defendants have combined, conspired and agreed with at least the DHL Defendants (defined in ¶37) and others to fix, inflate and maintain new charges or prices for U.S. Freight Forwarding Services (defined in ¶¶16-17) in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

321.  Such  agreement, conspiracy or combination had the following effects, among others:

a.    Defendants' prices charged for U.S. Freight Forwarding Services were raised, fixed, and maintained;

b.    Plaintiffs and the other members of the Class were deprived of the benefits of free and open competition in the purchase of U.S. Freight Forwarding Services; and

c.    Price competition in the sale of U.S. Freight Forwarding Services was restrained, suppressed, and/or eliminated.

322.    During the Class Period, Plaintiffs and the other members of the Class purchased substantial quantities of U.S. Freight Forwarding Services from Defendants.  By reason of the violations of Sections 1 and 3 of the Sherman Act alleged herein, Plaintiffs and the other members of the Class paid more for U.S. Freight Forwarding Services than they would have in the absence of Defendants' conspiratorial conduct.  As a direct result, Plaintiffs and members of the Class have each been injured in their business and property.

### AS AND FOR A FIFTEENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

323.  Plaintiffs re-allege and incorporate by reference each and every allegation set forth above.

324.  Beginning in or about late summer 2004 and continuing until a date unknown to plaintiffs, Defendants whose identities who are presently unknown to Plaintiffs

combined, conspired and agreed with at least themselves or others (John Doe Defendants 1-10) whose identities are not presently known to Plaintiffs to fix inflate and maintain and new charge or price for U.S. Freight Forwarding Services on air cargo and ocean cargo shipments into the United States in respect of the AMS charge.

325. The effects of such combination, conspiracy or agreement were to inflate the prices for U.S. Freight Forwarding Services on air cargo and ocean cargo shipments into the United States between late summer 2004 and a date unknown to Plaintiffs.

326. As a direct result, Plaintiffs and other class members were injured in their property and are entitled to recover damages under 15 U.S.C. § 15.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request:

1. That the Court determine that the Sherman Act claims contained herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and that Plaintiffs be found to be adequate representatives;

2. That Defendants' unlawful agreements, conspiracies or combinations alleged herein each be adjudged and decreed to be a *per se* violation of Section 1 of the Sherman Act;

3. That Plaintiffs and the Class recover damages as provided by law, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws;

4. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be compelled to implement appropriate antitrust compliance

progress and permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conspiratorial conduct alleged herein or proved at trial; (2) entering into any conspiracy alleged herein or any other conspiracy or combination having a similar purpose or effect; (3) adopting or following any practice, plan, program, or device having a similar purpose or effect; (4) communicating or causing to be communicated to any other person engaged in the distribution or sale of U.S. Freight Forwarding Services, information concerning prices or other terms or conditions of sale of any such products except to the extent necessary in connection with *bona fide* sale transactions between the parties to such communication; or (5) engaging in such other acts as the proof herein shall demonstrate to be appropriate for injunctive relief;

5.      That Plaintiffs and members of the Class be awarded pre- and post-judgment interest and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

6.      That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

7.      That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed.R.Civ.P. 38(b), Plaintiffs demand a trial by jury for all issues so triable.

Dated:  New York, New York

June 7, 2010

By:  */s/ Christopher Lovell*
     Christopher Lovell (CL-2595)
     Craig M. Essenmacher
     Ian T. Stoll (IS-3424)
     Christopher M. McGrath (CM-4983)
     LOVELL STEWART HALEBIAN LLP
     61 Broadway, Suite 501
     New York, NY 10006
     Telephone:   (212) 608-1900
     Facsimile:   (212) 719-4775

     W. Joseph Bruckner
     Heidi M. Silton
     Matthew R. Salzwedel
     LOCKRIDGE GRINDAL NAUEN P.L.L.P.
     100 Washington Avenue South, Suite 2200
     Minneapolis, MN 55401
     Telephone:   (612) 339-6900
     Facsimile:   (612) 339-0981

     Steven N. Williams
     COTCHETT, PITRE & MCCARTHY
     San Francisco Airport Office Center
     840 Malcolm Road, Suite 200
     Burlingame, CA 94010
     Telephone:   (650) 697-6000
     Facsimile:   (650) 697-0577

     Imtiaz A. Siddiqui (IS-4090)
     COTCHETT, PITRE & MCCARTHY
     One Liberty Plaza, 23rd Floor
     New York, NY  10006
     Telephone:  (212) 682-3198
     Facsimile:  (646) 219-6678

Daniel E. Gustafson
Daniel C. Hedlund
Michelle Looby
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone:      (612) 333-8844
Facsimile:      (612) 339-6622

***Interim Co-Lead Counsel for Plaintiffs***


Bruce L. Simon
Esther L. Klisura
PEARSON, SIMON, SOTER, WARSHAW &
PENNY, LLP
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:      (415) 433-9000
Facsimile:      (415) 433-9008

Lori E. Andrus
Jennie Lee Anderson
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone:      (415) 986-1400
Facsimile:      (415) 986-1474

William F. Flahavan
FLAHAVAN LAW OFFICES
19528 Ventura Boulevard, Suite 568
Tarzana, CA 91356
Telephone:      (818) 708-7894
Facsimile:      (818) 344-8007

James A. Thompson
JAMES A. THOMPSON, ATTORNEY AT LAW,
A PROFESSIONAL CORPORATION
101 Wikiup Drive, Suite A
Santa Rosa, CA 95403
Telephone:      (707) 575-7799
Facsimile:      (707) 575-9924

Rudy Gonzales, Jr.
Catherine D. Tobin
GONZALES HOBLIT FERGUSON LLP
802 North Carancahua, Suite 2000
Corpus Christi, TX 78470
Telephone:    (361) 888-9392
Facsimile:    (361) 888-9187

***Additional Counsel for Plaintiffs***