UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
PRECISION ASSOCIATES, INC.,
ANYTHING GOES LLC d/b/a MAIL BOXES
ETC., and JCK INDUSTRIES, INC., on behalf
of themselves and all others similarly situated,

                             Plaintiffs,        **REPORT AND RECOMMENDATION**

        - v -

                                      08-CV-42 (JG)(VVP)

PANALPINA WORLD TRANSPORT
(HOLDING) LTD., PANALPINA, INC.,
et. al.,

                             Defendants.
-----------------------------------------------------------x

# TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
II.    The Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
III.   The Motions to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.     Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
II.    The Plaintiffs' Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     A.      The Local and Regional Conspiracies . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
          1.      Claims 1, 3, and 11 - "European Conspiracy" . . . . . . . . . . . . . . . . . . . . . 12
          2.      Claims 2, 4, 10, and 12 -"Japanese Conspiracy" . . . . . . . . . . . . . . . . .  14
          3.      Claims 5-9 and 13 - "Chinese Conspiracy" . . . . . . . . . . . . . . . . . . . . . . 16
     B.      Claim 14: Global Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
     C.      Claim 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
III.   Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
     A.      Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
     B.      Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
IV.   Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     A.      Grouping of Defendants Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     B.      Corporate Grouping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
V.    Plausibility of the Conspiracies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
     A.      Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
     B.      Local Conspiracies in Claims 1-10 and Claim 15 . . . . . . . . . . . . . . . . . . 42
     C.      Global Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

|      | D.    | Regional Conspiracies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61 |
| VI.  | Subject Matter Jurisdiction and the FTAIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64 |
|      | A.    | The FTAIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65 |
|      | B.    | The Relevant Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66 |
|      | C.    | "Import Trade or Import Commerce" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69 |
|      | D.    | Effect on "Import Trade or Import Commerce" . . . . . . . . . . . . . . . . . . . . . . . . . 71 |
| VII. | Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74 |
|      | A.    | New York Civil Practice Law § 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76 |
|      | B.    | New York Civil Practice Law § 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80 |
|      |       | 1.    New York Civil Practice Law § 302(a)(1) . . . . . . . . . . . . . . . . . . . . . . . 80 |
|      |       | 2.    New York Civil Practice Law § 302(a)(2) . . . . . . . . . . . . . . . . . . . . . . . 84 |
|      |       | 3.    New York Civil Practice Law § 302(a)(3) . . . . . . . . . . . . . . . . . . . . . . . 84 |
|      | C.    | Federal Rule of Civil Procedure 4(k)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86 |
| VIII.| Service of Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88 |
| IX.  | Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89 |
|      | A.    | The Relation Back Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89 |
|      | B.    | Antitrust Conspiracy and Continuing Conspiracy Doctrine . . . . . . . . . . . . . . . 92 |
|      | C.    | Fraudulent Concealment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97 |
| X.   | Leave to Replead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105 |

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . post

-2-

POHORELSKY, Magistrate Judge:

Judge Gleeson has referred this matter to me for a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1), concerning motions by various defendants seeking the dismissal of the complaint.  The complaint, which has been brought as a class action, seeks redress for alleged violations of the Sherman Act.  For the reasons that follow, it is respectfully recommended that these motions be GRANTED in part and DENIED in part, but with leave to replead.

## BACKGROUND

This putative class action litigation concerns an alleged conspiracy to fix prices in the international commercial freight forwarding industry.  The plaintiffs are various businesses who purchased freight forwarding services from the defendants during the period from January 1, 2001 to July 21, 2009 (the "Class Period").[1]  The plaintiffs' antitrust claims are brought against sixty-five defendants, who are domestic and foreign providers of international freight forwarding services as well as two trade associations.[2]

---

[1]  The named Plaintiffs are Precision Associates, Inc., a Minnesota corporation, Anything Goes LLC d/b/a Mail Boxes Etc., a California corporation, and JCK Industries, Inc., an Ohio corporation. Compl. ¶ 20-22.  They bring this action on behalf of a class defined as "[a]ll persons . . . who directly purchased United States Freight Forwarding Services from any of the Defendants or any subsidiary or affiliate thereof, at any time during the period from January 1, 2001 to the present."  Compl. ¶ 91.

This case has been designated to be related to a Multi District Litigation ("MDL") pending in this district, *In Re Air Cargo Shipping Services Antitrust Litigation,* Case No. 06-MDL-1775 (JG) (VVP) ("*Air Cargo MDL*").  Unlike that case, which was brought primarily by freight forwarders against airlines or air carriers, the freight forwarders themselves are the defendants in this case.

[2]  The defendants named in the Amended Complaint are Panalpina World Transport (Holding) Ltd.; Panalpina, Inc.; Kühne + Nagel International AG; Kuehne + Nagel, Inc.; Expeditors International of Washington, Inc.; EGL, Inc.; EGL Eagle Global Logistics, LP; Deutsche Bahne AG; Schenker AG; Schenker, Inc.; BAX Global, Inc.; DB Schenker; Deutsche Post AG; DHL Danzas; DHL Global Forwarding; DHL Express (USA), Inc.; DHL Global Forwarding Japan K.K.; Airborne Express, Inc.; Air Express International USA, Inc.; Uti Worldwide Inc.; Spedlogswiss, aka The Association of Swiss Forwarders; United Parcel Service, Inc., UPS Supply Chain Solutions, Inc.; ABX Logistics Group (this defendant asserts that its correct name is "ABX Logistics Worldwide NV/SA" and the court reads the Complaint as asserted as against it); DSV A/S; DSV Solutions Holding A/S; DSV Air & Sea Ltd.; SDV

# I.   THE COMPLAINT

The Second Amended Class Action Complaint ("the Complaint" or "Compl.")[3] alleges the following facts, which are accepted as true for the purpose of the motions.  Beginning sometime in 2001, the defendants conspired to fix, inflate, and maintain new charges and prices for freight forwarding services.  *Id.* ¶¶ 1, 99.  The defendants accomplished that objective through various mechanisms including meetings, telephone calls, specially established e-mail accounts, the creation of documents like suggested pricing letters to be sent to customers, and the use of code words.  The parties to this agreement also accomplished their objective through the imposition of different surcharges and fees for freight forwarding services for the transportation of goods on various international trade routes to and from the United States.  *Id.* ¶¶ 2-3.

The Complaint defines "Freight Forwarding Services" as those "relating to the organization of transportation of items [products, commodities, and other goods] via air, ship,

---

International Logistics; Dachser Intelligent Logistics; Dachser Transport of America, Inc.; Geo-Logistics; Baltrans Logistics, Inc.; Toll Global Forwarding (USA), Inc.; Hellmann Worldwide Logistics, Inc.; Geodis Group; Geodis Wilson USA, Inc.; Con-way, Inc.; Exel Global Logistics, Inc.; Jet Speed Logistics, Ltd.; Jet Speed Air Cargo Forwarders (USA), Inc.; Jet Speed Logistics (USA), LLC; Morrison Express Logistics PTE Ltd.; Morrison Express Corporation (USA); Nippon Express Co., Ltd.; Nippon Express USA, Inc.; Yusen Air & Sea Service Co., Ltd.; Yusen Air & Sea Service (U.S.A.), Inc.; Kintetsu World Express, Inc.; Kintetsu World Express (U.S.A.), Inc.; Nishi-Nippon Railroad Co., Ltd.; Hankyu Hanshin Express Holdings Corporation; Nissin Corporation; Nissin International Transport U.S.A., Inc.; Vantec World Transport Co., Ltd.; Vantec World Transport (USA), Inc.; "K" Line Logistics, Ltd.; "K" Line Logistics (U.S.A.), Inc.; Yamato Global Logistics Japan Co., Ltd.; Yamato Transport U.S.A., Inc.; MOL Logistics (Japan) Co., Ltd.; MOL Logistics (U.S.A.), Inc.; Hanshin Air Cargo Co., Ltd.; Hanshin Air Cargo USA, Inc.; United Aircargo Consolidators, Inc.; and Japan Aircargo Forwarders Association (collectively "defendants").  The Complaint also names unspecified "John Doe Defendants 1-10."

[3]  The Original Complaint in this action was filed on January 3, 2008 and the plaintiffs filed an Amended Class Action Complaint on July 21, 2009.  In order to allow the plaintiffs to make ministerial changes to complaint to meet requirements for service for some of those defendants located abroad, the parties stipulated to the filing of a Second Amended Class Action Complaint with only those changes.  That Complaint was filed on October 7, 2010.  All of the motions to dismiss are deemed responsive the most recently filed Complaint.

rail, and truck, both nationally and internationally, and can include related activities such as customs clearance, warehousing and ground services." Compl. ¶¶ 16, 105. "U.S. Freight Forwarding Services" are defined as "Freight Forwarding Services purchased or sold in the United States regardless of the location of shipment or (b) Freight Forwarding Services in respect of shipments into, out of, or within the United States." *Id.* ¶ 17. Freight forwarders act on behalf of the shipper and "assist in all aspects of cargo transport, from pick up to drop off," and so a "Freight Forwarder may advise on exporting costs, including freight costs, port charges, consular fees, costs of special documentation, insurance costs and freight handling fees" and "may also prepare and file required export documentation such as the bill of lading." *Id.* ¶¶ 106-07. While some freight forwarders also provide services for the actual transport of goods, the majority of them act as brokers for freight forwarding services. *Id.* ¶ 108. The named plaintiffs and the members of the class use Freight Forwarding Services to assist in the transport of freight over long distances. *Id.* The plaintiffs have all purchased U.S. Freight Forwarding Services from one or more of the named defendants or their co-conspirators. *Id.* ¶¶ 20-22. The defendants are major international shipping concerns, and are alleged, either directly or through their subsidiaries and/or affiliates, to have sold Freight Forwarding Services throughout the United States. *Id.* ¶¶ 23-85, 114. The Complaint alleges that various groups of specifically identified defendants are members of several trade organizations, including Spedlogswiss, aka The Association of Swiss Forwarders, Freight Forward International (FFI), the Japan Aircargo Forwarders Association (JAFA), and the Shanghai International Freight Forwarder Association (SIFFA), and that the defendants' membership in these organizations "gave them ample

opportunities to meet and secretly engage in collusive conduct under the pretext of engaging in lawful activity."  *Id.* ¶¶ 157-171.  The Complaint names Spedlogswiss and JAFA as defendants.

The Complaint alleges that the market for freight forwarding services is highly concentrated, has a "small number of global players" with substantial market share, and has substantial barriers to entry because of high expenditures and high risks.  *Id.* ¶¶ 113-23.  Freight forwarding services are highly fungible and the primary determinant is price.  *Id.* ¶ 113.  Due to the increasing globalization of the world's economy, freight forwarders, including the defendants, have global operations with warehouses in dozens of countries.  *Id.*

Beginning in October 2007, the media, governmental agencies and the defendants themselves began to announce government investigations into suspected anticompetitive practices in the freight forwarding industry.  According to these reports, in October 2007, worldwide governmental antitrust enforcers in the United States, Europe, South Africa, and elsewhere conducted raids on the offices of a number of freight forwarder defendants and issued subpoenas for information as to suspected anticompetitive activity.  Compl. ¶¶ 124-40.  According to news agencies, the world-wide probe began when one of the freight forwarders sought conditional immunity from antitrust regulators in Switzerland, the United States and the European Union for possible violations.  *Id.*  ¶ 127.

On April 16, 2008, several news outlets reported that the Japan Fair Trade Commission ("JFTC"), the Japanese antitrust authority, had raided at least 12 freight forwarders and one industry association as part of an antitrust investigation into fixed air cargo charges.  Compl. ¶ 141. On March 18, 2009, JFTC issued a written cease-and-desist order ("JFTC Order") and levied $94.7 million in fines against a number of international freight forwarders for violations

of antitrust laws.  *Id.* ¶ 142 & Translation of JFTC Order, attached as Ex. A to Complaint.   The

JFTC Order found that fourteen companies conspired to restrict competition by fixing prices on

four separate surcharges, thereby "substantively restrict[ing] competition in the field of the

International Freight Forwarding Business."  Compl. ¶ 143.  Those fourteen companies, also

named as defendants in the Complaint, reached these agreements at the meetings of the

Executive Board of International Committee ("EBIC"), an organization within JAFA.  *Id.* ¶ 154.

The conspiracies outlined in the JFTC Order form the basis for Claims 2, 4, 10, and 12 of the

Complaint.

On September 30, 2010, after oral argument on the motions to dismiss was held, the

Department of Justice announced that six international freight forwarders have agreed to plead

guilty and pay criminal fines totaling $50.27 million for their roles in several separate

conspiracies to fix fees and charges in connection with the provision of international freight

forwarding services for air cargo.  *See* Press Release, Department of Justice (Sept. 30, 2010),

attached as Ex. 1 to Oct. 1, 2010 Letter from Plaintiffs, Dkt. Entry 457 ("Sept. 30, 2010 DOJ

Press Release").[4]

## II.   THE CLAIMS

The Complaint asserts fifteen separate violations of Section 1 of the Sherman Act, 15

U.S.C. §1, as against different groups of defendants for conspiracies to fix prices in the freight

forwarding industry.  Claims 1 through 10 concern ten distinct conspiracies to impose surcharges

---

[4]  The six freight forwarder defendants who have agreed to plead guilty to charges contained in separate Criminal Informations filed by the Department of Justice are EGL Inc., Kühne + Nagel International AG, Geologistics International Management (Bermuda) Limited, Panalpina World Transport (Holding) Ltd., Schenker AG, and BAX Global Inc.  *Id.*

on freight forwarding services by different groups of the defendants on different trade routes during disparate time periods (the "local conspiracies").  Compl. ¶¶ 182-298.  These individual conspiracies involve the following allegedly anticompetitive surcharges: a security surcharge for freight forwarding services on air cargo shipped around the world beginning in 2001 (Claim 1); a fuel surcharge with respect to all freight loaded on aircraft departing from Japan beginning in 2002 (Claim 2); a New Export System fee for air freight shipments from Heathrow Airport in the United Kingdom beginning in 2002 (Claim 3); a surcharge on air cargo flights between Japan and the United States to account for an Automated Manifest System ("AMS") reporting requirement imposed by United States Customs starting in 2004 (Claim 4); Chinese Currency Adjustment Factor ("CAF") surcharges on air cargo shipments between Asia, including China, and worldwide locations beginning in 2005 and 2006 (Claims 5 & 6, respectively); peak season surcharges on air cargo shipments from China beginning in 2005, 2006, and 2007 (Claims 7, 8, & 9, respectively); and a security surcharge and an explosives surcharge on air cargo flights between Japan and the United States beginning in 2006 (Claim 10).  *Id.* ¶¶ 182-298.  Claims 11, 12, and 13 then group these ten local conspiracies into "regional conspiracies" based on the continent on which the local conspiracies occurred.  *Id.* ¶¶ 299-314.   The plaintiffs add a final layer to their Complaint by grouping all of the local conspiracies into a single overarching global conspiracy in Claim 14. *Id.* ¶¶ 315-22.

Plaintiffs also assert a fifteenth claim based on an alleged AMS surcharge.  This claim alleges almost no facts and appears to be a placeholder should the plaintiffs be granted leave to amend their Complaint.  *Id.* ¶¶ 323–26.

Pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), the plaintiffs

seek treble damages and costs of suit, including reasonable attorneys' fees.  The plaintiffs also

seek appropriate injunctive relief against the defendants for future similar conduct. Compl. ¶ 10.

## III.   THE MOTIONS TO DISMISS

This Report and Recommendation addresses in a comprehensive fashion the various

pending motions to dismiss brought by the defendants in a series of joint and individual motions.

The various motions to dismiss raise common issues, chief among them that the Complaint fails

to state a claim under prevailing pleading standards, does not allege adequate standing by the

plaintiffs to bring this suit, and does not provide adequate notice to these defendants as to their

role in these conspiracies.  The defendants also argue that the court does not have subject matter

jurisdiction over the conduct alleged in the Complaint because it took place abroad.  Finally,

some of the defendants also move to dismiss for lack of personal jurisdiction and on statute of

limitations grounds.  The briefing on the motions to dismiss is voluminous.  A list of the papers

submitted in support and in opposition to the motions, as well as short forms for those cited

herein, can be found in an Appendix to this Report and Recommendation.

## DISCUSSION

## I.   LEGAL STANDARDS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal,

not the factual, sufficiency of a complaint.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974),

*abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Sims v. Artuz*, 230

F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is

likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the

claims.'") (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)).  At this stage, the court accepts as true all factual allegations in the complaint, views the complaint in the light most favorable to the plaintiff, and draws all reasonable inferences in his favor.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).  Even so, conclusory allegations or conclusions of law "couched" as factual allegations need not be accepted as true.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994).  Courts may also consider documentary exhibits or written instruments annexed to the complaint, documents integral to the parties' case and on which the complaint relies heavily, and matters subject to judicial notice.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §1357 (3d ed. 2004 and Supp. 2007)); *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007)*; Chambers*, 282 F.2d at 152-53; *Int'l Audiotext Network, Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir. 1995); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); *see also* Fed. R. Civ. P. 10(c).

For half a century, the "accepted rule [was] that a complaint should not be dismissed for failure to state a claim unless it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  *Twombly* abrogated this standard by requiring enough factual matter so that the plaintiff's entitlement to relief is raised "above the speculative level," reasoning that the "no set of facts language has been questioned, criticized, and explained away long enough."  550 U.S. at

555, 562 (citing authorities).  Even so, the Court took care to avoid the imposition of a

probability requirement, and instead required a reasonable expectation that discovery could

produce adequate evidence to support the elements of the claim.  *Id.* at 556; *see also Villager

Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995).  Allegations in the complaint that

were merely "consistent" with – as opposed to suggestive of – a claim, were insufficient.  *See

Twombly*, 550 U.S. at 557.  To avoid dismissal, therefore, the plaintiffs must plead facts that

"nudg[e] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

Mere labels, conclusions, and a "formulaic recitation of the elements of a cause of action" do not

suffice to state a plausible claim.  *Twombly*, 550 U.S. at 555.  In *Iqbal*, the Court fleshed out

these plausibility considerations, requiring factual allegations that "allow[] the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  129 S. Ct. at 1949.

The court reiterated that plausibility requires that the pleaded facts demonstrate more than a

"mere possibility of misconduct."  *Id.* at 1950.  And the factual allegations must go beyond

conclusory labels, legal conclusions, and "threadbare recitals"of the elements of a claim.  *Id.* at

1949. Still, as there is no probability requirement, even claims which appear unlikely to succeed

may be entitled to go forward.  *See Twombly*, 550 U.S. at 556 (quoting *Scheuer*, 416 U.S. at

236); *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996); *Villager Pond*, 56 F.3d at 378.  And

while *Twombly* raised the bar for what must be pleaded in a complaint, it explicitly rejected a

blanket requirement of heightened fact pleading; the Court's subsequent decision in *Erickson v.

Pardus* reaffirmed that the notice pleading standard still determines legal sufficiency as a general

matter.  *See* 551 U.S. 89, 94  (2007).

## II.   THE PLAINTIFFS' ALLEGATIONS

As noted earlier, the claims in the Complaint consist of ten individual conspiracies, which are then grouped together geographically into regional conspiracies, and then lumped into one global conspiracy.  Thus, Claims 1 and 3 allege "local" conspiracies originating in Europe to impose surcharges and Claim 11 describes a European "regional" conspiracy based on the conduct described in Claims 1 and 3.  Likewise, Claim 2, 4, and 10 describe local conspiracies to fix prices originating in Japan and Claim 12 alleges a Japanese regional conspiracy based on the conduct described in the three local Japanese conspiracies.  Finally, Claims 5 through 9 describe five local conspiracies originating in China and Claim 13 alleges an Asian regional conspiracy on the basis of the conduct alleged therein.  The global conspiracy alleged in Claim 14 is based on the conduct alleged in all ten local conspiracy claims.  Claim 15 attempts to stand on its own, alleging a conspiracy by unknown defendants on unspecified routes.

### A.    The Local and Regional Conspiracies

#### 1.    Claims 1, 3, and 11 - "European Conspiracy"

Claim 1: 2001 Security Surcharge Agreement (Global)

The plaintiffs' first claim alleges an agreement by the "Security Surcharge Defendants"[5] beginning in October 2001 to impose a security surcharge on freight forwarding services for air cargo shipped all around the world.  Compl. ¶ 183.  These defendants made and implemented their agreement through several meetings, including meetings of their trade association Freight

---

[5]   These defendants are identified as "ABX Logistics, Dachser, DHL, Excel, Geodix (Geodix Wilson), Geo Logistics (Agility), Kuehne + Nagel, Panalpina, and Schenker."  In this claim, as in all the other local and regional conspiracy claims, some of the defendants identified in the heading of each claim actually refer to multiple defendants as defined in paragraphs 23-84 of the Complaint.

Forwarders Europe ("FFE"), where they agreed to impose a surcharge of €0.15 per kilogram (approximately $0.13 per kilo) on air freight shipments throughout the world. *Id.* ¶¶ 184-85, 189.  The plaintiffs and class members paid the security surcharge. *Id.* ¶ 189.  The Complaint also alleges that these defendants conspired to enter into an agreement with the air cargo carriers to impose an increased surcharge. *Id.* ¶¶ 191-93.

<u>Claim 3: 2002 New Export System Fee Agreement (Heathrow Airport)</u>

Claim 3 arises out of a New Export System ("NES") created by the United Kingdom to require shippers to electronically submit declarations to Her Majesty's Revenue and Customs before freight could be shipped.  Compl. ¶ 207.  Beginning as early as October 1, 2002, the "NES Defendants"[6] conspired to impose a NES fee for air freight shipments from Heathrow Airport in the United Kingdom.  The NES Defendants effectuated their conspiracy through at least three meetings, one of which was held at a restaurant. *Id.* ¶ 208-09. They used code words to refer to themselves, to the agreed upon surcharge, and to their meetings. *Id.* ¶ 210-11.  The Complaint does not specify the amount of the NES fee, but it does allege that the these defendants imposed NES fees on flights departing from Heathrow Airport. *Id.* ¶ 212-13.  It also alleges that the aforementioned "unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members." *Id.* ¶ 213(c).

<u>Claim 11: Regional European Conspiracy</u>

The Complaint alleges that between October 2001 until at least October 2004, the Security Surcharge Defendants in Claim 1 and the NES Defendants in Claim 3 (except for Eagle)

---

[6]  These defendants are identified in the heading of this claim as "DHL, Exel, Kuehne + Nagel, Eagle, Hellmann, Emery, UPS (a/k/a Menlo Worldwide), Geo Logistics, Walker Freight, and Bax."

conspired to fix, inflate and impose new charges for air cargo routes between Europe and the United States.  Compl. ¶ 300.  This conspiracy was implemented through the conduct alleged in Claims 1 and 3 and inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.  *Id.* ¶¶ 301-03.

2.   *Claims 2, 4, 10 and 12 -"Japanese Conspiracy"*

Claim 2: 2002 Fuel Surcharges Agreement (Japan)

The plaintiffs' second claim for relief alleges a conspiracy formed in 2002 by the "2002 Fuel Surcharges Agreement Defendants"[7] to impose fuel surcharges on flights between Japan and the United States in response to fuel surcharges imposed by air cargo carriers.  *Id.* ¶ 195-97. The Complaint alleges that the agreement was reached through meetings of the EBIC of JAFA. *Id.* ¶ 201.  The plaintiffs also allege that this agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.  *Id.* ¶ 203(c).

Claim 4: 2004 U.S. Customs "AMS" Charge (Japan)

Claim 4 alleges a conspiracy formed in 2004 by the "AMS Defendants"[8] to impose an AMS charge in response to new United States Customs regulations on flights between Japan and

---

[7]  These defendants are Yusen Air & Sea Service Co., Ltd., Kintetsu World Express, Inc., Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin Express Holdings Corporation, Nissin Corporation, Vantec World Transport Co., Ltd., "K" Line Logistics, Ltd., Yamato Global Logistics Japan Co., Ltd., MOL Logistics (Japan) Co., Ltd., Hanshin Air Cargo Co., Ltd., United Aircargo Consolidators, Inc., and Airborne Express, Inc.

The plaintiffs also allege that the defendants DHL Global Forwarding Japan K.K. and Nippon Express Co., Ltd. joined this agreement no later than November 8, 2002.  *Id.* ¶ 199. Although these two defendants are alleged to have joined the agreement at this time, they are not named as defendants in the heading of this Claim and the court does not read the Complaint as alleging Claim 2 as against them.

