**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

PRECISION ASSOCIATES, INC.;
ANYTHING GOES LLC d/b/a MAIL BOXES
ETC.;JCK INDUSTRIES, INC.; RBX
INDUSTRIES, INC.; MARY ELLE
FASHIONS, INC. d/b/a MERIDIAN
ELECTRIC; INTER-GLOBAL INC.; ZETA
PHARMACEUTICALS LLC.; KRAFT
CHEMICAL COMPANY; PRINTING
TECHNOLOGY, INC.; DAVID HOWELL
PRODUCT DESIGN, INC., d/b/a DAVID
HOWELL & COMPANY; INNOVATION
714 INC.; MIKA OVERSEAS
CORPORATION and NORMA
PENNSYLVANIA, INC. on behalf of
themselves and all others similarly situated,

        Plaintiffs,

    *vs*.

PANALPINA WORLD TRANSPORT
(HOLDING) LTD.; PANALPINA, INC.;
KÜHNE + NAGEL INTERNATIONAL AG;
KUEHNE + NAGEL, INC.; EXPEDITORS
INTERNATIONAL OF WASHINGTON,
INC.; EGL, INC.; EGL EAGLE GLOBAL
LOGISTICS, LP; DEUTSCHE BAHN AG;
SCHENKER AG; SCHENKER, INC.; BAX
GLOBAL, INC.; DB SCHENKER;
DEUTSCHE POST AG; DANZAS
CORPORATION, d/b/a DHL GLOBAL
FORWARDING; DHL EXPRESS (USA),
INC.; DHL GLOBAL FORWARDING
JAPAN K.K.; DHL JAPAN, INC.; EXEL
GLOBAL LOGISTICS, INC.; AIR EXPRESS
INTERNATIONAL USA, INC.; UTI

Case No.: 08-CV-00042 (JG) (VVP)

**CORRECTED THIRD AMENDED**
**CLASS ACTION COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

**REDACTED – PUBLIC VERSION**

WORLDWIDE INC.; UNITED PARCEL
SERVICE, INC., UPS SUPPLY CHAIN
SOLUTIONS, INC.; ABX LOGISITCS
WORLDWIDE NV/SA; DSV A/S; DSV
SOLUTIONS HOLDING A/S; DSV AIR &
SEA LTD.; SDV LOGISTIQUE
INTERNATIONALE; DACHSER
INTELLIGENT LOGISTICS; DACHSER
TRANSPORT OF AMERICA, INC.; GEO-
LOGISITCS CORPORATION; AGILITY
LOGISTICS CORPORATION;
GEOLOGISTICS INTERNATIONAL
MANAGEMENT (BERMUDA) LTD.;
BALTRANS LOGISTICS, INC.; TOLL
GLOBAL FORWARDING (USA), INC.;
HELLMANN WORLDWIDE LOGISTICS
GmbH & CO. KG; HELLMANN
WORLDWIDE LOGISTICS LTD. HONG
KONG; HELLMANN WORLDWIDE
LOGISTICS, INC.; GEODIS GROUP;
GEODIS WILSON USA, INC.; JET SPEED
LOGISTICS, LTD.; JET SPEED AIR
CARGO FORWARDERS (USA), INC.; JET
SPEED LOGISTICS (USA), LLC;
MORRISON EXPRESS LOGISTICS PTE
LTD.; MORRISON EXPRESS
CORPORATION (USA); NIPPON EXPRESS
CO., LTD.; NIPPON EXPRESS USA, INC.;
YUSEN AIR & SEA SERVICE CO., LTD.;
YUSEN AIR & SEA SERVICE (U.S.A.),
INC.; KINTETSU WORLD EXPRESS, INC.;
KINTETSU WORLD EXPRESS (U.S.A.),
INC.; NISHI-NIPPON RAILROAD CO.,
LTD.; HANKYU HANSHIN EXPRESS
HOLDINGS CORPORATION;  HANKYU
HANSHIN EXPRESS CO. LTD.; HANSHIN
AIR CARGO CO., LTD; HANSHIN AIR
CARGO USA, INC.; NISSIN
CORPORATION; NISSIN
INTERNATIONAL TRANSPORT U.S.A.,

THIRD AMENDED CLASS ACTION COMPLAINT

INC.; VANTEC CORPORATION; VANTEC
WORLD TRANPORT (USA), INC.; "K"
LINE LOGISTICS, LTD.; "K" LINE
LOGISTICS (U.S.A.), INC.; YAMATO
GLOBAL LOGISTICS JAPAN CO.;
YAMATO TRANSPORT U.S.A., INC.; MOL
LOGISTICS (JAPAN) CO., LTD.; MOL
LOGISTICS (U.S.A.), INC.; UNITED
AIRCARGO CONSOLIDATORS, INC.;
JAPAN AIRCARGO FORWARDERS
ASSOCIATION; SHANGHAI
INTERNATIONAL FREIGHT
FORWARDERS ASSOCIATION;
SPEDLOGSWISS, AKA THE
ASSOCIATION OF SWISS FORWARDERS;
AND JOHN DOE DEFENDANTS 1-10,

Defendants.

THIRD AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page(s)**

NATURE OF THE ACTION ..................................................................................... 2

JURISDICTION AND VENUE .............................................................................. 6

DEFINITIONS ......................................................................................................... 7

PARTIES .................................................................................................................. 7

    A.    <u>Plaintiff Class Representatives</u> ............................................................ 7

    B.    <u>Defendants</u> ............................................................................................ 11

        1.    <u>Panalpina Corporate Family</u> ...................................................... 11

        2.    <u>Kuehne + Nagel Corporate Family</u> ............................................ 11

        3.    <u>Expeditors International of Washington, Inc.</u> ............................. 12

        4.    <u>EGL Corporate Family</u> ............................................................... 12

        5.    <u>Schenker Corporate Family</u> ....................................................... 13

        6.    <u>DHL Corporate Family</u> .............................................................. 15

        7.    <u>UTi Worldwide Inc.</u> ................................................................... 19

        8.    <u>UPS Corporate Family</u> .............................................................. 19

        9.    <u>DSV Corporate Family</u> .............................................................. 20

        10.    <u>SDV Corporate Family</u> .............................................................. 22

        11.    <u>Dachser Corporate Family</u> ......................................................... 22

        12.    <u>Agility Logistics (f/n/a Geo-Logistics)</u> ...................................... 23

        13.    <u>Toll Global Forwarding Corporate Family</u> ................................ 23

        14.    <u>Hellmann Corporate Family</u> ...................................................... 24

        15.    <u>Geodis Corporate Family</u> .......................................................... 25

        16.    <u>Jet Speed Corporate Family</u> ...................................................... 26

        17.    <u>Morrison Corporate Family</u> ....................................................... 27

18.   Nippon Express Corporate Family ......................................................... 27

19.   Yusen Air & Sea Service Corporate Family ....................................... 28

20.   Kintetsu World Express Corporate Family ......................................... 29

21.   Nishi-Nippon Corporate Family ........................................................... 29

22.   Hankyu Hanshin Corporate Family ..................................................... 30

23.   Nissin Corporate Family ......................................................................... 31

24.   Vantec Corporate Family ....................................................................... 32

25.   "K" Line Logistics Corporate Family ................................................. 33

26.   Yamato Corporate Family ...................................................................... 33

27.   MOL Logistics Corporate Family ....................................................... 34

28.   UAC Corporate Family ........................................................................... 35

29.   Defendant Trade Associations .............................................................. 35

THE VARIOUS CORPORATE FAMILIES ACTED AS SINGLE ENTERPRISES
WITH THE PARENT COMPANIES EXERCISING SUBSTANTIAL CONTROL
OVER THEIR SUBSIDIARIES ....................................................................... 36

A.   The nature of the conspiracies and the Freight Forwarding Services
     industry generally require companies to operate as single-enterprises
     rather than separate, but related, corporate entities ............................... 37

B.   The representatives from Defendants who attended conspiratorial
     meetings and engaged in collusive conduct did so on behalf of the entire
     corporate family ........................................................................................ 42

C.   The Collusive Agreements Were Directed From The Top Down ....................... 44

D.   Examples of corporate control over subsidiaries and affiliates and unified
     activity between corporate families .............................................................. 46

     1.   DHL Defendants ................................................................................. 46

     2.   Panalpina Defendants ........................................................................ 48

     3.   Kuehne + Nagel Defendants ............................................................ 49

     4.   Schenker Defendants ......................................................................... 50

5.      EGL Defendants ................................................................ 51

6.      Geo-Logistics Defendants ................................................. 52

7.      Dachser Defendants .......................................................... 52

8.      DSV Defendants ............................................................... 53

9.      Morrison Defendants ........................................................ 53

10.     Jet-Speed Logistics Defendants ....................................... 54

11.     Toll Global Forwarding Defendants ................................ 54

12.     Kintetsu Defendants ......................................................... 55

13.     K-Line Defendants ........................................................... 56

14.     MOL Defendants .............................................................. 56

15.     Vantec Defendants ........................................................... 57

16.     Yamato Defendants .......................................................... 58

17.     Nippon Express Defendants ............................................. 58

18.     Nissin Defendants ............................................................ 59

19.     Hankyu Hanshin Defendants ........................................... 59

20.     Yusen Defendants ............................................................ 60

21.     UPS Defendants ............................................................... 60

22.     Hellmann Defendants ....................................................... 61

CLASS ACTION ALLEGATIONS ................................................. 62

TRADE AND COMMERCE ............................................................ 65

THE FREIGHT FORWARDING SERVICES INDUSTRY ............. 66
        A.      The Market for Freight Forwarding Services ................... 66

        B.      Defendants Have Significant Market Share ...................... 70

C.    World-Wide Antitrust Agency Raids on Defendants' Operations ........................ 72

D.    Several Defendants plead guilty, or agree to plead guilty, to U.S. DOJ's
      criminal price-fixing in the Freight Forwarding industry ..................................... 78

E.    The Japan Fair Trade Commission Finds Several Defendants Guilty  of
      Price-Fixing ........................................................................................................... 81

F.    The European Commission imposes €169 million in fines on Freight
      Forwarders for anticompetitive conduct ............................................................... 85

G.    Defendants' Trade Association Memberships ....................................................... 87

TOLLING OF STATUTE OF LIMITATIONS AND CONCEALMENT .................................. 90

EFFECTS ON U.S. COMMERCE AND INJURY TO PLAINTIFFS AND CLASS
MEMBERS ............................................................................................................................... 91

AS AND FOR A FIRST CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF
THE SHERMAN ANTITRUST ACT ....................................................................................... 92

A.    The October 1, 2001 Conference Call Meeting ................................................... 93

B.    The October 3, 2001 Conference Call Meeting ................................................... 94

C.    The October 4, 2001 Meeting ............................................................................... 94

AS AND FOR A SECOND CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF
THE SHERMAN ANTITRUST ACT ....................................................................................... 95

AS AND FOR A THIRD CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF
THE SHERMAN ANTITRUST ACT ....................................................................................... 99

A.    British International Forwarder Association Meetings ....................................... 100

B.    The October 1, 2002 "Gardening Club" Meeting ............................................... 101

AS AND FOR A FOURTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF
THE SHERMAN ANTITRUST ACT ..................................................................................... 104

A.    September 21, 2004 EBIC Meeting .................................................................... 105

B.    The November 22, 2004 Meeting ....................................................................... 107

AS AND FOR A FIFTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF
THE SHERMAN ANTITRUST ACT ..................................................................................... 109

A.      The July 27, 2005 Meeting ...................................................................... 111

B.      The August 12, 2005 Meeting ................................................................. 120

C.      The September 15, 2005 Meeting ............................................................ 121

D.      The November 18, 2005 Meeting ............................................................ 122

E.      The November 21, 2005 Conference Call ............................................... 123

F.      The March 13, 2006 Meeting .................................................................. 123

G.      Further Implementation of the CAF Agreement Through SIFFA ........... 124

AS AND FOR A SIXTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE
SHERMAN ANTITRUST ACT ..................................................................................... 127

2005 Peak Season Rate Increase ................................................................................... 129

A.      The August 9, 2005 Meeting ................................................................... 129

B.      The September 21, 2005 Meeting ............................................................ 129

C.      The December 6, 2005 Meeting ............................................................... 130

2006 Peak Season Rate Increase ................................................................................... 131

A.      January 4, 2006 Meeting ......................................................................... 131

B.      The February 3, 2006 Meeting ................................................................ 131

C.      The June 23, 2006 Meeting ..................................................................... 132

2007 Peak Season Rate Increase ................................................................................... 133

A.      The May 21, 2007 Meeting ..................................................................... 133

AS AND FOR A SEVENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF
THE SHERMAN ANTITRUST ACT ............................................................................. 135

AS AND FOR AN EIGHTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF
THE SHERMAN ACT ................................................................................................... 137

A.      FFE / FFI Airfreight and CEO Committee Meetings ............................... 139

B.      Country-Level Discussions ..................................................................... 145

AS AND FOR A NINTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF
THE SHERMAN ACT ................................................................................................... 149

THIRD AMENDED CLASS ACTION COMPLAINT                                    v

AS AND FOR A TENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT..........................................................................................153

AS AND FOR A ELEVENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT ..........................................................................................158

REQUEST FOR RELIEF .........................................................................................160

JURY TRIAL DEMAND...........................................................................................162

Plaintiffs Precision Associates, Inc.; Anything Goes LLC d/b/a Mail Boxes Etc., JCK Industries, Inc.; RBX Industries, Inc.; Mary Elle Fashions, d/b/a Meridian Electric, Inter-Global, Inc.; Zeta Pharmaceuticals LLC; Kraft Chemical Company; Printing Technology, Inc.; David Howell Product Design Inc., d/b/a David Howell & Company; Innovation 714, Inc.; Mika Overseas Corporation, and Norma Pennsylvania, Inc., individually and on behalf of the Class defined below of all those similarly situated direct purchasers of Freight Forwarding Services as defined herein, bring this action against: Panalpina World Transport (Holding) Ltd.; Panalpina, Inc.; Kühne + Nagel International AG; Kuehne + Nagel, Inc.; Expeditors International of Washington, Inc.; EGL, Inc.; EGL Eagle Global Logistics, LP; Deutsche Bahn AG; Schenker AG; Schenker, Inc.; BAX Global, Inc.; DB Schenker; Deutsche Post AG; DHL; Danzas Corporation, d/b/a DHL Global Forwarding; DHL Express (USA), Inc.; DHL Global Forwarding Japan K.K.; DHL Japan, Inc.; Exel Global Logistics, Inc.; Air Express International USA, Inc.; UTi Worldwide Inc.; United Parcel Service, Inc., UPS Supply Chain Solutions, Inc.; ABX Logistics Worldwide NV/SA; DSV A/S; DSV Solutions Holding A/S; DSV Air & Sea Ltd.; SDV Logistique Internationale; Dachser Intelligent Logistics; Dachser Transport of America, Inc.; Geo-Logistics; Agility Logistics Corporation, Geologistics International Management (Bermuda) Ltd.; Baltrans Logistics, Inc.; Toll Global Forwarding (USA), Inc.; Hellmann Worldwide Logistics GmbH & Co. KG; Hellmann Worldwide Logistics Ltd. Hong Kong; Hellmann Worldwide Logistics, Inc.; Geodis Group; Geodis Wilson USA, Inc.; Jet Speed Logistics, Ltd.; Jet Speed Air Cargo Forwarders (USA), Inc.; Jet Speed Logistics (USA), LLC; Morrison Express Logistics PTE Ltd.; Morrison Express Corporation (USA); Nippon Express Co., Ltd.; Nippon Express USA, Inc.; Yusen Air

---

THIRD AMENDED CLASS ACTION COMPLAINT                                    1

&Sea Service Co., Ltd.; Yusen Air & Sea Service (U.S.A.), Inc.; Kintetsu World Express, Inc.; Kintetsu World Express (U.S.A.), Inc.; Nishi-Nippon Railroad Co., Ltd.; Hankyu Hanshin Express Holdings Corporation; Hankyu Hanshin Express Co. Ltd.,; Hanshin Air Cargo Co., Ltd.,; Hanshin Air Cargo USA, Inc.;  Nissin Corporation; Nissin International Transport U.S.A., Inc.; Vantec Corporation; Vantec World Transport (USA), Inc.; "K" Line Logistics, Ltd.; "K" Line Logistics (U.S.A.), Inc.; Yamato Global Logistics Japan Co.; Yamato Transport U.S.A., Inc.; MOL Logistics (Japan) Co., Ltd.; MOL Logistics (U.S.A.), Inc.; United Aircargo Consolidators, Inc.; Spedlogswiss, aka The Association Of Swiss Forwarders; Shanghai International Freight Forwarders Association; and Japan Aircargo Forwarders Association,  (collectively, "Defendants") for damages and injunctive relief under the antitrust laws of the United States.

Plaintiffs respectfully demand a trial by jury, and complain and allege on information and belief as follows:

## NATURE OF THE ACTION

1.     Between at least as early as January 2001 and January 4, 2011, Defendants have combined, conspired and agreed with at least the DHL Defendants and others to fix, inflate and maintain new charges or prices for U.S. Freight Forwarding Services (defined in ¶¶ 17-18 below) in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

2.     Defendants have implemented their combination, conspiracy and agreement through many mechanisms:

(a)     Multiple meetings, telephone calls, specially established e-mail accounts, the creation and exchange of various documents, including suggested pricing letters to be sent to their customers and the use of code words;

---

THIRD AMENDED CLASS ACTION COMPLAINT                                              2

(b)      Freight Forwarding Services are fungible and very price sensitive.  Thus, any Defendant that attempted to impose a new charge faced the very real risk of loss of business to other competitors who did not impose such a new charge;

(c)      Based on the tone set at the top of each of the corporate families named herein, the parties to these conspiratorial agreements repeatedly made other agreements to impose new charges or prices for Freight Forwarding Services.  These include but are not limited to the specific agreements alleged hereafter;

(d)      Each of these specific agreements to make new charges also constitutes a separate, standalone violation of Section 1 of the Sherman Antitrust Act by the Defendants participating therein.

3.      Such specific and repeated agreements include but are by no means limited to:

i.      the 2001 Security Surcharge Agreement;

ii.      the 2002 Fuel Surcharges Agreement;

iii.      the 2002 New Export System Fee Agreement;

iv.      the U.S. Customs Air "AMS" Charge Agreement (Japanese Defendants' Conspiracy);

v.      the 2005 Chinese Currency Adjustment Factor Agreement;

vi.      the 2005, 2006, and 2007 Peak Season Rate Increase Agreement;

vii.      the 2006 Security and Explosives Examination Surcharges Agreement;

viii.      the U.S. Customs Air "AMS" Charge Agreement (European Defendants' Conspiracy);

ix.      the U.S. Customs Ocean "AMS" Charge Agreement (Japanese Defendants' Conspiracy);

      x.     the Global Overarching Agreement; and

      xi.    the Japanese Defendants' Overarching Conspiracy.

Defendants' specific agreements to fix new charges or prices also include many other agreements, the details of which are presently unknown to Plaintiffs.

4.     Several of the Defendants named in this Complaint have pled guilty or have agreed to plead guilty to U.S. Department of Justice ("DOJ") criminal antitrust charges in relation to the claims alleged in this Complaint.  Defendants Schenker, Panalpina, Kuehne + Nagel, EGL, Inc., Geo-Logistics (acquired by Agility Logistics), Nippon Express, Kintetsu, Nishi-Nippon Railroad Co., Ltd., Hankyu-Hanshin Express, Vantec Corporation, Nissin Corporation, Yamato, MOL Logistics and Yamato Global Logistics have all entered into plea agreements or agreed to plead guilty to price-fixing surcharges and fees in the Freight Forwarding industry as alleged in this Complaint.

5.     Competition authorities across the globe, including in Europe, Japan, South Africa, Brazil, and New Zealand, have also been investigating various Defendants' activities related to price-fixing in the international Freight Forwarding industry.  The European Commission and Japan Fair Trade Commission ("JFTC") have found that several Defendants in this Complaint have engaged in anticompetitive conduct and issued substantial fines – €169 million and $94.7 million, respectively.  The non-U.S. fines and investigations related to substantial volumes of imports into and exports out of the United States.

6.     The last fifteen years have witnessed dramatic increases in globalization and world trade.  United States commerce has been particularly affected.  This is because, among other things, the United States has been the world's leading importer.

7.      Such increases in world trade have helped the Defendants achieve very substantial gains in sales volumes and revenues from their U.S. Freight Forwarding Services business.  This includes gains in imports into and exports out of the U.S.

8.      Not content with this substantial growth and concerned about the loss of business if mere unilateral or even delayed collusive action were taken to implement a new charge, Defendants entered into illicit price-fixing conspiracies with respect to the surcharges and extra charges alleged in this Complaint.

9.      Defendants have done so in order to increase Defendants' revenues and sales. Defendants have thereby denied the benefits of competition to their customers and U.S. trade and commerce, including U.S. import and export commerce.  Defendants' unlawful specific agreements individually have substantially burdened U.S. commerce.  This includes U.S. trade and commerce in imports into the United States.

10.     As a direct result of Defendants' conspiratorial conduct in violation of Section 1 of the Sherman Antitrust Act, Defendants' new charges, surcharges, fees and prices for U.S. Freight Forwarding Services, which were the subjects of the specific agreements among Defendants and their co-conspirators as alleged in this Complaint, have been fixed, inflated and maintained at supra-competitive levels and have been paid by Plaintiffs and the members of the proposed class.

11.     Plaintiffs bring this action for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), Plaintiffs seek to recover treble damages and the costs of the suit, including reasonable attorneys' fees.  Plaintiffs also seek appropriate injunctive relief against Defendants in order to compel them to implement antitrust compliance measures and to prevent the continuation or revival of

each of the agreements, each additional agreement that Plaintiffs may discover and prove in this action to exist and other anticompetitive conduct.

**JURISDICTION AND VENUE**

12.     Plaintiffs bring this Class Action Complaint ("Complaint") under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), to recover treble damages and the costs of the suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations of Section 1 of the Sherman Act (15 U.S.C. §1) as alleged herein.

13.     In addition, Plaintiffs institute this action to secure injunctive relief against Defendants to prevent them from further violating Section 1 of the Sherman Act.  Plaintiffs continue to use U.S. Freight Forwarding Services.  Absent injunctive relief, the agreements and industry structure alleged herein will continue to violate or threaten violations of U.S. antitrust laws.

14.     This Court has subject matter jurisdiction of this case under 28 U.S.C. §1331 and §1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

15.     Venue is proper in this Judicial District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391(b), (c), and (d).

16.     Defendants maintain offices, have agents, transact business, or are found within this Judicial District.  Plaintiffs' claims alleged in this Complaint arise in part within this District. The interstate trade and commerce described herein is and has been carried out in part within this District.  Defendants have shipped products in the stream of commerce that have reached this District.

## DEFINITIONS

17.     As used in this Complaint, the term "Freight Forwarding Services" includes services relating to the organization of transportation of items via air and ship and can include related activities such as customs clearance, warehousing and ground services.  The providers of this package of services are sometimes referred to as "third party logistics providers," and are referred to in this Complaint as "Freight Forwarders."  While air and ocean freight forwarding services include ancillary truck and rail services, "Freight Forwarding Services" does not include transportation services related solely to truck and/or rail.

18.     The term "U.S. Freight Forwarding Services" means: (a) Freight Forwarding Services purchased or sold in the United States regardless of the location of shipment or (b) Freight Forwarding Services with respect to shipments into, out of, or within the United States.

19.     The term "Class Period" or "Conspiracy Period" means the period from at least as early as January 1, 2001 to the January 4, 2011.

20.     "Person" means any individual, partnership, corporation, association, or other business or legal entity.

## PARTIES

A.     **Plaintiff Class Representatives**

21.     Plaintiff Precision Associates, Inc. is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  During the Class Period, Plaintiff Precision Associates, Inc. purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

22.     Plaintiff Anything Goes LLC d/b/a Mail Boxes Etc. is a California corporation with its principal place of business in Tarzana, California.  During the Class Period, Plaintiff Anything Goes LLC d/b/a Mail Boxes Etc. purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

23.     Plaintiff JCK Industries, Inc. is an Ohio corporation with its principal place of business in Huron, Ohio.  During the Class Period, Plaintiff JCK Industries purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

24.     Plaintiff RBX Industries, Inc.,[1] is a Delaware corporation doing business in Virginia and elsewhere.  During the Class Period, RBX Industries, Inc. purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.  Harnan Consulting, LLC, as Successor Plan Administrator for and on behalf of the Estate of RBX Industries, Inc., has the power to prosecute this lawsuit.

25.     Plaintiff Mary Elle Fashions, Inc. d/b/a Meridian Electric is a Missouri corporation with its principal place of business in St. Louis, Missouri.  During the Class Period, Mary Elle Fashions d/b/a/ Meridian Electric purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

---

[1] RBX Industries, Inc. f/k/a/ Rubatex Corporation t/a Groendyk Manufacturing Company, Inc., Ole Tex, Inc., Waltex Corporation, UPR Disposition, Inc., Universal Rubber Company, Hoover-Hanes Rubber Custom Mixing Corp. and Midwest Rubber Custom Mixing Corp.

26.     Plaintiff Inter-Global, Inc. is a Missouri corporation with its principal place of business in St. Louis, Missouri.  During the Class Period, Inter-Global, Inc. purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

27.     Plaintiff Zeta Pharmaceuticals LLC is a New Jersey limited liability company with its principal place of business in Montvale, New Jersey.  During the Class Period, Zeta Pharmaceuticals LLC purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

28.     Plaintiff Kraft Chemical Company is an Illinois corporation with its principal place of business in Melrose Park, Illinois.  During the Class Period, Kraft Chemical Company purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

29.     Plaintiff Printing Technology, Inc. is a California corporation with its principal place of business in Chatsworth, California.  During the Class Period, Printing Technology, Inc. purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

30.     Plaintiff David Howell Product Design Inc., d/b/a David Howell & Company, is a New York corporation with its principal place of business in Bedford Hills, New York.  During the Class Period, Plaintiff David Howell Product Design Inc., d/b/a David Howell & Company purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants

or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

31.     Plaintiff Innovation 714 Inc., is a New York corporation with its principal place of business in White Plains, New York.  During the Class Period, Innovation 714 Inc. purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

32.     Mika Overseas Corporation is a New York corporation with its principal place of business New York, New York. During the Class Period, Mika Overseas Corporation purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

33.     Plaintiff NORMA Pennsylvania Inc. is a Delaware corporation which does business through itself and through its wholly owned subsidiaries, Norma Michigan, Inc. with its principal place of business in Auburn Hills, MI; R.G. Ray Corporation, an Illinois entity with principal place of business in Auburn Hills, MI and Craig Assembly, Inc., a Michigan entity with its principal place of business in St. Clair, MI.  During the Class Period, NORMA Pennsylvania Inc. itself and through its subsidiaries purchased U.S. Freight Forwarding Services directly from one or more of the named Defendants or their co-conspirators, and has been injured by reason of the antitrust violations alleged in this Complaint.

B.     **Defendants**

1.     **Panalpina Corporate Family**

34.     Defendant Panalpina World Transport (Holding) Ltd. is organized under the laws of Switzerland, with its principal place of business at Viaduktstrasse 42 / P.O. Box CH – 4002 Basel, Switzerland.  Panalpina World Transport (Holding) Ltd. is the parent of Defendant Panalpina, Inc.  During the Class Period, Panalpina World Transport (Holding) Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

35.     Defendant Panalpina, Inc. is a New York corporation with its principal place of business at 1776 On-The-Green, 67 Park Place, Morristown, New Jersey 07960-7103. Panalpina, Inc. is a subsidiary of Defendant Panalpina World Transport (Holding) Ltd.  At all times during the Class Period, its activities were under the control and direction of its parent company, Panalpina World Transport (Holding) Ltd.  During the Class Period, Panalpina, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Panalpina World Transport (Holding) Ltd. and Panalpina, Inc. are collectively referred to herein as "Panalpina."  Panalpina has offices in this District at 152-81 Rockaway Blvd., Jamaica, New York 11434.

2.     **Kuehne + Nagel Corporate Family**

36.     Defendant Kühne + Nagel International AG is a Swiss corporation with its principal place of business at Dorfstrasse 50, Schindellegi, Switzerland 8834.  During the Class Period, Kühne + Nagel International AG, directly or through its subsidiaries and/or affiliates,

sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

37.     Defendant Kuehne + Nagel, Inc. is a New York corporation with its principal place of business at 10 Exchange Place, 19th Floor, Jersey City, New Jersey 07302.  Kuehne + Nagel, Inc. is a subsidiary of Kuehne + Nagel Investment, Inc., which in turn is a subsidiary of Defendant Kühne + Nagel International AG.  At all times during the Class Period, Kuehne + Nagel, Inc.'s activities were under the control and direction of its parent company, Kühne + Nagel International AG.  During the Class Period, Kuehne + Nagel, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Kühne + Nagel International AG and Kuehne + Nagel, Inc. are collectively referred to herein as "Kuehne + Nagel" or "K+N" or "KN".  Kuehne + Nagel has offices in this District at 156-15 146th Avenue, 3rd Floor, Jamaica, New York 11434.

