**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

PRECISION ASSOCIATES, INC., *et al*,
on behalf of themselves and all others
similarly situated,

          Plaintiffs,

     *vs*.

PANALPINA WORLD TRANSPORT
(HOLDING) LTD., et al.,

          Defendants.

_____

**Case No.: 08-CV-00042 (JG) (VVP)**

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF
FINAL APPROVAL OF TEN PROPOSED SETTLEMENTS
<u>AND PLAN OF ALLOCATION</u>**

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................1

     A.   The Settlements Provide Substantial Consideration to the Class ...........................1

          1.   There Is No Reversion Of Funds To Defendants.........................................3

          2.   Non-settling Defendants Remain Jointly And Severally Liable
               For The Surcharge Conspiracies ................................................................3

     B.   The Class Faced Substantial Risks at the Time the Settlements
          Were Entered ...........................................................................................3

     C.   Class Members Unanimously Support Nine Settlements and
          Overwhelmingly Support The Remaining Settlement ..............................4

     D.   Class Counsel Had Adequate Information To Exercise Their
          Experience And Reasonable Judgment In Entering The Ten Settlements .............5

     E.   The Objectors Attack the Very Strategies that Produced the Substantial
          Consideration that Resulted in the Overwhelming Approval of Potentially
          Hundreds Of Thousands Of Class Members ...........................................7

     F.   Class Certification And The Plan Of Allocation ......................................7

II.  STATEMENT OF FACTS .....................................................................................8

     A.   Commencement of the Case .....................................................................8

     B.   Schenker Provided Timely Cooperation When the Amnesty
          Applicant, DHL Refused ...........................................................................8

          1.   Schenker's Cooperation Was Valuable .....................................................9

          2.   Schenker's Monetary Compensation Is Significant..................................10

          3.   The Universal Opt-Out Provision ............................................................10

     C.   Defendants' First Motion to Dismiss And The R&R ...........................11

     D.   The Vantec Settlement .............................................................................12

     E.   The EGL Settlement .................................................................................13

F.       The Expeditors Settlement ....................................................................14

G.       The Nishi-Nippon Settlement ...............................................................14

H.       Plaintiffs' Motion To Provide Notice to the Class................................14

I.        The UAC Settlement .............................................................................14

J.        The KN Settlement ................................................................................15

K.       The Morrison Express Settlement .........................................................15

L.       The Amended Complaint .......................................................................15

M.       The UTi Settlement ...............................................................................16

N.       The ABX Settlement .............................................................................16

O.       Defendants' Motion to Dismiss All Claims in the
         Amended Complaint ..............................................................................16

P.       Class Notice Has Been Provided In Accordance
         With The Orders Of The Court ..............................................................16

Q.       A Miniscule Percentage of the Class Has Opted-Out ...........................17

R.       No Class Members Objected To Nine Settlements or
         To The Plan Of Allocation ....................................................................17

III.    ARGUMENT ....................................................................................................17

A.       The Standard of Review for Class Action Settlements
         Under Rule 23 ........................................................................................17

B.       Each Settlement Merits Final Approval.................................................18

         1.       The Proposed Settlements are Procedurally
                  Fair and Reasonable ....................................................................18

         2.       The Proposed Settlements Are Substantively
                  Fair and Reasonable ....................................................................19

                  a.       The Complexity, Expense And Likely Duration
                           Of the Litigation Warrant Approval of the
                           Settlements ........................................................................20

        b.      The Class Unanimously Supports Nine Settlements
and Overwhelmingly Supports the Remaining
Settlement ....................................................................................22

        c.      The Case Was Sufficiently Advanced At the Time
Each Settlement Was Reached........................................................22

        d.      Plaintiffs Faced Significant Risks of Establishing
Liability at Trial and Establishing and Collecting Damages .........24

        e.      It Is Uncertain Whether All Defendants Could
Withstand a Greater Judgment.......................................................25

        f.      Each of These Settlements Falls Within The Range of
Reasonableness in Light of the Potential
Recovery and the Attendant Risks of Litigation............................26

C.     This Court Should Overrule Objections to the Schenker Agreement...................28

    1.     HP's and Dell's Objections to the Schenker Settlement Lack
Merit and Should be Rejected...................................................................28

        a.      The Schenker agreement provided the class with
critical, timely, and substantial cooperation  ...............................29

        b.      Courts recognize the value of ice-breaker settlements .................30

    2.     The Schenker Agreement's Universal Opt-Out Provision is
Fair, Adequate and Reasonable.................................................................31

        a.      Rule 23 does not grant class members the right to opt out
of settlements on a defendant-by-defendant basis ........................31

        b.      Class members have more rather than less
 information to evaluate whether to opt out...................................33

    3.     The lack of objections to the Schenker agreement militates in
favor of approval.......................................................................................34

D.     This Court Should Approve the MFN Provisions in the
Vantec and Nishi Agreements ............................................................................35

    1.     This Court In *Air Cargo*, And Other Courts Properly Allow Limited
MFN Provisions, Because They Encourage Early Settlements................36

    2.     The Vantec and Nishi MFN Provisions Are Manifestly

In The Best Interest Of The Class.............................................................37

3.     The Vantec and Nishi MFN Provisions Are Limited ...............................40

4.     Non-Settling Japanese Defendants Lack Standing To Object ..................42

E.     The Requirements of Class Certification Have Been Met......................................43

1.     Plaintiffs' Class Notice Program Complied with this Court's
       Orders and Rule 23 ...................................................................................43

F.     The Plan of Allocation Is Fair and Reasonable ....................................................44

IV.    CONCLUSION................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Adams Extract Co., Inc. v. Green Bay Packaging, Inc.*, 752 F.2d 137 (5th Cir. 1985)............... 37

*Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981) ....................................................................... 20

*Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209 (S.D.N.Y. 1992) ...................... 23, 24

*Cintech Indus. Coatings, Inc. v. Bennett Indus., Inc.*, 85 F.3d 1198 (6th Cir. 1996)................... 42

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)............................................. *passim*

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d. Cir. 2001) ............................................................ 4

*Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446 (E.D. Pa. 1985)...................... 37, 42

*Fisher Bros. v. Phelps Dodge Indus., Inc.*, 614 F. Supp. 377 (E.D. Pa. 1985) (affirmed table
   decision, 791 F.2d 917 (3d Cir. 1986))................................................................................ 39, 41

*Hyland v. Homeservices of Am., Inc.*, No. 3:05-CV-612, 2012 WL 1575310
   (W.D. Ky. May 3, 2012) .................................................................................. 37, 41, 42

*In re Air Cargo Shipping Services Antitrust Litig., 06-MD-1775*.......................................... *passim*

*In re Am. Bank Note Holographics Secs. Litig.*, 127 F. Supp. 2d 418
   (S.D.N.Y. 2001) ........................................................................................................... 23, 45

*In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652 (D.D.C. 1979)........................................ 3, 37, 42

*In re Auction Houses Antitrust Litig.*, No. 00-cv-0648, 2001 WL 170792 (S.D.N.Y. Feb. 22,
   2001) ............................................................................................................................... 5

*In re Bisphenol A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, MDL No. 1967, 2011 WL
   1790603 (W.D. Mo. May 10, 2011) ................................................................................ 37, 41

*In re Chicken Antitrust Litig.*, 560 F. Supp. 943 (N.D. Ga. 1979)........................................ 41, 42

*In re Computron Software, Inc. Sec. Litig.*, 6 F. Supp. 2d 313 (D. N.J. 1998)............................ 44

*In re Corrugated Container Antitrust Litig.*, MDL 310, 1981 WL 2093
   (S.D. Tex., June 4, 1981) .................................................................................... 29, 30, 38

*In re Cuisinart Food Processor Antitrust Litig.*, MDL No. 447, 1983 WL 153
   (D. Conn. Oct. 24, 1983)................................................................................................. 17

*In re Del-Val Fin. Corp. Sec. Litig.,* 162 F.R.D. 271 (S.D.N.Y. 1995) ...................... 11, 31, 32, 33

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, MDL No. 1446 , 2006 WL 1006611
  (S.D. Tex. Apr. 12, 2006) *interlocutory appeal denied*, 2006 WL 1663737
  (S.D. Tex. June 14, 2006) ...................................................................................... 11, 31, 33

*In re Enron Corp. Secs. Derivative & "ERISA" Litig.*, No. MDL-1446, 2008 WL 2566867
  (S.D. Tex. June 24, 2008) ...................................................................................... 37, 41, 42, 43

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588 (S.D.N.Y. 1992) ................ 21, 44

*In re Linerboard Antitrust Litig.*, 292 F. Supp.2d  631 (E.D. Pa., 2003).......................... 29, 30, 38

*In re Lloyd's Am. Trust Fund Litig.*, No. 96 Cir. 1262, 2002 22663WL 31663577
  (S.D.N.Y. Nov. 26, 2002) .................................................................................................... 23

*In re Luxottica Grp. S. P.A. Sec. Litig.*, 233 F.R.D. 306 (E.D.N.Y. 2006).................................. 28

*In re Med. X-Ray Film Antitrust Litig.*, No. 93-5904, 1997 WL 33320580 (E.D.N.Y. Dec. 26,
  1997) ............................................................................................................................. 37, 41, 43

*In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46 (S.D.N.Y. 1993) .............................. 21

*In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379 (D. Md. 1983) .................................... 29

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998)............... 18, 25

*In re Oracle Sec. Litig.*, No. C-90-0931-VRW, 1994 WL 502054 (N.D. Cal. June 18, 1994) .... 44

*In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519 (E.D. Mich.,
  Feb. 22, 2011) ........................................................................................................... *passim*

*In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd sub
  nom. In re PaineWebber Inc. Ltd. P'ships Litig.*, 117 F.3d 721 (2d Cir. 1997) ................... 5, 24

*In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697 (M.D. Pa. 2008)........ 29

*In re Prudential Sec., Inc.*, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995). .................................... 25

*In re San Juan DuPont Plaza Hotel Fire Litig.*, No. MDL-721, 1989 WL 996278 (D.P.R. Sept.
  14, 1989) ............................................................................................................................... 39

*In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950
  (S.D.N.Y. Nov. 18, 1983) ................................................................................................ 20, 24

*In re Sumitomo Copper Litig.*, 189 F.R.D. 274 (S.D.N.Y. 1999)................................................. 27

*In re Time Warner Commc'ns Sec. Litig.*, 618 F.Supp. 735 (S.D.N.Y. 1985)
*aff'd*, 798 F.2d 35 (2d Cir. 1986). ........................................................................ 26

*In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503
(E.D.N.Y. 2003) ........................................................................... 17, 21

*Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000) ................................................ 17, 20

*Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................ 4, 22, 34, 44

*Martens v. Smith Barney, Inc.*, 190 F.R.D. 134 (S.D.N.Y. 1999) .................................... 11, 31, 33

*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2d Cir. 1995) .................... 20, 26, 28

*McBean v. City of New York*, 233 F.R.D. 377 (S.D. N.Y. 2006) ........................................... 22, 34

*MetLife Demutualization Litig.*, 689 F. Supp. 2d 297 (E.D.N.Y. 2010) ........................................ 28

*Nat'l Rural Telecomms Coop v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) .................. 28

*Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972) ........................................................ 26

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) .................................. 28

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ........................................... 11, 32

*PPM Am., Inc. v. Marriot Corp.*, 853 F. Supp. 860 (D. Md. 1994) ........................................... 34

*Schwartz v. Novo Industry A/S*, 119 F.R.D. 359 (S.D.N.Y. 1998) ....................................... 24

*Strang v. JHM Mortg. Sec. L.P.*, 890 F. Supp. 499 (E.D. Va. 1995) ........................................... 24

*Strougo v. Bassini*, 258 F.Supp.2d 254 (S.D.N.Y. 2003) ........................................... 21, 22

*Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55 (S.D.N.Y. 2003) ........................................... 24

*TVT Records v. The Island Def Jam Music Grp.*, 412 F.3d 82 (2d Cir. 2005) ....................... 22, 25

*U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040 (S.D.N.Y. 1986),
*aff'd*, 842 F.2d 1335 (2d Cir. 1988). ........................................................................... 25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005), *cert. denied*, 544 U.S.
1044 (2005) ........................................................................... 4, 18, 19, 20

