UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------- X
PRECISION ASSOCIATES, INC.; :
ANYTHING GOES LLC d/b/a MAIL :
BOXES ETC., and JCK INDUSTRIES, :
INC., on behalf of themselves and all others :
similarly situated, :
 :
        Plaintiffs, : Case No. 08-CV-00042 (JG) (VVP)
 :
  -against- :
 :
PANALPINA WORLD TRANSPORT :
(HOLDING) LTD., et al., :
 :
        Defendants. :
 :
---------------------------------------- X

---

**OPPOSITION OF HEWLETT-PACKARD COMPANY TO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT WITH SCHENKER DEFENDANTS**

---

DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas
41st Floor
New York, NY 10036
(212) 248-3140

*Attorneys for Intervenor-Plaintiff
Hewlett-Packard Company*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii

I.

INTRODUCTION ...................................................................................................................... 1

II.

ARGUMENT .............................................................................................................................. 3

    A.    Class Counsel Have Not Shown Actual Value to Class Members Stemming from Schenker's Cooperation. ............................................................. 3

    B.    The Schenker Settlement is Inconsistent with Rule 23 and Due Process. ............. 7

    C.    The Schenker Settlement Is Not Substantively Fair. .......................................... 11

V.    CONCLUSION ............................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amchem Products Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................................... 8, 12

*Comcast Corp. v. Behrend*,
   133 S.Ct. 1426 (2013) ............................................................................................ 8, 11

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir.2001) ........................................................................................... 12

*In re Bluetooth Headset Products Liability*,
   654 F.3d 935 (9th Cir. 2011) ..................................................................................... 2, 3

*In re Del-Val Fin. Corp. Sec. Litig.*,
   162 F.R.D. 217 (S.D.N.Y. 1995) .................................................................................. 10

*In re Dry Max Pampers Litig.*,
   2013 U.S. App. LEXIS 15930 (6th Cir. Aug. 2, 2013) ................................................ 3,5

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
   MDL 1446, 2006 WL 1006611 (S.D. Tex. Apr. 12, 2006) .......................................... 10

*Malchman v. Davis*,
   706 F.2d 426 (2d. Cir. 1983) .......................................................................................... 3

*Martens v. Smith Barney, Inc.*,
   190 F.R.D. 134 (S.D.N.Y. 1999) .................................................................................. 10

*McBean v. New York*,
   233 F.R.D. 377 (S.D.N.Y. 2006) .................................................................................. 12

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ...................................................................................................... 11

*Silberblatt v. Morgan Stanley*,
   524 F. Supp. 2d 425 (S.D.N.Y. 2007). .......................................................................... 3

*Stephenson v. Dow Chem. Co.*,
   273 F.3d 249 (2d Cir. 2001), *rev'd in part on other grounds*, 539 U.S. 111 (2003) ................. 8

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S.Ct. 2541 (2011) ...................................................................................... 8, 10, 11

## TABLE OF AUTHORITIES
(continued)

Page

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)..................................................................................................11, 12

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982)..................................................................................................3, 12

**STATUTES, RULES & REGULATIONS**

Fed. R. Civ. P 23 ....................................................................................................... *passim*

Antitrust Criminal Penalty Enhancement and Reform Act of 2004,
  PUB. L. NO. 108-237, § 213(b), 118 Stat. 665, 666
  (codified as amended at 15 U.S.C. §1 note) ...................................................................5

**OTHER AUTHORITIES**

7AA CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE & RICHARD L.
  MARCUS, FEDERAL PRACTICE AND PROCEDURE § 1787 (3d ed.) ...............................................8

Manual for Complex Litigation (Fourth) (2004) ...............................................................8, 12, 14

Press Release, U.S. Department of Justice, Six International Freight Forwarding
  Companies Agree to Plead Guilty to Criminal Price-fixing Charges (Sept. 30, 2010)
  *available at*: http://www.justice.gov/atr/public/press_releases/2010/262791.htm....................5

