UNITED STATES DISTRICT COURT                    <u>ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

_____

PRECISION ASSOCIATES, INC.;
ANYTHING GOES LLC d/b/a MAIL BOXES
ETC.; JCK INDUSTRIES, INC.; RBX
INDUSTRIES, INC.; MARY ELLE
FASHIONS, INC. d/b/a MERIDIAN
ELECTRIC; INTER-GLOBAL INC.; ZETA
PHARMACEUTICALS LLC; KRAFT
CHEMICAL COMPANY; PRINTING                        MEMORANDUM
TECHNOLOGY, INC.; DAVID HOWELL                    <u>AND ORDER</u>
PRODUCT DESIGN, INC. d/b/a DAVID                  08-cv-42 (JG) (VVP)
HOWELL & COMPANY; INNOVATION
714 INC.; MIKA OVERSEAS
CORPORATION; and NORMA
PENNSYLVANIA, INC. on behalf of
themselves and all others similarly situated,

                                        Plaintiffs,

                - versus -

PANALPINA WORLD TRANSPORT
(HOLDING) LTD., *et al.*,

                                        Defendants.

_____

JOHN GLEESON, United States District Judge:

        This putative class action alleges a conspiracy to fix prices in the international

commercial freight forwarding industry.[1]  Plaintiffs are various businesses who purchased freight

forwarding services from defendants.  Defendants are domestic and foreign providers of freight

---

[1]        This case is related to a Multi District Litigation ("MDL") pending in this district, *In Re Air Cargo Shipping Services Antitrust Litigation*, No. 06-md-1775 (JG) (VVP) ("*Air Cargo MDL*").  The *Air Cargo MDL* is a putative antitrust class action brought in the wake of an investigation by governmental authorities of international price-fixing activity in the air cargo industry.  Plaintiffs in that case are domestic and foreign purchasers of allegedly price-fixed air freight shipping services, and they include freight forwarders who are among the defendants in this action.

forwarding services and freight forwarding trade associations.[2]  Plaintiffs allege that during the period from January 1, 2001 to January 4, 2011, defendants conspired to fix prices through the concerted imposition of surcharges and other anti-competitive behaviors.  *See* 3d Am. Compl. ¶ 1, ECF No. 677.

Plaintiffs seek final approval of ten settlement agreements that would establish a $112 million guaranteed settlement fund and award additional settlement payments based upon a percentage of settling defendants' recovery in the *Air Cargo MDL*.  The ten settling defendants, or groups of defendants, are (1) Schenker Deutsche Bahn AG, Schenker AG, Schenker, Inc., Bax Global Inc. and DB Schenker (collectively "Schenker"); (2) Vantec Corporation and Vantec World Transport (USA), Inc. (collectively "Vantec"); (3) EGL, Inc. and EGL Eagle Global Logistics, LP, Inc. (collectively "EGL"); (4) Expeditors International of Washington, Inc. ("Expeditors"); (5) Nishi-Nippon Railroad Co., Ltd. ("Nishi-Nippon"); (6) United Aircargo Consolidators, Inc. ("UAC"); (7) Kuehne + Nagel International AG and Kuehne + Nagel, Inc. (collectively "KN"); (8) Morrison Express Logistics Pte Ltd. (Singapore) and Morrison Express

---

[2]  Defendants named in the Third Amended Complaint are Panalpina World Transport (Holding) Ltd.; Panalpina, Inc.; Kühne + Nagel International AG; Kuehne + Nagel, Inc.; Expeditors International of Washington, Inc.; EGL, Inc.; EGL Eagle Global Logistics, LP; Deutsche Bahne AG; Schenker AG; Schenker, Inc.; BAX Global, Inc.; DB Schenker; Deutsche Post AG; Danzas Corporation d/b/a DHL Global Forwarding; DHL Express (USA), Inc.; DHL Global Forwarding Japan K.K.; DHL Japan, Inc.; Exel Global Logistics, Inc.; Air Express International USA, Inc.; Uti Worldwide Inc.; United Parcel Service, Inc., UPS Supply Chain Solutions, Inc.; ABX Logistics Worldwide NV/SA; DSV A/S; DSV Solutions Holding A/S; DSV Air & Sea Ltd.; SDV Logistique Internationale; Dachser Intelligent Logistics; Dachser Transport of America, Inc.; Geo-Logistics Corporation; Agility Logistics Corporation; Geologistics International Management (Bermuda) Ltd.; Baltrans Logistics, Inc.; Toll Global Forwarding (USA), Inc.; Hellmann Worldwide Logistics, Inc.; Geodis Group; Geodis Wilson USA, Inc.; Con-way, Inc.; Exel Global Logistics, Inc.; Jet Speed Logistics, Ltd.; Jet Speed Air Cargo Forwarders (USA), Inc.; Jet Speed Logistics (USA), LLC; Morrison Express Logistics PTE Ltd.; Morrison Express Corporation (USA); Nippon Express Co., Ltd.; Nippon Express USA, Inc.; Yusen Air & Sea Service Co., Ltd.; Yusen Air & Sea Service (U.S.A.), Inc.; Kintetsu World Express, Inc.; Kintetsu World Express (U.S.A.), Inc.; Nishi–Nippon Railroad Co., Ltd.; Hankyu Hanshin Express Holdings Corporation; Hankyu Hanshin Express Co. Ltd.; Hanshin Air Cargo Co., Ltd.; Hanshin Air Cargo USA, Inc.; Nissin Corporation; Nissin International Transport U.S.A., Inc.; Vantec Corporation; Vantec World Transport (USA), Inc.; "K" Line Logistics, Ltd.; "K" Line Logistics (U.S.A.), Inc.; Yamato Global Logistics Japan Co., Ltd.; Yamato Transport U.S.A., Inc.; MOL Logistics (Japan) Co., Ltd.; MOL Logistics (U.S.A.), Inc.; United Aircargo Consolidators, Inc.; Japan Aircargo Forwarders Association; Shanghai International Freight Forwarders Association; and Spedlogswiss, aka the Association of Swiss Forwarders (collectively "defendants"). The Complaint also names unspecified "John Doe Defendants 1–10."

Corporation (U.S.A.) (collectively "Morrison"); (9) UTi Worldwide, Inc. ("UTi"); and (10) ABX

Logistics Worldwide NV/SA ("ABX").  Plaintiffs also seek approval of their plan of allocution,

as well as an interim fee award and reimbursement of expenses.

       I held a fairness hearing on August 9, 2013, at which objectors to the final

approval of the settlement agreements appeared and argued orally.  I hereby approve the ten

settlement agreements and the plan of allocation.  Co-lead counsel are directed to submit a

supplemental fee application and expenses request as discussed below.

BACKGROUND

A.    *Litigation Background*

       Plaintiffs commenced this action on January 3, 2008.  *See* Compl., ECF No. 1.

On July 21, 2009 they filed a first amended complaint.  *See* Am. Compl., ECF No. 117.  On

November 16, 2009 defendants moved to dismiss the first amended complaint.  Mot. to Dismiss

Am. Compl., ECF Nos. 233-35, 239-40, 242, 247.  On October 7, 2010 the parties stipulated to

the filing of a second amended complaint, with the pending motions to dismiss deemed

responsive to this complaint.  *See* 2d Am. Compl., ECF No. 460.  On January 4, 2011 Magistrate

Judge Pohorelsky issued a Report and Recommendation ("R & R"), in which he recommended

that virtually all the claims in the second amended complaint be dismissed without prejudice and

with leave to replead.  *Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*,

No. 08-cv-42, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011).  On August 13, 2012  I adopted

Magistrate Judge Pohorelsky's R & R in its entirety.  *Precision Associates, Inc. v. Panalpina*

*World Transport (Holding) Ltd.*, No. 08-cv-42, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).

On November 15, 2012 plaintiffs filed a third amended complaint.  *See* 3d Am. Compl., ECF No.

677.  On February 27, 2013 non-settling defendants moved to dismiss the third amended

3

complaint.  Mot. to Dismiss 3d Am. Compl., ECF Nos. 727, 778, 781-83, 786-87, 789, 798, 803, 806, 808.  Magistrate Judge Pohorelsky heard oral argument on the motions on June 13, 2013. Minute Order, June 18, 2013, ECF No. 839.

B.      *The Settlement Agreements*

        1.      *The Schenker Settlement Agreement*

        On July 7, 2009 counsel for plaintiffs and counsel for Schenker signed a settlement agreement.  Pursuant to the proposed agreement, Schenker agreed to pay $8,750,000 into the settlement fund, Schenker Settlement § II.B.1,[3] representing 7.9% of its affected revenues,[4] Pls.' Mem. in Supp. Mot. Final Approval 12, ECF No. 855.  In addition, Schenker agreed to provide extensive cooperation to plaintiffs in their ongoing prosecution of the case. Schenker Agreement § II.B.3.

