UNITED STATES DISTRICT COURT       <u>FOR ONLINE PUBLICATION</u>
EASTERN DISTRICT OF NEW YORK

---

PRECISION ASSOCIATES, INC., et al.,

                      Plaintiffs,

         - versus -

PANALPINA WORLD TRANSPORT
(HOLDING) LTD., et al.,

                      Defendants.

MEMORANDUM
<u>AND ORDER</u>
08-CV-00042 (JG)(VVP)

A P P E A R A N C E S:

     LOCKRIDGE GRINDAL NAUEN P.L.L.P.
         100 Washington Avenue South, Suite 2200
         Minneapolis, MN 55401
     By:    W. Joseph Brockner
             Heidi M. Silton
             Anna M. Horning Nygren
             Craig S. Davis
             Kristen G. Marttila
             *Attorneys for Plaintiffs*

     LOVELL STEWART HALEBIAN JACOBSON LLP
         61 Broadway, Suite 501
         New York, NY 10006
     By:    Christopher Lowell
             Gary S. Jacobson
             Ian T. Stoll
             Merrick S. Rayle
             Benjamin M. Jaccarino
             *Attorneys for Plaintiffs*

     GUSTAFSON GLUEK PLLC
         Canadian Pacific Plaza
         120 South 6th Street, Suite 2600
         Minneapolis, MN 55402
     By:    Daniel E. Gustafson
             Daniel C. Hedlund
             Michelle J. Looby
             Joshua J. Rissman
             *Attorneys for Plaintiffs*

COTCHETT, PITRE & MCCARTHY, LLP
    San Francisco Airport Office Center
    840 Malcolm Road, Suite 200
    Burlingame, CA 94010
By:    Steven N. Williams
    Adam J. Zapala
    *Attorneys for Plaintiffs*

CLEARY GOTTLIEB STEEN & HAMILTON LLP
    2000 Pennsylvania Avenue NW
    Washington, DC 20002
By:    Mitchell A. Lowenthal
    Jeremy Calsyn
    Steven J. Kaiser
    *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

This case involves allegations of multiple conspiracies to fix prices in the international commercial freight forwarding industry. Defendants Deutsche Post AG, DHL Express (USA), Inc., Exel Global Logistics, Inc., Air Express International (USA), Inc., and Danzas Corporation (the "DHL Defendants" or "DHL") move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). DHL seeks an order dismissing the remaining claims against them (*i.e.*, Claims 1, 3, 5-6, and 8-10) to the extent they are based upon purchases made after October 11, 2007, on the ground that DHL had ceased their participation in the conspiracy by that date. For the reasons that follow, the motion is granted.

## BACKGROUND

Plaintiffs originally filed suit on January 3, 2008 and have since filed four amended complaints, culminating in the "Corrected Third Amended Complaint" ("CTAC"), which alleges a class period ending on January 4, 2011. *See* CTAC ¶¶ 1, 19, 180, ECF No. 677.

A.  *DHL's Leniency Application*

DHL argues that plaintiffs have not alleged any facts occurring after 2007 because the conspiracy ended when DHL applied for leniency from the government in October 2007. Defendant's Memorandum of Law ("Def. Br.") at 4, ECF. No 1183. First, DHL turned itself in to antitrust regulators in the United States and Europe in October 2007. CTAC ¶ 216. As such, one would not expect that an applicant for leniency continued to participate in the conspiracy after approaching the government and admitting to a violation of the Sherman Act. Def. Br. at 10; *see also* CTAC ¶ 135 (explaining that by seeking leniency Deutsche Post and all of its subsidiaries including DHL admitted to a violation of the Sherman Act). Additionally, on October 11, 2007, Bloomberg News reported that an unnamed company had turned itself in to regulators and triggered an international investigation, and the Associated Press reported that the company had provided documents sufficient to trigger the international investigation. CTAC ¶ 216. The CTAC acknowledges that the company was DHL, CTAC ¶ 216, and that DHL did in fact receive leniency. CTAC ¶ 265; *see also* CTAC ¶ 226 (describing various reports on October 11 and 12, 2007 that authorities were seeking information from DHL).

