| UNITED STATES DISTRICT COURT | ONLINE PUBLICATION ONLY |
| EASTERN DISTRICT OF NEW YORK | |

PRECISION ASSOCIATES, INC., *et al.*, on behalf of themselves and all others similarly situated,

         Plaintiffs,

- versus -

PANALPINA WORLD TRANSPORT (HOLDING) LTD., *et al.*,

         Defendants.

MEMORANDUM AND ORDER
08-cv-42 (JG) (VVP)

JOHN GLEESON, United States District Judge:

    This putative class action alleges a conspiracy to fix prices in the international commercial freight forwarding industry.[1] Plaintiffs are various businesses who purchased freight forwarding services from defendants. Defendants are domestic and foreign providers of freight forwarding services and freight forwarding trade associations.[2] Plaintiffs allege that beginning in

---

[1] This case is related to a Multi District Litigation ("MDL") pending in this district, *In Re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775 (JG) (VVP) ("*Air Cargo MDL*"). The *Air Cargo MDL* is a putative antitrust class action brought in the wake of an investigation by governmental authorities of international price-fixing activity in the air cargo industry. Plaintiffs in that case are domestic and foreign purchasers of allegedly price-fixed air freight shipping services, and they include freight forwarders who are among the defendants in this action.

[2] Defendants named in the Fourth Amended Complaint, ECF No. 1311, are Panalpina World Transport (Holding) Ltd.; Panalpina, Inc.; Kühne + Nagel International AG; Kuehne + Nagel, Inc.; Expeditors International of Washington, Inc.; EGL, Inc.; EGL Eagle Global Logistics, LP; Deutsche Bahn AG; Schenker AG; Schenker, Inc.; BAX Global, Inc.; DB Schenker; Deutsche Post AG; Danzas Corporation d/b/a DHL Global Forwarding; DHL Express (USA), Inc.; DHL Global Forwarding Japan K.K.; DHL Japan, Inc.; Exel Global Logistics, Inc.; Air Express International USA, Inc.; Uti Worldwide Inc.; United Parcel Service, Inc., UPS Supply Chain Solutions, Inc.; ABX Logistics Worldwide NV/SA; DSV A/S; DSV Solutions Holding A/S; DSV Air & Sea Ltd.; SDV Logistique Internationale; Dachser Intelligent Logistics; Dachser Transport of America, Inc.; Geo-Logistics Corporation; Agility Logistics Corporation; Geologistics International Management (Bermuda) Ltd.; Baltrans Logistics, Inc.; Toll Global Forwarding (USA), Inc.; Hellmann Worldwide Logistics, Inc.; Hellmann Worldwide Logistics GmbH & Co. KG; Hellmann Worldwide Logistics Ltd. Hong Kong; Geodis Group; Geodis Wilson USA, Inc.; Jet Speed Logistics, Ltd.; Jet Speed Air Cargo Forwarders (USA), Inc.; Jet Speed Logistics (USA), LLC; Morrison Express Logistics PTE Ltd.; Morrison Express Corporation (USA); Nippon Express Co., Ltd.; Nippon Express USA, Inc.; Yusen Air & Sea Service Co., Ltd.; Yusen Air & Sea Service (U.S.A.), Inc.;

at least January 1, 2001 and continuing until October 11, 2007, defendants conspired to fix prices through the concerted imposition of surcharges and other anti-competitive behaviors. *See* Fourth Am. Compl. ¶¶ 1, 10.

This is the second installment of proposed settlements ("*Panalpina 2*").[3] Plaintiffs seek final approval of 11 settlement agreements that would establish a $197,623,497.87 guaranteed settlement fund and award additional settlement payments based upon a percentage of settling defendants' future recovery in the *Air Cargo MDL*. The 11 settling defendants, or groups of defendants, are: (1) SDV Logistique Internationale ("SDV"); (2) Panalpina World Transport (Holding) Ltd. and Panalpina, Inc. (collectively "Panalpina"); (3) Geodis S.A. and Geodis Wilson USA, Inc. (collectively "Geodis"); (4) DSV A/S; DSV Solutions Holding A/S; and DSV Air & Sea Ltd. (together, "DSV"); (5) Jet Speed Logistics, Ltd. also known as Jet Speed Air Cargo Forwarders (HK), Ltd; Jet Speed Logistics (USA), LLC; and Jet-Speed Air Cargo Forwarders, Inc. (USA) (collectively "Jet Speed"); (6) Toll Global Forwarding (USA), Inc.; and Baltrans Logistics, Inc. (collectively "Toll"); (7) Agility Holdings, Inc.; Agility