[8]  The Claim 4 defendants are the same as the 2002 Fuel Surcharges Agreement Defendants in Claim 2 except with the exclusion of Airborne Express, Inc. and the addition of Nippon Express Co., Ltd. and DHL Global Forwarding Japan K.K.

the United States.  The agreement was reached through EBIC meetings of JAFA.  *Id.* ¶ 216.

These defendants agreed to impose the surcharge at a specific rate by December 13, 2004, or at

the latest, January 1, 2005.  *Id.* ¶ 219.  This agreement inflated the prices paid for U.S. Freight

Forwarding Services by plaintiffs and Class members.  *Id.* ¶ 221(c).

Claim 10: 2006 Security and Explosives Surcharges (Japan)

The plaintiffs also allege a conspiracy formed in 2006 by the "2006 Surcharge

Defendants"[9] in response to new security regulations implemented by the Japanese Transport

Ministry.  Beginning prior to February 20, 2006, these defendants agreed to impose two new

surcharges, a "security charge," and an "explosives examination charge," at specific rates on air

cargo flights between Japan and the United States.  Compl. ¶ 293.  The 2006 Surcharge

Defendants reached and monitored this agreement, among other ways, during EBIC meetings of

JAFA.  *Id.* ¶ 294-96.  The plaintiffs also allege that this agreement inflated the prices paid for

U.S. Freight Forwarding Services by Plaintiffs and Class members.  *Id.* ¶ 298(c).

Claim 12: Japanese Regional Conspiracy

Claim 12 alleges that starting at least as early as August 2002 and continuing until at

least November 2007, the defendants in Claims 2, 4, and 10 combined, conspired or agreed to

fix, inflate and impose new charges for freight forwarding services on air cargo routes between

Japan and the United States.  Compl. ¶¶ 304-09.  These defendants formed and implemented this

overarching agreement through, among other steps, meetings of JAFA, as well as through the

conspiracies alleged in Claims 2, 4 and 10.  *Id.* ¶ 307.  This overarching conspiracy inflated the

---

[9]  The defendants named in this Claim are the same as those named in Claim 4.

charges for freight forwarding services on United States-Japan air cargo routes and inflated the prices paid for U.S. Freight Forwarding Services by plaintiffs and Class members. *Id.* ¶ 309(c).

       3.    *Claims 5-9 and 13 -"Chinese Conspiracy"*

<u>Claim 5: 2005 Chinese Currency Adjustment Factor Surcharges</u>

Claim 5 describes a conspiracy that arises out of a change in Chinese currency rates. Until July 2005, the official currency of the People's Republic of China (Renminbi or "RMB") was pegged to the U.S. Dollar at an exchange rate of 8.28 RMB per Dollar. Compl. ¶ 225. Beginning on July 21, 2005, the RMB was revalued at 8.11 RMB per U.S. Dollar and pegged to a basket of foreign currencies. *Id.* ¶ 226. Claim 5 alleges an agreement beginning in July 2005 by the "CAF Surcharge Defendants"[10] to fix and maintain a Chinese Currency Adjustment ("CAF") surcharge on air cargo shipments between Asia, including China, and worldwide locations. *Id.* ¶¶ 222-249. These defendants implemented their conspiracy through meetings at hotels and through a "Yahoo" group email distribution list. *Id.* ¶¶ 227-47. At an initial meeting, the CAF Surcharge Defendants agreed that (a) existing long-term contracts will be subject to a CAF surcharge of 2.1%; (b) as of August 1, 2005, all new air freight business would be quoted in RMB, not U.S. Dollars; and (c) all future or renewal contracts would be quoted in RMB, not U.S. Dollars. *Id.* ¶¶ 227-29. These defendants eventually agreed to increase the CAF surcharge to 3%. *Id.* ¶ 248. As a result of the aforementioned agreements, the plaintiffs and Class members paid inflated prices for U.S. Freight Forwarding Services. *Id.* ¶ 249(c).

---

[10]  The CAF Surcharge Defendants are identified as "Exel, DHL, Eagle, Expeditors, Kuehne + Nagel, Panalpina, UPS, Kintetsu World Express, Yusen, Nippon Express, SDV, Dachser, Schenker, and Bax Global." Compl. ¶ 57.

<u>Claim 6: 2005 CAF Surcharge-SIFFA</u>

Claim 6 alleges that starting in October 2005, the CAF Surcharges-SIFFA Defendants[11]

combined, conspired and agreed to impose a CAF surcharge on air cargo shipments between

Asia, including China, and worldwide locations.  Compl. ¶¶ 250-57.  The CAF Surcharge

Defendants are all members of the SIFFA trade association.  *Id.* ¶ 251.  On or about October 15,

2005, SIFFA issued a circular suggesting that its members impose a 2.1% CAF Surcharge and on

March 29, 2006, SIFFA issued a circular suggesting that surcharge be increased to 3.0%.  *Id.* ¶¶

253-55.  As a result of this agreement, the plaintiffs and Class members paid inflated prices for

U.S. Freight Forwarding Services.  *Id.* ¶ 257(c).

<u>Claims 7-9: Peak Season Surcharges</u>

Claims 7, 8, and 9 allege an ongoing conspiracy by the "Peak Season Surcharge

Defendants"[12] from as early as August 2005 to at least May 2007 to impose a peak season

surcharge on air cargo shipments, including shipments into, out of, or within the United States.

Compl. ¶¶ 258-91.  Although Claims 7 and 9 do not specify whether the peak season surcharge

was applied to certain routes, Claim 8 alleges that the defendants agreed to institute a peak

season surcharge on air cargo flights from Hong Kong SAR, China to the United States.  *Id.* ¶

283. These defendants formed, implemented, and monitored their conspiracies during a series of

meetings.  *Id.* ¶ 260.  The Complaint alleges that the 2005 Peak Season Surcharge in Claim 7

---

[11]  The Claim 6 defendants are the same as those defined in Claim 5 with the exclusion of Dachser and Schenker and with the addition of ABX Logistics.  Claim 6 also names SIFFA in the heading of this claim but SIFFA is not identified as a defendant in the Complaint, has not been served in this action and will not be considered as a defendant by the court.

[12]  These defendants, who are all named in Claims 7 through 9, are identified as "Baltrans, DHL Danzas, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, Bax, Schenker, UPS, Hellmann, SDV, ABX Logistics, Jet Speed, DFDS Transport, Morrison Express, and UTi."

was formed and monitored during three meetings held in 2005 at a hotel in Hong Kong. *Id.* ¶¶ 262-72. Claims 8 and 9 specify four additional meetings in Hong Kong between different grouping of the Peak Season Surcharge Defendants where similar issues were discussed. *Id.* ¶¶ 274-90. The peak season surcharges outlined in these counts inflated the prices paid for U.S. Freight Forwarding Services by the plaintiffs and Class members. *Id.* ¶ 291(c).

Claim 13: Asian Regional Conspiracy

Claim 13 alleges an overarching conspiracy to fix, inflate and impose new charges for freight forwarding services on air cargo between the United States and Asia by the defendants named in Claims 5 through 9, except Dachser and SIFFA. Compl. ¶¶ 310-14. This overarching conspiracy began at least as early as May 2005 and was implemented through meetings to agree to fix prices and the conspiracies alleged in Claims 5 through 9. *Id.* ¶ 312.

**B.    Claim 14: Global Conspiracy**

Claim 14 alleges a global overarching conspiracy evidenced by and comprising the local conspiracies alleged in Claims 1 through 10. Compl. 315-22. Some of the factors that the conspiracies have in common are that each defendant failed to employ or enforce proper antitrust compliance procedures, they used the cover of freight forwarder associations to implement their agreements, and the "DHL Defendants" are a "common denominator" in all of the price fixing agreements. *Id.* ¶¶ 1, 318-19. As a result this global conspiracy, the plaintiffs and members of the Class purchased U.S. Freight Forwarding Services from the defendants at inflated prices. *Id.* ¶ 321-22.

### C.     Claim 15

Claim 15 alleges a conspiracy by unspecified defendants beginning around late summer 2004 to fix, inflate, and maintain a new "AMS" charge for freight forwarding services on air cargo shipments entering the United States from unspecified locations.  No details are alleged concerning the means and methods of the conspiracy.  Compl. ¶¶ 323-26.

## III.   STANDING

The defendants move to dismiss Claims 2 through 10, 12, 13 and 15 because the plaintiffs have failed to allege that they have the requisite constitutional and statutory standing to assert their antitrust claims.  They point out that with the exception of Claim 1, the plaintiffs have not alleged that they paid the specific surcharges that they claim to be unlawful.  The plaintiffs argue that they have standing because the surcharges led to the inflation of prices for freight forwarding services in the U.S. market overall and that the plaintiffs purchased freight forwarding services from the defendants at these inflated prices.  The plaintiffs' arguments in opposition to the motion to dismiss are unconvincing.  They completely fail to allege how the fixed surcharges on specific routes could and did inflate prices for freight forwarding services in the broad U.S. market for such services.  Because the plaintiffs do not make any connection between the defendants' anticompetitive conduct and their alleged injuries, the court concludes that they do not have standing to pursue these claims.

### A.     Legal Standards

To demonstrate that they have standing to pursue their Sherman Act claims, the plaintiffs bear the burden to allege both injury-in-fact under Article III of the United States Constitution and antitrust injury under § 4 of the Clayton Act.  *See Ross v. Bank of America, N.A. (USA)*, 524

F.3d 217, 222 & n.1 (2d Cir. 2008).  Moreover, in a purported class action, "the named class

plaintiffs 'must allege and show that they personally have been injured, not that the injury has

been suffered by other, unidentified members of the class to which they belong and which they

purport to represent.'" *Central States Southeast and Southwest Areas Health and Welfare Fund

v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005) (quoting *Warth v.

Seldin*, 422 U.S. 490, 502 (1975)); *see also Hinds County, Miss. v. Wachovia Bank, N.A.*, 700 F.

Supp. 2d. 378, 392-93 (S.D.N.Y. 2010).

Under Article III of the United States Constitution, the federal courts' jurisdiction

extends only to actual cases and controversies.  U.S. Const. art. III; *Ross*, 524 F.3d at 222.  In

order to establish "constitutional standing under Article III, § 2, 'a plaintiff must have suffered

an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the

challenged action; and the injury must be likely redressable by a favorable decision.'"  *Ross*, 524

F.3d at 222 (citation omitted); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992).  Antitrust standing requires a "much more detailed and focused inquiry" into whether the

plaintiff is the proper party to bring a private antitrust action.  *Id.* at 225.  Although § 4 of the

Clayton Act broadly authorizes private suits and recovery of treble damages by "any person who

shall be injured in his business or property by reason of anything forbidden in the antitrust laws,"

15 U.S.C. §15(a), the Supreme Court has narrowed the permissible class of antitrust plaintiffs in

several cases.  *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,

459 U.S. 519, 534-46 (1983) (employing multi-factor inquiry to determine whether a plaintiff

has alleged antitrust injury); *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476 (1982)

("An antitrust violation may be expected to cause ripples of harm to flow through the Nation's

economy; but 'despite the broad wording of § 4 there is a point beyond which the wrongdoer

should not be held liable.'") (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728 (1977)).

The Second Circuit summarized "antitrust injury" in 2006:

> An antitrust injury is an injury of the type the antitrust laws were intended to prevent
> and that flows from that which makes defendants' acts unlawful. The injury should
> reflect the anticompetitive effect either of the violation or of anticompetitive acts
> made possible by the violation because the antitrust laws were enacted for the
> protection of *competition*, not *competitors*. Thus, the antitrust injury requirement
> ensures that a plaintiff can recover only if the loss stems from a competition-reducing
> aspect or effect of the defendant's behavior. A plaintiff must demonstrate antitrust
> injury whether the alleged violation is unreasonable *per se* or under the rule of
> reason, and whether it seeks damages or injunctive relief.

*Paycom Billing Services, Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006)

(internal quotation marks, citations and alterations omitted) (emphasis in original).

### B.     Analysis

The plaintiffs do not have constitutional or antitrust standing to pursue the claims in

claims 2 through 10, 12, 13 and 15 because they provide only conclusory allegations that they

were harmed by the defendants' alleged conspiracies to impose fixed surcharges on various air

cargo routes. While the plaintiffs go into great detail as to the formation and execution of the

conspiracies, they provide precious little as to their alleged injury. As to injury, the plaintiffs

make only the following broad allegations:

> As a direct result of Defendants' conspiratorial conduct in violation of Section 1 of the
> Sherman Antitrust Act, Defendants' new charges, surcharges, fees and prices for U.S.
> Freight Forwarding Services, which were the subjects of the specific agreements among
> Defendants and their co-conspirators as alleged in this Complaint, have been fixed,
> inflated and maintained at supra-competitive levels that have been paid by Plaintiffs and
> the members of the proposed class. Moreover, as a result of Defendants' conspiratorial
> conduct as alleged in this Complaint, Defendants' prices and rates overall for U.S.
> Freight Forwarding Services have been fixed, inflated and maintained at supra-
> competitive levels that have been paid by Plaintiffs and the members of the proposed
> class. (Compl. ¶¶ 9, 177-78);

Defendants' conspiratorial conduct as alleged in this amended Complaint not only led to the fixing and inflation of the new charges, surcharges, fees and prices for U.S. Freight Forwarding Services which were the subjects of the specific agreements among Defendants and their co-conspirators as alleged in this Complaint, but also to the wrongful inflation of prices and rates overall for U.S. Freight Forwarding Services. (*id.* ¶ 179);

The Complaint alleges that each of the three named plaintiffs,

purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.  (*id.* ¶¶ 20-22).

Finally, the Complaint contains a general allegation in each count that each surcharge "inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members."  *Id.* ¶¶ 203(c); 213(c); 221(c); 249(c); 257(c); 273(c); 285(c); 291(c); 298(c); 309(c); 314(c).[13]  Read closely, then, the above allegations do not assert that the plaintiffs actually paid any of the collusively fixed surcharges.  This stands in stark contrast to the claim of injury in Claim 1, which alleges that "Plaintiffs and class members did pay, a security surcharge on such air freight shipments [and] [t]he amount of such security surcharge was at least EURO 0.15 per kilo (approximately U.S. $.13 per kilo)."  *Id.* ¶ 189.[14]

Thus, the basis for the plaintiffs' claim of injury to their "business and property" in all of their claims, other than Claim 1, is not that they paid the fixed surcharges, but that the imposition of those surcharges on some air cargo routes somehow resulted in inflated prices for all "U.S.

_____

[13]  Claim 15 does not even make this allegation, claiming only that "[a]s a direct result, Plaintiffs and other class members were injured in their property and are entitled to recover damages under 15 U.S.C. § 15." *Id.* ¶ 326.

[14]  The plaintiffs also make the conclusory, boilerplate allegation, tracking the statute, that "[b]y reason of the alleged violations of the antitrust laws, Plaintiffs and members of the Class have been injured in their business and property and have suffered damages in an amount presently undetermined." *Id.* ¶ 180.

Freight Forwarding Services."  The plaintiffs define "Freight Forwarding Services" broadly as "services relating to the organization of transportation of items via air, *ship, rail, and truck . . . .*" *Id.* ¶ 16 (emphasis added).  "U.S. Freight Forwarding Services" are defined as those Freight Forwarding Services "purchased or sold in the United States regardless of the location of shipment or . . . in respect of shipments into, out of, or within the United States."  *Id.* ¶ 17.  The Complaint, however, includes *no allegations* to support or lead to the conclusion that the imposition of surcharges on specific routes had such a dramatic effect on the broad and diverse market for U.S. Freight Forwarding Services.  Even if harm to the United States market generally could be the kind of injury the antitrust laws were intended to address, the plaintiffs' failure to "specifically articulate any of the links in this causal chain" is fatal to their standing argument.  *Arista Records LLC v. Lime Group LLC*, 532 F. Supp. 2d 556, 574 (S.D.N.Y. 2007); *see also Associated Gen. Contractors*, 459 U.S. at 526 (court need not "assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged").

Not only do the plaintiffs fail to allege that they paid the surcharges, they do not even allege that they purchased freight forwarding services from the defendants on the routes on which the surcharges were imposed – they only allege that they purchased "U.S. Freight Forwarding Services," which could refer to any manner of transportation on any number of routes.  As a result, it is conceivable that they never made any purchases on the relevant routes. Thus, for example, in Claim 3, the plaintiffs allege that beginning in October 2002, the NES Defendants imposed a surcharge for air freight shipments from Heathrow Airport to anywhere in the world, including flights to the United States.  While it could be the case that the named

plaintiffs paid this surcharge, it could just as likely be the case that the plaintiffs only purchased

freight forwarding services from defendants on air cargo flights between Brazil (or anywhere in

South America, for that matter) and the United States.  Or even more removed, the plaintiffs

could have purchased these freight forwarding services with respect to transport, not via air, but

via "ship, rail [or] truck."   This possibility is supported by the plaintiffs' own extensive

allegations that the defendants possess significant market share and are among the largest and

leading providers of Freight Forwarding Services in the United States and worldwide.  Compl. ¶

114.  There are no allegations that suggest any connection between specific air cargo routes like

Heathrow-United States, Japan-United States, or China-United States and the U.S. Freight

Forwarding Services market overall and no reasonable basis for the court to make such an

inference.  The plaintiffs' standing allegations are precisely the type of "unadorned, the-

defendant-unlawfully-harmed-me accusation" that cannot survive a motion to dismiss.  *Iqbal*,

129 S.Ct. at 1949; *see also Twombly*, 550 U.S. at 557 (complaint that tenders "naked

assertion[s]" devoid of "further factual enhancement" cannot survive the pleading stage).

The plaintiffs argue that the Second Circuit's decision in *Ross* demonstrates that their

Complaint "easily" clears the low threshold of constitutional injury-in-fact.  In *Ross*, credit

cardholders brought a putative antitrust class action against credit card issuing banks, alleging an

agreement to force cardholders to accept mandatory arbitration clauses.  The banks argued that

the plaintiffs did not have constitutional standing because the arbitration clauses had not been

invoked as against them.  The Court rejected this argument because coercive practices that

prevent individuals from making free choices between market alternatives is an accepted form of

antitrust injury.  *Id.* at 223-24.  Thus in *Ross*, the injury to the individuals, *i.e.* lack of choice,

"stem[med] directly from the alleged collusion and [was] distinct from the issue of whether any cardholder's mandatory arbitration clause is ever invoked."  *Id.*  Here, however, the collusive activities at issue are various price-fixing conspiracies and yet, the plaintiffs do not claim to have paid the fixed charges or even purchased services on the general routes on which the surcharges were allegedly imposed.  Nor do they make any allegations that the alleged harm to the U.S. Freight Forwarding Services market overall was in fact a plausible consequence of the price-fixing conspiracies alleged in the Complaint.

The plaintiffs also mistakenly rely on *In re Nine West Shoes Antitrust Litigation*, 80 F. Supp. 2d 181, 190 (S.D.N.Y. 2000) to assert that they have adequately alleged antitrust injury. According to the plaintiffs, *Nine West* establishes that they may allege "that 'as a result of the conspiracy' plaintiffs have paid higher prices 'than they would have paid in the absence of the conspiracy'" and that the defendants' conduct "'reduced overall competition' in the market for the product generally."  *Nine West*, 80 F. Supp. 2d at 190.  In *Nine West*, purchasers of Nine West shoes alleged that the defendant and several department stores conspired as to the prices of Nine West shoes over a period of time, resulting in overall inflated prices.  *Id.* at 184.  The *Nine West* plaintiffs alleged that the conspiracy was to fix prices on the entire domestic market for Nine West shoes and that they purchased the products in that market at the resulting inflated and fixed prices.  There is simply no parallel allegation here.  To the extent the plaintiffs allege that the individual conspiracies to impose surcharges on certain air cargo routes inflated the prices for U.S. Freight Forwarding Services overall, these allegations are conclusory.  The plaintiffs plead no facts that would demonstrate a plausible connection between increased surcharges for air cargo on selected routes and the pricing of all freight forwarding services regardless of the

mode of transportation – i.e., air ship, rail or truck – and regardless of the origin and destination of the cargo.

The purported injury here is more closely parallel to those cases where courts have denied standing because the plaintiffs fail to allege that they acquired or attempted to acquire the product that was the target of the defendants' anticompetitive conduct. *See Arista Records*, 532 F. Supp. 2d at 567-71; *de Atucha v. Commodity Exchange, Inc.*, 608 F. Supp. 510, 516 (S.D.N.Y. 1985) (antitrust standing lacking where plaintiff's purported injury in foreign market was highly speculative and too attenuated from defendants' purported domestic conspiracy). In *Arista Records*, the defendants created two joint ventures that became the exclusive vehicles through which they would license music content for online distribution by retailers. 532 F. Supp. at 563-64. The defendants then allegedly pooled their copyrights and created a price-fixing arrangement for the sale of those licenses. *Id.* at 564. The plaintiff was a retail distributor of online music content that needed these licenses to sell copyrighted music through its website. *Id.* at 565. The plaintiff did not allege that it either purchased or attempted to purchase a license from the defendants; rather it alleged that it "solicited licensed content" from non-parties like independent labels, artists and other retailers. *Id.* at 569. The court found that such allegations did not demonstrate injury to the plaintiff because while its "retail competitors may have 'faced excessive wholesale prices' for licenses as a result of the alleged price-fixing scheme, [plaintiff] has not alleged any facts demonstrating that it suffered such harm." *Id.* Similarly here, where the plaintiffs allege that they purchased services from the defendants in the United States market, they fail to sufficiently allege that the fixed surcharges had any "'adverse effect on competition

-26-

market-wide'" or imposed a "'cognizable harm'" to themselves.  *Id.* at 575 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001)).

While it may be that the plaintiffs can plead that they paid the surcharges at issue, they have not and concede so in their briefs.  *See* Joint MTD Opp. at 43 n.35. Therefore, I recommend that the court grant the defendants' motion to dismiss Claims 2 through 10, 12, 13 and 15 for lack of standing, but with leave to replead to cure the defects if possible.

## IV.   NOTICE

The defendants argue that the plaintiffs' use of various shorthand devices for referring to the defendants fails to allege sufficiently each defendant's participation in the alleged conspiracies, and does not give adequate notice to each defendant of the plaintiff's claims.  As explained below, the court concludes that while the use of the term "defendants" to refer generally to a group of defendants in a given claim is not necessarily fatal to the claim, the plaintiffs' decision to lump together certain related defendants and refer to them by a single name, without differentiating between them, is flawed.

### A.   Grouping of Defendants Generally

The defendants object to the use of the term "defendants" or to defined groups of defendants in the individual claims.  For example, the heading of Claim 1 defines the nine defendants named in that heading as the "Security Surcharge Defendants" and subsequently makes allegations as to the anticompetitive conduct of the "Defendants" or the "Security Surcharge Defendants" rather than renaming each individual defendant.  The defendants argue that such "definitional tactics" fail to tie each individual defendant to each conspiracy.  The defendants' argument misses the point.  The more relevant consideration is whether the instances

in which they are specifically identified sufficiently allege, or permit the reasonable inference, that they were members of the alleged conspiracy.  *See In re OSB Antitrust Litig.*, No. 06-MDL-826, 2007 WL 2253419, at *5-*6 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed defendant by defendant"); *Jung v. Ass'n of American Medical Colleges*, 300 F. Supp. 2d 119, 164 n. 27 (D.D.C. 2004) (plaintiff must plead that "an individual defendant was a participant in the conspiracy in the first instance," but "need not allege overt acts committed by each defendant in furtherance of a conspiracy") (citing *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705, at *10-*11 (D.D.C. May 9, 2000)).

While the general use of the term "defendants" is problematic if used without any allegation as to each defendant, the Complaint does make specific allegations against specific defendants.  Thus, in some instances a defendant is only alleged to have been a member of a trade association whose members are implicated in the conspiracy and to have imposed the surcharge at issue.  But even without an allegation that this defendant attended specific meetings where the conspiracy was discussed, the plaintiffs have alleged more than parallel conduct–rather, they have alleged parallel conduct in circumstances that raise the inference of a preceding agreement.  *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322 (2d Cir. 2010); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (cautioning against "compartmentalizing the various factual components" of the claim); *OSB*, 2007 WL 2253419, at *5 (citing cases).