**3.     Expeditors International of Washington, Inc.**

38.     Defendant Expeditors International of Washington, Inc. ("Expeditors") is a Washington corporation with its principal place of business at 1015 Third Avenue, 12th Floor, Seattle, Washington 98104.  During the Class Period, Expeditors, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Expeditors has offices in this District at 245 Roger Avenue, Inwood, New York 10096.

**4.     EGL Corporate Family**

39.     Defendant EGL, Inc. is a Texas corporation with its principal place of business at 15350 Vickery Drive, Houston, Texas 77032.  On August 2, 2007, CEVA Group plc ("CEVA")

announced the completion of its merger with EGL, Inc.  EGL, Inc. is now an indirect subsidiary

of CEVA.  CEVA, a leading global logistics company, is a U.K. public limited company owned

by affiliates of Apollo Management VI, L.P.  During the Class Period, EGL, Inc., directly or

through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-

fixed services alleged in this Complaint throughout the United States.  EGL, Inc. has offices in

this District at 55 Johnson Road, Lawrence, NY 11559.

40.     Defendant EGL Eagle Global Logistics, LP is a Delaware corporation with its

principal place of business at 15350 Vickery Drive, Houston, Texas 77032.  EGL Eagle Global

Logistics, LP is a subsidiary of Defendant EGL, Inc.  At all times during the Class Period, its

activities were under the control and direction of its parent company, EGL, Inc.  During the

Class Period, EGL Eagle Global Logistics, LP, directly or through its subsidiaries and/or

affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this

Complaint throughout the United States.  Defendants EGL, Inc. and EGL Eagle Global

Logistics, LP are collectively referred to herein as "EGL."

**5.     Schenker Corporate Family**

41.     Defendant Deutsche Bahn AG is a German corporation with its principal place of

business at Potsdamer Platz 2, D-10785 Berlin, Germany.  Defendant Deutsche Bahn AG is the

parent of Defendants Schenker AG and Schenker, Inc., as well as other subsidiaries.  During the

Class Period, Deutsche Bahn AG, directly or through its subsidiaries and/or affiliates, sold

Freight Forwarding Services, including the price-fixed services alleged in this Complaint

throughout the United States.

42.     Defendant Schenker AG is a German corporation with it principal place of

business at Alfredstrasse 81, 45130 Essen, Germany.  Schenker AG is a subsidiary of Defendant

Deutsche Bahn AG.  At all times during the Class Period, its activities were under the control

and direction of its parent company, Deutsche Bahn AG.  During the Class Period, Schenker AG,

directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services including

the price-fixed services alleged in this Complaint throughout the United States

      43.     Defendant Schenker, Inc. is a New York corporation with its principal place of

business at 150 Albany Avenue, Freeport, New York 11520.  Schenker, Inc. is a subsidiary of

Defendant Deutsche Bahn AG.  At all times during the Class Period, its activities were under the

control and direction of its parent company, Deutsche Bahn AG.  During the Class Period,

Schenker, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding

Services, including the price-fixed services alleged in this Complaint throughout the United

States.  Schenker, Inc. has an office in this District at 182-21 150th Avenue, Jamaica, New York

11413.

      44.     Defendant BAX Global, Inc. is a Delaware corporation with its principal place of

business at 440 Exchange, Irvine, California 92602.  BAX Global, Inc. and Schenker, Inc.

merged to form Defendant DB Schenker.  At all times during the Class Period, BAX Global,

Inc.'s activities were under the control and direction of its parent company, Deutsche Bahn AG.

During the Class Period, BAX Global, Inc., directly or through its subsidiaries and/or affiliates,

sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint

throughout the United States.

      45.     Defendant DB Schenker is organized under the laws of Germany with its

principal place of business at Leipziger Platz 9, D-10117, Berlin, Germany.  DB Schenker has

two U.S. based subsidiaries, Schenker Logistics, Inc. and Schenker, Inc.  Schenker Logistics,

Inc. is a North Carolina corporation with its principal place of business at 111 Eighth Avenue,

New York, New York 10011.  At all times during the Class Period, DB Schenker's activities were under the control and direction of its parent company.  During the Class Period, DB Schenker, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Deutsche Bahn AG, Schenker AG, Schenker, Inc., BAX Global, Inc., and DB Schenker are collectively referred to herein as "Schenker."

      6.    **DHL Corporate Family**

      46.    Defendant Deutsche Post AG is a German corporation with its principal place of business at Charles-de-Gaulle-Str. 20, 53113 Bonn, Germany.  During the Class Period, Deutsche Post AG utilized various trade names for itself, including "Deutsche Post World Net" and "Deutsche Post DHL" and together with its divisions, business units, subsidiaries and affiliates, operated under yet other trade names, including "Danzas AEI INCO", "Danzas AEI Intercontinental", "DHL Danzas Air & Ocean" and "DHL Global Forwarding".  Deutsche Post AG directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

      47.    Defendant Danzas Corporation, doing business as, DHL Global Forwarding, is an Ohio corporation with its principal place of business at 1210 South Pine Island Road, Suite 140-145, Plantation, Florida 33324.  The DHL corporate family uses the "DHL Global Forwarding" name as a trade name for several of its subsidiaries.  DHL Global Forwarding was formerly known as "DHL Danzas."  Danzas Corporation is a subsidiary of Deutsche Post AG.  During the Class Period, Deutsche Post AG changed the name, "DHL Danzas" by dropping "Danzas" and renaming the unit "DHL Global Forwarding."  DHL Global Forwarding/Danzas Corporation remains liable for all the actions and debts of DHL Danzas.  Danzas Corporation has served as

the head office of DHL's North American operations.  At all times during the Class Period,

Danzas Corporation's (d/b/a, DHL Global Forwarding) activities were under the control and

direction of its parent company, Deutsche Post AG.  During the class period, it directly or

through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-

fixed services alleged in this Complaint throughout the United States.

48.     Defendant DHL Express (USA), Inc. is an Ohio corporation with its principal

place of business at 1200 South Pine Island Road, Suite 600, Plantation, Florida 33324.  DHL

Express (USA), Inc. is a subsidiary of Defendant Deutsche Post AG.  At all times during the

Class Period, DHL Express (USA), Inc.'s activities were under the control and direction of its

parent company, Deutsche Post AG.  During the Class Period, DHL Express (USA), Inc.,

directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including

the price-fixed services alleged in this Complaint throughout the United States.

49.     Defendant DHL Global Forwarding Japan K.K. is a Japanese corporation with its

principal place of business at 1-19-9 Tsutsumi-dori, Sumida-ku, Tokyo 131-0034.  It has also

done business during the Class Period as "Danzas Maruzen".  At all times during the Class

Period, its activities were under the control and direction of its parent company, Deutsche Post

AG.  During the Class Period, DHL Global Forwarding Japan K.K., directly or through its

subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services

alleged in this Complaint throughout the United States.

50.     Defendant DHL Japan Inc. is a Japanese corporation with its principal place of

business at 1-37-8 Higashi-shinagawa, Shinagawa-ku, Tokyo, Japan.  It has also used the trade

name Airborne Express, Inc. during the Class Period.  In 2004, Airborne Express Inc. merged

into DHL Japan, Inc.  DHL Japan, Inc. is a subsidiary of Deutsche Post AG.  As a consequence,

---

THIRD AMENDED CLASS ACTION COMPLAINT                              16

DHL Japan, Inc. is liable not only for its own acts, but also for the activities of Airborne Express, Inc., complained of herein. At all times during the Class Period, its activities were under the control and direction of its parent company, Deutsche Post AG.  During the Class Period, DHL Japan Inc. directly or through its predecessor, subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

51.     Defendant Exel Global Logistics, Inc. ("Exel") is a New York corporation with its principal place of business at 570 Polaris Park Way, Westerville, Ohio, 43082.  Exel is a subsidiary of Deutsche Post AG.  Defendant Deutsche Post acquired Defendant Exel in December of 2005.  The DHL corporate family remains liable for the debts and conduct of Defendant Exel.   After its acquisition, Exel's activities were under the control and direction of its parent company, Deutsche Post AG.  During the Class Period, Exel, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

52.     Defendant Air Express International USA, Inc. is an Ohio corporation with its principal place of business at 1200 South Pine Island Road, Suite 600, Plantation, Florida 33324.  Air Express International USA, Inc. is a subsidiary of Deutsche Post AG.  At all times during the Class Period, its activities were under the control and direction of its parent company, Deutsche Post AG.  During the Class Period, Air Express International USA, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Deutsche Post AG, Danzas Corporation/DHL Global Forwarding, DHL Express (USA), Inc., DHL Global Forwarding Japan

K.K., Exel Global Logistics, Inc., Airborne Express, Inc. and Air Express International USA, Inc. are collectively referred to herein as "DHL" or the "DHL Defendants."

53.     Other Deutsche Post AG subsidiaries known to have conspired with other Defendants with respect to one of more of the claims asserted herein include

a.     Unnamed co-conspirator Radix Group International is an Ohio corporation with its principal place of business at 1210 South Pine Island Rd., Plantation, Florida, 33324.

b.     Airborne Express, Inc. was a Japanese corporation that was acquired by Deutsche Post AG in 2003, and terminated its international freight forwarding business effective December 31, 2003.  Subsequently, Deutsche Post AG merged Airborne Express, Inc. into Defendant DHL Japan Inc.

c.     Unnamed co-conspirator DHL Logistics (Hong-Kong) is a Hong-Kong corporation with its principal place of business in Hong Kong SAR, China.

d.     Unnamed co-conspirator Danzas Limited is a British corporation with its principal place of business in Great Britain.  Danzas Limited served as the head office of DHL's European operations.

e.     Unnamed co-conspirator Danzas Management (Switzerland) Ltd., f/k/a Danzas Management, Ltd., is a Swiss corporation with its principal place of business in Basel, Switzerland.  Danzas Management (Switzerland) Ltd. served as DHL's worldwide head office.

f.     Unnamed co-conspirator Danzas Z.F. Freight Agency Co. Ltd. is a Chinese corporation with its principal place of business in China.

g.     Unnamed co-conspirator DHL Danzas Management (Asia Pacific) Pte. Ltd. is a Singapore corporation with its principal place of business in Singapore.  DHL Danzas Management (Asia Pacific) Pte. Ltd. served as the head office for DHL's Asia Pacific Operations.

54.     At all times during the Class Period, the activities of each of the companies listed above were under the control and direction of its parent corporation, Deutsche Post AG.  During the Class Period, each, directly or through its subsidiaries, predecessors and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Deutsche Post AG and its affiliates, subsidiaries and predecessors, include those named above as either Defendants or unnamed co-conspirators are sometimes referred to herein as "DHL", "the DHL Group" or "the DHL Defendants."

**7.     UTi Worldwide Inc.**

55.     Defendant UTi Worldwide Inc. ("UTI") is a British Virgin Islands corporation with its principal place of business at 9 Columbus Centre, Pelican Drive, Road Town, Tortola, British Virgin Islands, and c/o UTi, Services, Inc., 100 Oceangate Boulevard, Suite 1500, Long Beach, California 90802.  During the Class Period, UTi, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  UTi has offices in this District at Suite 1000, 230-39, International Airport Center Blvd., Springfield Gardens, New York 11413.

**8.     UPS Corporate Family**

56.     Defendant United Parcel Service, Inc. is a Delaware corporation with its World Headquarters located at 55 Glenlake Parkway, NE, Atlanta, GA 30328.  Unnamed entity, Emery Worldwide was at one time a subsidiary of CNF.  CNF subsequently changed its name to Con-

---

Way.  Con-Way then changed the name of Emery Worldwide to Menlo Worldwide Forwarding, Inc.  In 2004, UPS acquired Menlo Worldwide Forwarding, Inc.  UPS presently uses the name Emery Worldwide to market its airfreight forwarding services.  UPS remains liable for the acts of Emery and Menlo Worldwide and also for its own acts in using those trade names in the course of its illegal conduct.  During the Class Period, UPS, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

57.    Defendant UPS Supply Chain Solutions, Inc. is a subsidiary or business unit of United Parcel Service, Inc. with its principal place of business at 12380 Morris Road, Alpharetta, Georgia 30005.  At all times during the Class Period, its activities were under the control and direction of its parent company, United Parcel Service, Inc.  During the Class Period, UPS Supply Chain Solutions, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants United Parcel Service, Inc. and UPS Supply Chain Solutions, Inc. are collectively referred to herein as "UPS" or the "UPS Defendants."

**9.    DSV Corporate Family**

58.    Defendant ABX Logistics Worldwide NV/SA ("ABX") was acquired by Defendant DSV A/S in September 2008. DSV is organized under the laws of Denmark, with its principal place of business at Banemarksvej 58, 2605 Brondby, Denmark. During the Class Period, ABX Logistics Group, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  ABX Logistics Worldwide NV/SA is referred to herein as "ABX Logistics" or "ABX."

THIRD AMENDED CLASS ACTION COMPLAINT                                    20

59.     Defendant DSV A/S is organized under the laws of Denmark with its principal place of business at Banemarksvej 58, DK-2605 Brøndby, Denmark. During the Class Period, DSV A/S, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

60.     Defendant DSV Solutions Holding A/S is organized under the laws of Denmark with its principal place of business at Banemarksvej 58, DK-2605 Brøndby, Denmark. Defendant DSV Solutions Holding A/S is a subsidiary of Defendant DSV A/S.  At all times during the Class Period, its activities were under the control and direction of its parent company, DSV A/S. During the Class Period, DSV Solutions Holding A/S, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

61.     Defendant DSV Air & Sea Ltd. f/n/a DFDS Transport (HK) Ltd. is organized under the laws of Hong Kong SAR, China with its principal place of business at 3rd Floor, MassMutual Tower, 38 Gloucester Road, Wanchai, Hong Kong SAR, China.  Defendant DSV Air & Sea Ltd. is a subsidiary of Defendant DSV A/S.  At all times during the Class Period, its activities were under the control and direction of its parent company, DSV A/S.  During the Class Period, DSV Air & Sea Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants ABX Logistics Worldwide NV/SA, DSV A/S, DSV Solutions Holding A/S, and DSV Air & Sea Ltd., f/n/a DFDS Transport (HK) Ltd. are collectively referred to "DSV" or "DSV Defendants."

10.     **SDV Corporate Family**

62.     Defendant SDV Logistique Internationale is French corporation with its principal place of business at Toure Bollore, 31-32, quai de Dion-Bouton, 92811 Puteaux Cedex, France. During the Class Period, SDV Logistique Internationale, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  SDV International Logistics has offices in this District at 150-10 132nd Ave., Jamaica, New York 11434.

11.     **Dachser Corporate Family**

63.     Defendant Dachser GmbH & Co., KG, doing business as Dachser Intelligent Logistics, is a German corporation with its principal place of business at Memminger Straße 140, 87439 Kempten, Germany. During the Class Period, Dachser Gmbh & Co., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

64.     Defendant Dachser Transport of America, Inc. is a New York corporation with its principal place of business at 2829 Paces Ferry Rd., Suite 300, Atlanta, Georgia 30339. Dachser Transport of America, Inc. is a subsidiary of Defendant Dachser Intelligent Logistics.  At all times during the Class Period, its activities were under the control and direction of its parent company, Dachser GmbH & Co.  During the Class Period, Dachser Transport of America, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States. Defendants Dachser Intelligent Logistics and Dachser Transport of America, Inc. are collectively referred to herein as "Dachser."

**12.** **Agility Logistics (f/n/a Geo-Logistics)**

65. Defendant Agility Logistics Corporation was previously known as Geo-Logistics Corporation. In 2005, PWC Logistics acquired Geo-Logistics Corporation. It changed its name to Agility Logistics but at times still operates under the trade name Geo-Logistics. Agility Logistics (aka Geo-Logistics Corporation) is a Delaware corporation with its principal place of business at 1251 Dyer Road, Suite 200, Santa Ana, CA 92705. During the Class Period, it directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States. "Geologistics" or "Agility Logistics" may be used interchangeably throughout the complaint. Agility Logistics Corporation remains liable for any acts of Geo-Logistics Corporation.

66. Defendant Geologistics International Management (Bermuda) Limited is a Bermudan corporation. On November 4, 2011, it pleaded guilty to engaging in the price-fixing conspiracies alleged in this Complaint. It agreed on behalf of itself and its subsidiaries and affiliates to cooperate in DOJ's ongoing investigation into the Freight Forwarding Industry. Defendants Geologistics Corporation, Agility Logistics Corporation and Geologistics International Management (Bermuda) Limited are collectively referred to herein as "Agility Logistics" or "Geo-Logistics." During the Class Period, it directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

**13.** **Toll Global Forwarding Corporate Family**

67. Defendant Baltrans Logistics, Inc. is a subsidiary of Toll Global Forwarding Ltd. Toll Global Forwarding Ltd. is a Hong Kong SAR, China corporation with its principal place of business at 12/F Tower II Enterprise Square, 9 Sheung Yuet Road, Kowloon Bay, Kowloon,

Hong Kong SAR, China. At all times during the Class Period, its activities were under the control and direction of its parent company, Toll Global Forwarding, Ltd.  In 2008, Toll Global Forwarding acquired Baltrans Logistics, Inc. and rebranded it as "Toll Global Forwarding." During the Class Period, Baltrans Logistics, Inc. and Toll Global Forwarding, Inc, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

68.     Defendant Toll Global Forwarding (USA), Inc. is a New York corporation with its principal place of business at One Cross Island Plaza, Suite 203, Rosedale, New York, 11422. At all times during the Class Period, its activities were under the control and direction of its parent company, Toll Global Forwarding Ltd.  During the Class Period, Toll Global Forwarding (USA), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Baltrans Logistics, Inc. and Toll Global Forwarding (USA), Inc. are collectively referred to herein as "Toll" or "Baltrans."

**14.     Hellmann Corporate Family**

69.

a.     Defendant Hellmann Worldwide Logistics GmbH & Co. KG ("Hellmann KG") is a German Corporation with its principal place of business at Elbestrasse 1 49090 Osnabruck / Germany. During the Class Period, Hellmann KG Worldwide Logistics GmbH & Co. KG, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint, throughout the United States.

b.     Defendant Hellmann Worldwide Logistics, Inc. is a Delaware corporation with its principal place of business at 10450 Doral Blvd., Miami, Florida 33178. During the

Class Period, Hellmann Worldwide Logistics, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint, throughout the United States. At all times during the Class Period, its activities were under the control and direction of its parent company Hellmann Worldwide Logistics GmbH & Co. KG.

c.      During the Class Period, Defendant Hellmann Worldwide Logistics Ltd. Hong Kong, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint, throughout the United States.  At all times during the Class Period, its activities were under the control and direction of its parent company Hellmann Worldwide Logistics GmbH & Co. KG.

d.      As used hereinafter, "Hellmann" collectively refers to Hellmann Worldwide Logistics GmbH & Co. KG, Hellmann Worldwide Logistics, Inc. and Hellmann Worldwide Logistics Ltd. Hong Kong.

**15.     Geodis Corporate Family**

70.     Defendant Geodis S.A., doing business as Geodis Group, is a French corporation with its principal place of business at Cap West, 7/9 allées de l'Europe, 92110 CLICHY, France. Geodis S.A. acquired the freight forwarding division of TNT and remains liable for its own conduct and that of TNT.  During the Class Period, Geodis Group, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

71.     Defendant Geodis Wilson USA, Inc. is a New York corporation with its principal place of business at 485C US Route 1 S, Iselin, New Jersey, 08830. Geodis Wilson USA, Inc. operates as the freight forwarding division of Geodis Group.  At all times during the Class

Period, its activities were under the control and direction of its parent company, Geodis Group. During the Class Period, Geodis Wilson USA, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Geodis S.A. and Geodis Wilson USA, Inc. are collectively referred to herein as "Geodis."

       16.    **Jet Speed Corporate Family**

      72.    Defendant Jet Speed Logistics, Ltd. is a Hong Kong SAR, China corporation with its principal place of business at 15 Wang Chiu Road, 11th Floor, Kowloon Bay, Hong Kong SAR, China.  During the Class Period, Jet Speed Logistics, Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

      73.    Defendant Jet Speed Air Cargo Forwarders (USA) Inc. is a New York corporation with its principal place of business at 153-66 Rockaway Blvd., Jamaica, New York 11434. Defendant Jet-Speed Air Cargo Forwarders (USA) Inc. is a subsidiary of Defendant Jet Speed Logistics, Ltd.  At all times during the Class Period, its activities were under the control and direction of its parent company, Jet Speed Logistics, Ltd.  During the Class Period, Jet-Speed Air Cargo Forwarders (USA) Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

      74.    Defendant Jet Speed Logistics (USA), LLC is an Illinois corporation with its principal place of business at 1555 Mittel Blvd., Suite J, Wood Dale, Illinois 60191.  Jet Speed Logistics (USA), LLC is the parent company of Defendant Jet Speed Air Cargo Forwarders (USA) Inc.  At all times during the Class Period, its activities were under the control and

direction of its parent company.  During the Class Period Jet Speed Logistics (USA), LLC, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Jet Speed Logistics, Ltd, Jet Speed Air Cargo Forwarders (USA) Inc., and Jet Speed Logistics (USA), LLC are collectively referred to herein as "Jet Speed"

### 17.  Morrison Corporate Family

75.    Defendant Morrison Express Logistics PTE Ltd. (Singapore) is a Singapore corporation with its principal place of business at 7 Airline Road, #04-09 Cargo Agents Building E, Singapore 819834.  During the Class Period, Morrison Express Logistics PTE Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

76.    Defendant Morrison Express Corporation (USA) is a California corporation with its principal place of business at 2000 Hughes Way, El Segundo, California 90245.  Defendant Morrison Express Corporation (USA) is a subsidiary of Morrison Headquarters Office, Morrison Express Corp., Ltd.  At all times during the Class Period, its activities were under the control and direction of its parent company, Morrison Express Logistics PTE Ltd.  During the Class Period, Morrison Express Corporation (USA), directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States. Defendants Morrison Express Logistics PTE Ltd. and Morrison Express Corporation (USA) are collectively referred to herein as "Morrison Express."

### 18.  Nippon Express Corporate Family

77.    Defendant Nippon Express Co., Ltd. is a Japanese corporation with its principal place of business at 1-9-3 Higashi-shimbashi, Minato-ku, Tokyo 105-8322, Japan.  During the

THIRD AMENDED CLASS ACTION COMPLAINT                                    27

Class Period, Nippon Express Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

78.      Defendant Nippon Express USA, Inc. is a New York corporation with its principal place of business at 590 Madison Avenue, Suite 2401, New York, New York 10022. Nippon Express USA, Inc. is a subsidiary of Defendant Nippon Express Co., Ltd.  At all times during the Class Period, its activities were under the control and direction of its parent company, Nippon Express Co., Ltd.  During the Class Period, Nippon Express USA, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Nippon Express Co., Ltd. and Nippon Express USA, Inc. are collectively referred to herein as "Nippon."

**19.      Yusen Air & Sea Service Corporate Family**

79.      Defendant Yusen Air & Sea Service Co., Ltd. is a Japanese corporation with its principal place of business at 30-1 Nihonbashi Hakozaki-cho, Chuo-ku, Tokyo 103-0015, Japan. During the Class Period, Yusen Air & Sea Service Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

80.      Defendant Yusen Air & Sea Service (U.S.A.), Inc. is a New York corporation with its principal place of business at 377 Oak Street, Suite 302, Garden City, NY 11530.  Yusen Air & Sea Service (U.S.A.), Inc. is a subsidiary of Defendant Yusen Air & Sea Service Co., Ltd. At all times during the Class Period, its activities were under the control and direction of its parent company, Yusen Air & Sea Service Co., Ltd.  During the Class Period, Yusen Air & Sea Service (U.S.A.), Inc., directly or through its subsidiaries and/or affiliates, sold Freight

Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Yusen Air & Sea Service Co., Ltd. and Yusen Air & Sea Service (U.S.A.), Inc. are collectively referred to herein as "Yusen."

     **20.**     **Kintetsu World Express Corporate Family**

     81.     Defendant Kintetsu World Express, Inc. is a Japanese corporation with its principal place of business at 1-6-1 Ohtemachi, Chiyoda-Ku, Tokyo 100-0004, Japan.  During the Class Period, Kintetsu World Express, Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

     82.     Defendant Kintetsu World Express (U.S.A.), Inc. is a California corporation with its principal place of business at 100 Jericho Quadrangle, Suite 326, Jericho, NY 11753.  Kintetsu World Express (U.S.A.), Inc. is a subsidiary of Defendant Kintetsu World Express, Inc.  At all times during the Class Period, its activities were under the control and direction of its parent company, Kintetsu World Express, Inc.  During the Class Period, Kintetsu World Express (U.S.A.), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Kintetsu World Express, Inc. and Kintetsu World Express (U.S.A.), Inc. are collectively referred to herein as "Kintetsu."

     **21.**     **Nishi-Nippon Corporate Family**

     83.     Defendant Nishi-Nippon Railroad Co., Ltd. ("Nishi-Nippon") is a Japanese corporation with its principal place of business at 1-11-7 Tenjin, Chuo-ku, Fukuoka 810-8570, Japan.  During the Class Period, Nishi-Nippon, directly or through its subsidiaries and/or

affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

22.   **Hankyu Hanshin Corporate Family**

84.   Defendant Hankyu Hanshin Express Holdings Corporation f/n/a Hankyu Travel International Co., Ltd. is a Japanese corporation with its principal place of business at 6-4-18 Nishi-tenma, Kita-ku, Osaka, Japan.  On April 1, 2008, Hankyu Travel International Co., Ltd. transferred its international freight forwarding business by way of demerger to Hankyu Express International, Co. Ltd. and changed its name to its current trade name, Hankyu Hanshin Express Holdings Corporation.  During the Class Period, Hankyu Hanshin Express Holdings Corporation, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

85.   Defendant Hankyu Hanshin Express Co., Ltd., is a Japanese corporation with its principal place of business at 1-9 Kanda Sakuma-cho, Chiyoda-ku, Tokyo 101-0025, Japan. Defendant Hankyu Hanshin Express Co. is a subsidiary of Defendant Hankyu Hanshin Express Holdings Corporation.  It was formed when Hanshin Air Cargo, Co., Ltd. and Hankyu Express International, Co. Ltd. merged.  Former Defendant Hanshin Air Cargo Co., Ltd. was a Japanese corporation with its principal place of business at 1-9 Kanda Sakuma-cho, Chiyoda-ku, Tokyo 101-0025, Japan.  During the Class Period, Hanshin Air Cargo Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States, including in this District.  It is now correctly named as Defendant Hankyu Hanshin Express Co., Ltd. and it remains liable for any conduct of former Defendant Hanshin Air Cargo Co., Ltd.   Hankyu Hanshin Express Co., Ltd. directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including

the price-fixed services alleged in this Complaint throughout the United States.  Defendant

Hankyu Hanshin Express Co. remains liable for the conduct of both Hanshin Air Cargo, Co.,

Ltd. and Hankyu Express International.

86.     Defendant Hanshin Air Cargo USA, Inc. is a New York corporation with its

principal place of business at147-08 183rd Street, Jamaica, New York 11413.  Hanshin Air

Cargo USA, Inc. is a subsidiary of Defendant Hankyu Hanshin Express Co., Ltd.  At all times

during the Class Period, its activities were under the control and direction of this parent

company.  During the Class Period, Hanshin Air Cargo USA, Inc., directly or through its

subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services

alleged in this Complaint throughout the United States.  Defendants Hankyu Hanshin Express

Holdings Corporation, f/n/a Hankyu Travel International Co., Ltd., Hankyu Hanshin Express

Co., Ltd., Hanshin Air Cargo Co., Ltd., and Hanshin Air Cargo USA, Inc. are collectively

referred to herein as "Hankyu Hanshin."

**23.    <u>Nissin Corporate Family</u>**

87.     Defendant Nissin Corporation is a Japanese corporation with its principal place of

business at 6-84 Onoe-cho, Naka-ku, Yokohama, Japan.  During the Class Period, Nissin

Corporation, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding

Services, including the price-fixed services alleged in this Complaint throughout the United

States.