*Weinberger v. Kendrick*, 698 F.2d 61 (C.A.N.Y. 1982) ........................................... 18, 23

**Statutes**

Antitrust Criminal Penalty Enhancement and Reform Act**,** Pub. L. No. 108-237, 118 Stat. 661, 666-67 (2004)........................................................................................................................ 8, 38

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................. passim

**Other Authorities**

150 Congr. Rec., at S3619 (Apr. 2, 2004) (Statement of Sen. DeWine) ...................................... 38

150 Cong. Rec., S3614 (Apr. 2, 2004) (Statement of Sen. Hatch) ............................................... 37

Christopher R. Leslie, *Judgment-Sharing Agreements*, 58 Duke L. J. 747, 768-74 (2009) ......... 39

*Division Update Spring 2011*, http://www.justice.gov/atr/public/division-update/2011/criminal-program.html (last visited June 11, 2013) ............................................................................. 27

*In re Air Cargo Shipping Services Antitrust Litigation*, http://aircargosettlement3.com/main (last visited June 11, 2013) .......................................................................................................... 27

*Manual for Complex Litigation (Fourth)* § 13:23 at 178 (2004) .................................................. 42

Rob Knigge, *Freight forwarding and logistics: What the high performers know*, Accenture Outlook Point of View (Jan. 2013), http://www.accenture.com/us-en/outlook/Pages/outlook-online-2013-freight-forwarding-and-logistics-what-high-performers-know.aspx ................... 26

# I.     INTRODUCTION

Plaintiffs seek final approval of ten settlements that establish a $112,356,911.58 guaranteed settlement fund in this class action.  This figure will grow from additional settlement payments by certain Settling Defendants of their recoveries of *Air Cargo*[1] proceeds.  This Court should approve the ten proposed settlements,[2] overrule the objections because they lack merit, finally certify each settlement class, and approve the proposed Plan of Allocation.  As described below in detail, the members of the Class overwhelmingly support the settlements because they provide material and substantial benefits to the Class.  Of the potentially hundreds of thousands of Class members, only two have objected, and those two object to and only to the Schenker settlement.[3]

## A.     The Settlements Provide Substantial Consideration to the Class

---

[1] *In re Air Cargo Shipping Services Antitrust Litig., 06-MD-1775 (JG) (VVP) (E.D.N.Y.) ("Air Cargo")* is also before this Court. Plaintiffs there claim that various airlines conspired to fix prices for air cargo services.  Many, if not all, of the Defendants in this case are class members in *Air Cargo*.  Most of the Settling Defendants have agreed to turn over some or all of the proceeds they receive from the pending *Air Cargo* distribution.  Their share of the pending *Air Cargo* distribution and any further *Air Cargo* settlements will add to their settlement payments here.

[2] The ten proposed settlements for which Plaintiffs seek final approval were reached with the following Defendants or groups of Defendants:

1. Schenker Deutsche Bahn AG, Schenker AG, Schenker, Inc., Bax Global Inc. and DB Schenker (collectively "Schenker").  ECF No. 530.
2. Vantec Corporation and Vantec World Transport (USA), Inc. (collectively "Vantec"). ECF No. 530.
3. EGL, Inc. and EGL Eagle Global Logistics, LP, Inc. (collectively "EGL").  ECF No. 530.
4. Expeditors International of Washington, Inc. ECF No. 587.
5. Nishi-Nippon Railroad Co., Ltd.  ECF No. 604.
6. United Aircargo Consolidators, Inc.  ECF No. 643.
7. Kuehne + Nagel International AG and Kuehne + Nagel, Inc. (collectively, "KN").  ECF No. 649.
8. Morrison Express Logistics Pte Ltd. (Singapore) and Morrison Express Corporation (U.S.A.). ECF No. 673.
9. UTi Worldwide, Inc. ECF No. 692.
10. ABX Logistics Worldwide NV/SA. ECF No. 715.

[3] As described in Part III.D below, the third objection is not by a Class member, but by certain non-settling Defendants.

*First,* the ten proposed settlements provide substantial consideration to the class. Plaintiffs have secured settlements from ten of the twenty-eight Defendant groups in this antitrust class action alleging a complex international worldwide conspiracy to inflate freight forwarding service surcharges and nine specific conspiracies, each of which includes a DHL Defendant.[4]  The DHL Defendants, who are by far the largest freight forwarder, have not settled. The resulting combined Settlement Fund guarantees $**112,356,911.58** in payments for the benefit of the Class.  The Settlements promise **substantial additional future payments** from certain Settling Defendants' actual pending payouts, as well as from any potential future new settlements, in *Air Cargo.*

The guaranteed payment presently constitutes 31.20% of the Settling Defendants' Affected Revenues.[5]  This 31.20% percentage **will** continue to grow as pending distributions

---

[4] DHL Defendants include: Deutsche Post AG, Danzas Corporation/DHL Global Forwarding, DHL Express (USA), Inc., DHL Global Forwarding Japan K.K., Exel Global Logistics, Inc., Airborne Express, Inc. and Air Express International USA, Inc. (collectively "DHL").

[5] The "Affected Revenues" for a given Settling Defendant is Plaintiffs' estimates of the whole amount of the non-trebled surcharges, for the duration of each conspiracy surcharge claim, on those of the following alleged conspiracies in which that Settling Defendant allegedly participated:  Security Surcharge, New Export System ("NES") Surcharge, Chinese Currency Adjustment Factor ("CAF"), Peak Season Surcharge, Air Automated Manifest System surcharge ("AMS"), Ocean AMS, Japanese AMS, Japanese Fuel, the Japanese Securities and Explosives surcharge, and the Japanese Regional Conspiracy.

Plaintiffs' estimate is based upon information obtained from settling Defendants and other sources. The percentage estimate for each Settling Defendant compares 90% of their guaranteed settlement payments here to their Affected Revenues.  *See infra* Part IV regarding the plan of allocation.

The Affected Revenues do **not** include any estimates of revenues from the European Regional, Asian Regional and Worldwide Conspiracy claims, which were previously dismissed by this Court on *Twombly* grounds.  ECF No. 628 (Order adopting Report and Recommendation from Magistrate Judge granting in part motions to dismiss with leave to replead); *see also* ECF No. 746 (Corrected Third Amended Complaint, hereinafter "CTAC" (filed under seal)).  The ten percent of the proposed Settlements that are being allocated to the worldwide claim reflects the far greater risks of this claim, and represents a miniscule fraction of the worldwide charges.  *See infra* Part IV regarding the Plan of Allocation.

2

from *Air Cargo* are made.  It will grow even further in the event of any future settlements in *Air Cargo*.

### 1.    There Is No Reversion Of Funds To Defendants

In addition to the substantial financial consideration provided by the ten proposed settlements, an additional benefit of each proposed settlement is that, unlike *Air Cargo*, there is no reversion of funds to the Settling Defendants regardless of the number of Class members who opt out and regardless of the number of Class members who submit proofs of claim against the Settlement Fund.  Under the proposed pro-rata Plan of Allocation, therefore, the distribution to Class members who submit proofs of claims will be enhanced to the extent that other Class members opt out or do not submit proofs of claims.

### 2.    Non-settling Defendants Remain Jointly And Severally Liable For The Surcharge Conspiracies

In addition, each Settling Defendant's sales of affected Freight Forwarding Services remain in the case, and each remaining Defendant—with the potential exception of the DHL Defendants (see *infra at* p.10)—is jointly and severally liable for *all* overcharges resulting from the conspiracies Plaintiffs allege.[6]  Moreover, in addition to the foregoing substantial cash benefits, many Settling Defendants have also provided the Class with very valuable (and, in the instance of the Schenker Defendants, critical and timely) cooperation.  This cooperation has already improved the Class' prior recoveries and has enhanced the Class' prospects of future recoveries.[7]

---

[6] *In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652, 654 (D.D.C. 1979).
[7] In addition to providing the Class with both of these benefits, the Schenker settlement also provides the Class with, in Class Counsel's judgment, significant improvement in the its claims against the DHL Defendants, who participated in every conspiracy alleged in the complaint, and failed to come forward in a timely matter to provide cooperation.  See p. 10 *infra.*

**B.      The Class Faced Substantial Risks At The Time The Settlements Were Entered**

*Second*, the foregoing settlement consideration was obtained notwithstanding very substantial litigation risks faced by the Class.  These risks include the fact that almost all of the claims here have already been dismissed without prejudice (but subsequently repleaded). Indeed, the cloud of pending motions to dismiss with prejudice **even now** continues to hang over **all** of Plaintiffs' remaining claims.  To the extent that Plaintiffs' claims survive the motions to dismiss, Plaintiffs face the risk not only of certifying a litigated Class, but also the risk of proving multiple conspiracies.

To the extent that Plaintiffs survive those risks, Plaintiffs face the risk of proving the "but for" price absent the conspiratorial conduct.  This involves an accompanying "battle of the experts."  To the extent that Plaintiffs succeed on all the foregoing, they face many additional risks and, ultimately, foreign collection risks as well.  *See infra* at pp. 21-22, 24-25 (recounting additional risks).

**C.      Class Members Unanimously Support Nine Settlements And Overwhelmingly Support The Remaining Settlement**

*Third*, recognizing the substantial individual and overall consideration provided by the proposed settlements in the face of the foregoing risks, **NOT** one out of the hundreds of thousands of Class Members objected to approval of nine of the ten settlements.  Also, no class member has objected to the Plan of Allocation.  Courts have held that that the reaction of the class "is perhaps ***the most significant factor to be weighed in considering its adequacy***."  *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002) (emphasis added); *see also Wal-Mart Stores, Inc., v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (concluding that a limited number of objections was ". . . indicative of class approval . . . ."); *D'Amato v.*

*Deutsche Bank*, 236 F.3d 78, 86-87 (2d. Cir. 2001) (concluding that district court properly determined that the receipt of a small number of objections weighed in favor of the settlement).

Only two Class members—out of potentially hundreds of thousands of Class members—have filed an objection to anything, and that is the initial ice breaker Schenker settlement, which, in Class Counsel's judgment, has helped to produce many of the additional settlements.  ECF Nos. 842, 844.  This low number of objections strongly supports final approval of the Schenker settlement.  *See In re Auction Houses Antitrust Litig.*, No. 00-cv-0648, 2001 WL 170792, at *6 (S.D.N.Y. Feb. 22, 2001) (finding that ". . . the reception of the settlement by the class has been overwhelmingly favorable" where only **sixty-one** class members out of approximately 130,000 filed objections); *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997), *aff'd sub nom. In re PaineWebber Inc. Ltd. P'ships Litig.*, 117 F.3d 721 (2d Cir. 1997).

As the Class's overwhelming approval indicates, the ten proposed settlements fully merit approval under this Court's and the Court of Appeals' settlement approval standards.  *See* Argument *infra*.

### D.    Class Counsel Had Adequate Information To Exercise Their Experience And Reasonable Judgment In Entering The Ten Settlements

*Fourth*, before entering each of these ten proposed Settlements, Class Counsel exercised their reasonable judgment to analyze the varying strengths and risks of the respective prospects of potential recovery on the differing mix of specific conspiracy claims and the overall world conspiracy claim that was made against each Settling Defendant.  Class Counsel then compared their foregoing judgments and analysis of the value, in Class Counsel's judgments, to the Class of the consideration provided by each such Settlement, and appropriately weighed the availability of joint and several liability against other Defendants named in each specific conspiracy claim.

With respect to the ice-breaker Schenker settlement, Class Counsel's judgment was especially important in estimating the value of the timely and extensive cooperation provided by Schenker and the improvement that such cooperation provided in pleading and establishing the alleged conspiracies here. *See infra* at p.9. Class Counsel's judgments about the value of the Schenker agreement were all based on (a) previews of its cooperation, (b) the eighteen-plus month investigation Class Counsel had conducted into the facts since the commencement of this action, and (c) Class Counsel's extensive experience with antitrust claims and complex litigation.[8]

In addition, the financial consideration alone provided by the Schenker settlement constitutes a significant percentage of its Affected Revenues. *Compare,* the settlements thus far approved by this Court in the *Air Cargo* litigation. Again, because of joint and several liability, Class Counsel knew that collection of treble damages on the damages caused by Schenker was not "forfeited" by the settlement.