# I.
# INTRODUCTION

Almost a year ago, this Court recognized that Class Counsel would be required to justify the "relatively small settlement amount" of the Schenker Settlement – and the associated Schenker opt-out penalty – at the final settlement hearing. Order of Sept. 25, 2012 [Dkt. 659 at 3]. At the time, the Court recognized the fundamental problems with evaluating such an agreement when so little information was available. At the hearing on HP's initial Motion to Modify Preliminary Approval of the Schenker Settlement [Dkt. 598], the Court suggested that the parties "wait and see" whether "there will be greater benefit" as a result of Schenker's putative cooperation. Hr'g Tr. 6:19-7:2 (Aug. 17, 2012) (attached as Ex. A to HP's Objection to the Class Settlement with Schenker Defendants ("Objection") [Dkt. 842]). The Court explained that a "critical mass of proposed settlements" of perhaps "75 percent of the defendants" settling would provide class members "enough information" to evaluate the Schenker settlement. *Id.* at 18:13-22. The key inquiry, according to the Court, was whether Schenker's alleged cooperation "is worth it" in providing "value in the form of cooperation that offsets the absence of value in terms of the number being contributed." *Id.* at 6:19-21. The Court's September 25, 2012 Order pointed the way for Class Counsel, advising that the purported value of Schenker's cooperation would ultimately be "the proper inquiry of a fairness hearing in contemplation of final approval." [Dkt. 659 at 3.]

Yet after nearly a year, Class Counsel do not, because they cannot, present evidence that Schenker's cooperation provided commensurate value to the victims of its criminal conduct. Under even the most conservative estimate, Schenker is receiving a discount of nearly $20 million compared to its co-conspirator Kuehne + Nagel while pocketing several million dollars in *Air Cargo* settlement proceeds to boot. Despite Schenker's assurances that their cooperation

would open the proverbial floodgates of additional settlements, only a handful of minimal settlements have trickled in over the last twelve months. There is simply no evidence – not even an attorney declaration – tying any meaningful progress in the case, by way of settlements or otherwise, to Schenker's cooperation back in 2009. Nor is there any expert declaration or indeed any other analysis showing that the package offered to class members bears any relation to Schenker's joint and several liability and treble damage exposure for the claims class members would release under the Settlement.

And the record otherwise before the Court tells a different story than the one promoted by Schenker and Class Counsel. Notwithstanding the purported Schenker "icebreaker" settlement, the litigation remains solidly frozen in place. Rather than any critical mass of settlements pouring into Court as a result of Schenker's cooperation, fully *two-thirds* of defendants have not settled after four years. Discovery has not commenced. The evolving Complaint now alleges nine disparate conspiracies, three of which have nothing to do with Schenker. And as Class Counsel have confirmed in their recent Fee Petition, they have relied heavily on the cooperation of the Amnesty Applicant – DHL, which began cooperating in March 2010 – and nine other settling defendants in framing the pending Third Amended Class Action Complaint. As for the actual value of the Schenker package, it now appears that class members will be left with cash amounting to less than eight percent (8%) of the illegal surcharges collected by Schenker.

This complete lack of evidence of any actual value to class members precludes approval of the Schenker Settlement. The 2003 Amendments to Rule 23 confirmed that "[s]ettlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class." *In re Bluetooth Headset Prod. Liab.*, 654 F.3d 935, 944 (9th Cir. 2011), quoting Fed. R. Civ. P. 23(h), 2003 Advisory Cmte. Notes; *see also*

*Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 432 (S.D.N.Y. 2007). The same is true for class settlements reached early in the litigation, prior to an opportunity for discovery and meaningful evaluation of the claims and settlement terms. *See, e.g.*, *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)("[w]e will demand a clearer showing of a settlement's fairness, reasonable and adequacy" in such circumstances).