        The agreement proposes a settlement class of "[a]ll persons . . . who directly purchased Freight Forwarding Services for shipments within, to, or from the United States from any of the Defendants or any subsidiary or affiliate thereof, at any time during the period from

---

[3]      The Schenker settlement agreement was filed as Exhibit A to the Declaration of Joseph Bruckner in Support of Plaintiffs' Motion to Preliminarily Approve the Schenker, Vantec, and EGL Settlements, ECF No. 527-2.

[4]      Plaintiffs define "affected revenues" as "[p]laintiffs' estimates of the whole amount of the non-trebled surcharges, for the duration of each conspiracy surcharge claim, on . . . the following alleged conspiracies in which that Settling Defendant allegedly participated: Security Surcharge, New Export System ("NES") Surcharge, Chinese Currency Adjustment Factor ("CAF"), Peak Season Surcharge, Air Automated Manifest System surcharge ("AMS"), Ocean AMS, Japanese AMS, Japanese Fuel, the Japanese Securities and Explosives surcharge, and the Japanese Regional Conspiracy."  Pls.' Mem. in Supp. Mot. Final Approval 2 n.5, ECF No. 855.  This estimate "is based upon information obtained from settling Defendants and other sources" and "compares 90% of [each settling Defendant's] guaranteed settlement payments . . . to their Affected Revenues."  *Id.*

        Hewlett-Packard ("HP"), a class member who objects to the Schenker settlement agreement, argues that plaintiffs' estimates are simply estimates and that "[n]either the Court nor class members can subject Plaintiffs' estimate to the requisite careful scrutiny . . . because no further breakdown or analysis is provided."  HP Mem. in Opp. Mot. Final Approval 9 n.5, ECF No. 861.  But Dell, a class member who also objects to the Schenker settlement agreement, relies on these numbers in its papers in opposition to the motion.  *See, e.g.*, Dell Mem. in Opp. Mot. Final Approval 3, ECF No. 858.  Given the current stage of litigation, the Court acknowledges an inevitable information gap regarding "affected revenues," but is not inclined to disregard plaintiffs' estimates.  *See In re Air Cargo Shipping Services Antitrust Litigation*, No. 06-md-1775, 2009 WL 3077396, at *9 (E.D.N.Y. Sept. 25, 2009) (accepting plaintiffs' estimate of the percentage of affected revenues represented by settlement amount).

January 1, 2001 to the Effective Date of this Settlement Agreement." *Id.* § II.D.1.  In defining

the right of exclusion from the settlement class, the proposed agreement contains an opt-out

provision, which provides as follows:

> [A]ny Opt-Out Class Member that elects to exclude itself from the
> Settlement shall have and shall be deemed to have[] elected to
> exclude itself from the Actions for all purposes, including but not
> limited to any and all future prosecution of the Actions by Class
> Counsel, any and all discovery undertaken in the Actions, and any
> and all future settlements with any named Defendants or any
> Defendant named in the future in the Actions.

*Id.* § II.D.4.c.

2.     *The Vantec Settlement Agreement*

On April 26, 2011 counsel for plaintiffs and counsel for Vantec signed a

settlement agreement.  Pursuant to the proposed agreement, Vantec agreed to pay $9,900,000

and 100% of its proceeds from the *Air Cargo MDL* (with a guaranteed minimum of $300,000 in

such proceeds) into the settlement fund.  Vantec Settlement § II.A.1.[5]  Thus far, the Vantec

settlement amounts to approximately $10,614,263.21,[6] representing 53% of Vantec's affected

revenues.  Pls.' Mem. in Supp. Mot. Final Approval 12.  In addition, Vantec agreed to provide

substantial cooperation to plaintiffs in their ongoing prosecution of the case.  Vantec Settlement

§ II.A.2.

The Vantec settlement includes a "most favored nation" ("MFN") provision,

applicable to subsequent settlements between plaintiffs and Japanese defendants.  *Id.* § II.D.1.

The provision establishes a "Settlement Ratio" of 88.35%, defined as the ratio of the settlement

amount to the fuel, AMS, and security and explosives surcharge revenues for air cargo shipments

---

[5]     The Vantec settlement agreement was filed as Exhibit C to the Declaration of Joseph Bruckner in
Support of Plaintiffs' Motion to Preliminarily Approve the Schenker, Vantec, and EGL Settlements, ECF No. 527-4.

[6]     This amount reflects the fixed amount of $9,900,000 in addition to the value of any *Air Cargo
MDL* proceeds received to date.  Pls.' Mem. in Supp. Mot. Final Approval 12 n.14.

5

from Japan to the United States from October 2002 to November 2007. *Id*. § II.D.3. The MFN

provision states that if the Settlement Ratio in a subsequent settlement between plaintiffs and a

Japanese defendant is less than 88.35%, Vantec "will be entitled to receive . . . an amount

sufficient to reduce [Vantec's] Settlement Ratio to the Settlement Ratio for that" subsequent

settling defendant. *Id*. § II.D.4. The MFN provision does not apply to Japanese defendants that

are "insolvent or bankrupt, or [have] an inability to pay the amount that would be required by the

application of the . . . Settlement Ratio." *Id*. § II.D.6. It is also inapplicable if a motion by

plaintiffs for class certification is denied or if summary judgment has been granted against

plaintiffs' claims. *Id*. § II.D.8.

        3.     *The EGL Settlement Agreement*

        On May 12, 2011 counsel for plaintiffs and counsel for EGL signed a settlement

agreement. Pursuant to the proposed agreement, EGL agreed to pay $10,000,000 and 100% of

its proceeds from the *Air Cargo MDL* (capped at $10,000,000) into the settlement fund. EGL

Settlement § II.C.1.[7] Thus far, the EGL settlement amounts to approximately $18,574,850.25,

representing 189.5% of EGL's affected revenues. Pls.' Mem. in Supp. Mot. Final Approval 13.

In addition, EGL agreed to provide cooperation to plaintiffs in their ongoing prosecution of the

case. EGL Settlement § II.C.3.

        4.     *The Expeditors Settlement Agreement*

        On February 28, 2012 counsel for plaintiffs and counsel for Expeditors signed a

settlement agreement. Pursuant to the proposed agreement, Expeditors agreed to pay 70% of its

proceeds from the *Air Cargo MDL* into the settlement fund. Expeditors Settlement § II.B.1.[8]

---

[7]      The EGL settlement agreement was filed as Exhibit B to the Declaration of Joseph Bruckner in Support of Plaintiffs' Motion to Preliminarily Approve the Schenker, Vantec, and EGL Settlements, ECF No. 527-3.
[8]      The Expeditors settlement agreement was filed as Exhibit A to the Declaration of Joseph Bruckner in Support of Plaintiffs' Motion to Preliminarily Approve the Expeditors Settlement, ECF No. 576-2.

Thus far, the Expeditors settlement amounts to approximately $10,872,222.08, representing 43% of Expeditors' affected revenues. Pls.' Mem. in Supp. Mot. Final Approval 14.

5.    *The Nishi-Nippon Settlement Agreement*

On May 9, 2012 counsel for plaintiffs and counsel for Nishi-Nippon signed a settlement agreement. Pursuant to the proposed agreement, Nishi-Nippon agreed to pay $20,082,896 and 50% of its proceeds from the *Air Cargo MDL* (capped at $500,000) into the settlement fund. Nishi-Nippon Settlement § II.A.1.[9] In addition, Nishi-Nippon agreed to provide cooperation to plaintiffs in their ongoing prosecution of the case. *Id*. § II.A.2. The Nishi-Nippon settlement includes a MFN clause virtually identical to that contained in the Vantec settlement. *Id*. § II.D.

6.    *The UAC Settlement Agreement*

On August 9, 2010 counsel for plaintiffs and counsel for UAC signed a settlement agreement. Pursuant to the proposed agreement, UAC agreed to pay $295,275 and 75% of its proceeds from the *Air Cargo MDL* into the settlement fund. UAC Settlement § II.B.1.[10] Thus far, the UAC settlement amounts to approximately $295,275, representing 50% of UAC's affected revenues. Pls.' Mem. in Supp. Mot. Final Approval 15. In addition, UAC agreed to provide cooperation to plaintiffs in their ongoing prosecution of the case. UAC Agreement § II.B.2.