In addition to its leniency application, DHL puts forth other reasons why the class period cannot plausibly extend beyond October 2007. For example, DHL points to the fact that many freight forwarding companies entered into plea agreements with various antitrust enforcement agencies and those plea agreements refer to conduct relevant to the conspiracy continuing until about October 2007. Def. Br. at 3. DHL also notes that this Court certified a class in the related *In re Air Cargo Shipping Services Antitrust Litigation*, No. 06-MD-1775 with an end date of September 30, 2006.

B.  *The Last Overt Acts Alleged by Plaintiffs in the CTAC*

The latest action the CTAC alleges with respect to DHL's participation in the conspiracies is May 2007. CTAC ¶¶ 478-85. The latest action the CTAC alleges with respect to other acts in furtherance of the conspiracies is for Claim 6, which plaintiffs allege lasted until January 2008. *See* CTAC ¶ 449. Plaintiffs, however, maintain that they have consistently pleaded that they do not know the end date of the conspiracies, and that the conspiracies were ongoing and open-ended in nature. Plaintiffs' Memorandum in Opposition ("Pl. Opp. Br.") at 2, ECF No. 1196. Specifically, the CTAC alleges that the antitrust surcharges "continued after November 2007 and until January 4, 2011," CTAC ¶ 182, and that "no agreement to withdraw and no affirmative acts of disbanding the unlawful agreements were taken by the conspirators through this period." CTAC ¶ 181. The CTAC alleges the following overt acts in connection with each of the remaining claims:

- **Claim 1**: At least as early as October 1, 2001, and continuing until a time unknown to the plaintiffs, DHL and others agreed to impose on customers a Security Surcharge fee for their freight forwarding services on all air cargo shipped around the world. CTAC ¶ 303. Some of the defendants met on October 4, 2001 in Frankfurt, Germany to discuss entering the Security Surcharge agreement. CTAC ¶ 314.

- **Claim 3**: At least as early as September 25, 2002, and continuing until a date unknown to the plaintiffs, DHL and others agreed to impose a New Export System ("NES") fee for air and ocean freight shipments from the United Kingdom to anywhere in the world. CTAC ¶ 338. This agreement was made through a series of exchanges and clandestine meetings held on or about October 1, 2002, June 2004 and October 2004. CTAC ¶ 339. These defendants were also invited to attend a meeting in November 2004 in order to monitor compliance with the agreement. CTAC ¶ 346.

- **Claim 5**: In July 2005, and continuing until a date unknown to the plaintiffs, DHL and others agreed to fix and maintain either the Chinese Currency Adjustment Factor ("CAF") Surcharge or quote new business in local Chinese currency ("RMB"). CTAC ¶ 380. Emails were exchanged between certain defendants as late as March 2006 suggesting to members of the conspiracy that they implement a CAF Surcharge increase. CTAC ¶¶ 439-40.

- **Claim 6**: At least as early as August 2005, and continuing until at least January 2008, DHL and others agreed to impose Peak Season Surcharge ("PSS") increases on air cargo shipments out of Asia to anywhere in the world. CTAC ¶ 450. Members of the conspiracy met on May 21, 2007 in Central Hong Kong SAR, China to discuss the PSS for 2007. CTAC ¶¶ 479-80. The CTAC also alleges that many of the defendants who pled guilty to imposing a PSS (which did not include DHL) admitted to doing so "beginning in or about August 2005 and continuing until in or about December 2007." CTAC ¶ 449 (quoting the DOJ plea agreements).

- **Claim 8**: Beginning in 2003 and 2004 and continuing until a date unknown to the plaintiffs, DHL and others agreed to fix and maintain charges affiliated with Air Automated Manifest System ("AMS") compliance for U.S. Freight Forwarding Services. CTAC ¶ 499. An April 29, 2005 PowerPoint presentation prepared by DHL discussed its profits from the AMS surcharges. CTAC ¶ 526.

- **Claim 9**: Beginning in or about 2002 and continuing until a date unknown to the plaintiffs, DHL and others agreed to impose AMS charges for U.S. Freight Forwarding Services on ocean freight shipments into the United States. CTAC ¶ 544. As late as September 21, 2004, members met to discuss whether to pass on Ocean AMS fees to customers. CTAC ¶ 556.