---

Kintetsu World Express, Inc.; Kintetsu World Express (U.S.A.), Inc.; Nishi–Nippon Railroad Co., Ltd.; Hankyu Hanshin Express Holdings Corporation; Hankyu Hanshin Express Co. Ltd.; Hanshin Air Cargo Co., Ltd.; Hanshin Air Cargo USA, Inc.; Nissin Corporation; Nissin International Transport U.S.A., Inc.; Vantec Corporation; Vantec World Transport (USA), Inc.; "K" Line Logistics, Ltd.; "K" Line Logistics (U.S.A.), Inc.; Yamato Global Logistics Japan Co.; Yamato Transport U.S.A., Inc.; MOL Logistics (Japan) Co., Ltd.; MOL Logistics (U.S.A.), Inc.; United Aircargo Consolidators, Inc.; Japan Aircargo Forwarders Association; Shanghai International Freight Forwarders Association; and Spedlogswiss, aka the Association of Swiss Forwarders (collectively "defendants"). The Complaint also names unspecified "John Doe Defendants 1–10."

[3]  I have previously approved settlements with 10 groups of settling defendants in this case. *See Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd.*, No. 08-cv-42 (JG)(VVP), 2013 WL 4525323 (E.D.N.Y. Aug. 27, 2013) ("*Panalpina 1*") (describing settlement agreements for $112 million with the following 10 defendants or groups of defendants: (1) Schenker Deutsche Bahn AG, Schenker AG, Schenker, Inc., Bax Global Inc. and DB Schenker (collectively "Schenker"); (2) Vantec Corporation and Vantec World Transport (USA), Inc. (collectively "Vantec"); (3) EGL, Inc. and EGL Eagle Global Logistics, LP, Inc. (collectively "EGL"); (4) Expeditors International of Washington, Inc. ("Expeditors"); (5) Nishi-Nippon Railroad Co., Ltd. ("Nishi-Nippon"); (6) United Aircargo Consolidators, Inc. ("UAC"); (7) Kuehne + Nagel International and Kuehne + Nagel, Inc. (collectively "Kuehne + Nagel"); (8) Morrison Express Logistics Pte. Ltd (Singapore) and Morrison Express Corporation (U.S.A.) (collectively "Morrison"); (9) UTi Worldwide, Inc. ("UTi"); and (10) ABX Logistics Worldwide NV/SA ("ABX")). In connection with the first round of settlements, I awarded plaintiff's counsel an interim fee award of 15% of the then-available settlement funds, or $16,853,536.74. *See* Order, Dec. 27, 2013, ECF No. 984.

2

Logistics Corp.; Geologistics Corp.; and Geologistics International Management (Bermuda) Limited (collectively "Agility"); (8) United Parcel Service, Inc. and UPS Supply Chain Solutions, Inc. (collectively "UPS"); (9) Dachser GmbH & Co., KG, doing business as Dachser Intelligent Logistics, and Dachser Transport of America, Inc. (collectively "Dachser"); (10) Hankyu Hanshin Express Holding Corporation; Hankyu Hanshin Express Co., Ltd.; Hanshin Air Cargo USA, Inc.; Japan Aircargo Forwarders Association; Kintetsu World Express, Inc.; Kintetsu World Express (U.S.A.) Inc.; "K" Line Logistics, Ltd.; "K" Line Logistics (U.S.A.), Inc.; MOL Logistics (Japan) Co., Ltd.; MOL Logistics (U.S.A.) Inc.; Nippon Express Co., Ltd.; Nippon Express USA, Inc.; Nissin Corporation; Nissin International Transport U.S.A., Inc.; Yamato Global Logistics Japan Co., Ltd.; Yamato Transport U.S.A. Inc.; Yusen Air & Sea Service Co., Ltd.; and Yusen Air & Sea Service (U.S.A.), Inc. (collectively "the Japanese Defendants"); and (11) Deutsche Post AG; Danzas Corporation, doing business as DHL Global Forwarding; DHL Express (USA) Inc.; DHL Global Forwarding Japan K.K.; DHL Japan Inc.; Exel Global Logistics, Inc.; Air Express International USA, Inc. (collectively "DHL"), for the Japanese, severed-claims only (the "DHL Japanese agreement").