## B.    Corporate Grouping

The defendants get much farther with their argument that the plaintiffs' method of "lumping" or "grouping" corporate families impermissibly ignores corporate separateness and

therefore fails to state a viable antitrust claim against those entities.  The plaintiffs have chosen to define certain defendants in the definition section of the Complaint and then refer to them in subsequent allegations by reference to a defined corporate entity or to "defendants" generally. For example, parent company Panalpina World Transport (Holding) Ltd. and its United States subsidiary Panalpina, Inc. are jointly defined as "Panalpina."  The local conspiracy claims in Claims 1, 5, 6, 7, 8 and 9 are brought against "Panalpina" and refer to the actions of employees of "Panalpina."  The plaintiffs thus allege that a representative of "Panalpina" participated in a meeting on a certain date, seeking to attribute the agreement to conspire on that date to all Panalpina entities.  The plaintiffs provide no basis for why *these* Panalpina entities, rather than any other Panalpina entities, entered into the agreements to fix prices.

This type of pleading is repeated for the majority of the defendants. The plaintiffs' individual definition of each defendant includes an allegation that said defendant "directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States."  *See* Compl. ¶¶ 23-85. The plaintiffs also allege that the "acts alleged against the corporate Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs."  *Id.* ¶ 88.  The plaintiffs do not specifically allege that the parents, subsidiaries, or affiliates of these corporate defendants either joined the alleged conspiracies individually nor were aware of their existence.  They also make no claim that the separate corporate existence of these entities should be ignored.  Instead, they rely on what appears to be a joint liability theory to put entire corporate families on the hook for antitrust violations.

It is axiomatic that "the mere fact that there exists a parent-subsidiary relationship between two corporations" does not "make the one liable for the torts of its affiliate." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quoting 1 W. Fletcher, *Cyclopedia of Law of Private Corporations* § 33, p. 568 (rev. ed. 1990)).  The plaintiffs' complaint thus fails the basic pleading requirement that where a complaint names multiple defendants, Rule 8(a) requires that the plaintiffs "indicate clearly the defendants against whom relief is sought, and the basis upon which relief is sought against the particular defendants."  *Yucyo, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 219 (S.D.N.Y. 1997) (quoting *Mathews v. Kilroe*, 170 F. Supp. 416, 417 (S.D.N.Y. 1959)).  As discussed above, the plaintiffs need not couch their allegations defendant-by-defendant, but they do need to allege that each individual defendant joined the conspiracy and played some role in it.  *See Jung,* 300 F. Supp. 2d at 164 n. 27; *Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 512 (S.D.N.Y. 2009).

The argument that the grouped defendants joined the alleged conspiracies through their corporate affiliation is precisely the sort of "legal conclusion couched as a factual allegation" that *Twombly* and *Iqbal* deemed insufficient to state a claim.  *See Iqbal*, 129 S.Ct. at 1950; *Twombly*, 550 U.S. at 555.  The Complaint is devoid of factual allegations that would support the inference that the corporate defendants joined the conspiracy separately or vicariously through the parents, subsidiaries, or affiliates.  The plaintiffs attempt to link the corporate groups by alleging that each defendant sold freight forwarding services in the United States "through its subsidiaries and/or affiliates."  ¶¶ 23-85.  The sale of freight forwarding services, however, is not enough.  There is no indication that every sale of freight forwarding services during the Class Period was connected to a conspiratorial surcharge.  Moreover, even if that were the case, there

is also no support for the conclusion that a corporate affiliate was aware of and joined a conspiracy simply by virtue of its participation in the sale of such services.

Read in the light most favorable to the plaintiffs, these allegations could be inferred to mean that the subsidiaries were used as instruments of the antitrust violations by facilitating the sale of freight forwarding services in the United States.  A similar argument was rejected in *In re Penn. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663 (E.D. Pa. 2009).  The plaintiffs there alleged that the parent corporations gave their assent and approval to their subsidiaries' conduct but did not include allegations as to how that approval aided or assisted the subsidiaries in carrying out the conspiracy.  *In re Penn.*, 648 F. Supp. at 688-89.  The court dismissed the claims against the parents because there were insufficient facts to "establish[] the parent corporations' direct and independent participation in the alleged conspiracy."  *Id.* at 688.  Not only have the plaintiffs here failed to provide any facts showing *knowing* assent or approval by the grouped defendants, they certainly have not provided any allegations of direct or independent participation.

A court in the Northern District of California has also held that the type of group pleading used in this case is insufficient to put any affiliate of a corporate entity on the hook for a conspiracy charge.  *See In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("general allegations as to all defendants . . . or to a single corporate entity such as 'Hitachi' is insufficient to put specific defendants on notice of the claims against them").[15]  Other courts are in accord with *Flat Panel*.  *See In re Penn.*, 648 F. Supp. 2d at 687

---

[15]  A subsequent amended complaint in *Flat Panel* survived a motion to dismiss on the grouping issue where the plaintiffs alleged, *inter alia,* that the "'individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families'" and that "'the individual participants in conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.'" *In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009).  There are

("plaintiffs can not rely merely on the parents' ownership interest in their respective subsidiaries to sustain a §1 claim against parent defendants"); *Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006) ("absent allegations of anticompetitive conduct by the parent, there is no basis for holding a parent liable for the alleged antitrust violation of its subsidiary"); *RSM Prod. Corp. v. Petroleos De Venezuela Societa Anonima (PDVSA)*, 338 F. Supp. 2d 1208, 1216 (D. Colo. 2004) (granting motion to dismiss in antitrust case because a complaint that alleged that the company "is a wholly owned subsidiary of [parent], without more, does not subject [the subsidiary] to liability on any basis"); *United National Records, Inc. v. MCA, Inc.*, 616 F. Supp. 1429, 1430-33 (N.D. Ill. 1985) (granting summary judgment as to antitrust claims against parent for acts of its former subsidiary because plaintiff did not show that corporate veil should be pierced or that parent had independently violated antitrust laws).

The Supreme Court has held that a parent corporation and its wholly owned subsidiary are considered a single entity in assessing whether a §1 conspiracy violation exists. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984). *Copperweld*, however, was concerned with whether a corporation could conspire with its own subsidiaries absent any outside parties' involvement in the anticompetitive conduct. The holding of that case does not extend to "hold that a subsidiary and its parent, or a subsidiary and a sister subsidiary, can be considered one entity for all §1 purposes, and either one can be liable for conspiring to restrain trade, even where there is no evidence that both were involved in the challenged

---

no such allegations in the plaintiffs' Complaint. A recent decision by that court is in accord. *See In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 2010 U.S. DIST. LEXIS 64930, at *23-*24 (N.D. Cal. June 29, 2010) (allegations as to a defendant's corporate status and that plaintiff purchased the product from defendant or its subsidiaries in the United States and elsewhere insufficient to allege defendant's participation in the price-fixing conspiracy).

conduct." *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 & n.12 (10th Cir. 1999) (discussing *Copperweld* and holding that allegations of conduct typical of any parent and subsidiary not sufficient to implicate subsidiary in conspiracy); *see also In re Penn.*, 648 F. Supp. 2d at 688-89 (same). In order to link related corporate entities in a Sherman Act conspiracy, the plaintiffs must allege something beyond corporate affiliation, like "evidence that both were involved in the challenged conduct," i.e., "specific evidence of coordinated activity," *Mitchael*, 179 F.3d at 857 or "set forth facts establishing the [affiliates'] direct and independent participation in the alleged conspiracy," *In re Penn.,* 648 F. Supp. 2d at 688.

The plaintiffs cite three cases addressing corporate affiliate liability in the antitrust context that merit discussion. In *Alco Standard*, a court upheld an antitrust conspiracy claim against a group of defendants that it characterized as "subsidiaries and affiliates of each other" with a separate unrelated competitor. *Alco Standard Corp. v. Schmid Bros., Inc.*, 647 F. Supp. 4, 6 (S.D.N.Y. 1986). The *Alco Standard* plaintiffs alleged that all of the defendant corporate affiliates and subsidiaries were parties to the distribution agreement which was at the heart of the alleged conspiracy. *Id.* at 5 ("WPG served notice to terminate the . . . distributorship agreement entered into among plaintiff and [the Goebel Defendants, subsidiaries and affiliates of each other]"). The court thus rejected the affiliates' claim that the Complaint did not state a claim against them on the grounds that the facts were "addressed 'for the most part' to the actions of [the corporate parent]." *Id.* at 6. Here, on the other hand, the plaintiffs do not specifically allege that the corporate affiliates each individually entered into the conspiracies, charged the fixed surcharges, or that the representatives at the meetings had the authority to act on each affiliates' behalf. The plaintiffs are also incorrect that the facts in *In re Commercial Explosives Litig.*, 945

F. Supp. 1489, 1491-92 (D. Utah 1996) are "virtually identical" to this one.  In that case, it was alleged that the defendant DuPont conspired to fix prices of commercial explosives and that it sold the product through a "commercial explosives division," not its subsidiary.  *Id.* at 1491.  Dupont was individually alleged to have attended meetings, rigged bids, and exchanged pricing documents in furtherance of the conspiracy.  *Id.*  While DuPont was grouped with the defendants generally, there was no indication that the allegations against it were related to any corporate affiliation.  *Id.* at 1491-92.   Neither of these cases involved the pervasive and cavalier grouping method employed by the plaintiffs in this case – which would impose liability on dozens of defendants based on corporate affiliation alone.  It is also worth noting that *Alco Standard* and *Commercial Explosives* were both decided before *Twombly* and explicitly relied on the now defunct standard for dismissal announced in *Conley*.  *See Alco Standard,* 647 F. Supp. at 6 (quoting *Conley*, 355 U.S. at 45-46); *In re Commercial*, 945 F. Supp. at 1491 (same).

The plaintiffs also rely on the Third Circuit's decision in *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004) for the proposition that only minimal evidence is necessary to link additional defendants to a properly alleged conspiracy.  The plaintiffs quote repeatedly from that court's statement that "[i]f six firms act in parallel fashion and there is evidence that five of the firms entered into an agreement, for example, it is reasonable to infer that the sixth firm acted consistent with the other five firms' actions because it was also a party to the agreement."  385 F.3d at 363.  Even if this statement were not *dicta*, it is inapplicable to the plaintiffs' Complaint.  The plaintiffs do not seek to impose liability on entire corporate families by alleging parallel conduct by them.  Nor do they allege that each corporate affiliate separately entered into any agreement to fix prices.  Rather, the plaintiffs wish to put individual defendants on the hook for

-34-

antitrust violations based on corporate affiliation alone, arguing that because they have alleged that each defendant "directly or through its subsidiaries and affiliates, sold Freight Forwarding Services throughout the United States" the Court can infer that those subsidiaries and affiliates also conspired in violation of antitrust laws. This is not a reasonable inference to be drawn. The conduct that forms the basis for the plaintiffs' conspiracy claims is collusion in the charging of fixed fees and surcharges, not the sale of freight forwarding services generally.

The claims against the United States subsidiaries of some of the Japanese Defendants ("the U.S. Subsidiaries"),[16] who have filed a separate motion to dismiss, suffer the aforementioned grouping defect as well as a vagueness problem. The plaintiffs group each Japanese parent with its subsidiary in the definition of the parties at the outset of the Complaint, and then proceed to name only the parents in the individual counts in Claims 2, 4, 10, and 12. The plaintiffs' failure to name any of the U.S. Subsidiaries in these individual claims is sufficient to dismiss the claims as against them. Such vague pleading, which does not even specify for the Court who is being sued for what cause of action, does not meet Rule 8's requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While it is true that "[s]pecific facts are not necessary," the Complaint does need to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555). Contrary to the plaintiffs' arguments, in a case like this, requiring them to name a defendant in at least the headings of its specific claims and distinguish it from its subsidiaries is not equivalent to "compartmentalizing

---

[16] These defendants contend that the plaintiffs are incorrect that certain of these defendants are indeed subsidiaries of named defendants as opposed to affiliates or sister subsidiaries. U.S. Subs. MTD at n.1.

the various factual components [of the complaint] and wiping the slate clean after scrutiny of each." *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 201 (2d Cir. 2006) (citation omitted). A complaint that defines a defendant in the introductory paragraphs of a 15-claim, 65-defendant complaint and never mentions it again to clarify, at the very least, what causes of action are brought against it clearly does not meet any plausibility standard.[17] *See Morpurgo v. Incorporated Village of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010) ("It is well settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that Defendant should be granted") (quoting *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999)).

The plaintiffs make a similar argument as to two DSV entities, DSV A/S and DSV Solutions Holding A/S who are not named specifically in any claim. Defendant ABX Logistics Group is named in Claims 1 and 6-9 and described as a corporation purchased by DSV A/S. Compl. ¶ 45. Defendant DSV Air & Sea, Ltd., who is listed as a defendant in Claims 7-9, is also a separate corporation from these DSV entities (in fact, Claims 7-9 are brought against "DFDS Transport," which is identified as the former name of DSV Air & Sea Ltd.). *Id.* ¶ 48. The plaintiffs contend that these allegations extend to DSV A/S and DSV Solutions Holding A/S

---

[17] The plaintiffs also maintain that the court must infer claims against the U.S. Subsidiaries in these counts because they "allege very specific factual allegations regarding the actions of the Japanese Defendants in the international market for Freight Forwarding Services and allege that these services were sold in the U.S." and that therefore "it is reasonable to infer, especially given the explicit allegations [that each defendant "acted directly or through its subsidiaries and/or affiliates"] that the Japanese Defendants' U.S. subsidiaries were also parties to this conspiracy and assisted in executing it in the U.S." U.S. Subs. MTD Opp. at 15. For the reasons stated in the main text, the court declines this request. Even if the court could infer that these claims are brought against the U.S. Subsidiaries, the plaintiffs run directly into the same corporate grouping problem described above.

because the "Complaint alleges that each Defendant acted by itself or through its subsidiaries or agents to violate the antitrust laws."  DSV MTD Opp. at 1 (citing Compl. ¶ 88).  The Complaint includes no such allegation.  Paragraph 88, which does not mention corporate parents, subsidiaries, or affiliates, states: "The acts alleged against the corporate Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs." While the Complaint does allege that each defendant sold freight forwarding services throughout the United States through their subsidiaries or affiliates, selling freight forwarding services does not violate the antitrust laws.[18]

The plaintiffs argue in the alternative that they have alleged that the corporate affiliates are implicated as agents in the conspiracy and that resolution of that issue is a fact-intensive inquiry inappropriate for a motion to dismiss.  U.S. Subs. MTD Opp. at 21, n.16 (citing *In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 272 (S.D.N.Y. 2009)).  The plaintiffs' agency theory is based on conclusory and generic statements that do not even provide the barest allegations as to the elements of the agency relationship.  As noted above, the plaintiffs allege generally that the defendants' anti-competitive conduct was "authorized, ordered, or done by their officers, agents, employees, or representatives[.]" Compl. ¶¶ 88, 90, 153.  These allegations

---

[18]  Following a pattern of ambiguity, the plaintiffs have thus failed to name thirteen defendants in any individual conspiracy claims: Air Express International Inc., DSV A/S, DSV Solutions Holding A/S, DB Schenker, Spedlogswiss, aka The Association of Swiss Forwarders, Japan Air Cargo Forwarders Association, Con-way, Inc., Yamato Transport U.S.A., Inc., MOL Logistics (U.S.A.), Inc., Vantec World Transport (USA), Inc., Nissin International Transport USA, Inc., "K" Line Logistics (USA), Inc., and Hanshin Air Cargo USA, Inc.  While these thirteen defendants do not appear in any of the individual conspiracy counts in Claims 1 through 10, they would be included in the allegations in Claim 14 which is brought against "Defendants" generally.  For the reasons stated in Section V(C), below, Claim 14 fails to state a claim against any defendant because the plaintiffs have failed to allege a plausible global conspiracy.

are not supported by any facts – they do not allege which affiliates acted as agents nor on whose behalf they were acting.  A recent decision in California federal court dismissed a claim against a parent corporation on allegations of agency that were arguably more detailed than what the plaintiffs have alleged here:

> Plaintiffs further allege that "[e]ach defendant acted as the principal, agent or joint venturer of, or for, other defendants with respect to the acts, violations and common course of conduct alleged by Plaintiffs." (*Id.* ¶ 67.) . . .  Plaintiffs here do not attempt to allege any facts to show that the parent corporations knew what their subsidiaries were doing. . . . Thus, to the extent Plaintiffs rely on an agency theory to assert claims against the Parent Corporations, the Court concludes that the allegations of agency are [no] more than bare legal conclusions, which the Court need not accept as true.

*In re Cal. Title Ins. Antitrust Litig.*, No. 08-01341, 2009 WL 1458025, at *8 (N.D. Cal. May 21, 2009).  The plaintiffs bare allegations of agency are insufficient to put the corporate affiliates on notice of the claims against them.

The plaintiffs have alleged that sixty-five different defendants were members of ten local conspiracies around the world, three regional conspiracies and one massive global conspiracy. It is in this complex type of case where there is the most danger of hardship on innocent defendants.  The Supreme Court recently reiterated that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  *Twombly*, 550 U.S. at 558 (quoting *Associated Gen. Contractors*, 459 U.S. at 528 n. 17).   Here, the plaintiffs corporate group pleading method only leaves "open the possibility that [they] might later establish some 'set of [undisclosed] facts' to support recovery" against the affiliates.  *Id.* at 561 (citation omitted).  This is not enough.[19]

---

[19]   The court declines the plaintiffs' request to take judicial notice of statements on the defendants' websites "about their corporate unity and their seamless communications."  Tr. of Oral Arg. Sept. 15, 2010, Dkt. Entry 454, at 58, 61-62.  "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

For these reasons, the court recommends that the claims against Panalpina World Transport (Holding) Ltd. and Panalpina, Inc. (defined as Panalpina"), Kuehne & Nagel International AG, Kuehne + Nagel Inc. (defined as "Kuehne + Nagel"), EGL, Inc., EGL Eagle Global Logistics, LP (defined as "EGL"),[20] Deutsche Bahne AG, Schenker AG, Schenker, Inc. (defined as "Schenker"), United Parcel Service, Inc. (UPS, Inc.), UPS Supply Chain Solutions, Inc.,[21] Dacsher GmbH & Co. KG i/s/h/a Dachser Intelligent Logistics, Dachser Transport of America, Inc. ("Dachser"), Baltrans Logistics, Inc., Toll Global Forwarding (USA), Inc. ("Baltrans"), Geodis S.A. (sued as Geodis Group), Geodis Wilson USA, Inc. ("Geodis")[22], Jet Speed Logistics, Ltd., Jet Speed Air Cargo Forwarders (USA), Inc., Jet Speed Logistics (USA),

---

documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322 (citation omitted); *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Here, the websites were not quoted in or referenced in the Complaint so the only issue is whether they are subject to judicial notice. Cases cited by the plaintiffs that have taken judicial notice of websites on motions to dismiss have done so for the limited purpose of ascertaining an undisputed fact or the fact of the website's publication. *See Ligon v. Doherty*, 208 F. Supp. 2d 384, 386 (E.D.N.Y. 2002) (where plaintiff failed to appear on dates ordered by court, court took judicial notice of the records posted by the New York State Department of Correctional Services that indicated that plaintiff was reincarcerated); *In re UBS Auction Rate Sec. Litig.*, 08-2967, 2010 WL 2541166, at *15 (S.D.N.Y. June 10, 2010) ("The Second Circuit, and several district courts in this Circuit, have found it appropriate to take judicial notice of the contents of a party's website for the fact of its publication"). The statements the plaintiffs point to are not the type of readily ascertainable and undisputed facts that are normally subject to judicial notice since they would have the court rely on them as a basis for disregarding the corporate form.

[20] The Complaint defines these two entities as "EGL," Compl. ¶ 29, but then contains references to both EGL and an undefined entity "Eagle" throughout. For the purposes of this motion and because the parties do the same, the court assumes that "EGL" and "Eagle" refer to the same grouped entities.

[21] Although not defined as such, these two entities are referred to collectively as "UPS." Moreover, Claim 3, which is brought against "Emery" and "UPS (a/k/a Menlo Worldwide)," neither of which are defendants, is assumed to be directed at "UPS" and should be dismissed as to them as well. *See* Compl. ¶¶ 58, 114, 208, 300, and p. 53.

[22] Although the Complaint identified the two Geodis entities as "Geodis" the only specific claim against any of these entities is the claim in Claim 1 against "Geodix (Geodix Wilson)." The court infers that the plaintiffs intend to group the Geodis defendants here.

LLC ("Jet Speed Logistics"), Morrison Express Logistics PTE Ltd., Morrison Express Corporation (USA) ("Morrison Express"), Deutsche Post AG, DHL Global Forwarding, and DHL Express (USA) be dismissed without prejudice. To the extent that Claims 3, 5, and 6 are brought against DHL Danzas they should be dismissed without prejudice as well. However, the claims where DHL Danzas is identified individually in the heading as well as Claim 1 should survive as against DHL Danzas. Although Claim 1 names "DHL" in the heading, the specific allegations of conspiratorial conduct in the supporting allegations all are directed to the conduct of employees of DHL Danzas and are sufficient to state a claim against DHL Danzas.

The court recommends that Claims 5 and 6 against Nippon Express Co., Ltd., Nippon Express USA ("Nippon"), Yusen Air & Sea Service Co., Yusen Air & Sea Service (U.S.A.), Inc. ("Yusen"), and Kintetsu World Express, Inc. and Kintetsu World Express (U.S.A.) ("Kintetsu") also be dismissed without prejudice. The purported claims in Claims 2, 4, 10, 12 and 14 against Nippon Express USA, Inc., Yusen Air & Sea Service (U.S.A.), Inc., Kintetsu World Express (U.S.A.), Inc., Nissin International Transport U.S.A., Inc., Vantec World Transport (USA), Inc., "K" Line Logistics (U.S.A.), Inc., Yamato Transport U.S.A., Inc., MOL Logistics (U.S.A.), Inc., and Hanshin Air Cargo USA, Inc. should be dismissed without prejudice.

Finally, any purported claims against the following thirteen defendants, who are not named in any specific claims, should also be dismissed without prejudice: Air Express International Inc., DSV A/S, DSV Solutions Holding A/S, DB Schenker, Spedlogswiss, aka The Association of Swiss Forwarders, Japan Air Cargo Forwarders Association, Con-way, Inc.,Yamato Transport U.S.A., Inc., MOL Logistics (U.S.A.), Inc., Vantec World Transport

(USA), Inc., Nissin International Transport USA, Inc., "K" Line Logistics (USA), Inc., and

Hanshin Air Cargo USA, Inc.

*   *   *   *

While the majority of the plaintiffs' claims should be dismissed due to the standing and

grouping issues discussed above, the court will address the defendants' remaining arguments for

dismissal below.  What follows refers at times to the discussion above, but proceeds on the

assumption that Judge Gleeson chooses not to follow the recommendations for dismissal

discussed in Sections III and IV.

## V.   PLAUSIBILITY OF THE CONSPIRACIES

The defendants also challenge the overall plausibility of the fifteen local, regional, and

global conspiracies for which the plaintiffs seek relief.  The court concludes that the plaintiffs

have alleged plausible conspiracies to fix prices in all but Claims 6, 11, 13, 14, and 15.

### A.   Legal Standards

As *Twombly* was an antitrust case, it provides specific guidance on how the plausibility

standard may be satisfied in a case brought under the Sherman Act.  The Sherman Act regulates

anti-competitive behavior, and makes illegal "[e]very contract, combination in the form of trust

or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

foreign nations."  15 U.S.C. § 1.  The *Twombly* plaintiffs asserted that the defendants had

engaged in parallel conduct, relying on allegations of lockstep or simultaneous business

decisions by the defendants as the basis for pleading anti-competitive behavior.  The Court

observed that, "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints

of trade . . . but only restraints effected by a contract, combination or conspiracy', '[t]he crucial

-41-

question is whether the challenged anti-competitive conduct 'stem[s] from independent decision

or from an agreement, tacit or express.'"  *Twombly*, 550 U.S. at 553 (quoting *Copperweld*, 467

U.S. at 775 and *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540

(1954)).  Thus, it is critical that the factual allegations in the complaint "suggest that an

agreement was made."  *Id.* at 556.  The Section 1 allegation of concerted action in *Twombly* was

legally insufficient because it alleged mere "parallel conduct unfavorable to competition"

without "some factual context suggesting agreement, as distinct from identical, independent

action."  *Id.* at 548-49.  *Twombly* noted that a "factual context suggesting agreement" could

mean specific allegations

about an independent agreement, or could be pleaded by parallel conduct allegations that are

indicative of an agreement, because they are, for instance, historically or commercially unusual.