88.     Defendant Nissin International Transport U.S.A., Inc. is a California corporation

with its principal place of business at 1540 W. 190th Street, Torrance, California 90501-1121.

Nissin International Transport U.S.A., Inc. is a subsidiary of Defendant Nissin Corporation.  At

all times during the Class Period, its activities were under the control and direction of its parent

company, Nissin Corporation.  During the Class Period, Nissin International Transport U.S.A., Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States. Defendants Nissin Corporation and Nissin International Transport U.S.A., Inc. are collectively referred to herein as "Nissin."

### 24. __Vantec Corporate Family__

89.    Defendant Vantec Corporation f/n/a Tokyu Air Cargo KK is a Japanese corporation with its principal place of business at 4-9-11 Nihonbashi-honcho, Chuo-ku, Tokyo 103-0023, Japan.  On April 1, 2009, Vantec Group Holdings Corporation merged its consolidated subsidiaries, Vantec Corporation and Defendant Vantec World Transport Co., Ltd., which were operating its two core businesses, automotive contract logistics and air/sea Freight Forwarding Services, and renamed itself Vantec Corporation in 2010.  During the Class Period, Vantec Corporation, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

90.    Defendant Vantec World Transport (USA), Inc. is a California corporation with its principal place of business at 991 Francisco Street, Torrance, California 90502.  Vantec World Transport (USA), Inc. is a subsidiary of Vantec Corporation.  At all times during the Class Period, its activities were under the control and direction of its parent company, Vantec Corporation.  During the Class Period, Vantec World Transport (USA), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Vantec Corporation and Vantec World Transport (USA), Inc. are collectively referred to herein as "Vantec."

THIRD AMENDED CLASS ACTION COMPLAINT                                    32

### 25.    "K" Line Logistics Corporate Family

91.    Defendant "K" Line Logistics, Ltd. f/n/a "K" Line Air Services, Ltd. is a Japanese corporation with its principal place of business at 3-7-9 Shibaura, Minato-ku, Tokyo 108-0023, Japan.  During the Class Period, "K" Line Logistics, Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

92.    Defendant "K" Line Logistics (U.S.A.), Inc. is a New York corporation with its principal place of business at 145 Hook Creek Blvd. Bldg. #C5B, Valley Stream, New York 11581.  "K" Line Logistics (U.S.A.), Inc. is a subsidiary of Defendant "K" Line Logistics, Ltd. At all times during the Class Period, its activities were under the control and direction of its parent company, "K" Line Logistics, Ltd.  During the Class Period, "K" Line Logistics (U.S.A.), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States. Defendants "K" Line Logistics, Ltd. and "K" Line Logistics (U.S.A.), Inc. are collectively referred to herein as "'K' Line."

### 26.    Yamato Corporate Family

93.    Defendant Yamato Global Logistics Japan Co., Ltd.[2] is a Japanese corporation with its principal place of business at 1-10-14 Shinkawa, Chuo-ku, Tokyo 104-0033, Japan. Defendant Yamato Global Logistics Japan Co. is a subsidiary of Yamato Holdings Co., Ltd. During the Class Period, Yamato Global Logistics Japan Co., Ltd., directly or through its

---

[2] Yamato Global Logistics Japan Co., Ltd. has changed its name multiple times during the Class Period.  On October 1, 2002, Yamato UPS International Aircargo KK changed its name to Yamato Global Freight KK.  On October 1, 2004, Yamato Global Freight KK changed its name to Yamato Logistics KK.  Finally, Yamato Logistics KK changed its name to Yamato Global Logistics Japan Co., Ltd.

subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

94.     Defendant Yamato Transport U.S.A., Inc. is a New York corporation with its principal place of business at 80 Seaview Drive, Secaucus, New Jersey 07094.  Yamato Transport U.S.A., Inc. is a subsidiary of Yamato Holdings Co., Ltd.  At all times during the Class Period, its activities were under the control and direction of its parent company.  During the Class Period, Yamato Transport U.S.A., Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.  Defendants Yamato Global Logistics Japan Co., Ltd. and Yamato Transport U.S.A., Inc. are collectively referred to herein as "Yamato."

### 27.     MOL Logistics Corporate Family

95.     Defendant MOL Logistics (Japan) Co., Ltd. is a Japanese corporation with its principal place of business at 2-5-1 Koraku, Bunkyo-ku, Tokyo 112-8582, Japan.  During the Class Period, MOL Logistics (Japan) Co., Ltd., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

96.     Defendant MOL Logistics (U.S.A.), Inc. is a California corporation with its principal place of business at 4 Expressway Plaza, Suite 120, Roslyn Heights, New York 11577.  MOL Logistics (U.S.A.), Inc. is a subsidiary of Defendant MOL Logistics (Japan) Co., Ltd.  At all times during the Class Period, its activities were under the control and direction of its parent company, MOL Logistics (Japan) Co., Ltd.  During the Class Period, MOL Logistics (U.S.A.), Inc., directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United

States.  Defendants MOL Logistics (Japan) Co., Ltd. and MOL Logistics (U.S.A.), Inc. are collectively referred to herein as "MOL."

### 28.   UAC Corporate Family

97.     Defendant United Aircargo Consolidators, Inc. ("United Air Cargo") is a Japanese corporation with its principal place of business at 5-5-5 Konan, Minato-ku, Tokyo 108-0075, Japan.  During the Class Period, United Aircargo, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States.

### 29.   Defendant Trade Associations

98.     Defendant Japan Aircargo Forwarders Association is a trade association with its principal place of business at 6-5 Nihonbashi-Ohdenmacho, Chuo-ku, Tokyo 103-0011, Japan.

99.     Defendant Spedlogswiss, aka, the Association of Swiss Forwarders, is a trade association with its principal place of business at Elisabethenstrasse 44, CH-4051/PO Box CH-4002, Basel, Switzerland.

100.     Defendant Shanghai International Freight Forwarder Association ("SIFFA") is a trade association with its principal place of business at RM 17B, 8 Ganhe Road, Shanghai, China, Postcode 200437.

101.     John Doe Defendants 1-10 include various individuals, partnerships, corporations, and associations, the identities of which are presently unknown to Plaintiffs, and have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  When and if Plaintiffs learn the identities of such co-conspirators, Plaintiffs may seek leave to amend this complaint to add such co-conspirators as defendants.

102.    The acts alleged against the corporate Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs.

103.    All averments herein against any named Defendant are also averred against these unnamed co-conspirators as though set forth at length.

104.    The acts that this Complaint alleges were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives or each co-conspirator while actively engaged in the management, direction, or control of its affairs.

**THE VARIOUS CORPORATE FAMILIES ACTED AS SINGLE ENTERPRISES WITH THE PARENT COMPANIES EXERCISING SUBSTANTIAL CONTROL OVER THEIR SUBSIDIARIES**

105.    When Plaintiffs refer to a corporate family or companies within a corporate family by a single name in their allegations of Defendants' participation in the conspiracy or conspiracies alleged in this Complaint, Plaintiffs are alleging that one or more employees or agents of entities within the particular Defendant's corporate family engaged in conspiratorial meetings on behalf of every company in that family.  This is because each corporate parent in a respective corporate family exercised substantial control over the subsidiary's functions, employees and decision-making processes.  Each corporate parent alleged herein has directed, controlled and/or encouraged its subsidiaries to engage in the anticompetitive conduct that is the subject of this Complaint.

A.    **The nature of the conspiracies and the Freight Forwarding Services industry generally require companies to operate as single-enterprises rather than separate, but related, corporate entities**

106.    Each of the corporate families alleged herein operate not as separate corporate entities but as a single enterprise, thereby making the parents liable for their controlled subsidiaries' conduct.  Indeed, as the following allegations demonstrate, each corporate family holds itself out as a single-enterprise to the public.  Each of the parent companies alleged herein operate a hierarchical corporate structure wherein they treat subsidiaries not as separate corporate entities under their own control but as mere divisions of the corporate parent.  Each corporate parent alleged herein also coordinates and manages meetings between the managers from each of the different subsidiaries to facilitate an integrated enterprise and to link the various supply-chain routes.  The parent companies dominate and control the finances, policies and business practices of their various subsidiaries.

107.    By virtue of their integrated enterprises, each Defendant individually entered into the conspiracies alleged herein on behalf of, and reported these meetings and discussions to, their respective corporate families or parent.  Consequently, each Defendant charged the fixed-surcharges or other charges or rate increases, and/or had representatives at the meetings that had the authority to act on the subsidiary's and/or parent's behalf.

108.    Given the nature of the Freight Forwarding industry, the price-fixing conspiracies alleged herein would not have worked unless there was involvement from both the parent company and its subsidiaries.  The affected trade routes at issue in this Complaint are transnational and require an integrated single enterprise for the purpose of shipping goods overseas.  The surcharges could only be imposed and collected with the cooperation of the entire corporate family because the surcharges were imposed *and* collected at origin and destination.

For example, if a Defendant was hired to ship goods from the United Kingdom to Japan, that Defendant would use its subsidiaries in the United Kingdom *and* Japan to complete the job.  The customer itself did not know whether it was dealing with, as an example, DHL Japan, Inc. or DHL in the United Kingdom.  Instead, the customer merely believed it was dealing with "DHL." In order to impose the conspiratorial surcharges on these transnational routes, the parent companies required their subsidiaries to act as their agents in both imposing the surcharges and in collecting them.

109.    There are several examples of how the Defendants named herein, with their various trade routes, required an integrated enterprise in order to achieve their conspiratorial aims.





113.    As another example of the integrated nature of these companies and their supply routes,



The Japanese AMS Defendants used their U.S. affiliates and subsidiaries to pick up the freight once it arrived in the United States, and relied on them to deliver the cargo to its appropriate ultimate destination.  The U.S. Corporate affiliates of these Japanese Defendants would collect the amounts owed by the shippers, including the conspiratorial surcharges and would, in most cases, remit those amounts to their Japanese parent company.



116.    As another example of corporate control from the top-down





123.    The Defendants named in this Complaint are part of vertically-integrated

operations that provide Freight Forwarding Service not only in the United States but across the

world.  Each of these Defendants controls its corporate affiliates, and together with its affiliates,

holds itself out to Plaintiffs, other Class members and the rest of the world as one unified, global

company, capable of instant communication among affiliates and the seamless provision of

services everywhere they operate.

**B.**    **The representatives from Defendants who attended conspiratorial meetings and engaged in collusive conduct did so on behalf of the entire corporate family**

124.    In many instances of meetings and communications between and among

Defendants in furtherance of their conspiracies alleged in this Complaint, Plaintiffs allege

specifically which corporate entity was represented in a particular meeting or communication and which corporate entity acted on behalf of its corporate family.  In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  Notwithstanding Plaintiffs' lack of knowledge of such details at this stage, Plaintiffs have alleged very specific information in this Complaint of the identity of which Defendants participated in such meetings and discussions on behalf of their respective corporate families.  As a result, entire corporate families were represented in meetings and discussions by their agents and were parties to the agreements reached in them.

125.    Most of the insider industry literature similarly did not distinguish between corporate entities within a particular corporate family.  The trade association known as "Freight Forwarder International" was comprised of DHL, Kuehne + Nagel, Panalpina, Schenker, UTi, Agility (f/k/a Geo Logistics) and ABX Logistics.  The FFI website simply listed its members as "DHL", "Kuehne + Nagel", "Panalpina", "Schenker", "UTi", "Agility" and "ABX Logistics" and did not distinguish based on a particular subsidiary's name.  FFI's website noted that its seven members alone controlled 25% of the air freight forwarding industry and 30% in ocean freight.  It stated that "[t]he several participating companies in FFI employ more than 324,000 people with a consolidated turnover for 2006 of €60.98 billion euros . . . ."  Again, the website did not distinguish between different entities within a corporate family and considered them to be single enterprises for purposes of their business ventures.

126.    When representatives from these companies met and made collusive agreements at FFI meetings, they did so on behalf of their entire corporate family.  The representatives from these companies did not distinguish between allegedly separate corporate subsidiaries.  They

entered agreements, for example, on behalf of "DHL."   Defendants knew the individuals at the meetings represented their entire respective corporate family; otherwise, the Defendants would not have entered into the illegal agreements because the surcharge conspiracies alleged herein would not have functioned properly with less than the agreement from the entire corporate family.



**C.     The Collusive Agreements Were Directed From The Top Down**

128.    In addition to Defendants holding themselves out as unified, global companies rather than separate corporate entities, certain Defendants' CEOs and other top officers met personally and established the first surcharge agreement of which Plaintiffs have learned to date, the 2001 Security Surcharge alleged herein.  This collusive agreement set the "tone at the top" of the particular corporate family all the way down to the affiliates, and subsidiaries, and, pursuant to that tone, Defendants repeatedly made other agreements to impose new charges or prices for Freight Forwarding Services.

129.    After the representatives from each corporate family entered into the illegal agreements, they would notify their counterparts, superiors and/or underlings across the entire corporate family of the new surcharge with instructions to impose it worldwide or on the appropriate routes as necessitated by the particular surcharge.



132.    As another example of how the conspiratorial surcharges were engineered from the "top down" by a centralized parent company emanating to its subsidiaries,



133.    As alleged in this Complaint, these companies repeatedly and regularly

established and agreed upon fees and surcharges related to U.S. Freight Forwarding Services,

and did not want their U.S. Freight Forwarding Services to undercut their collusive agreement

with other Defendants.  Thus, of necessity, the entire corporate enterprise was managed in a

centralized "top-down" manner than ensured the conspiracy would function as to the

Defendants' provision of Freight Forwarding Services into, out of, and within the U.S. and

around the world.

**D.    Examples of corporate control over subsidiaries and affiliates and unified activity
between corporate families**

**1.    DHL Defendants**

134.    Defendant Deutsche Post AG, the DHL parent company and its business units,

divisions and subsidiaries operate as, and hold themselves out to be, a single integrated unit.

Deutsche Post AG has and controls over 800 subsidiaries.  It dominates and controls the

subsidiaries' finances, policies and business practices.

135.    DHL is the leniency-applicant under the Antitrust Criminal Penalty Enhancement

and Reform Act of 2004 ("ACPERA").  Deutsche Post AG, the parent corporation of the entire

DHL enterprise, has applied to the DOJ for leniency on behalf of itself ***and*** "its majority owned

subsidiaries engaged in the 'international air freight forwarding services' industry."  The DHL

subsidiaries named in this Complaint are all majority-owned.  By seeking leniency from the

Department of Justice, Deutsche Post has admitted to a violation of the Sherman Act and has

caused each of its subsidiaries named herein and others to admit to a violation of the Sherman

Act.

136.    Moreover, in its Annual Reports, it describes its corporate organization as one

consisting of several "Divisions," including a "Global Forwarding, Freight" division, a

"division" that encompasses all subsidiaries providing Freight Forwarding businesses.  It also

admits that "DHL is the brand that covers the divisions for Express, Global Forwarding and

Supply Chain.  It has a global network of 120,000 destinations in over 200 countries and

territories and about 500,000 employees to provide supply chain solutions to its customers.  The

Group promotes collaboration among employees and offers standardized products to enhance

value for its customers."  http://www.dp-

dhl.com/content/dam/ueber_uns/publikationen/keyfact_english_final2009.pdf (last visited Sept.

8, 2010).

137.    These admissions demonstrate that Deutsche Post AG treats its subsidiaries as

mere divisions of the corporate parent rather than separate legal entities.  The destinations,

countries, territories and employees it lists as its own are actually those of its allegedly separate

subsidiaries.  When providing Freight Forwarding services, members of the Deutsche Post group

operated under various trade names without disclosing their actual corporate identity.  As a

consequence, its customers and its subsidiaries' customers were unaware of the actual corporate

entity or entities with whom they were dealing.

138.    During the Class Period, Deutsche Post, its business units, divisions, subsidiaries

and affiliates operated like a single global company, with offices located worldwide, but where

each "office" was often a separately incorporated entity.  The "office" of the DHL Group's

Danzas Management (Switzerland) Ltd. served as headquarters or "CEO" of the various regional

"offices," and was itself controlled directly by Defendant Deutsche Post.

139.    During the Class Period, competitors of Deutsche Post referred to the members of

the DHL Group by general names such as "Danzas" or "DHL" without regard to the actual

corporate entity which utilized the name.  In fact, the competitors, as well as the general public,

were likely unaware of the actual corporate entity which employed the personnel with whom they had contact.

## 2.   **Panalpina Defendants**

140.     Panalpina World Transport Holding (Ltd.), the parent company, states that the "Panalpina Group operates a close knit network with some 500 *branches* in more than 80 countries."  It further represents that "Panalpina employs approximately15,500people worldwide."  These representations demonstrate that the parent corporation treats its subsidiaries as mere divisions of the company rather than separate entities.  Panalpina World Transport Holding Ltd., the parent, does not have 15,500 employees itself, but is instead counting the employees of its controlled subsidiaries.   http://www.panalpina.com/www/global/en/about.html (last visited Sept. 8, 2010).

141.     Moreover, Panalpina World Transport Holding (Ltd.), the parent company for the "Panalpina Defendants", entered into a guilty plea with the DOJ regarding its criminal conduct related to the claims in this Complaint.  With respect to its collusive conduct, it admitted to acting through its subsidiaries, which include Defendant Panalpina, Inc.  Defendant Panalpina World Transport Holding (Ltd.)'s substantial control over its subsidiaries is evidenced by the fact that it agreed, on behalf of itself and "its subsidiaries [to] cooperate fully and truthfully with the United States in the prosecution of this case . . . ."  Although it bound its subsidiaries to the plea agreement, only the Head of Government Affairs for Panalpina World Transport Holding (Ltd.) signed the agreement and its Board of Directors acknowledged and agreed to it.  This demonstrates the fact that Panalpina World Transport Holding (Ltd.) engaged in the collusive conduct at issue in this Complaint and that it exercises substantial control over its subsidiaries

such that it is a single enterprise. Panalpina World Transport Holding (Ltd.)'s guilty plea also demonstrates that it utilized its subsidiaries as an instrumentality in its conspiratorial conduct.

### 3.    Kuehne + Nagel Defendants

142.    Kuehne + Nagel International AG, the parent company, also holds itself out as an integrated single-enterprise with control over its subsidiaries. It states that it "is one of the world's leading logistics providers with a global network of 1000offices in over 100 countries and over 63,000 employees with leading-edge IT systems." http://www.kn-portal.com/about/ (last visited Sept. 8, 2010). It represents that the 55,000 employees of its allegedly separate corporate subsidiaries are actually its own employees. "Kuehne + Nagel also promotes its standardized processes and technology across its Global Logistics Network to deliver integrated supply chain solutions for its customers." http://www.kn-portal.com/about/ (last visited Sept. 8, 2010).



144.    Additionally, Kuehne + Nagel International AG, the parent corporation, entered into a plea agreement with the United States' DOJ, admitting to criminal conduct in relation to the claims in this Complaint. It also admitted that it acted through its various subsidiaries in furtherance of its criminal antitrust schemes. The parent corporation agreed, on behalf of itself and its subsidiaries, to fully and truthfully cooperate with the United States in its criminal investigation. The plea agreement is signed by an officer of the parent company. This

agreement demonstrates that the Kuehne + Nagel Defendants operate as a single enterprise and the parent exercises substantial control over its subsidiaries.

### 4.  <u>Schenker Defendants</u>

145.    The Schenker Defendants are also structured as a single enterprise with the parent corporation controlling the subsidiaries in a manner that makes them akin to divisions of the parent rather than separate legal entities.  For example, BAX Global, Inc., the Delaware subsidiary of the Schenker Defendants, pled guilty to DOJ criminal price-fixing charges in relation to the claims raised in this Complaint.  Notwithstanding the fact that BAX Global, Inc. was formally named the "Defendant" in that criminal action, its plea agreement states that "[t]he defendant, Deutsche Bahn AG [*i.e.,* the parent corporation] and their subsidiaries . . . (the 'Covered Entities') will cooperate fully and truthfully with the United States . . . .".  In return for the cooperation, guilty plea and fines, the United States government agreed not to bring further criminal charges against the "Covered Entities" for conduct related to the claims in that case. The plea agreement is signed by the corporate secretary for Defendant BAX Global, Inc. and acknowledged by its Board of Directors.  This plea agreement demonstrates that all of the Schenker Defendants were involved in the unlawful agreements alleged in this Complaint and that they operate as a single enterprise rather than as several separate and distinct legal entities.

146.    In addition to BAX Global, Inc. specifically pleading guilty to criminal antitrust charges in relation to the claims raised in this Complaint, Deutsche Bahn AG also pled guilty to DOJ criminal antitrust charges.  It admitted that it acted through its various subsidiaries in furtherance of its criminal antitrust scheme.  The parent corporation agreed, on behalf of itself and its subsidiaries, to fully and truthfully cooperate with the United States in its criminal investigation.  The plea agreement is signed by an officer of the parent company.  This

THIRD AMENDED CLASS ACTION COMPLAINT                                    50

agreement demonstrates that the Schenker Defendants operate as a single enterprise and the parent exercises substantial control over its subsidiaries.

147.    In coordinating the collusive CAF surcharge explained herein,



148.    The CEO of the parent company in the Schenker corporate family was considered the CEO of the entire enterprise, including the various subsidiaries.  This CEO spoke for the entire corporate family.  After conspiratorial meetings, messages would be delivered to the various Schenker subsidiaries instructing them to implement the collusive surcharge.

**5.    EGL Defendants**

149.    The EGL Defendants' plea agreement also demonstrates that it operates as a single enterprise.  CEVA Group PLC is the parent company of both EGL, Inc. and EGL Eagle Global Logistics.  Although EGL, Inc. was formally named the Defendant in the DOJ's criminal action in relation to the claims in this Complaint, its plea agreement states that "[t]he Defendant, CEVA Group PLC and their subsidiaries will cooperate fully and truthfully with the United States . . . ."  In return, the United States government agreed not to bring further criminal charges against CEVA Group PLC and its subsidiaries.  The plea agreement is signed by the Vice President and Chief Legal Officer of Defendant EGL, Inc. and acknowledged by its Chief Legal Officer.  This plea agreement also demonstrates that all of the EGL Defendants were involved in

the unlawful agreements alleged in this Complaint and that they operate as a single enterprise rather than as several separate and distinct legal entities.

**6.** **Geo-Logistics Defendants**

150. Defendant Geo-Logistics was acquired by Agility Logistics in July 2008. As discussed, during the Class Period, Geo-Logistics, directly or through its subsidiaries and/or affiliates, sold Freight Forwarding Services, including the price-fixed services alleged in this Complaint throughout the United States. Geo-Logistics International Management (Bermuda) Limited pled guilty to criminal price-fixing charges by the DOJ. That entity admitted to using its subsidiaries as instrumentalities of its price-fixing conspiracy. Although Geo-Logistics International Management (Bermuda) Limited was formally named as the "Defendant" in the price-fixing conspiracy, its parent corporation at the time, The Public Warehousing Company ("PWC"), agreed to cooperate with the DOJ's investigation on behalf of itself and all of its various subsidiaries in return for a release of criminal liability.

151. Defendant Agility Logistics Corporation acquired Geo-Logistics Corporation in July 2008. Agility Logistics is now the successor-in-interest to Defendant Geo-Logistics and remains liable for its debts and conduct during the Class Period. Defendant Geo-Logistics' guilty plea with the DOJ is signed by John Kao, an officer of Agility Logistics Corporation.

**7.** **Dachser Defendants**

152. Defendant Dachser Intelligent Logistics, the parent company to Dachser Transport of America, Inc., represents that it is, in reality, one company. It states that it is "[m]any parts – one unified whole" with "a unique network of people and systems, which we have integrated worldwide into a unified whole. As a transnational company, we are experienced in integration . . . all over the world." Dachser Intelligent Logistics, therefore, treats

its allegedly separate subsidiary as a mere division of the parent company.

http://www.dachser.com/de/en/SID-8C6D8F22-978698B3/54.htm (last visited Jan. 28, 2011).

Similarly, Dachser's U.S. subsidiary, Dachser Transport of America, Inc., believes that "[i]t is

our strong Dachser culture, the feeling that we belong together" that has led to its success.  These

admissions demonstrate that the parent exercises substantial control over the subsidiary such that

they are a single-enterprise liable for price-fixing conduct.

### 8. __DSV Defendants__

153.    DSV A/S, parent company to several subsidiaries, touts itself as a "global supplier

of transport and logistics solutions."  In demonstrating its control over its subsidiaries and

affiliates, the parent states that the "[g]roup has companies in more than 70countries all over the

world. Together with its partners and agents, our staff of around 22,000 employees offers local

distribution, European road transport, air and sea freight within and between the largest

continents, and professional overall solutions in more than 110 countries."  These representations

by the parent company take responsibility for the operations of supposedly separate corporate

subsidiaries.  Indeed, the parent even admits that employees (*i.e.*, 21, 300) of the subsidiaries are

really just the employees of the parent.  These representations demonstrate that the parent

exercises substantial control over the subsidiary and holds itself out as a single

enterprise.http://www.dsv.com/irj/go/km/docs/documents/DSV_DFDS%20Transport/Integrated

%20Internet/Corporate%20Web%20Repository/Public%20Content/Annual%20Reports/ENG/U

K-Annual%20Report%202009.pdf (last visited Sept. 8, 2010).

### 9. __Morrison Defendants__

154.    Morrison Express is yet another example of a single-enterprise exercising control

over its subsidiaries.  The parent company, Morrison Express Logistics PTE Ltd., states that it

"transformed from a Taiwan [,China]-based company to a global corporation . . . ." It states that "all employees", even employees of its subsidiaries, "are part of a global team, committed to working together across regions and functions." http://www.morrisonexpress.com/career_1.php (last visited Sept. 8, 2010).

### 10.   Jet-Speed Logistics Defendants

155.   Jet Speed Logistics, Ltd., the parent company to Jet Speed Logistics (USA), LLC, also admits to control from the top to the bottom. Its website states that "Jet Speed Logistics, Ltd, [ the] parent company founded in 1967 has a global network of *offices* in 50 countries." (emphasis added). It has, therefore, admitted to its single-enterprise status by taking credit (and responsibility) for its' and its subsidiaries' offices in 50 countries, including its U.S. "offices." Where there are truly separate lines of corporate control, Jet Speed Logistics, Ltd. has indicated such separate corporate existence. For example, it also states on its website that one particular subsidiary, Jet Speed Air Cargo Forwarders (HK) Limited was "started in Hong Kong [SAR, China] in 1967" and is "privately owned by Arthur Antonio da Silva and partner . . . ." The parent corporation represents that it has "over 300 employees worldwide in 25 offices" and "representatives in most places around the globe . . . ." thereby again admitting to its single-enterprise status. http://www.jetspeed.com/eng/main.html (last visited Sept. 8, 2010).

### 11.   Toll Global Forwarding Defendants

156.   Toll Global Forwarding admits that it is a single-enterprise with its parent, and subsidiaries (*i.e.,* Baltrans Logistics, Inc) when it states that its "network of company-owned offices provides a full range of international freight forwarding and advanced supply chain management." http://www.tollglobalforwarding.com/global-forwarding.html (last visited Sept. 8, 2010). It further concedes that "[w]ith the acquisition *and integration* of Baltrans, Toll Global

Forwarding is now a *single* dynamic and cohesive force with 65 offices in 26 countries and over 2,500 employees." Annual Report 2009, page 5.

http://www.toll.com.au/investor/AnnualReport2009.pdf (last visited Sept. 8, 2010).

### 12.   Kintetsu Defendants

157.   Kintetsu World Express, Inc., parent company to Kintetsu World Express (U.S.A.) and others, states that "to further promote its business globalization and at the same time provide services responsive to each region's unique needs [it] has established a Five Regional Group Management System to increase both operation efficiency and speed. The Five Regional Group Management System [consists of] 48 affiliated companies with a total of 298 offices in 189 cities in 30 countries . . . ." http://www.kwe.com/corporate/5management.html (last visited Sept. 8, 2010).Moreover, Kintetsu World Express explains how they are able to communicate and coordinate with their various divisions through "an advanced information system that allows the entire [Kintetsu World Express] Group to share information and deliver services and quality that our customers expect."

http://www.kwe.co.jp/en/investment/pdf/AR2009.pdf (last visited Sept. 8, 2010).

158.   Kintetsu World Express, Inc. has agreed to plead guilty to DOJ's criminal charges related to the claims raised in this Complaint. In a Criminal Information, DOJ has charged Defendant Kintetsu World Express, Inc., the parent company, with engaging in a criminal antitrust conspiracy. The Criminal Information charges Kintetsu World Express, Inc. with utilizing its affiliates to transmit the goods that were subject to the price-fixed services. The Kintetsu Defendants participated in the conspiracies alleged herein and operate as a single-enterprise. Kintetsu World Express Inc. was also issued a cease and desist order by the JFTC related to conduct that is the subject of this Complaint.