With respect to the remaining nine settlements, Class Counsel's judgment was based on: (a) the voluminous cooperation that had been received from Schenker; (b) the extensive documents that had been obtained during the litigation from other Defendants; (c) assertions by each Settling Defendant of their defenses as well as previews of their cooperation; (d) Class Counsel's continuing investigation until the time of each respective settlement;[9] (e) estimates of the amount of charges by each Settling Defendant; (f) as to the KN and Expeditors settlements, full-day mediation sessions with an experienced mediator; and (g) such other information that became available (including regarding risks of foreign collection).

---

[8] Each Class Counsel firm has decades of experience prosecuting antitrust claims.
[9] This included information from counsel's informal investigation, of governmental announcements, complaints or, in some instances, guilty pleas. *See, e.g.*, CTAC ¶¶ 4-5, 66, 135, 141, 144-45, 151.

Appropriately weighing the availability of joint and several liability against the risks, Class Counsel determined that the value of the consideration provided by each different Settling Defendant was fair, reasonable, and adequate.  *See* Exs. A-C.

The matrices attached as Exhibits A-C summarize information indirectly indicating the potential differences in the degrees of risks against the respective Settling Defendants.  Exhibits B and C reflect the specific local conspiracy claims that were alleged against each Settling Defendant, whether the claim had been charged by any governmental entity and the duration of the conspiracy that Plaintiffs alleged compared to the duration of any government charged conspiracy.

> **E.   The Objectors Attack The Very Strategies That Produced The Substantial Consideration That Resulted In The Overwhelming Approval Of Potentially Hundreds Of Thousands Of Class Members**

In order to produce the substantial results recounted above while the cloud of pending motions to dismiss and all the subsequent substantial risks continued to hang over **all** of Plaintiffs' claims, Co-Lead Counsel chose to employ two common pro-settlement strategies that have repeatedly been approved in prior cases.

One of these strategies is now objected to by eight non-Settling Defendants as providing "economically irrational" consideration, ECF No. 841 at 7-8 (the Japanese MFN).  The other strategy is objected to by two Class members as providing unreasonably low consideration.  ECF No.842 (objections to Schenker Settlement).  Both objections should be overruled on multiple grounds, including, in part, because they seek to overturn and eliminate the very strategies that produced the substantial settlement recoveries.  *See* Argument *infra*.

> **F.   Class Certification And The Plan Of Allocation**

The Court has preliminarily found that each Settlement Class satisfies Rule 23 class certification requirements. No one has objected to that finding. This Court should now finally approve same. *See* Argument *infra*. Similarly, no one has objected to the Plan of Allocation, which should be approved as reasonable and fair. *See* Argument *infra*.

## II.   STATEMENT OF FACTS

### A.   Commencement of the Case

On January 3, 2008, Plaintiffs filed the original complaint commencing this action. ECF No. 1. No other class action complaints followed this complaint, and no amnesty-seeking or other Defendant cooperated with Plaintiffs to supply the information for the original complaint. After service of foreign defendants and other work, Plaintiffs, on January 29, 2009, filed a motion for a first pretrial order and to appoint interim co-lead counsel. ECF No. 100. On June 2, 2009, Magistrate Judge Viktor Pohorelsky held a pretrial conference to hear Plaintiffs' motion. ECF No. 114.

### B.   Schenker Provided Timely Cooperation When the Amnesty Applicant, DHL, Refused

During the June 2, 2009 conference, and separately in direct communications with all Defendants, Plaintiffs warned any applicant to the DOJ for amnesty, to come forward and timely cooperate with Plaintiffs or risk waiving the benefits under the Antitrust Criminal Penalty Enhancement and Reform Act**,** Pub. L. No. 108-237, 118 Stat. 661, 666-67 (2004) ("ACPERA"). The *Twombly* risk and the continued chance that the DOJ would not act in any civil or criminal case, were (in Class Counsel's judgment) key reasons why the amnesty applicant made the calculated decision not to come forward to cooperate with Plaintiffs during the first, critical twenty-plus months of this litigation.

Notwithstanding Plaintiffs' repeated warnings, the amnesty applicant, which turned out to be DHL, refused to come forward.  Rather than waiting for the outcome of the motion to dismiss, however, the Schenker Defendants did come forward. They offered to settle and provide substantial cooperation to Plaintiffs.  Under tight constraints, Schenker carefully previewed its cooperation.  As recounted earlier, Co-Lead Counsel determined to settle with Schenker.  *See supra* at 5-7.  At that time, Co-Lead Counsel knew the dimensions of the Class's claims and exercised their reasonable judgment to enter into the Schenker settlement.  In addition to the substantial monetary and cooperation benefits of the Schenker settlement, the settlement was virtually necessitated by the prejudice to the Class resulting from the amnesty applicant's refusal to come forward and cooperate at that critical time.

### 1.      Schenker's Cooperation Was Valuable

Together with Co-Lead Counsel's ongoing investigation and efforts, Schenker's prompt settlement cooperation enabled Plaintiffs to allege seven new, specific foreign conspiracies in sufficient detail to survive Defendants' *Twombly* challenges.[10]  Further, based upon Schenker's cooperation, Plaintiffs alleged specific meetings (ECF No. 460 [Corrected Second Amended Complaint] at ¶¶ 186-193, 208-211, 228-248, 262-263, 266, 269-272, 276, 279-80, 282-83, 288-89) in specified locations overseas (*id.* at ¶¶ 193, 209, 228, 237, 240, 243, 247, 263, 266, 270, 276, 279, 282, 288), through specified foreign communications including in secret joint email accounts (*id.* at ¶¶ 231-232, 234-236, 241, 244, 262, 265, 269, 275, 278, 281, 287), and through foreign emails using secret code words  (*id.* at ¶¶ 206, 210-211).  Plaintiffs also added twenty-nine new Defendants to the claims.

---

[10]  The seven conspiracies were Security Surcharge (Claim 1), New Export System ("NES") Surcharge (Claim 3), Chinese Currency Adjustment Factor ("CAF") (Claims 5 and 6), and Peak Season Surcharge (Claims 7, 8, and 9). *See* ECF No. 460.

Plaintiffs' detailed allegations pulled together in one place the alleged wrongs involved in the freight forwarding industry. The recitation of Defendants' secret foreign meetings, secret foreign conference calls, secret foreign email account, and duplicitous code words in foreign emails, transformed the attitudes of many of the Defendants in this case.  For example, the Amnesty Applicant, DHL revealed itself and belatedly started producing documents to Plaintiffs in March 2010 (twenty-six months after the case began and one year after having prejudiced Plaintiffs by failing to provide the "timely" cooperation required under ACPERA.).  After the filing of the amended complaint, as the litigation progressed, multiple additional Defendants gradually came forward to test the waters on settlement.  Nine did eventually negotiate the settlements described in "D"-"N" below.

### 2.        Schenker's Monetary Compensation Is Significant

The Schenker settlement provides for $8,750,000 in cash, which constitutes 7.9% of Schenker's affected revenues.  The monetary component is significant.  First, the Schenker settlement provides a greater amount of compensation relative to the fines it has paid to the DOJ than many such settlements.  Second, as discussed above, the settlement contained no reversion of funds to the Settling Defendant regardless of opt-outs or levels of claims. Third, the settlement was made **without** the benefit of cooperation from the amnesty applicant.  Fourth, the settlement provided Plaintiffs with the benefit of additional arguments against the entitlement to ACPERA benefits of the amnesty applicant, DHL.   (Again, DHL is, by far, the largest all freight forwarders.)  The Schenker settlement thereby increased the threat to DHL of treble damages and joint and several liability resulting from DHL's waiver of ACPERA benefits by failing "timely" to cooperate.

### 3.        The Universal Opt-Out Provision

10

While the Schenker Agreement does not preclude Class members from opting out, it does provide Schenker reasonable protection from an opt-out unfairly using Schenker's own extensive cooperation against it in a separate action while also remaining in this class to reap the benefits of Schenker's cooperation against other Defendants. The settlement, therefore, provides that any Class member who opts out of the Schenker settlement thereby opts out of the entire litigation. As will be discussed at length in Argument "C", such a provision has repeatedly been upheld[11], has never been set aside, and was preliminarily approved by this Court over the same or similar objections that have now been re-raised. *See infra* Part II.A.

### C.    Defendants' First Motion to Dismiss And The R&R

On November 16, 2009, Defendants moved to dismiss the complaint on multiple grounds. ECF Nos. 233-235, 239-40, 242, 247. After extensive briefing,[12] oral argument was held on September 15, 2010. On January 4, 2011, Magistrate Judge Pohorelsky recommended denial of the most important parts of Defendants' motions to dismiss: the supposed implausibility of the allegations of eleven specific conspiracies, and the supposed bar of Plaintiffs' claims by the FTAIA. ECF No. 468 ("R&R"). However, the R&R recommended granting the motion to dismiss: (a) multiple defendant subsidiaries; (b) two regional non-specific conspiracy claims, and the overarching world conspiracy; and (c) all but one claim on for

---

[11] *Martens v. Smith Barney, Inc.*, 190 F.R.D. 134, 139 (S.D.N.Y. 1999) ("Prospective plaintiffs who opt out of a class settlement effectively opt out of the *entire* class litigation.") (emphasis added); *see In re Del-Val Fin. Corp. Sec. Litig.*, 162 F.R.D. 271, 275-76 (S.D.N.Y. 1995); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, MDL No. 1446 , 2006 WL 1006611, at *1 (S.D. Tex. Apr. 12, 2006) (disallowing institutional class member to cherry-pick settlements), *interlocutory appeal denied*, 2006 WL 1663737 (S.D. Tex. June 14, 2006); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810-11 (1985) ("In most class actions an absent plaintiff is provided at least with an opportunity to 'opt out' of the class, and if he takes advantage of that opportunity he is removed from the litigation entirely.").

[12] ECF Nos. 233-235, 239-40, 242, 247, 29734, 322-30, 361-62, 364, 366-68, 370-732, 383-87, 390-92, 396-97, 405-10, 413-15, 418-19, 421-24, 427-31, 445, 455, 459.

Plaintiffs' failure to adequately plead injury in fact.  The R&R recommended that Plaintiffs be allowed to replead.

On February 18, 2011, the parties submitted their respective objections to the R&R, and responded to these objections on March 21, 2011.[13]  On August 13, 2012, this Court upheld the R&R in full, including granting Plaintiffs leave to replead.  ECF No. 628.

### D.    The Vantec Settlement

By April 26, 2011, Plaintiffs had received substantial cooperation from Schenker and some documents from DHL.  On that date, Plaintiffs made the second settlement with Vantec.  The Vantec settlement provides for a $9,900,000 fixed cash payment and 100% of its  Air Cargo proceeds with a guaranteed minimum of $300,000 in Air Cargo proceeds.  Thus, the Vantec settlement, so far, is for at least approximately $10,614,263.21,[14] which constitutes 53% of Vantec's affected revenues.  *See* Ex. A.  In addition to the monetary consideration, the Vantec settlement provided Plaintiffs with substantial cooperation.  This included, but was not limited to, 206 documents used in the proceedings by the Japanese Fair Trade Commission ("JFTC").  *See infra* Part II.B.  These documents have proved valuable to Plaintiffs.

---

[13] ECF Nos. 471-74, 476-83, 488-90, 492-500.

[14] A number of settlements, including the Vantec settlement, comprise both fixed cash payments, as well as the payment of *Air Cargo* proceeds.  Because the *Air Cargo* litigation is ongoing, the exact amount of the Class's recovery from these Settling Defendants' *Air Cargo* proceeds is currently unknown.  However, it is anticipated that additional *Air Cargo* recoveries will be significant.  Payments to *Air Cargo* class members, including Settling Defendants in this litigation, from a third round of partial settlements in *Air Cargo* totaling approximately $207 million are currently pending.

In addition, a number of defendants, from whom additional damages may ultimately be recovered, remain in the *Air Cargo* litigation.  This brief includes the minimum dollar value of each settlement Plaintiffs seek final approval of, which is based exclusively on fixed cash payments plus the value of any *Air Cargo* proceeds received to date. But these settlement values are expected to rise substantially.