Class Counsel have presented no new settlements, nor made any other showing of actual value to class members flowing from the Schenker settlement and its opt-out penalty. Instead, the only credible conclusion from the available evidence is that there is no such value to be had, and that the $20 million plus in collusive profits that Schenker has retained will not result in any commensurate value to the victims of its criminal conduct. The Court should deny Plaintiffs' Motion for final approval.[1]

## II.
## ARGUMENT

**A.   Class Counsel Have Not Shown Actual Value to Class Members Stemming from Schenker's Cooperation.**

"The burden of proving the fairness of the settlement is on the proponents." *In re Dry Max Pampers Litig.*, 2013 U.S. App. LEXIS 15930, *13 (6th Cir. Aug. 2, 2013) (citations omitted). Further, that proof must be made via an evidentiary record, such as affidavits, evidence and discovery materials. *Malchman v. Davis*, 706 F.2d 426, 434 (2d. Cir. 1983) (reversing and remanding settlement approval). Rather than actual proof of real value – or indeed any evidence whatsoever – Class Counsel and Schenker offer only generalizations and attorney argument. They have wholly failed to show in concrete terms and with actual evidence how and to what extent Schenker's cooperation has actually benefited class members.

---

[1] HP hereby incorporates by reference and endorses all arguments set forth in Dell Inc.'s Response to Plaintiff's Consolidated Memorandum of Law in Support of Final Approval of Ten Proposed Class Settlements and Plant of Allocation.

In moving for final approval, Class Counsel assert generally that the Schenker Settlement when taken "as a whole . . . provides material benefits" to class members. Motion for Final Approval [Dkt. 855] at 29. Schenker similarly states that its cooperation "provided enormous benefit to Plaintiffs, well beyond that measured simply in dollars." July 26, 2013 Letter from Mary Ellen Hennessy ("Schenker Final Approval Letter") [Dkt. 853] at 2. Schenker continues that it was the "critical first company to break the silence and to provide the essential cooperation" that led to the First Amended Complaint. *Id*. at 2. According to Schenker, its "cooperation in this case" has been nothing short of "extraordinary," and thanks to that cooperation "and the resulting treasure trove of information provided . . . the floodgates opened" to other settlements. *Id*. at 4.

Even considered on their face, and without regard to the actual record before the Court, counsel's verbal bouquets would be plainly insufficient to meet their burden of proving actual value. Neither Schenker nor Class Counsel provide any declaration or other evidence as to the information obtained through Schenker's cooperation, or demonstrate how that information, if any, differed from the information obtained from other defendants, including the Amnesty Applicant.

And a review of the actual record shows no reason to believe that Schenker provided any material aid, let alone sufficient aid to justify accepting a substantially undervalued cash payment in settlement of the substantial claims. For example, the timing of the settlement raises questions about its fairness. Class Counsel filed their initial Complaint months after international freight forwarder investigations became public, "before any government indictments or guilty pleas," and without having received "any assistance from the Amnesty Applicant." Fee Petition [Dkt. 836] at 1. On June 3, 2009, this Court appointed Class Counsel on an interim basis and ordered

them to file the First Amended Class Action Complaint by July 15. [Dkt. 115.] Plainly, Class Counsel jumped into the fray early on a bet that the Amnesty Applicant would immediately cooperate. When that did not happen, Class Counsel cut a deal for "an early settlement and cooperation from another Defendant," namely Schenker. In doing so, Class Counsel essentially created a new amnesty applicant by agreeing to accept a minimal settlement in exchange for information.

As for Class Counsel's attempts to portray Schenker as having stepped in bravely to assist the class, class settlements "are better decided on reality than on fiction." *In re Dry Max Pampers Litig.*, 2013 U.S. App. LEXIS 15930 at *20 (citation omitted). Schenker was not a white knight riding in to expose its own misconduct and make class members whole, nor did Schenker enjoy the protections of ACPERA that otherwise might justify a smaller settlement.[2] To the contrary, Schenker faced multiple millions of dollars in liability once the Amnesty Applicant began cooperating, and it had every reason to push for an early deal that would allow it to retain the ill-gotten gains from its criminal conduct, all the while providing nothing of real value to class members. It took advantage of the Amnesty Applicant's delay and bought its freedom for a song.

This is borne out by a review of the actual chronology leading up to and after the Schenker Settlement. Class Counsel and Schenker struck their deal on July 7, 2009 – just a week before the deadline for filing the First Amended Complaint. [Dkt. 527-2 at 1.] In their Motion for Final Approval, Class Counsel defend their conduct by asserting (without citing any support) that they "exercised their reasonable judgment" when entering the Schenker Settlement because at that time they "knew the dimensions of the Class's claims." Motion for Final Approval [Dkt.