7.    *The KN Settlement Agreement*

On September 14, 2012 counsel for plaintiffs and counsel for KN signed a settlement agreement. Pursuant to the proposed agreement, KN agreed to pay $28,000,000 and

---

[9]    The Nishi-Nippon settlement agreement was filed as Exhibit A to the Declaration of Joseph Bruckner in Support of Plaintiffs' Motion to Preliminarily Approve the Nishi-Nippon Settlement, ECF No. 590-2.
[10]    The UAC settlement agreement was filed as Exhibit A to the Declaration of Joseph Bruckner in Support of Plaintiffs' Motion to Preliminarily Approve the Nishi-Nippon Settlement, ECF No. 639-1.

99.7% of its proceeds from the *Air Cargo MDL* into the settlement fund.  KN Settlement §

II.A.1.[11]  Thus far, the KN settlement amounts to approximately $34,244,829.80, representing

26% of KN's affected revenues.  Pls.' Mem. in Supp. Mot. Final Approval 15.

       8.    *The Morrison Settlement Agreement*

       On October 5, 2012 counsel for plaintiffs and counsel for Morrison signed a

settlement agreement.  Pursuant to the proposed agreement, Morrison agreed to pay $1,678,700

and 72.5% of its proceeds from the *Air Cargo MDL* into the settlement fund.  Morrison

Settlement § II.A.1.[12]  Thus far, the settlement amounts to approximately $1,678,700,

representing 93% of Morrison's affected revenues.  Pls.' Mem. in Supp. Mot. Final Approval 15.

In addition, Morrison agreed to provide cooperation to plaintiffs in their ongoing prosecution of

the case.  Morrison Settlement § II.A.2.

       9.    *The UTi Settlement Agreement*

       On December 5, 2012 counsel for plaintiffs and counsel for UTi signed a

settlement agreement.  Pursuant to the proposed agreement, UTi agreed to pay $3,243,658 and

80.5% of its proceeds from the *Air Cargo MDL* into the settlement fund.  UTi Settlement §

II.A.[13]  Thus far, the UTi settlement amounts to approximately $3,243,658, representing 22% of

UTi's affected revenues.  Pls.' Mem. in Supp. Mot. Final Approval 16.

       10.    *The ABX Settlement Agreement*

       On January 28, 2013 counsel for plaintiffs and counsel for ABX signed a

settlement agreement.  Pursuant to the proposed agreement, ABX agreed to pay $3,500,000 into

---

[11]    The KN settlement agreement was filed as Exhibit A to the Declaration of Joseph Bruckner in Support of Plaintiffs' Motion to Preliminarily Approve the KN Settlement, ECF No. 646-1.

[12]    The Morrison settlement agreement was filed as Exhibit A to the Declaration of Joseph Bruckner in Support of Plaintiffs' Motion to Preliminarily Approve the Morrison Settlement, ECF No. 669-1.

[13]    The UTi settlement agreement was filed as Exhibit A to the Declaration of Joseph Bruckner in Support of Plaintiffs' Motion to Preliminarily Approve the UTi Settlement, ECF No. 688-1.

the settlement fund, ABX Settlement § II.A.1,[14] representing 58% of ABX's affected revenues,
Pls.' Mem. in Supp. Mot. Final Approval 16.  In addition, ABX agreed to provide cooperation to
plaintiffs in their ongoing prosecution of the case.  ABX Settlement § II.A.2.

      11.   *Releases*

The Schenker settlement agreement contains a release provision that, in
substance, releases Schenker of all claims by settlement class members relating to freight
forwarding services to, from, or within the United States based on any federal, state, local,
statutory, or common law, or any other law, code, rule or regulation of any country or
jurisdiction worldwide, regardless of legal theory or type of relief or damages claimed.  Schenker
Settlement §§ I.B.20-22, II.A.  The other nine settlement agreements contain a similar release
provision but provide an exception to the release for claims involving (1) product defect or
breach of warranty; (2) breach of contract, or (3) indirect purchase of freight forwarding services
by persons or entities other than the settlement class members.  Vantec Settlement §§ I.B.26-28,
II.B.; EGL Settlement §§ I.B.21-23, II.B; Expeditors Settlement §§ I.B.17-19, II.A; Nishi-
Nippon Settlement §§ I.B.27-29, II.B; UAC Settlement §§ I.B.27-29, II.C; KN Settlement §§
I.B.26-28, II.B; Morrison Settlement §§ I.B.25-27, II.B; UTi Settlement §§ I.B.25-27, II.B; ABX
Settlement §§ I.B.25-27, II.B.

C.   *Preliminary Approval of the Settlement Agreements and the Notice Program*

      1.   *Preliminary Approval of the Settlement Agreements*

On September 23, 2011 I entered an order preliminarily approving the Schenker,
Vantec, and EGL settlement agreements and certifying the settlement classes.  Order, Sept. 23,

---

[14]     The ABX settlement agreement is filed as Exhibit A to the Declaration of Joseph Bruckner in
Support of Plaintiffs' Motion to Preliminarily Approve the ABX Settlement, ECF No. 713-1.

2011, ECF No. 530.  On May 7, 2012 I entered an order preliminarily approving the Expeditors settlement agreement and certifying the settlement class.  Order, May 7, 2012, ECF No. 587.

On July 2, 2012 Dell, Inc. ("Dell"), Hewlett-Packard Company ("HP"), and Sony Electronics, Inc. and Sony Supply Chain Solutions (Americas), Inc. (collectively "Sony") intervened in this action and filed motions to modify the order preliminarily approving the Schenker settlement agreement.[15]  *See* Dell Mot. Modify Preliminary Approval, ECF No. 594; HP Mot. Modify Preliminary Approval, ECF No. 598.  Specifically, Dell, HP, and Sony opposed the opt-out provision in the Schenker settlement agreement.  On September 25, 2012 I denied the motions to modify the order preliminarily approving the Schenker settlement agreement.  Order, Sept. 25, 2012, ECF No. 659.

On July 9, 2012 I entered an order preliminarily approving the Nishi-Nippon settlement agreement and certifying the settlement class.  Order, July 9, 2012, ECF No. 604.  On September 10, 2012 I entered an order preliminarily approving the UAC settlement agreement and certifying the settlement class.  Order, Sept. 10, 2012, ECF No. 643.  On September 18, 2012 I entered an order preliminarily approving the KN settlement agreement and certifying the settlement class.  Order, Sept. 18, 2012, ECF No. 649.  On October 16, 2012 I entered an order preliminarily approving the Morrison settlement agreement and certifying the settlement class.  Order, Oct. 16, 2012, ECF No. 673.  On December 12, 2012 I entered an order preliminarily approving the UTi settlement agreement and certifying the settlement class.  Order, Dec. 12, 2012, ECF No. 692.  On January 30, 2013 I entered an order preliminarily approving the ABX settlement agreement and certifying the settlement class.  Order, Jan. 30, 2013, ECF No. 715.

---

[15]     Dell, HP, and Sony had previously filed motions to intervene, which I granted.  *See* ECF No. 566 (HP Motion to Intervene) and Order dated March 12, 2012 (granting HP's unopposed motion); ECF No. 579 (Dell Motion to Intervene) and Order dated April 27, 2012 (granting Dell's unopposed motion); ECF No. 618 (Sony Motion to Intervene) and Order dated August 8, 2012 (granting Sony's unopposed motion but consigning Sony to rely on advocacy of Dell and HP).

2.    *The Notice Program*

On July 2, 2012 plaintiffs moved for approval of their class notice program.  Mot. to Approve Class Notice Program, ECF No. 596.  Plaintiffs proposed a notice program consisting of four components: (1) direct mail notice to approximately 2.01 million potential class members; (2) publication notice in magazines, in-country and international newspapers, trade publications, and banner and text ads on trade websites; (3) an "earned media" program consisting of a press release distributed on PR Newswire's Premier Global Service, which would reach approximately 18,783 media outlets worldwide, and (4) a settlement website.  *Id*. at 6-10. On October 10, 2012 I entered an order approving the class notice program on the condition that plaintiffs make certain revisions to the proposed class notice documents.[16]  Order, Oct. 10, 2012, ECF No. 666.

Notice papers were mailed to approximately 2.3 million potential class members between March 21 and March 29, 2013.  Julie Redell Decl. ¶ 6; Katherine Kinsella Decl. ¶¶ 10-11.[17]  Publication notice appeared in magazines, in-country and international newspapers, trade publications, and banner and text ads on trade websites throughout April and May 2013. Kinsella Decl. ¶¶ 22-30, Ex. E.  The press release, conceived as part of the "earned media" program, was distributed on April 11, 2013.  Kinsella Decl. ¶ 33.