- **Claim 10**: DHL and others participated in a phone meeting on or around October 2001, in which high-ranking executives agreed to pass on to their customers all impending and future surcharges from air and ocean carriers. CTAC ¶ 565. The surcharges that were subject to this agreement included at least the following: the Security Surcharge, the Ocean AMS Surcharge, the Air AMS Surcharge, the NES Surcharge to the extent that it applied to a particular Defendant, the Peak Season Surcharges and the CAF Surcharge. CTAC ¶ 566.

DISCUSSION

A. *The Applicable Legal Standards*

1. *The Rule 12(c) Motion for Judgment on the Pleadings*

A motion for judgment on the pleading implicates the same legal standard that applies to a motion under Rule 12(b) to dismiss for failure to state a claim. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). In evaluating a motion to dismiss, I must determine whether the complaint contains sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 545. At this stage, I must accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiffs. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, I am not bound to accept as true conclusory allegations or conclusions of law couched as factual allegations. *Iqbal*, 556 U.S. at 678.

I may also consider documentary exhibits or written instruments annexed to the complaint, documents integral to the parties' case and on which the complaint relies heavily, and matters subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §1357 (3d ed. 2004 and Supp. 2007)); *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007); *Chambers*, 282 F.2d at 152-53; *Int'l Audiotext Network, Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir. 1995); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); *see also* Fed. R. Civ. P. 10(c).

2. *Sherman Act Violation*

To plead a conspiracy in violation of Section 1 of the Sherman Act, a complaint must include "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Thus, to overcome a motion to dismiss, a complaint must "allege enough facts to support the inference that a conspiracy actually existed." *Mayor and City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). "The crucial question is whether the challenged anti-competitive conduct 'stem[s]

from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). The complaint therefore may assert direct evidence of the agreement, or, alternatively, circumstantial facts "supporting the *inference* that a conspiracy existed." *Citigroup*, 709 F.3d at 136 (emphasis in original).

A conspiracy is presumed to continue until the last overt act by any of the coconspirators, unless a defendant can prove that the conspiracy terminated or that he took affirmative steps to withdraw. *United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002). Withdrawl is an affirmative defense, and when affirmative defenses require consideration of facts outside of the complaint, they are "inappropriate to resolve on a motion to dismiss." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013). Affirmative defenses, however, may be adjudicated on a motion to dismiss "when the facts necessary to establish the defense are evident on the face of the complaint." *Id.* "[W]hen material facts are not disputed, courts have decided the issue [of withdrawal] as a matter of law." *Drug Mart Pharmacy Corp. v. American Home Prods. Corp.*, 288 F. Supp. 2d 325, 329 (E.D.N.Y. 2003); *Iowa Pub. Employees' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010) ("An affirmative defense may be raised by a [Rule 12 motion] if the defense appears on the face of the complaint.") (internal quotation marks omitted). However, plaintiffs are held only to the burden of a motion to dismiss, "which is to say that they must plead sufficient facts to plausibly suggest that they are entitled to relief." *Id.* (citation omitted).

B.  *Analysis*

   1.  *The Facts Alleged in the CTAC Establish that DHL Withdrew from the Conspiracy When It Applied for Leniency*

DHL contends that the class period cannot plausibly extend beyond October 11, 2007, and that all claims relating to purchases made after that date should be dismissed. Def. Br. at 2, 20. It asserts that it did not plausibly participate in any conspiracy past that date, and that the allegations in the CTAC in fact establish that DHL had withdrawn from the conspiracy by that time. *Id.* at 2-4.

Withdrawal from a conspiracy can be demonstrated as a matter of law where there is "uncontroverted, affirmative evidence of abandonment." *United States v. Goldberg*, 401 F.3d 644, 649 (2d Cir. 1968). DHL asserts that its voluntary cooperation with antitrust regulators is affirmative evidence of its abandonment of the conspiracy. In support of its argument, DHL points out that the CTAC alleges that on October 10, 2007, DHL "turned itself in" to "multiple antitrust enforcers around the world in exchange for cooperating against other co-conspirators." CTAC ¶¶ 214, 216. Furthermore, the CTAC concedes that DHL's leniency application includes all of the DHL defendants. CTAC ¶ 135.