Plaintiffs' counsel ("Class Counsel") also seek approval of their proposed plan of allocation, as well as an interim fee award of 25% of the total available settlement fund and reimbursement of expenses. I held a final fairness hearing on November 2, 2015, at which there was oral argument in support of the proposed settlement, allocation plan, and the requested attorneys' fees. No one objected at the hearing and there have not been any written objections filed.

For the reasons discussed below, I approve the 11 settlement agreements and allocation plan, and I grant the request for attorneys' fees.

BACKGROUND

I assume familiarity with the facts of the case as set forth in *Panalpina 1*. As noted above, I have granted final approval to 10 settlements and have awarded $16,853,536.74 in interim fee awards.[4] The 11 new settlements for which plaintiffs seek approval are briefly summarized below.

A. *The Settlement Agreements*

1. *The SDV Settlement Agreement*

SDV has agreed to pay $350,000.00 into the settlement fund, and has agreed to provide substantial cooperation. SDV Settlement §§ II.B.1.a, II.B.2.[5] SDV has also agreed to pay 75% of the proceeds it has received or may receive from the *Air Cargo MDL*. *Id.* § II.B.1.b. Thus far, SDV has paid approximately $1,955,573.19, and the amount "is likely to grow" based on SDV's continued receipt of proceeds from the *Air Cargo MDL*. *See* Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307, at 9.

2. *The Panalpina Settlement Agreement*

Panalpina has agreed to pay $35,000,000.00 and 100% of its future proceeds from the *Air Cargo MDL*. Panalpina Settlement § II.A.1.[6] Thus far, plaintiffs have received approximately $39,158,324.45 from the Panalpina settlement, and that amount is expected to grow based on future receipt of proceeds from the *Air Cargo MDL*. Pls.' Mem. in Supp. Mot. Final Approval at 9-10. In addition, Panalpina agreed to provide substantial cooperation to plaintiffs in their ongoing prosecution of the case. Panalpina Settlement § II.A.2.

---

[4] *See supra* note 3.
[5] The SDV settlement agreement was filed as Ex. 3 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-3.
[6] The Panalpina settlement agreement was filed as Ex. 4 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-4.

### 3. *The Geodis Settlement Agreement*

Geodis agreed to pay $3,000,000.00, as well as to cooperate. Geodis Settlement § II.A.[7]

### 4. *The DSV Settlement Agreement*

DSV agreed to pay $1,500,000.00 to the settlement class, as well as 100% of any future proceeds from the *Air Cargo MDL*. DSV Settlement § II.A.1.[8] DSV has also agreed to cooperate with the plaintiffs' ongoing prosecution of the case. *Id.* § II.A.2.

### 5. *The Jet Speed Settlement Agreement*

Jet Speed agreed to pay $750,000.00 and 100% of any future proceeds from the *Air Cargo MDL* into the settlement fund. Jet Speed Settlement § II.A.1.[9] In addition, Jet Speed agreed to cooperate with plaintiffs in their ongoing prosecution of the case. *Id*. § II.A.2.

### 6. *The Toll Settlement Agreement*

Toll agreed to pay $900,000.00 and 100% of any future proceeds from the *Air Cargo MDL* into the settlement fund. Toll Settlement § II.A.1.[10] Toll has also agreed to cooperate with the plaintiffs' ongoing efforts against other defendants. *Id.* § II.A.2.