*Id.* at 549, 557-59 (requiring that parallel conduct allegation be placed "in a context that raises a

suggestion of a preceding agreement").  But the core of *Twombly* is that parallel conduct

"coupled with only a bare assertion of conspiracy" does not give rise to a plausible claim under

the Sherman Act.  *See Starr*, 592 F.3d at 322.  In whatever way they can, antitrust plaintiffs must

establish "plausible grounds to infer an agreement" by pleading "enough fact to raise a

reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550

U.S. at 556.

### B.      Local Conspiracies in Claims 1-10 and Claim 15

In *Starr v. Sony BMG Music Entm't*, the Second Circuit had occasion to start applying, in

the antitrust context, the Supreme Court's recent pronouncements on plausibility.  *See* 592 F.3d

314 (2d Cir. 2010).  There, the court determined that a complaint alleging price-fixing by record

companies in the online music industry stated a plausible claim, and vacated the district court's

dismissal.  *Id.* at 327.  In so doing, it specifically rejected the defendants' contention that the

complaint needed to allege facts sufficient to exclude the possibility of independent self-

interested conduct on the part of the defendants.  *Id.* at 325. The *Starr* decision also noted that

since the claim rested on allegations of parallel conduct, the defendants need not have alleged the

specific time, place, or person related to each conspiracy allegation.  *Id.*  *Starr* rejected another

of the defendants' arguments, which was that the Department of Justice's decision not to proceed

with its own antitrust investigation of the conduct at issue should be given dispositive weight.

*Id.*  Ultimately, the court concluded that facts specific to the online music industry that were

pleaded in the complaint, gave rise to the plausible inference that the defendants' parallel

conduct resulted from an illegal agreement.  *Id.* at 323-24.  Unlike in *Twombly*, the parallel

conduct, in factual context, was suggestive of, as opposed to merely consistent with, an illegal

agreement.

    If the factual matter there was sufficient, the majority of the allegations here, which go

beyond those in *Starr*, should suffice to state a plausible claim.  For each local conspiracy,

except for Claim 6, the complaint makes allegations as to specific meetings, including in many

instances the (1) dates or time periods, (2) locations, (3) specific participants, and (4) at least the

general substance of what was discussed and agreed upon.  "There is no question that such

allegations – allegations that the defendants met, agreed to fix prices at a certain level, and then

did fix prices at that level – state a viable antitrust claim."  *In re Publication Paper Antitrust

Litig.*, No. 304-MD-1631, 2005 WL 2175139, at *2 (D. Conn. Sept. 7, 2005).  These specifics

make the conspiracy claims even more plausible, and in combination with the concessions of

misconduct on the part of many of the co-conspirators, there is ample factual matter to suggest that illegal agreements were made and entered into by the defendants. *See Twombly*, 550 U.S. at 556; *Starr*, 592 F.3d at 321. Moreover, unlike in *Starr*, both the JFTC and the Department of Justice have chosen to pursue actions against freight forwarders for some of the conspiracies that form the basis of the complaint and to accept guilty pleas on the part of others.

By way of contrast, the complaint in *In re Elevator Antitrust Litigation* was deemed deficient because it made conclusory allegations "in entirely general terms without any specification of any particular activities by any particular defendant . . . [and was] nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever." 502 F.3d 47, 50-51 (2d Cir. 2007) (quoting *In re Elevator Antitrust Litig.*, No. 04-CV-1178, 2006 WL 1470994, at *2-*3 (S.D.N.Y. May 30, 2006)). That does not describe the majority of the complaint in this case, which possesses what was lacking in *Elevator*. If the entirety of the plaintiffs' allegations was that the defendants conspired to restrain trade and violate the Sherman Act, that would be the sort of conclusory allegation that falls short under *Twombly* and *Iqbal*, and even before. Most of the local conspiracies, however, allege that particular defendants agreed with other named defendants to impose particular surcharges, and then provides factual detail to flesh out those allegations. These allegations go beyond the sort of bare labels or legal conclusions that are not presumed true at the 12(b)(6) stage, and they provide the basis for a plausible claim under the Sherman Act.

In addition to the general attack on the Complaint as a whole, various defendants have launched more specific attacks on individual counts to which the court now turns.

-44-

The defendants argue that Claim 1 should be dismissed because it only alleges an attempted agreement with the airlines to impose the security surcharge. "Section 1 proscribes only actual combinations, contracts and conspiracies; it does not reach attempts." *United States v. American Airlines, Inc.*, 570 F. Supp. 654, 657 (N.D. Tex. 1983), *rev'd on other grounds*, 743 F.2d 1114, 1119 (5th Cir. 1984). Claim 1 does, however, allege that the Security Surcharge Defendants conspired to and indeed did impose a security surcharge on the plaintiffs and members of the proposed class. *Id.* ¶¶ 188-89. The plaintiffs allege that the conspiracy was formed during a conference call of the FFE, a trade association formed by the eight freight forwarders named as defendants in Claim 1. Compl. ¶¶ 185, 186-88. The members on the call "included at least" the specified defendants, which indicates that others may have participated on the call. These allegations suffice to state a plausible conspiracy and that it was joined by all of the Security Surcharge Defendants. *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) (at motion to dismiss stage, plaintiffs "only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy"). While the plaintiffs do not allege that the airlines accepted the defendants' subsequent offer to join their conspiracy, the offer itself is another "overt act" that adds to the overall plausibility of the Security Surcharge Agreement.

The defendants Dachser and Geodis Wilson argue that Claim 1 fails to allege that they were members of this conspiracy because they are not alleged to have participated in any of the meetings. Although the claims against these defendants should be dismissed because of improper grouping for the reasons stated in Section IV(B), above, the failure to specifically allege their participation in any meetings would not be fatal to the claim. The plaintiffs have

alleged that these defendants were members of FFE and also imposed the security surcharge on their customers at the same rate agreed upon at these meetings.  Moreover, in addition to this parallel conduct, the plaintiffs have alleged that the attendees at the meetings and conference calls outlined in Claim 1 included "at least" the specified individuals, indicating that others may have been present.  *See* Compl. ¶¶ 185-89.  These allegations, taken together, are sufficient to tie Dachser and Geodis Wilson to the conspiracy.  *See* discussion above at Section IV(A) (addressing notice and citing cases).

The defendants' arguments against the plausibility of Claim 3 rest solely on their assertion that the plaintiffs' method of grouping various corporate entities together does not give each defendant adequate notice of which of its actions gave rise to the claims.  Joint MTD, at 33-34.  This issue is addressed above in Section IV(B).  That issue aside, the Complaint has alleged sufficient facts to raise the inference that the Claim 3 defendants entered into an unlawful agreement to impose the 2002 NES fee.  The plausibility of this conspiracy is further supported by the charges brought by the Department of Justice for what appears to be the same conduct against at least three of the NES Defendants.  *See* Sept. 30, 2010 DOJ Press Release.

The defendants allege that the allegations in Claim 5 demonstrate only an opportunity to conspire, that the plaintiffs fail to allege that the CAF Surcharge Defendants actually charged the 2.1% surcharge, and that the allegations are equally explained by lawful conduct.  It is true that allegations that "allude to nothing more than Defendants' participation in meetings, conversations, and communications," and state that the defendants "reached agreement during these meetings as to their anticompetitive practices," do not satisfy *Twombly*.  *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*, 596 F. Supp. 2d 630, 640 (E.D.N.Y. 2009); *see also*

*In re Elevator*, 502 F.3d at 51 & n.5 (allegations that defendants "participated in meetings . . . to discuss pricing and market divisions" insufficient to state a cause of action); *Oreck Corp. v. Whirlpool Corp.*, 639 F.2d 75, 79 (2d Cir. 1980) ("A mere showing of close relations or frequent meetings between the alleged conspirators, however, will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement").

The plaintiffs here have provided more than stock allegations of participation in meetings or exchange of pricing information that provided a mere opportunity to conspire. Rather, they provide allegations as to the dates, locations and participants in five specific meetings where the defendants agreed to impose a specific CAF surcharge of 2.1% on their customers and further allegations from which the court can infer that many of the defendants did indeed impose the agreed upon surcharge. Compl. ¶¶ 223-46. The plaintiffs allege that after the first meeting, a draft of a letter to customers regarding the surcharge was circulated among the defendants and that at least some of the defendants confirmed with their co-conspirators that they had sent these letters to their customers. *Id.* ¶¶ 230-36. Moreover, the plaintiffs allege that the CAF Surcharge Defendants communicated with one another through a "Yahoo Group" email distribution list rather than their work emails in order to conceal their agreement. *Id.* Finally, the plaintiffs allege that the defendants monitored each others' compliance with the agreement through subsequent meetings and email exchanges. These detailed allegations "raise a suggestion of a preceding agreement" rather than mere parallel conduct that resulted from "'chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *Starr*, 592 F.3d at 322 (quoting *Twombly*, 550 U.S. at 556 & n.4). This conclusion is further supported by the Criminal Informations to which four

of the CAF Surcharge Defendants have agreed to plead guilty that describe a "conspiracy that took place from July 2005 to June 2006, to impose a [CAF] on international air shipments from China to the United States."  *See* Sept. 30, 2010 DOJ Press Release.

The plaintiffs have also sufficiently connected the CAF Surcharge Defendants to the agreement alleged in Claim 5.  The defendant Expeditors argues that Claim 5 fails to state a claim against it because the only facts connecting it to the conspiracy are that a single Expeditors' employee received emails from a Yahoo mailing list where the defendants exchanged information about the progress of the conspiracy.  While the mere receipt of communications by competitors is not sufficient to allege a conspiracy, the plaintiffs have alleged more than that here.  In order to determine whether a conspiracy exists, the court will not "view each piece of evidence in a vacuum" but rather look at "[s]eemingly innocent or ambiguous behavior . . . in light of the background against which the behavior takes place." *Apex Oil Co. v. Di Mauro*, 822 F.2d 246, 255 (2d Cir. 1987).  Here, the plaintiffs have alleged that an employee of Expeditors was a member of a Yahoo Group mailing list and that as part of this private email distribution group, Expeditors received multiple emails from co-conspirators confirming that they sent an agreed-upon letter announcing the conspiratorial surcharge to their customers.  Compl. ¶¶ 232-36.  This is not "chit-chat during chance encounters in the field among competitors' employees," *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999), but rather the receipt of serious communications in private regarding a conspiracy to fix surcharges.  The plaintiffs have also alleged that the attendees at the five alleged meetings may have included individuals other than the specified attendees.  While discovery may reveal that Expeditors did not attend any meetings or join the agreement in fact, the plaintiffs have alleged

sufficient facts to link this defendant to the conspiracy at this time.  *See Apex Oil*, 822 F.2d at

258 ("once a conspiracy is shown, only slight evidence is needed to link another defendant with

it") (citation and internal quotation marks omitted).  Likewise, the plaintiffs have sufficiently

alleged that defendant SDV joined the conspiracy.  An employee of SDV, who is also a member

of the Yahoo Group, emailed the co-conspirators to confirm that SDV's customers had accepted

the surcharge.  Compl. ¶¶ 232, 236.  Moreover, there is an allegation that this employee was

invited to and attended a meeting where the defendants shared progress reports concerning the

implementation of agreed upon surcharge.  *Id.* ¶ 241.

In Claim 6, the plaintiffs make a failed attempt to assert a separate claim for recovery for

the exact same CAF surcharge that is the basis for Claim 5, as against the same defendants,

except with the addition of the defendant ABX Logistics and SIFFA, a non-party.  Since the

Court has already found that Claim 5 sufficiently states a conspiracy to impose a CAF surcharge,

the only question is whether the Claim 5 defendants entered into a separate conspiracy with

SIFFA and defendant ABX Logistics to impose that same surcharge.  It is first worth noting that

the plaintiffs have named SIFFA as one of the "defendants" in the heading of Claim 6 even

though SIFFA is not named as a defendant in the caption or anywhere else in the Complaint and

has not been served in the action.  More importantly, based on the allegations in the Complaint,

the court concludes that Claim 6 is not based on a separate conspiracy from Claim 5 and fails to

tie ABX Logistics to a CAF Surcharge conspiracy.

In support of a separate claim of conspiracy in Claim 6, the plaintiffs point to the

issuance of two circulars by SIFFA to its members "suggesting" that its members impose a CAF

Surcharge.  The first circular was sent in October 2005 (three months after the initial meeting of

the Claim 5 defendants) recommending the implementation of a 2.1% CAF and the second

circular, recommending an increased surcharge of 3.0%, was sent in March 2006 about a week

after the Claim 5 defendants met and agreed to increase the CAF Surcharge to 3.0%.  Compl. ¶¶

253-55.  There is no indication that the surcharge was to be imposed on different routes or on

different customers.  The plaintiffs do not allege that ABX Logistics imposed the surcharge, but

rather allege that "[i]n each instance, pursuant to such unlawful agreement, *many* SIFFA

members did implement such charges." (Compl. ¶ 256 (emphasis added).  This is insufficient to

demonstrate that ABX Logistics was a knowing and active participant in this conspiracy.  The

Second Circuit has held that "every action by a trade association is not concerted action by the

association's members." *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 234 (2d

Cir. 1999).  Here, the mere issuance of the circulars by the trade association is not sufficient by

itself to give rise to an inference of an agreement by ABX Logistics to impose the surcharge,

because "[m]ere exchanges of information, even regarding price, are not necessarily illegal, in

the absence of additional evidence that an agreement to engage in unlawful conduct resulted

from, or was a part of, the information exchange."  *Mitchael*, 179 F.3d at 859.  While the

issuance of these circulars may evidence an additional overt act in furtherance of the conspiracy

by the Claim 5 defendants, it fails to allege the existence of a separate conspiracy with ABX

Logistics to impose the CAF Surcharge.

     The Complaint adequately states a claim in each of Claims 7, 8, and 9 by the Peak Season

Surcharge Defendants to conspire to impose, implement and impose a peak season surcharge on

air cargo shipments from China starting in August 2005 and through May 2007.  The Complaint

alleges that the defendants formed and monitored the conspiracies through a series of meetings

over the course of three years.  The Complaint provides information as to who initiated these meetings, when and where they took place, as well as the names of specific attendees for certain defendants.  These meetings did not take place at the defendants' offices or other places of business but rather at a coffee shop or clubs located in hotels.  While all of the Peak Season Surcharge Defendants are named in each claim and the plaintiffs allege that this was a "continuing conspiracy" the Complaint brings three separate claims, one for each year in which the defendants agreed to extend the surcharge. Thus, Claim 7 is based on a conspiracy to impose and implement a peak season surcharge in 2005 (Compl. ¶¶ 258-73), Claim 8 alleges a conspiracy with identical methods and participants in 2006 (*id.* ¶¶ 274-85), and Claim 9 does the same for 2007 (*id.* ¶¶ 286-91).  The plaintiffs have thus alleged more than mere parallel conduct or ordinary encounters by competitors but rather allege sufficient facts to indicate that the defendants acted pursuant to a conspiracy to fix peak season surcharges on freight forwarding services.  *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1020 (N.D. Cal. 2007) (allegations of meetings at trade shows that specified the attendees and how they were involved in fixing prices sufficient to allege a conspiracy when coupled with parallel pricing) (discussing holding in *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 790 (N.D. Cal. 2007)).  This conclusion is further supported by Criminal Informations to which four of the Peak Season Surcharge Defendants have agreed to plead guilty that describe a "conspiracy that took place from August 2005 to December 2007, to impose a Peak Season Surcharge (PSS) on shipments from Hong Kong to the United States."  *See* Sept. 30, 2010 DOJ Press Release.

The defendants argue that the Complaint fails to allege what the defendants agreed to during these meetings and provide no factual description of an illegal agreement.  But the

plaintiffs are not required to allege what the details of those meetings were at this stage.  It is more than sufficient that they have alleged the dates, times, and in many instances the specific names of the attendees at those meetings.  *Hinds County*, 700 F. Supp. 2d at 393-94; *Publication Paper*, 2005 WL 2175139, at *2.

The defendants also argue that the plaintiffs have failed to allege whether these defendants introduced a surcharge at all, whether the surcharges were at the same rate, and on what routes the surcharges were imposed. The defendants cite *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) in support of their argument, but that case only further supports the plausibility of these conspiracies.  *Socony-Vacuum* involved a price-fixing conspiracy to fix and raise prices in the oil industry.  The Court approved an instruction that allowed the jury to conclude that there was a Sherman Act violation if it was found that the defendants "had the power to raise prices and acted together for that purpose" and noted that it was "immaterial how reasonable or unreasonable those prices were *or to what extent they had been affected by the combination*."  310 U.S. at 210 (emphasis added).  The Court found that any conspiracy that "tampers with price strictures" is unlawful and it was unimportant that there be a showing that the prices were "fixed in the sense that they were uniform and inflexible."  *Id.* at 221-22.  While the plaintiffs have not alleged that the defendants agreed on any particular level for the peak season surcharges, they have alleged that, acting pursuant to agreement reached at specific meetings, the defendants imposed peak season surcharges on their customers.  Compl. ¶¶ 272, 284, 290.  Moreover, the Criminal Informations include a statement that "[t]he timing and amount of [the peak season surcharge] price increases varied from year to year" and that "these higher charges amounted to temporary rate increases."  *See*, *e.g.*, Information in *United*

-52-

*States of America v. Schenker AG*, at ¶ 22, attached as Ex. 2 to Oct. 1, 2010 Letter from Plaintiffs, Dkt. Entry 457.

The defendants SDV, Morrison, and UTi also move separately to dismiss Claim 7 because it contains no factual averments as to their participation in that conspiracy. These arguments are unconvincing. *See* discussion above at Section IV(A). The plaintiffs have included allegations in the Complaint that representatives of these three entities were invited to and/or attended meetings where the participants agreed to impose the peak season surcharges in Claims 8 and 9. *See* Compl. ¶¶ 275-90. The plaintiffs have also alleged that the peak season surcharge conspiracy in those claims was the result of an agreement to extend the 2005 peak season surcharge. *Id.* ¶ 269-72 (describing a meeting in December 2005 where the participants agreed to extend and continue charging customers the peak season surcharge). These allegations, as well as allegations that the attendees at the meetings in 2005 may have included unidentified individuals, are sufficient to state a claim against the defendants SDV, Morrison and UTi in Claim 7.

The defendants are correct that Claim 15 fails to state a claim. The plaintiffs have not alleged that the surcharges were imposed on specific routes or customers, nor named specific defendants as participating in this scheme. Such skeletal allegations provide even less detail than those rejected by *Elevator* and thus fail to state a claim. *See In re Elevator*, 502 F.3d at 51-52.

## C.     Global Conspiracy

The Complaint is silent as to how, when, or where these sixty-five defendants or the conduct identified in the 10 local conspiracy claims became connected to each other into one

global conspiracy connected by common actors, methods and goals.  *See United States v. Strickland,* 245 F.3d 368, 385 (4th Cir. 2001) (single criminal conspiracy generally demonstrated by an "overlap of key actors, methods, and goals.") (citation and internal quotation marks omitted).  As is apparent from the allegations in the Complaint, the alleged local conspiracies are logically, temporally, and geographically distinct.  They relate to different routes, in different countries on different continents, and were imposed by different (albeit somewhat overlapping) groups of defendants.  In some instances, the charges were fixed in response to local regulatory conditions, while in other instances they were not.  Thus, the plaintiffs' argument that the defendants identified in the 10 local conspiracies (with the addition of 13 others not named in any individual conspiracy) joined a single global conspiracy fails.

The plaintiffs assert that the ten local conspiracies evidence parallel conduct because the defendants all failed to ensure antitrust compliance.  Compl. ¶ 318(a).  Such allegations of "parallel" conduct is no different from asserting that, because several firms in different markets engaged in different antitrust violations at different times they were all part of one anticompetitive agreement.  *Cf. Twombly*, 550 U.S. at 556-57 ("[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality").  The plaintiffs also allege that the conspiracies all involved the same "designs and methods" because they used in person meetings, conference calls, and email communications to form and monitor the conspiracies and because these meetings often involved local trade associations.  There is nothing unique about using these methods to formulate a conspiracy.  The Complaint does not allege any connection between the separate and distinct regional freight forwarding associations.  Nor does the fact that

the trade associations had common goals like facilitating information exchange or promoting solidarity among their members connect them.  *See* Compl. ¶¶ 157, 161.  Finally, the fact that thirteen of the defendants are not named as defendants in any of the local conspiracies and yet are still alleged to be part of the global conspiracy undercuts the plaintiffs' claim that the defendants all participated in the same parallel conduct.

The plaintiffs also argue that the overarching claim is plausible because the structure of the freight forwarding industry is conducive to a global price-fixing conspiracy.  The Complaint alleges that "Freight Forwarding Services are commodity-like and are highly fungible," that the industry is "highly concentrated . . . resulting in a small number of global players," and that it has "substantial barriers to entry."  Compl. ¶ 113.  The plaintiffs point out that the five largest freight forwarders are defendants and allege that in 2005 "the top ten Freight Forwarders, including many of the Defendants, controlled more than 45% of the market."  *Id.* ¶ 122.  But even if these allegations established that the "industry is concentrated in the hands of a few large [players]," which they do not, the global conspiracy claim is not brought against these five or ten defendants.  Rather, the plaintiffs' claim is brought against sixty-five geographically diverse defendants with varying levels of market share.  The allegations as to the industry will raise the inference of a conspiracy to fix prices where the plaintiffs have alleged parallel conduct or other facts that indicate that the defendants were engaged in a global conspiracy to fix prices.  *See Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 883 (N.D. Ill. 2009) (considering allegations regarding the nature of the industry as the "backdrop" against which "Plaintiffs allege the specifics of their Section 1 antitrust claim").  As discussed above, the individual conspiracies

themselves do not evidence parallel conduct because they involve different defendants acting at different times.

The Complaint repeatedly asserts that the "DHL Defendants" were a "common denominator" in all of the agreements.  Compl. ¶¶ 318(m), 319-20.  This is apparently because the Complaint names at least one affiliate of the DHL Defendants in each local conspiracy. "DHL" or the "DHL Defendants" are defined to include Duetsche Post AG, DHL Danzas, DHL Global Forwarding and DHL Express (USA), Inc.  Compl. ¶ 37.  The Complaint names "DHL" as a defendant in Claims 1, 3, 5, and 6, DHL Danzas as a defendant in Claims 7, 8, and 9, and DHL Global Forwarding Japan K.K. in Claim 4 (this entity is also alleged to have joined the conspiracy in Claim 2 but is not named as a defendant in that Claim).  As discussed above, the plaintiffs have not provided the court with any basis for disregarding the separate corporate existence of the DHL Defendants or their affiliates.  Moreover, there is no allegation in the Complaint as to how the DHL affiliates provided leadership among the various local conspiracies.[23]  The simple fact that a DHL affiliate is named as a defendant in each conspiracy is not enough to demonstrate that the various local conspiracies were in fact part of an overarching global conspiracy.

---

[23]  The defendants argue that the plaintiffs allegations amount to an implausible "rimless wheel conspiracy" where "various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction."  *Dickson v. Microsoft Corp.,* 309 F.3d 193, 203 (4th Cir. 2002).  In *Dickson*, the court found that the plaintiffs had failed to allege a single conspiracy among Microsoft and various computer manufacturers, despite common involvement of Microsoft with each computer manufacturer.  The plaintiffs had failed to provide allegations linking the separate computer manufacturers to a common conspiracy.  The plaintiffs deny that they have attempted to allege a hub-and-spokes conspiracy. Joint MTD Opp. at 24 n. 21.  Even if they have, the theory would not be plausible since they have not provided the court with any allegation beyond the naming of the DHL defendants in nine of the ten local conspiracies to connect all ten of them.

In the alternative, the plaintiffs argue that they have alleged a single conspiracy where "a small group of co-conspirators are at the heart of an unlawful agreement" and who then conspire with other parties who may not be aware of each others' identities. Joint MTD Opp. at 23 (quoting *United States v. Boyd*, 595 F.2d 120, 123 (3d Cir. 1978)). They argue that at least one of the five largest freight forwarders was involved in each local conspiracy and thus provided "leadership, cohesion and coordination" between and among the local conspiracies. But again, the plaintiffs have not provided the court with anything more than the overlap of some of the sixty-five defendants in some of the ten alleged local conspiracies. *Cf. United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000) (single rather than multiple conspiracy demonstrated where various group members in drug rings used "common methods of operations (the same drug couriers . . . common participants . . . and common leadership and direction [single individual]"). These defendants were involved in multiple conspiracies at different times in different regions and there is no basis for concluding that they were part of a "single, common and continuing objective of fixing, maintaining and establishing prices to suppress and eliminate competition" in the freight forwarding industry. *United States v. Wilshire Oil Co. of Texas*, 427 F.2d 969, 975-77 (10th Cir. 1970) (declining to find overarching conspiracy where there were overlapping defendants in two different conspiracies to fix prices of liquid asphalt in different states but there was no "connecting link" between the two conspiracies).