### 13.    K-Line Defendants

159.    K-Line is another example of a company that controls all of its corporate affiliates.  It states that through its K Line Vision 100 program, it recognizes that the "most effective organizational structures are to permit "borderless" business management..."   K Line Annual Report 2009, page 11.  http://www.kline.co.jp/ir/pdf/annual_2009/annual_2009_e.pdf (last visited Sept. 8, 2010).

160.    K-Line Logistics, Ltd. was named in the JFTC's cease and desist order for conduct related to the claims raised in this Complaint.

### 14.    MOL Defendants

161.    MOL Logistics, Co. Ltd. also exercises substantial control over its subsidiaries. This is shown through the fact that "MOL Logistics (USA) Inc. is a North American subsidiary of MOL Logistics, Co. Ltd., *which reports to the President at the parent company.*" (emphasis added).  MOL Profile 2009, page 20.  http://www.mol-logistics.co.jp/japan/en/corporate/profile/img/profile2009.pdf (last visited Sept. 8, 2010). As discussed at the outset, these corporate families operate in a hierarchical structure wherein subsidiaries are actually controlled by their parents and must seek advice, counsel and acquiescence from the corporate parent.

162.    MOL Logistics, Co. Ltd, the parent company, has agreed to plead guilty to DOJ's criminal price-fixing charges regarding conduct related to the claims in this case.  In a Criminal Information, DOJ has charged Defendant MOL Logistics, Co. Ltd., the parent company, with engaging in a criminal antitrust conspiracy.  The Criminal Information charges MOL Logistics, Co. Ltd. with utilizing its affiliates to transmit the goods that were subject to the price-fixed

services.  The MOL Defendants participated in the conspiracies alleged herein and operate as a single-enterprise.

163.    The JFTC also issued a cease and desist order against MOL Logistics, Co. Ltd. relating to price-fixing conduct that is the subject of this Complaint.

**15.    Vantec Defendants**

164.    Vantec Corporation is yet another example of a parent's control over a subsidiary. Vantec Corporation, parent to Vantec World Transport (USA) and other subsidiaries, is a single-enterprise and controls its subsidiaries. It states that with "global resources and a reliable network of the parent company, Vantec Corporation, . . . is well positioned to offer a seamless one-stop logistics and distribution service, flexibility and fast turnaround time in the freighting and handling of goods."  http://www.vwtsg.com/ (last visited Sept. 8, 2010).

165.    Vantec Corporation agreed to plead guilty to DOJ's criminal antitrust charges related to the claims made in this Complaint.  In a Criminal Information, DOJ charged Defendant Vantec Corporation, the parent company, with engaging in a criminal antitrust conspiracy.  The Criminal Information charges Vantec with utilizing its affiliates to carry out its illicit price-fixing conspiracy.  The Vantec Defendants participated in the conspiracies alleged herein and operate as a single-enterprise.

166.    On November 2, 2012, Vantec Corporation pled guilty to engaging in some of the price-fixing conspiracies alleged herein.  As part of its plea agreement and demonstrating its control over its subsidiaries, including Defendant Vantec World Transport (USA), Inc., Vantec Corporation agreed that its subsidiaries would cooperate in DOJ's ongoing investigation into the Freight Forwarding industry.  Despite its allegedly separate corporate status, Vantec World

Transport (USA) did not sign the agreement.  In return, DOJ released Vantec Corporation and its subsidiaries from further prosecution.

167.    The JFTC also issued a cease and desist order against Vantec World Transport Co., Ltd.  relating to price-fixing conduct that is the subject of this Complaint.

**16.    <u>Yamato Defendants</u>**

168.    Yamato Global Logistics Japan Co. Ltd., the parent company, has agreed to plead guilty to criminal DOJ charges in relation to the claims raised in this Complaint.  The Criminal Information upon which the parent company has agreed to plead guilty, charges Yamato Global Logistics Japan Co. with utilizing its affiliates to carry out its illicit price-fixing conspiracy.  The Yamato Defendants participated in the conspiracies alleged herein and operate as a single-enterprise.

169.    The JFTC also issued a cease and desist order against Yamato Global Logistics Japan Co. Ltd relating to price-fixing conduct that is the subject of this Complaint.

**17.    <u>Nippon Express Defendants</u>**

170.    Nippon Express Co. Ltd. has agreed to plead guilty to DOJ criminal charges related to the claims made in this Complaint.  In a Criminal Information, DOJ has charged Defendant Nippon Express Co., Ltd., the parent company, with engaging in a criminal antitrust conspiracy.  The Criminal Information charges Nippon Express Co., Ltd. with utilizing its affiliates to carry out its illicit price-fixing conspiracy.   In its plea agreement with the United States DOJ, Nippon Express Co. Ltd., the parent company and named Defendant, agreed to cooperate on behalf of itself and its various subsidiaries in return for a release of criminal liability.  Notwithstanding the allegedly separate corporate existence of its subsidiaries, only officers of the parent company signed the plea agreement and bound the subsidiaries. The

Nippon Express Defendants participated in the conspiracies alleged herein and operate as a single-enterprise.

171.    The JFTC also issued a cease and desist order against Nippon Express Co. Ltd. relating to price-fixing conduct that is the subject of this Complaint.

**18.    Nissin Defendants**

172.    Nissin Corporation, the parent company, has agreed to plead guilty to criminal DOJ charges in relation to the claims raised in this Complaint.  The Criminal Information upon which the parent company agreed to plead guilty, charges Nissin Corporation with utilizing its affiliates to carry out its illicit price-fixing conspiracy. In its plea agreement with the United States DOJ, Nissin Corporation., the parent company and named Defendant, agreed to cooperate on behalf of itself and its various subsidiaries in return for a release of criminal liability. Notwithstanding the allegedly separate corporate existence of its subsidiaries, only officers of the parent company signed the plea agreement and bound the subsidiaries.  The Nissin Defendants participated in the conspiracies alleged herein and operate as a single-enterprise.

173.    Nissin Corporation was also issued a cease and desist order by the JFTC relating to price-fixing conduct that is the subject of this Complaint.

**19.    Hankyu Hanshin Defendants**

174.    On November 1, 2012, Hankyu-Hanshin Express Co., Ltd. pled guilty to criminal antitrust violations in relation to the claims raised in this Complaint.  As part of its plea agreement and demonstrating its control over its subsidiaries and affiliates, including Hanshin Air Cargo USA, Inc., Hankyu-Hanshin Express Co., Ltd. agreed that its subsidiaries and affiliates would cooperate in DOJ's ongoing investigation into the Freight Forwarding industry. Despite its allegedly separate corporate status, Hanshin Air Cargo USA, Inc. did not sign the

agreement.  In return, DOJ released Hankyu-Hanshin Express Co., Ltd. and its subsidiaries and affiliates from further prosecution.

**20.** **Yusen Defendants**

175.    Yusen Air & Sea Service Co., Ltd. was issued a cease and desist order by the JFTC for engaging in collusive conduct in relation to the claims raised in this Complaint.  It has not challenged the JFTC's findings.

**21.** **UPS Defendants**

176.    United Parcel Service, Inc., the parent company, operates a single enterprise and exercises substantial control over its various subsidiaries, including UPS Supply Chain Solutions, Inc.   UPS Supply Chain Solutions, Inc. describes itself not as a separate legal entity, but as a "business unit" of United Parcel Service, Inc.  Hiring for UPS Supply Chain Solutions is done through the parent company's website.

177.    As discussed below, United Parcel Service, Inc. and its subsidiary, UPS Supply Chain Solutions, Inc. were fined by the European Commission for its involvement in the NES, AMS, and CAF surcharge conspiracies.  Overall, these two allegedly separate but single entities were fined approximately €9.8 million for its collusive conduct.



THIRD AMENDED CLASS ACTION COMPLAINT                                                60

**22.**    **Hellmann Defendants**

179.    Hellmann Worldwide Logistics GmbH & Co. KG, the parent company, holds

itself out as an integrated single-enterprise with control over its subsidiaries and entities. It states

that it is "family owned and run," and that the "company started with one man, Carl Heinrich

Hellmann … Four generations later, Carl's great-grandchildren, Jost and Klaus, own and run the

company with an active network in 157 countries. Today we operate a truly global

organization…." http://www.hellmann.net/about_hellmann/about_hellmann. (last visited January

17, 2013). Hellmann KG further states that its "global network of offices and warehouses is

connected by our fleet of 5,000 trucks, cooperative agreements with 50 shipping lines and 55

airlines, and cutting-edge IT and communication systems…." See

http://www.hellmann.net/en/about_hellmann/products_services (last visited January 17, 2013)

Further, Hellmann KG states that they are "Strategically located across five continents".

Hellmann KG represents that they have 10,003 worldwide employees, in 211 branches, located

in 54 countries. See http://www.hellmann.net/en/about_hellmann/facts_figures (last visited

January 17, 2013).  Specifically, Hellman KG lists the air and sea freight services it provides for

the United States and Hong Kong. For example, Hellman KG states "Our extensive global

network allows us to deliver reliable air freight services . . . our customer service in branches

around the world takes care of your specific air freight needs . . . That is a big concern for us –

wherever you are." http://www.hellmann.net/en_EN/hongkong/products_services/airfreight (last

visited January 25, 2013).  Hellmann KG's corporate linkedin.com page lists that Hellmann

Worldwide Logistics is "hiring" for numerous positions around the world.

http://www.linkedin.com/company/hellmann-worldwide-logistics (last visited January 17, 2013)

([listing available positions in Dallas, Texas, Bielefeld, Germany and Osnabruck, Germany).

These admissions demonstrate that the parent exercises substantial control over the US and Hong

Kong entities such that they are a single-enterprise liable for price-fixing conduct.

## CLASS ACTION ALLEGATIONS

180.    Plaintiffs bring this action on behalf of themselves and as a class action under

Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of

the following Class:

> All persons (excluding governmental entities, Defendants, their
> subsidiaries and affiliates, and their co-conspirators) who directly
> purchased U.S. Freight Forwarding Services from any of the
> Defendants or any subsidiary or affiliate thereof, at any time
> during the period from January 1, 2001 to the January 4, 2011 (the
> "Class")

Plaintiffs reserve their right to amend the Class Definition to include separate classes or sub-

classes or in other respects in their motion to certify the class.  Plaintiffs also reserve their right

to amend the Class Period if discovery demonstrates a different period

181.    The Class Period alleged above has been upheld by this Court and is presently the

law of the case.  Plaintiffs have had no discovery and have good grounds and do allege as

follows: there was no agreement to withdraw and no affirmative acts of disbanding the unlawful

agreements that were taken by the conspirators through this period.

182.    The pricing practices that were unlawfully and systematically created from the

highest levels of the different Defendants continued after November 2007 and until January 4,

2011.  Consequently, Defendants continued to reap the benefits of the conspiratorially created

pricing practices until at least January 4, 2011.  In the foregoing circumstances, Defendants have

continued to receive the benefits and following pricing practices that they received and created prior to November 2007.

183.    Class members number in the tens of thousands and are geographically dispersed, including at opposite ends of the United States and in the middle, as well as overseas. Joinder of all Class members in this action is impracticable.

184.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all Class members are all direct purchasers of Freight Forwarding Services who paid artificially inflated prices for Freight Forwarding Services due to Defendants' conspiracy or combination alleged herein.

185.    Plaintiffs will fairly and adequately protect the interests of the Class as the interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. In addition, Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action and antitrust litigation.

186.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

187.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members. Among the questions of law and fact common to the Class are:

    i.  whether Defendants and their co-conspirators combined, conspired or agreed to fix, inflate or maintain prices;

    ii.  the extent and duration of such agreement(s), combination(s) or conspiracy(ies);

iii.    the methods and mechanisms by which Defendants effectuated the same;

iv.    the role of each Defendant therein;

v.    whether Defendants' conspiratorial conduct violated Section 1 of the Sherman Act;

vi.    whether Defendants and their co-conspirators took affirmative steps to conceal their agreement(s)

whether Defendants and their co-conspirators took affirmative steps to conceal their agreement(s);

vii.    whether Defendants' conspiratorial conduct caused the prices of U.S. Freight Forwarding Services to be inflated;

viii.    the appropriate measure of monetary relief, including the appropriate measure of damages; and

ix.    whether Plaintiffs and Class members are entitled to declaratory and/or injunctive relief, among others.

188.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.  No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.  The Class is readily ascertainable from Defendants' records.

189.     Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.  Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

## TRADE AND COMMERCE

190.     Beginning at least as early as January 1, 2001, and continuing until the January 4, 2011 the exact dates unknown to Plaintiffs at this time, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act.

191.     During the Class Period, Defendants sold substantial quantities of U.S.  Freight Forwarding Services in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where Defendants produced their Freight Forwarding Services.

192.     Defendants' business activities that are the subject of this Complaint were within the flow of and substantially affected interstate trade and commerce. The collusive behavior alleged in this Complaint has a direct, substantial and foreseeable adverse effect on U.S. commerce, including on U.S. import trade and commerce and U.S. export trade and commerce.

193.     Freight forwarder services for air freight on imports into and exports out of the US have a substantial effect on US commerce.  During the years 2001 to 2006, the amounts of air freight charges for imports into and exports out of the US were as follows: $9.4 billion in 2001; $10.7 billion in 2002; $11.9 billion in 2003; $13.7 billion in 2004; $15.4 billion in 2005; and $16.3 billion in 2006.

194.     Charges for air freight between Asia and the United States amounted to $6.5 billion in 2004; $ 7.2 billion in 2005; $7.3 billion in 2006; and $7.4 billion in 2007.

---

THIRD AMENDED CLASS ACTION COMPLAINT                                            65

195.    Charges for air freight on imports into U.S. from the U.K. during the years 2001 to 2007 were as follows: $386 million in 2001; $493 million in 2002; $412 million in 2003; $431 million in 2004; $393 million in 2005; $402 million in 2006; and $397 million in 2007. The majority of imports from the U.K. into the U.S. originated from London's Heathrow Airport: 58.8% in 2007, 59.8% in 2006, 60.6% in 2005, 59.2% in 2004, 58.3% in 2003, 56.8% in 2002 and 52.9% in 2001.

## THE FREIGHT FORWARDING SERVICES INDUSTRY

**A.    The Market for Freight Forwarding Services**

196.    Defendants and other Freight Forwarders organize the transport of products, commodities and other goods, by all modes of transportation, including air, ground (rail and truck) and ship, on behalf of customers such as Plaintiffs and members of the Class. In some instances, Defendants also transport the goods themselves, in addition to coordinating their transport.

197.    Acting for the shipper, a Freight Forwarder may assist in all aspects of cargo transport, from pick up to drop off, and thus provides a wide variety of services. The Freight Forwarder may advise on exporting costs, including freight costs, port charges, consular fees, costs of special documentation, insurance costs and freight handling fees. The Freight Forwarder may also prepare and file required export documentation such as the bill of lading and routing appropriate documents to the seller, the buyer or a paying bank. Further, the Freight Forwarder may advise on the most appropriate mode of cargo transport and making arrangements to pack and load the cargo. The Freight Forwarder may reserve the necessary cargo space on a vessel, aircraft, train, or truck. Finally, a Freight Forwarder may arrange with overseas customs brokers to ensure that the goods and documents comply with customs regulations.

198.    International Freight Forwarders are licensed by the International Air Transport Association (IATA) to handle airfreight and the Federal Maritime Commission to handle ocean freight.

199.    Plaintiffs and other Class members use Freight Forwarding Services to assist in the transport of freight, generally over long distances.  While some Freight Forwarders also provide services for the actual transport of the goods, the majority of Freight Forwarders are brokers for Freight Forwarding Services.  Using a Freight Forwarder is often the fastest and most efficient means for a shipper or receiver to organize the transportation of freight.

200.    In 2007 alone, the total value of global trade in consumer goods for the freight forwarding industry has been estimated to be over $500 billion.  As long ago as 2002, the most recent information available from the U.S. Census Bureau, the Freight Forwarding Services industry in the United States alone reported revenues of $27.7 billion.  *See* U.S. Census Bureau's 2002 Economic Census for Transportation and Warehousing, available at http://www.census.gov/econ/census02/data/us/US000_48.HTM#N488 (last visited 07/10/09).

201.    Internationally, the freight forwarding industry has experienced significant year-on-year growth as a result of increased international trade volumes.  Freight Forwarders' revenue and profits have surged in recent years.

202.    According to Philip Damas, director of research for London-based Drewry Shipping Consulting, a leading provider of economic, marketing and technical information to the international shipping industry, the freight forwarding industry controlled about 20 percent of the global container market in 2006 and earned revenue of $50 billion (not counting customs services).  In comparison, Freight Forwarders earned $30 billion from the airfreight market where they control 95 percent of the market.  According to Damas, the ocean Freight Forwarder

---

THIRD AMENDED CLASS ACTION COMPLAINT                              67

market was growing at near double-digit rates through 2007.  The very large forwarders, including Defendants Kuehne + Nagel, DHL, Panalpina, Schenker, and more recently UPS, are gaining market share even faster.  For example, Kuehne + Nagel sea freight volume increased 19.4 % in 2005.

203.    The May 2007 edition of *Global Logistics & Supply Chain Strategies* ("*GL&SCS*")provides the following overview regarding the demand for, and growth of, the Freight Forwarding Services industry:

> The cravings of the world's largest manufacturers and retailers for outsourced logistics services seems to know no end.  In 2006, Fortune's Global 500 companies spent $170 [billion] on third-party logistics.  In the U.S. alone, [third party logistics] revenues exceeded $110 [billion].  The menu, however, is still meat and potatoes.
>
> More than three quarters of [third party logistics services] purchased were for everyday tactical functions such as transportation management, warehousing and similar value-added services.

204.    The structure of the Freight Forwarding industry facilitated the implementation and promulgation of the price-fixing practices of which Plaintiffs complain.  For example:

i.    Freight Forwarding Services are commodity-like and are highly fungible. That is, Freight Forwarding Services provided by one Freight Forwarder are readily substitutable for the Freight Forwarding Services provided by another Freight Forwarder, and therefore sales are driven primarily by price.  This commodity-like nature of these services is demonstrated by the fact that Freight Forwarders routinely provide Freight Forwarding Services for each other.

ii.      The principal competitors for Defendants in this freight forwarding industry are each other and other Freight Forwarders.

iii.     Freight Forwarding Services are highly concentrated, which facilitates coordination of prices among its major providers, including Defendants. Indeed, the industry has experienced increasing concentration. The industry has experienced an unprecedented level of mergers and acquisitions, resulting in a small number of global players, including Defendants. Indeed, during the Class Period and as detailed more specifically below, Defendants accounted for a substantial portion of Freight Forwarding Services.

iv.      The Freight Forwarding industry has substantial barriers to entry. To enter and maintain a viable competitive presence in the Freight Forwarding industry requires an expenditure of capital investment and other resources over a long period of time. Specifically, a viable entry requires not only significant capital and overhead expenditures, but also requires that a new provider capture a significant share of market from existing providers. New entry is thus both expensive and risky. Due to the increasing globalization of the world's economy, Freight Forwarders, to survive, must also have global operations, as do Defendants. Defendants have thousands of warehouses in dozens of countries. For example, Defendant DHL has 1,600 warehouses around the world, and air freight forwarding operations in more than 150 countries, and Defendant Kuehne + Nagel has

operations in more than 100 countries.  The other Defendants have similar resources.

**B.**    <u>**Defendants Have Significant Market Share**</u>

205.    Defendants are among the largest and leading providers of Freight Forwarding Services in the United States and worldwide.  During the Class Period, Defendants handled a substantial percentage of Freight Forwarding business.  According to the May 2007 edition of Global Logistics & Supply Chain Strategies ("GL&SCS"), Defendants include the world's three largest third-party logistics providers based on 2006 revenues (DHL, $31 billion; Kuehne + Nagel, $14.9 billion; and Schenker / BAX Global $14 billion).  Other Defendants on the list of the top 25 global third party-logistic providers include: UPS ranked 4th ($8 billion), Panalpina ranked 5th ($7.2 billion), Agility (f/k/a Geo-Logistics) ranked 7th ($4.9 billion), Expeditors ranked 9th ($4.6 billion), UTi ranked 11th ($3.5 billion), Nippon ranked 12th ($3.4 billion), EGL ranked 13th ($3.2 billion), Hellmann Worldwide Logistics ranked 16th ($2.6 billion), Kintetsu ranked 18th ($2.3 billion), Menlo Worldwide (a/k/a UPS) ranked 20th ($4.2 billion), and Toll ranked 22nd ($1.1 billion).

206.    Defendants possess significant market share.  As noted in more detail below in part C of "The Freight Forwarding Industry and Government Investigations" section of this Complaint, seven of the Defendants DHL, Kuehne + Nagel, Panalpina, Schenker, UTi, Agility (f/k/a Geo Logistics) and ABX Logistics, constitute the trade association known as Freight Forward International ("FFI").  FFI's website notes that its seven members alone had a 2006 market share of more than 25% in air freight forwarding, and nearly 30% in ocean freight forwarding.  Moreover, the Japanese Defendants (defined below) control approximately 75% of

the Japanese market for international Freight Forwarding Services, with Defendants Nippon,

Kintetsu, and Yusen holding a combined market share of nearly 50%.

207.    *GL&SCS* noted the following information regarding the enormous revenues

generated by the leading Freight Forwarders, including the Defendants, and rapid consolidation

in the industry:

> The *GL&SCS* Top 25 Global [third party logistics providers] for
> 2006 continued to bulk up with gross revenues of $131.5 [billion],
> up more than 20 percent over 2005.  These heavyweights are
> increasing their market share each year, both by swallowing each
> other and by expanding their own global reach, physical handling
> abilities and the quality of their information technology.

208.    *GL&SCS* also described large customers' increasing reliance on a concentrated

number of Freight Forwarders including Defendants, and Freight Forwarders' resulting explosive

revenue growth:

> While large customers are reticent to put all their business with one
> logistics provider, they are more and more inclined to limit the
> number of core [third party logistics providers].  As a consequence,
> the large players will continue to capture more of the strategic
> relationships going forward.  For example, the top five [third party
> logistics providers] [including Defendants DHL, Kuehne + Nagel,
> Schenker/BAX Global, and Panalpina] grew their revenue by 37
> percent last year while world [gross domestic product] grew by
> five percent.  [Defendant] Kuehne + Nagel leads this growth wave
> with a 39.3 percent revenue increase.

209.    *GL&SCS* also detailed the leading role that Freight Forwarding Services played in

the dramatic revenue growth described above:

> As companies extend their supply chains around the world, it is not
> surprising that the greatest area of revenue growth for [third party
> logistics providers] was global transportation and forwarding.  The
> revenue growth was also reflected in unit volume increases.  For

---

THIRD AMENDED CLASS ACTION COMPLAINT                                      71

> example, ocean freight leader [Defendant] Kuehne + Nagel
> handled 2.3 million TEU's [twenty foot equivalent units – twenty
> foot containers] last year.  Other leading ocean forwarders all
> handling more than one million TEU's included:
>
> • [Defendant] DHL              1.9 million
>
> • [Defendant] Schenker         1.3 million
>
> • [Defendant] Expeditors       1.2 million
>
> • [Defendant] Panalpina        1.2 million

210.   Defendant DHL was the world's largest air-freight forwarder in 2006, according

to *GL&SCS*, handling 2.4 million tons of cargo and generating $6.4 billion in airfreight revenue.

Defendants Schenker, Panalpina, Kuehne + Nagel, and EGL were the next four largest in terms

of air-freight forwarding revenue.

211.   GL&SCS further noted the following with respect to DHL:

> DHL Logistics is by far the world's largest [third party logistics *provider*] with
> annual revenue nearly twice that of its nearest rival.  Its gross revenue take is:
> DHL Exel Supply *Chain* [$16.2 billion], DHL Global Forwarding [$12.6 billion]
> and DHL Freight [$2.7 billion].  In fact, DHL Logistics now exceeds the revenues
> of its better-known sister division, DHL Express, and even the postal division of
> its parent company, Deutsche Post World Net . . . DHL Logistics achieved its
> growth rapidly through acquisitions . . . just a few years ago it purchased
> Danzas/AEI, then the world's largest freight forwarder.

212.   In 2005, it was estimated that the top ten Freight Forwarders, including many of

the Defendants, controlled more than 45% of the market.

**C.     World-Wide Antitrust Agency Raids on Defendants' Operations**

213.   In October 2007, governmental antitrust enforcers in the United States, Europe

and elsewhere subpoenaed or raided the offices of numerous Defendants in connection with

suspected anticompetitive practices in the Freight Forwarding Services industry.  For example,

on October 11, 2007, the European Commission publicly announced:

---

THIRD AMENDED CLASS ACTION COMPLAINT                                    72

The European Commission can confirm that on 10th October 2007 Commission officials carried out unannounced inspections at the premises of various providers of international freight forwarding services.  Freight forwarding is the organisation of transportation of items along with related activities such as customs clearance, warehousing and ground services. The Commission has reason to believe that the companies concerned may have violated EC Treaty rules that outlaw restrictive business practices (Article 81).

The Commission officials were accompanied by their counterparts from the relevant national competition authorities.
Surprise inspections are a preliminary step in investigations into suspected cartels . . .

214.    Similarly, on October 10, 2007, a spokeswoman for the U.S. Department of Justice confirmed its Antitrust Division's investigation into "anticompetitive practices in the international freight forwarding industry" and that it was "coordinating with the EU and other foreign competition authorities." *See* U.S. Probing Freight Forwarding Industry, available at www.reuters.com/article/governmentFilingsNews/idUSN1027773220071010 (dated Oct. 10, 2007; visited Oct. 23, 2007).

215.    One or more Defendants have already admitted that price-fixing occurred.  For example, on October 15, 2007, e-Cargonews Asia, a publicly available on-line version of the Asian cargo industry newspaper Cargonews Asia, reported that "Deutsche Bahn won't rule out that its logistics unit Schenker could have participated in illegal price-fixing.  Deutsche Bahn Logistics chief Nobert Bensel said there are certain reasons to suspect that the EC Treaty's anti-trust rules may have been violated.  Deutsche Bahn last week said the offices of its Zurich-based Schenker transport unit were searched in South Africa, Switzerland and the US."

216.    DHL has sought conditional immunity from multiple antitrust enforcers around the world in exchange for cooperating against the other co-conspirators.  Specifically, on

October 11, 2007, the Bloomberg news agency reported that the world-wide "probe began when a company turned itself in to antitrust regulators in Switzerland, the U.S. and the EU for possible violations, [Patrick] Durcey of [Swiss competition authority] Weko said." On that same day, the Associated Press news agency reported that "[d]ocuments provided by the company aroused sufficient suspicion to trigger the international investigation." The company that turned itself in is DHL.

217.    The world-wide raids extended to South Africa. On October 15, 2007, Creamer Media, a South African news agency, publicly reported:

> The South African Competition Commission conducted a raid on October 10 on three freight forwarding companies – two international operations and one local company – following a complaint, senior legal analyst Nandi Mokoena said.
>
> The companies are suspected to have engaged in practices which might contravene the Competition Act, and information has indicated that they may be part of an international price-fixing cartel.
>
> Mokoena said that the information received indicated that three companies were engaged in price-fixing on war-risk surcharges (surcharges imposed for security following the attacks on September 11, 2001), security charges and the fee charged for the automated manifest system, which is a data system used to input, for example, the contents of cargo, its country of departure and its destination.
>
> The commission conducted the raids in coordination with its counterparts from the European Commission and the US Department of Justice.
>
> "The raids were conducted simultaneously between the three competition jurisdictions for maximum impact on a cartel activity whose reach is believe to be international . . . ," the commission noted in a statement.

218.    The worldwide investigation into Defendants' conduct included raids in the

United States, the United Kingdom, and Switzerland.  On October 10, 2007, Defendant Kuehne

+ Nagel stated in a press release that "various competition authorities have carried out an

unannounced inspection at a number of international freight forwarding companies.  The

inspection encompassed amongst others Kuehne + Nagel in Switzerland, in the USA, and in the

UK."

219.    The investigations extend to Defendant Spedlogswiss, a trade association.  In

antitrust cases, trade association meetings frequently are found to have served as the situs for

collusive conduct, as they provide an ostensibly legal reason to meet, thus providing "cover" for

illegal conspiratorial activity.  On October 10, 2007, Defendant Panalpina stated:

> In connection with alleged concerted practices in the area of
> transportation services, on 10 October 2007 the Swiss Federal
> Competition Commission (Weko) conducted a search also of the
> premises of Panalpina in Basel.  A similar investigation by US
> anti-trust authorities has been conducted in the company's
> headquarters in the USA.
>
> The investigation of Weko is aimed at the Association of Swiss
> Forwarders (Spedlogswiss) and several forwarding companies,
> among them Panalpina.