To obtain such valuable settlement consideration while the motion to dismiss was pending, Plaintiffs provided Vantec with an MFN clause.  This MFN was a very limited MFN and did NOT apply to non-Japanese Defendants.  Even as to Japanese Defendants, the MFN provided only that, IF there was no material adverse event,[15] then later settling Japanese Defendants **similarly situated** to Vantec[16] either would make non-*Air Cargo* payments constituting the same percentage of specified revenues as Vantec did, or Vantec would be entitled to a refund of some specified portion of its settlement payment.

### E.    The EGL Settlement

On May 12, 2011, Plaintiffs entered a settlement with EGL.  Before entering the EGL settlement and each of the remaining settlements, Plaintiffs had received the benefit of substantial cooperation and documents from various Defendants.  The EGL settlement provides for a fixed cash payment of $10,000,000 and 100% of EGL's Air Cargo proceeds capped at an additional $10,000,000.  In addition, EGL provided Plaintiffs with valuable cooperation. The EGL settlement has so far provided at least approximately $18,574,850.25. All three of the conspiracies in which EGL allegedly engaged involved criminal charges, and EGL plead guilty to two of the three. Thus, EGL's payment to date constitutes, so far, 189.5% of EGL's Affected Revenues.

---

[15] The MFNs do not apply if the subsequent settling Defendant is insolvent or bankrupt *or* has an inability to pay such a settlement required by the Settlement Ratio, or if a motion by Plaintiffs for class certification has been denied, or if summary judgment has been granted in favor of Defendants as to some or all of Plaintiffs' claims.   Vantec Agreement ¶ II(D)(8); Nishi Nippon Agreement ¶ II(D)(8).

[16] The MFN does not apply to non-criminally charged Japanese Defendants **such as UAC**. Plaintiffs have nonetheless obtained a similar ratio of payment from UAC, which was a Japanese Defendant that was **never** criminally charged.  See *infra* re UAC Settlement.  If this specified ratio is reasonable for a non-criminally charged Defendant, it likely is very reasonable for a Defendant that pleads guilty to three price fixing felonies (as each objecting non-Settling Japanese Defendants has).

**F.      The Expeditors Settlement**

On February 28, 2012, Plaintiffs settled with Expeditors. The Expeditors settlement

provides for the payment of 70% of Expeditors' Air Cargo proceeds.  So far, this settlement is

for approximately $10,872,222.08, which constitutes 43% of Expeditors' Affected Revenues.

See Ex. A.  Unlike with EGL and some other Defendants, there were no criminal charges against

Expeditors.

**G.      The Nishi-Nippon Settlement**

On May 9, 2012, Plaintiffs entered a settlement with Nishi-Nippon.  The Nishi-Nippon

settlement provides for a $20,082,896 cash payment and 50% of its Air Cargo proceeds capped

at $500,000.  Thus, the total settlement constitutes 50% of Nishi's affected revenues.  The Nishi

settlement included an MFN similar to that in the Vantec settlement and also included valuable

cooperation.

**H.      Plaintiffs' Motion To Provide Notice to the Class**

 In consultation with notice experts, Plaintiffs developed a robust, multifaceted class

notice program.  Thereafter, Plaintiffs moved for approval of the program for all the foregoing

settlements.  *See* ECF No. 596 (motion filed July 2, 2012).  Because of ongoing negotiations

with other Defendants, Plaintiffs repeatedly interrupted the planned program in order to provide

more value and savings to the Class.  This Court repeatedly permitted Plaintiffs to delay

providing notice in order to incorporate subsequent settlements reached with KN, Morrison, UTi,

and ABX.  *See supra* n.1.  At the times of each of these settlements, Plaintiffs had received

increasingly more cooperation and documents from various Defendants.

**I.      The UAC Settlement**

14

On August 9, 2012, Plaintiffs entered the settlement with UAC.  The UAC settlement provides for fixed cash payments totaling $295,275, 75% of UAC's future Air Cargo proceeds, and cooperation.  The UAC settlement, so far, has provided approximately $295,275, which constitutes 50% of UAC's affected revenues.

### J.    The KN Settlement

On September 14, 2012, Plaintiffs entered the settlement with KN.  The KN settlement provides for a fixed cash payment of $28,000,000, 99.7% of Air Cargo proceeds, and valuable cooperation.  The settlement amount, so far, is approximately $34,244,829.80.  This constitutes 26% of KNs Affected Revenues.  More than 80% of KN's Affected Revenues were received in non-criminally charged conspiracies or outside the time bracket of the duration of the criminally charged conspiracy.

### K.    The Morrison Express Settlement

On October 5, 2012, Plaintiffs entered the settlement with Morrison Express.  The Morrison Express settlement provides for a fixed cash payment of $1,678,700 , 72.5% of future Air Cargo proceeds, and valuable cooperation.  The settlement amount, so far, is approximately $1,678,700.  This constitutes 93% of Morrison's Affected Revenues.  Morrison has not been criminally charged by any governmental agency.

### L.    The Amended Complaint

On November 15, 2012, Plaintiffs filed an amended complaint.  ECF No. 677.  Plaintiffs: (1) dropped two dismissed regional conspiracies (Asian and European); (2) modified, greatly limited, and repleaded the dismissed worldwide conspiracy claim; (3) extensively addressed corporate grouping issues; and (4) repleaded injury-in-fact in response to Magistrate Judge Pohorelsky's holding in the R&R.

### M.    The UTi Settlement

On December 5, 2012, Plaintiffs entered the settlement with UTi.  The UTi settlement is for a fixed cash payment of $3,243,658 and 80.5% of future Air Cargo proceeds.  The settlement amount, so far, is approximately $3,243,658.00.  This constitutes 22% of UTi's Affected Revenues.  *See* Ex. A.  UTi was not criminally charged.

### N.    The ABX Settlement

On January 28, 2013, Plaintiffs entered the settlement with ABX Logistics.  The settlement is for $3,500,000 in cash and valuable cooperation.  This constitutes 58% of ABX's Affected Revenues.  See Ex. A.  ABX was not criminally charged.

### O.    Defendants' Motion to Dismiss All Claims in the Amended Complaint

On February 27, 2013, the remaining Defendants—including DHL, the Amnesty Applicant—moved to dismiss **all** claims in the amended complaint.  After another round of extensive briefing,[17] oral argument was held on June 13, 2013.  The motions are *sub judice*.

### P.    Class Notice Has Been Provided In Accordance With The Orders Of The Court

Pursuant to the orders of this Court, Plaintiffs caused the Notice of Pendency of Class Action and Proposed Settlement, Motion for Attorneys' Fees and Settlement Fairness Hearing (the "Notice") to be mailed to a total of 2.01 million potential Class Members.

Additionally, the Summary Notice of Proposed Settlement of Class Action and Settlement Hearing was published in numerous publications including the *Financial Times* (Global Edition), *The Wall Street Journal* (Global Edition), *Fortune Worldwide,* and *Time*; 22 in-country newspapers in China, Hong-Kong, Japan, Taiwan, and the United Kingdom in

---

[17] ECF Nos. 779, 781-783, 786, 787, 789, 792-793, 799, 803-04, 806, 809-10, 816-829, 780, 784-785, 788, 790-91, 794-95, 802, 805, 807, 811-12.

appropriate languages; nine trade publications; and internet banner ads were run on numerous

targeted websites.  *See* Decl. of Katherine Kinsella ("Kinsella Decl."), at ¶¶ 22-31, annexed as

Exhibit "2" to the Notice of Motion.

The Notice informed the Class Members that they had until June 25, 2013 to request

exclusion from the Settlements or to object to the Settlements or proposed Plan of Allocation.

> **Q.     A Miniscule Percentage of the Class Has Opted-Out**

The deadline to opt-out from the Class or object to any settlement was June 25, 2013.

Including apparently duplicate and late opt out requests, one hundred and eighty three (183)

Class members have requested exclusion from the Class.  *See* Decl. of Julie Redell ("Redell

Decl."), at ¶8 annexed as Exhibit "1" to the Notice of Motion.  This represents a miniscule

fraction of the estimated total Class—less than 1/10 of 1%.

> **R.     No Class Members Objected To Nine Settlements Or To The Plan Of
>         Allocation**

Also, as previously discussed, no Class member objected to the plan of allocation, the

Class, the notice program, nor to final approval of nine of the ten settlements.  Only two class

members have objected to final approval of one of the settlements – the Schenker agreement.

> **III.     ARGUMENT**

> **A.     The Standard of Review for Class Action Settlements Under Rule 23**

Rule 23 requires court approval of all class action settlements.  Fed. R. Civ. P. 23(e).

Under Rule 23, a class action settlement should be approved if it is "fair, adequate and

reasonable, and not a product of collusion."  *In re Visa Check/MasterMoney Antitrust Litig*., 297

F. Supp. 2d 503, 509 (E.D.N.Y. 2003) (quoting *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir.

2000)).  In making this examination, "[i]t is not the court's function 'to reopen and enter into

negotiations with the litigants in the hope of improving the terms of the settlement' or to

'substitute its business judgment for that of the parties who worked out the settlement.'" *In re Cuisinart Food Processor Antitrust Litig*., MDL No. 447, 1983 WL 153, at *3 (D. Conn. Oct. 24, 1983) (citations omitted).  Rather, in determining whether the settlement meets these criteria, courts often consider both "the settlement's terms and the negotiating process leading to settlement."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 116 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005); *see also In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06–MDL–1775, 2009 WL 3077396, at *6 (E.D.N.Y. Sept. 25, 2009) (Gleeson, J).

As discussed below, each Settlement qualifies for a presumption that it is fair, adequate and reasonable.  *Id.* at *7; *see also In re NASDAQ Market-Makers Antitrust Litig*., 187 F.R.D. 465, 474 (S.D.N.Y. 1998) ("So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement.").  That presumption has not been challenged here.

**B.     Each Settlement Merits Final Approval**

**1.     The Proposed Settlements are Procedurally Fair and Reasonable**

Procedural fairness "must be examined in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves."  *Id*. (internal quotation marks omitted).  Courts also consider the negotiation process and the opinion of competent counsel in assessing the procedural fairness of a proposed settlement.  *See Weinberger v. Kendrick,* 698 F.2d 61, 74 (C.A.N.Y. 1982) ("*Weinberger*").

Each preliminary approval brief and the supporting declarations for the ten Settlements are hereby incorporated herein by reference.  *See* ECF Nos. 527, 576, 590, 639-640, 646, 669, 687, 713. The Settlements, as previously attested, were entered into in good faith, after extensive

18

arms'-length negotiations between experienced and informed counsel on both sides.  *Id*. The
Expeditors settlement and the KN settlement were entered **only** with the assistance of a
nationally recognized mediator.  ECF Nos. 576, 646.

Plaintiffs' Counsel, who have decades of experience in antitrust class action litigation,
zealously represented the interests of Plaintiffs and the Class during all settlement negotiations.
Plaintiffs' counsel had received substantial cooperation and documents prior to entering the nine
settlements made after the Schenker settlement.  Before entering the Schenker settlement,
Plaintiffs had sufficient information to analyze the contested legal and factual issues and to
accurately evaluate and compare the cooperation benefits and monetary benefits with the risks of
not entering into the settlement.

Moreover, with respect to all settlements, Settling Defendants are represented by
nationally renowned law firms whose attorneys skillfully negotiated on behalf of their clients.
Thus, there was intense, arms'-length bargaining and the integrity of the negotiation process
shows that the settlements are procedurally fair.

## 2.     The Proposed Settlements Are Substantively Fair and Reasonable

In assessing whether a proposed class action settlement is fair and reasonable, the Second
Circuit has developed a number of factors that courts should consider.  These factors include: (i)
the complexity, expense and likely duration of the litigation; (ii) the reaction of the class to the
settlement; (iii) the stage of the proceedings and the amount of discovery completed; (iv) the
risks of establishing liability at trial; (v) the risks of establishing damages; (vi) the risks of
maintaining the class action through the trial; (vii) the ability of defendants to withstand a greater
judgment; (viii) the range of reasonableness of the settlement fund in light of the best possible
recovery; and (ix) the negotiation process and the opinion of competent counsel.  *Compare Wal-*

*Mart*, 396 F.3d at 117 *with Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995) ("*Maywalt*"), *and City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).