---

[2] ACPERA is the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, §213(b), 118 Stat. 665, 666 (codified as amended at 15 U.S.C. § 1 note) ("ACPERA").

855] at 9. But there is no evidence supporting this assertion, and it seems unlikely considering that the original Complaint does not state the known "dimensions" of the conspiracy, and neither does Class Counsel describe how they understood the "dimensions" of the case.

Moreover, it is highly doubtful that Schenker's cooperation contributed *anything* of unique value after July 2009. In fact, it is now clear – from Class Counsel's Fee Petition – that help from other defendants preceded any further settlements. Most importantly, in March 2010, the Amnesty Applicant came forward and began its cooperation with Class Counsel. Fee Petition [Dkt. 836] at 6; *see also* Motion for Final Approval [Dkt. 855] at 10. Then, in September 2010, the Department of Justice announced six guilty pleas among the Defendants.[3] Those pleas resulted in over $50 million in criminal fines. Not surprisingly, Schenker was one of the guilty parties, along with EGL, Kuehne + Nagel, and Panalpina.

It was only after these events that further settlements came to fruition. In April 2011 Class Counsel reached their second settlement agreement, this time with Vantec, who in turn agreed to cooperate. [Dkt. 527 at 4.] One month later, Class Counsel settled with another defendant, EGL, who *also* agreed to cooperate. [Dkt. 527 at 5.] Then, in September 2011, Class Counsel publicly announced and sought preliminary approval for their settlements with Schenker, Vantec, and EGL. [Dkt. 527.] As this was the first public acknowledgement of any of those three settlements, there is no reason to believe that any of these defendants knew that the others had settled, much less cooperated with Class Counsel. In fact, Vantec wrote this Court on September 20, 2012 to advise that they had not known of the unique Schenker opt-out penalty and that they objected to it. [Dkt. 652.]

---

[3] *See, e.g.*, Press Release, U.S. Department of Justice, Six International Freight Forwarding Companies Agree to Plead Guilty to Criminal Price-fixing Charges (Sept. 30, 2010) *available at*: http://www.justice.gov/atr/public/press_releases/2010/262791.htm (last viewed July 31, 2013).

-6-

Seven other settlements followed. As acknowledged in their Fee Petition, Class Counsel "used the information obtained in each settlement to inform their negotiations with other Defendants, including those with whom [Class Counsel] decided to enter subsequent settlements." Fee Petition [Dkt. 836] at 9. Even in their Motion for Final Approval, Class Counsel have noted that *each* of the settling defendants has provided valuable cooperation. Motion for Final Approval [Dkt. 855] at 13.

Nevertheless, even with the cooperation from nine other settling defendants *and* the Amnesty Applicant, Class Counsel have failed to wrest settlements out of almost two-thirds of the Defendants – many of whom have pled guilty to criminal price-fixing in multiple international jurisdictions, encompassing conspiracies that stretch far beyond the allegations contained in the Third Amended Complaint. As these facts amply show, Class Counsel rushed into Schenker's arms to avoid a court-imposed deadline. No additional settlements were forthcoming in the immediate wake of that settlement and the putative Schenker cooperation. Not until guilty pleas before the DOJ and the cooperation of the Amnesty Applicant did even *one* additional settlement appear. And not until the cooperation of the Amnesty Applicant, other settling defendants, and six guilty pleas did counsel piece together an operative Complaint. The actual chronology of events fully belies, rather than supports, any notion that the Schenker settlement has contributed to what minimal progress has been made to date in settlements or in prosecution of class claims.

## B.     The Schenker Settlement is Inconsistent with Rule 23 and Due Process.

Class Counsel argue that "class members have no right to opt out of a class action on a defendant-by-defendant, settlement-by-settlement basis." Motion for Final Approval [Dkt. 855] at 32. This completely dodges HP's point. The Schenker Settlement, by its timing and structure,

precludes HP and other class members from exercising an *informed* decision whether to opt-out of future class settlements, or contested class proceedings, as to more than two-thirds of the remaining defendants, including key participants in the illegal conspiracies.