The notice papers provided a deadline of June 25, 2013 for class members to opt out of any settlement.  Co-Lead Counsel for plaintiffs represent to the Court that they have received 183 opt-out requests from a potential class size estimated at over 2 million members. Pls.' Mem. in Supp. Mot. Final Approval 17 ("This represents a minuscule fraction of the

---

[16]    I approved subsequent requests to revise the notice program in order to incorporate subsequent settlements and to permit minor, ministerial changes to the notice papers.  *See* Order, Nov. 19, 2012; Order, Nov. 21, 2012; Order, Jan. 4, 2013; Order, Feb. 11, 2013; Order, April 5, 2013.
[17]    The Redell and Kinsella Declarations were respectively filed as Exhibits 1 and 2 to the Pls.' Mot. for Final Approval, ECF Nos. 854-1, 854-2.

estimated total Class – less than 1/10 of 1%."); Redell Decl. ¶ 8.  Two class members – Dell and

HP – have objected to final approval of the Schenker settlement agreement.  No class members

have objected to final approval of the nine other settlement agreements.

D.      *The Plan of Allocation*

Under the Plan of Allocation, the net settlement funds shall be distributed in two

ways to class members that submit valid claim forms in two ways.  Pls.' Mem. in Supp. Mot.

Final Approval 45 & Ex. D.  First, 10% of the net settlement funds will be allocated pro rata

based on the total worldwide freight forwarding charges paid for shipments to, from, or within

the United States during the period of January 1, 2001 to September 14, 2012.  *Id.*  Second, 90%

of the net settlement funds will be allocated pro rata based on the surcharges paid on the shipping

routes of all defendants "that conspired on that particular surcharge for which a particular Class

Member paid surcharges on freight forwarding services" during the same period.[18]  *Id.* at Ex. D.

E.      *Fee Award Request*

Co-Lead Counsel for plaintiffs seek a total interim fee award of $37,077,780.82

payable in the following installments: (1) $32,596,320.32, representing 33% of the settlement

proceeds currently paid into the settlement fund, payable now; (2) $4,459.980.25, representing

33% of the settlement proceeds scheduled to be paid by Schenker, EGL, and UAC upon final

approval of their respective settlement agreements, payable 15 business days following final

approval of those agreements; and (3) $21,480.25, representing 33% of the settlement proceeds

scheduled to be paid by UAC one year following the fairness hearing, payable when UAC

---

[18]     The Plan of Allocation provides the following example: "[I]f a Class Member paid surcharges for a shipment from Japan to the United States, that Class Member would be entitled to a pro rata portion of the net settlement proceeds from the Defendant(s) who allegedly participated in the conspiracies on the Japan to United States route."

forfeits those proceeds.  In addition, Co-Lead Counsel seek reimbursement of $811,095.84 in expenses incurred to date.

DISCUSSION

A.    *The Settlement Agreements*

   1.    *The Standard for Approving a Proposed Settlement*

   Pursuant to Federal Rule of Civil Procedure 23(e), any settlement of a class action requires court approval.  A court may grant approval of a proposed settlement of a class action if the settlement is "fair, adequate, and reasonable, and not a product of collusion."  *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000).  In so doing, the court must "eschew any rubber stamp approval" yet simultaneously "stop short of the detailed and thorough investigation that it would take if it were actually trying the case."  *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000).  Judicial discretion is informed by the general policy favoring settlement.  *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also Denney v. Jenkins & Gilchrist*, 230 F.R.D. 317, 328 (S.D.N.Y. 2005) ("There is a strong judicial policy in favor of settlements, particularly in the class action context.  The compromise of complex litigation is encouraged by the courts and favored by public policy.") (internal quotation marks, footnotes and citations omitted), *aff'd in part and vacated in part*, 443 F.3d 253 (2d Cir. 2006).

   To evaluate whether a class settlement is fair, a district court examines (1) the negotiations that led up to the settlement, and (2) the substantive terms of the settlement.  *See In re Holocaust Victims Assets Litigation*, 105 F. Supp. 2d 139, 145 (E.D.N.Y. 2000).  "The [negotiation] process must be examined 'in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the

13

negotiations themselves.'"  *Id*. at 145-46 (quoting *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983)).  Factors relevant to the substantive fairness of a proposed settlement include: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  *See Grinnell*, 495 F.2d at 463.

### a.      *Procedural Fairness*

I find that the ten settlement agreements are procedurally fair because they were each the product of arm's length negotiations between experienced and able counsel on all sides. Co-Lead Counsel for plaintiffs represent that the settlements were each "entered into in good faith, after extensive arms'-length negotiations between experienced and informed counsel on both sides."  Pls.' Mem. in Supp. Mot. Final Approval 18-19.  They further represent that "Settling Defendants are represented by nationally renowned law firms whose attorneys skillfully negotiated on behalf of their clients."  *Id*. at 19.  There is nothing in the record to indicate otherwise.  Rather, the record is replete with support that each settlement agreement was the product of hard fought negotiations, as attested to by counsel in support of their motions for preliminary approval of each settlement agreement.  *See* Joseph Bruckner Decl. ¶¶ 7-8, ECF No. 527-1; Christopher Lovell Decl. ¶¶ 3-8, ECF No. 527-5; Daniel Hedlund Decl. ¶¶ 6-10, ECF No. 527-6; Bruckner Decl. ¶¶ 5-10, ECF No. 576-1; Lovell Decl. ¶¶ 4-6, ECF No. 590-1; Benjamin Jaccarino Decl. ¶¶ 3-7, ECF No. 639; Lovell Decl. ¶¶ 3-6, ECF No. 646; Lovell Decl. ¶¶ 3-6,

14

ECF No. 669; Bruckner Decl. ¶¶ 3-6, ECF No. 688; Hedlund Decl. ¶¶ 4-6, ECF No. 713.

Furthermore, there is no indication that the settlement agreements are a product of collusion or

that they confer, upon the class representative or any portion of the class, "improper[] . . .

preferential treatment." *In re NASDAQ Market-Makers Antitrust Litigation*, 176 F.R.D. 99, 102

(S.D.N.Y. 1997). Accordingly, I conclude that the settlement agreements were reached by good-

faith negotiations that were "fair, adequate, and reasonable, and not a product of collusion." *Joel

A.*, 218 F.3d at 138.

        b.     *Substantive Fairness*

        (1)     *The Complexity, Expense, and Likely
Duration of the Litigation*

From the outset, the potential for this complex litigation to consume considerable

time and resources has been great. Complex factual and legal issues abound. Protracted,

voluminous discovery and dueling experts would no doubt add to the complexity of the

presentation of proof. The losing parties would likely appeal any adverse jury verdicts, thereby

extending the duration of the litigation. Indeed, with respect to the non-settling defendants, this

case may yet result in enormous expense and remain pending for a significant period of time. It

is undisputed that developing cases against any of the settling defendants would have required

significant time and expense. In addition, as a result of many of these defendants' bargained-for

cooperation, these settlement agreements may facilitate a more expeditious outcome of the

remaining claims, and may advance the final resolution of this litigation.

        (2)     *The Reaction of the Class to the Settlement*

The small number of objectors to the settlements weighs in favor of approval.

Notice papers were mailed to over 2.3 million potential class members; plaintiffs estimate the

class size to number in the hundreds of thousands. Pls.' Mem. in Supp. Mot. Final Approval 4.

However, only 183 members have opted out.  As for objections, only two class members – Dell

and HP – have objected to final approval of the Schenker settlement agreement.  (Non-settling

Japanese defendants have also lodged objections against final approval of the Vantec and Nishi-

Nippon settlement agreements).  No class members have objected to final approval of the nine

other settlements.  *See* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41, at

108 (4th ed. 2002) ("[A] certain number of objections are to be expected in a class action with an

extensive notice campaign and a potentially large number of class members.  If only a small

number of objections are received, that fact can be viewed as indicative of the adequacy of the

settlement."); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (holding

that "[t]he District Court properly concluded that this small number of objections [18 out of

27,883 notices] weighed in favor of settlement").

(3)  *The Stage of the Proceedings and the*<br>*Amount of Discovery Completed*

   The purpose of the third *Grinnell* factor is to "assure the Court that the counsel for

plaintiffs have weighed their position based on a full consideration of the possibilities facing

them."  *In re Global Crossing Securities and ERISA Litigation*, 225 F.R.D. 436, 458 (S.D.N.Y.