It is well established that withdrawal from a conspiracy can be found where a defendant "either ma[de] . . . a clean breast to the authorities . . . or communicat[ed] . . . the abandonment in a manner reasonably calculated to reach coconspirators." *United States v. Dallas*, 229 F.3d 105, 110 (2d Cir. 2000) (internal quotations omitted) (alterations in original). There is no question that DHL made a clean breast to authorities when it applied for leniency and began cooperating with authorities against other conspirators in October 2007. *See, e.g.*, *United States v. Park Ave. Pharmacy, Inc.*, 56 F.2d 753, 755 (2d Cir. 1932) (participants had "without doubt" withdrawn from conspiracy when they confessed and assisted the government in

8

dismantling the conspiracy); *see also Fiswick v. United States*, 329 U.S. 211, 216 (1946) (confession by a coconspirator is not the furtherance of the conspiracy, but rather the frustration of the criminal enterprise). It is the very definition of making a "clean breast to authorities" when a participant in a conspiracy approaches the government to admit its involvement in the conspiracy and volunteers to assist in the prosecution of other conspirators. Confession and assistance to governmental authorities in undoing a conspiracy are the hallmarks of withdrawal. *See, e.g.*, *Park Ave. Pharmacy, Inc.*, 56 F.2d at 755 (party confessed and assisted the government in dismantling the conspiracy against coconspirators); *United States v. Greenfield*, 44 F.3d 1141, 1145, 1150 (2d Cir. 1995) (withdrawal requires "affirmative evidence" which does not necessarily require that a conspirator "inform on his or her co-conspirators," admirable as that may be, but that he abandon the agreement). And the CTAC acknowledges that "[b]y seeking leniency from the Department of Justice, Deutsche Post [the parent corporation of the entire DHL enterprise] has admitted to a violation of the Sherman Act and has caused each of its subsidiaries . . . to admit to a violation of the Sherman Act." CTAC ¶ 135.

Plaintiffs suggest that DHL continued to participate in the conspiracy while cooperating with and under the scrutiny of antitrust regulators for over three years, until January 2011. But it is not plausible that the antitrust regulators would have offered leniency to a defendant that continued to actively participate in the conspiracy. In fact, the Antitrust Division confers immunity from prosecution to a corporation when the corporation has met six conditions, one of which is that "[t]he corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity." Dep't of Justice, Corporate Leniency Policy at (A)(2), *available at* http://www.justice.gov/atr/public/guidelines/0091.htm. In sum, DHL had no incentive to continue participating in the conspiracy and risk jeopardizing

9

its leniency agreement, which insulated it from treble damages and joint and several liability. *See* Def. Br. at 10. Plaintiffs' complaint expressly alleges that DHL applied for leniency on October 10, 2007 and that it was the recipient of a leniency agreement. CTAC ¶¶ 135, 265. In short, the plaintiffs' own factual allegations support DHL's assertion that it withdrew from the conspiracy at that time as a matter of law.

        2.     *The CTAC Fails to Allege that the Conspiracy Plausibly Continued Through January 2011*

While the allegations in the CTAC that establish DHL's withdrawal in October 2007 are fatal to the plaintiffs' position, so too is the dearth of factual allegations that the conspiracy extended until January 2011. DHL argues that the CTAC contains no allegations of any conspiratorial conduct occurring after 2007.[1] *Id.* at 13. Courts have dismissed claims that are outside part of a claimed class period where there are no specific facts establishing the existence of a conspiracy for the entire time period alleged. *See, e.g.*, *In re Lithium Ion Batteries*, No. 13-MD-2420 (YGR), 2014 WL 309192, at *12 (granting motion to dismiss portion of claims arising during period where there were "no specific meetings" and preserving the class period up until the beginning of DOJ investigations, despite the "paucity" of allegations leading up to that time). Here, plaintiffs allege no overt acts later than May 2007. They argue only that the CTAC specifically alleges that the illegally-set surcharges "continued after November 2007 and until January 4, 2011," CTAC ¶ 182, and that no defendant withdrew from or otherwise disbanded the conspiracies through January 4, 2011, CTAC ¶ 181. However, in the absence of specific allegations of conspiratorial activity, conclusory statements couched as facts,

---

[1] Specifically, DHL argues that May 2007 is the date of the latest factual allegation regarding the PSS agreement. Defendant's Reply Memorandum ("Def. Rep. Br.") at 3, ECF No. 1211. DHL points out that plaintiffs allege that the plea agreements entered into by defendants other than DHL with regard to the PSS agreement describe the conspiracy as ending in December 2007. *See id.* (citing CTAC ¶ 449). The CTAC goes on to assert that the PSS agreement continued until January 2008 without alleging any factual content in support of this allegation. *Id.* (citing CTAC ¶ 450).