### 7. *The Agility Settlement Agreement*

Agility agreed to pay $16,000,000.00 and 100% of its proceeds from the *Air Cargo MDL* into the settlement fund. Agility Settlement § II.A.2.[11] The Agility settlement thus

---

[7] The Geodis settlement agreement was filed as Ex. 5 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-5.
[8] The DSV settlement agreement was filed as Ex. 6 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-6.
[9] The Jet Speed settlement agreement was filed as Ex. 7 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-7.
[10] The Toll settlement agreement was filed as Ex. 8 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-8.
[11] The Agility settlement agreement was filed as Ex. 9 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-9.

far amounts to $17,859,499.23, and plaintiffs expect the amount to grow based on Agility's receipt of future proceeds from the *Air Cargo MDL*. Pls.' Mem. in Supp. Mot. Final Approval at 11. Agility has also agreed to cooperate. Agility Settlement § II.A.3.

        8.    *The UPS Settlement Agreement*

UPS agreed to pay 100% of its proceeds from the *Air Cargo MDL* received from June 18, 2014 forward, in an amount not to exceed $25,000,000.00. UPS Settlement § II.A.1.[12] If the proceeds from the *Air Cargo MDL* are less than $25,000,000.00, UPS will pay the difference up to $7,000,000.00. *Id.* Class Counsel estimates that UPS will receive $18,000,000.00 from the *Air Cargo MDL*, and thus the Class will receive $25,000,000.00 from the UPS settlement. Pls.' Mem. in Supp. Mot. Final Approval at 11. UPS has also agreed to cooperate with the plaintiffs. UPS Settlement § II.A.2.

        9.    *The Dachser Settlement Agreement*

Dachser agreed to pay $2,500,000.00 and assign 100% of its rights to proceeds from the *Air Cargo MDL* into the settlement fund. Dachser Settlement § II.A.1.[13] Dachser has also agreed to cooperate. *Id.* § II.A.2.

---

[12] The UPS settlement agreement was filed as Ex. 10 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-10.
[13] The Dascher settlement agreement was filed as Ex. 11 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-11.

10. *The Japanese Settlement Agreement*

The Japanese Defendants agreed to settle all claims on a collective basis by paying $100,000,000.00 into the settlement fund.[14] Japanese Settlement § II.A.1.[15] They also agreed to cooperate. *Id.* § II.A.2.[16]

11. *The DHL Japanese Settlement Agreement*

DHL has agreed to settle the severed claims affecting the Japanese-only routes as defined in the settlement agreement by paying $5,000,000.00 into the settlement fund. DHL Japanese Settlement § II.A.1.[17] Plaintiffs continue to litigate against DHL on the non-severed claims. *See* Pls.' Mem. in Supp. Mot. Final Approval at 13.

B. *Preliminary Approval of the Settlement Agreements and the Notice Program*

1. *Preliminary Approval of the Settlement Agreements*

On October 7, 2013, I entered an order preliminarily approving the SDV settlement agreement and certifying the settlement class. Order, ECF No. 894. On August 22, 2014, I entered an order preliminarily approving the Panalpina, Geodis, DSV, and Jet Speed

---

[14] The $100,000,000.00 payment is subject to a pro-rata opt-out reduction provision that authorizes up to a $10 million reduction "based on the total dollar amount of qualifying surcharges paid for by an Opt-Out Class member to the Japanese Defendants" between October 16, 2002 and November 12, 2007. Pls.' Mem. in Supp. Mot. Final Approval at 12; *accord* Japanese Settlement § II.E. However, Class Counsel represent that there is no reduction to the settlement amount "[b]ecause there were so few opt-outs." Letter, Nov. 5, 2015, ECF No. 1328.

[15] The Japanese Defendants' settlement agreement was filed as Ex. 12 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-12.

[16] This settlement implicates the Most Favored Nations ("MFN") clauses in the Vantec and Nishi-Nippon settlement agreements, which I approved on September 23, 2013. *See* Vantec Settlement, Ex. C to the W. Joseph Bruckner Decl., ECF No. 527-4; and Nishi-Nippon Settlement, Ex. A to the Christopher Lovell Decl., ECF No. 590-2; Order, Sept. 25, 2013, ECF No. 879 (approving the Vantec settlement); Order, Sept. 25, 2013, ECF No. 883 (approving the Nishi-Nippon settlement). Those MFN provisions establish a "Settlement Ratio" of 88.35%, which represents "the ratio of the settlement amount to the fuel, AMS, and security and explosives surcharge revenues for air cargo shipments from Japan to the United States from October 2002 to November 2007." *Panalpina 1*, 2013 WL 4525323, at *2; *see also* Vantec Settlement § II.D; Nishi-Nippon Settlement § II.D. If the settlement ratio is less than 88.35%, Vantec and Nishi-Nippon are entitled to receive the amount necessary to reduce the 88.35% settlement ratio to that used by the subsequent settling defendant. *Id.* This provision as implicated here results in a $14,729,135.52 total repayment to Nishi-Nippon and Vantec. *See* Pls.' Mem. in Supp. Mot. Final Approval at 13.