Even the presence of the "big five" in the various conspiracies is a red herring. These five "defendants" are actually various corporate affiliates that the plaintiffs have defined as single entities. Thus, "big five" defendant "DHL" consists of at least six separate entities, "Kuehne + Nagel" consists of two separate entities, "Schenker" consists of three separate

entities, "UPS" consists of three separate entities, and Panalpina is defined as two separate

entities.  *See* Compl. ¶¶ 23-24, 25-26, 30-32, 36-40, 43-44, 58.  The plaintiffs have not provided

the court with any plausible allegations as to why the separate corporate status of these 16

corporate affiliates should be disregarded.  There is also no basis on which to conclude that the

employees of various entities present at meetings in different parts of the world at different times

indeed represented and reported to all corporate affiliates of that company.

  The authority cited in support of this core group theory does not help the plaintiffs' case.

In *United States v. Boyd*, the Third Circuit found that a single conspiracy existed to make and

distribute methamphetamine produced by overlapping defendants at two laboratories.  595 F.2d

120 (3d Cir. 1978).  The court rejected the defendants' contention that the conduct at each

laboratory constituted a separate conspiracy but rather found that the testimony demonstrated

that the defendants were aware of a single continuous operation to produce and distribute meth

first at a failed lab and then at a successor lab.  *Id.* at 124-25.  Unlike *Boyd*, there is no indication

here that the defendants were acting as part of a single continuous operation to fix prices

globally.   While there are some overlapping parties in the conspiracy, there are no allegations in

the Complaint that lead to the conclusion that the various local conspiracies were formulated

pursuant to an overarching scheme to raise prices generally.  Rather, the ten local conspiracies

allege that different groups of defendants conspired to impose separate surcharges on various

different routes.

  Although the plaintiffs also cite to the dissent in the Third Circuit's decision in *United

States v. Sargent Electric Co.*, 785 F.2d 1123, 1140 (3d Cir. 1986) (Adams, J., dissenting), the

decision of the majority is persuasive.  The majority held that separate conspiracies to rig bids at

different industrial facilities in Pennsylvania were not also a single conspiracy merely because a core group of defendants conspired with different subgroups of defendants to eliminate competitive bidding at each of the facilities. *Id.* at 1130-31. A number of reasons contributed to the court's conclusion that there were separate offenses rather than a single conspiracy. There were separate bid lists at each facility, the participants in the different bid lists were not identical, some firms qualified to bid at more than one facility did not rig bids at all of them, separate bid-rigging meetings were held with respect to each facility, the allocation of business among the bid-riggers was made on a facility-by-facility basis, not all the conspiring personnel knew each other, and the bid-rigging commenced and ended at each facility at different times. *Id.* at 1131.

Similarly here, the surcharges at issue in the local conspiracies were made on different routes during different time periods, there are different defendants involved in each of the local conspiracies, the meetings where these local conspiracies were formed took place in different parts of the world at different times and with different participants, and there is no indication that the meeting participants in local conspiracies knew the individuals or defendants involved in the other conspiracies. While it is true that each co-conspirator need not know the identity of the other co-conspirators, there do need to be allegations that plausibly suggest that each of the defendants was aware of and committed to the essential purpose of the overarching conspiracy. *See United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002) (even though later joining conspirator need not know identities of all of the other defendants, he does need to know the essential nature of the plan).

The plaintiffs also rely on the decision in the *Air Cargo MDL*, which allowed a single Sherman Act claim to go forward on the basis of various surcharges. Joint MTD Opp. at 25

n.22.[24]  The global conspiracy claim here bears no resemblance to the Sherman Act claim that

passed *Twombly* muster in *Air Cargo*. In that case, the plaintiffs alleged that all of the defendants

joined a worldwide price-fixing conspiracy in the air freight industry which "affected thousands

of routes flown by the defendants worldwide, including flights to, from, and within the United

States, and flights to, from, and within the European Union."  *In re Air Cargo Shipping Services*

*Antitrust Litig.*, MDL No. 06-1775, 2008 WL 5958061, at *2 (E.D.N.Y. Sept. 26, 2008).  The

plaintiffs alleged that the defendants attended meetings regarding these surcharges and that they

imposed them on their customers.  *Id.* at *5-*6.  Similarly, in *In re Rail Freight Fuel Surcharge*

*Antitrust Litig.*, 587 F. Supp. 2d 27 (D.D.C. 2008), the complaint alleged that four major

railroads, controlling 90% of the market, sought to increase their revenues through uniform fuel

surcharges.  The existence of overarching conspiracies was thus plausible based on the

allegations in *Air Cargo* and *Rail Freight*.  On the other hand, it is not plausible that defendants

who met in different years and imposed surcharges on specific routes intended to raise the

uniform base rate for freight forwarding services overall.  While the various local conspiracies

alleged in this Complaint may evidence a widespread problem in the industry, the allegations as

they presently stand do not demonstrate a global conspiracy by sixty-five defendants.

---

[24]  The plaintiffs also rely on *Air Cargo MDL* and other decisions for the proposition that the government antitrust investigations involved here (and subsequent agreements to plead guilty) support the plausibility of the overarching conspiracies. Joint MTD Opp. at 38-40.  Both the JFTC and the Department of Justice, however, chose to charge individual conspiracies, some of which are similar to the local conspiracies in the Complaint, not a global conspiracy.  While this does not preclude the finding of a global conspiracy, it does not support it either.

### D.    Regional Conspiracies

The plaintiffs have also failed to establish overarching regional conspiracies in Claims 11 and 13 because they have not established that these conspiracies were connected by common goals, methods, or actors.  *See Strickland,* 245 F.3d at 385.

Claim 11 alleges that the Security Surcharge Defendants in Claim 1 and the NES Defendants in Claim 3 joined together in a conspiracy to impose new charges "on air cargo routes between Europe and the United States."  There is no allegation as to when or how these 14 defendants joined the regional conspiracy or any circumstantial evidence that they even could have done so.  The underlying conspiracies are wholly independent of one another, they occurred in different years, targeted different markets, and were imposed on different trade lanes.  The security surcharge was directed at all air cargo shipped "around the world" beginning in October 2001 while the NES fee applied only to shipments out of Heathrow airport in the United Kingdom beginning in October 2002.  Compl. ¶¶ 183, 205.  Thus, the allegation that all 14 defendants conspired "beginning as early as October 2001" (*id.* ¶ 300) is contradicted by the allegations in the Complaint that the NES Fee defendants did not conspire until October 2002.  Nor are there overlapping methods used in these two conspiracies.  The Security Surcharge Agreement was allegedly formed at a trade association meeting, while the 2002 NES Agreement was formed at a secret meeting at a restaurant.  Compl. ¶¶ 186-88, 208-09.  Finally, while four of these defendants were involved in both conspiracies (DHL, Exel, Geo Logistics, and Kuehne + Nagel), they were represented in each case by different individuals and there is no allegation in the Complaint that these companies provided any particular leadership in the individual

conspiracies.  Moreover, "DHL" and "Kuehne + Nagel" are actually several separate entities and there is no reason to disregard their corporate forms.

Claim 13 provides a similarly scant connection between the local conspiracy claims in Claims 5 and 6 with those in Claims 7, 8, and 9.  As in Claim 11, these conspiracies involve different defendants who are not alleged to have communicated with one another on any overarching regional conspiracy.  Nor is it alleged when, where or how they could have done so. While some of the defendants do overlap, the allegations again provide no basis for disregarding the corporate form of the grouped entities and no explanation for how these overlapping defendants provided leadership or linked the individual conspiracies.  Moreover, these underlying conspiracies had different goals.  The participants in the CAF conspiracies alleged in Claims 5 and 6 sought to pass on costs to their customers related to changes in the Chinese currency.  Compl. ¶¶ 225-26.  The agreements in Claims 7 through 9, on the other hand, were not a reaction to any external factors but are alleged to be fictional "peak season" charges. Finally, these agreements were reached at different times, in different locations, and by different representatives of the various defendants.  The fact that they originated in Asia and were imposed generally on trade routes coming out of Asia is not enough to connect these 25 defendants to an overarching regional conspiracy.

The overarching conspiracy alleged in Claim 12, however, brings together actors, methods, and markets in a way the other overarching conspiracies do not.  In Claim 12, the plaintiffs have alleged that the three distinct alleged Japanese surcharge conspiracies in Claims 2, 4, and 10 were part of an "overarching agreement," started in August 2002, to "fix, inflate and impose new charges" on flights between Japan and the United States.  Compl. ¶ 306-07.  The

plaintiffs have named the same fourteen defendants in Claims 2, 4, and 10 as they charge in

Claim 12 (except for defendant Airborne Express who is only named in Claim 2). Most

importantly, the plaintiffs have alleged that beginning in 2002, these Japanese Defendants would

conspire at meetings of the EBIC of JAFA to collectively impose surcharges on freight

forwarding services between Japan and the United States in response to adverse market activity.

These adverse actions included a fuel surcharge imposed by the air carriers in 2002 (Claim 2),

new United States Customs regulations imposed in 2004 (Claim 4), and new security regulations

implemented by the Japanese Transport Ministry in 2006 (Claim 10). In each situation, the

Japanese Defendants responded by convening at an EBIC meeting and agreeing to pass these

new burdens to their customers. Upon learning of the investigations into the international freight

forwarding industry, some of the Japanese Defendants held a meeting where they agreed not to

hold any EBIC meetings in the future. Compl. ¶ 155. This further supports the argument that

the EBIC meetings were in place for the alleged purpose of furthering a conspiracy to fix the

prices of freight forwarding services on air cargo departing from Japan.

The Complaint clearly alleges that the Japanese Defendants were acting in concert

through the EBIC and were aware of each others' participation in all three conspiracies. It can

also reasonably be inferred that the Japanese Defendants felt bound to act in accordance with

each subsequent agreement as a result of joining the earlier conspiracies. It is therefore plausible

to infer from these facts that they were "were linked by a 'mutual interest in sustaining [one]

overall enterprise,' an enterprise based on a single conspiracy." *See Bowens*, 224 F.3d at 308

(citation omitted). Finally, the fact that the JFTC Order was only directed at three individual

conspiracies does not foreclose the finding of an overarching conspiracy at this stage. *See In re*

*High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65 (7th Cir. 2002) (refusing to dismiss price-fixing claim simply because Department of Justice had not pursued it).

## VI.   SUBJECT MATTER JURISDICTION AND THE FTAIA

The defendants contend that the Foreign Trade Antitrust Improvements Act, 15 U.S.C. §6a (the "FTAIA"), deprives the court of subject matter jurisdiction over the plaintiffs' claims. They argue that the Complaint fails to assert that the defendants' alleged anticompetitive conduct outside of the United States either involves import commerce or has a direct, substantial, or reasonably foreseeable domestic effect to give rise to the plaintiffs claims.  The defendants' arguments on this ground lack merit.

On a motion to dismiss for lack of subject matter jurisdiction, the party asserting jurisdiction bears the burden of persuasion.  *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).  Challenges to subject matter jurisdiction may contest "either the facial sufficiency of the pleadings in the complaint or the existence of subject matter jurisdiction in fact."  *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 404 (S.D.N.Y. 2002).  The court views the defendants' arguments in the instant motion to dismiss on FTAIA grounds as "facial" attacks based on the sufficiency of the pleadings.  The motion, therefore, requires the court to review whether the allegations on the face of the plaintiffs' complaint allege facts sufficient to invoke the jurisdiction of the district court.  *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 887 n.15 (2d Cir. 1996).  The "uncontroverted factual allegations in the complaint" will be accepted as true, *Dow Jones*, 237 F. Supp. 2d at 404, *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998), but "argumentative inferences favorable to

the party asserting jurisdiction" will not be drawn, *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992).

### A.     The FTAIA

The FTAIA removes from the reach of the Sherman Act export activities and other commercial activities taking place abroad, unless those activities adversely affect domestic commerce, imports to the United States, or the exporting activities of persons engaged in such activities within the United States.  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) (hereinafter *Empagran I*).  The FTAIA provides,

> Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
>    (1) such conduct has a direct, substantial, and reasonably foreseeable effect–
>          (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>          (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>    (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.  The complex language of this provision was deconstructed by the Supreme Court in *Empagran I*.  The Court found that the FTAIA initially places all nonimport activity involving foreign commerce *outside* the Sherman Act's reach.  *Empagran I*, 542 U.S. at 162.  The FTAIA "then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce . . . *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.* , the "effect" must "giv[e] rise to a [Sherman Act] claim." *Id.* (italics in original) (alterations supplied).

"The initial sentence of [S]ection 6a, along with its 'import trade or commerce' parenthetical, provides that the antitrust law *shall* apply to conduct 'involving import trade or

commerce' with foreign nations."  *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227

F.3d 62, 69 (3d Cir. 2000) (emphasis in original).  "The Foreign Trade Antitrust Improvements

Act does not define the term 'import,' but the term generally denotes a product (or perhaps a

service) that has been brought into the United States from abroad."  *Turicentro, S.A. v. Am.

Airlines*, 303 F.3d 293, 303 (3rd Cir. 2002) (*citing Webster's Third New International Dictionary*

(1986) (defining an "import" as "something (as an article of merchandise) brought in from an

outside source (as a foreign country)"); *Black's Law Dictionary* (6th ed. 1990) (defining an

"import" as a ''product manufactured in a foreign country, and then shipped to and sold in this

country")).  Moreover, the Section 6a language makes clear that not only import commerce, but

conduct *involving* import commerce, is never removed from the reach of the Sherman Act.  As

illustrated by the analysis below, the defendants' conduct at issue involves import trade or import

commerce, and the plaintiffs' claims based on that conduct remain within the scope of the

Sherman Act.

 To determine whether the plaintiffs' Sherman Act claims are permitted under the FTAIA,

the court focuses on two issues.  First, what is the relevant conduct here?  *See Kruman v.

Christie's Int'l PLC*, 284 F.3d 384, 398 (2d Cir. 2002).  Second, does that conduct "involve[]

import trade or import commerce"?  *See Carpet Group*, 227 F.3d at 71 (internal quotes omitted)

(emphasis added).

 **B. The Relevant Conduct**

 "The relevant inquiry is whether the conduct of the defendants – not the plaintiffs –

involves import trade or commerce."  *Kruman*, 284 F.3d at 395 (citing *Carpet Group*, 227 F.3d at

71-72).  The defendants would construe the relevant conduct narrowly, as the charging of fixed

prices for freight forwarding services provided at the location of shipment.  The defendants also argue that their conduct is fundamentally different from that of air cargo carriers because freight forwarders are local intermediaries between cargo-shipping customers and the air carriers similar to the travel agents in *Turicentro*.  The defendants thus seek to place the locus of their conduct entirely outside of the United States and therefore outside the reach of United States courts. These arguments are contrary to the well-pleaded allegations in the Complaint.

The significant conduct as defined in the Complaint is not reducible to the mere charging of fixed prices at locations abroad for the defendants' services nor the provision of freight forwarding services solely located abroad.  In *Kruman v. Christie's Int'l*, the Second Circuit specifically rejected construing "conduct" to mean "[t]he precise acts that caused injury," or "the imposition of charges for . . . services at levels determined or affected by the illicit agreement." 284 F.3d 384, 398 (2d Cir. 2002) (*citing Kruman v. Christie's Int'l PLC*, 129 F. Supp. 2d 620, 625 (S.D.N.Y. 2001)).  "'[C]onduct' . . . refers to acts that are illegal under the Sherman Act. . . . under the Sherman Act,  . . . a horizontal price agreement is itself illegal regardless of its effect or purpose."  *Id.* (*citing United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485, 489 (1950); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 427 (1945).  Here, like in *Kruman*, the conduct at issue is the illegal agreement to fix prices for the freight forwarders' services on various routes entering the United States, not simply the charging of those fixed prices.  *Id.* at 399 ("In sum, the 'conduct' in this case was not the imposition of high prices pursuant to an illicit agreement, but the alleged agreement by the defendants to fix prices in foreign auction markets").

Thus, because "the essence of any violation of § 1 is the illegal agreement itself – rather than the overt acts performed in furtherance of it," *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991), the commercial activity affected by the agreement is really the focus of this inquiry. And here, the Complaint provides sufficient allegations to allow the court to take a broad view of the relevant conduct.  The defendants are alleged to have agreed to a conspiracy to fix the cost of freight forwarding services for air cargo shipped on various routes into and out of the United States.  The Complaint describes freight forwarders as those who "organize the transport of products, commodities and other goods, by all modes of transportation," who, in some instances, "transport the goods themselves, in addition to coordinating their transport" and who "may assist in all aspects of cargo transport, from pick up to drop off . . . ."  Compl. ¶¶ 105-06.  For example, the forwarders may prepare and file export documentation at the country of origin or arrange with overseas customs brokers to ensure that the goods and documents comply with customs regulations.  *Id.* ¶ 106.  Additionally, the Criminal Informations to which several defendants have agreed to plead guilty state that "freight forwarders arrange for and manage the shipment of goods from one point to another" and that part of the forwarders' work involves "packaging, tracking, incidental handling and other ancillary services associated with the transportation of goods, both internationally and domestically."  *See, e.g.*, Information in *United States of America v. Schenker AG*, at ¶ 4, attached as Ex. 2 to Oct. 1, 2010 Letter from Plaintiffs, Dkt. Entry 457.  Thus, freight forwarders do not act only as local service providers at the origin of the goods, but rather are responsible for the goods they service "along entire transportation routes, touching both the country of origin and the country of destination."  *Air Cargo*, 2008 WL 5958061, at *13.  The Court finds that the relevant conduct at issue here is the fixing of prices for the service of

-68-

organizing and facilitating the transport of air cargo between locations abroad and the United

States.

C.     **"Import Trade or Import Commerce"**

Two types of Sherman Act claims that implicate import trade or import commerce fall

outside the scope of the FTAIA and therefore may be pursued in United States courts.  First, the

FTAIA excludes from its reach those claims arising out of conduct involving "import trade or

import commerce" by means of the parenthetical "(other than import trade or import commerce)"

in 15 U.S.C. § 6a(1)(A).  Second, the FTAIA brings back within the reach of the Sherman Act

conduct involving nonimport trade or nonimport commerce when that conduct (1) has a direct,

substantial, and foreseeable effect *on* import trade or import commerce, and (2) the Sherman Act

claim arises out of that effect.  15 U.S.C. § 6a(1)(A), (2).  These two universes of claims are

differentiated by whether the conduct at issue involves import trade or import commerce, or

involves nonimport trade or nonimport commerce.  If the former is found, then the inquiry ends,

the FTAIA does not apply, and United States courts may exercise jurisdiction over the Sherman

Act claims at issue.  If the latter is found, than an inquiry regarding the foreseeable effects of the

challenged conduct is required.

Like the services at issue in *Air Cargo*, the claims here involve conduct that directly

implicates import commerce in goods transported by air into the United States.  The freight

forwarding service at issue in the plaintiffs' claims is the business of obtaining money for placing

goods into the flow of commerce into and out of the United States, which indicates that the

service being provided affects both the origin and the country of destination.  Indeed, freight

forwarders may be involved more in import commerce than the air carriers because they actually

-69-

organize, provide, and manage the importation of the goods rather than simply transport them.

Since "import commerce" is the business of bringing goods into the United States, *Turicentro*,

303 F.3d at 303, a company that is in the business of managing the shipment of goods into and out

of the United States either by coordinating their transport or transporting the goods themselves,

and who "may assist in all aspects of cargo transport, from pick up to drop off" are involved in

"import commerce" and thus subject to the Sherman Act.  The inseparable connection between

freight forwarding services for the shipment of goods and the commerce in those goods leads to

the conclusion that the defendants' price-fixing conduct "involves 'import trade or import

commerce'" within the meaning of the FTAIA. *Carpet Group*, 227 F.3d at 71-72.  The plaintiffs'

claims based on those price-fixing agreements are therefore not excluded by the FTAIA from the

court's subject matter jurisdiction.

The defendants argue that the "involves import commerce" exception to the FTAIA

should be narrowly construed to be that conduct whose "performance must reach into the United

States–not be limited to one foreign location–and must be essential to commerce in imported

goods."  Joint MTD FTAIA at 5.  In support of this argument, the defendants cite *Kruman* and

*Turicentro* for the proposition that the defendant's conduct must target the United States import

market, not just have some incidental effect on it.  In *Kruman v. Christie's International*, the

defendant auction houses were accused of conspiring to fix commissions on foreign auctions.

284 F.3d 384.  In *Turicentro*, the defendant air carriers and a trade association were accused of

fixing rates of travel agent commissions.  303 F.3d 293.  In finding that the travel agents were not

involved in import trade of import commerce," the Third Circuit reasoned that "[t]heir actions did

not directly increase or reduce imports into the United States." *Turicentro*, 303 F.3d at 303.  In

each case, the conspiracy had little to do with import commerce and the defendants' commercial

activity was not directed at the United States: neither overseas auctions commissions nor travel

agent commissions concern import commerce in any but the most attenuated manner.

Unlike those cases, where the goods or services at issue may or may not have entered the

United States, the surcharges here are alleged to have been imposed on shipments between

foreign locations and the United States.  The Complaint includes allegations that the freight

forwarders act hand-in-hand with the air cargo carriers and service providers at both the origin

and destination of the freight to ensure the delivery of goods imported into United States

commerce.  Even a narrow construction of the "involving" import commerce exception in the

FTAIA would lead to the conclusion that this conduct involves an essential part of import

commerce in the domestic market.[25]

### D.      Effect on "Import Trade or Import Commerce"

In the alternative, the allegations summarized above are sufficient to demonstrate that the

freight forwarding services here have a "direct, substantial, and foreseeable effect" on import

trade or import commerce, and that "the Sherman Act claim arises out of that effect."  15 U.S.C. §

6a(1)(A), (2); *Empagran I*, 542 U.S. at 162.

This court previously determined that the service provided by air carriers for cargo

transport to and from the United States involves import commerce.  *Air Cargo*, 2008 WL

5958061, at *12-*15. The various anticompetitive surcharges that form the basis of the Sherman

---

[25] The defendants appear to dispute the allegations in the Complaint, arguing that "the freight
forwarding service at issue here ends when the freight is handed off to the carriers."  Joint MTD FTAIA
at 1.  Since this contention is contrary to the well-pleaded allegations in the Complaint and the Criminal
Informations to which several of the defendants have agreed to plead guilty, it presents a factual issue that
is more appropriately resolved at a later stage of the litigation.

Act claims here were imposed in connection with the purchase of freight forwarding services for goods transported on air cargo routes to and from the United States. The defendants' increasing and significant market share around the world demonstrates the reliance of importers and air cargo carriers on the services the freight forwarders provide. *See* Compl. ¶¶ 114-23. The Complaint includes statistics that indicate that freight forwarding services have a substantial impact on United States commerce; for example, in 2006, there were $16.3 billion in air freight charges for imports into and exports out of the United States. Compl. ¶ 102. Common sense leads to the conclusion that the fixing of prices for a service that ensures the shipment of goods into and out of the United States could in turn affect the costs of the transported goods themselves. *See id.* ¶ 123 ("the actions of Defendants complained of herein have touched virtually every American business and household in some way"). Thus, it is not unreasonable to infer that an increase in prices for freight forwarding services on air cargo routes entering the United States has a direct, substantial and foreseeable effect on import commerce in those goods. *See Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (finding that where defendant's anticompetitive conduct increases prices paid by American purchasers, albeit indirectly, FTAIA did not preclude jurisdiction)*; In re Korean Air Lines Co., Ltd.*, 2008 U.S. Dist. LEXIS 111722 at *20 (C.D. Cal. June 25, 2008) ("[a] conspiracy to fix the prices charged for the service of flying passengers between Korea and the United States has a direct, substantial, and reasonably foreseeable effect on domestic commerce: higher prices in the U.S.").