On October 11, 2007, a spokesman for Defendant Panalpina, Martin Spohn, confirmed that the

raid in the United States occurred at Panalpina's offices in Morristown, New Jersey.

220.    On October 11, 2007, the Dow Jones Newswires news agency reported that "[t]he

*probe* includes the Swiss logistics trade body."  Additionally, Dow Jones reported that "Dora

Naumann, a spokeswoman for Spedswisslog [sic], confirmed the raids on its Basel office . . ."

221.    On October 10, 2007, Defendant Expeditors revealed the following in a press

release, which it restated in an SEC Form 8-K issued that day:

THIRD AMENDED CLASS ACTION COMPLAINT                                    75

Expeditors International of Washington, Inc., the international
freight forwarding and logistics company, said today they were the
recipient of a subpoena issued by the U.S. Department of Justice
(DOJ) ordering the company to produce certain information and
records relating to an investigation of air cargo freight forwarders.

222.    On October 10, 2007, the Reuters news agency reported that United States

"Department of Justice spokeswoman Gina Talamona said the DOJ antitrust division was

investigating possible anti-competitive practices in the international freight forwarding industry.

She also confirmed that the department was 'coordinating with EU and other foreign competition

authorities.'"

223.    On October 10, 2007, the *Houston Chronicle* reported that government

investigators raided the Houston and London offices of Defendant EGL, and that a spokesman

for EGL stated that it "believes the investigation is related to surcharge practices in the global

freight industry."  The article further noted that "Pat Villafranca, a spokeswoman for the FBI,

said agents raided an EGL office near Bush Intercontinental Airport."

224.    On October 10, 2007, Defendant UTi Worldwide, Inc. filed an SEC Form 8-K

and stated:

[The United States Department of Justice] executed a search
warrant on a subsidiary of the company on October 10, 2007 . . .
On the same day, UTi received a notice from the Canadian
Competition Bureau that the Bureau has commenced an
investigation with respect to alleged anti-competitive activity of
persons involved in the provision of international freight
forwarding services to and from Canada and requesting that UTi
preserve any records relevant to such investigation.

225.    On October 11, 2007, Defendant Deutsche Bahn AG issued a press release from

Dr. Peter Sauer, spokesman for Defendant Schenker AG, and stated:

Within the framework of an inspection ordered by the Commission
of the European Communities in Brussels, representatives of the

---

THIRD AMENDED CLASS ACTION COMPLAINT                                    76

General Directorate for Competition and of the German Federal
Antitrust Authority, Bundeskartellamt, have been carrying out an
investigation into Schenker AG in Essen.  Similar investigations
have been conducted at Schenker's offices in South Africa,
Switzerland and the US by the competent authorities of the various
countries.

226.    On October 11, 2007, the Bloomberg news agency reported that "Deutsche Post

AG, Europe's biggest mail service, was 'contacted' by Swiss, EU and U.S. authorities seeking

information," according to Nicole Mommsen, a spokeswoman for the company.  On that same

day, the Dow Jones Newswires news agency reported that "DHL, an international shipping unit

of Deutsche Post AG, also said European authorities had contacted the company . . . ."  On

October 12, 2007, AmericanShipper.com, an on-line publication reporting on the international

logistics industry, publicly reported that "DHL spokeswoman Silje Skogstad confirmed that her

company's global forwarding division had received requests for information from the Swiss, EU,

and U.S. authorities . . . ."

227.    On October 11, 2007, the Dow Jones Newswires news agency stated that

Defendant "Kuehne & Nagel's CFO [Gerald] van Kesteren said that the investigation is a spill-

over from an earlier probe into price fixing of fuel surcharges by the airline industry.  Earlier this

year, British Airways and Korean Airlines pleaded guilty to charges of price-fixing."  On

October 12, 2007, the *Wall Street Journal* online edition reported that "[t]he investigation centers

on whether the freight forwarders fixed prices for fuel and other charges . . . ."  On October 12,

2007, AmericanShipper.com reported that "Rolf Altorfer, chief executive officer for the U.S.

operations of Swiss forwarder Kuehne + Nagel, said his company's offices had been visited by

investigators who removed some files and mirrored hard drives on computers."

THIRD AMENDED CLASS ACTION COMPLAINT                              77

228.     On October 12, 2007, AmericanShipper.com reported that worldwide competition authorities were "looking into activities of more than a dozen [freight forwarding] companies, including some of the largest in the world.  An executive with one of the companies involved gave American Shipper the names of 15 firms that he said were listed on the subpoena served on his company."

229.     On October 22, 2007, the Thomson Financial News agency reported that "Kuehne &Nagel International AG said it has launched an internal investigation after competition authorities have searched the logistics group's premises in Switzerland, the US and the UK . . .." The article further noted that Kuehne + Nagel's deputy Chief Executive Officer Reinhard Lange "said that *all business units* apart from contract logistics were affected by the investigation." According to its 2006 "Report of the Business Units," Kuehne + Nagel's business units include the following:  Airfreight; Seafreight; and Rail and Road Logistics.  Previously, on October 11, 2007, the Thomson Financial News agency reported that Kuehne + Nagel's "Lange said it was unlikely that there were any irregularities at group level, even though he did not rule out incidents of malpractice in individual units."

**D.     Several Defendants plead guilty, or agree to plead guilty, to U.S. DOJ's criminal price-fixing in the Freight Forwarding industry**

230.     Several Defendants have already pled guilty to price-fixing the surcharges that are the subject of this Complaint.  Several other Defendants have agreed to plead guilty but have not yet formally had their individual plea agreements entered.

231.     On November 4, 2011, Panalpina entered into a plea agreement admitting to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint. Panalpina and its subsidiaries were fined $11.9 million for their involvement in the conspiracies.

---

Panalpina pled guilty to a worldwide conspiracy to fix the Air AMS Surcharge, the CAF Surcharge and the Peak Season Surcharge.

232.    Also on November 4, 2011 Kuehne + Nagel entered into a plea agreement admitting to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.  Kuehne + Nagel and its subsidiaries were fined $9.8 million for their involvement in the conspiracies. Kuehne + Nagel pled guilty to conspiring to fix the prices on the Air AMS Surcharge, the NES Surcharge, the CAF Surcharge, and the Peak Season Surcharge.

233.    Also on November 4, 2011, EGL entered into a plea agreement admitting to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint. EGL and its subsidiaries were fined $4.4 million for their involvement in the conspiracies.  EGL pled guilty to conspiring to fix the prices on the Air AMS Surcharge and the NES Surcharge.

234.    Defendant Geologistics International Management (Bermuda) Limited also entered into a plea agreement on November 4, 2011, admitting that it utilized its subsidiaries to engage in criminal price-fixing conduct related to claims alleged in this Complaint.  Geologistics and its subsidiaries were fined $687,960 for their involvement in the conspiracy.  Geologistics pled guilty to conspiring to fix the prices on the Air AMS Surcharge.

235.    On December 9, 2011, Schenker, along with its subsidiary BAX Global, Inc. entered into a plea agreements admitting to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.  Schenker and its subsidiaries were fined $23.2 million for their involvement in the conspiracies.  They pled guilty to conspiring to fix the prices on the Air AMS Surcharge, the CAF Surcharge, the NES Surcharge, and the PSS Surcharge.

236.    On November 2, 2012, Defendant Vantec entered into a plea agreement admitting to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.

THIRD AMENDED CLASS ACTION COMPLAINT                                          79

Vantec and its subsidiaries were fined $3.3 million for their involvement in the conspiracies.  It pled guilty to conspiring to fix various components of fees and surcharges on Freight Forwarding Services, including a fuel surcharge and security fees.

237.    On November 1, 2012, Defendant Hankyu Hanshin entered into a plea agreement admitting to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.  Hankyu Hanshin and its subsidiaries were fined $4.5 million for their involvement in the conspiracies.  It also pled guilty to conspiring to fix various components of fees and surcharges on Freight Forwarding Services, including a fuel surcharge and security fees.

238.    On November 1, 2012, Defendant Nippon Express pled guilty to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.  Nippon Express and its subsidiaries have agreed to pay a $21.1 million fine.  It pled guilty to conspiring to fix various components of fees and surcharges on Freight Forwarding Services, including a fuel surcharge and security fees.

239.    On November 2, 2012, Defendant Nissin pled guilty to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.  Nissin and its subsidiaries agreed to pay a $2.6 million fine.  It pled guilty to conspiring to fix various components of fees and surcharges on Freight Forwarding Services, including a fuel surcharge and security fees.

240.    On November 1, 2012, Defendant Nishi-Nippon Railroad Co. Ltd. pled guilty to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.  Nishi-Nippon has agreed to pay a $4.6 million fine.  It pled guilty to conspiring to fix various components of fees and surcharges on Freight Forwarding Services, including a fuel surcharge and security fees.

241.    Defendant Kintetsu has agreed to plead guilty to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.  Kintetsu and its subsidiaries have agreed to pay a $10.4 million fine.

242.    Defendant Yamato has agreed to plead guilty to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.  Yamato and its subsidiaries agreed to pay a $2.3 million fine.

243.    Defendant MOL Logistics has agreed to plead guilty to criminal price-fixing conduct in relation to several of the surcharges alleged in this Complaint.  MOL Logistics and its subsidiaries agreed to pay a $1.8 million fine.

E.    **The Japan Fair Trade Commission Finds Several Defendants Guilty   of Price-Fixing**

244.    On April 16, 2008, several news outlets reported that the Japanese antitrust authority, the JFTC, had raided at least 12 Freight Forwarders and one industry trade association as part of an antitrust investigation into whether the Freight Forwarders had formed an illegal cartel to fix prices on air cargo charges.

245.    After several months of investigation, the JFTC found and determined that the Freight Forwarders had violated antitrust laws.  On March 18, 2009, the JFTC issued a cease-and-desist order and levied $94.7 million in fines against a number of international Freight Forwarders for forming an illegal cartel to raise air cargo charges. *See* Translation of JFTC Order attached as Exhibit A hereto.

246.    The JFTC held that the following 14 Defendants conspired to restrict competition by fixing prices on four separate surcharges, thereby "substantively restrict[ing] competition in the field of the International Freight Forwarding Business": (1) Nippon Express Co., Ltd.; (2) Yusen Air & Sea Service Co., Ltd.; (3) Kintetsu World Express, Inc.; (4) Nishi-Nippon Railroad

THIRD AMENDED CLASS ACTION COMPLAINT                              81

Co., Ltd.; (5) Hankyu Hanshin Express Holdings Corporation; (6) Nissin Corporation; (7) Vantec World Transport Co., Ltd.; (8) "K" Line Logistics, Ltd.; (9) Yamato Global Logistics Japan Co., Ltd.; (10) MOL Logistics (Japan) Co., Ltd.; (11) Hanshin Air Cargo Co., Ltd.; (12) United Aircargo Consolidators, Inc.; (13) DHL Global Forwarding Japan K.K.; and (14) Airborne Express, Inc. (collectively the "Japanese Defendants").

247.   The JFTC fined the Japanese Defendants (except for DHL Global Forwarding Japan K.K. and Airborne Express, Inc., whom received amnesty for their early cooperation in the JFTC's investigation) for their participation in the conspiracy.  The largest fines were imposed on Defendants Nippon ($26.1 million), Yusen ($18.1 million), and Kintetsu ($15.6 million).

248.   The JFTC also ordered the Japanese Defendants that still participated in the international freight forwarding industry to adopt resolutions at meetings of their respective boards of directors (or, with respect to Defendant Vantec World Transport Co., Ltd., at a general meeting of shareholders) confirming that the illegal agreements described in detail below had terminated and ensuring "that, in the future, the tariffs and surcharges in respect of the International Freight Forwarding Business will be determined, not by any agreement among themselves or in a concerted manner with other companies, but independently by each company."  In addition, each company was ordered to notify its co-conspirators, customers, and employees of the measures it was taking to comply with said resolutions, and to institute guidelines, training and auditing procedures to ensure that their employees were aware of and in compliance with the antitrust laws.

249.   According to news reports, immediately following the issuance of the JFTC's order Defendants Nippon, Yusen, and Kintetsu all pledged to strive to prevent a recurrence of a

similar incident.  Defendant Hanshin Air Cargo announced that "although it has some differences of opinion" with the JFTC, it had decided to accept the JFTC's cease-and-desist order and fine.

250.    The details of the Japanese Defendants' anticompetitive agreements and conduct are contained in the JFTC's cease-and-desist order attached hereto and incorporated herein by reference as Exhibit A.

251.     According to the JFTC, around August 2002 the "Airlines" (*i.e.*, companies engaged in the international air cargo transport business) decided to begin imposing a fuel surcharge on Freight Forwarders, including the Japanese Defendants, with respect to all freight loaded on aircrafts departing from Japan.  Soon thereafter, the Airlines informed Defendants Nippon, Kintetsu, and Yusen of their intent to begin imposing a new fuel surcharge.

252.    In response, on September 18, 2002, the Japanese Defendants (except DHL Global Forwarding Japan K.K. and Nippon) agreed among themselves that when they were charged a fuel surcharge by the Airlines they in turn would charge their customers a corresponding fuel surcharge.  In October 2002, the Airlines began imposing the new fuel surcharge.  No later than November 8, 2002, Defendants DHL Global Forwarding Japan K.K. and Nippon joined the other Japanese Defendants' illegal fuel surcharge agreement.

253.    On or about August 13, 2004, the Airlines began phasing in a new fee, which they charged the Japanese Defendants and other Freight Forwarders.  The new fee was supposedly designed to cover costs arising in relation to the new Advanced Notification System employed by the United States Customs and Border Protection with regard to all freight that was delivered to, or traveled through, the United States.  Under this new system, prior to flight, Airlines were required to electronically provide U.S. customs authorities with information related to the freight to be loaded on an aircraft departing from an airport outside the United States and landing in an

airport inside the United States by way of a customs clearance system called the Automated

Manifest System ("AMS").  The Airlines decided to charge the Freight Forwarders a certain

preset fee to send the required information to the customs authorities and provided defendant

Kintetsu with an explanation to this effect.

254.   In response to the Airline's new fee, the Japanese Defendants again agreed among

themselves to pass on this new fee to their customers.  On November 22, 2004, the Japanese

Defendants agreed that they would institute an additional charge, the "AMS charge" ("Japanese

Air AMS") which would be set at a rate no lower than the agreed minimum rate of 500 yen.  The

Japanese Defendants agreed to implement this AMS charge by December 13, 2004, or at the

very latest January 1, 2005.

255.   On February 20, 2006, the Japanese Defendants agreed that they would institute

two new surcharges, a "security charge" and an "explosives examination charge," at rates no

lower than the agreed minimum rates of 300 yen and 1,500 yen, respectively.  These new

surcharges were allegedly implemented to cover costs arising as a result of complying with new

security regulations imposed by the Japanese Transport Ministry.

256.   The Japanese Defendants imposed the fuel, AMS, security and explosives

examination surcharges on their customers, either directly or via other parties (including agents),

at rates no lower than the agreed minimum rates, thereby substantively restricting competition in

the field of Freight Forwarding Services.

257.   The Japanese Defendants reached the agreements discussed above at EBIC

meetings of the Japan Aircargo Forwarders Association ("JAFA").  The EBIC, or Executive

Board of International Committee, is an organization within JAFA.  The Japanese Defendants

used EBIC meetings to exchange information regarding the status of the receipt of the fuel,

AMS, security and explosives examination surcharges in order to implement and monitor their conspiracy.

258.    Upon receiving information that the U.S. Department of Justice and other antitrust authorities were investigating Freight Forwarders, Defendants Nippon, Kintetsu, and Yusen held a meeting at Nippon's head office in Minato-ku Tokyo and agreed not to hold any more EBIC meetings.  No more EBIC meetings were held in compliance with their agreement.

259.    Based on JAFA's role in the conspiracy, the JFTC requested that JAFA "take preventative measures so that the activities such as described in 1-(2) above [outlining the illegal agreements regarding the fuel, AMS, security and explosives examination surcharges reached at EBIC meetings of JAFA] shall not be reiterated at any meetings of the Association."

**F.    The European Commission imposes €169 million in fines on Freight Forwarders for anticompetitive conduct**

260.    The European Commission has fined several of the Defendants named in this Complaint for engaging in anticompetitive conduct with respect to the surcharges outlined herein.

261.    Defendant Kuehne + Nagel was fined €5.3 million for its involvement in the NES surcharge, €36.6 million for its involvement in the AMS surcharge, €451,000 for its involvement in the CAF surcharge and €11.2 million for its involvement in the Peak Season surcharges.

262.    Defendant Schenker was fined €3.6 million for its involvement in the NES surcharge, €23 million for its involvement in the AMS surcharge, €3 million for its involvement in the CAF surcharge, and €2.6 million for its involvement in the Peak Season surcharges.

263.    Defendant UPS was fined €2.2 million for its involvement in the NES surcharge, €3.5 million for its involvement in AMS, and €3.9 million for its involvement in the CAF surcharge.

264.    Defendant EGL was fined €2 million for its involvement in the NES surcharge, €2.2 million for its involvement in the AMS surcharge, €935,000 for its involvement in the CAF surcharge and €2.6 million for its involvement in the Peak Season surcharges.

265.    Defendant DHL received leniency for its involvement in the NES surcharge, AMS surcharge, CAF surcharge, and Peak Season surcharges.

266.    Defendant Panalpina was fined €23.6 million for its involvement the AMS surcharge, €3.2 million euros for its involvement in the CAF surcharge, and €19.5 million for its involvement in the Peak Season surcharges.

267.    Defendant UTi was fined €3 million for its involvement in the AMS surcharge.

268.    Defendant DSV was fined €379,00 for its involvement in the AMS surcharge.

269.    Defendant Nippon Express was fined €812,000 for its involvement in the CAF surcharge.

270.    Defendant Kintetsu was fined €623,000 for its involvement in the CAF surcharge.

271.    Defendant Hellman was fined €4.2 million for its involvement in the Peak Season surcharges.

272.    Defendant Expeditors was fined €4.1 million for its involvement in the Peak Season surcharges.

273.    Defendant Toll Global Forwarding was fined €2.9 million for its involvement in the Peak Season Surcharge.

274.    Defendant Geo Logistics was fined €2.2 million for its involvement in the AMS surcharge and €2.6 million for its involvement in the Peak Season surcharges.

275.    Defendant Yusen was fined €319,000 for its involvement in the CAF surcharge.

276.    Some of the above-fines were reduced for a particular Defendant's cooperation in the ongoing EU investigation.

**G.    Defendants' Trade Association Memberships**

277.    As noted above, Defendant Spedlogswiss, aka The Association of Swiss Forwarders, is a trade association with offices in Basel.  Those offices were raided by competition authorities.  Its members include Defendants Kuehne + Nagel; Panalpina; EGL; Schenker; DHL; and UTi.  There are various subsections of Spedlogswiss—for example, the Basel section.  One of the stated purposes of the Basel section, as stated on Spedlogswiss' website and translated, is to "promote solidarity among the member companies."  The Basel section further notes that "[i]t is a unity, and acts as such."

278.    Moreover, Defendants constitute all of the seven members of the trade association "FFI" headquartered in England.  Its website states that FFI is "an interest grouping of seven of the leading global forwarders and logistics providers" and identifies its members as Defendants "DHL", "Kuehne + Nagel", "Panalpina", "Schenker", and "UTi", "Agility"(f/k/a Geo Logistics) and "ABX Logistics".  FFI's website further states that "[t]he seven participating companies in FFI employ more than 324,000 people with a consolidated turnover for 2006 of €60.98 billion euro and a total market share of more than 25% in the airfreight and nearly 30% in ocean freight."  FFI additionally notes that it "seeks to reinforce the common interests of the whole forwarding and logistics industry" and "[c]asting itself as a bridgehead for the industry, the actions of FFI are in support of the existing national and international associations of freight forwarders."

279.    FFI's website continues that "FFI is governed by the CEO's of the participating companies.  The CEO's will meet twice a year focusing on the issue of strategic interest for the

industry."  Additionally, "[w]orking committees have been established in the following areas:

Air; Customs; Overland; Security," and "[a]ll companies are represented in the Working

Committees on Management Board level or equivalent."  The Working Committees "meet 2-3

times per year."

280.     FFI states that its "vision" is to provide its members "with a knowledge-sharing

platform," and that one of its "goals" is to "provide invaluable advise [sic] and facilitate

information exchange between members."

281.     The Japanese Defendants are or were regular members of the trade organization

JAFA.  They were also members of an organization within JAFA, the EBIC.  The Japanese

Defendants attended EBIC meetings, which were usually held every two months.

282.     On its website JAFA describes itself "[a]s the unique organization to represent the

interests of air freight forwarding industry in Japan, [our] members are composed of air cargo

forwarders, consolidators, express carriers and/or air cargo agents, either they are domestic or

foreign companies."

283.     Several high-level executives of the Japanese Defendants and their related

companies were listed as JAFA board members, including: Toshifumi Kato (President, MOL

Logistics (Japan) Co., Ltd.); Mamoru Shozui (President, "K" Line Logistics, Ltd.); Hiroshi

Kimura (President & COO, Vantec World Transport Co., Ltd.); Kazufumi Yamaguchi (Senior

Managing Director Executive Officer, Nissin Corporation); Yutaka Yamada (President, Hanshin

Air Cargo Co., Ltd.); Yoshiki Fujita (Operating Officer Administration, DHL Global Forwarding

Japan K.K.); Toshinori Yuasa (President, United Aircargo Consolidators, Inc.); Junichi Sasahara

(Vice President, Operations, DHL Japan, Inc.); Yasuo Ito (Chairman, Nippon Courier Service

Co., Ltd.); Takanori Tada (Vice President, Hankyu Express International Co., Ltd.); Katsuji

Inoue (President, Hankyu Cargo Service Co., Ltd.); and Etsuo Ogawa (Chairman, Yamato Logistics Co., Ltd.).  JAFA's Chairman was listed as Keiichi Nakatani (Executive Vice President, Nippon Express Co., Ltd.).  Vice Chairmen include: Satoshi Ishizaki (Senior Managing Director, Kintetsu World Express, Inc.); Shunichi Yano (President, Yusen Air & Sea Service Co., Ltd.); and Osamu Okada (President, Yamato Global Express Co., Ltd.).

284.    As alleged in this Complaint, these Defendants reached their wrongful agreements on the fuel, AMS, 2006 security and explosives examination surcharges, among other ways, during EBIC meetings of JAFA.  Defendants used EBIC meetings to exchange information regarding the status of the receipt of the fuel, AMS, security and explosives examination surcharges in order to implement and monitor their conspiracy.

285.    According to the JFTC's cease-and-desist order, the Japanese Defendants "mutually disclosed information as to the collection of [the] Fuel Surcharge passed on [to] the Customer, AMS charge, security charge and Explosives Examination fee, at EBIC meetings."

286.    The order further states that "[u]pon receiving information that the United States Department of Justice, the EC Commission and other authorities were starting to investigate the Forwarders based in the United States, Europe and other regions, [Defendants Nippon, Kintetsu, and Yusen] agreed not to hold any EBIC meetings in the future."

287.    Several Defendants also are members of the Shanghai International Freight Forwarder Association (SIFFA), another trade association.

288.    As described in detail below, Defendants' collusive behavior in connection with the Chinese Currency Adjustment Factor Surcharge included an agreement involving SIFFA.

THIRD AMENDED CLASS ACTION COMPLAINT                                    89

289.    The collusive behavior alleged in this Complaint in connection with these charges for Freight Forwarding Services has a direct, substantial and foreseeable adverse effect on U.S. commerce, including on U.S. import trade and U.S. import commerce.

290.    Defendants' memberships in trade associations, such as those described above, gave them ample opportunities to meet and secretly engage in collusive conduct under the pretext of engaging in lawful activity.

## TOLLING OF STATUTE OF LIMITATIONS AND CONCEALMENT

291.    Defendants engaged in successful conspiratorial conduct that, by its nature, was inherently self-concealing.  On or about October 10, 2007, various Defendants' press releases were issued concerning international antitrust raids on certain Defendants' operations.  But even these press releases and subsequent events still have given Plaintiffs no information about some of Defendants' specific conspiracies which remain undiscovered and have not been pled in this Amended Complaint.

292.    Plaintiffs and the Class members could not have discovered Defendants' conspiratorial conduct at an earlier date by the exercise of reasonable diligence.  This is because of the inherently self-concealing nature of a conspiracy as well as deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, the conspiratorial conduct.

293.    The agreements of the Defendants herein alleged were wrongfully concealed and carried out in a manner that precluded detection.  For one example, as alleged in detail below, Defendants created fictitious names – for example, the "Heathrow Garden Club" –and related code words to hide their clearly illegal activities.

294.    For another example, certain Defendants used home email addresses instead of work email accounts to send messages to their co-conspirators, in an effort to help avoid detection.

295.    As another example that demonstrates Defendants' effort to conceal their conspiracy, when Defendants believed that the authorities were uncovering their conspiracies, they decided to cease meeting to further conceal their conspiratorial conduct.

296.    By virtue of such conduct by Defendants and their co-conspirators, and for other reasons, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiffs and the other Class members have as a result of the unlawful conspiracy violations and conspiratorial conduct alleged in this Complaint.

## EFFECTS ON U.S. COMMERCE AND INJURY TO
## PLAINTIFFS AND CLASS MEMBERS

297.    During the period covered by this Complaint, Plaintiffs and members of the Class purchased substantial quantities of U.S. Freight Forwarding Services from the Defendants.

298.    As a direct result of Defendants' conspiratorial conduct in violation of Section 1 of the Sherman Antitrust Act, Defendants' new charges, surcharges, fees and prices for US. Freight Forwarding Services – which were the subjects of the specific agreements among Defendants and their co-conspirators as alleged in this Complaint – have been fixed, inflated and maintained at supra-competitive levels that have been paid by Plaintiffs and the members of the proposed class.  Moreover, as a result of Defendants' conspiratorial conduct, Defendants' prices and rates overall for Freight Forwarding Services have been fixed, inflated and maintained at supra-competitive levels that have been paid by Plaintiffs and the members of the proposed class.

299.    Defendants' conspiratorial conduct not only led to the fixing and inflation of the new charges, surcharges, fees and prices for Freight Forwarding Services which were the

subjects of the specific agreements among Defendants and their co-conspirators as alleged in this Complaint, but also to the wrongful inflation of prices and rates overall for Freight Forwarding Services.

300.    By reason of the alleged violations of the antitrust laws, Plaintiffs and members of the Class have been injured in their business and property and have suffered damages in an amount presently undetermined.

301.    The anticompetitive conduct complained of herein will continue (and to the extent temporarily and only partially abandoned, will resume) absent an injunction.  Plaintiffs and members of the Class are likely to buy U.S. Freight Forwarding Services in the future and will be repeatedly injured unless the continuation of this anticompetitive conduct is enjoined.

## AS AND FOR A FIRST CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**The 2001 Security Surcharge Agreement Made By Defendants ABX Logistics; Dachser; DHL; Exel (now DHL); Geodis; Geo-Logistics (now Agility); Kuehne + Nagel; Panalpina; and Schenker (the "Security Surcharge Defendants")**

302.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

303.    Between at least as early as October 1, 2001 and continuing until a time unknown to Plaintiffs, the Security Surcharge Defendants, possibly other Defendants and other unnamed co-conspirators combined, conspired and agreed, to fix, maintain, and impose on their customers (including members of the Class) a Security Surcharge fee for their Freight Forwarding Services on all air cargo shipped around the world, including within, from and to the United States.

304.    Defendants made and implemented this agreement through the following meetings and communications, including through their trade association, Freight Forwarders Europe ("FFE"), later known as Freight Forwarders International("FFI").

---

THIRD AMENDED CLASS ACTION COMPLAINT                                    92

305.     One or more Plaintiffs purchased Freight Forwarding Services on routes affected by the Security Surcharge Defendants' agreement alleged herein.

306.     FFE is a freight forwarder trade group formed in 1994 by the eight largest Freight Forwarders in operation at the time:  ABX Logistics, Dachser, DHL, Exel, Geodis (Geodis Wilson); Geo Logistics (Agility); Kuehne + Nagel; Panalpina; and Schenker.

## A.     The October 1, 2001 Conference Call Meeting

307.     On or about October 1, 2001 a conference call was held by the members of the Air Freight Committee of the FFE.  This call lasted approximately 2 hours and 20 minutes.