Fundamental to a determination of whether a settlement is fair, reasonable and adequate "'is the need to compare the terms of the compromise with the *likely* rewards of litigation.'" *Maywalt,* 67 F.3d at 1079-80 (emphasis added).  In making the determination, the settlement agreement must be considered as a whole.  *Id.* at 1079.

The decision to approve a class action settlement lies within the court's broad discretion. *Joel A.*, 218 F.3d at 139.  "The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Grinnell*, 495 F.2d at 462.  In this regard, courts have consistently concluded that the function of a judge reviewing a settlement is not to rewrite the settlement agreement reached by the parties or to try the case by resolving issues intentionally left unresolved.  *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 (1981).[18]  Rather, as this Court well knows, its function is merely to determine whether the settlement is fair, reasonable and adequate.  *Joel A.*, 218 F.2d at 138.

### a. The Complexity, Expense And Likely Duration Of The Litigation Warrant Approval Of The Settlements

Courts consistently hold that the complexity, expense and likely duration of litigation are all factors supporting approval of a settlement.  *See, e.g., Grinnell*, 495 F.2d at 463.  In particular, "antitrust cases, by their nature, are highly complex."  *Wal-Mart Stores, Inc.*, 396 F.3d at122; *In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950, at *6 (S.D.N.Y.

---

[18]  *See also Walsh v. Northrop Grumman Corp.*, No. 94-cv-5105 TCP, 1999 WL 184654, at *3 (E.D.N.Y. Mar. 25, 1999) (the court should not substitute its own business judgment for the business judgment of the parties); *Zerkle v. Cleveland Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971) (same).

Nov. 18, 1983) ("[A]ntitrust price fixing actions are generally complex, expensive and lengthy.").

This case is no different. Plaintiffs assert complex claims arising under the Sherman Antitrust Act. Further prosecution against the Settling Defendants would be not only complex, but expensive and time-consuming. The Court need only look to the ongoing litigation against the remaining Defendants to assure itself of this fact. Five years into this case, discovery is still stayed and the non-settling Defendants' second motion to dismiss *all* claims was argued in June 2013.

But for these settlements, the future prosecution of these multiple claims would also be time consuming, requiring expenditure of substantial time and resources to complete foreign fact and expert discovery, and to defend against Settling Defendants' likely motions for summary judgment.

Assuming Plaintiffs would be able to defeat summary judgment motions by the Settling Defendants, the trial itself would likely require many weeks, "with its attendant pretrial order, laborious winnowing of proof before trial, and post-trial skirmishing." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 591 (S.D.N.Y. 1992). Additionally, any trial judgment would still be subject to the continuing risks of litigation through probable appeals.[19] Even large judgments recovered after litigation and trial can be completely lost on appeal or as a result of a

---

[19] Even assuming Plaintiffs were able to recover a favorable judgment at trial, Defendants almost certainly would appeal, which would further delay any benefit to the Class. *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F.Supp.2d at 510 (approving settlement where action "would be taken many more years to finally resolve, taking into account the time necessary to exhaust all avenues of review"); *Strougo v. Bassini*, 258 F.Supp.2d 254, 261 (S.D.N.Y. 2003) ("[V]ictory – even at the trial stage – is not a guarantee of ultimate success.") (quoting *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993)).

post-trial judgment as a matter of law.[20]  Finally, there are collection proceedings and risks, some or many of which could play out in this Court.

Thus, "'[t]he potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interests of the Class.'"  *Strougo*, 258 F.Supp.2d at 258 (quoting *Slomovics v. All for a Dollar, Inc.*, 906 F. Supp. 146, 149 (E.D.N.Y. 1995)).  The Settlements secure a substantial and immediate benefit without the significant expense, prolonged delay and inevitable risk of continued litigation.  This factor, "weighs heavily in favor of the Settlement."  *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Cir. 6689,  2003 WL 22244676, at *3 (S.D.N.Y. Sept. 29, 2003).

### b.    The Class Unanimously Supports Nine Settlements And Overwhelmingly Supports The Remaining Settlement

As discussed, the reaction of class members to a settlement is an important factor in determining its fairness.  *McBean v. City of New York*, 233 F.R.D. 377, 386 (S.D.N.Y. 2006).  Indeed, courts have held that that the reaction of the class "is perhaps the most significant factor to be weighed in considering its adequacy."  *Maley v. Del Global Techs. Corp.*, 186 F.Supp.2d 358, 362 (S.D.N.Y. 2002) (emphasis added).  After receiving extensive notice, none of the Class Members objected to final approval of nine of the ten settlements.  Out of hundreds of thousands of Class members, only two have objected, and only to the Schenker Settlement.  *Id.*  This overwhelming approval of the settlements by the Class strongly supports final approval of all ten settlements.

### c.    The Case Was Sufficiently Advanced At the Time Each Settlement Was Reached

---

[20]  *E.g., TVT Records v. The Island Def Jam Music Grp.*, 412 F.3d 82 (2d Cir. 2005) (reversing and setting aside $54 million judgment).

In determining whether a class-action settlement is fair, the Court also is to consider the stage of the proceedings, including the amount of discovery completed. *See Weinberger*, 698 F.2d at 74; *Grinnell*, 495 F.2d at 463. This factor ensures that plaintiffs had access to sufficient material to evaluate their case and to assess the adequacy of any settlement proposal. *See Chatelain v. Prudential-Bache Sec., Inc.,* 805 F. Supp. 209, 213-214 (S.D.N.Y. 1992) ("*Chatelain*"). It is not necessary, however, for the parties to conduct formal discovery, as long as they have engaged in sufficient factual investigation to enable them to make an intelligent assessment of the case. *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Cir. 1262, 2002 22663WL 31663577, at *15 (S.D.N.Y. Nov. 26, 2002); *In re Am. Bank Note Holographics Secs. Litig.*, 127 F. Supp. 2d 418, 425-26 (S.D.N.Y. 2001).

Formal discovery has been stayed. However, after the Schenker settlement, Plaintiffs obtained substantial cooperation, documents, attorney proffers, witness interviews, and other information... This permitted extensive factual investigation and analysis relating to the events and transactions alleged in the Complaint prior to entering each of the nine remaining settlements.[21]

Although Plaintiffs' knowledge of the facts of the case at the time of the Schenker settlement was not as extensive as it is now, Plaintiffs learned of important facts about the dimensions of the case during the eighteen months prior to the Schenker settlement and from the preview of Schenker's cooperation *prior* to entering the Schenker settlement. This preview

---

[21] Ultimately, this investigation included documents that Plaintiffs received from Settling Defendants and eventually the Amnesty Applicant which now total approximately 1.3 million documents. So far, Plaintiffs' Counsel also interviewed 34 fact witnesses. Plaintiffs' Counsel also researched the applicable law with respect to Plaintiffs' claims and the potential defenses thereto, and has retained economists and consultants familiar with the freight forwarding industry to analyze liability, impact and damages issues.

presaged that Schenker's cooperation would assist Plaintiffs in alleging seven specific foreign

conspiracies in a detailed way that survived the *Twombly* arguments.

Given the foregoing and Plaintiffs' analysis of the strengths and weaknesses of the case

and of the legal and factual defenses that Settling Defendants likely would raise, Plaintiffs

clearly had sufficient information to bargain vigorously in negotiating the terms of the

Settlements.  *See Strang v. JHM Mortg. Sec. L.P.*, 890 F. Supp. 499, 501 (E.D. Va. 1995)

(approving settlement at early stages of litigation where plaintiffs had conducted sufficient

investigation to enable them to evaluate the merits of defendants' position); *Chatelain*, 805 F.

Supp. at 213 ("'[T]he absence of formal discovery has not . . . prevented consideration of

settlement.'"), *quoting Schwartz v. Novo Industry A/S*, 119 F.R.D. 359, 362 (S.D.N.Y. 1998).

Thus, this factor weighs strongly in favor of approval of the Settlements.  *Thompson v. Metro.*

*Life Ins. Co.*, 216 F.R.D. 55, 62 (S.D.N.Y. 2003); *PaineWebber*, 171 F.R.D. at 125.

> **d.    Plaintiffs Faced Significant Risks of Establishing Liability at Trial and Establishing and Collecting Damages**

In assessing substantive fairness, the Court must balance the Settlements' benefits  to the

Class – especially the *immediacy* and *certainty* of a substantial recovery for them-- against the

continuing risks of litigation.  *See Grinnell*, 495 F.2d at 463.

This includes balancing the likelihood of ultimate success on the merits against the relief

offered by the proposed Settlements.  In making such determination the court "has no duty and

no right to make any ultimate conclusions on the issues of fact and law underlying the merits of

the dispute, it is required to 'consider the strength of the case presented by the class members in

order to determine whether . . . the settlement was grossly unfair and inadequate.'"  *In re*

*Shopping Carts*, MDL No. 451, 1983 WL 1950, at *7 (quoting *Grinnell*, 495 F.2d at 456).

Here, motions to dismiss **all** claims remain pending.  To the extent Plaintiffs' claims survive the motions and a litigated class is certified, the Settling Defendants would continue to strenuously insist that most or all of the charges and surcharges at issue in this case were based on cost increases or other exogenous charges imposed on them.. That is, Settling Defendants argued that this litigation is supposedly unlike the typical price fixing case in which defendants make a free standing agreement to inflate charges.  If Defendants' arguments were accepted, to the extent that Plaintiffs succeeded in establishing liability, they nonetheless would face substantial risks and uncertainty as to the quantum of damages.

The history of litigation is replete with cases in which plaintiffs succeeded at trial on liability, but recovered no damages, or only disappointing damages, at trial, or on appeal.  *See, e.g., TVT Records*, 412 F.3d 82 (reversing and setting aside $54 million judgment); *U.S. Football League v. Nat'l Football League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) ("[T]he jury chose to award plaintiffs only nominal damages, concluding that the USFL had suffered only $1.00 in damages."), *aff'd*, 842 F.2d 1335, 1377 (2d Cir. 1988).  Damages at trial would inevitably involve a "battle of the experts," and it is "difficult to predict with any certainty which testimony would be credited."  *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. at 476.

Even assuming Plaintiffs were able to establish liability and prove damages, their ability to collect a judgment in excess of the Settlement amounts is uncertain as to foreign Defendants. Given the uncertainty of future litigation and foreign collection, these factors strongly favor the decision to obtain the immediate and tangible benefits for the Class that have been obtained by the Settlements. *In re Prudential Sec., Inc.*, 1995 WL 798907, at *14 (S.D.N.Y. Nov. 20, 1995).

e.      **It Is Uncertain Whether All Defendants Could Withstand a Greater Judgment**

25

In determining whether a proposed settlement is fair, reasonable and adequate, the Court must consider defendants' ability to withstand a judgment greater than that secured by the settlement. *Grinnell*, 495 F.2d at 463. In this case, some Defendants (Morrison, UTi, and ABX) argued that they would not have been able to withstand a substantial judgment.

The remaining Settling Defendants may be able *at this time* to satisfy a judgment greater than the specific amount of the Settlements. But what about in the future, which is when any judgment will be obtained? There is an uncertain economic climate in Europe and Japan. *See In re Air Cargo*, 2009 WL 3077396, at *9. A recent forecast of the freight forwarding industry found slowing growth in the near term and identified some of the most serious risks as stagnant yields resulting from freight rates remaining under severe pressure, pessimism about air freight business growth in the Asia-Pacific region, and overcapacity and declining rates in all ocean freight routes. *See* Rob Knigge, *Freight forwarding and logistics: What the high performers know*, Accenture Outlook Point of View (Jan. 2013), http://www.accenture.com/us-en/outlook/Pages/outlook-online-2013-freight-forwarding-and-logistics-what-high-performers-know.aspx.

This factor also weighs in favor of the Settlements. *In re Time Warner Commc'ns Sec. Litig.*, 618 F.Supp. 735, 746 (S.D.N.Y. 1985) *aff'd*, 798 F.2d 35 (2d Cir. 1986).