Class members must have the information "needed to decide, intelligently, whether to stay in or opt out" of a settlement. *Amchem Prod. Inc. v. Windsor*, 521 U.S. 591, 628 (1997). Indeed, Rule 23(b)(3)[4] actions require meaningful notice and a *bona fide* opportunity to exclude oneself from a settlement *once it is known what is at stake*. *See, e.g., Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2559 (2011) ("that absence of notice and opt-out violates due process." (citation omitted)). If class members lack such information, a final class-wide judgment may be set aside on Due Process grounds. *Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 260 (2d Cir. 2001), *rev'd in part on other grounds,* 539 U.S. 111 (2003) (setting aside judgment following class-wide settlement). As the Supreme Court confirmed yet again this past Term, the "procedural safeguards" of Rule 23(b)(3) are "designed for situations" where class members lack sufficient information to evaluate their damages claims. *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013), citing *Dukes* and *Amchem Products*.

Here, despite Class Counsel's comment last year that class members need only "wait and see," no greater benefit has developed for class members after twelve months of waiting and watching. The "information problem" that the Court identified last year (Aug. 15, 2012 Tr. at

---

[4] In 2003, Rule 23 was amended so that the requirements related to a class member's opt-out rights are now "more fully elaborated." 7AA CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 1787 (3d ed.). Specifically, Rule 23(c)(2)(B) now requires, for a class certified under Rule 23(b)(3), "the best notice that is practicable under the circumstances," including a clear, concise explanation of "the class claims, issues, or defenses" and "that the court will exclude from the class any member who requests exclusion." As the Federal Judicial Center's Manual for Complex Litigation has stated, Rule 23(c)(2)(B) requires notice that includes enough information "to enable class members to make an informed decision about their participation," and that such notice "explain any risks and benefits of retaining class membership and opting out." MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.311 at 289 (2004). In this case, it is without question that Class Counsel have not explained all the "risks and benefits of retaining class membership [or] opting out" of yet undisclosed settlements with other defendants.

9:22) has not been alleviated by any material new settlements or litigation developments. Indeed, even if the Court were to accept Class Counsel's metric of "Affected Revenues" – i.e., illegal surcharges – less than one-third of the class members' claims have been resolved through settlement on that measure.[5] While Class Counsel points to the "substantial additional future payments" from the *Air Cargo* proceeds, no such benefits will be paid by Schenker, as its Agreement allows Schenker to retain all such proceeds from its illegal conduct. In short, the "critical mass" of "75 percent" that would provide class members "enough information to know whether to opt out or stay in" remains as remote now as it was a year ago – despite Schenker supposedly having "opened the floodgates" in 2009.

Nor have litigation developments over the past year shown any evidence of actual value to class members. The only material development in the litigation has been a narrowing of claims, to the point that Schenker is confirmed to have had no involvement in three of the nine separate conspiracies now alleged in the Third Amended Complaint. *See* Third Amended Complaint [Dkt. 772] at 95, 104, 135 (confirming that Schenker is not named as a defendant to Japanese Fuel Surcharge, Japanese AMS and Japanese Securities and Explosive Surcharge). Class Counsel make no attempt to explain how Schenker's purported cooperation as to one group of European conspiracies can provide "actual value" to victims of three separate Japanese-based conspiracies. Nor can they, as counsel acknowledged last year that "Schenker had nothing to do with three" of the conspiracies (Tr. at 7:25) and was only "involved in five or six of them * * *."

---

[5] Although Plaintiffs contend in their Memorandum that "31.20%" of Affected Revenues are subject to settlement, they acknowledge in the footnote that this percentage is only "Plaintiffs' estimate." Neither the Court nor class members can subject Plaintiffs' estimate to the requisite careful scrutiny, however, because no further breakdown or analysis is provided, either in the Memorandum or any accompanying Declaration of counsel. Nor has counsel provided any declaration from an economist or other witness with any professional expertise to vouch for whatever estimate they have prepared. Plaintiffs do acknowledge that they based their estimates at least in part on "information obtained from settling Defendants and other sources" but that information and the identity of these "sources" remains undisclosed.