2004) (internal quotation marks and citation omitted).  The Schenker settlement agreement was

concluded early in the litigation process, but there is no evidence that it was ill-informed or

premature.  Nor is there a requirement that discovery be completed "as long as the court is

assured that the parties had sufficient information about the claims to evaluate intelligently the

desirability of settlement."  *In re International Murex Technologies Corporation Securities*

*Litigation*, No. 93-cv-336 (JG), 1996 WL 1088899, at *4 (E.D.N.Y. Dec. 4, 1996); *see also*

*Global Crossing*, 225 F.R.D. at 458-59.  Plaintiffs note that they "learned of important facts

about the dimensions of the case during the eighteen months prior to the Schenker settlement and

16

from the preview of Schenker's cooperation *prior* to entering the Schenker settlement."  Pls.'
Mem. in Supp. Mot. Final Approval 23.  In assessing these facts, they relied heavily on the
expertise of counsel for plaintiffs, who have "extensive experience with antitrust claims and
complex litigation."  *Id*. at 6 ("Class Counsel's judgment was especially important in estimating
the value of the timely and extensive cooperation provided by Schenker and the improvement
that such cooperation provided in pleading and establishing the alleged conspiracies here.").

      As for the subsequent nine settlement agreements at issue here, the parties
concluded them with the benefit of considerably more robust information.  Specifically, this
information included:

> (a) the . . . cooperation that had been received from Schenker; (b)
> the . . . documents that had been obtained during the litigation from
> other Defendants; (c) assertions by each Settling Defendant of their
> defenses as well as previews of their cooperation; (d) Class
> Counsel's continuing investigation until the time of each respective
> settlement; (e) estimates of the amount of charges by each Settling
> Defendant; (f) as to the KN and Expeditors settlements, full-day
> mediation sessions with an experienced mediator; and (g) such
> other information that became available (including regarding risks
> of foreign collection).

Pls.' Mem. in Supp. Mot. Final Approval 6.  Accordingly, this *Grinnell* factor weighs in favor of
a conclusion that the settlement is fair and advantageous to the class.

      (4)     *The Risks of Establishing Liability and*
               *Damages, and of Maintaining the Class*
               *Action through the Trial*

      Plaintiffs continue to litigate against non-settling defendants.  Motions to dismiss
all the claims remain pending.  As plaintiffs themselves note, to the extent their claims survive
these motions, non-settling defendants appear prepared to vigorously contest their liability.  Pls.'
Mem. in Supp. Mot. Final Approval 25.  Plaintiffs further note that even if they succeed in

establishing liability, "they nonetheless would face substantial risks and uncertainty as to the quantum of damages." *Id.*; *see, e.g.*, *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998) ("[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."). In short, trial of the case would involve significant risks to plaintiffs and any theory of damages would be hotly contested. Not only have plaintiffs eliminated the risk of litigating the case against the settling defendants, but several of the settling defendants' obligations under the settlements to cooperate may assist plaintiffs to resolve the action as against the non-settling defendants. Accordingly, this factor weighs in favor of approval of the settlements.

        (5)    *The Ability of Defendants to Withstand a Greater Judgment*

In light of the current economic climate, I find that the settlements represent a significant commitment by the settling defendants.

        (6)    *The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation*

The settlement amounts presented here are within the range of reasonableness. In the aggregate, the settlement proceeds from the ten agreements presently establish a guaranteed settlement fund worth approximately $112 million.[19] Thus, the agreements provide for

---

[19]    Plaintiffs assert that the ten settlement agreements establish a $112,356,911.58 guaranteed settlement fund. But the sum of payments guaranteed thus far, at least as set forth in the Plaintiffs' Memorandum of Law in Support of the Motion for Final Approval and the attached Exhibit A, is $111,856,694.34. The discrepancy is largely resolved in Exhibit O of the Declaration of Joseph Bruckner in support of Co-Lead Counsel's Motion for Interim Fee Award and Reimbursement of Expenses: The former exhibit lists Nishi-Nippon's guaranteed settlement payment to date as $20,082,896 while the latter lists Nishi-Nippon's guaranteed settlement payment to date as $20,582,896. But the sum of payments guaranteed thus far as set forth in that latter exhibit is $112,356,694.34,

substantial payments to the class members now – relatively early in the litigation – rather them

leaving them with the prospect of uncertain relief later.  The settlement fund currently represents

31.2% of the settling defendants' affected revenues, a percentage that compares favorably with

settlements reached in other price-fixing antitrust class actions.  *See, e.g. In re Air Cargo*, 2009

WL 3077396 (approving settlement representing 10.5% of settling defendant's affected

revenues); *In re Air Cargo*, 2011 WL 2909162, at *4 (E.D.N.Y. July 15, 2011) (approving

second wave of settlements and finding that "[w]ith each new settlement," the percentage of each

settling defendant's affected revenues represented by the settlement amount "rises by less than

one percent").  Moreover, the settlement proceeds from the agreements will continue to grow as

settling defendants receive payments from the *Air Cargo MDL*.[20]

       Considering each settlement agreement on an individual basis, I see no reason that

the specific settlement amounts provided for in any of the agreements are outside the range of

reasonableness.  Leaving aside the Schenker settlement agreement, which I address below, the

other nine settlement agreements provide for settlement amounts representing significant

percentages of each settling defendants' affected revenues.  The lowest such percentage is

reflected in the UTi settlement, which provides for a fixed cash payment of $3,243,658,

representing 22% of UTi's affected revenues.  *See* Pls.' Mem. in Supp. Mot. Final Approval 16.

That percentage is certain to grow, given that UTi has further agreed to pay 80.5% of future *Air*

*Cargo MDL* proceeds into the Settlement Fund.  *Id*.  But even on its own, the percentage falls

well within the bounds of reasonableness.

---

which still presents a shortfall of $217.24.  I recognize that this shortfall is miniscule compared to the total
guaranteed settlement fund.  Nonetheless, these discrepancies in plaintiffs' papers need to be resolved.

[20]     The *Air Cargo MDL* remains ongoing, rendering uncertain the exact amount of settling
defendants' recovery from that litigation.  However, plaintiffs anticipate "that additional *Air Cargo* recoveries will
be significant" and note that payments to class members from a third wave of settlements are pending.  Pls.' Mem.
in Supp. Final Approval 12 n.14.  In approving that third wave of settlements, I found that they would produce a
total recovery (after reductions for opt-outs) of $183,432,485.76.  *In re Air Cargo*, 2012 WL 3138596, at *3
(E.D.N.Y. Aug. 2, 2012).

The Schenker settlement agreement provides for a fixed cash payment of $8,750,000, representing 7.9% of Schenker's affected revenues.  This financial consideration alone represents a commitment by Schenker that I cannot dismiss as insignificant or outside the bounds of reasonableness.  Furthermore, the Schenker settlement includes an extensive agreement to cooperate.  Schenker's cooperation pursuant to this agreement helped to bolster plaintiffs' position in the litigation.[21]  Pls.' Mem. in Supp. Mot. Final Approval 9-10.  This cooperation adds considerable value to the Settlement and must be factored into an analysis of the overall reasonableness of the agreement.[22]

In sum, I conclude that the ten proposed settlement agreements are both procedurally and substantively fair and therefore I approve them.

2.      *Objections to the Schenker Settlement Agreement*

Class members Dell and HP object to the proposed settlement agreement with Schenker.  The crux of their objection is to the agreement's opt-out provision.  That provision provides as follows:

> [A]ny Opt-Out Class Member that elects to exclude itself from the Settlement shall have and shall be deemed to have[] elected to exclude itself from the Actions for all purposes, including but not limited to any and all future prosecution of the Actions by Class Counsel, any and all discovery undertaken in the Actions, and any and all future settlements with any named Defendants or any Defendant named in the future in the Actions.

Schenker Settlement § II.D.4.c.  In other words, class members who choose to opt out of the Schenker settlement agreement must opt-out out of the litigation altogether, including any future settlements reached by Co-Lead Counsel for plaintiffs.

---

[21]      Dell and HP vigorously contest the actual value of the cooperation provided by Schenker, but I find that Co-Lead Counsel for plaintiffs are in a superior position to evaluate the value of this cooperation in strengthening plaintiffs' claims against non-settling defendants.

[22]      Similarly, the agreements to cooperate in the Vantec, EGL, Nishi-Nippon, UAC, Morrison and ABX settlements also enhance the value of those settlements.