10

are not sufficient to raise the inference that the conspiracy extended until January 4, 2011. *See Iqbal*, 556 U.S. at 678.

While plaintiffs fail to adequately allege that the conspiracy continued until January 2011, they do allege facts tending to show that the conspiracy ended in 2007. Specifically, plaintiffs cite to plea agreements entered into by various defendants in which they pled guilty to participating in a PSS conspiracy "beginning in or about August 2005 and continuing until in or about December 2007." Pl. Opp. Br. at 3 (citing CTAC ¶ 449). Additionally, other plea agreements (*i.e.*, other than those relating to the PSS) refer to anti-competitive activity having ended by 2007. Def. Br. at 12-13. Specifically, the CTAC cites to plea agreements entered into by six defendants in 2011, which relate to price fixing between 2002 and 2007. CTAC ¶¶ 231-35.

The only factual allegation in the CTAC that postdates October 11, 2007, is plaintiffs' statement that the PSS "continu[ed] until at least January 2008 . . . ." CTAC ¶ 450. This conclusory statement is not supported by factual allegations, and is in fact contradicted by allegations that defendants who pled guilty to participating in the PSS agreement all pleaded that the conspiracy lasted until December 2007. *See* CTAC ¶ 449. The CTAC does not explain how plaintiffs arrive at the January 2008 date when the factual allegations indicate this specific conspiracy ended a month earlier.

Furthermore, even if the Peak Season Surcharge extended through December 2007, it has no bearing on whether or not DHL had withdrawn from the conspiracy to charge it by that time. Where a party has withdrawn from an antitrust conspiracy, it is not legally responsible for the harm done by the subsequent conspiratorial actions of its former coconspirators. *See, e.g.*, *Drug Mart*, 288 F. Supp. 2d at 328-32 (holding that claims relating to

11

purchases made after defendants had withdrawn from antitrust conspiracy could not be pursued against withdrawing defendants); *see also United States v. Carneglia*, 403 F. App'x 581, 583 (2d Cir. 2010) ("[M]embership is presumed to continue until the last overt act by any of the coconspirators, unless the defendant proves that the conspiracy was terminated or that he took affirmative steps to withdraw.") (internal quotations omitted). However, because a conspiracy may have an inertial effect felt by its victims even after a conspirator has withdrawn, and because the CTAC alleges such effects until January 2008, I will consider this the end of the PSS class period for purposes of damages.

CONCLUSION

The conspiracies that the CTAC alleges extended until October 2007, when plaintiffs discovered their claims because "various worldwide antitrust authorities [had] announced investigations into possible price-fixing conspiracies in the freight forwarding industry." *See* First R&R at *43. While a district court must be cautious in dismissing an antitrust complaint before discovery, it must also keep in mind that proceeding to such discovery can be expensive, and courts must therefore "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17 (1983)). That specificity is absent here with regard to claims against DHL after October 11, 2007.

Because the complaint alleges facts sufficient to establish that DHL withdrew from the conspiracy in October 2007 as a matter of law, and because such withdrawal serves "to end a conspirator's liability for acts taken thereafter by another conspirator[,]" *Dallas*, 229 F.3d at 110, the motion to dismiss the remaining claims (1, 3, 5, and 8-10) against DHL as they relate

to any acts *after* October 11, 2007 is granted.  Claim 6 is dismissed to the extent it is based on any conduct after January 2008.  Plaintiffs are respectfully directed to amend the complaint to exclude the periods as described herein from class definition.

So ordered.


John Gleeson, U.S.D.J.


Dated: August 19, 2015
      Brooklyn, New York