[17] The DHL settlement agreement was filed as Ex. 13 to the Pls.' Mem. in Supp. Mot. Final Approval, ECF No. 1307-13.

settlement agreements and certifying the settlement classes. Order, ECF No. 1102. Also on August 22, 2014, I entered an order preliminarily approving the Toll settlement agreement and certifying the settlement class. Order, ECF No. 1103.

On December 18, 2014, I entered an order preliminarily approving the Agility and UPS settlement agreements and certifying the settlement classes. Order, ECF No. 1124. On February 20, 2015, I entered an order preliminarily approving the Dachser settlement agreement and certifying the settlement class. Order, ECF No. 1147. On April 27, 2015, I entered an order preliminarily approving the settlement agreements as to the Japanese Defendants and as to DHL for the Japanese-only claims, as well as certifying the settlement class. Order, ECF No. 1189.

2. *The Notice Program*

On May 21, 2015, plaintiffs moved for approval of their class notice program. Mot. to Approve Class Notice Program, ECF No. 1201. On May 29, 2015, I entered an order approving the program.[18] Order, May 29, 2015, ECF No. 1216. Proof of the implementation of the notice program has been filed with the Court. *See* Katherine Kinsella Decl., ECF No. 1309; Julie Redell Decl., ECF No. 1308. It consisted of four components: (1) direct mail notice to 1.67 million potential class members identified in customer lists provided by the defendants between July 7, 2015 and July 10, 2015; (2) publication notice in magazines, domestic and international newspapers, trade publications, and Internet ads; (3) an "earned media" program consisting of a press release distributed on PR Newswire's Premier Global Service on July 20, 2015, which reaches more than 35,000 global points; and (4) a settlement website, which as of October 1, 2015 had been visited by over 6,000,000 unique visitors. Kinsella Decl. ¶¶ 6, 10-11, 22, 41-43.

---

[18] I also approved a subsequent request to revise the notice program to permit a ministerial change to the notice papers. *See* Order, June 9, 2015, ECF No. 1229.

The notice papers provided a deadline of September 18, 2015 for class members to opt out of or object to any settlement. Redell Decl. ¶¶ 9-10. Only six class members have opted out, and no class members have objected to final approval of any of the 11 settlement agreements. Pls.' Mem. in Supp. Mot. Final Approval at 18-19; Redell Decl. ¶¶ 9-10.

C. *The Plan of Allocation*

The Plan of Allocation is the same as that for the first round of settlements, which I previously approved. *See* Pls.' Mem. in Supp. Mot. Final Approval at 25 & Ex. 14; *Panalpina 1*, 2013 WL 4525323, at *13. As I described in *Panalpina 1*: "10% of the net settlement funds will be allocated pro rata based on the total worldwide freight forwarding charges paid for shipments to, from, or within the United States during the [relevant time period]. Second, 90% of the net settlement funds will be allocated pro rata based on the surcharges paid on the shipping routes of all defendants that conspired on that particular surcharge for which a particular Class Member paid surcharges on freight forwarding services during the same period." *Panalpina 1*, 2013 WL 4525323, at *13 (internal quotation marks and citations omitted); *accord* Pls.' Mem. in Supp. Mot. Final Approval at 25 & Ex. 14.