The defendants seek to analogize this case to *McLafferty v. Deutsche Lufthansa A.G.*, where the defendant airlines conspired to fix the prices for passenger travel on routes between

Europe and Japan.  2009 WL 3365881 (E.D. Pa. Oct. 16, 2009).  The defendants' conduct was located "wholly outside the United States" since the target of the conspiracy was passenger air travel between Europe and Japan which is itself clearly foreign commerce.  *Id.* at *4.  The fact that some of the purchasers were located in the United States did not "establish, or even intimate, that the conspiracy directly affected United States commerce."  *Id.*  The defendants also cite *CSR Limited v. Cigna Corporation*, where the defendant insurers were accused of, among other things, engaging in a conspiracy to threaten denial of new or renewal insurance for a plaintiff unless it withdrew a request for coverage.  405 F. Supp. 2d 526 (D.N.J. 2005).  There, the only product involved was the purchase of liability insurance by an Australian company located in Australia or London.  *Id.* at 540.  The fact that the insurance covered global risks, including United States risks and could involve claims in American courts did not transform the defendants conduct – the sale of insurance in Australian market – into import commerce.  *Id.* at 541-42.  Unlike *McLafferty* and *CSR*, the conduct for which the plaintiffs seek relief directly affected the United States because they have alleged that each surcharge was connected to freight forwarding services for the transport of goods between the United States and other countries.[26]

The foregoing conclusions are bolstered by the fact that several of the defendants have agreed to plead guilty to Criminal Informations that state that the freight forwarding services they provide "moved in interstate and foreign commerce" and were "within the flow of, and

---

[26]  The other cases cited by the defendants also involve wholly foreign conduct with minimal connection to United States markets.  *See McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 813 (9th Cir. 1988) (court denied subject matter jurisdiction where American plaintiff "pleaded only injury to customers or potential customers located in Southeast Asia" or to himself for contracts to provide services in Southeast Asia); *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 558-60 (D. Del. 2006) (where plaintiff was seeking recovery for lost sales of foreign-made microprocessors sold in foreign countries, the fact that plaintiff was "an American company engaged in a world-wide market [did] not create jurisdiction [with] substantial, direct effects on the domestic market").

substantially affected, interstate and foreign trade and commerce." *See, e.g.*, Information in

*United States of America v. Schenker AG*, at ¶¶ 10-11, attached as Ex. 2 to Oct. 1, 2010 Letter

from Plaintiffs, Dkt. Entry 457.  Accordingly, the court recommends denial of the defendants'

motion to dismiss the Complaint on FTAIA grounds.

## VII.  PERSONAL JURISDICTION

Several foreign defendants[27] move to dismiss the Complaint for lack of personal

jurisdiction, arguing that they have insufficient contacts with the forum to be subject to suit here.

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure

12(b)(2), the plaintiffs bear the burden of demonstrating that the court has jurisdiction over the

defendants and that the exercise of jurisdiction comports with due process.  *Whitaker v. Am.*

*Telecasting, Inc.,* 261 F.3d 196, 208 (2d Cir. 2001).  Personal jurisdiction over the foreign

defendants in this case is governed by New York law.  *Id.* (citing *Bensusan Rest. Corp. v. King,*

126 F.3d 25, 27 (2d Cir. 1997)).  At the pleading stage and prior to engaging in discovery on the

defendant's contacts with the forum, the plaintiffs may rely on their own affidavits and supporting

materials and need only make a prima facie showing of jurisdiction.  *Bank Brussels Lambert v.*

*Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999); *Porina v. Marward, Shipping*

*Co.*, Ltd., 521 F.3d 122, 126 (2d Cir. 2008); *Stephan v. Babysport, LLC*, 499 F. Supp. 2d 279, 285

(E.D.N.Y. 2007).

---

[27]  These defendants are Vantec World Transport Co., Ltd., ABX Logistics Worldwide NV/SA, Dacsher GMBH (sued as "Dachser Intelligent Logistics"), DSV A/S, DSV Solutions Holding A/S, "K" Line Logistics, Ltd., MOL Logistics (Japan) Co., Ltd., Nippon Express Co., Ltd., Nissin Corporation, United Aircargo Consolidators, Inc., Yamato Global Logistics Japan Co., Ltd., Yusen Air & Sea Service Co., Ltd., Morrison Express Logistics PTE, Ltd., and Geodis S.A. (sued as "Geodis Wilson").

The plaintiffs concede that the foreign defendants are not domiciliaries of New York State.  They argue that the foreign defendants are nevertheless subject to personal jurisdiction in New York on several alternative bases: (1) they were "doing business" in New York under N.Y.C.P.L.R. § 301; (2) they are "transacting business" or contracted to supply services in New York under N.Y.C.P.L.R. § 302(a)(1); (3) they committed a tortious act within New York under N.Y.C.P.L.R. § 302(a)(2); (4) they committed a tortious act outside of New York that injured persons within New York under N.Y.C.P.L.R. § 302(a)(3) and they either derive substantial revenue from business regularly transacted in New York or expected their tortious conduct to have consequences in New York and derived substantial revenue from interstate or international commerce; (5) jurisdiction exists under Section 12 of the Clayton Act, 15 U.S.C. § 22;[28] or (6) if there is no personal jurisdiction over the defendants in any state, the plaintiffs assert that there is jurisdiction under Federal Rule of Civil Procedure 4(k)(2) because their claims arise under federal law and the exercise of jurisdiction comports with the United States Constitution.  Finally, the plaintiffs argue in the alternative that if they have not alleged sufficient facts to establish jurisdiction, they are entitled to jurisdictional discovery.

The plaintiffs have made a prima facie showing that the foreign defendants, except for DSV A/S and DSV Solutions Holding A/S, are subject to personal jurisdiction in New York under N.Y.C.P.L.R. § 302(a)(1) and are entitled to jurisdictional discovery on that ground.  Their remaining bases for jurisdiction either fail or are incomplete, but the plaintiffs should be

---

[28]  The plaintiffs provide no arguments in support of their claim of jurisdiction under the Clayton Act Section 12, which confers jurisdiction over a defendant in any district where it is found to "transact business."  15 U.S.C. § 22; *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 428-29 (2d Cir. 2005). The court therefore does not address this issue.

permitted to provide additional allegations in an amended complaint, if any, in support of those arguments.

A.      New York Civil Practice Law § 301

Under New York law, this Court may exercise personal jurisdiction over a foreign corporation if it is "doing business" in New York at the time the complaint is filed.  N.Y.C.P.L.R. § 301; *Frummer v. Hilton Hotels International Inc.*, 19 N.Y.2d 533, 536 (1967), *cert. denied*, 389 U.S. 923 (1967).  "A corporation is doing business and is therefore present in New York and subject to personal jurisdiction with respect to any cause of action . . . if it does business in New York not occasionally or casually, but with a fair measure of permanence and continuity."  *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000) (citations and quotation marks omitted), *cert. denied*, 532 U.S. 941 (2001). The corporation must be engaged in "continuous, permanent, and substantial activity in New York."  *Wiwa*, 226 F.3d at 95 (quoting *Landoil Resources Corp. v. Alexander & Alexander Services, Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990)). An allegation that the defendant solicits business in New York is not enough.  It must be accompanied by additional allegations such as the existence of a New York office, the presence of bank accounts in New York, ownership of property in New York, or the presence of agents or employees in New York.  *See Babysport*, 499 F. Supp. 2d at 285-86.

The plaintiffs assert that they have alleged "solicitation plus" in New York by the foreign defendants because they solicited business in New York and have New York offices.[29]  The Complaint includes an allegation that "Defendants maintain offices, have agents, transact

---

[29]  The plaintiffs do not assert that Geodis S.A. has a New York office, but rather allege that it acted through its subsidiary, which is alleged to be a New York corporation.  Compl. ¶¶ 56-57; Geodis MTD Opp. at 12-18.

business, or are found within this Judicial District. " Compl. ¶ 15.  However, the Complaint itself

as well as excerpts from the defendants' websites (submitted by the plaintiffs) disclose that it is

not the foreign defendants' own offices to which the plaintiffs refer, but to the New York offices

of their subsidiaries or affiliates.  The plaintiffs' attempt to base jurisdiction on the foreign

defendants' purported New York offices therefore fails.[30]

--------

[30]  The Complaint alleges that DSV A/S is a Denmark corporation with its principal place of business in Denmark, that its subsidiary DSV Solutions Holding A/S is a Denmark corporation with its principal place of business in Denmark, and that ABX Logistics Worldwide NV/SA is a subsidiary of DSV A/S.  Compl. ¶¶ 45-47. DSV A/S's website indicates that "DSV Air & Sea, Inc." (unidentified in the Complaint or the pleadings) has a head office in New York.  Hedlund Decl., Ex. 4.  Dachser GMBH (named in the Complaint as "Dachser Intelligent Logistics") is a German corporation with its principal place of business in Kempten, Germany.  It has a subsidiary that is a New York corporation with its principal place of business in Atlanta, Georgia.  Compl. ¶¶ 50-51; Hedlund Decl., Ex. 1.  "K" Line Logistics, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan and has a U.S. subsidiary that is a New York corporation with a New York office.  Compl. ¶¶ 77-78.  MOL Logistics (Japan) Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan and has a U.S. subsidiary that is a California corporation with its principal place of business in Roslyn Heights, New York.  Id. ¶¶ 81-82; Hedlund Decl., Ex. 13.  Nippon Express Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan and has a U.S. subsidiary that is a New York corporation with its principal place of business in New York, NY.  Compl. ¶¶ 65-66.  Nissin Corporation is a Japanese corporation with its principal place of business in Japan and has a subsidiary that is a California corporation with its principal place of business in California and an office in New York.  Id. ¶¶ 73-74; Hedlund Decl., Ex. 25.  Yamato Global Logistics Japan Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo Japan and has a U.S. subsidiary that is a New York corporation with its principal place of business in Secaucus, New Jersey.  Compl. ¶¶ 79-80.  Yusen Air & Sea Service Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan and has a U.S. subsidiary that is a New York corporation with its principal place of business in Garden City, New York.  Id. ¶¶ 67-68.  Vantec World Transport Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo Japan and has a U.S. subsidiary with its principal place of business on Torrance, California.  Id. ¶¶ 75-76.  According to its 2008 Annual Report, an affiliate of Vantec Group Holdings Corporate (not defined in the Complaint or the pleadings) has an office in New York.  Hedlund Decl., Exs. 36-38.  The Complaint alleges that Morrison Express Logistics PTE, Ltd. is a Taiwan corporation with its principal place of business in Taiwan and with an office in this district located in Jamaica, New York.  Compl. ¶ 63.  Defendant Morrison Express Logistics PTE, Ltd. disputes that it has a New York office and has submitted a declaration by one of its general managers where he states that the company's only office is in Singapore and that he is aware that Morrison Express Corporation (U.S.A.) has an office in Jamaica, New York.  Tan Decl. at ¶ 2.  The plaintiffs do not refute this in their opposition brief - they instead attach an excerpt from the website of "Morrison Express Corporation" (not defined in the Complaint or the pleadings) that indicates that Morrison Express Corporation (U.S.A.) has an office in Jamaica, New York.  Davis Decl., Ex. 4.  Finally, the Complaint alleges United Aircargo Consolidators, Inc. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Compl. ¶ 85.  The plaintiffs have attached to their supporting papers an excerpt from a third-party website which includes a

There is also no support for the argument that the foreign defendants solicited sales in New York through their websites.  Nothing in the Complaint or supporting papers indicate that an individual could even purchase freight forwarding services through the defendants' websites. "[S]imply maintaining a website that is accessible in New York" without more is insufficient to support personal jurisdiction.  *See O'Keefe v. Blue & Gold Fleet, L.P.*, 634 F. Supp. 2d 284, 287-88 (E.D.N.Y. 2009) (citing cases); *cf. Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 166 (2d Cir. 2010) (maintenance of website which offered product for sale to New York customers and facilitated shipment to New York was factor in favor of jurisdiction).

The plaintiffs argue in the alternative that the foreign defendants were transacting business in New York through their United States subsidiaries or affiliates.  "Where a plaintiff alleges that "the foreign corporation is present in New York state because of the activities there of its subsidiary, the presence of the subsidiary alone" does not establish jurisdiction absent a finding that the subsidiary is the "agent" or "mere department" of the parent.  *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998).  Moreover, to establish agency, "the plaintiff must show that the subsidiary 'does all the business which [the parent corporation] could do were it here by its own officials.'"  *Id.* (quoting *Frummer*, 19 N.Y.2d at 537).  Conclusory restatements of the elements of agency will not suffice nor is a foreign company present in New York simply because

---

description of this company that states that "[w]e have 95 professional employees working at our own office [sic] in Tokyo, Narita, Osaka and New York . . ."  Hedlund Decl., Ex. 29.  The defendants dispute the accuracy of this statement, arguing that it is referring to the office of its former U.S. subsidiary. Foreign Defs. PJ MTD Reply at 2 n.3.  Even if the accuracy of this website were not in dispute, the most it could establish is that United Aircargo Consolidators held itself out to the public as having an office in New York.  This is not enough to show proof of "doing business" in New York absent additional facts demonstrating that the company solicited business in New York.  *Cf. United Mizrahi Bank Ltd. v. Sullivan*, No. 97-9282, 1998 WL 575137, at *5 (holding onself out as having "principle [sic] place of business in New York" enough to establish jurisdiction).

it sells its product through a New York distributor.  *Id.*  As discussed above in Section IV(B), the plaintiffs have provided skeletal agency allegations in the Complaint.  The plaintiffs therefore fail to make a prima facie showing that the defendants were doing business in New York through in-state agents. *See Stutts v. De Dietrich Group*, 465 F. Supp. 2d 156, 163 (E.D.N.Y. 2006) (excerpts from defendants' corporate websites that refer to affiliate as "partner" and show identical product lists insufficient to establish jurisdiction); *Schenker v. Assicurazioni Generali S.p.A. Consol.*, No. 98-cv-9186, 2002 WL 1560788, at *7 (S.D.N.Y. July 15, 2002) (identification of subsidiaries on corporate website not enough to establish agency).

In *Jazini*, the Second Circuit affirmed a district court's holding that the plaintiff failed to make a prima facie showing of agency on allegations similar to those provided here.  There, New York residents brought a products liability action against a Japanese company for injuries as a result of an accident that occurred in Iran.  148 F.3d at 183.  The plaintiffs alleged that (1) the Japanese corporation "maintains a presence" in New York through its wholly-owned subsidiary and two wholly-owned subsidiaries of that corporation; (2) that the New York subsidiary was "wholly controlled" and "wholly dependent on its parent, among other things, for its business plan and financing," (3) that the New York subsidiary was "able to act as would its parent, were [it] directly present in the State of New York," and (4) that the Japanese company's annual report indicated that one of its four executive directors was the chairman of the board of the New York subsidiary and that the Japanese corporation "directs the manufacturing operations of the American subsidiary."  *Id.*  The court held that the mere presence of the subsidiary and these conclusory allegations of jurisdiction were insufficient to make a prima facie showing of jurisdiction, and that the district court did not abuse its discretion in denying jurisdictional

discovery.  *Id.* at 184.  Likewise here, the plaintiffs' summary allegations that each defendant sold freight forwarding services throughout the United States through their subsidiaries and/or affiliates and that the conduct alleged in the Complaint was "ordered, or done by . . . agents" of each co-conspirator fail to make a prima facie showing of agency.  *See* Compl. ¶¶ 88, 90.

### B.    New York Civil Practice Law § 302

New York's long arm statute, N.Y.C.P.L.R. § 302, provides in part:

(a) Acts which are the basis of jurisdiction.  As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state . . . or

3. commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]

As further discussed below, the plaintiffs have sufficiently alleged that the foreign defendants are subject to personal jurisdiction under subsection (a)(1) but not as to subsections (a)(2) and (a)(3).

### 1.    *New York Civil Practice Law § 302(a)(1)*

A party can establish jurisdiction over a defendant under section 302(a)(1) where the defendant (a) either (i) transacted business within the state or (ii) contracted to supply goods in the state; and (b) the claim arises out of that activity.  *Bank Brussels*, 171 F.3d at 786-87; *Babysport*, 499 F. Supp. 2d at 286.  Factors that a court will consider when determining whether a defendant transacted business in New York under section (i) include whether the defendant (1)

has an ongoing contractual relationship with a New York corporation, (2) whether that contract was negotiated or executed in New York, (3) whether the contract contains a choice of law provision, and (4) whether the contract requires payments in New York or subjects them to supervision in New York.  *See Agency Rent A Car Systems, Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29-30 (2d Cir. 1996).  The ultimate determination is made based on the totality of the circumstances and the defendant need not have ever been present in New York.  *Bank Brussels*, 171 F.3d at 789; *Agency Rent A Car*, 98 F.3d at 30.  As to prong (ii), "even if a defendant never enters the state to negotiate [the] contracts, to complete performance or for any other reason, the second prong of § 302(a)(1) can provide long-arm jurisdiction over a defendant who has minimal contacts with the state and who has entered a contract anywhere to supply goods or services in the state."  *Bank Brussels*, 171 F.3d at 789.

The Second Circuit recently recognized that some courts in this circuit view section 302 as a "single act" statute where "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Chloe*, 616 F.3d at 170 (*dicta*).  The plaintiffs do not point to any specific transactions where the foreign defendants made or solicited sales to New York, or contracted to supply freight forwarding services in New York.  The Second Circuit has held, however, that it "can scarcely be doubted that a . . . carrier delivering cargo in New York would come within CPLR § 302(a)(1) as a non-domiciliary who 'transacts any business within the state' and would thus be subject to suit for breach of the contract of carriage."  *Aquascutum of London, Inc. v. S.S. American Champion*, 426 F.2d 205, 209 (2d Cir. 1970); *see also Chloe*, 616 F.3d at 171 (noting

-81-

that § 302(a)(1) can be invoked against a defendant who "*commits a commercial tort* against

plaintiff in the course of transacting business or contracting to supply goods or services in New

York") (quoting *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir. 1983))

(emphasis in original).

The plaintiffs' allegations, taken together, raise the inference that the defendants'

anticompetitive surcharges were imposed on freight forwarding services entering New York and

that the plaintiffs' claims arise in part out of those transactions.  The plaintiffs have alleged that

each of the foreign defendants (except for DSV A/S and DSV Solutions Holding A/S) imposed

anticompetitive surcharges on freight forwarding services entering the United States.[31]  Moreover,

the Complaint includes an allegation that each defendant either "directly or through its

subsidiaries and/or affiliates, sold Freight Forwarding Services throughout the United States."

Compl. ¶¶ 20-85.  The plaintiffs also assert that "[t]he interstate trade and commerce described

herein is and has been carried out in part within this District," and "Plaintiffs' claims alleged in

this Complaint arise in part within this District." Compl. ¶ 15.  The plaintiffs have sufficiently

alleged that the freight forwarding service occurs at both the origin and destination of the freight,

indicating that the service is partially performed at the destination in the United States.  Compl.

¶¶105-06.  The plaintiffs also point to statements on the foreign defendants' or third-party

websites that indicate that they hold themselves out as global service providers who serve United

States markets.  *See* Foreign Defs. PJ MTD Opp. at 6-11 (summarizing exhibits to Hedlund Decl.

as to defendants' global operations); Davis Decl., Exs. 4, 6, 7, 10,  (websites indicate that

---

[31]  As discussed in Section IV(B) above, the plaintiffs have not named these two entities in any of the local conspiracy counts and thus have not alleged that they were part of any conspiracy to fix surcharges for freight forwarding services.  Therefore, there cannot be any transactions pleaded in the Complaint that would serve as the basis for jurisdiction over these entities under Section 302(a)(1).

"Morrison Express Corporation" has global operations and operates in the United States,

including in New York); Geodis MTD Opp., at 13 (referring to statements on Geodis' website as

to its global operations); *see also* Hedlund Decl., Ex. 39 (listing the family companies of eight of

the foreign defendants as the top freight forwarders in terms of revenue in the United States).

These allegations make it plausible that, except for DSV A/S and DSV Solutions Holding A/S,

the foreign defendants imposed anticompetitive surcharges on freight forwarding services that

reached New York. *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999)

(defendant's exclusive distribution agreement with a distributor to sell its products throughout

North America made it foreseeable that product would serve New York).

The defendants respond by arguing that the plaintiffs have failed to show a "substantial

nexus" between New York and the alleged illegal conduct.  The defendants are correct that the

plaintiffs' support in this regard is sparse, but it is sufficient at this stage, where the court has not

conducted an evidentiary hearing, to make out a prima facie case of jurisdiction under §

302(a)(1).  In this instance, the court can exercise its discretion to allow for jurisdictional

discovery to determine the issue of personal jurisdiction. *Stutts*, 465 F. Supp. 2d at 169 ("A

district court has 'considerable procedural leeway' when deciding a motion to dismiss for lack of

personal jurisdiction and 'may permit discovery in aid of the motion'") (quoting *Marine Midland

Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).  "Having raised a jurisdictional issue of

fact," i.e., whether the foreign defendants (except for the two DSV entities), either themselves, or

through their subsidiaries or affiliates, provided freight forwarding services in New York at fixed

prices, "jurisdictional discovery is appropriate." *Schmidt v. Martec Industries Corp.*, No. 07-

5020, 2009 WL 2883071, at *5 (E.D.N.Y. Sept. 3, 2009); *see also In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 207-08 (2d Cir. 2003).

> 2.    *New York Civil Practice Law § 302(a)(2)*

The plaintiffs have failed to allege that the foreign defendants committed a tortious act within New York to assert jurisdiction under CPLR § 302(a)(2).  This provision requires the plaintiffs to allege that "defendant or his agents committed a tortious act while physically present in New York."  *Newmarkets Partners LLC v. Oppenheim*, 638 F. Supp. 2d 394, 403 (S.D.N.Y. 2009) (quoting *Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563, 572 (S.D.N.Y. 2006) (alterations and internal quotation marks omitted).  In support of jurisdiction under this provision, the plaintiffs argue that "[e]ach defendant took numerous steps to effectuate this conspiracy as alleged in detail in the [Complaint], including by soliciting sales of and offering these inflated U.S. Freight Forwarding Services for sale in the U.S., and New York in particular."  Foreign Defs. PJ MTD Opp. at 18.  The plaintiffs thus do not even make a bare allegation that the foreign defendants solicited sales while actually present in New York, arguing instead that such conduct "will be discovered."  Such allegations fail to make a prima facie showing of jurisdiction under CPLR 302(a)(2).  *See Maggi v. Women's College Hosp.*, No. 03-0768, 2007 WL 841765, at *2 (N.D.N.Y. Mar. 19, 2007).

> 3.    *New York Civil Practice Law § 302(a)(3)*

Jurisdiction under CPLR § 302(a)(3)(ii) rests on a showing that "(1) The defendant [or its agent] committed a tortious act outside the state; (2) the cause of action arose from that act; (3) the act caused injury to a person or property within the state; (4) the defendant expected or should reasonably have expected the act to have consequences in the state; (5) the defendant derives

substantial revenue from interstate or international commerce." *Sole Resort, S.A. DE C.V. v. Allure Resorts Management, LLC*, 450 F.3d 100, 107 (2d Cir. 2006); *Babysport*, 499 F. Supp. 2d at 288.[32]  "[E]ach element is essential, and if plaintiffs fail to proffer sufficient evidence for any element, it is dispositive of the issue of personal jurisdiction under this provision." *Virgin Enterprises Ltd. v. Virgin Eyes LAC*, No. 08-cv-8564, 2009 WL 3241529, at *5 (S.D.N.Y. Sept. 30, 2009) (internal quotation marks and citation omitted).  Courts interpreting this section apply a "situs-of-injury test" which looks to the location of the original event that caused the injury to determine jurisdiction rather than the location of the financial consequences of that event. *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001).

The plaintiffs argue that the defendants committed tortious acts outside of New York "when they conspired overseas to inflate the price of U.S. Freight Forwarding Services and should have reasonably expected this conduct to have consequences in New York where these inflated U.S. Freight Forwarding Services were sold and they maintained offices."  Foreign Defs. PJ MTD Opp. at 20. While the conspiracies are alleged to have been formed abroad, a conspiracy is not a tort that provides jurisdiction under § 302(a)(3).  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) ("New York does not recognize an independent tort of conspiracy").  If it is the surcharges themselves that are alleged to be the basis for their tort claim, the plaintiffs have not alleged where they were charged for the specific surcharges or where they suffered an injury for this conduct.  That defendants' conduct has "consequences in New York" does not connect

---

[32]  The plaintiffs' arguments in favor of jurisdiction under § 302(a)(3)(i) (defendants "regularly does or solicits business" in the state) are identical to those made in favor of jurisdiction under CPLR § 301 and likewise fail under this provision.

any specific overseas tortious activity to an injury here.  The plaintiffs therefore fail to make a

prima facie showing of jurisdiction under CPLR § 302(a)(3).