308.     The FFE Air Freight Committee members on the call included at least the following Security Surcharge Defendants: Francesco Campironi of ABX, Tony Widmer and Holger Bilz of DHL, Ole Ringheim of Exel, Dermot Leeper of Geo Logistics, Werner Blaser of Kuehne + Nagel, and Robert Frei of Panalpina.  Robert Frei of Panalpina was Chair of the FFE Air Freight Committee and a high-ranking executive at Panalpina.  Ole Ringheim of Exel was Vice Chair of the FFE Air Freight Committee and also a high-ranking executive at Exel.

309.     During the conference call, the participating Security Surcharge Defendants agreed to impose on their customers a security surcharge of €0.15 per kilo (or U.S. $0.13 per kilo) for air freight shipments anywhere including shipments into, out of, and within the U.S. The exchange rate then was $0.13 for €0.15.

310.     Pursuant to this agreement, the Security Surcharge Defendants and others did impose, and Plaintiffs and class members did pay, a security surcharge on such air freight shipments including shipments into, out of and within the United States.  The amount of such security surcharge was at least €0.15 per kilo (approximately U.S. $0.13 per kilo).

THIRD AMENDED CLASS ACTION COMPLAINT                               93

311.     The Security Surcharge Defendants' illegal combination, conspiracy and agreement to fix, inflate and maintain security surcharges had a direct, substantial and foreseeable effect on United States commerce.  It resulted in inflated prices for U.S. Freight Forwarding Services in the United States including on air cargo shipments into, from and within the United States.

## B.      The October 3, 2001 Conference Call Meeting

312.     On or about October 3, 2001, a conference call took place, this time among members of the FFE CEO Committee.  This call lasted approximately 95 minutes.  Participants in this call included at least the following: two FFE secretariats (Alfons Westgeest and Marie Teresa Scardigli) as well as Wolfgang Suess of ABX, Peter Wagner of DHL, John Allan of Exel, Steve Finch of Geo Logistics, Reinhard Lange of Kuehne + Nagel, and Bruno Sidler and Robert Frei of Panalpina.

313.     During the October 3, 2001 conference call meeting, the members of the FFE CEO Committee agreed that they should jointly offer to enter an agreement with various airlines to impose an increased security surcharge that would pay more revenues to the Security Surcharge Defendants.

## C.      The October 4, 2001 Meeting

314.     Pursuant to such an agreement, on or about October 4, 2001, Robert Frei of Panalpina, representing the FFE Air Freight Committee, met in Frankfurt, Germany with Marc Boudier of Air France and Andreas Otto of Lufthansa.  Others whose identities presently are unknown to Plaintiffs also participated in this meeting.  At the Frankfurt meeting, the Security Surcharge Defendants jointly offered, in violation of U.S. antitrust laws, to enter an agreement with the foregoing airlines and others to increase the security surcharge on air freight, including

air freight on shipments into, out of, and within the U.S.  This joint offer was subject to the proviso that part of such increase would be paid to the Security Surcharge Defendants.

315.    One or more Plaintiffs paid the collusive surcharge described in this claim and imposed by the Security Surcharge Defendants and were therefore harmed by Defendants' illegal price-fixing agreement.

316.    Pursuant to their agreement, the Security Surcharge Defendants did impose artificially fixed and inflated security surcharge fees on all air cargo shipped around the world, including within, from and to the United States, and Plaintiffs and class members paid these artificially fixed and inflated security surcharges.

317.    The Security Surcharge Defendants' combination, conspiracy and agreement to fix, inflate and maintain prices for security surcharge fees on all air cargo shipped around the world, including within, from and to the United States, violated Section 1 of the Sherman Antitrust Act.

318.    Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

319.    Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class Members.

**AS AND FOR A SECOND CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT**

**2002 Fuel Surcharges Agreement Made By Defendants Yusen,  Kintetsu, Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin, Nissin, Vantec, "K" Line, Yamato, MOL Logistics, United Aircargo Consolidators, DHL, Nippon Express, (the "2002 Japanese Fuel Surcharges Agreement Defendants")**

320.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

THIRD AMENDED CLASS ACTION COMPLAINT                    95

321.    In August 2002 various airlines engaged in the international air transport business, decided to impose a fuel surcharge with respect to all freight loaded on aircraft departing from Japan to anywhere in the world, including into the United States.

322.    Beginning at least as early as September 18, 2002 and continuing until a date unknown to plaintiffs, Defendants Yusen Air & Sea Service Co., Ltd., Kintetsu World Express, Inc., Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin Express Holdings Corporation, Nissin Corporation, Vantec Corporation., "K" Line Logistics, Ltd., Yamato Global Logistics Japan Co., Ltd., MOL Logistics (Japan) Co., Ltd., Hanshin Air Cargo Co., Ltd., United Aircargo Consolidators, Inc., DHL Global Forwarding Japan K.K., Airborne Express, Inc., and Nippon Express as well as their various subsidiaries named in this Complaint and possibly other Defendants and other unnamed co-conspirators combined, conspired and agreed to impose air freight fuel surcharges on their customers with respect to freight loaded on aircrafts departing from Japan to the anywhere in the world, including into the United States.

323.    In October 2002, various airlines began imposing the new fuel surcharge. Pursuant to their agreement alleged above, the Defendants alleged in the preceding sub-paragraph began charging their customers a corresponding fuel surcharge, and Plaintiffs and other members of the Class did pay this fuel surcharge for all shipments for which an airway bill was issued after October 16, 2002.

324.    No later than November 8, 2002 did Defendants DHL Global Forwarding Japan K.K. and Nippon Express Co., Ltd. join the agreement, along with their affiliates and subsidiaries named herein, of the Defendants alleged in the preceding paragraph to impose such fuel surcharges.

THIRD AMENDED CLASS ACTION COMPLAINT                                              96

325.     Pursuant to such agreement, the Fuel Surcharge Defendants imposed these fuel surcharges on their customers, including the Class herein, at rates no lower than the agreed minimum rate.

326.     Such Defendants made and implemented this agreement through, among other things:  (1) their membership in JAFA, and, more specifically JAFA's Executive Board of International Committee ("EBIC"); (2) attending an EBIC meeting on September 18, 2002 at which such Defendants joined and engaged in a combination and conspiracy with the intent of suppressing and eliminating competition regarding fuel surcharges that were charged to customers with respect to freight loaded on aircrafts departing from Japan; (3) in order to ensure the effective implementation of the foregoing agreement, such Defendants mutually disclosed and exchanged information as to the collection of the fuel surcharge and monitored each other's compliance with the illegal agreement.



THIRD AMENDED CLASS ACTION COMPLAINT                    97



330.    The foregoing allegations are each based on and supported by the specific findings of the JFTC Cease and Desist Order which were consented to or not contested by all Fuel Surcharge Defendants except Yusen, K Line, Nishi-Nippon and Vantec.  Defendant Nissin contested only the amount of the JFTC's fine and not the findings.  These Defendants appeals of the JFTC order were ultimately denied.



332.    One or more Plaintiffs paid the collusive surcharge described in this claim and imposed by the Fuel Surcharge Defendants and were therefore harmed by Defendants' illegal price-fixing agreement.

333.    Pursuant to their agreement, the Fuel Surcharge Defendants imposed artificially fixed and inflated fuel surcharges on air freight shipments including shipments into, out of and

within the United States, as well as on routes all around the world that were purchased in the United States, and Plaintiffs and class members paid these artificially fixed and inflated fuel surcharges.

334.    The Fuel Surcharge Defendants' combination, conspiracy and agreement to fix, inflate and maintain the prices paid for Freight Forwarding Services on air freight shipments including shipments into, out of and within the United States violated Section 1 of the Sherman Antitrust Act.

335.    Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

336.    Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

## AS AND FOR A THIRD CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2002 New Export System Fee Agreement Made By Defendants DHL, Exel, Kuehne + Nagel, EGL, Hellmann, Emery, UPS (f/n/a Emery and Menlo Worldwide), Geo-Logistics, Expeditors, Panalpina, DSV, Schenker, and BAX Global (the "NES Defendants")**

337.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

338.    Beginning at least as early as September 25, 2002 and continuing until a date unknown to Plaintiffs, the NES Defendants and their subsidiaries named in this Complaint and others combined, conspired and agreed to impose a New Export System ("NES") fee for air and ocean freight shipments from the United Kingdom to anywhere in the world, including shipments to the United States.

---

THIRD AMENDED CLASS ACTION COMPLAINT                    99

339.    Such Defendants made and implemented this agreement through the use of code words, emails and clandestine meetings held on or about October 1, 2002, in June 2004, and in October 2004 as alleged below. ███████████████████████████████████

████████████████████████████████████

340.    In 2002, the United Kingdom introduced the New Export System ("NES").  NES required shippers to electronically submit declarations to Her Majesty's Revenue and Customs ("HMRC").  NES applied to air and ocean shipments of exports out of the United Kingdom to anywhere in the world, including the United States.  HMRC required that the data contained in the declarations be filed before freight could be shipped.

**A.    British International Forwarder Association Meetings**





344.    At the November 5, 2002 and March 5, 2003 Air Freight Policy BIFA meetings,

Defendants policed their agreement by confirming that each was actually charging the NES.

**B.      The October 1, 2002 "Gardening Club" Meeting**

345.    In order to attempt to levy a fee on their customers with respect to this

declaration, the following Defendants, together with others whose identities presently are not

known to Plaintiffs, were invited to and participated in meetings on October 1, 2002:  DHL

(Mark Wardman), Exel (Douglas Overett), Kuehne + Nagel (Chris Edwards), EGL (David Lara),

Hellmann (Peter Cochrane), Emery (a/k/a Menlo Worldwide) (David Harrison), UPS (a/k/a

Menlo Worldwide), Geo Logistics (Tony Russell), BAX Global, possibly other Defendants and

other unnamed co-conspirators.

346.    This meeting took place at Mama Mia, an Italian restaurant outside of London, in

Staines, Middlesex, United Kingdom.  During the meeting, the NES Defendants agreed to

implement a NES fee on their customers.  The participants also discussed how they would

monitor each other's compliance with their agreement.  In order to monitor such compliance and

otherwise, the participants alleged above were invited to and attended meetings in June and

November 2004.



348.    The NES Defendants did impose an NES fee at the same time and at the same rate for both ocean and air freight.

349.    The NES Defendants also frequently emailed each other to police and expand the NES agreement.



350.    Because the NES Defendants and other participants knew that their meetings and activities were unlawful, they created code words to use for themselves, their meetings, the agreed upon charge, etc.

351.    For example, they referred to themselves interchangeably as the "Heathrow Garden Club," the "Heathrow Club" or the "Garden Club."  They referred to the NES fee as "asparagus" or "marrow."  They referred to the conspirators as members of the "Club"; "planters" or "gardeners."  They referred to their companies participating in the conspiracy as "greenhouses."  They referred to their meetings as "horticultural reviews."



353.    Deutsche Post AG, on behalf of itself and its subsidiaries and affiliates, sought and received amnesty from the Department of Justice for their anticompetitive conduct in the air and ocean freight forwarding industry related to the NES fee.

354.    Schenker, Kuehne + Nagel, and EGL pled guilty to DOJ criminal antitrust charges related to the NES surcharge on airfreight.

355.    Schenker, BAX Global, Inc., EGL, Geo-Logistics, Kuehne + Nagel, and Panalpina all agreed to cooperate with the United States DOJ regarding its investigation into conspiratorial Ocean NES conduct.  In return for their cooperation, DOJ agreed not to further prosecute those companies for conduct related to the Ocean NES surcharge.

356.    Pursuant to the NES Defendants' foregoing agreement, they imposed NES fees on their customers, including members of the Class herein, which inflated prices for U.S. Freight Forwarding Services for imports from the United Kingdom into the United States.

THIRD AMENDED CLASS ACTION COMPLAINT                                    103

357.     One or more Plaintiffs paid the collusive surcharge described in this claim and imposed by the NES Defendants and were therefore harmed by Defendants' illegal price-fixing agreement.

358.     Pursuant to their agreement, the NES Defendants and others imposed artificially fixed and inflated NES fees for air and ocean freight shipments from the United Kingdom to the United States, and Plaintiffs and class members paid these artificially fixed and inflated NES fees.

359.     The NES Defendants' combination, conspiracy and agreement to fix, inflate and maintain prices for NES fees on air and ocean cargo shipments from the United Kingdom to the United States and other countries violated Section 1 of the Sherman Antitrust Act.

360.     Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

361.     Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

## AS AND FOR A FOURTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2004 U.S. Customs "AMS" Charge Agreement Made By Defendants Nippon Express, Yusen, Kintetsu, Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin, Nissin, Vantec, "K" Line, Yamato, MOL Logistics, United Aircargo Consolidators, Inc., and DHL (the "Air AMS Japanese Defendants")**

362.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

363.     Beginning on or about November 22, 2004 and continuing until a date unknown to Plaintiffs, the Air AMS Japanese Defendants combined, conspired or agreed to fix, inflate and maintain an AMS charge of at least 500 yen on air cargo flights originating outside the United

States and delivered to the United States as a final destination or through the United States to a third country for Freight Forwarding Services.

364.    The Air AMS Japanese Defendants made and implemented this agreement through the following meetings and communications, including through: (1) their membership in JAFA, and, more specifically JAFA's Executive Board of International Committee ("EBIC"); (2) attending an EBIC meeting on November 22, 2004; and (3) in order to ensure the effective implementation of the foregoing agreement, such Defendants mutually disclosed and exchanged information as to the collection of the AMS charge.

A.    **September 21, 2004 EBIC Meeting**





[4] "HAWB" stands for House Air Waybill, a standardized document covering each individual shipment of a consolidated shipment, and showing all details pertaining to the air carriage of a consignment.  It is usually issued by the freight forwarding agent and also contains relevant instructions to the break-bulk agent at final destination.

THIRD AMENDED CLASS ACTION COMPLAINT                    106



**B.**     **The November 22, 2004 Meeting**

369.     In or around August 2004, various airlines began phasing in a new fee supposedly designed to cover U.S. customs costs.

370.     On or about November 22, 2004, an EBIC meeting took place and was attended by representatives from the AMS Defendants.  During this meeting, the AMS Defendants agreed among themselves to impose on their customers an additional charge, the "AMS charge."  They

THIRD AMENDED CLASS ACTION COMPLAINT                    107

further agreed that this charge was to be set at a rate no lower than the agreed minimum rate of 500 yen and would (at the very least) pass on to their customers the airlines' charge.



372.    The Air AMS Japanese Defendants imposed these agreed upon AMS surcharges on their customers, at rates no lower than the agreed minimum rate, by December 13, 2004 or, at the very latest, January 1, 2005. This substantially restricted U.S. import commerce on air cargo flights between Japan and the United States, as well as on other routes.

373.    The foregoing allegations are each based on and supported by the specific findings of the JFTC Cease and Desist Order which have been consented to or not contested by all AMS Defendants except Yusen, K Line, Nishi-Nippon Rail and Vantec. Defendant Nissin contested only the amount of the JFTC's fine and not the JFTC's findings. Subsequent appeals of the JFTC order have been denied.

374.    One or more Plaintiffs paid the collusive surcharge described in this claim and imposed by the Air AMS Japanese Defendants and were therefore harmed by Defendants' illegal price-fixing conspiracy.

THIRD AMENDED CLASS ACTION COMPLAINT                                    108

375.     Pursuant to their agreement, the Air AMS Japanese Defendants and other imposed artificially fixed and inflated AMS fees on air cargo flights originating outside the United States and delivered to or through the United States, and Plaintiffs and class members paid these artificially fixed and inflated AMS fees.

376.     The Air AMS Japanese Defendants' combination, conspiracy and agreement to fix, inflate and maintain prices for AMS fees on air cargo flights originating outside the United States and delivered to or through the United States violated Section 1 of the Sherman Antitrust Act.

377.     Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

378.     Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

## AS AND FOR A FIFTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2005 Chinese Currency Adjustment Factor ("CAF") Surcharges Agreement Made By Defendants Exel, DHL, ABX Logistics, Shanghai International Freight Forwarders Association ("SIFFA"), EGL, Expeditors, Kuehne + Nagel, Panalpina, UPS, Kintetsu, Yusen, Nippon Express, SDV, Dachser, Schenker, Geodis, Hellman, Vantec, Geo-Logistics, and BAX Global (the "CAF Surcharge Defendants")**

379.     Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

380.     Beginning in July 2005 and continuing until a date unknown to Plaintiffs, the CAF Surcharge Defendants, possibly other Defendants, and other presently unknown co-conspirators combined, conspired and agreed to fix and maintain either the Chinese Currency Adjustment Factor ("CAF") Surcharge or quote new business in local Chinese currency (RMB)

for air cargo shipments between Asia, including China, and worldwide locations, including the United States.

381.    The CAF Surcharge Defendants made and implemented this agreement through the following meetings and communications.

382.    The official currency of the People's Republic of China ("PRC") is the Renminbi ("RMB").  The primary unit of the renminbi is the Chinese yuan.   The People's Bank of China, the PRC's monetary authority, issues the Chinese currency.  Until July 2005 the RMB was pegged to the U.S. Dollar at 8.28 RMB.

383.    On July 21, 2005 the People's Bank of China announced that the RMB was no longer pegged to the U.S. Dollar and instead was revalued at 8.11 RMB per U.S. Dollar.  From that point on, the People's Bank of China pegged the RMB to a basket of foreign currencies, rather than only to the U.S. Dollar.

384.    In July 2005 Sebastian Chan, a Sales Director of Defendant Exel (later DHL), contacted a colleague at Defendant BAX Global and suggested that Defendants meet to discuss this development and address how best to respond to the change in currency valuation.



THIRD AMENDED CLASS ACTION COMPLAINT                                    110



**A.**     **The July 27, 2005 Meeting**

388.     On or about July 27, 2005 at the Renaissance Yangtze Hotel in Shanghai,

representatives of at least Exel, DHL, EGL, Kuehne + Nagel, Panalpina, Nippon Express,

Kintetsu World Express, UPS, Yusen and BAX Global met for approximately two hours.

389.     The meeting focused on planned collusive actions that the CAF Surcharge

Defendants would take to inflate their Chinese currency adjustment.  The CAF Surcharge

Defendants agreed during this meeting to establish and impose a CAF Surcharge.  In particular, the CAF Surcharge Defendants agreed that:

    a.    Businesses subject to existing long-term contracts will be subject to a CAF Surcharge of 2.1%;

    b.    As of August 1, 2005 all new air freight business will be quoted in RMB, not U.S. dollars; and

    c.    When existing contracts came up for renewal and/or negotiations, future quotes would be made in RMB instead of U.S. dollars.

Each of the CAF Surcharge Defendants agreed to notify their customers by letter of these new terms.



393.     The CAF Surcharge Defendants also agreed to communicate with one another and monitor their compliance with the illegal price-fixing agreement.

394.     One method by which they implemented their agreement and reported to one another was to establish a special, joint email address, rmb_rates_china@yahoo.com.

395.     The CAF Surcharge Defendants' email distribution list for this matter was named "logisticscommunity."  The address book of "logisticscommunity" included at least the following Defendants:  Holger Beyer and Jochen Thewes of Kuehne + Nagel; Sebastian Chan, Kenneth Mak and Steven Wong of Exel; Th Chiu of Expeditors; Damon Wong of UPS; Linda Yang of EGL; Xie Simon of ABX Logistics; Toshiaki Enokido and Jerry Liu of Yusen; Thomas Gronen of Panalpina; Steve Huang, Maxwell Wang and Richard Huang of DHL; Sam Chen and Rong Mo of Kintetsu; Berry Lin of SDV; Shinya Suto of Nippon Express; James Gagne and Chaminda Gunasekera of BAX Global; and Gerhard Blumensaat of Schenker (the "Yahoo Group").

396.     In furtherance of their agreement, the CAF Surcharge Defendants circulated among themselves a draft letter to customers which included the components of the agreements set forth above,











412.    Starting in late July 2005, the CAF Surcharge Defendants began sending letters to their customers with the exact or substantively identical language and in this way, among others, implemented their CAF Surcharge agreement.  For instance, on July 29, 2005, Kuehne + Nagel sent such a letter to its customers, and on August 1, 2005, Holger Beyer of Kuehne + Nagel emailed several Defendants who had attended the July 27 meeting to assure them that Kuehne + Nagel had sent the agreed upon letter to "the Entire KN Network." The Kuehne + Nagel letter was substantively identical to the draft letter circulated within the Yahoo Group.  Beyer's email confirmation was sent to Soren Poulsen of Kuehne + Nagel; Shinya Suto of Nippon Express; Sebastian Chan and Kenneth Mak of Exel; Linda Yang of EGL; Maxwell Huang and Steve Huang of DHL; Damon Wong of UPS-SCS; Jerry Liu of Yusen; Thomas Gronen of Panalpina; and to the aforementioned Yahoo Group.

413.    For another example, on August 4, 2005, Defendant Panalpina sent a similar letter to its customers.  Thereafter, Thomas Gronen of Panalpina emailed other Freight Forwarders to assure them that Panalpina had sent its customers the agreed-upon letter.  Mr. Gronen's

confirmatory email was sent at least to the following Defendants, and possibly others: Sam Chen of Kintetsu; Sebastian Chan, Steve Wong and Kenneth Mak of Exel; Shinya Suto of Nippon Express; Steve Huang of DHL; Damon Wong of UPS; Linda Yang of EGL; Berry Lin of SDV; Toshiaki Enokido and Jerry Liu of Yusen; Jochen Thewes and Holger Beyer of Kuehne + Nagel; and the aforementioned Yahoo Group.

414. For yet another example, on August 9, 2005 Berry Lin of SDV emailed the other CAF Surcharge Defendants to inform them they had imposed the surcharge. Lin's email was sent to at least the following Defendants: Lin Zhihong of Panalpina; Kenneth Mak of Exel; Holger Beyer and Jochen Thewes of Kuehne + Nagel; Toshiaki Enokido and Jerry Liu of Yusen; Linda Yang of EGL; Steven Wong and Sebastian Chan of Exel; Thomas Gronen of Panalpina; Sam Chen of Kintetsu; Damon Wong of UPS; Shinya Suto of Nippon Express; and Steve Huang and Maxwell Wang of DHL.



416. In addition to exchanging and agreeing to send fraudulent letters concealing the CAF Surcharge conspiracy, Defendants took other actions to ensure customers could not negotiate paying the CAF Surcharge. 

---

THIRD AMENDED CLASS ACTION COMPLAINT                                    119



**B.    The August 12, 2005 Meeting**

419.    On or about August 12, 2005 CAF Surcharge Defendants met again, this time at
the Radisson New World Hotel in Shanghai.  In attendance were, among others, the following:
Holger Beyer and Jochen Thewes of Kuehne + Nagel; Sebastian Chan, Kenneth Mak and Steve
Wong of Exel; Gerhard Blumensaat of Schenker; Sam Chen of Kintetsu; Steve Huang and
Maxwell Wang of DHL; Toshiaki Enokido and Jerry Liu of Yusen; Xie Simon of ABX; Damon
Wong of UPS; Linda Yang of EGL; Shinya Suto of Nippon Express; and James Gagne of BAX
Global.

420.    At this meeting, the representatives from such CAF Surcharge Defendants shared
progress reports confirming the implementation of their agreements regarding the CAF
Surcharge.  They discussed reactions of their respective customers to Defendants' letters
referenced above.



C.      **The September 15, 2005 Meeting**

423.    On or about September 15, 2005, CAF Surcharge Defendants met again, this time at the Howard Johnson Plaza Hotel in Shanghai, to confirm and discuss their adherence to and implementation of the CAF Surcharge and related issues.  This meeting was sponsored by DHL and Kuehne + Nagel.

424.    Defendants' representatives invited to and in attendance at this meeting included at least:  Berry Lin of SDV, Holger Beyer and Soren Poulsen of Kuehne + Nagel; Connie Xu, James Sung, Kenneth Mak and Sam Wong of Exel; Rong Mo, Sam Chen, Toru Katayama, Toshimichi Inamura and Yoshihiro Shirai of Kintetsu; Steve Huang and Maxwell Wang of DHL; Jerry Liu, Toshi Okita, T. Anda and T. Takahashi of Yusen; Damon Wong of UPS; Linda Yang of EGL; Thomas Gronen of Panalpina; Christophe Vincent of Dachser; Gerhard Blumensaat of Schenker; James Gagne of Bax Global; and Kobayashi Matsuo and Shinya Suto of Nippon Express.

425.    At this meeting, the companies shared progress reports concerning the implementation of their agreements regarding the CAF Surcharge.

**D.    The November 18, 2005 Meeting**



427.    On or about November 18, 2005, CAF Surcharge Defendants met again, this time at the Shanghai Marriott Hotel Hongqiao, to discuss implementation of their CAF Surcharge agreement.  Representatives from at least DHL, Bax Global, Exel, EGL, Kuehne + Nagel, Dachser and Kintetsu attended this meeting.  Once again, the CAF Surcharge Defendants shared

---

THIRD AMENDED CLASS ACTION COMPLAINT                                    122

progress reports concerning the implementation of their agreements regarding the CAF

Surcharge

428.    After this meeting, Maxwell Wang of DHL circulated minutes of this meeting.

Mr. Wang distributed the meeting minutes from his hotmail e-mail address, not his DHL e-mail

address.

**E.      The November 21, 2005 Conference Call**

429.    On or about November 21, 2005, CAF Surcharge Defendants held a

conference call to follow up on the November 18 meeting.  Invited to participate in this call were

representatives of at least the following Defendants: DHL, Schenker, Bax, Exel, Kintetsu, EGL

and Kuehne + Nagel.  Many did participate in this November 25 conference call.  Once again,

the companies confirmed and discussed their implementation of their agreements regarding the

CAF Surcharge.

**F.      The March 13, 2006 Meeting**

430.    On or about March 13, 2006 the CAF Surcharge Defendants met again, this time

at the Hotel Inter-Continental Pudong in Shanghai to discuss the status of their agreements and to

follow up on implementation.  Defendants invited to the meeting included J. Sung of Exel; Steve

Huang of DHL; Sven Koethe and Gerhard Blumensaat of Schenker; Rong Mo of Kintetsu;

Thomas Li of EGL; Thomas Gronen of Panalpina, C. Sebastian of UPS; and Soren Poulsen of

Kuehne + Nagel.

431.    At this meeting, Defendants discussed the implementation of their agreement

regarding the CAF Surcharge, the further appreciation of the RMB against the U.S. Dollar, and

increasing the agreed-upon CAF Surcharge.  During and shortly after this meeting, the CAF

Surcharge Defendants agreed to increase the CAF surcharge to 3%.



**G.** **Further Implementation of the CAF Agreement Through SIFFA**

434.    The Shanghai International Freight Forwarder Association ("SIFFA") (which includes as members the CAF Surcharge Defendants plus many other members), pursuant to its agreement with the members of the Yahoo Group, issued circulars to its members recommending that all SIFFA members implement the currency adjustments agreed to by the CAF Defendants.







440.     On or about March 29, 2006, SIFFA issued a second circular suggesting to its members to implement a CAF Surcharge increase from 2.1% to 3.0%.  It also advised its members that further increases may be necessary.

441.     In each instance, pursuant to such unlawful agreement, many SIFFA members did implement such charges.  In this manner, SIFFA was involved in, assisted, and aided and abetted in the implementation of the CAF conspiracy.

442.     One or more Plaintiffs paid the collusive surcharge described in this claim and imposed by the CAF Defendants and were therefore harmed by Defendants' illegal price-fixing agreement.

443.     Pursuant to their agreement, the CAF Defendants and others did impose artificially fixed and inflated CAF fees for air cargo shipments between Asia, including China,

and worldwide locations, including the United States.  Plaintiffs, therefore, paid the price-fixed fees and artificially inflated CAF charges illegal imposed by Defendants.

444.    The CAF Defendants' combination, conspiracy and agreement to fix, inflate and maintain prices for CAF fees for air cargo shipments between Asia, including China, and worldwide locations, including the United States violated Section 1 of the Sherman Antitrust Act.

445.    Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

446.    Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

## AS AND FOR A SIXTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**Peak Season Rate Increase Agreements Made By Defendants ABX Logistics, Baltrans, DHL, Exel, Expeditors, Geo-Logistics, Kuehne + Nagel, Panalpina, BAX Global, Schenker, UPS, Hellmann, SDV, Jet Speed, DSV (also, f/n/a DFDS), Morrison Express, Nippon Express, Kintetsu and UTi (the "Peak Season  Surcharge Defendants")**

447.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

448.    Several of the Defendants have pled guilty to criminal DOJ and EU charges and fines regarding the Peak Season Surcharges.  Though the investigation is ongoing, these Defendants include, but are not necessarily limited to, Kuehne + Nagel, BAX Global, Schenker, EGL, Hellman, Expeditors, Toll Global Forwarding, and Geo-Logistics.  DHL has sought and received amnesty for its involvement in the Peak Season Surcharges.