### f.   Each of These Settlements Falls Within The Range Of Reasonableness In Light Of The Potential Recovery And The Attendant Risks Of Litigation

The determination of a reasonable settlement is not susceptible to a simple mathematical equation yielding a particular sum. Rather, "in any case there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any

particular case and concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

Further, the intricacies of what can and cannot be proved based on the facts known today are pertinent to both the "likely" recovery standard under *Maywalt,* 67 F.3d at 1079, and the "best possible" recovery standard under *Grinnell*.  However, a detailed statement of the risks and intricacies of best possible recovery is inappropriate where, as here, partial settlements are presented and Plaintiffs are continuing to prosecute their claims against other Defendants.  *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 282 (S.D.N.Y. 1999) (Pollack, J) (noting that the presence of non-settling defendants rendered specific recitation of the risks inappropriate).

In this case, the Settlements provide immediate concrete cash benefits to Class members in an aggregate so far of $112,356,911.58.  Second, additional cash payments will be made from pending distributions in *Air Cargo* as well as from future settlements in *Air Cargo*.  Unlike many class action settlements, the amounts of the cash consideration provided by these settlements is more than the amount of the fines imposed by the DOJ.  In fact, here it is more than double such amounts of fines.[22]  And there is no reversion for opt-outs or Class members who do not claim.

---

[22] The Settling Defendants who paid DOJ fines have agreed to make, in aggregate, fixed cash payments totaling $76,732,896 [Nishi Nippon ($20,082,896); Vantec ($9,900,000); EGL ($10,000,000); KN ($28,000,000); Schenker ($8,750,000)] and all but Schenker have agreed to make further cash payments based upon proceeds from *Air Cargo*. *Air Cargo* proceeds received from these Settling Defendants to date already exceed $16,000,000 [Nishi Nippon ($500,000); Vantec ($714,263.21); EGL ($8,574,850.25); KN ($6,244,829.80)]. The $92,766,839.26 in payments from Settling Defendants who also paid fines to the DOJ is more than twice the amount that such Settling Defendants paid to the DOJ in aggregate: $45,645,367. [Nishi Nippon ($4,673,114) + Vantec ($3,339,648) + EGL ($4,486,120) + KN ($9,865,044) + Schenker ($3,535,514) + Bax ($19,745,927)]. In contrast, according to the DOJ, the fines paid in the *Air Cargo* case have reached $1.8 billion. U.S. Department of Justice, *Division Update Spring 2011*, http://www.justice.gov/atr/public/division-update/2011/criminal-program.html (last visited June 11, 2013). In the civil *Air Cargo* litigation, the total settlements to date are significantly less: $485 million. *In re Air Cargo Shipping Services Antitrust Litigation*, http://aircargosettlement3.com/main (last visited June 11, 2013).

C.      **This Court Should Overrule Objections to the Schenker Agreement**

      1.      **HP's and Dell's Objections to the Schenker Settlement Lack Merit and Should be Rejected**

Out of hundreds of thousands of Class members, only HP and Dell have objected to final approval of the Schenker settlement agreement.[23]  They principally object on three grounds: (a) the agreement's purported inadequate financial consideration, (b) the universal opt-out provision requiring class members that opt out of the Schenker agreement to opt out of the entire litigation, and (c) alleged inadequate notice regarding future class-wide recoveries.  Each of these contentions lacks merit.

"In assessing the consideration obtained by the class members in a class action settlement, '[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness.'"  *Nat'l Rural Telecomms Coop v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (alteration in original) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982)).  Again, the settlement as a whole must be considered.  *Maywalt*, 67 F.3d at 1079.  "The evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice."  *Grinnell*, 495 F.2d at 468.  It is well-settled that even if "a proposed settlement may only amount to a fraction of the potential recovery [it] does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."  *Id.* at 455; *see also MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 340 (E.D.N.Y. 2010) ("The fact that the class potentially could have achieved a

---

[23] By including references to Sony in HP and Dell's objections, they suggest that Sony has also objected to the Schenker settlement.  ECF No. 842 at 16; ECF No. 843 at 2.  This is incorrect.  Although Sony previously sought intervention for the purpose of altering the universal opt-out provision, when that request was denied by this Court, Sony did not file an objection to the Schenker settlement.  Consequently, HP and Dell are the only class members that have objected to the Schenker agreement.

greater recovery at trial is not dispositive and does not preclude the court from finding that the settlement is within a 'range of reasonableness' that is appropriate for approval.") (quoting *In re Luxottica Grp. S. P.A. Sec. Litig.*, 233 F.R.D. 306, 316 (E.D.N.Y. 2006)).

> a.   **The Schenker agreement provided the class with critical, timely, and substantial cooperation**

When evaluating the Schenker agreement as a whole, it is clear that it provides material benefits and should be approved.  The Schenker settlement's financial provisions are substantial and would alone justify final approval.  *See supra* at 6, 10. But, Schenker also provided extensive, valuable cooperation, and did so in a very timely fashion.  *See supra* at 6, 9-10; Schenker Agreement ¶ II.B.3.  This cooperation helped Plaintiffs make detailed allegations of seven new conspiracies and helped in multiple other respects.  *See supra* at 9.

Courts have repeatedly recognized the value of a settling defendant's cooperation when approving class settlements.  *See, e.g., In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *10 (E.D. Mich., Feb. 22, 2011) (noting that cooperation "has already been beneficial to the Plaintiffs in their continued prosecution of their claims against the non-settling Defendants"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp.2d 697, 702 (M.D. Pa. 2008) ("Moreover, the benefit of obtaining the cooperation of the Settling Defendants tends to offset the fact that they would be able to withstand a larger judgment."); *In re Linerboard Antitrust Litig.*, 292 F. Supp.2d  631, 643 (E.D. Pa., 2003) ("The provision of such assistance is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement."); *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1386 (D. Md. 1983) ("In addition, the commitment Distributor defendants have made to cooperate with plaintiff will certainly benefit the classes, and is an appropriate factor for the court to consider in approving a settlement.") (citation omitted); *In re Corrugated Container Antitrust Litig.*, MDL

310, 1981 WL 2093, at *16 (S.D. Tex., June 4, 1981) ("The settlement agreements provided for cooperation from the settling defendants that constituted a substantial benefit to the class.").

However, HP's and Dell's objections miss the mark because they give short shrift to the substantial cooperation Schenker provided here. For this further reason alone, their objection should be overruled.

### b.   Courts recognize the value of ice-breaker settlements

An "ice-breaker" settlement "is the first settlement in the litigation – and increases the likelihood of future settlements. An early settlement with one of many defendants can 'break the ice' and bring other defendants to the point of serious negotiations." *Linerboard*, 292 F. Supp. 2d at 643 (citation omitted); *see Packaged Ice,* 2011 WL 717519, at *10 ("Also *of significant value* is the fact that the Settlement Agreement with Home City can serve as an 'ice-breaker' settlement.") (emphasis added); *Corrugated Container,* 1981 WL 2093, at *19 (stating that settlement "was the first one negotiated and, in addition to the benefits already detailed, broke the ice and brought other defendants to the point of serious negotiations"). The first settlement in a case with this many defendants has value because it signals to other defendants that they should consider settlement as well.

Discounts for first or early settlements in a multi-defendant antitrust case add value to the class by strategically building higher recoveries in subsequent settlements:

> These first three settlements, and especially the first two, were negotiated at dollar amounts which in themselves do not closely correlate to the three defendants' potential liability. Nevertheless, as will be seen as we progress through the history of this litigation, this strategy was designed to achieve a maximum aggregate recovery for the class and the fact that the later settlements were at considerably higher rates tends to show that the strategy was successful. Certainly, the coercive impact of such a strategy, combined with the law on joint and several liability and right to contribution, is increasingly great as one settlement succeeds another.

30

*Corrugated Container*, 1981 WL 2093, at *23; *see id.* at *23 n.13 (noting that defendant's counsel admitted that without such a strategy it would have settled for less).  As discussed above, the Schenker agreement was the "ice-breaker" agreement.  As in *Corrugated Container*, this litigation's history and the number of settlements entered into after the Schenker agreement, as well as the overall settlement fund, show the importance of obtaining the Schenker agreement.  This further demonstrates the reasonableness of Class Counsel's judgment regarding its value.

Finally, HP and Dell ignore the improvements in the Class' claims against DHL resulting from the Schenker settlement.  Considering the settlement as a whole, their objections should be overruled.

## 2. The Schenker Agreement's Universal Opt-Out Provision is Fair, Adequate and Reasonable

To demonstrate the Schenker agreement's purported inadequacy, HP and Dell highlight the fact that its opt-out provision requires class members to opt-out of the entire litigation.  In HP's and Dell's version of litigation, parties should be permitted to obtain a windfall to the detriment of other class members by pursuing claims as absent class members against parties for whom they have potentially weak claims, and opting out of particular settlements against Defendants with whom they have potentially strong claims.  This view of class litigation is neither supported by the case law nor by judicial economy.  Indeed, this Court has already rejected HP and Dell's strained (and incorrect) view of the requirements of Rule 23.  *See* ECF No. 659 (Order) (Sept. 25, 2012) (denying intervenors' motion to modify the order preliminarily approving the Schenker agreement).

### a. Rule 23 does not grant class members the right to opt out of settlements on a defendant-by-defendant basis

Courts have repeatedly held that class members have no right to opt out of a class action on a defendant-by-defendant, settlement-by-settlement basis. *Martens v. Smith Barney, Inc.*, 190 F.R.D. 134, 139 (S.D.N.Y. 1999) ("Prospective plaintiffs who opt out of a class settlement effectively opt out of the *entire* class litigation.") (emphasis added); *see In re Del-Val Fin. Corp. Sec. Litig.,* 162 F.R.D. 271, 275-76 (S.D.N.Y. 1995); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, MDL No. 1446, 2006 WL 1006611, at *1 (S.D. Tex. Apr. 12, 2006) (disallowing institutional class member to cherry-pick settlements), *interlocutory appeal denied*, 2006 WL 1663737 (S.D. Tex. June 14, 2006); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810-11 (1985) ("In most class actions an absent plaintiff is provided at least with an opportunity to 'opt out' of the class, and if he takes advantage of that opportunity he is removed from the litigation entirely.").

HP and Dell cite no authority for the proposition that they should be treated differently. In ruling on their initial motion to intervene, this Court agreed that there was none. *See* ECF No. 659. Not only is there no authority to support HP and Dell, but this Court properly found that the authority points in the opposite direction. That is, courts facing similar arguments have found that "no precedent exists for permitting class members to opt out of a class, whether certified for purposes of settlement or otherwise, *with respect to some defendants or claims but not others*." *Del-Val,* 162 F.R.D. at 275 (emphasis added). Instead, Rule 23 "requires potential class members to make a trade-off: an individual either decides to remain a class member, bound by any and all judgments rendered in the class action but spared the expense of litigating on her own behalf, or she elects exclusion. If she chooses exclusion, she is required to expend her own resources to bring her claims against the defendants, but she may potentially be rewarded by receiving a larger recovery." *Id.* As the court in *Del-Val* noted:

> Permitting an individual eligible to be a class member to opt-out as to some defendants but not as to others *would allow her to have the best of both worlds*. She could opt to remain in the class action as to defendants against whom her claims were relatively weak, hoping for some recovery at little or no expense to herself, while opting out as to other defendants to pursue relatively stronger claims in the hopes of securing a more lucrative recovery than she would receive as a class member.

*Id.* at 275-76 (emphasis added). The court properly declined "to endorse such a novel application of Rule 23." *Id.* at 276; *see also Martens,* 190 F.R.D. at 139 ("Such a policy would allow opt out plaintiffs to benefit from the work the class had done to move the case forward without being subject to any of the constraints which bind class members."). To hold otherwise in this circumstance would upset the balance struck by Rule 23 to protect a class member's rights and to promote the efficient resolution of class actions. *See Del-Val, 162 F.R.D.* at 275 (stating that allowing individuals to choose to participate in settlements with some defendants and to not participate in others upsets the balance created by Rule 23); *see also Enron Corp.*, 2006 WL 1006611, at *1(disallowing plaintiffs "to cherry pick the class in which they wish to stay").

This is precisely what HP and Dell seek to do in this case: deny final approval of the Schenker settlement because they seek a windfall from the class settlements against Defendants for whom they have potentially weak claims and desire to independently pursue litigation against Schenker for potentially stronger claims. Notwithstanding HP's and Dell's characterization of the opt-out provision as a "penalty," Schenker simply sought to preclude the very real scenario that a class member could obtain all of the benefit of Schenker's material cooperation in all the other settlements herein, but use Schenker's cooperation against Schenker in an opt-out action or otherwise. As it did before, this Court should reject HP and Dell's arguments.