-9-

*Id*. at 8:1.[6]  Under any scrutiny, much less the careful scrutiny required by the current Rule 23, the Schenker opt-out penalty must be rejected.

Rather than address this disconnect between the low value Schenker deal from 2009 and the current litigation stalemate, Class Counsel focus on a series of district court cases to support their Settlement. *See Plaintiffs' Memo.* at 32, *citing In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, MDL 1446, 2006 WL 1006611 (S.D. Tex. Apr. 12, 2006); *Martens v. Smith Barney, Inc.*, 190 F.R.D. 134 (S.D.N.Y. 1999); *In re Del-Val Fin. Corp. Sec. Litig.*, 162 F.R.D. 217, 275 (S.D.N.Y. 1995).  But these cases are inapposite on several grounds.  First, *Del-Val*, *Smith Barney* and *Enron* predate the Supreme Court's holdings in *Dukes* and *Behrend* that opt-out rights are a critical procedural safeguard that must be preserved to comply with the requirements of Due Process in class actions for monetary damages.  *Dukes,*131 S.Ct. at 2559.  Similarly, these cases involved settlements that were disclosed to the court and class members at the time of opt-out and final settlement approval.[7]

None of these cases presents the issues framed here.  None involved Sherman Act claims against dozens of companies, with settlement agreements presented for only a handful of the

---

[6] To this day, Schenker still unblinkingly takes credit for these three Japanese-based settlements, notwithstanding that it was not party to the underlying conspiracies. See 7/26/2013 Hennessy Letter to Court [Dkt. 853], at 4 ("Now, there are nine additional settling defendants, whereas prior to Schenker's settlement and cooperation, there was none.") 5 ("The detailed information provided by Schenker related in significant respects to the conspiracies alleged in Claims 1 through 10").  Presumably, Schenker made the same representation to Class Counsel in 2009 as to the potential value of its cooperation, without regard to the true scope of its criminal conduct.  At least on this point, it appears that Class Counsel no longer believes in Schenker's representation.

[7] Class Counsel's reliance on *Enron* is particularly flawed.  In that case, the settlements that were the subject of the district court's order (and which were a subset of a larger number of settlements) were "substantially identical, and provide[d], among other things, for a single, unified process for preliminary approval, notice, and an opportunity to opt out, and final approval." *In re Enron Corp. Sec. Derivative Litig.*, Opp. of Citigroup, JPMorgan Chase, and CIBC to Mot. to Permit Opt Out, Civ. A. No. H-01-3624, Docket No. 4583, at 2 (S.D. Tex. Apr. 11, 2006).  That is fundamentally different from the situation here where putative class members are forced to opt out of *anticipated* or *potential* settlements in a case where a litigation class has yet to be certified.  Moreover, the *Enron* opt-out provisions provided a benefit to all class members because they "contain[ed] provisions for an *increase* in the settlement amounts if a plaintiff who is pursuing an individual action elects to stay in the class and forego pursuit of its private case," which therefore incentivized class members to stay in that litigation for the benefit of all *class members*. *In re Enron Corp. Sec. Derivative Litig.*, Pl's Opp. to Mot. Permit Opt Out, Civ. A. No. H-01-3624, Docket No. 4579, 2 (S.D. Tex. Apr. 11, 2006).  Here, the Schenker Opt-Out Penalty benefits only Schenker, and actually penalizes putative class members and the remaining defendants.

-10-

admitted conspirators. None involved an initial "ice breaker" settlement that contained an onerous opt-out restriction unfairly forcing class members to gamble their own ability to recover compensation for harms caused to them. Most importantly, none of them even discusses the procedural safeguards required under the current version of Rule 23, or endorses the "cut and paste" approach to Rule 23(b)(3) opt-out rights to which Schenker and class counsel agreed.