Dell and HP raised this objection prior to my preliminary approval of the

Schenker settlement agreement.  At an August 12, 2012 hearing, counsel for HP represented that

Dell, HP, and Sony objected to the opt-out provision primarily on the ground that class members

lack sufficient information to evaluate whether or not to opt out:

> THE COURT:  As I understand these objections, the essence of
> them is an information problem.  That is, if you opt out of the
> Schenker Settlement and that means you opt out of all future
> settlements, you don't have sufficient information to make an
> informed decision as to whether to be in the class or out, correct?
>
> MR. STORTZ:  That's correct, Your Honor.
>
> THE COURT:  . . . I don't get the sense that there's this visceral
> reaction against you're either all in or you're all out.  It's mostly
> just a problem of the timing.  That is to say if we had an array of
> proposed settlements with all of the defendants and you had to
> choose to be in them all or out of them all, you would be fine with
> that. . . .
>
> MR. STORTZ:  I think the Court has put the finger right on it.  The
> issue when you have one or four or five settlements presented out
> of this array of defendants, an array of different conspiracies, some
> involving Schenker, some not involving Schenker, that there's
> really a lack of information at this point . . . .

Aug. 12, 2012 Tr. 9:21-10:16.[23]  In other words, they conceded that they were not objecting in

principle to an opt-out provision of this nature.  Regardless, in denying Dell and HP's motion to

modify the preliminary approval of the Schenker settlement agreement, I held that Dell and HP

> [did] not have an independent right to pick-and-choose which
> settlement agreements to join or opt out of, unless such a right is
> provided for in the agreement itself.  *See, e.g.*, *In re Del-Val
> Financial Corp. Securities Litigation*, 162 F.R.D. 271, 275
> (S.D.N.Y. 1995) ("[T]he balance struck by Rule 23 would be upset
> if individuals could choose to participate in a class for the purposes
> of settlement with some defendants, but to exclude themselves
> from the settlement with other defendants.  Rule 23 requires

---

[23]     The transcript is filed as Exhibit A to the Declaration of Michael J. Stortz in Support of Plaintiffs'
Motion for Final Approval, ECF No. 842-2.

> potential class members to make a trade-off: an individual either
> decides to remain a class member, bound by any and all judgments
> rendered in the class action but spared the expense of litigating on
> her own behalf, or she elects exclusion.").

Order, Sept. 25, 2012, ECF No. 659.

Turning to the information problem, I find Dell and HP's objections to final approval of the Schenker settlement agreement unpersuasive. At the August 12, 2012 hearing, I observed that a larger package of settlements would give class members a better sense of whether to opt out of the Schenker Settlement.[24] Dell and HP try to minimize this package of settlements, arguing that it represents only about one-third of defendants.[25] But I find one-third to be a significant segment of the defendant pool, enough to give class members sufficient information to determine whether it makes sense to opt out of these settlements and pursue claims on their own.[26]

This conclusion is buttressed by the fact that Dell and HP are the only two class members out of a potential class of hundreds of thousands to object to the Schenker settlement agreement. Dell and HP argue that the opt-out provision "deprives class members of the opportunity to freely express their opinions about the adequacy of the settlement," suggesting that some critical mass of class members agree with their objection to the settlement, but have somehow been silenced by the opt-out provision. Dell Objections to Schenker Settlement 3,

---

[24] Dell and HP have placed great weight on my statement at the August 12, 2012 hearing that "hypothetically, if you know what the lay of the land is [with respect to] 75 percent of the defendants . . . then you have enough information to know whether to opt out or stay in." Aug. 12, 2012 Tr. 18:19-22. But that statement simply posed a hypothetical scenario in which the class members might have sufficient information to decide whether to opt out; it by no means established 75 as the percentage of defendants that must settle before class members can make such a decision.

[25] The proper metric here would appear to be the percentage of so-called "affected revenues" addressed by the settlements, as opposed to the number of settling defendants; Dell and HP do not provide the Court with a sense of what percentage of "affected revenues" are represented by this package of settlements.

[26] Intertwined in Dell and HP's objection to the opt-out provision is the argument that they lack sufficient information to determine whether the $8,500,000 settlement amount is adequate, particularly with respect to the actual value of Schenker's cooperation. But as discussed above, I find the settlement amount alone to be reasonable financial consideration, and that the value of Schenker's cooperation further enhances the overall reasonableness of the settlement agreement.

ECF No. 843. The opt-out provision may deter some class members from opting out, but it has

no deterrent effect on their ability to *object* to the Schenker settlement agreement. As plaintiffs

observe, the class is composed of "sophisticated business and Fortune 500 companies" that

certainly possess the wherewithal to file an objection if they wish to the Schenker settlement

agreement. Pls.' Mem. in Supp. Mot. Final Approval 35. Their silence is significant.

Accordingly, I overrule Dell and HP's objections to the Schenker settlement agreement.

      3.     *Objections to the Vantec and Nishi-Nippon Settlement Agreements*

      Non-settling Japanese defendants[27] object to the proposed settlement agreements

with Vantec and Nishi-Nippon. Their objection is with the MFN provisions in both agreements,

which are applicable to subsequent settlements between plaintiffs and Japanese defendants. The

MFN provisions establish a "Settlement Ratio" of 88.35%, defined as the ratio of the settlement

amount to the fuel, AMS, and security and explosives surcharge revenues for air cargo shipments

from Japan to the United States from October 2002 to November 2007. Vantec Settlement §

II.D.3; Nishi-Nippon Settlement § II.D.3. These MFN provisions state that if the Settlement

Ratio in a subsequent settlement between plaintiffs and a Japanese defendant is less than 88.35%,

Vantec and Nishi-Nippon "will be entitled to receive . . . an amount sufficient to reduce [Vantec

or Nishi-Nippon's] Settlement Ratio to the Settlement Ratio for that" subsequent settling

defendant. Vantec Settlement § II.D.4; Nishi-Nippon Settlement § II.D.4. The MFN provisions

do not apply to Japanese defendants that are "insolvent or bankrupt, or [have] an inability to pay

the amount that would be required by the application of the . . . Settlement Ratio." Vantec

Settlement § II.D.6; Nishi-Nippon Settlement § II.D.6. They are also inapplicable if a motion by

---

     27        The non-settling Japanese defendants consist of eight Japanese companies and their U.S.
subsidiaries or affiliates: Hankyu Hanshin Express Holdings Corporation; Hankyu Hanshin Express Co., Ltd.;
Hanshin Air Cargo Co., Ltd.; MOL Logistics (U.S.A.), Inc.; Nippon Express Co., Ltd.; Nippon Express USA< Inc.;
Nissin Corporation; Nissin International Transport U.S.A., Inc.; Yamato Global Logistics Japan Co., Ltd.; Yamato
Transport U.S.A., Inc.; Yusen Air & Sea Service Co., Ltd.; and Yusen Air & Sea Service (U.S.A.), Inc.

plaintiffs for class certification is denied or if summary judgment has been granted against plaintiffs' claims. Vantec Settlement § II.D.8; Nishi-Nippon Settlement § II.D.8.

As a threshold matter, plaintiffs contend that non-settling Japanese defendants lack standing to object to the Vantec and Nishi-Nippon Settlements. "Usually, a nonsettling defendant lacks standing to object to a court order approving a partial settlement because a nonsettling defendant is ordinarily not affected by such a settlement." *Zupnick v. Fogel*, 989 F.2d 93, 98 (2d Cir. 1993); *see also Newberg on Class Actions* § 11:55 ("[N]onsettling defendants in a multiple defendant litigation context have no standing to object to the fairness or adequacy of the settlement by any other defendants . . . ."). "This rule advances the policy of encouraging the voluntary settlement of lawsuits." *Id*. (quoting *Waller v. Financial Corp. of America*, 828 F.2d 579, 583 (9th Cir. 1987)) (internal quotation marks omitted). But "[b]ecause . . . courts also have a duty to protect the rights of the parties before them, there is a recognized exception to this general rule which 'permit[s] a non-settling defendant to object where it can demonstrate that it will sustain some formal legal prejudice as a result of the settlement.'" *Id*. (citing *Waller*, 828 F.2d at 583). "In practice, such prejudice has only been found to exist in rare circumstances, such as where the settlement agreement strips a non-settling party of a claim for contribution or indemnification, or invalidates a non-settling party's contract rights." *Armco Inc. v. North Atlantic Insurance Co. Ltd.*, No. 98-cv-6084, 1999 WL 173579, at *1 (S.D.N.Y. 1999); *see also id.* ("A settlement that does not divest non-settling parties of their legal claims or prevent the assertion of those claims does not constitute legal prejudice to the non-settling parties.") (citations omitted); *Agretti v. ANR Freight System, Inc.*, 982 F.2d 242, 247 (7th Cir. 1992) ("Mere allegations of injury in fact or tactical disadvantage as a result of a settlement simply do not rise to the level of plain legal prejudice.").