D. *Fee Award Request*

Counsel for plaintiffs seek a total interim fee award of $42,246,681.08 payable in the following installments: (1) $40,684,181.08, representing 25% of the settlement proceeds currently paid into the settlement fund, payable now; (2) $250,000.00, representing 25% of the settlement proceeds scheduled to be paid by Geodis upon final approval of its settlement agreement, payable at the time of final approval of that agreement; (3) $1,250,000.00, representing 25% of the settlement proceeds scheduled to be paid by Agility on the later of 15 days after final approval of that agreement or on January 4, 2016, payable on the same date; and

(4) $62,500.00, representing 25% of the settlement proceeds scheduled to be paid by Jet Speed on May 8, 2016, payable on the same date. Pls.' Mem. in Supp. Mot. Final Approval at 24. In addition, Class Counsel seek reimbursement of $4,046,323.05 for interim litigation expenses. *Id.*

DISCUSSION

A.  *The Standard for Approving a Proposed Settlement*

Pursuant to Federal Rule of Civil Procedure 23(e), any settlement of a class action requires court approval. A court may grant approval of a proposed settlement of a class action if it is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). In so doing, the court must "eschew any rubber stamp approval" yet simultaneously "stop short of the detailed and thorough investigation that it would take if it were actually trying the case." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000). Judicial discretion is informed by a general policy favoring settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also Denney v. Jenkins & Gilchrist*, 230 F.R.D. 317, 328 (S.D.N.Y. 2005) ("There is a strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy." (citations and internal quotation marks omitted), *aff'd in part and vacated in part*, 443 F.3d 253 (2d Cir. 2006)).

To evaluate whether a class settlement is fair, I examine (1) the negotiations that led up to it, and (2) the substantive terms of the settlement. *See In re Holocaust Victims Assets Litig.*, 105 F. Supp. 2d 139, 145 (E.D.N.Y. 2000). In evaluating procedural fairness, "[t]he [negotiation] process must be examined 'in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the

10

negotiations themselves.'" *Id*. at 145-46 (quoting *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983)). Factors relevant to the substantive fairness of a proposed settlement include: "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *See Grinnell*, 495 F.2d at 463 (internal citations omitted).

B.  *The Proposed Settlements*

   1.  *Procedural Fairness*

   I find that the 11 settlement agreements are procedurally fair. Plaintiffs represent that the settlements were each "entered into in good faith, after extensive arms' length negotiations between experienced and informed counsel on both sides." Pls.' Mem. in Supp. Mot. Final Approval at 14. Nine of the settlement agreements—the Panalpina, Geodis, Jet Speed, Toll, Agility, UPS, Dachser, DHL and Japanese Settlement Agreements—were aided by a "nationally recognized mediator." *Id*. at 15. Further, plaintiffs represent that Class Counsel "zealously represented the interests of the Class during all settlement negotiations," that extensive discovery had occurred, and that Class Counsel "were well informed as to the facts of the case and the strengths of the claims asserted" in negotiating the settlement terms. *Id.* There is nothing in the record to indicate otherwise. Rather, the record supports that each settlement agreement was the product of numerous meetings, resolutions of "disputed terms," and the

11

assessment of relevant data, including revenue data and other information about settling defendants' operations. *See* Joint Decl. of Co-Lead Counsel, ECF No. 1282, ¶¶ 278-312.

I have no reason to believe that the parties entered into the settlement agreements through collusive behavior or that any preferential treatment was improperly conferred upon the class representative or any portion of the class. *See, e.g.*, *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). Accordingly, I conclude that the settlement agreements were reached by good-faith negotiations that were "fair, adequate, and reasonable, and not a product of collusion." *Joel A.*, 218 F.3d at 138.

2. *Substantive Fairness*

I also find that the settlement agreements are substantively fair. My findings here borrow from those set forth in my previous opinion approving settlements in this case.

First, the complexity of federal antitrust cases is well known. *See, e.g.*, *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (noting the "factual complexities of antitrust cases"); *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (Nickerson, J.) (antitrust class actions "are notoriously complex, protracted, and bitterly fought"). As I noted in *Panalpina 1*, "the potential for this complex litigation to consume considerable time and resources has been great. Complex factual and legal issues abound." *Panalpina 1*, 2013 WL 4525323, at *7. Continued proceedings would likely involve some or all of the following necessities to present proof and litigate a case: voluminous discovery, dueling experts, trial preparation, damages calculations, and appeals of any adverse jury verdicts. Each of these stages involve risk. As I wrote in *Panalpina 1*, "[i]t is undisputed that developing cases against any of the settling defendants would have required significant time and expense. In addition, as a result of many of these defendants' bargained-for cooperation,

these settlement agreements may facilitate a more expeditious outcome of the remaining claims, and may advance the final resolution of this litigation." *Id.* The same conclusions remain undisputed here.