###### C.        Federal Rule of Civil Procedure 4(k)(2)

Rule 4(k)(2) confers personal jurisdiction over a party who is not subject to personal

jurisdiction in any state, but who has minimum contacts with the United States as a whole, such

that personal jurisdiction is proper under the Due Process Clause of the Fifth Amendment.  *See*

*Dardana Ltd. v. Yugauskueftegaz*, 317 F.3d 202, 207 (2d Cir. 2003) (citing *Chew v. Dietrich*, 143

F.3d 24, 27-28 (2d Cir. 1998)).  This rule "acts as a federal long-arm statute" and allows a federal

court to exercise jurisdiction over a defendant where (1) the plaintiff's claim arises under federal

law, (2) the defendant lacks sufficient contacts to be subject to jurisdiction in any particular state,

and (3) the federal court's exercise of personal jurisdiction over the defendant does not conflict

with the Constitution or other federal law.  *Aqua Shield, Inc. v. Inter Pool Cover Team*, No. 05-

CV-4880, 2007 WL 4326793, at *5 (E.D.N.Y. Dec. 7, 2007).

The parties are in dispute as to who bears the burden of establishing that the defendant

lacks sufficient contacts with any particular state.  The Second Circuit has not ruled on this issue

and the federal courts are divided.[33]  This court agrees with the burden-shifting rule adopted by

---

[33] *Compare United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 41-42 (1st Cir. 1999)
(adopting burden-shifting scheme with initial burden on plaintiff to "certify that, based on the information
that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of
general jurisdiction of any state"); *In re South African Apartheid Litigation*, 643 F. Supp. 2d 423, 429
(S.D.N.Y. 2009); *Aqua Shield*, 2007 WL 4326793, at *8 (adopting First Circuit view and directing
plaintiff to make such certification); *Porina v. Marward Shipping Co.*, No. 05-5621, 2006 WL 2465819,
at *4 (S.D.N.Y. Aug. 24, 2006)("better authority" is that initial burden is on the plaintiff), *aff'd*, 521 F.3d
122 (2d Cir. 2008), *with ISI International, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th
Cir. 2001) (to prevent a state-by-state analysis, "defendant who wants to preclude use of Rule 4(k)(2)) has
only to name some other state in which the suit could proceed") *Mwani v. Bin Laden*, 417 F.3d 1, 11
(D.C. Cir. 2005) (adopting Seventh Circuit view); *Adams v. Unione Mediterranea di Sicurta*, 364 F.3d
646, 651 (5th Cir. 2004) (same), *cert. denied sub nom. UMS Generali Marine S.p.A. v. Adams*, 543 U.S.

the First Circuit and many district courts in this Circuit.  Under this rubric, the plaintiff has the

burden of making out a prima facie case of all the elements of Rule 4(k)(2), including a

certification that "based on the information that is readily available to the plaintiff and his

counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state."

*Swiss American Bank*, 191 F.3d at 41.  Should the plaintiff make out its prima facie case, the

burden then shifts to the defendant to produce evidence that it is subject to jurisdiction in one or

more states or that its contacts with the United States generally are insufficient.  *Id.*  This burden-

shifting scheme fairly apportions the responsibility for assessing nationwide contacts between the

plaintiff, who has limited information on the one hand, and the defendant, who has limited desire

to submit itself to jurisdiction in any particular state.  *Id.*  Since neither the plaintiffs nor the

defendants have addressed their burden on this issue, the court cannot adequately address

jurisdiction under Rule 4(k)(2) at this time.  As discussed above, the plaintiffs will have an

opportunity to amend their pleading.  The parties can raise and brief the issue of personal

jurisdiction under Rule 4(k)(2) in a subsequent motion to dismiss, if any is filed, using the

burden-shifting rubric scheme described above.

> *Request for discovery*

As noted above, the court should allow the plaintiffs to pursue jurisdictional discovery on

the foreign defendants' contacts with the forum, except for DSV A/S and DSV Solutions Holding

A/S whom the plaintiffs have failed to connect to any conspiracy and thus cannot be held to

personal jurisdiction under CPLR § 302(a)(1).  The court also agrees with the parties that any

jurisdictional discovery on these issues should take place at the same time as the merits discovery.

---

979 (2004).

Once such discovery is complete, the foreign defendants may seek leave to move for summary judgment on the personal jurisdiction issue, and the court may also address any due process arguments.

## VIII.  SERVICE OF PROCESS

In addition to the personal jurisdictional arguments discussed above, Geodis S.A. moves to dismiss under Federal Rule of Civil Procedure 12(b)(4) for insufficient service of process.  The Complaint and the Summons served on Geodis S.A. names "Geodis Group" as the defendant. Geodis S.A. moves to dismiss for insufficient service, claiming that "Geodis Group" is a non-existent legal entity.  The Complaint identifies Geodis Group as "a French [sic] with its principal place of business at Cap West, 7/9 allées de l'Europe, 92110 CLICHY, France" and Geodis S.A. admits that it is headquartered at that address and that it received the Complaint and summons served on "Geodis Group."  Cassagne Decl. at 1-2.  Geodis S.A. submits a declaration in support of its motion to dismiss where it asserts that it is a French holding company of several independent shipping-related subsidiaries.  The declaration states that "Geodis Group" is a term used by Geodis S.A. and its direct subsidiaries to refer generally to both Geodis S.A. and its shipping-related subsidiaries as a whole.  Thus, Geodis S.A. asserts that it cannot be certain whether the plaintiffs intend to sue it directly or impute its direct subsidiaries' actions to Geodis S.A.  The plaintiffs respond that the Geodis website makes multiple references to "Geodis Group" as a single entity and assert that their claims are brought against Geodis S.A.  Geodis MTD Opp. at 23 ("Since Geodis S.A. clearly intends to be known by the world as 'Geodis Group,' it cannot claim prejudice when it is sued under that name").  Since this appears to be a technical defect in the summons, the appropriate remedy at this stage would not be to dismiss the claims but to serve

-88-

an amended summons on "Geodis S.A."  *See Baskin v. Lagone*, No. 90-cv-5478, 1993 WL 59781, at *5 (S.D.N.Y. Mar. 3, 1993).  The court therefore recommends that the motion to dismiss on this ground be denied, but that the plaintiffs be directed to serve an amended summons on the proper defendant.

## IX.   STATUTE OF LIMITATIONS

The defendants move to dismiss Claims 1, 2, 3, 4, and 12 on the basis that these claims are barred by the four-year statute of limitations applicable to the plaintiffs' antitrust claims. The court disagrees and will deal with these issues in three parts.  First, the court examines the relation-back doctrine in Federal Rule of Civil Procedure 15(c) to determine whether the plaintiffs can rely on the filing date of their Original Complaint for purposes of assessing the statute of limitations, or whether the filing date of the Amended Complaint is controlling.  Second, the court employs the continuing conspiracy (or continuing violation) theory to decide the point in time at which the plaintiffs' price-fixing claims accrued in order to determine whether they fall within the four-year statute of limitations.  This task involves a determination of whether the plaintiffs have sufficiently alleged that the conspiracy existed, and that sales pursuant to the conspiracy were made less than four years prior to the operative filing date for the plaintiffs' claims.  Finally, the court considers whether the plaintiffs have adequately pleaded fraudulent concealment in order to toll the statute of limitations.

### A.     The Relation Back Doctrine

Under Federal Rule of Civil Procedure 15, a claim will relate back to an earlier pleading where "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  Fed. R.

Civ. P. 15(c)(1)(B).  Where a new defendant is named in the amended pleading, the claim will relate back where Rule 15(c)(1)(B) is satisfied and the new defendant "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C).

The Original Complaint was brought against fourteen of the sixty-five defendants named in the Amended Complaint and alleged a single global conspiracy beginning in January 2001 "to raise, fix, stabilize, and maintain at artificially high and non-competitive levels the prices at which they sold Freight Forwarding Services throughout the United States."[34]  The Amended Complaint includes 10 claims arising from the collusive imposition of various specific surcharges for freight forwarding services on specific routes during various time periods starting as early as 2001.  The Amended Complaint also includes an assertion of three regional conspiracies and one global conspiracy, based on those individual local conspiracies, whose objects were to raise the rates paid for U.S. Freight Forwarding Services overall.  Both complaints allege that the plaintiffs discovered their claims when various worldwide antitrust authorities announced investigations into possible price-fixing conspiracies in the freight forwarding industry in October 2007.

The claims in the plaintiffs' Amended Complaint arose out of the conduct complained of in their original pleading: a pattern of anticompetitive conduct in the freight forwarding industry to increase the price of freight forwarding services through the imposition of fixed surcharges. While the plaintiffs' discovery of the more specific details of the defendants' anticompetitive

---

[34]  The defendants named in the Original Complaint are Panalpina World Transport (Holding) Ltd.; Panalpina, Inc.; Kühne + Nagel, Inc.; Expeditors International of Washington, Inc.; EGL, Inc.; EGL Eagle Global Logistics, LP; Deutsche Bahne AG; Schenker AG; Schenker, Inc.; Deutsche Post AG; DHL Express (USA), Inc.; UTi Worldwide Inc.; and Spedlogsiwss, aka The Association of Swiss Forwarders.

conduct led them to alter their legal theories to assert individual conspiracies at different time periods and on specific routes, their claims are based on the same circumstances that gave rise to their original complaint.  On this basis, the court can conclude that the fourteen defendants named in the Original Complaint were given adequate notice of the "general fact situation alleged in the original pleading."  *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992) ("While allegations pronouncing new claims in an amended pleading will not relate back when based upon new facts and different transactions, allegations which simply 'amplify the facts alleged in the original pleading or set forth those facts with greater specificity" will relate back.'") (citations omitted).

The flexible standard set forth in Rule 15(c) does not apply, however, to those defendants not named in the Original Complaint.  Relation back for the plaintiffs' claims against the defendants that were not named in their original pleading may be available only if the plaintiffs can show that those defendants had actual or constructive notice of the action, would not be prejudiced in defending it, and were not initially named because of a mistake in identity.  *See* Rule 15(c)(1)(C).  The plaintiffs have not set forth any reason why the defendants named for the first time in the Amended Complaint should have been on notice of the plaintiffs' claims against them, of that they knew they should have been named but for a mistake.  Therefore, before accounting for tolling for fraudulent concealment, as discussed later in this opinion, the relevant filing date for the fourteen defendants named in the Original Complaint is January 3, 2008.  For the defendants named for the first time in the Amended Complaint, again before accounting for fraudulent concealment, the relevant filing date is July 21, 2009.

**B.      Antitrust Conspiracy and Continuing Conspiracy Doctrine**

The antitrust laws impose a four-year statute of limitations.  Under Section 5(b) of the

Clayton Act, which also applies to a Sherman Act claim,  "[a]ny action to enforce any cause of

action under Section 15, 15a, or 15c of this title shall be forever barred unless commenced within

four years after the cause of action accrued."  15 U.S.C. § 15(b).  The relevant consideration,

then, becomes the point in time when the cause of action accrues, and it is the general rule that a

cause of action under the Sherman Act accrues when the defendant takes some action, or commits

some act that injures the plaintiff's business.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*,

401 U.S. 321, 338 (1971) (citing authorities).  Thus, with certain exceptions, a complaint that

relies on acts committed prior to the four-year limitations period will usually be barred by the

statute of limitations.

The rule is different, however, for continuing conspiracies.  "In the context of a continuing

conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually

been understood to mean that each time the plaintiff is injured by an act of the defendants a cause

of action accrues to him to recover the damages caused by that act and that, as to those damages,

the statute of limitations runs from the commission of the act."  *Zenith*, 401 U.S. at 338 (citing

cases); *see also Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1088-90 (10th Cir.

2006) (citing cases).  A continuing conspiracy or continuing violation occurs when "the violator's

actions consist not only of some definitive act in violation of the antitrust laws, but also of a series

of subsequent acts that cause further injury to the plaintiff."  2 P. Areeda & H. Hovenkamp,

*Antitrust Law* ¶ 320(c), p. 285 (3d ed. 2007).  "Antitrust law provides that, in the case of a

'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high

-92-

priced sales over a period of years, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g., each sale to the plaintiff,* 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (quoting 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 338b, p. 145) (rev. ed. 1995)) (emphasis added). *Accord Nine West*, 80 F. Supp. 2d at 192 (applying continuing conspiracy doctrine to price-fixing conspiracy).

The principle animating limitations considerations involving a continuing antitrust conspiracy is also found in jurisprudence under Section 2, which regulates monopolies. 15 U.S.C. § 2. In *Berkey Photo, Inc. v. Eastman Kodak Co.*, the plaintiff charged that the defendant achieved a monopoly through anti-competitive conduct prior to the limitations period, as a result of which the plaintiff purchasers continued to pay overcharges into the limitations period. *See* 603 F.2d 263, 295 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093 (1980). The court rejected the defendant's limitations argument, finding that a purchaser's antitrust claim does not accrue until it actually pays the overcharge. *Berkey Photo*'s core holding was thus that a "purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anti-competitive actions taken before the limitations period." *Id.* at 296. "So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide." *Id.* at 295. The court was speaking there of monopolists, but there is no reason that the principle should differ when it comes to the conspirators in this case. *Berkey Photo* in fact recognized the applicability of that principle in the continuing conspiracy context and drew on it to buttress its argument. *See id.* (quoting *Zenith*, 401 U.S. at 338). For limitations purposes, the

"taint of an impure origin does not dissipate after four years if a monopolist [or conspirator] continues to extract excessive prices because of it."  *Id.* at 296.

Each of the claims at issue here includes an allegation that the surcharges were imposed beginning on a certain date up until a "time unknown" or "date unknown" and also generally allege that the "anticompetitive conduct complained of herein will continue (and to the extent temporarily and only partially abandoned, will resume) absent an injunction."  Compl. ¶¶ 181, 183, 197, 205, 215.  Since the object of the conspiracies was to provide freight forwarding services at inflated, fixed prices, that the defendants continued to sell such price-fixed services is a rational inference to be drawn.  *Cf. SJ Advanced Technology & Mfg. Corp v. Junkunc*, 627 F. Supp. 572, 577-78 (N.D. Ill. 1986) (requiring more than "mere" invocation of continuing violation in the absence of overt acts occurring during limitations period).  In addition to this inference, the plaintiffs allege directly that they each purchased freight forwarding services from one or more of the defendants and/or the named co-conspirators at artificially inflated prices during the Class Period.  *See* Compl. ¶¶ 20-22, 322.  The Class Period is defined earlier in the Complaint to cover the period from January 1, 2001 up until the date when the Complaint was filed.  *Id.* ¶ 18.  Taking the allegations at face value, the plaintiffs continued to buy freight forwarding services from the defendants throughout the entire period.  It is also worth noting that the price-fixing conspiracies charged in the Criminal Informations to which some of the defendants have pleaded guilty state that these conspiracies extended to dates in 2006 and 2007. *See* Sept. 30, 2010 DOJ Press Release.  Among other things charged in those Informations is the collusive imposition of an NES fee on shipments from the United Kingdom to the United States that bears a significant resemblance to the surcharge alleged in Claim 3.  *See id.* at p. 2

-94-

(describing conspiracy "that took place from October 2002 to October 2007, to impose a [NES] fee on international shipments from the United Kingdom to the United States").  It makes sense that the price-fixing conduct would have continued until this time since it is in 2007 that antitrust authorities announced their investigations into the international freight forwarding industry. Compl. ¶¶ 124-40.  Moreover, the JFTC Order found that the Japanese surcharge agreements were terminated in November 2007 when the Japanese Defendants received word that the United States Department of Justice and other antitrust authorities had started to investigate the forwarders.  *See* Translation of JFTC Order, at p. 7 ¶ 5, attached as Ex. A to Complaint.

All of this supports the timeliness of the claims.  The "statute of limitations for antitrust litigation 'runs from the most recent injury caused by the defendants' activities rather than from the violation's inception.'"  *Exhaust Unlimited, Inc. v. Cintas Corp.*, 326 F. Supp. 2d 928, 931 (S.D. Ill. 2004) (quoting *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004)).  Therefore, as the defendants continued to cause injury (through sales) into the limitations period, these claims would be timely.  *See Cintas*, 326 F. Supp. 2d at 931 (dismissing limitations defense because, although actionable conduct was initiated seven years prior to filing the complaint, sales by the defendant continued into limitations period and continued to cause injury to the plaintiff); *Molecular Diagnostics Labs. v. Hoffmann-La Roche, Inc.*, 402 F. Supp. 2d 276, 286 (D.D.C. 2005) (applying continuing violation theory to find that purchaser plaintiff's claim accrued for limitations purposes each time it paid a "supra-competitive" price as a result of the defendants' anti-competitive conduct); *Thomas v. Petro-Wash, Inc.*, 429 F. Supp. 808, 811-12 (M.D.N.C. 1977) (finding that in continuing conspiracy each sale of gas pursuant to conspiratorial

agreement constituted an overt act serving to allow cause of action to accrue and rejecting defendants' limitations argument).

Even so, in the absence of tolling, the recovery of damages is limited to acts that occurred within the four-year limitations period that precede the filing of the complaint.[35]  *See Klehr*, 521 U.S. at 189;  *Zenith*, 401 U.S. at 339.  *Klehr* cautioned that the "commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."  521 U.S. at 189-90 (citing *Zenith*, 401 U.S. at 388 and other authorities).  Antitrust plaintiffs may not use an "independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."  *Klehr*, 521 U.S. at 190 (citing cases).  But it is irrelevant for the question of liability that all the specific allegations with respect to these defendants' activities occurred prior to the limitations period.  *See Klehr*, 521 U.S. at 189; *Zenith*, 401 U.S. at 388; *Berkey Photo*, 603 F.2d at 295-96.  There is no requirement that the plaintiffs identify specific conduct on the part of a defendant during the limitations period.  *See Petro-Wash*, 429 F. Supp. at 812-13.  The Complaint clearly alleges that the defendants formed a conspiracy that was active in selling price-fixed freight forwarding services until a time unknown and that the conspiracy could have been continuing to the date of the filing of the Complaint.  It is possible that discovery will reveal that no overt acts did in fact occur during the limitations period, but reading the Complaint in the light most favorable to the plaintiffs, these allegations are sufficient to raise the inference that price fixing did indeed occur within the four-year period before the operative complaints were filed.

---

[35]  As a practical matter, recovery in this case will be extended beyond that period due to fraudulent concealment of the plaintiffs' claims by the defendants.

### C.        Fraudulent Concealment

The court has recommended that the claims themselves are not time barred, even without

the benefit of fraudulent concealment.  Notwithstanding that recommendation, it is still necessary

to address fraudulent concealment because of its impact on recoverable damages and the effect it

will have on discovery.  The doctrine of fraudulent concealment may serve to toll the statute of

limitations until the time an antitrust plaintiff discovers the claim.  *See Klehr*, 521 U.S. at 194-95

(discussing antitrust law and fraudulent concealment); *New York v. Hendrickson Bros., Inc.*, 840

F.2d 1065, 1083 (2d Cir. 1988); *Nine West*, 80 F. Supp. 2d at 192.  In this circuit, a plaintiff who

seeks the benefit of fraudulent concealment is required to establish three elements: (1) that the

defendant concealed the existence of the cause of action from the plaintiff; (2) that the plaintiff

brought suit within the applicable limitations period upon learning of the cause of action; and (3)

that the plaintiff's ignorance of the claim did not result from a lack of diligence.  *Hendrickson*

*Bros., Inc.*, 840 F.2d at 1083 (citing authorities); *see also Baskin v. Hawley*, 807 F.2d 1120, 1131

(2d Cir. 1986); *Cerbone v. Int'l Ladies Garment Workers Union*, 768 F.2d 45, 48 (2d Cir. 1985);

*City of Detroit v. Grinnel Corp.*, 495 F.2d 448, 460 (2d Cir. 1974).

Although the burden of establishing fraudulent concealment is on the plaintiff, *see*

*Hendrickson Bros*., 840 F.2d at 1085-86, at the Rule 12(b)(6) stage, a plaintiff need only plead

fraudulent concealment, as opposed to affirmatively proving it.  *See Hinds County*, 700 F. Supp.

2d. at 400 (citing *Nine West*, 80 F. Supp. 2d at 192-93)  Because it is a concept that relies on

allegations of fraudulent conduct, courts in this circuit and others require it to be pleaded in

accordance with Federal Rule of Civil Procedure 9(b), under which "[i]n alleging fraud or

mistake, a party must state with particularity the circumstances constituting fraud or

mistake." *See, e.g., National Group for Comm's & Computers, Ltd. v. Lucent Techs Inc.*, 420 F.

Supp. 2d 253, 265 (S.D.N.Y. 2006); *In re Vitamins*, 2000 WL 1475705, at *2.

With regard to the first prong, concealment is proven by showing either that (1) "the

defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury" or (2)

"that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d

at 1083; *see also Nine West*, 80 F. Supp. 2d at 192.  The plaintiffs contend that they have

adequately pleaded that the defendants affirmatively concealed the conspiracies alleged in Claims

1 and 3, and that in any event, all five of the price-fixing claims affected by the statute of

limitations were by their nature inherently self-concealing.

This court recently addressed the issue of what allegations are sufficient to plead

fraudulent concealment in a price-fixing conspiracy.  *See Benchmark Export Servs. v. China*

*Airlines Ltd.*, No. 06–MDL–1775 (JG) (VVP), Slip. Op. at 23-39 (E.D.N.Y. Sept. 22, 2010)

("*Benchmark*").  Judge Gleeson adopted that Report and Recommendation on November 1, 2010.

(No. 06-MDL-1775, Dkt. Entry at 11/1/2010).  There, it was found that the defendants' use of

press releases to offer false and pretextual reasons for surcharges for air cargo services

demonstrated affirmative concealment.  *Benchmark*, Slip. Op. at 30-32.  On the other hand, the

court noted that had the plaintiffs "relied only on the stock allegations of 'secret meetings,'

'surreptitious communications,' 'deceptive practices,' or agreements 'not to discuss publicly or

otherwise reveal the nature' of the communications so as to 'preclude detection' or 'prevent the

existence of written records,' then perhaps the result might be different."  *Id.* at 32 (citing *In re*

*Publication Paper*, 2005 WL 2175139, at *3).

Here, the plaintiffs have not sufficiently pleaded that the defendants took "affirmative steps to prevent the plaintiff's discovery of [the] claim[s]" in Claims 1 and 3. *Hendrickson Bros.*, 840 F.2d at 1083. The plaintiffs base their arguments of affirmative concealment on the allegations that the defendants' formulated the conspiracy during secret meetings. Thus, while the Complaint refers generally to "deceptive practices and techniques of secrecy employed by Defendants . . . to avoid detection of, and fraudulently conceal" their conduct (Compl. ¶ 173), the plaintiffs do not allege that the defendants made any pretextual press announcements or directly communicated with the public as to the conspired surcharges. As to Claim 1, the plaintiffs plead that members of a freight forwarder trade association group held a conference call on October 2, 2001 where they agreed to impose a security surcharge on their customers. Compl. ¶¶ 183-90. They also allege that the CEOs of the trade association members held a subsequent conference call regarding the security surcharge and the minutes of that meeting were sent to DHL's outside counsel. Compl. ¶¶ 318 (d)-(h). The minutes of a subsequent meeting of the CEOs did not mention the new surcharge. *Id.* at ¶ 318(i). None of these allegations demonstrate an effort to affirmatively deceive *the public*. Even if these allegations could support the inference that the minutes of the CEO meeting were manipulated, the plaintiffs do not allege who received and relied on those allegedly fraudulent minutes. As to Claim 3, the plaintiffs allege that the conspiracy was first formed at a secret meeting held at an Italian restaurant outside of London and that the members of the conspiracy used code words to refer to themselves, their meetings, and the agreed upon surcharges. *Id.* at ¶¶ 206-11. While secret meetings and the use of code words lends credence to the plausibility of the conspiracy itself, they do not demonstrate affirmative concealment. There is no indication as to where, when, and in whose presence these code words

were used.  *See Publication Paper*, 2005 WL 2175139, at *2 (rejecting affirmative concealment where there were no indication as to "misrepresentations to customers, to which customers the misrepresentations were made, when they were made, or what was said" and how the secret meetings were used to prevent discovery of the claims).