THIRD AMENDED CLASS ACTION COMPLAINT                                    127

449.    According to the DOJ plea agreements, many of the above listed Defendants, and others, pled guilty to imposing a Peak Season Surcharge ("PSS") "beginning in or about August 2005 and continuing until in or about December 2007."

450.    Beginning at least as early as August 2005 and continuing until at least January 2008, the Peak Season Surcharge Defendants, possibly other Defendants, and other presently unknown co-conspirators combined, conspired and agreed to impose peak season rate increases on air cargo shipments out of Asia, including China and Hong Kong SAR, China to anywhere in the world, including shipments into, out of, or within the United States during specified times.

451.    The charged combination and conspiracy consisted of a continuing agreement, understanding and concert of action among the Defendants and their coconspirators, the substantial terms of which were to (a) agree annually to impose the peak season surcharges on their customers who exported goods to anywhere in the world; (b) agree on an approximate date for implementation of the peak season surcharges, (c) agree on an approximate date on which they would end their peak season surcharges, (d) agree on an approximate amount to increase their charges during the peak season, and (e) agree, broadly, to announce to their customers the timing and amount of their peak season surcharges.

452.    Such Defendants formed, implemented, and monitored their conspiracy during a series of meetings, including meetings sometimes known as "Breakfast Meetings."

453.    Invitations to these meetings were typically sent via electronic mail by an employee of DHL, Maria Lee, on behalf of DHL executive, Kelvin Leung, both of DHL Logistics (Hong Kong, SAR) Ltd.

**2005 Peak Season Rate Increase**

**A.       The August 9, 2005 Meeting**

454.     On August 3, 2005, Mr. Leung, via Maria Lee, sent electronic mail invitations for a meeting on August 9, 2005, to Baltrans (Kelly King), DHL (Roland Wong), Expeditors (Ronald Wong), Exel (Michael Yuen), Geo-Logistics (Ricky Lam), Kuehne + Nagel (Joerg Bull),  Panalpina (Markus Muecke), Schenker (Andreas Becker), BAX Global (Danny Chan) and UPS (Josef Ko).

455.     On August 9, 2005, representatives from Defendants Baltrans, DHL, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, BAX Global, Schenker, UPS and other parties whose identities are not known to Plaintiffs met at a coffee shop in the Grand Hyatt Hotel in Wan Chai, Hong Kong SAR, China.

457.     Such Defendants agreed during their meeting to implement a peak season surcharge on air cargo shipments beginning in September 2005.

**B.       The September 21, 2005 Meeting**

458.     On September 13, 2005, Mr. Leung, via Maria Lee sent electronic mail invitations for another meeting, this time on September 21, 2005, to Baltrans (Kelly King), DHL (Kelvin Leung), Expeditors (Ronald Wong), Exel (Michael Yuen), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull), Panalpina (Markus Muecke), BAX Global (Danny Chan), Schenker (Andreas Becker), and UPS (Josef Ko).

---

THIRD AMENDED CLASS ACTION COMPLAINT                                      129

459.     On September 21, 2005, these Defendants and other parties whose identities presently are not known to Plaintiffs met again at a coffee shop in the Grand Hyatt Hotel in Wan Chai, Hong Kong SAR, China.

460.     At a minimum, representatives from Baltrans, DHL, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, BAX Global, Schenker, and UPS participated in the meeting.

461.     The meeting participants again discussed and agreed upon the peak season surcharge, and updated one another on their respective progress in implementing the surcharge.

**C.     The December 6, 2005 Meeting**

462.     On November 28, 2005, Mr. Leung, via Maria Lee, sent electronic mail invitations for another meeting, this time on December 6, 2005, to Baltrans (Kelly King), DHL (Roland Wong), Expeditors (Ronald Wong), Exel (Michael Yuen), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull),  Panalpina (Markus Muecke), BAX Global (Danny Chan), Schenker (Andreas Becker), and UPS (Josef Ko).

463.     On December 6, 2005, these Defendants and ABX Logistics (Michael Groebsch) and other parties whose identities presently are not known to Plaintiffs met again at a coffee shop located in the Grand Hyatt Hotel in Wan Chai, Hong Kong SAR, China.

464.     At a minimum, representatives from Baltrans, DHL, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, BAX Global, Schenker, ABX Logistics, and UPS participated in the meeting.

465.     At the meeting, Defendants and the other participants discussed and agreed to extend and continue charging their customers the peak season rate increase.

THIRD AMENDED CLASS ACTION COMPLAINT                                   130

**2006 Peak Season Rate Increase**

466.     Pursuant to the agreement to extend and continue charging a peak season rate increase, Defendants and the other participants met in 2006 to discuss and provide regular updates of their implementation of the peak season rate increase.

A.     <u>**January 4, 2006 Meeting**</u>

467.     On January 4, 2006, Mr. Leung, via Maria Lee, again sent electronic mail invitations for a meeting on January 13, 2006 to Baltrans (Kelly King), DHL (Roland Wong), Exel (Michael Yuen), Expeditors (Ronald Wong), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull),  Panalpina (Markus Muecke), BAX Global (Danny Chan), Schenker (Andreas Becker), and UPS (Josef Ko).  In addition, electronic mail invitations were also sent to Hellmann (Andy Poon, Mark Hellman, and Nelson Lai), SDV (an individual using an email address with the name "i.fok") and ABX Logistics (Michael Groebosch).

468.     On January 13, 2006, representatives from Defendants Baltrans, DHL, Exel, Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, BAX Global, Schenker, UPS, Hellmann, SDV, ABX Logistics and other parties whose identities presently are not known to Plaintiffs met again, this time at the China Club on the 13th Floor of the Bank of China building in Central Hong Kong SAR, China.

469.     The participants discussed and provided each other with a regular update of their extension and implementation of the peak season rate increase.

B.     <u>**The February 3, 2006 Meeting**</u>

470.     On January 17, 2006, Mr. Leung, via Maria Lee, sent electronic mail invitations for another meeting, this time on February 3, 2006 to Baltrans (Kelly King), DHL (Roland Wong), Exel (Michael Yuen), Expeditors (Ronald Wong), Geo Logistics (Ricky Lamb), Kuehne

+ Nagel (Joerg Bull),  Panalpina (Markus Muecke), BAX Global (Danny Chan), Schenker

(Andreas Becker), UPS (Josef Ko), ABX Logistics (Michael Groebosch), Hellmann (Andy Poon,

Mark Hellman, and Nelson Lai), and SDV (again to the "i.fok" email address).

471.    On February 3, 2006, representatives from Baltrans, DHL, Exel, Expeditors, Geo

Logistics, Kuehne + Nagel, Panalpina, BAX Global, Schenker, UPS, ABX Logistics, Hellmann,

and SDV and other parties whose identities presently are not known to Plaintiffs, met again at

the China Club on the 13th Floor of the Bank of China building in Central Hong Kong SAR,

China.

472.    The participants discussed and provided each other with a regular update of their

extension and implementation of the peak season rate increase.

**C.**     **The June 23, 2006 Meeting**

473.    On June 12, 2006, Mr. Leung, via Maria Lee, sent electronic mail invitations for a

meeting on June 23, 2006 to Baltrans (Kelly King), DHL (Roland Wong), Exel (Michael Yuen),

Expeditors (Ronald Wong), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull),

Panalpina (Markus Muecke), BAX Global (Danny Chan), Schenker (Andreas Becker), UPS

(Josef Ko), ABX Logistics (Michael Groebosch), Hellmann (Andy Poon, Mark Hellman, and

Nelson Lai), and SDV (again to the "i.fok" email address).  This time Mr. Leung also invited Jet

Speed (Antonio M. da Silva), DFDS Transport (P. Minor), Morrison Express (Nelson Wong) and

UTi (Mabel Wong).

474.    On June 23, 2006, representatives from Defendants Baltrans, DHL, Exel,

Expeditors, Geo Logistics, Kuehne + Nagel, Panalpina, BAX Global, Schenker, UPS, ABX

Logistics, Hellmann, SDV, Jet Speed, DFDS Transport, Morrison Express, UTi and other parties

whose identities presently are not known to Plaintiffs met again at the China Club on the 13th Floor of the Bank of China building in Central Hong Kong SAR, China.

475.    Once again, the participants discussed and agreed upon the peak season rate increase.  The topics of discussion also included market information exchanges and the further schedule for continued implementation of the peak season rate increase.  The participants agreed to institute the peak season rate increase beginning in August 2006.  The participants expressly agreed to implement their agreed upon peak season rate increase on air cargo flights from Asia, including Hong Kong SAR, China and China, to other parts of the world, including the United States.

476.    Pursuant to this agreement, at minimum these Peak Season Surcharge Defendants did impose such a 2006 surcharge on air cargo shipments on August 1, 2006.

**2007 Peak Season Rate Increase**

477.    The Peak Season Surcharge Defendants and the other participants continued to meet in 2007 to discuss and provide regular updates of their implementation of the peak season rate increase.

**A.    The May 21, 2007 Meeting**

478.    On May 3, 2007, Mr. Leung sent electronic mail invitations for a meeting on May 21, 2007, to Baltrans (Kelly King), DHL (Roland Wong), Exel (Michael Yuen), Expeditors (Ronald Wong), Geo Logistics (Ricky Lamb), Kuehne + Nagel (Joerg Bull), Panalpina (Markus Muecke), BAX Global (Danny Chan), Schenker (Andreas Becker), UPS (Josef Ko), ABX Logistics (Michael Groebosch), Hellmann (Andy Poon, Mark Hellman, and Nelson Lai), SDV ( again to the "i.fok" email address), Jet Speed (Antonio M. da Silva), DFDS Transport (P. Minor), Morrison Express (Nelson Wong) and UTi (Mabel Wong).

479.    On May 21, 2007, these Defendants and other parties whose identities presently are not known to Plaintiffs met again at the China Club located in the Bank of China building in Central Hong Kong SAR, China.  This time apparently the meeting took place on the 15th rather than the 13th Floor of the Bank of China building.

480.    Once again, the participants discussed and agreed upon the peak season rate increase for 2007.  The topics of discussion also included market information exchanges.

481.    One or more Plaintiffs paid the collusive surcharges described in this claim and imposed by the PSS Defendants and were therefore harmed by Defendants' illegal price-fixing agreement.

482.    Pursuant to their agreement, such Defendants implemented peak season rate increase on all air cargo shipped out of Asia, including China and Hong Kong SAR, China to anywhere in the world, including shipments into, out of, or within the United States during specified times and Plaintiffs and class members paid these artificially fixed and inflated Peak Season Surcharges.

483.    The Peak Season Surcharge Defendants combination, conspiracy and agreement to fix, inflate and maintain prices for peak season surcharges on all air cargo shipped out of Asia, including China and Hong Kong SAR, China to anywhere in the world, including shipments into, out of, or within the United States violated Section 1 of the Sherman Antitrust Act.

484.    Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

485.    Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

## AS AND FOR A SEVENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

**2006 Security and Explosives Examination Surcharges Agreement Made By Nippon Express, Yusen, Kintetsu, Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin, Nissin, Vantec, "K" Line, Yamato, MOL Logistics, Hankyu Hanshin Express Co., Ltd, United Aircargo Consolidators, Inc., and DHL (the "2006 Security and Explosives Examination Surcharge Defendants")**

486.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

487.    Beginning prior to February 20, 2006 and continuing until a date unknown to Plaintiffs, Defendants Nippon Express Co., Ltd., Yusen Air & Sea Service Co., Ltd., Kintetsu World Express, Inc., Nishi-Nippon Railroad Co., Ltd., Hankyu Hanshin Express Holdings Corporation, Nissin Corporation, Vantec World Transport Co., Ltd., "K" Line Logistics, Ltd., Yamato Global Logistics Japan Co., Ltd., MOL Logistics (Japan) Co., Ltd., Hankyu Hanshin Express Co., Ltd., United Aircargo Consolidators, Inc., and DHL Global Forwarding Japan K.K. and their U.S. subsidiaries or affiliates combined, conspired and agreed to fix, impose and maintain two new surcharges. These surcharges consisted of a "security charge" of at least 300 yen and an "explosives examination charge" of at least 1,500 yen that was applied on any air cargo flights between the U.S. and Japan after April 1, 2006, where an airway bill was issued. The airway bill mandated that Defendants maintain security measures and conduct explosives examination.

488.    The 2006 Security and Explosives Examination Surcharge Defendants reached such agreement, among other ways, during EBIC meetings of the JAFA held prior to February 20, 2006.

---

THIRD AMENDED CLASS ACTION COMPLAINT                                    135

489.     Pursuant to such an agreement, each of the 2006 Security and Explosives Examination Surcharge Defendants imposed the above security and explosives examination surcharges on their customers, including the Class herein, at rates no lower than the agreed minimum rate. This conspiracy substantially restricted competition.

490.     The Security and Explosives Examination Surcharge Defendants also used EBIC meetings after February 20, 2006 to exchange information regarding the status of the security and explosives examination surcharges, and otherwise to implement and monitor their conspiracy.

491.     The foregoing allegations are each based on and supported by the specific findings of the JFTC Cease and Desist Order which have been consented to or not contested by all these Defendants except Yusen, K Line, Nishi-Nippon Rail and Vantec.  Defendant Nissin contested only the amount of the JFTC's fine and not the JFTC's findings.  These appeals were ultimately rejected.

492.     The 2006 Security and Explosives Examination Surcharge Defendants combination, conspiracy and agreement to fix, inflate and maintain prices for "security charges" and "explosives examination charges" on air cargo flights between Japan and the U.S and violated Section 1 of the Sherman Antitrust Act.

493.     One or more Plaintiffs paid the collusive surcharge described in this claim and imposed by the Security and Explosives Surcharge Defendants and were therefore harmed by Defendants' illegal price-fixing agreement.

494.     Pursuant to their agreement, such Defendants implemented the Security and Explosives Examination Surcharge on flights between Japan and the United States and Plaintiffs and class members paid the artificially fixed and inflated Security and Explosives Surcharges.

THIRD AMENDED CLASS ACTION COMPLAINT                                     136

495.     Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

496.     Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

**AS AND FOR AN EIGHTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT**

**2004 U.S. Customs Air "AMS" Charge Agreement Made by Defendants Schenker, Dachser, Geodis, Geo-Logistics, DHL, Panalpina, UTi, Kuehne + Nagel, ABX Logistics, EGL, UPS, Exel, DSV (later DFDS), Hellman, BAX Global, SDV and other unnamed Co-Conspirators ("Air AMS Defendants")**

497.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in this Complaint.

498.     The Automated Manifest System or Advanced Airfreight Manifest System ("AMS" or "AAMS") requires that information regarding cargo shipped into the United States be transmitted to U.S. Customs and Border Protection within a specified period of time before it arrives in the United States.  For air shipments the information must be transmitted to U.S. Customs four hours before any form of transportation commences.  For ocean shipments the information must be transmitted twenty-four hours before the shipments are loaded onto the ships.  As a result of the September 11th attacks, the AMS systems required more extensive information on cargo shipped into the United States.  As a result, the systems were modified in order to comply with the new requirements.

499.     In 2003 and 2004 and continuing until a date unknown to Plaintiffs, Defendants, including Schenker, Dachser, Geo-Logistics, DHL, Panalpina, UTi, Kuehne + Nagel, ABX Logistics, EGL, UPS, Geodis, Exel, DSV (then DFDS), Hellman, BAX Global, SDV and possibly other Defendants and other unnamed co-conspirators, conspired and agreed to fix,

---

THIRD AMENDED CLASS ACTION COMPLAINT                    137

inflate and maintain charges purportedly affiliated with Air AMS compliance for U.S. Freight Forwarding Services on air shipments into the United States.  Defendants wrongfully agreed to pass any costs associated with Air AMS compliance on to their customers with a markup and agreed on the amount and timing of such Air AMS charges that Defendants would impose on their respective customers.





**A.**     <u>**FFE / FFI Airfreight and CEO Committee Meetings**</u>



506.     The FFI Airfreight Committee met to set and implement Air AMS fees.  They reported these conspiratorial meetings and their progress in reaching various agreements related to the conspiratorial Air AMS Surcharge directly to the FFI CEO Committee and the various individual CEOs.  The CEOs adopted the Airfreight Committee's recommendations and agreed

to fix the price of the Air AMS fee.  This conspiratorial tone at the top of the respective corporate families was then disseminated to the local trade associations and country-level managers.

507.    The FFE Airfreight Committee held a meeting in London, England on or about March 19, 2003, which was attended by representatives of Panalpina (Robert Frei, who was also the Chairman of the FFE Airfreight Committee), ABX (Laurence Vandenbrouck), DHL (Tony Widmer), Geodis (Massimo Norcaro), Geo-Logistics (Dermot Leeper), UTi (John Hextall) and UPS (Chuck Cocci).  A second representative from ABX (Francesco Campironi) and representatives from Exel (Ole Ringheim), Schenker (Thomas Mack, who was also the Vice-Chairman of the FFE Airfreight Committee) and Kuehne + Nagel (Roland Bischoff) were sent the minutes of this meeting, along with the participants who attended the meeting.

508.    During this meeting, the FFE secretariat updated members on the developments at the U.S. level on the AMS initiative and discussed communications with BIFA, CLECAT (a European freight forwarding association) and FIATA (the International Federal of Freight Forwarders Associations).  The meeting participants agreed that Freight Forwarders should pass on Air AMS implementation costs to their customers.

509.    The participants in this meeting reported the details of their agreement to charge their customers an Air AMS fee to the CEOs of their respective corporate families.  The Airfreight Committee members reported this information to the CEO Committee on or around April 8, 2003 in Brussels.  That CEO Committee meeting was attended by representatives from at least Kuehne + Nagel, Exel, ABX, Dachser, DHL, Geo-Logistics, Panalpina, Schenker, and UTi.  A representative from Geodis was also sent the minutes from this meeting, along with the participants who attended the meeting.

510.     On or about June 12, 2003, the FFI secretariat communicated via email with individuals at DHL, Dachser, Exel, Geo-Logistics, Panalpina, Schenker, ABX, Kuehne + Nagel and UTi regarding new Air AMS requirements.

511.     On October 3, 2003 certain members of the FFI/FFE Airfreight Committee had a "Small Circle Meeting."  The "Small Circle" members were market leaders and the largest forwarders in FFI/FFE.  The following Defendants attended the meeting: Robert Frei (Panalpina), Roland Bischoff (Kuehne + Nagel), Ole Ringheim (Exel), Thomas Mack (Schenker) and Tony Widmer (DHL).  The Defendants discussed how to pass on (and markup) the AMS charge to their customers.  The "Small Circle" members prepared a recommendation on Air AMS for the Airfreight Committee and CEO Committee.

512.     The FFE Airfreight Committee met in Brussels on or about October 21, 2003. Representatives of Panalpina, (Robert Frei) ABX Logistics (Laurence Vandenbrouck), DHL (Tony Widmer), Exel (Ole Ringheim), Geo-Logistics (Dermot Leeper), Kuehne + Nagel (Foland Bischoff), Schenker (Susanne Stemmer), UTi (John Hextall and Kurt Jensen), EGL (David Lara) and UPS (Chuck Cocci) were present.  During this meeting participants discussed how to implement the Air AMS requirements and coordinated pricing for the Air AMS fee.

513.     On or around November 12, 2003, the CEO Committee met at the Hotel Amigo in Brussels with the CEOs of Kuehne + Nagel, Exel, ABX Logistics, Dachser, DHL, Geo-Logistics and Schenker attending.  Guests at this meeting also included other non-CEO representatives from Panalpina, DHL, Kuehne + Nagel, Schenker, ABX Logistics and possibly other Defendants and other unnamed co-conspirators.

514.     On or about November 24, 2003, the FFE Chairman sent a letter regarding the implementation of Air AMS requirements to the airlines and copied members of the FFE Airfreight Committee and others on his letter.

515.     On January 9, 2004 Tony Widmer (DHL) reported to other high level executives in the DHL corporate family regarding the Air AMS fee, "We have to be careful about talking to competitors about pricing.  In order to launch this issue I mentioned in the last FFI that we all should do this not for free. . . ."

516.     On January 16, 2004, representatives of ABX, Dachser, DHL, Exel, Geo-Logistics, Kuehne + Nagel, Panalpina, Schenker, and UTi had a telephone conference call to discuss Air AMS.

517.     On March 24, 2004, the Airfreight Committee held a meeting in Basel, Switzerland, which was attended by representatives from Panalpina (Robert Frei, Jürg Meier, Vincent Bissinger and Christopher Wadley), Schenker (Thomas Mack), ABX Logistics (Laurence Vandenbrouck), DHL (Tony Widmer, Holger Bilz and Colin Cook), Exel (Ole Ringheim), Geo-Logistics (Dermot Leeper), Kuehne + Nagel (Roland Bischoff) and UTi (Kurt Jensen)  The meeting participants confirmed the agreement to charge an Air AMS fee, which they expected to be between €8 and €10, and they discussed a coordinated approach to setting the amount moving forward. In an email discussing the meeting and attaching the minutes, Tony Widmer explained that the discussion of Air AMS pricing "is not reflected in the minutes as we are not supposed to talk pricings."

518.     Another CEO Committee meeting was held at the Hotel Conrad in Brussels on May 5, 2004 where representatives of Kuehne + Nagel, Exel, Dachser, DHL, Geo-Logistics, Panalpina, Schenker, UTi, possibly other Defendants and other unnamed co-conspirators

THIRD AMENDED CLASS ACTION COMPLAINT                                    142

attended.  During this meeting Robert Frei of Panalpina reported on the status of the Airfreight Committee activities, including mechanics related to the implementation of AMS fees.  In addition, the CEOs reiterated their support for a common approach to dealing with carriers regarding commissions and fees on AMS charges.

519.    In a series of emails between FFI members in June and July of 2004, Exel, ABX, UTi, Dasher, Panalpina, Kuehne + Nagel, Geo-Logistics, Schenker and DHL coordinated their implementation of the Air AMS charge.  In a June 30, 2004 email sent to the FFI Secretariat; Carsten Borchert, Thomas Mack, and Susanne Stemmer of Schenker; Holger Bilz and Colin Cook of DHL; Ole Ringheim of Exel; Roland Bischoff and Werner Blaser of Kuehne + Nagel; Dermot Leeper of Geo-Logistics; Robert Frei and Vincent Bissinger of Panalpina, and Kurt Jensen of UTi, Marcus Liegandt of Dachser asked whether "we as freight forwarders [shall] try to introduce [an Air AMS] fee towards our customers to refinance our investment and to unlock a source of income" and proposed a conference call to discuss the matter further.  The FFI Secretariat replied, "FFI does not allow co-ordinated commercial activity or facilitate any attempt by Members to fix pricing for freight forwarding services."  Notwithstanding the FFI Secretariat's admonition, the Air AMS Defendants continued their discussions and agreements regarding the Air AMS charges.

520.    On July 20, 2004, representatives of ABX, Exel, Geo-Logistics, Panalpina, Schenker and UTi participated in a telephone conference call that focused on issues related to AMS.

521.    The FFI Airfreight Committee, along with David Lara from EGL, other Defendants and unnamed co-conspirators held a series of conference calls on July 23rd, 26th, and 27th, 2004.  On those calls, Defendants discussed the level of the Air AMS fee.  In a series of

internal EGL emails, David Lara suggested that DHL, Panalpina and Kuehne + Nagel were leading the discussions.

522.     The FFI Airfreight Committee and Air AMS Task Force held a conference call on August 19, 2004.  Participants included representatives of Dachser (Marcus Liegandt), Exel (John Roach), Geo-Logistics (Dermot Leeper), Kuehne + Nagel (Werner Blaser), Panalpina (Robert Frei), Schenker (Thomas Mack), and UTi (Kurt Jensen); representatives of ABX and DHL were also sent the minutes of this meeting, along with the participants who attended.  Each participant shared the amount of its current Air AMS surcharge, which ranged from €8 to €15 or an equivalent amount, and the participants discussed monitoring their other competitors to ensure all Freight Forwarders implementing the agreement to impose an Air AMS fee.  The FFI members also endorsed the German and Swiss forwarder association agreements to price-fix the AMS charge for shipments from Germany and Switzerland to the United States, respectively.

523.     The Airfreight Committee met on or about September 7, 2004 in Montreal.  The Montreal meeting included participants from at least Panalpina (Robert Frei), ABX Logistics (Francesco Campironi), DHL (Tony Widmer), Exel (John Roach and Ole Ringheim), Geo-Logistics (Dermot Leeper), Dachser (Dieter Bendele and Marcus Liegandt), Uti (Kurt Jensen), Schenker (Thomas Mack) and Kuehne + Nagel (Roland Bischoff), who confirmed that they were charging and in what amount they were charging Air AMS fees worldwide.  The FFI members also endorsed the German and Swiss forwarder association agreements to price-fix the AMS charge for shipments from Germany and Switzerland to the United States, respectively.

524.     On October 26, 2004 Roland Bischoff (Kuehne + Nagel) emailed the others members of the original "Small Circle," including Ole Ringheim (Exel), Robert Frei (Panalpina),

Thomas Mack (Schenker) and Tony Widmer (DHL) regarding what the Defendants should charge for Air AMS.

525.    The Airfreight Committee held an in-person meeting in Switzerland at the offices of Kuehne + Nagel on February 14, 2005.  In attendance were representatives from at least Panalpina, Schenker, ABX, DHL, Geo-Logistics, and Kuehne + Nagel.



**B.    Country-Level Discussions**







538.    One or more Plaintiffs paid the collusive surcharge described in this claim and imposed by the Air AMS Defendants and were therefore harmed by Defendants' illegal price-fixing agreement.

539.    Pursuant to their agreement, the Air AMS Defendants did impose artificially fixed and inflated Air AMS charges on all air cargo shipped into the United States between late summer 2004 and a date unknown to Plaintiffs and Plaintiffs and class members paid these artificially fixed and inflated Air AMS charges.

540.    The Air AMS Defendants' combination, conspiracy, and agreement to fix, inflate, and maintain prices for Air AMS fees on all air cargo shipped into or through the United States violated Section 1 of the Sherman Antitrust Act.

541.    Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

542.    Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class Members.

## AS AND FOR A NINTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

**U.S. Customs Ocean "AMS" Charge Agreement Made by Defendants Schenker, Geo-Logistics, DHL, Panalpina, UTi, Kuehne + Nagel, ABX Logistics, Exel, DSV (f/n/a DFDS) Hellmann, Geodis and other unnamed Co-Conspirators (the "Ocean AMS Defendants")**

543.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

544.    Beginning in or about 2002 and continuing until a date unknown to Plaintiffs, Defendants including at least DHL, Schenker, Kuehne + Nagel, Geo-Logistics, Panalpina, UTi, ABX and Exel and other unnamed Co-Conspirators combined, conspired and agreed to fix, inflate and maintain AMS charges for U.S. Freight Forwarding Services on ocean freight shipments into the United States.

545.    Ocean AMS Rules came into effect around early February 2003 and Ocean AMS fees began around March 2003.  Starting in late 2002, the Ocean AMS Defendants and other unnamed co-conspirators had discussions regarding the new AMS rules, including technical requirements necessary for complying with the rules, and discussed and agreed on the Ocean AMS charges worldwide, including on shipments into the United States.



---

THIRD AMENDED CLASS ACTION COMPLAINT                                    149







557.    One or more Plaintiffs paid the collusive surcharge described in this claim and imposed by the Ocean AMS Defendants and were therefore harmed by Defendants' illegal price-fixing agreement.

558.    Pursuant to their agreement, the Ocean AMS Surcharge Defendants did impose artificially fixed and inflated Ocean AMS surcharge fees on all ocean cargo shipped into the United States, and Plaintiffs and class members paid these artificially fixed and inflated Ocean AMS surcharges.

559.    The Ocean AMS Surcharge Defendants' conspiracy or agreement to fix, inflate and maintain prices of ocean AMS fees on all ocean cargo shipped into the United States violated Section 1 of the Sherman Antitrust Act.

560.    Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

561.    Such unlawful agreement inflated prices paid for U.S. Freight Forwarding services by Plaintiffs and Class Members.

## AS AND FOR A TENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

**Global Agreement Made by Defendants ABX Logistics, Dachser, Exel, Panalpina, Schenker, Geo-Logistics, Geodis, Kuehne + Nagel, Hellman, UPS, BAX Global, UTI, DHL and other unnamed Co-Conspirators (the "Global Agreement Defendants")**

562.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

563.    After the September 11th attacks in 2001, many countries began imposing additional security measures related to air and ocean cargo.  Moreover, given the uncertainty in the fuel market amid possible conflicts in the Middle East, air carriers faced increased and uncertain fuel costs.