        **b.**     **Class members have more rather than less information to evaluate whether to opt out**

As they did before, HP and Dell also argue that the settlement should not be approved because the opt-out provision forces them to choose whether to remain in the case prior to knowing the scope of the class-wide recovery.  *See* ECF No. 842 at 17, 19-20.  Yet, as discussed in a previous submission to this Court, neither Rule 23 nor its case law grants class members the right to a crystal ball to determine with ultimate clarity how the litigation will end and what settlement amounts will be reached.  To the contrary, Rule 23 contemplates that class members ordinarily will be given a single opportunity, *at an early practicable time*, to decide whether to request exclusion from the class.  *See* Fed. R. Civ. P. 23 (c)(1)(A) (emphasis added); Fed. R. Civ. P. 23 (c)(2)(B)(v).  Nothing in the Rule requires that class members know or understand what settlements or other relief will ultimately flow from the litigation.  As the court held in *PPM America*, risks are inherent in litigation and settlement, including class actions:

> Members of [the Class] must make their own individual decisions concerning whether to opt-out or whether to participate in the [Settlement Offer].  Those who choose to opt-out will have decided that the value of future litigation is higher than the value of the settlement.  Those who do not opt-out and who participate . . . will have made financial calculations persuading them to participate in the settlement.  The incentive to participate present in this and any other proposed settlement does not, however, constitute the type of 'coercion' which would require this Court to find the proposed settlement to be inadequate.

*PPM Am., Inc. v. Marriot Corp.*, 853 F. Supp. 860, 877 (D. Md. 1994) (citation omitted).  Here, HP and Dell already had the benefit of extensive information about ten settlements.  This is ten more than Class members frequently have.  HP and Dell are not immune from the residual risks of litigation as to the other eighteen defendants, merely because they are members of a class or because they are sophisticated and well-represented business entities.  This Court should reject their objection.

### 3.    The lack of objections to the Schenker agreement militates in favor of approval

The reaction of class members to a settlement is an important factor in determining its fairness. *McBean v. City of New York*, 233 F.R.D. 377, 386 (S.D. N.Y. 2006). Indeed, courts have held that that the reaction of the class "is perhaps ***the most significant factor to be weighed in considering its adequacy***." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D. N.Y. 2002) (emphasis added).

This factor overwhelmingly supports overruling the objections of HP and Dell, and approving the Schenker settlement. Out of a class made up of potentially hundreds of thousands of purchasers of freight forwarding services, only HP and Dell have objected to either the adequacy of the Schenker agreement's financial terms or its universal opt-out provision. The lack of any similar objections from other class members – a class that includes sophisticated businesses and Fortune 500 companies – strongly suggests that the agreement should be approved. Moreover, despite the vociferousness of their objections, neither HP nor Dell has adequately explained why this factor should be ignored in the context of final approval. *See* ECF No. 842 at 15-16. Ignoring the fact that they have themselves filed objections, HP and Dell argue that the universal opt-out provision coerces class members into not filing objections. This is sheer speculation. There is no support in the case law or logic for this argument and it should be rejected by this Court.

**D.     This Court Should Approve the MFN Provisions in the Vantec and Nishi Agreements**

The Vantec and Nishi Nippon settlements and their MFN provisions warrant approval on their merits. These limited MFNs are proper, are in the Class's best interest, and encourage multiple settlements, thereby conserving judicial resources. Further, the Non-Settling Japanese Defendants lack standing to object and have themselves inhibited future settlements through their own judgment-sharing agreement.

The Vantec and Nishi MFNs are reasonably limited in scope and provide reasonable protection to Vantec and Nishi for settling when they did.  The MFNs provide in essence that under certain limited conditions, if a subsequent Settling Japanese Defendant (as that term is defined) settles with the Class, and the ratio of its settlement payment (excluding *Air Cargo* proceeds) compared to certain revenues from conspiratorial Japanese surcharges is less than the same ratio for the Vantec or Nishi settlement, then Vantec or Nishi is entitled to a partial refund commensurate with the Settlement Ratio.  Vantec Agreement ¶¶ I(B)(17), II(D)(1),(3),(4); Nishi Nippon Agreement ¶¶ I(B)(18), II(D)(1),(3),(4).  The MFNs only apply to Japanese Defendants which, within eighteen months after Vantec or Nishi pled guilty, themselves plead guilty to U.S. criminal antitrust charges (or in Vantec's case, plead or are indicted) related to the Plaintiffs' claims.  Vantec Agreement ¶ II(D)(1); Nishi Nippon Agreement ¶ II(D)(1).  That includes all objecting Non-Settling Defendants here.  The MFNs do not apply if specified material and adverse events subsequently occur—specifically, if the subsequent settling Defendant is insolvent or bankrupt *or* has an inability to pay such a settlement required by the Settlement Ratio, or if a motion by Plaintiffs for class certification has been denied, or if summary judgment has been granted in favor of Defendants as to some or all of Plaintiffs' claims. Vantec Agreement ¶ II(D)(6),(7); Nishi Nippon Agreement ¶ II(D)(6)(7).

### 1.   This Court In *Air Cargo*, And Other Courts Properly Allow Limited MFN Provisions, Because They Encourage Early Settlements.

As Non-Settling Japanese Defendants concede, this Court has approved settlements with MFN provisions.  *Air Cargo* (E.D.N.Y. Mar. 14, 2011) (ECF No. 1414) ("Order Approving Air France-KLM Settlement Agreement And Final Judgment"); *id.* (ECF No. 1416) ("Order Approving SAS Settlement Agreement And Final Judgment"); *id.* (E.D.N.Y. Oct. 6, 2009) (ECF No. 974) ("Order Approving Lufthansa Settlement Agreement And Entering Final Judgment").

Other courts have routinely approved settlements with MFN provisions.  One court cogently noted:

> The MFN is designed to assuage the first settling defendant's fears that it will lose the opportunity for a favorable settlement by "settling first" or "settling early."   The Court simply does not discern any unfairness to the class members.

*In re Bisphenol A (BPA) Polycarbonate Plastic Prods. Liab. Litig*., MDL No. 1967, 2011 WL 1790603, at *1, 4  (W.D. Mo. May 10, 2011); *see also, e.g*., *Hyland v. Homeservices of Am*., *Inc*., No. 3:05-CV-612, 2012 WL 1575310, at *5, 8 (W.D. Ky. May 3, 2012) (noting MFN suggested by impartial mediator, noting material change provision, and granting final approval); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *4 (E.D. Mich. Feb. 22, 2011) (granting MFN); *In re Enron Corp. Secs.  Derivative & "ERISA" Litig*., No. MDL-1446, 2008 WL 2566867, at *13 (S.D. Tex. June 24, 2008) ("[T]he Court finds that public policy favoring settlement and the avoidance of substantial expensive litigation is clearly served by the settlement with six large financial institutions[.]"); *In re Med. X-Ray Film Antitrust Litig*., No. 93-5904, 1997 WL 33320580, at *6-7 (E.D.N.Y. Dec. 26, 1997) (approving settlements with "no obvious deficiencies"); *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 449, 452-53 (E.D. Pa. 1985) ("*Fisher Bros. II*"); *In re Ampicillin Antitrust Litig*., 82 F.R.D. 652, 655 (D.D.C. 1979); *see also Adams Extract Co., Inc. v. Green Bay Packaging, Inc.,* 752 F.2d 137, 139, 145 (5th Cir. 1985) (remanding for evidentiary hearing on interpretation and enforcement of MFN provision).

## 2.    The Vantec and Nishi MFN Provisions Are Manifestly In The Best Interest Of The Class.

The MFN provisions here are manifestly favorable because they encouraged early settlements.  These early settlements, in turn, provide an increased incentive for Non-Settling Japanese Defendants to settle on terms commensurate with the risks that these Defendants—all

of whom have already pled guilty to anticompetitive conduct—will face at trial.  Settlements are

a favored manner of resolution, and early antitrust settlements with cooperation from defendants

are consistent with federal policy "to destabilize cartels" and cause cartel members "to turn

against one another in a race to the Government."  150 Cong. Rec., S3614 (Apr. 2, 2004)

(Statement of Sen. Hatch) (supporting Antitrust Criminal Penalty Enhancement Act of 2004

("ACPERA"), Pub. L. No. 108-237, § 213, et seq., 118 Stat. 661-67 (2004) (civil damages

provisions to enhance government leniency program)); *see also* 150 Congr. Rec., at S3619 (Apr.

2, 2004) (Statement of Sen. DeWine) (same).

MFN provisions are useful bargaining tools for plaintiffs.  They encourage early and

helpful settlements by reducing the risk to earlier-settling defendants that they might have gotten

better settlement terms by waiting.  As noted in Argument "C" *Supra*, early settlements

encourage further settlements, conserving judicial resources and furthering federal antitrust

policy.[24]

In this case, Vantec and then Nishi came early to the settlement table and settled; others

chose not to settle.  Vantec's settlement, on April 26, 2011, was the second settlement in this

case.  Nishi-Nippon's settlement, on May 9, 2012, was the fifth settlement in the case, and the

second Japanese settlement.  Eight Non-Settling Japanese Defendants and their affiliates (in

addition to non-Japanese Defendants) remain in the case.[25]

---

[24] *Corrugated Container*, 1981 WL 2093, at *23 (encouraging early settlements can "achieve a maximum aggregate recovery for the class."); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) (early settlements can "bring other defendants to the point of serious negotiations."); *Packaged Ice*, 2011 WL 717519, at *10 (cooperation beneficial in claims against non-settling defendants).

[25] Defendant DHL, who has not objected to the MFN clause in the Vantec or Nishi Settlements, is also named in the Japanese conspiracies.

Along with early and substantial monetary compensation, both Vantec and Nishi agreed to cooperate with Plaintiffs in litigating their claims against the remaining Defendants. Their cooperation includes documents related to the Japan Fair Trade Commission appeal,[26] price announcements, customer data, documents provided to governmental authorities,[27] proffer meetings with defense counsel,[28] witness interviews, and trial witnesses.[29] The documents, interviews, and information have already been valuable to the Class and its claims.

Each Non-Settling Japanese Defendant had the same opportunity as Vantec and Nishi to settle this case early, and had it reached agreement, it would almost certainly have insisted on an MFN itself. The fact that each chose to litigate instead while others chose to settle does not make the MFNs unfair.

Further, Non-Settling Defendants' complaint that the MFNs erect a barrier to settlement is ironic in light of their own decision to enter into a judgment-sharing agreement among themselves. Such a judgment-sharing agreement itself runs counter to settlement. *Cf. In re San Juan DuPont Plaza Hotel Fire Litig.*, No. MDL-721, 1989 WL 996278, at *2-3 (D.P.R. Sept. 14, 1989) (invalidating a judgment-sharing agreement where the "real purpose behind" the agreement was to "prevent resolution of plaintiffs' claims using the armor of a defense cooperation" agreement); *Manual for Complex Litigation (Fourth)* § 13:23 at 178 (2004) (noting that judgment-sharing agreements may "expressly prohibit or indirectly discourage individual settlements"); Christopher R. Leslie, *Judgment-Sharing Agreements*, 58 Duke L. J. 747, 768-74 (2009) ("In addition to diminishing the value of settlements, JSAs reduce the probability of

---

[26] Vantec Agreement ¶¶ I(B)(18) & II(A)(2)(a); Nishi Nippon Agreement ¶¶ I(B)(19) & II(A)(2)(a)(1).

[27] Vantec Agreement ¶ II(A)(2)(b)-(c); Nishi Nippon Agreement ¶¶ II(A)(2)(a)-(c).

[28] Vantec Agreement ¶ II(A)(2)(e); Nishi Nippon Agreement ¶¶ II(A)(2)(d).

[29] Vantec Agreement ¶ II(A)(2)(h) & (i); Nishi Nippon Agreement ¶¶ II(A)(2)(e) & (g).

settlement for two reasons.  First, JSAs reduce the defendants' incentive to settle by significantly limiting each defendant's potential exposure.").