*Dukes* and now *Behrend* confirm that such opt-out rights are a fundamental component of Rule 23(b)(3), of Due Process dimension. *See Dukes*, 131 S.Ct. at 2559 ("[i]n the context of a class action predominantly for money damages we have held the absence of notice and opt-out violates due process" (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985))).[8] *See also Behrend*, 133 S.Ct. at 1432 (confirming 23(b)(3) as a "procedural safeguard" for class members). By forcing an opt-out decision as to claims against non-settling defendants that are not yet certified for class treatment, the Schenker settlement violates Rule 23 and Due Process. That Constitutional injury is now compounded by the lack of any showing of actual value to class members in exchange for Class Counsel's decision to forfeit class members' Due Process rights.

C.   **The Schenker Settlement Is Not Substantively Fair.**

As demonstrated in HP's Objection, the Schenker Settlement does not satisfy the "*Grinnell* factors" courts use to determine substantive fairness. Objection [Dkt. 842] at 13-24.[9]

---

[8] Class counsel quote a soundbite from *Shutts* to suggest that the United States Supreme Court somehow addressed or endorsed a similar opt-out penalty. But neither the facts nor rationale of *Shutts* supports that suggestion. Rather than any sort of a settlement class involving multiple defendants, *Shutts* was a contested class action against one defendant, Phillips Petroleum. Further, the opinion makes clear that each class member could effectively exercise an opt out right only with enough information to determine whether the "claim is sufficiently large or important that he wishes to litigate it on his own * * *." 473 U.S. at 813. It is precisely the lack of adequate information as to future settlements, if any, that deprives class members of an informed decision as to whether the putative Schenker cooperation has provided adequate value.

[9] "In determining the substantive fairness, adequacy, and reasonableness of a class settlement, the Court weighs nine considerations, commonly referred to as the "*Grinnell* factors." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) (citing *Grinnell*, 495 F.2d at 463). These factors are: (1) the complexity, expense and likely

-11-

Putting those factors to one side, evaluating "a settlement's fairness" ultimately requires the Court to determine whether "both the settlement's terms and the negotiating process leading to settlement" were fair.  *Wal-Mart Stores, Inc.* 396 F.3d 96, 116 (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)); *see also McBean v. New York*, 233 F.R.D. 377, 383 (S.D.N.Y. 2006).  This scrutiny is heightened when the class is certified early for settlement purposes, prior to discovery or a contested motion for class certification.  *See e.g., Weinberger*, 698 F.2d at 73 ("we will demand a clearer showing of a settlement's fairness, reasonable and adequacy and the propriety of negotiations leading to it * * *."); *accord*, Manual for Complex Litigation, Fourth (2004) ("MCL") § 21.612 at 313 ("Class actions certified solely for settlement, particularly early in the case, sometimes make meaningful judicial review more difficult and more important." (citing *Amchem Prods.,* 521 U.S. at 620 (settlement classes require "undiluted, even heightened, attention")).  The new arguments raised by Class Counsel in their Motion for Final Approval only confirm that the Schenker Settlement is deeply unfair to class members.

First, Class Counsel argue that each remaining non-settling defendant is "jointly and severally liable for *all* overcharges resulting from the conspiracies" and thus "collection of treble damages on the damages caused by Schenker was not 'forfeited' by the settlement."  Motion for Final Approval [Dkt. 855] at 3, 15.  This is a remarkable argument in the wake of class counsel having told class members to "wait and see" for subsequent settlements would show the Schenker deal was "worth it," while simultaneously using the Schenker opt-out penalty to coerce class members into remaining in the action.  The argument only confirms that Class Counsel

---

duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Id.* (citing *Grinnell*, 495 F.2d at 463).

negotiated an undervalued settlement. The Schenker Settlement cannot now be justified by telling short-changed class members to pursue direct actions against other defendants, all so that Schenker can retain its ill-gotten gains.

Moreover, this point, if accepted, vitiates the careful scrutiny required under Rule 23. Any low-value settlement could be approved under this rationale, as class members can always be told to make themselves whole by pursuing direct actions against the remaining jointly and severally liable defendants. In other words, class members remain free to opt-out of other, later settlements (without any hint of what those future settlements may entail) and pursue joint and several liability against other defendants. While that might be optimal for Class Counsel otherwise burdened with negotiating for full value, it would be a disaster for the Court and for class members. It would engender a multiplicity of direct actions, as courts approved lowball "ice breaker" settlements with opt-out penalties and told unhappy class members to go sue for themselves.