24

The MFN provisions at issue do not result in legal prejudice to non-settling Japanese defendants.  Non-settling Japanese defendants object to these provisions primarily on the ground that they inhibit future settlements between themselves and plaintiffs by establishing a settlement ratio.  This argument best describes a "tactical disadvantage" rather than formal legal prejudice.  At any rate, these provisions may inhibit, but do not prohibit, non-settling Japanese defendants from negotiating settlements with a settlement ratio below that contained in the MFN provisions.  The MFN provisions simply contemplate that in such a scenario, Vantec and Nishi-Nippon would receive an amount sufficient to reduce their settlement ratios so that they are equivalent to that contained in the subsequent settlement.[28]  Accordingly, I overrule non-settling Japanese defendants' objections to the Vantec and Nishi-Nippon Settlements.

B.    *Plan of Allocation*

"As a general rule, the adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and reasonable' under the particular circumstances of the case.  *In re Painewebber Ltd. Partnerships Litigation*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) (quotation marks omitted).  Whether the allocation plan is equitable is "squarely within the discretion of the

---

[28]    Non-settling Japanese defendants make several arguments to the effect that these MFN provisions harm the class.  In particular, they argue that the provisions are unworkable because they do not articulate how refunds to Vantec and Nishi-Nippon would be distributed in the event that plaintiffs conclude a settlement with a non-settling Japanese defendant with a more favorable settlement ratio.  For example, they point out that the Vantec and Nishi-Nippon settlements require the distribution of proceeds to class members upon final approval and that it would be "impractical to 'claw back' cash . . . in order to make the 'repayments' to Vantec and N[ishi-Nippon] in the event of a breach of the MFN provision."  Non-Settling Japanese Ds' Objections to Mot. Final Approval 12, ECF No. 841.  These arguments may be valid but I am not inclined to consider them given that not a single member of the class that would be directly affected by such a scenario has raised them.

district court." *In re PaineWebber*, 171 F.R.D. at 132.  I find that the plan is both fair and reasonable, and thus I approve it.

      As discussed above, the proposed plan of allocation works as follows.  First, 10% of the net settlement funds will be allocated pro rata based on the total worldwide freight forwarding charges paid for shipments to, from, or within the United States during the period January 1, 2001 to September 14, 2012.  Pls.' Mem. in Supp. Mot. Final Approval 45 & Ex. D. Second, 90% of the net settlement funds will be allocated pro rata based on the surcharges paid on the shipping routes of all defendants "that conspired on that particular surcharge for which a particular Class Member paid surcharges on freight forwarding services" during the same period. *Id*. at Ex. D.  The ten settlements at issue each provide that no funds will revert to settling defendants regardless of the number of opt-outs and regardless of the number of class members who submit valid claims.  *Id*. at 3.

      I conclude that this plan of allocation, which is recommended by experienced and competent counsel, is fair, reasonable, and adequate.  This conclusion is buttressed by the relatively small number of opt-outs and absence of objections from class members.  Accordingly, I approve as final the allocation plan.

C.      *Fee Award*

      In awarding attorneys' fees, the Second Circuit has held that both the "lodestar" method of computation (*i.e.*, hours reasonably expended multiplied by a reasonable hourly rate, plus an enhancement if deemed appropriate) and the "percentage of the fund" method are available to district judges in calculating attorneys' fees in common fund cases.  *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  As one court has noted, "[t]he trend, however, in the Second Circuit, appears to be the utilization of the percentage method."

*Baffa v. Donaldson Lufkin & Jenrette Securities Corp.*, No. 96-cv-0583, 2002 WL 1315603, at

*1 (S.D.N.Y. June 17, 2002) (citing *In re American Bank Note*, 127 F. Supp. 2d 418, 431

(S.D.N.Y. 2001)) ("Although the law in the Circuit has not been uniform, the trend of the district

courts in this Circuit is to use the percentage of the fund approach to calculate attorneys' fees.");

*see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend

in this Circuit is toward the percentage method."); *In re Merrill Lynch & Co., Inc. Research

Reports Securities Litigation*, 246 F.R.D. 156, 171 (S.D.N.Y. 2007) ("The trend in the Second

Circuit . . . has been to express attorneys' fees as a percentage of the total settlement, rather than

to use the lodestar method to arrive at a reasonable rate.").  The percentage method spares the

court and the parties the "cumbersome, enervating, and often surrealistic process of lodestar

computation." *Goldberger*, 209 F.3d at 50 (quotation marks omitted).  Even when the

percentage method is used, however, the Second Circuit recommends analyzing the

documentation of the hours submitted by counsel as a "cross check" on the reasonableness of the

requested percentage. *See id.*  Courts in this Circuit commonly adhere to this practice.  *See

Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (quoting

*Goldberger*, 209 F.3d at 49-50).

        Regardless of which method of calculation is employed, the key consideration in

awarding fees is what is reasonable under the circumstances. *Goldberger*, 209 F.3d at 47.  The

traditional criteria in determining a reasonable common fund fee include: (1) the time and labor

expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the

litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and

(6) public policy considerations.  *Id*. at 50.

The Second Circuit has cautioned district courts, in applying these criteria, not to blindly follow a one-size-fits-all "benchmark" in determining the appropriate fee. Such a practice "could easily lead to routine windfalls where the recovered fund runs into the multi-millions." *Id*. at 52; *see also, e.g.*, *in re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. at 486 ("In many instances the increase [in the fund] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel."). Thus, in megafund cases particularly, courts have "traditionally accounted for these economies of scale by awarding fees in the lower range[s]." *Goldberger*, 209 F.3d at 52; *In re Independent Energy Holdings PLC*, No. 00-cv-6689, 2003 WL 22244676, at *6 (S.D.N.Y. Sept. 29, 2003) ("[T]he percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement. Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent."); *In re NASDAQ*, 187 F.R.D. at 486 (explaining that "absent unusual circumstances, the percentage will decrease as the size of the fund increases" and thus "[i]n cases where a class recovers more than $75-$200 million, . . . fees in the range of 6-10 percent and even lower are common") (internal quotation marks omitted).

In determining a reasonable fee, it is also my responsibility to act as a "fiduciary who must serve as a guardian of the rights of absent class members." *Grinnell Corp.*, 560 F.32d at 1099 (quotation marks omitted); *see also id.* ("The point is that plaintiffs in common fund cases typically are not fully informed. Nor are they able to negotiate collectively, or at arm's length. This is why we emphasized . . . that awards in these cases are proper only if made with moderation.") (quotation marks omitted). Accordingly, I must assess the requested fee award

with "a jealous regard to the rights of those who are interested in the fund." *Id.* at 53 (internal quotation marks omitted).

Co-Lead Counsel for plaintiffs have requested a fee of 33% of the settlement fund ($37,077,780.82, payable in three installments). They assert that the amount is fair and reasonable when examined under the *Goldberger* factors and when "cross-checked" against that lodestar. They assert that "[t]he total lodestar . . . from inception of the case through March 31, 2012" is $27,898,295.45. Pls.' Mem. in Supp. Mot. Interim Attorneys' Fees 16, ECF No. 836. No objections to the requested fees have been filed.

The first factor I must consider in evaluating an award of attorneys' fees is the time and labor expended by Co-Lead Counsel together with other class counsel (collectively "Class Counsel"). Class Counsel invested significant time in negotiating these settlement agreements. *See* Bruckner Decl. ¶ 7, ECF No. 527-1 (negotiations with Vantec from mid-2010 to April 2011); Lovell Decl. ¶ 4, ECF No. 527-5 (negotiations with Schenker from June 2008 to July 2009); Hedlund Decl. ¶¶ 6, 8 (negotiations with EGL from January 2010 to May 2011), ECF No. 527-6; Bruckner Decl. ¶ 5, ECF No. 576-1 (negotiations with Expeditors from 2010 to February 2012); Lovell Decl. ¶ 3, ECF No. 590-1 (negotiations with Nishi-Nippon from May 2011 to May 2012; Jaccarino Decl. ¶ 3, ECF No. 639 (negotiations with UAC from November 2011 to August 2012); Lovell Decl. ¶ 3-6, ECF No. 646 (negotiations with KN from September 2010 to September 2012); Lovell Decl. ¶ 3-6, ECF No. 669 (negotiations with Morrison Express from June 2012 to September 2012); Bruckner Decl. ¶ 3, ECF No. 688 (negotiations with UTi from September 2012 to December 2012); Hedlund Decl. ¶ 3-6, ECF No. 713 (negotiations with ABX from May 2010 to January 2013). This labor included numerous in-person meetings and conference calls, researching and evaluating the relative strengths and weaknesses of each side's

litigation position, and preparing a notice program.  However, Class Counsel's additional efforts with respect to prosecuting the case generally, such as preparing the Complaint (and subsequently amending the Complaint), effectuating service, investigating and researching the freight forwarding industry, and briefing opposition to defendants' motions to dismiss amount to time that should not be considered as part of the present fee application because it is not directly related to the settlement agreements.  *See* Joseph Bruckner Decl. in Supp. Mot. Interim Attorneys' Fees ¶¶ 4-14, ECF No. 837.  Accordingly, I do not find that the time and labor expended by Class Counsel warrants the 33% fee award.