Due process requires that class members be given notice of a proposed settlement and opportunity to be heard. Notice papers were mailed to over 1.67 million potential class members, Kinsella Decl. ¶ 11, and plaintiffs estimate the class size to number in the hundreds of thousands. Pls.' Mem. in Supp. Mot. Final Approval at 18. Only six members of the class have opted out, and there was not a single objection. *Id.* at 18-19. That the overwhelming—almost unanimous—majority of the class members have elected to remain in the settlement class supports a finding that the settlement is fair, reasonable, and adequate. *See, e.g.*, *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 (E.D. Mich. 2003).

I also find that the settlement amounts presented here are within the range of reasonableness. In the aggregate, the settlement proceeds from the 11 agreements presently establish a guaranteed settlement fund worth approximately $197,623,497.87. In addition, the defendants have agreed to cooperate to help the plaintiffs pursue their claims. "[T]hough the agreement[s] to cooperate with Plaintiffs ha[ve] not been factored in to the overall value of these settlements, [they] add[] significant value." *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG)(VVP), 2011 WL 2909162, at *4 (E.D.N.Y. July 15, 2011). Finally, the settlement proceeds from the agreements will continue to grow as settling defendants receive payments from the *Air Cargo MDL*.[19] I find that the reasonableness of the settlements in light of

---

[19] The *Air Cargo MDL* remains ongoing, rendering uncertain the exact amount of settling defendants' recovery from that litigation. However, plaintiffs anticipate growing amounts from the various settlement agreements based on future receipt of payments from the *Air Cargo MDL*. Pls.' Mem. in Supp. Final Approval at 9-11.

the best possible recovery and all attendant litigation risks weighs in favor of approving the settlements.

In sum, I conclude that the 11 proposed settlement agreements are both procedurally and substantively fair, and I therefore approve them.

C.      *Plan of Allocation*

"As a general rule, the adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and reasonable" under the particular circumstances of the case. *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re American Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) (internal quotation marks omitted). Whether the allocation plan is equitable is "squarely within the discretion of the district court." *In re PaineWebber*, 171 F.R.D. at 132.

I find that the plan is both fair and reasonable, and thus I approve it. The plan is the same as the one I approved in *Panalpina 1*, and I see no reason to reach a different result here. Moreover, no class member has objected to the plan, strongly suggesting it is fair, reasonable and adequate to the class.

D.      *Attorneys' Fees*

I may award attorneys' fees using either a percentage of the fund or the lodestar method.[20] *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014)*; see also Wal-Mart,* 396 F.3d at 121. Regardless of which

---

[20] The lodestar method multiplies hours reasonably expended against a reasonable hourly rate. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005) ("*Wal-Mart*"). In determining appropriate attorneys' fees, courts have the discretion to increase the lodestar by applying a multiplier based on factors such as the risk of the litigation and the quality of work performed by the attorneys. *Id.*

method of calculation is employed, class action fee awards are evaluated for reasonableness based on the six-factor standard set forth in *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir. 2000). Under that standard, I must weigh "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.* at 50 (alterations in original).

Class Counsel seek an interim fee award of $42,246,681.08, which represents 25% of the total available settlement fund ($168,986,724.33, payable in four installments).[21] Pls.' Mem. in Supp. Mot. Interim Attorneys' Fees, ECF No. 1281, at 24. They assert that the amount is fair and reasonable when examined under the *Goldberger* factors and when "cross-checked" against that lodestar. They assert that the total lodestar from inception of the case through August 15, 2015 is $69,869,851.59. *Id.* at 21. No objections to the requested fees have been filed. With respect to comparing the requested fee to the lodestar, Class Counsel assert that because 25% of the total available settlement fund is less than the lodestar, the recommended fee represents a deflator, not a multiplier.[22]

I find the requested attorneys' fees are fair and reasonable, and satisfy the *Goldberger* factors. This litigation is almost eight years old, and Class Counsel represent that they have "spent a total of 153,782.18 hours prosecuting the litigation." Pls.' Mem. in Supp.