Therefore, to meet the first prong of the fraudulent concealment inquiry, the plaintiffs must rely exclusively on their allegations that the conspiracies in Claims 1, 2, 3, 4, and 12 are inherently self-concealing.  Some courts have held that simply alleging that a price-fixing conspiracy is self-concealing is sufficient.  *Benchmark*, Slip. Op. at 33 (citing *Hinds County*, 700 F. Supp. at 378); *Nine West*, 80 F. Supp. 2d at 192-93).  This court in *Benchmark* expressed doubt as to whether "pleading fraudulent concealment with particularity can be met by the cavalier, self-fulfilling allegation that the conspiracy was inherently self-concealing."  *Id.* at 33 (citing *OBG Tech. Servs., Inc. v. Northrop Grumman Corp.*, 503 F. Supp. 2d 490, 507-08 (D. Conn. 2007); *Nine West*, 80 F. Supp. at 192-93).  Nonetheless, the *Benchmark* plaintiffs' allegations of the circumstances surrounding the defendants' public announcements of price increases and the nature of the air cargo industry were sufficient to plead that the conspiracy alleged was inherently self-concealing.  *Benchmark*, Slip. Op. at 34.

The plaintiffs here have also set forth sufficient allegations to demonstrate that the defendants' price-fixing conduct was inherently self-concealing.  They have alleged that the conspiracies were agreed to and implemented through private meetings under the guise of the defendants' trade association membership or at public locations where the defendants spoke in code.  The surcharges that were imposed corresponded with an external event in the market that provided the defendants a "cover" to preclude detection by consumers of their collusion.  The

surcharge in Claim 1 was labeled as a "security surcharge fee," the surcharge in Claim 2 was labeled a "fuel surcharge," and was imposed whenever the forwarders were charged a fuel surcharge by an airline, the surcharge in Claim 3 was labeled a "New Export System" fee to correspond to a new reporting requirement on air and ocean shipments of exports out of the United Kingdom, and the surcharge in Claim 4 was labeled a "U.S. Customs AMS charge" to cover costs in relation to a new Advanced Notification System employed by United States Customs.  Moreover, as in *Benchmark*, the plaintiffs here allege that freight forwarding services are "commodity-like," "highly-fungible," and that "sales are primarily driven by price."  Compl. ¶ 113(a).  That many of the defendants and coconspirators imposed these surcharges at the same time "could be reflective not of any collusive agreement, but of the fact that the competitors were confronted with the same sets of external variables and already had similar pricing structures in place."  *Benchmark*, Slip. Op. at 38.  A reasonable customer in this market could have assumed that the surcharges that were imposed were the natural result of market forces, not a conspiracy to fix prices.  Thus, in this case, "proof of the conspiracy itself sufficed to [allege] concealment by the coconspirators."  *Hendrickson*, 840 F.2d at 1084; *In re Catfish Antitrust Litigation*, 826 F. Supp. 1019, 1031-32 (N.D. Miss. 1993) (finding concealment established through allegations of secret meetings because "any evidence of efforts designed to keep price fixing activities secret" would suffice).

As to the second prong of fraudulent concealment, nothing indicates that the plaintiffs have not asserted their claims within four years of discovering them.  The Complaint makes clear that the plaintiffs did not discover their potential claims until October 2007 when the international antitrust raids on the defendants' operations were made public.  *See* Compl. ¶¶ 124-141, 172.

This action was initiated by filing the Original Complaint on January 3, 2008 and the Amended Complaint on July 21, 2009, both of which are within four years of discovery. The argument that the plaintiffs should have or could have discovered the claims earlier goes to the final element of fraudulent concealment, whether the plaintiffs were reasonably diligent in pursuing their claims.

To establish the third requirement of fraudulent concealment, a plaintiff must allege that it "neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.'" *Nine West*, 80 F. Supp. 2d at 193 (quoting *Klehr*, 521 U.S. at 195). The defendants argue that the plaintiffs' general assertions of diligence and ignorance, which rely on conclusory allegations of a self-concealing conspiracy, do not satisfy the pleading requirements. The defendants are correct that the plaintiffs do not allege "any specific inquiries of [Defendants], [or] detail when such inquiries were made, to whom, regarding what and with what response." Joint MTD, at 28 (citing *Hinds County*, 620 F. Supp. 2d at 521). The plaintiffs respond that they were unaware of the defendants' conduct or any facts that might have led to their discovery until October 2007 and in any event, the question of diligence is a fact question that cannot be resolved on a motion to dismiss. Joint MTD Opp. at 47 (citing cases).

Again, this Court looks to the *Benchmark* decision for guidance since the price-fixing conduct at issue there has certain parallels to this case. There, the court held:

> It is at least questionable whether diligent inquiry by the plaintiffs would have actually uncovered any anti-competitive conduct. . . . It is worth recalling that it was the government investigations that opened the door for the plaintiffs to walk through. If the announcement of lockstep price increases were curious, even somewhat suspicious, they still did not provide notice to the plaintiffs. Due diligence does not demand such unmitigated cynicism on the part of consumers. *See Graphite Products*, 2007 WL 1062979, at *4 (knowledge of parallel price increases and limited knowledge of government investigation does not establish lack of diligence). This is particularly so in the context of inflated surcharges. Surcharges, by nature, reflect various external costs that the airlines are forced to expend in order to provide

commercial freight services. *See* Complaint ¶¶132-33. And because shipping is a highly fungible service, it is natural to expect that the airlines would be faced with highly similar external costs and variables relating to fuel, security, and customs charges. Thus, that many of the defendants and coconspirators inaugurated similar surcharges at the same time could be reflective not of any collusive agreement, but of the fact that the competitors were confronted with the same sets of external variables and already had similar pricing structures in place. It is natural to assume that business competitors forced to confront the same external stimuli will react in a similar way, and that such a reaction would not result from any conspiracy.

*Benchmark,* Slip. Op. at 37-38. The reasoning above is equally applicable in this case, which involves similar factual scenarios in a related industry.[36] In the antitrust context, "[t]he requisite notice required to defeat a claim of fraudulent concealment is an 'awareness of sufficient facts to identify . . . the particular cause of action at issue, not [notice] of just any cause of action.'" *Molecular Diagnostics Labs.*, 402 F. Supp. 2d at 284 (citation omitted); *cf. Merck & Co. v. Reynolds*, 130 S.Ct. 1784, 1798 (2010) (plaintiff in private securities fraud case is on notice when he discovers, or a reasonably diligent plaintiff would have discovered, the facts constituting the violation). As discussed in *Benchmark*, to the extent the plaintiffs were made aware of the parallel price increases by the defendants, there is nothing to indicate at this point that they would have been put on notice of price-fixing activity. *Twombly* stands for the proposition that parallel conduct by itself does not give rise to a plausible claim and it would be overly burdensome to put the plaintiffs on notice of their cause of action at that point. *Benchmark*, Slip. Op. at 36-37. As a result, "courts have held that knowledge of 'apparent parallel price increases' is not sufficient to

---

[36] That the facts in the *Air Cargo* cases seem parallel to this one is not a mere coincidence; the cases appear to be related in origins and methods. For example, in Claim 1 the plaintiffs allege that the Security Surcharge Defendants conspired to offer to enter into an agreement with various airlines to impose an increased security surcharge, Compl.¶¶ 192-93, and in Claim 2, it is alleged that the 2002 Fuel Surcharges Defendants imposed the fuel surcharge each time they were assessed a fuel surcharge by an airline, *Id.* at ¶¶ 196-97.

demonstrate that plaintiffs should have known that they had an antitrust cause of action." *In re Bulk Extruded Graphite Products Antitrust Litigation*, No. 02-cv-6030, 2007 WL 1062979, at *3 (D.N.J. Apr. 4, 2007) (citing *United Nat'l Records, Inc. v. MCA*, Inc. 609 F. Supp. 33, 37 (N.D. Ill. 1984); *see also Catfish Litigation*, 826 F. Supp. at 1031 (parallel conduct by itself does not necessarily give "rise to the duty to inquire"); *see also Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 504 (9th Cir. 1988), *cert. denied*, 488 U.S. 1010 (1989).

The cases cited by the defendants are inapposite. Courts have rejected claims of diligence by plaintiffs at the motion to dismiss stage where they were able to point to specific public disclosures or information that should have alerted the plaintiffs to possible misconduct. *See In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (public disclosures in defendants' public filings "should have alerted the investors that they had been misled"); *Hinds County*, 620 F. Supp. 2d at 521 (plaintiffs failed to plead when they became aware of the conspiracy and at least one of the challenged transactions giving rise to the claims was publicly disclosed more than four years before complaint filed); *Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 225-26 (E.D.N.Y. 2003) (given that the settlement agreement that formed the basis for the claims was disclosed more than four years before the claims were filed, plaintiffs could not "credibly claim ignorance of the operative facts of their claims"). Here, however, the only public statements that the parties point to are the press releases in October 2007 announcing government investigations into the freight forwarding industry.

In this case, where the plaintiffs have adequately pleaded a self-concealing conspiracy, the question of diligence for purposes of fraudulent concealment is better left for the summary judgment stage or the finder of fact at trial. *Accord In re Mercedes-Benz Antitrust Litig.*, 157 F.

Supp. 2d 355, 373-74 (D.N.J. 2001); *Flat Panel*, 586 F. Supp. 2d at 1120 (finding it "generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment" on a motion to dismiss); *In re Vitamins*, 2000 WL 1475705, at *8 (recognizing inherent tension with raising fraudulent concealment defense at motion to dismiss stage where evidence is mostly in the hands of defendants).  The only relevant allegations in the Complaint indicate that the conspiracy was both hidden from the public and wrapped in a cloak of legitimacy.  The court therefore finds that the plaintiffs have adequately asserted a continuing conspiracy and fraudulent concealment and that the statute of limitations should not limit the time period for the plaintiffs' recovery of damages.  The court recommends that the defendants' motions to dismiss on statute of limitations grounds be denied.

## X.   LEAVE TO REPLEAD

The plaintiffs have requested leave to replead if the court found their allegations lacking – and indeed, they argue that they can plead additional factual detail in an amended complaint. Whether to permit parties to amend their pleadings is a matter entrusted to the court's "sound discretion."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."  While leave to amend is denied where amendment would be futile, *Tocker v. Philip Morris Cos., Inc.*, 470 F.3d 481, 491 (2d Cir. 2006), "a court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003) (quotation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[i]t is the usual practice upon granting a motion to dismiss to allow leave to

replead"), *aff'd sub nom. Cortec Industries, Inc. v. Westinghouse Credit Corp.*, 503 U.S. 960 (1992).

## CONCLUSION

In accordance with the above, the undersigned hereby RECOMMENDS that all of the claims in the Complaint, except for those asserted in Claim 1 as against ABX Logistics Group, Exel Global Logistics Inc., DHL Danzas, and Geo-Logistics, be dismissed, without prejudice, and the plaintiffs be afforded an opportunity to replead them.

*  *  *  *  *  *

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992).

Respectfully recommended,

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
   January 4, 2011

-106-

# APPENDIX

The following are the papers filed in support of various joint motions to dismiss:

| Docket Number | Title of Document | Parties Represented |
|---|---|---|
| 234-1 | Memorandum in Support of Joint Motion to Dismiss by the First-Served Defendants ("Joint MTD") | Deutsche Post AG, DHL Express (USA), Inc., Exel Global Logistics, Inc., Air Express International (USA), Inc., United Parcel Service, Inc., UPS Supply Chain Solutions, Inc., EGL, Inc., EGL Eagle Global Logistics, LP, Hanshin Air Cargo USA, Inc., Dachser Transport of America, Inc., MOL Logistics (USA), Inc., Jet-Speed Logistics (USA), LLC, Jet-Speed Air Cargo Forwarders (USA), Inc., Vantec World Transport (USA), Inc., UTi Worldwide, Inc., Kuehne + Nagel, Inc., Kuehne + Nagel International AG, Nissin International Transport U.S.A., Inc., Panalpina, Inc., Panalpina World Transport (Holding) Ltd., "K" Line Logistics (U.S.A.), Inc., Kintetsu World Express (U.S.A.), Inc., Geo-Logistics Corp., Hellmann Worldwide Logistics, Inc., Nippon Express USA, Inc., Yamato Transport U.S.A., Inc., Yusen Air & Sea Service (USA), Inc. ("First-Served Defendants") |
| 322 | Plaintiffs' Opposition to Motion to Dismiss by the First-Served Defendants ("Joint MTD Opp.") | Plaintiffs |
| 372 | Reply in Support of Joint Motion to Dismiss by the First-Served Defendants ("Joint MTD Reply") | First-Served Defendants |
| 235-1 | Joint Motion to Dismiss for Failure to Meet the Requirements of the FTAIA ("Joint MTD FTAIA") | First-Served Defendants |

| 327 | Plaintiffs' Opposition to Joint Motion to Dismiss for Failure to Meet the Requirements of the FTAIA ("Joint FTAIA MTD Opp.") | Plaintiffs |
|---|---|---|
| 373 | Reply in Support of Joint Motion to Dismiss for Failure to Meet the Requirements of the FTAIA ("Joint MTD FTAIA Reply") | First-Served Defendants |
| 233-1 | Joint Motion to Dismiss by the U.S. Subsidiaries of Japanese parent corporations ("U.S. Subs. MTD") | Nippon Express USA, Inc., Yusen Air & Sea Service (U.S.A.), Inc., Kintetsu World Express (U.S.A.), Inc., Nissin International Transport U.S.A., Inc., Vantec World Transport (USA), Inc., "K" Line Logistics (U.S.A.), Inc., Yamato Transport U.S.A., Inc., MOL Logistics (U.S.A.), Inc., and Hanshin Air Cargo USA, Inc. ("U.S. Subsidiaries") |
| 326 | Plaintiffs' Opposition to Joint Motion to Dismiss by the U.S. Subsidiaries ("U.S. Subs. MTD Opp.") | Plaintiffs |
| 366 | Reply in Support of Joint Motion to Dismiss by the U.S. Subsidiaries ("U.S. Subs. MTD Reply") | U.S. Subsidiaries |
| 387-1 | Joint Motion to Dismiss by the Late-Served Defendants ("Late-Served MTD") | ABX Logistics Worldwide NV/SA (incorrectly sued as ABX Logistics Group), Airborne Express, Inc. (now known as DHL Japan, Inc.), Dachser GmbH (incorrectly sued as Dachser Intelligent Logistics), DHL Global Forwarding Japan K.K., DSV A/S, DSV Solutions Holding A/S, Hanshin Air Cargo Co., Ltd., Hankyu Hanshin Express Holdings Corporation, K Line Logistics, Ltd., Kintetsu World Express, Inc., MOL Logistics (Japan) Co., Ltd., Nippon Express Co., Ltd., Nishi-Nippon Railroad Co., Ltd., Nissin Corporation, SDV International |

| | | Logistics, United Aircargo Consolidators, Inc., Vantec World Transport Co., Ltd., Yamato Global Logistics Japan Co., Ltd., and Yusen Air & Sea Service Co., Ltd. ("Late-Served Defendants") |
|---|---|---|
| 405 | Plaintiffs' Opposition to Joint Motion to Dismiss by the Late-Served Defendants ("Late-Served MTD Opp.") | Plaintiffs |
| 422 | Reply in Support of Joint Motion to Dismiss by the Late-Served Defendants ("Late-Served Reply") | Late-Served Defendants |
| 386-1 | Joint Motion to Dismiss by the Late-Served Defendants for Failure to Meet the Requirements of the FTAIA ("Late-Served FTAIA MTD") | Late-Served Defendants |
| 407 | Plaintiffs' Opposition to Joint Motion to Dismiss by the Late-Served Defendants for Failure to Meet the Requirements of the FTAIA ("Late-Served FTAIA MTD Opp.") | Plaintiffs |
| 421 | Reply in Support of Joint Motion to Dismiss by the Late-Served Defendants for Failure to Meet the Requirements of the FTAIA ("Late-Served FTAIA Reply") | Late-Served Defendants |
| 392-1 | Joint Motion to Dismiss by the foreign defendants for lack of personal jurisdiction ("Foreign Defs. PJ MTD") | Vantec World Transport Co., Ltd., ABX LOGISTICS Worldwide NV/SA (incorrectly sued as ABX Logistics Group), Dachser GmbH (incorrectly sued as Dachser Intelligent Logistics), DSV A/S, DSV Solutions Holding A/S, "K" Line Logistics, Ltd., MOL Logistics (Japan) Co., Ltd., Nippon Express Co., Ltd., Nissin Corporation, United Aircargo Consolidators, Inc., Yamato Global Logistics Japan Co., Ltd., and Yusen Air & Sea Service Co., Ltd. ("Foreign Defendants") |

| 410 | Plaintiffs' Opposition to Joint Motion to Dismiss by the foreign defendants for lack of personal jurisdiction ("Foreign Defs. PJ MTD Opp.") | Plaintiffs |
|---|---|---|
| 410-1 | Declaration of Daniel C. Hedlund in Support of Plaintiffs' Opposition to Foreign Defendants' Motion to Dismiss for Lack of Personal Jurisdiction ("Hedlund Decl.") | Plaintiffs |
| 424 | Reply in Support of Joint Motion to Dismiss by the Foreign Defendants for lack of personal jurisdiction ("Foreign Defs. PJ MTD Reply") | Foreign Defendants |

Several of the defendants also filed individual motions and supplemental and reply memoranda of law in support of their motions.  These defendants all joined in the joint motions of the first-served defendants.

| Docket Number | Title of Document | Parties Represented |
|---|---|---|
| 120 | Memorandum in Support of Motion to Dismiss of Expeditors International of Washington, Inc. | Expeditors International of Washington, Inc. |
| 330 | Plaintiffs' Opposition to Expeditors International of Washington, Inc.'s Motion to Dismiss | Plaintiffs |
| 361 | Reply in Support of Expeditors International of Washington, Inc.'s Motion to Dismiss | Expeditors International of Washington, Inc. |
| 362 | Declaration of Ethan E. Litwin in Support of Expeditors International of Washington, Inc.'s Motion to Dismiss | Expeditors International of Washington, Inc. |
| 220 | Memorandum in Support of Motion to Dismiss of Dachser Transport of America, Inc. | Dachser Transport of America, Inc. |

| 325 | Plaintiffs' Opposition to Motion to Dismiss of Dachser Transport of America, Inc. | Plaintiffs |
|---|---|---|
| 364 | Reply in Support of Motion to Dismiss of Dachser Transport of America, Inc. | Dachser Transport of America, Inc. |
| 239 | Memorandum in Support of Motion to Dismiss of UTi Worldwide, Inc. | UTi Worldwide, Inc. |
| 328 | Plaintiffs' Opposition to Motion to Dismiss of UTi Worldwide, Inc. | Plaintiffs |
| 368 | Reply in Support of Motion to Dismiss of UTi Worldwide, Inc. | UTi Worldwide, Inc. |
| 242 | Memorandum in Support of Motion to Dismiss of Jet Speed Air Cargo Forwarders and Jet Speed Logistics (USA), LLC | Jet Speed Air Cargo Forwarders and Jet Speed Logistics (USA), LLC. |
| 323 | Plaintiffs' Opposition to Motion to Dismiss of Jet Speed Air Cargo Forwarders and Jet Speed Logistics (USA), LLC | Plaintiffs |
| 367 | Reply in Support of Motion to Dismiss of Jet Speed Air Cargo Forwarders and Jet Speed Logistics (USA), LLC | Jet Speed Air Cargo Forwarders and Jet Speed Logistics (USA), LLC |
| 247-1 | Memorandum in Support of Motion to Dismiss of Toll Global Forwarding, (USA), Inc. | Toll Global Forwarding, (USA), Inc. |
| 324 | Plaintiffs' Opposition to Motion to Dismiss of Toll Global Forwarding, (USA), Inc. | Plaintiffs |
| 370 | Reply in Support of Motion to Dismiss of Toll Global Forwarding, (USA), Inc. | Toll Global Forwarding, (USA), Inc. |
| 297-1 | Memorandum in Support of Motion to Dismiss of Morrison Express Corporation (USA) | Morrison Express Corporation (USA) |

| 329 | Plaintiffs' Opposition to Motion to Dismiss of Morrison Express Corporation (USA) | Plaintiffs |
|---|---|---|
| 371 | Reply in Support of Motion to Dismiss of Morrison Express Corporation (USA) | Morrison Express Corporation (USA) |
| 384 | Memorandum in Support of Motion to Dismiss of DSV A/S, DSV Solutions Holding A/S | DSV A/S, DSV Solutions Holding A/S |
| 408 | Plaintiffs' Opposition to Motion to Dismiss of DSV A/S, DSV Solutions Holding A/S ("DSV MTD Opp.") | Plaintiffs |
| 419 | Reply in Support of Motion to Dismiss of DSV A/S, DSV Solutions Holding A/S | DSV A/S, DSV Solutions Holding A/S |
| 390 | Memorandum in Support of Motion to Dismiss of SDV International Logistics | SDV International Logistics |
| 409 | Plaintiffs' Opposition to Motion to Dismiss of SDV International Logistics | Plaintiffs |
| 423 | Reply in Support of Motion to Dismiss of SDV International Logistics | SDV International Logistics |
| 391-1 | Memorandum in Support of Motion to Dismiss of Dacsher GmbH & Co. KG i/s/h/a Dachser Intelligent Logistics | Dacsher GmbH & Co. KG i/s/h/a Dachser Intelligent Logistics |
| 406 | Plaintiff's Opposition to Motion to Dismiss of Dacsher GmbH & Co. KG i/s/h/a Dachser Intelligent Logistics | Plaintiffs |
| 418 | Reply in Support of Motion to Dismiss of Dacsher GmbH & Co. KG i/s/h/a Dachser Intelligent Logistics | Dacsher GmbH & Co. KG i/s/h/a Dachser Intelligent Logistics |
| 397-1 | Memorandum in Support of Motion to Dismiss of Morrison Express | Morrison Express Logistics PTE, Ltd. |

| | Logistics PTE, Ltd. for failure to state a claim | |
|---|---|---|
| 413 | Plaintiffs' Opposition to Motion to Dismiss of Morrison Express Logistics PTE, Ltd. for failure to state a claim | Plaintiffs |
| 430 | Reply in Support of Motion to Dismiss of Morrison Express Logistics PTE, Ltd. for failure to state a claim | Morrison Express Logistics PTE, Ltd. |
| 430-1 | Declaration of Lisa M. Kaas in Support of Morrison Express Logistics PTE, Ltd. Motion to Dismiss | Morrison Express Logistics PTE, Ltd. |
| 396-1 | Memorandum in Support of Motion to Dismiss of Morrison Express Logistics PTE, Ltd. for Lack of Personal Jurisdiction | Morrison Express Logistics PTE, Ltd. |
| 396-2 | Declaration of George Tan in Support of Morrison Express Logistics PTE, Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction ("Tan Decl.") | Morrison Express Logistics PTE, Ltd. |
| 414 | Plaintiffs' Opposition to Motion to Dismiss of Morrison Express Logistics PTE, Ltd. for Lack of Personal Jurisdiction | Plaintiffs |
| 415 | Declaration of Craig S. Davis in Opposition to Morrison Express Logistics PTE, Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction ("Davis Decl.") | Plaintiffs |
| 431 | Reply in Support of Motion to Dismiss of Morrison Express Logistics PTE, Ltd. for Lack of Personal Jurisdiction | Morrison Express Logistics PTE, Ltd. |
| 445 | Memorandum in Support of Motion to Dismiss of Geodis S.A. i/s/h/a Geodis Group, Geodis Wilson USA, Inc. | Geodis S.A. i/s/h/a Geodis Group, Geodis Wilson USA, Inc. |

| 445-2 | Declaration of Stéphane Cassagne in Support of Geodis Defendants' Motion to Dismiss Geodis S.A. for Lack of Personal Jurisdiction ("Cassagne Decl.") | Geodis S.A. i/s/h/a Geodis Group, Geodis Wilson USA, Inc. |
|---|---|---|
| 455 | Plaintiffs' Opposition to Geodis Defendants' Motion to Dismiss ("Geodis MTD Opp.") | Plaintiffs |
| 455-1 | Declaration of Craig S. Davis in Opposition to Geodis Defendants' Motion to Dismiss | Plaintiffs |
| 459 | Reply in Support of Geodis Defendants' Motion to Dismiss | Geodis S.A. i/s/h/a Geodis Group, Geodis Wilson USA, Inc. |