564.    In order to offset costs that air and ocean carriers were planning to pass on to the Freight Forwarders, the Global Agreement Defendants met and generally agreed that post-9/11 surcharges should be passed on to their customers in violation of the Sherman Act.



---

THIRD AMENDED CLASS ACTION COMPLAINT                    153

566.    At this meeting, those Defendants met and agreed to pass on to their customers all impending as well as future surcharges from the carriers, which ended up including at least the following:

a.    The Security Surcharge alleged herein;

b.    The Ocean AMS Surcharge alleged herein;

c.    The Air AMS Surcharge alleged herein;

d.    The NES Surcharge alleged herein to the extent that it applied to a particular Defendant;

e.    The Peak Season Surcharges alleged herein; and

f.    The CAF Surcharge alleged herein.



570.    The first surcharge implemented as a result of this overarching conspiracy was the

2001 Security Surcharge. ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

571.    At a later date, Defendants UTi, Dachser, UPS and Hellman joined the Global

Agreement to pass on surcharges to their customers.

572.    These discussions and agreements continued between the Defendant CEOs and

other high ranking executives at the Global Agreement Defendant companies.  The CEOs and

Executives used meetings of the FFI CEO's Committee and FFI Airfreight Committee to

monitor each other's compliance with the overarching conspiracy and to encourage additional

competitors to join the agreement, as several did.



_____

THIRD AMENDED CLASS ACTION COMPLAINT                    155



577.     In the Judgment in the High Court of New Zealand, with respect to sentencing Schenker, BAX Global, Inc. and Panalpina, the Commission stated that "there is an inter-relationship between entry into these agreements and giving effect to them, and also that separate agreements may be taken to simply form part and parcel of a single approach adopted within the industry over the relevant period to rapid escalations of surcharges and costs.  In other words, the agreements were part of a wider culture within the freight forwarding and air cargo industries."

578.     These Global Agreement Defendants' numerous price fixing conspiracies reflect or constitute an overall agreement between at least the DHL Defendants and all other Global Agreement Defendants to fix and inflate the prices for Freight Forwarding services generally.

579.     By their combination, conspiracy or agreement, the Global Agreement Defendants intended to and did inflate the prices for Freight Forwarding Services on all

shipments into, out of, within, and purchased within the United States and routes around the world between 2001 and a date unknown to Plaintiffs.

580. As a direct result, Plaintiffs and other class members suffered antitrust injury to their business or property and are entitled to recover damages under 15 U.S.C. § 15.

581. One or more Plaintiffs paid the collusive surcharges described in this claim and imposed by the Global Agreement Defendants and were therefore harmed by Defendants' illegal price-fixing agreement.

582. The Global Agreement Defendants' conspiracy or agreement to fix, inflate and maintain prices of the foregoing surcharges and fees into the United States violated Section 1 of the Sherman Antitrust Act.

583. Pursuant to their agreement, the Global Conspiracy Defendants imposed artificially fixed and inflated security and other related surcharges on all freight shipments including shipments into, out of and within the United States, and Plaintiffs and class members paid these artificially fixed and inflated surcharges.

584. Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

585. Such unlawful agreement inflated prices paid for U.S. Freight Forwarding services by Plaintiffs and Class Members.

## AS AND FOR A ELEVENTH CLAIM FOR *PER SE* VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT

**Japanese Regional Conspiracy Made By Nippon Express; Yusen; Kintetsu; Nishi-Nippon Railroad Co., Ltd.; Hankyu Hanshin; Nissin; Vantec; "K" Line; Yamato; MOL Logistics; Hanshin Air Cargo Co., Ltd.; United Aircargo Consolidators, Inc.; DHL; and Airborne Express, Inc.(the "Japanese Regional Conspiracy Defendants")**

586.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in this Complaint.

587.    Additionally Plaintiffs allege the following three per se violations of Section 1 of the Sherman Antitrust Act.

588.    Between at least as early as August 2002 and continuing until at least November 2007, Defendants Nippon Express Co., Ltd.; Yusen Air & Sea Service Co., Ltd.; Kintetsu World Express, Inc.; Nishi-Nippon Railroad Co., Ltd.; Hankyu Hanshin Express Holdings Corporation; Nissin Corporation; Vantec Corporation Co., Ltd.; "K" Line Logistics, Ltd.; Yamato Global Logistics Japan Co., Ltd.; MOL Logistics (Japan) Co., Ltd.; Hanshin Air Cargo Co., Ltd.; United Aircargo Consolidators, Inc.; DHL Global Forwarding Japan K.K.; Airborne Express, Inc., and their U.S. subsidiaries, possibly other Defendants and other unnamed co-conspirators combined, conspired or agreed to fix, inflate and impose new charges for Freight Forwarding Services, including U.S. Freight Forwarding Services, on air cargo routes between Japan and the U.S.

589.    Such Defendants formed and implemented this overarching agreement through, among other steps, meetings at the Japanese Freight Forwarder Association during which Defendants discussed and agreed upon multiple types of co-operation;

      a.    the 2002 Fuel Surcharges Agreement;

      b.    the 2004 U.S. Customs "AMS" Charge Agreement; and

      c.    the 2006 Security and Explosives Examination Surcharges Agreement.

590.    This overarching agreement, conspiracy or combination to impose new charges for Freight Forwarding Services on U.S.-Japan air cargo routes, had the following effects, among others:

(a)    The foregoing Defendants' charges and prices for U.S. Freight Forwarding Services on the U.S.-Japan air cargo routes were raised, fixed, and maintained;

(b)    Plaintiffs and the other members of the Class were deprived of the benefits of free and open competition in the purchase of U.S. Freight Forwarding Services on such routes; and

(c)    Price competition in the sale of U.S. Freight Forwarding Services for such routes was restrained, suppressed, and/or eliminated.

591.    Defendants combined, conspired or agreed to fix, inflate and impose new charges for Freight Forwarding Services, including U.S. Freight Forwarding Services, on air cargo routes between Japan and the U.S. and violated Section 1 of the Sherman Antitrust Act.

592.    One or more Plaintiffs purchased Freight Forwarding Services on routes affected by the Defendants' agreement alleged herein, and paid the artificially established and inflated 2002 Fuel Surcharge, the 2004 U.S. Customs "AMS" Charge, and the 2006 Security and Explosives Examination Surcharge.  One or more Plaintiffs and other Class members also paid inflated prices for U.S. Freight Forwarding Services resulting from Defendants' overarching agreement as alleged herein.  Such unlawful agreement had a direct, substantial and foreseeable effect on U.S. trade and commerce, including U.S. import trade and commerce.

593.    Such unlawful agreement inflated the prices paid for U.S. Freight Forwarding Services by Plaintiffs and Class members.

/ / /

THIRD AMENDED CLASS ACTION COMPLAINT                                   159

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request:

1.      That the Court determine that the Sherman Act claims contained herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and that Plaintiffs be found to be adequate representatives;

2.      That Defendants' unlawful agreements, conspiracies or combinations alleged herein each be adjudged and decreed to be a *per se* violation of Section 1 of the Sherman Act;

3.      That Plaintiffs and the Class recover damages as provided by law, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws;

4.      That Defendants, their affiliates, subsidiaries, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be compelled to implement appropriate antitrust compliance progress and permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conspiratorial conduct alleged herein or proved at trial; (2) entering into any conspiracy alleged herein or any other conspiracy or combination having a similar purpose or effect; (3) adopting or following any practice, plan, program, or device having a similar purpose or effect; (4) communicating or causing to be communicated to any other person engaged in the distribution or sale of U.S. Freight Forwarding Services, information concerning prices or other terms or conditions of sale of any such products except to the extent necessary in connection with *bona fide* sale transactions between the parties to such communication; or (5) engaging in such other acts as the proof herein shall demonstrate to be appropriate for injunctive relief;

5.      That Plaintiffs and members of the Class be awarded pre- and post-judgment interest and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

6.      That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

7.      That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Fed.R.Civ.P. 38(b), Plaintiffs demand a trial by jury for all issues so triable.

Dated: May 9, 2013     By: _____

          Christopher Lovell (CL-2595)
          Craig M. Essenmacher
          Benjamin M. Jaccarino (BJ-1273)
          LOVELL STEWART HALEBIAN LLP
          61 Broadway, Suite 501
          New York, NY 10006
          Telephone:   (212) 608-1900
          Facsimile:    (212) 719-4775

     By: _____

          W. Joseph Bruckner
          Heidi M. Silton
          Craig S. Davis
          LOCKRIDGE GRINDAL NAUEN P.L.L.P.
          100 Washington Avenue South, Suite 2200
          Minneapolis, MN 55401
          Telephone:   (612) 339-6900
          Facsimile:    (612) 339-0981

By: _____

Steven N. Williams
Adam J. Zapala
Gene W. Kim
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:    (650) 697-6000
Facsimile:    (650) 697-0577

Imtiaz A. Siddiqui (IS-4090)
COTCHETT, PITRE & MCCARTHY, LLP
One Liberty Plaza, 23rd Floor
New York, NY 10006
Telephone: (212) 201-6820
Facsimile: (646) 219-6678

By: _____

Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua R. Rissman
GUSTAFSON GLUEK PLLC
120 South 6th Street #2600
Minneapolis, MN 55402
Telephone:    (612) 333-8844
Facsimile:    (612) 339-6622

***Interim Co-Lead Counsel for Plaintiffs***

# Exhibit A

2009 Case No.5 (So)

## CEASE-AND-DESIST ORDER

Addressees: as listed in Schedule 1

The Japan Fair Trade Commission (the *JFTC*) hereby issues this cease-and-desist order as against the above parties pursuant to Article 7, Paragraph 2 of the Anti-monopoly Act (the *Act*).

### MAIN TEXT

1.  Of the twelve companies listed in Schedule 1 (the *Twelve Companies*), each of the eleven companies except for Hankyu Hanshin Express Holdings Corporation (*HHEH*) (the *Eleven Companies*), must resolve the matters set out in (1) and (2) below at a meeting of the board of directors (or, with respect to Vantec World Transport Co., Ltd., at a general meeting of shareholders), and HHEH must resolve the matters set out in (1) and (3) below at a meeting of the board of directors:

    (1) to confirm that, with respect to the tariffs and surcharges in respect of the transport business as specified in the attachment (the *International Freight Forwarding Business*), there no longer exists any of the following agreements: (A) the agreement reached on 18 September 2002 among the Twelve Companies and the two companies set out in Schedules 4 and 5 respectively, (together, the *Fourteen Companies*) to the effect that the Fourteen Companies would additionally charge customers (including both shippers and receivers (the *Customers*)) a fuel surcharge in the amount corresponding to the fuel surcharge charged to the Fourteen Companies by the relevant international air transport business operators in respect of the freight loaded on aircrafts departing from Japan (or, with respect to Nippon Express Co., Ltd. (*NEC*) and DHL Global Forwarding Japan K.K. (*DHLJ*), the agreement joined by each of them from no later than 8 November 2002); (B) the agreement reached on 22 November 2004 among the thirteen companies consisting of the Twelve Companies and the company set out in Schedule 4 (together, the *Thirteen Companies* ) to the effect that the Thirteen Companies would additionally charge the Customers an "AMS charge" (i.e. a new surcharge designed to cover the costs arising in relation to the flight information advance notification system introduced and adopted by the US customs authorities system) at a rate no lower than the agreed minimum rate; and (C) the agreement reached on 20 February 2006 among the Thirteen Companies to the effect that the Thirteen Companies would additionally charge the Customers a "security charge" (i.e. a new surcharge designed to cover the costs arising as a result of dealing with

the air transport security measures implemented by the Transport Ministry) and an "explosives examination fee" (i.e. a new surcharge designed to cover the costs arising as a result of conducting the explosives examination (by using explosive test machines or by opening freight to ensure the security of freight) in dealing with the air transport security measures implemented by the Transport Ministry), each at a rate no lower than the agreed minimum rate.

(2) to ensure that, in the future, the tariffs and surcharges in respect of the International Freight Forwarding Business will be determined, not by any agreement among themselves or in a concerted manner with other companies, but independently by each company; and

(3) (a) to ensure that the company set out in Schedule 6 will not determine the tariffs and surcharges in respect of the International Freight Forwarding Business by any agreement with the Eleven Companies or in a concerted manner with other companies, and (b) to instruct the company set out in Schedule 6 to resolve at a meeting of the board of directors that it will determine the tariffs and surcharges in respect of the International Freight Forwarding Business, not by any agreement with the Eleven Companies or in a concerted manner with other companies, but independently.

2. Each of the Eleven Companies must notify the other members of the Eleven Companies and the company set out in Schedule 6 of the measures taken by it pursuant to the preceding paragraph and ensure that the Customers are made aware of such measures, and must also keep its employees informed of such measures. Furthermore, HHEH must notify the Eleven Companies of the measures taken by it pursuant to the preceding paragraph and ensure that the Customers are made aware of such measures, and must also instruct the company set out in Schedule 6 to keep its employees informed of such measures. The JFTC's approval must be obtained in advance with respect to the method to be taken in giving notice, providing information and giving instructions to the relevant persons.

3. Each of the Eleven Companies must, in the future, refrain from determining the tariffs and surcharges in respect of the International Freight Forwarding Business by any agreement among themselves or in a concerted manner with other companies. Furthermore, HHEH must, in the future, refrain from causing the company set out in Schedule 6 to determine the tariffs and surcharges in respect of the International Freight Forwarding Business by any agreement with the Eleven Companies or in a concerted manner with other companies.

4. Each of the Eleven Companies must take the measures necessary for the matters set forth in (1) through (4) below, and HHEH must instruct the company set out in Schedule 6 to take the measures necessary for the matters set forth in (1) through (4) below. Such measures and instructions must be

sufficient in content so as to prevent the above-mentioned acts from occurring in the future, and the JFTC's approval must be obtained in advance for such measures.

Relevant matters:

(1) the preparation or review of action guidelines to ensure compliance with the Act in relation to the International Freight Forwarding Business;

(2) with respect to ensuring compliance with the Act in relation to the International Freight Forwarding Business, the implementation of regular training for officers and employees who are in charge of work relating to the International Freight Forwarding Business and the conducting of regular audits by an employee or employees in charge of legal or compliance matters;

(3) the establishment or review of internal rules regarding sanctions to be imposed upon officers and employees who violate the Act; and

(4) the establishment or review of an internal informing system which is made effective by releasing the informer or certain persons being investigated from his/her liability for the relevant violation of the Act etc.

5.   Each of the Twelve Companies must promptly notify the JFTC of the measures taken by it pursuant to paragraphs 1, 2 and 4 above.

## REASONS

### I. Facts

**1**(1) A. (a)  Of the Twelve Companies listed in Schedule 1, the Eleven Companies with the exception of HHEH are forwarders engaged in the transport business as specified in the attachment (***International Freight Forwarding*** or the ***Business***) with a license granted by, or registration with, the Transport Minister pursuant to the Forwarding Business Act (1989 Act No.82) (the ***Forwarding Act***), having their respective head offices as set out in the section entitled "Location of Head Office" in Schedule 1.

(b)  Of the Twelve Companies, Vantec World Transport Co., Ltd. does not have a board of directors.

(c)  Of the Twelve Companies, HHEH used to be engaged in International Freight Forwarding with a license granted by the Transport Minister, having its head office set out in Schedule 1, but it transferred its business by way of demerger as of the date as stated in the section "Date" of Schedule 2 to the company  stated in Schedule 6 which is wholly-owned by HHEH, after which HHEH has not been engaged in the Business.

(d)  Of the Twelve Companies, the companies listed in Schedule 3 have changed their respective names as stated in the section entitled "Status of Changes" in  Schedule 3.

B. DHLJ in Schedule 4, who is not included among the addressees of this Order, is engaged in the Business with a license by the Transport Minister pursuant to the Forwarding Act, having its head office as stated in the section entitled "Location of Head Office" in Schedule 4.

C. Airborne Express KK (***ABE***) in Schedule 5 used to be engaged in the Business with a license issued by the Transport Minister pursuant to the Forwarding Act, having its head office as stated in the section entitled "Location of Head Office" in Schedule 5, but it has terminated the Business as of the date stated in the section entitled "Date" in Schedule 5, after which it has not been engaged in the Business.

(2) A.  The Eleven Companies and DHLJ are regular members of the Japan Aircargo Forwarders Association (the ***JAFA***), while HHEH and ABE used to be a regular member of the JAFA.

The Eleven Companies and DHLJ are members of an organisation within the JAFA called "the Executive Board of International Committee" (the ***EBIC***), whilst HHEH and ABE used to be members of the EBIC.

B. The Fourteen Companies attended EBIC meetings which were usually held every 2 months.

(3) In principle, when the Fourteen Companies introduced new tariffs and surcharges for their Business or made changes to them, they implemented such new tariffs and surcharges or changes to them, and notified them to the Transport Minister, pursuant to the Regulations (Transport Ministry Regulations No.32, 1990) for the Forwarding Act.

(4) The Fourteen Companies set the tariffs and surcharges to be imposed on the Customers, and actually charged the Customers such tariffs and surcharges by themselves or via other parties (including agents).

(5) A. The gross freight volume handled by the Fourteen Companies through their International Freight Forwarding business constituted the majority of the total freight volume handled by the whole Business in Japan.

B. Aggregated freight volume handled by Nippon Express Co., Ltd. (*NEC*), Kintetsu World Express, Inc. and Yusen Air & Sea Service Co., Ltd. (together, the *Three Major Companies*) constituted the majority of the total freight volume handled by the Fourteen Companies.

2(1)A. Around August 2002, air fuel price started to rise, and companies engaged in the international air transport business (the *Airlines*) decided to impose a fuel surcharge which corresponds to the fluctuations of air fuel price, and is charged in addition to a base tariff only at the time of surging air fuel price with respect to freight loaded on aircrafts departing from Japan (aircrafts used for international flights departing from an airport located in Japan). The Airlines, one after another started to charge international freight forwarders (companies engaged in the International Freight Forwarding (the *Forwarders*)) fuel surcharges after 16 October 2002, with the approval of the Transport Minister.

B. (a) The Three Major Companies received an explanation from the Airlines that air fuel price had been rising and that the Airlines were intending to introduce a fuel surcharge to be imposed on freight loaded on aircrafts departing from Japan after 16 October 2002.

(b) The explanation as described in paragraph (a) above increased the prospect of the Forwarders being charged a fuel surcharge by the Airlines. To deal with such a situation, the Fourteen Companies, except for NEC and DHLJ, attended an EBIC meeting held on 18 September 2002 and reached an agreement as to tariffs and surcharges related to the Business to introduce a fuel surcharge (the *Fuel Surcharge passed on to the Customer*) in the amount corresponding to the surcharge charged by the Airlines with respect to freight for which a house airway bill (an airway bill that is issued and agreed between Forwarders and Customers to certify that a forwarding contract has been executed regarding the particular freight (the *HAWB*)) was issued after 16 October 2002.

Page 5

(c)   NEC and DHLJ joined the agreement described in paragraph (b) above by 8 November 2002 at the latest.

(2) A. (a)   The United States Customs Authorities, as part of their security measures regarding air transport, decided to introduce, in a phased manner after 13 August 2004, a system (the *Advance Notification System*) where the Airlines electrically notify to the authorities prior to the flight information related to the freight to be loaded on an aircraft departing from an airport outside the United States and landing in an airport inside the United States by way of a customs clearance system called "the Automated Manifest System"(the *AMS*), and to implement the Advance Notification System regarding freight loaded on aircrafts landing in all airports in the United States after 13 December 2004.

(b)   In response to the introduction of the Advance Notification System, the Airlines decided to notify, to the United States Customs, information stated in a HAWB (*HAWB information*) with respect to freight commissioned by the Forwarders by electrically sending such information forwarded by the Forwarders via the AMS.

(c)   In addition, the Airlines decided to charge the Forwarders a certain pre-set fee to send HAWB information (a fee charged for the service to electrically send HAWB information via AMS (the *HAWB Fee*)) after 13 August 2004, and provided Kintetsu World Express, Inc. with an explanation to this effect.

B.   In order to cover the cost arising out of the introduction of the Advance Notification System including the HAWB Fee, the Thirteen companies took the opportunity of the EBIC meeting held on 22 November 2004 and agreed, in relation to the Business tariffs and surcharges, to introduce a new surcharge called "AMS charge" to the Customers on the following conditions:

(a)   to be imposed on freight regarding which the HAWB was issued in principle after 13 December 2004, or at the latest after 1 January 2005;

(b)   to be imposed on freight delivered to the United States (as a final destination) or through the United States to a third country except for Europe

(c)   to be imposed at the rate of at least JPY500 per HAWB

(3) A.(a)   As part of the security measures regarding air transport, the Transport Ministry decided to require the Forwarders after 1 April 2006 in principle to conduct an explosives examination (examination by using explosive test machines or by opening freight to ensure the security of freight (the *Explosives Examination*)) in respect of all freight to be loaded on aircrafts operated by the Airlines, and to introduce a new system whereby the Ministry acknowledges a Forwarder as a special Forwarder (the *Regulated Agent*) if the Forward is applying appropriate security measures including

security education and training, management of facilities and handling of cargo, and in principle exempts such Regulated Agents from the obligation of Explosives Examination, provided that the freight is commissioned by a party who, among its Customers, such Regulated Agent acknowledges as applying appropriate security measures (the ***Regulated Customers***) and the freight is handled by such Regulated Agent alone from the shipping by the Regulated Customer until delivery to the Airline.

(b) The Thirteen Companies obtained the status of Regulated Agent by 1 April 2006, decided to conduct the Explosives Examination by themselves or by commissioning to an agent with respect to freight that is subject to such examination, and established systems that are necessary for it.

B. The Thirteen Companies took the opportunity of the EBIC meeting held on 20 February 2006 and reached an agreement, with respect to the tariffs and surcharges related to the Business, as applicable to freight of which the HAWB was issued after 1 April 2006, with the following contents:

(a) to additionally charge the Customers as a "security charge" at least JPY300 per HAWB in order to cover the necessary cost to maintain the security measures as required for Regulated Agents; and

(b) to additionally charge the Customers, if an Explosives Examination is conducted, an "Explosives Examination fee" of at least JPY1,500 per HAWB in addition to a security charge described in paragraph (a) above in order to cover the necessary cost to implement the Explosives Examination.

**3.** In order to ensure the effective implementation of the agreements as described in section 2 above, the Fourteen Companies mutually disclosed information as to the collection of Fuel Surcharge passed on the Customer, AMS charge, security charge and Explosives Examination fee, at EBIC meetings.

**4.** Based on the agreements above, the Fourteen Companies invoiced to the Customers, Fuel Surcharges passed on to the Customers, AMS charge, security charge and Explosives Examination fee. The collection of such fees was largely successful.

**5.** Upon receiving information that the United States Department of Justice, the EC Commission and other authorities were starting to investigate the Forwarders based in the United States, Europe and other regions, the Three Major Companies held a meeting on 12 November 2007 between executives of these companies at a conference room in NEC's head office located in Minato-ku Tokyo, and agreed not to hold any EBIC meetings in the future. After this, no EBIC meeting were held. On this basis, after such date, the agreements as described in section 2 above was terminated.

## II. Application of law

According to the facts stated above, with respect to the tariffs and surcharges for the International Freight Forwarding Business, the Fourteen Companies determined in a concerted manner that they would additionally charge to the Customers the Fuel Surcharge passed on to the Customers as well as the AMS charge, the security charge and the explosives examination fee, each at a rate no lower than the agreed minimum rate, by which they substantively restricted competition in the field of the International Freight Forwarding Business. Such acts fall under "unfair restriction of trade" in Paragraph 6, Article 2 of the Act and constitutes a violation of Article 3 of the Act. Furthermore, upon considering in a comprehensive manner the various circumstances surrounding this case, including the fact that the violations had existed for a long period of time, we find it especially necessary to order a cease and desist order against the Twelve Companies.

Accordingly, we hereby issue against the Twelve Companies this cease-and-desist order as set forth in the main text, pursuant to Paragraph 2, Article 7 of the Act.


18 March 2009


Japan Fair Trade Commission

[Names of JFTC officers are omitted for the purpose of this translation.]

Attachment

Outbound transportation service of freight, upon demand of customers, by using transport service of air career companies (including, where applicable, collection and delivery of the freight by automobile made prior to and following air transport).

Schedule 1     List of addressees

| Number | Location of Head Office | Name of Company | Representative |
|---|---|---|---|
| 1 | 1-9-3 Higashi-shinbashi, Minato-ku, Tokyo | Nippon Express Co., Ltd | Masanori Kawai, President |
| 2 | 30-1 Nihonbashi Hakozaki-cho, Chuo-ku, Tokyo | Yusen Air & Sea Service Co., Ltd. | Shunichi Yano, President |
| 3 | 1-6-1 Otemachi, Chiyoda-ku, Tokyo | Kintetsu World Express Inc. | Hirokazu Tsujimoto, President and Chief Executive Officer |
| 4 | 1-11-17 Tenjin, Chuo-ku, Fukuoka | Nishi-Nippon Railroad Co., Ltd. | Kazuyuki Takeshima, President |
| 5 | 6-4-18 Nishi-tenman, Kita-ku, Osaka | Hankyu Hanshin Express Holdings Corporation | Hiroshi Ojima, President |
| 6 | 6-84 Onoe-cho, Naka-ku, Yokohama | Nissin Corporation | Masahiro Tsutsui, President |
| 7 | 4-9-11 Nihonbashi-honcho, Chuo-ku, Tokyo | Vantec World Transport Co., Ltd. | Hiroshi Kimura, President |
| 8 | 3-7-9 Sibaura, Minato-ku, Tokyo | "K" line Logistics, Ltd. | Mamoru Shozui, President |
| 9 | 1-10-14 Sinkawa, Chuo-ku, Tokyo | Yamato Global Logistics Japan Co., Ltd. | Jun Tsunoda, President & Chief Executive Officer |
| 10 | 2-5-1 Kouraku, Bunkyo-ku, Tokyo | MOL Logistics (Japan) Co., Ltd. | Toshifumi Kato, President |
| 11 | 1-9 Kanda Sakuma-cho, Chiyoda-ku, Tokyo | Hanshin Air Cargo Co., Ltd. | Yutaka Yamada, President |

| 12 | 5-5-5 Kounan, Minato-ku, Tokyo | United Aircargo Consolidators, Inc | Yoshinori Yuasa, President |
|---|---|---|---|

Schedule 2    Company which terminated its international freight forwarding business among addressees

| Number | Name of Company | Date | Notes |
|---|---|---|---|
| 5 | Hankyu Hanshin Express Holdings Corporation | 1 April 2008 | Hankyu Travel International Co., Ltd transferred by way of demerger the International Freight Forwarding Business to Hankyu Express International Co., LTd. on 1 April 2008, and changed its trade name to the current trade name on the same day. |

Note: The number shown in the "Number" corresponds to the number in the section "Number" of Schedule 1.

Schedule 3    Companies which changed its trade names among addressees

| Number | Name of Company | Status of Changes |
|---|---|---|
| 7 | Vantec World Transport Co., Ltd. | Tokyu Air Cargo KK changed its trade name to current trade name on 1 February 2005. |
| 8 | "K" line Logistics, Ltd. | "K" Line Air Service, Ltd. changed its trade name to the current trade name on 1 July 2006. |

| 9 | Yamato Global Logistics Japan Co., Ltd. | Yamato UPS International Aircargo KK changed its trade name to Yamato Global Freight KK on 1 October 2002, and Yamato Global Freight KK changed its trade name to Yamato Logistics KK on 1 October 2004, and Yamato Logistics KK changed its trade name to the current trade name. |
| --- | --- | --- |

Note: The number shown in the section "Number" corresponds to the number in the "Number" of Schedule 1.

Schedule 4    Company which engages in the International Freight Forwarding Business other than Addressees

| Name of Company | Location of Head Office |
| --- | --- |
| DHL Global Forwarding Japan K.K. | 1-19-9 Tsutsumi-dori, Sumida-ku, Tokyo |

Schedule 5    Company which discontinued the International Freight Forwarding Business other than Addressees

| Name of Company | Address of Head Office | Date | Notes |
| --- | --- | --- | --- |
| Airbourn Express, Inc. | 1-37-8 Higashi-shinagawa, Shinagawa-ku, Tokyo | 31 December 2003 | Reported to Minister of the Transport Ministry that it would terminate the International Freight Forwarding Business effective 31 December 2003 |

Schedule 6    Company which succeeded the International Freight Forwarding

Business other than addressees

| Name of Company | Location of Head Office | Date | Notes |
|---|---|---|---|
| Hankyu Express KK | 6-4-18 Nishi Tenman, Kita-ku, Osaka | 1 April 2008 | Succeeded the International Freight Forwarding Business from Hankyu Travel International Co., Ltd by way of merger on 1 April 2008. |