### 3.    The Vantec and Nishi MFN Provisions Are Limited.

"There are two types of most favored nations clauses."  *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 614 F. Supp. 377, 381 (E.D. Pa. 1985) ("*Fisher Bros. III*") (affirmed table decision, 791 F.2d 917 (3d Cir. 1986)).  An unconditional clause prohibits settlements on terms better for subsequent defendants unless a penalty is paid to the first defendant.  *Id*.  By contrast,

> A qualified or conditional most favored nations clause permits flexibility because of financial or other differences among defendants, or a material change in circumstances relevant to the litigation.  The purpose of a qualified or conditional clause is to ensure an early settling defendant that plaintiffs will vigorously pursue their case against remaining defendants."

*Id*.

The Vantec and Nishi-Nippon MFNs are the second, qualified type of provision.  They exclude most Defendants in the case. Even as to the Japanese Defendants, the MFNs are further limited by adverse financial condition, time period, guilty pleas, amounts to be paid, and litigation conditions.  They are limited in application.  They apply only to other specified Japanese Defendants named in conspiracies involving shipments between Japan and the United States who are indicted or plead guilty to DOJ price-fixing claims.  Even then, the MFNs only apply to those Defendants if their pleas occur within eighteen months of Vantec's or Nishi's respective pleas, creating a time limit for the MFNs.  Vantec Agreement ¶¶ I(B)(17) & II (D)(1); Nishi Nippon Agreement ¶¶ I(B)(18) & II(D)(1).

The MFNs also consider the ability of subsequent Defendants to pay the "MFN amount." The MFN repayment provisions do not apply "if a subsequent settling Japanese Defendant is insolvent or bankrupt, or has an inability to pay the amount that would be required by the application" of that Japanese Defendant's MFN ratio.  Vantec Agreement ¶ II(D)(6); Nishi

Nippon Agreement ¶ II(D)(6). Any repayments are capped, so neither Vantec nor Nishi is

entitled to repayments that reduce their settlement ratio below the lowest subsequent

settlement.[30]

The MFNs are also limited in that they no longer apply in the unlikely event of class

certification denial, or grant of summary judgment in favor of a Defendant and against some or

all of Plaintiffs' claims. Vantec Agreement ¶ II(D)(7); Nishi Nippon Agreement ¶ II(D)(7).

Non-Settling Japanese Defendants' only case that declined to approve a settlement with

an MFN is *In re Chicken Antitrust Litig.*, 560 F. Supp. 943 (N.D. Ga. 1979). That early case[31] is

readily distinguishable, since it involved enforcement of an unconditional MFN clause and

preceded the development of the case law. *See Fisher Bros. III*, 614 F. Supp. at 381. Further, in

*Chicken Antitrust*, "economically stronger" settling defendants refused to waive repayment for

two economically marginal defendants who needed relief for financial reasons. Since the

stronger defendants' insistence on payment placed the weaker defendants in financial peril, it

was "strongly suggestive of predatory intent." *Chicken*, 560 F. Supp. at 947-48; *see also Enron*,

2008 WL 2566867, at *2 n.7 (noting that the "Court concluded that the settling parties'

insistence on a most favored nations provision suggested an attempt to drive their smaller

---

[30] "But in no event shall Settling Defendant be entitled to MFN Refund Amounts that, in aggregate, reduce Settling Defendant's Settlement Ratio to less than the lowest Settlement Ratio of any other Qualifying Subsequent Settlement." Vantec Agreement ¶ II(D)(4); Nishi Nippon Agreement ¶ II(D)(4).

[31] As noted in the text above, more recent opinions have approved settlements with MFNs. *E.g., Hyland*, 2012 WL 1575310, at *5, 8 (approving settlement with MFN that had provision for material changes and did not preclude subsequent settlement); *Bisphenol A (BPA) Polycarbonate*, 2011 WL 1790603, at *1, 4 (approving settlement with MFN allowing subsequent modification of settlement to give earlier settling defendant "the full benefit of [any subsequent] more favorable settlement"); *Packaged Ice*, 2011 WL 717519, at *4, 14 (approving settlement with MFN requiring refund to equalize settlement with more favorable subsequent settlement); *Med. X-Ray Film*, 1997 WL 33320580, at *6, 14 (approving settlement forbidding more favorable subsequent settlement unless discovery showed "ultimate recovery from remaining defendants is substantially reduced").

41

competitors out of business"). No such circumstances exist here. The Non-Settling Japanese

Defendants include Japan's three largest freight forwarders, so any suggestion of predation or

unfair competitive advantage simply does not exist in this case. Moreover, the MFNs do not

apply to later settling defendants who are bankrupt, insolvent, or have a demonstrated inability to

pay. The *Chicken Antitrust* court also noted that the MFN provisions there "were powerful

catalysts for settlement." *Id*. at 944.[32]

     Vantec and Nishi chose to negotiate early settlements, and they gave valuable

cooperation for prosecuting claims against the remaining Defendants. The MFN clauses give

them reasonable protection for their decision to settle early and cooperate. The MFN clauses are

limited in their application and timing, and have relief clauses for unexpected financial or

litigation events. The settlements should be approved on the merits with their MFN provisions.

### 4. Non-Settling Japanese Defendants Lack Standing To Object

     The Non-Settling Japanese Defendants lack standing to object to these settlements. Not

only are they not class members, they should not be heard to complain about MFN provisions

that apply because of their own guilty pleas for criminal price-fixing, especially when they have

entered their own judgment-sharing agreement that erects a barrier to future settlements.

---

[32] *Cintech Indus. Coatings, Inc. v. Bennett Indus., Inc.*, 85 F.3d 1198, 1203 (6th Cir. 1996) declined to strike the MFN provision involved there. *See Enron*, 2008 WL 2566867, at *3 n.9 (stating that the Cintech court specifically stated that it did not strike the MFN provision). Instead, the *Cintech* court applied an exception in that MFN for material changes causing the plaintiffs to reasonably conclude the chances of recovering from remaining defendants was substantially lessened or reduced. *Cintech*, 85 F.3d at 1202. The Sixth Circuit affirmed a district court's finding that circumstances had changed so materially that the MFN did not require plaintiffs to offer the same terms to a subsequent defendant. *Id*. at 1201, 1203. As previously noted, *Hyland*, 2012 WL 1575310, at *5, 8, *Ampicillin* , 82 F.R.D. at 655, and *Fisher Bros. II*, 604 F. Supp. at 449, also cited by the Non-Settling Japanese Defendants, all upheld MFN provisions.

"The general rule is that a non-settling defendant lacks standing to object to a partial settlement." *Enron,* 2008 WL 2566867, at *3. A limited exception exists where the defendant can demonstrate plain legal prejudice. "'Plain legal prejudice' is narrowly construed and occurs only when a partial settlement deprives a non-settling party of a substantive right." *Id.* at *4. "[N]on-settling defendants cannot object to clauses precluding settlement with such defendants on terms more favorable to the settling defendants." *Med. X-Ray Film*, 1997 WL 3320580, at *6. Moreover, "a tactical disadvantage does not constitute the level of plain legal prejudice necessary to create standing for a non-settling defendant to challenge a settlement." *Enron* 2008 WL 2566867, at *5.

The Non-Settling Japanese Defendants cannot demonstrate any plain legal prejudice. They have no "substantive right" to the protection they now ask the Court to give them. Like Vantec and Nishi, they made strategic and tactical decisions as to how best to address the Class's claims. Unlike Vantec and Nishi, they chose to litigate instead of settling early. They should not now be heard to complain about the obvious and foreseeable ramifications of their decisions.

### E.    The Requirements of Class Certification Have Been Met

This Court has previously preliminarily approved in each and every settlement, the proposed settlement class. See *supra* n.1. No objections have been made. The same showings that were made for preliminary approval apply today. Accordingly, as provided in the ten proposed judgments and final approval orders, annexed as Exhibits "3"-"12" to the Notice of Motion, this Court should finally approve each settlement class.

### 1.    Plaintiffs' Class Notice Program Complied with this Court's Orders and Rule 23

Plaintiffs developed the Notice Program with the assistance of experts with extensive experience in global notice programs. The Notice Program is a robust, multi-faceted approach

that delivered clear and understandable information to potential Class Members about this case and the proposed settlements.

Plaintiffs' Program provided for (1) individual direct mail notice to potential Class Members whose identity has been derived from Defendants' records, (2) publication notice (*i.e.*, paid media) based on expert demographic studies, in various magazines, newspapers, trade journals and websites throughout the world in several foreign languages, (3) an "earned media" publication campaign designed to reach 18,783 worldwide media outlets and an additional 5,600 websites, and (4) a settlement website dedicated to providing Class Members with detailed information regarding the case. This comprehensive, multi-pronged approach provided the Class with the best notice practicable under the circumstances and satisfies Rule 23 and due process. The Court approved this program. ECF No. 666.[33]  The Plaintiffs have complied fully with the Court approved Notice Program.  *See* Kinsella Decl. at ¶¶ 5-37.

F.     **The Plan of Allocation Is Fair and Reasonable**

Approval of a plan of allocation of settlement in a class action is made under the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate.  *In re Computron Software, Inc. Sec. Litig*., 6 F. Supp. 2d 313, 321 (D. N.J. 1998); *In re Oracle Sec. Litig*., No. C-90-0931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) (citing *In re Gulf Oil/Cities Serv. Tender Offer Litig*., 142 F.R.D. 588, 596 (S.D.N.Y. 1992)) (observing that a "plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable").

---

[33] *See also* ECF Notice Order (Nov. 19, 2012); ECF Notice Order (Nov. 21, 2012); ECF Notice Order (Jan. 4, 2013); ECF Notice Order (Feb. 11, 2013); & ECF Notice Order (April 5, 2013) (approving modifications to the notice primarily to add additional settling defendants, as well as, other ministerial changes).

Here, the favorable reaction of the Class to the Settlements also supports approval of the Plan of Allocation. *See Maley*, 186 F.Supp.2d at 367 (noting lack of objectors supports approval of Plan of Allocation); *In re Am. Bank Note Holographics*, 127 F. Supp. 2d at 430 (observing that "lack of any objections suggests that approval of the Plan of Allocation is warranted").

Finally, a plan of allocation "need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." *In re Am. Bank Note Holographics*, 127 F. Supp. 2d at 429-30.

Plaintiffs respectfully submit that there is a rational basis for the Plan of Allocation (which is the reason that no Class member objected to the Plan). Ninety percent of the Net Settlement Fund from each Settling Defendant will be allocated pro rata according to the estimated charges paid by each Class member in the specific alleged conspiracies in which that Settling Defendant participated. *See* Ex. "D" hereto (proposed Plan and answers to Frequently Asked Questions). The remaining 10% of the Net Settlement Fund from each Settling Defendant will be allocated pro rata among all qualified Class members based upon the total worldwide freight forwarding charges paid by each and all Class members. Because of the absence of reversions, the less Class members who claim, the greater the payout to claiming Class members.

This proposed Plan of Allocation has a rational basis and is supported by all Class members. It is also eminently fair and reasonable, and should be approved by the Court.

## IV.   CONCLUSION

Each Settlement is fair, reasonable, and adequate. The requirements for class certification have been satisfied. The Plan of Allocation is eminently fair and reasonable. Final approval of the foregoing should be granted by means of the individual forms of judgment

45

submitted for each Settlement.  The objections to the Schenker, Vantec and Nishi settlements

should be overruled.


Dated: July 26, 2013


Respectfully submitted,

*/s/*Christopher Lovell

Christopher Lovell
Benjamin M. Jaccarino
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775
Email: clovell@lshllp.com
        bjaccarino@lshllp.com

W. Joseph Bruckner
Heidi M. Silton
Craig S. Davis
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South, Suite
2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: wjbruckner@locklaw.com
        hmsilton@locklaw.com
        csdavis@locklaw.com


Daniel E. Gustafson
Daniel C. Hedlund
Michelle J. Looby
Joshua J. Rissman
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email:dgustafson@gustafsongluek.com
        dhedlund@gustafsongluek.com
        mlooby@gustafsongluek.com
        jrissman@gustafsongluek.com

Steven N. Williams
Adam Zapala
COTCHETT, PITRE & McCARTHY,
LLP
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: swilliams@cpmlegal.com
        azapala@cpmlegal.com


*Interim Co-Lead Counsel for Plaintiffs*