Second, Class Counsel now concede that they negotiated the Schenker Settlement with their backs against the wall. They state that their "knowledge of the facts of the case" was limited at the time of the Schenker Settlement. Motion for Final Approval [Dkt. 855] at 23. They also contend that their initial Complaint faced significant "*Twombly* risk" of dismissal, and that "[u]nder tight constraints" Schenker came forward and provided the information necessary to "allege seven new, specific foreign conspiracies in sufficient detail to survive Defendants' *Twombly* challenges." *Id*. at 9. In other words, rather than reaching a careful settlement after a thorough and complete investigation of facts and discovery, conducted with a mediator and

-13-

assisted by an economist to value the deal,[10] Class Counsel rushed into an agreement with Schenker in a matter of weeks.

Nowhere is that more evident than in the $8.75 million settlement number Class Counsel reached with Schenker. Class Counsel makes no attempt to justify that settlement amount. They do not state what it represents, nor do they provide any insight into how the parties arrived at that amount. Class Counsel lacked the benefit of clarity from criminal fines at the time they reached this settlement amount. Class Counsel do not suggest that they conducted an analysis of the aggregate surcharges imposed by Schenker when arriving at this settlement amount. In short, there is no basis for the amount, which badly missed in terms of representing Schenker's potential liability, and instead allowed Schenker to retain the lion's share of its profits from the illegal surcharges.

The lack of value in the $8.75 million settlement is underscored by the fact that Schenker retains all of its proceeds from the *Air Cargo* litigation, while all other settling defendants have paid all or a substantial portion of those proceeds into the settlement pool for class members. It does not appear that Class Counsel even negotiated this point with Schenker. This fact alone should be sufficient grounds to reject the settlement. And although all of the other defendants agreed to cooperate with Class Counsel, only Schenker was given a cash discount in the millions of dollars for that cooperation.

But by far, the settlement term that most confirms Class Counsel's lack of settlement leverage in July 2009 is the opt-out penalty. That penalty is unique among the other settlements

---

[10] These would be among the hallmarks of a legitimate class settlement. *See* MCL §21.62 at 316 (criteria for settlement approval include "the maturity of the underlying substantive issues," "the extent of participation in the settlement negotiations * * * by a judge, a magistrate judge, or a special master,"). By the same token, settlements are rejected where "the settlement amount is much less than the estimated damages incurred by members of the clas as indicated by preliminary discovery or other obje ctive measures," where "the settlement was completed at an early stage of the litigation without substantial discovery and with significant uncertainties remaining" and where "nonmonetary relief * * * is unlikely to have much, if any, market or other value to the class."). *Id.* at 317.

in this case, and indeed is unique among any other settlement in recent memory. It has clear value for Schenker, and Class Counsel was obviously more than willing to accept it during desperate negotiations. However, that term has had a direct and negative impact on class members. It confirms the lack of fairness inherent in the Schenker Settlement.

## V.

## CONCLUSION

HP respectfully submits that the Schenker Settlement is inadequate, unreasonable and unfair when viewed against Schenker's criminal liability and the other settlements in this litigation. For all of the reasons set forth above, HP requests that the Court DENY Class Counsel's Motion for Final Approval with respect to the Schenker Settlement.

Dated: San Francisco, California  
August 2, 2013

DRINKER BIDDLE & REATH LLP

By: */s Michael J. Stortz*

Michael J. Stortz  
50 Fremont St., 20th Floor  
San Francisco, CA 94105-2235  
(415) 591-7583  
Michael.Stortz@dbr.com

*Attorneys for Intervenor-Plaintiff*  
*Hewlett-Packard Company*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on this 2nd day of August 2013, I caused a true and correct copy of the foregoing **Opposition of Hewlett-Packard Company to Plaintiff's Motion for Final Approval of Class Settlement with Schenker Defendants** to be served via this Court's Case Management/Electronic Case Filing System upon all counsel of record.

Dated: San Francisco, California          DRINKER BIDDLE & REATH LLP
August 2, 2013

By:     /s Michael J. Stortz