The second factor is the magnitude and complexities of the litigation.  This litigation is irrefutably complex.  Class Counsel spent significant resources gaining an understanding of the freight forwarding industry as it operates globally.  With respect to the cases against the settling defendants, counsel invested resources researching, analyzing, and evaluating contested legal and factual issues, in order to negotiate favorable settlements.

Third, in light of the current economic climate, as well as the scope and nature of the litigation, this action is obviously risky.  As discussed above, defendants have vigorously contested liability and will continue to do so.  And even if plaintiffs succeed in establishing liability, they will face substantial risks in terms of recovering damages.  The benefit of this package of settlements may well facilitate speedier resolution with respect to the remaining defendants.

Fourth, Class Counsel are highly experienced practitioners in complex litigation generally and antitrust litigation specifically.  The settlement agreements were the result of hard fought arms'-length negotiation with settling defendants' respective counsel.

30

The fifth factor is the relationship of the fee to the settlement.  For the reasons discussed below, I find an award of 33% of the total settlement to be unreasonable.

The final factor is whether public policy considerations support a substantial fee award.  The Second Circuit has noted that "[i]n the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation."  *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973).  But fees awarded must nonetheless be reasonable.  Fee awards should "provid[e] lawyers with sufficient incentive to bring common fund cases that serve the public interest," *Goldberger*, 209 F.3d at 51, but they should not provide counsel with a "windfall."

In light of all these factors and considering all of the circumstances of this case to date, I find that the requested attorneys' fee is excessive.  My conclusion is not intended to diminish the commendable efforts of Class Counsel, who have worked vigorously and ably to achieve these outcomes.  Nevertheless, I find that a 33% fee award is not reasonable for several reasons.

First, the 33% fee award is unreasonable in light of similar cases involving mega-funds.  "To avoid routine windfalls where the recovered fund runs into the multi-millions, courts typically decrease the percentage of the fee as the size of the fund increases."  *In re Interpublic Securities Litigation*, No. 02-cv-6527, 2004 WL 2397190, at *11 (S.D.N.Y. Oct. 26, 2004) (12% award of $96 million recovery to class) (internal citations and quotation marks omitted).  "In cases where a class recovers more than $75-$200 million, courts weigh the economies of scale inherent in class actions in fixing a percentage to yield a recovery of reasonable fees."  *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. at 486.  Thus, "fees in the range of 6-

31

10 percent and even lower are common in megafund cases." *Id*. at 486-87 (citing cases). *Cf.* *Goldberger*, 209 F.3d at 52 ("[E]mpirical analyses demonstrate that in cases . . . with recoveries of between $50 and $75 million, courts have traditionally accounted for these economies of scale by awarding fees in the lower range of about 11% to 19%.") (citations omitted).

Co-Lead Counsel argue that the megafund analysis is not appropriate here for several reasons. First, they observe that I did not apply a megafund reduction to fee requests in the *Air Cargo MDL*. Co-Lead Counsel Mem. in Supp. Mot. Interim Attorneys' Fees 14. Second, they observe that the Second Circuit has never required the application of the megafund doctrine. *Id*. at 14-15. Finally, they argue that the nature of this litigation – "a case with relatively small government fines for many Defendants and no fines for others, and sixty-eight individual defendants, twenty-eight Defendant families, and eleven conspiracies – make it the opposite of and distinguishable from a typical monolithic two-defendant mega conspiracy." *Id*. at 15.

The touchstone for evaluating attorneys' fees is reasonableness. In the *Air Cargo MDL*, I did not apply by rote a megafund reduction to fee requests; nevertheless, I found that the first request for attorneys' fees – in the amount of 25% of total settlement – to be unreasonable in light of the factors for evaluating such a request and the circumstances of that case. *In re Air Cargo*, 2009 WL 3077396, at *12-*16. The Second Circuit may not mandate the application of the megafund doctrine, but to the extent that the reasoning underlying such a doctrine coalesces with an evaluation of reasonableness, that doctrine provides useful guidance for considering an application for attorneys' fees. And I am, of course, required to consider the particular nature of this litigation, including the number of defendants and particular constellation of claims, in

determining the reasonableness of the fee request.  Indeed, one of the factors that I considered above was the magnitude and complexities of this litigation.

Using reasonableness as the touchstone, but keeping in mind the megafund doctrine, I consider the 33% fee award to be unreasonable.  In the *Air Cargo MDL*, which Co-Lead Counsel themselves have used as an apt comparator, I reduced a request for a 25% fee award to 15% brought in connection with the first settlement, *In re Air Cargo*, 2009 WL 3077396, at *16, and subsequently approved requests for a 25% fee award brought in connection with a second and third wave of settlements, *In re Air Cargo*, 2012 WL 3138596, at *5-*6; *In re Air Cargo*, 2011 WL 2909162, at *5-*7.  Moreover, my reasoning for reducing the first fee request in the *Air Cargo MDL* – from 25% to 15% – applies with equal force here.  I found it inappropriate, as I do here, to grant a fee request in connection with settlement agreements by reference to the total number of hours expended on the litigation as a whole.[29]  While much of the work the attorneys have done is related to the settlement agreements, a significant percentage is not.  The other work pertains to prosecuting the case against non-settling defendants, and counsel should be compensated for that work if and when they are successful in prosecuting those claims.  Accordingly, I direct Co-Lead Counsel to submit a supplemental fee application and expenses request limited to work performed with respect to the ten settlements.[30]

---

[29]     For that reason, I do not find the lodestar cross-check to be particularly helpful here, although I note that the fee award represents a multiplier of 1.3 on the lodestar.

[30]     At oral argument, Co-Lead Counsel represented that it would be difficult to disentangle the work performed on the settlement agreements from the work performed on the litigation as a whole.  But their motion for attorneys' fees describes discrete aspects of the litigation (for which they request compensation) that are not directly related to the settlement agreements.  As discussed above, these aspects include preparing the Complaint (and subsequently amending the Complaint), effectuating service, investigating and researching the freight forwarding industry, and briefing opposition to defendants' motions to dismiss.  *See* Bruckner Decl. in Supp. Mot. Interim Attorneys' Fees ¶¶ 4-14.  Moreover, at least some of this work is documented in the charts submitted by Co-Lead Counsel in support of their motion for attorneys' fees.  *See, e.g.*, Bruckner Decl. in Supp. Mot. Interim Attorneys' Fees Ex. A, ECF No. 837-1 (reporting hours expended on various aspects of litigation including "Investigations & Factual Research," "Discovery," "Pleadings, Briefs (drafting, serving, filing & legal research," "Trial & Preparation," and "Litigation Strategy, Analysis & Case Management").

CONCLUSION

For the reasons stated above, the EGL and Expeditors settlement agreements are approved, and all claims against those defendants by those members of the settlement class who have not timely exercised their right to be excluded from the settlement agreements are dismissed with prejudice.  My grant of final approval to the Schenker, Vantec, Nishi-Nippon, UAC, KN, Morrison Express, UTi, and ABX settlement agreements will be held in abeyance until September 2, 2013.[31]  Co-Lead Counsel shall submit a supplemental fee application and expenses request by September 10, 2013.


So ordered.


John Gleeson, U.S.D.J.


Dated:  August 27, 2013
        Brooklyn, New York

---

[31]       On June 20, 2013 Co-Lead Counsel informed the Court by letter that settling defendants had not served notices for these settlements 90 days prior to the fairness hearing as required under the Class Action Fairness Act ("CAFA").  These CAFA notices were sent on June 3, 2013.  Accordingly, under CAFA, the Court may not enter final approval of these settlement agreements until the 90-day CAFA notice period expires on September 2, 2013.