---

[21] Class Counsel calculated the $168,986,724.33 representing the total available settlement fund as follows: $21,092,361.98, representing proceeds obtained from the *Air Cargo MDL* based on provisions in the *Panalpina 1* settlements; less $14,729,135.52, representing the refund due to Vantec and Nishi-Nippon based on the most favored nation clauses in their respective settlement agreements, *see supra* note 16; plus $179,623,497.87, representing the guaranteed payments and proceeds already received from the *Air Cargo MDL* from the instant 11 settlement agreements; less the $7 million UPS guaranteed minimum payment not yet due; less the $10 million maximum refund to the Japanese Defendants under the opt-out ratchet-down provision discussed *supra* note 14. Pls.' Mem. in Supp. Mot. Interim Attorneys' Fees at 6.

[22] Class Counsel assert that this is true even looking at the aggregate fees awarded so far in the case—$59,100,217.82 (the $16,853,536.74 awarded in connection with *Panalpina 1*, plus the $42,246,681.08 currently sought). Pls.' Mem. in Supp. Mot. Interim Attorneys' Fees at 6.

Mot. Interim Attorneys' Fees at 12. The amount of time and energy spent on the litigation is directly related to the factual and legal complexity of this action. "[A]ntitrust cases, by their nature, are highly complex," and this case is no different. *Wal-Mart*, 396 F.3d at 122; *see also Weseley*, 711 F. Supp. at 719 (antitrust class actions "are notoriously complex, protracted, and bitterly fought"). As I have already discussed, this litigation was obviously risky and complex.

As I stated in *Panalpina 1*, 2013 WL 4525323, at *16: "Class Counsel are highly experienced practitioners in complex litigation generally and antitrust litigation specifically. The settlement agreements [are] the result of hard fought arms'-length negotiation with settlement defendants' respective counsel." The settlement amounts proposed here attest to Class Counsel's abilities. In sum, I find the proposed attorneys' fees reasonable and thus grant the request.

CONCLUSION

For the reasons stated above, the SDV, Geodis, Jet Speed, DSV, Toll and Japanese Defendants' settlement agreements are approved, and all claims against those defendants by those members of the settlement class who have not timely exercised their right to be excluded from the settlement agreements are dismissed with prejudice. My grant of final approval to the Agility, UPS, and DHL Japanese settlement agreements will be held in abeyance until January 7, 2016.[23] My grant of final approval to the Panalpina and Dachser settlement agreements will be held in abeyance until January 11, 2016.[24] The plan of allocation is approved. Class Counsel are awarded $42,246,681.08 in fees and expenses of $4,046,323.05.

---

[23] On October 26, 2015 and October 27, 2015, plaintiff's counsel informed the Court by letter that settling defendants had not served notices for these settlements 90 days prior to the fairness hearing as required under the Class Action Fairness Act ("CAFA"). *See* Letter, Oct. 26, 2015, ECF No. 1317; Letter, Oct. 27, 2015, ECF No. 1318. These CAFA notices for the settling Agility, UPS, and DHL Defendants were served on October 9, 2015. *Id.* Accordingly, under CAFA, I may not enter final approval of these settlement agreements until the 90-day CAFA notice period expires on January 7, 2015.

[24] On October 26, 2015, plaintiff's counsel informed the Court by letter that settling defendants had not served notices for these settlements 90 days prior to the fairness hearing as required under CAFA. *See* Letter, Oct. 26, 2015. These CAFA notices for the settling Daschser and Panalpina Defendants were served on October 12,

16

So ordered.


John Gleeson, U.S.D.J.


Dated: November 10, 2015
       Brooklyn, New York

---

2015 and October 13, 2015, respectively. *Id.* Accordingly, under CAFA, the Court may not enter final approval of these settlement agreements until the 90-day CAFA notice period expires on January 10, 2016 and January 11, 2016. Because January 10, 2016 falls on a Sunday, I will enter final approval of both settlement agreements on January 11, 2016.