## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PRECISION ASSOCIATES, INC.; ANYTHING GOES LLC d/b/a MAIL BOXES ETC., and JCK INDUSTRIES, INC., on behalf of themselves and all others similarly situated, | **Case No.: 08-CV-00042 (BMC) (PK)** |
| Plaintiffs, | |
| *vs.* | |
| PANALPINA WORLD TRANSPORT (HOLDING) LTD., et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO DISTRIBUTE NET SETTLEMENT FUNDS AND AMEND THE PLAN OF ALLOCATION

Christopher Lovell
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006

Steven N. Williams
**COTCHETT, PITRE & MCCARTHY LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010

W. Joseph Bruckner
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401

Daniel E. Gustafson
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN  55402

45565

**TABLE OF CONTENTS**

**Page**

I.      Factual Background ............................................................................................... 1

II.     Claims Administration Process.............................................................................. 4

III.    Claim Form Deadline and Documentation ........................................................... 5

IV.     Deficiency Review and Audit Process................................................................... 8

V.      Proposed Distribution of Settlement Fund........................................................... 11

VI.     Process for Claimants to Object to a Denial or to the Award Amount............................ 13

VII.    The Plan of Allocation Should be Amended to Include a
        Minimum $25 Award for All Qualified Claimants........................................................ 14

VIII.   Conclusion ......................................................................................................... 17

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                        **Page(s)**

*Blank v. Jacobs*,
   No. 03-CV-2111 JS WDW, 2013 WL 1310503 (E.D.N.Y. Mar. 27, 2013)................ 4, 5, 6, 7

*In re Citigroup Inc. Sec. Litig.*,
   No. 07 CIV. 9901 SHS, 2014 WL 2445714 (S.D.N.Y. May 30, 2014) .................................... 4

*In re Crazy Eddie Sec. Litig.*,
   906 F. Supp. 840 (E.D.N.Y. 1995) ................................................................................ 4

*In re Holocaust Victim Assets Litig.*,
   424 F.3d 158 (2d Cir. 2005) ........................................................................................ 4

*In re Orthopedic Bone Screw Prod. Liab. Litig.*,
   246 F.3d 315 (3d Cir. 2001) ........................................................................................ 4

*In re Platinum and Palladium Commodities Litig.*, 10 Civ. 3617 (WHP),
   2014 WL 3500655  (S.D.N.Y. July 15, 2014) ........................................................ 15

*In re Worldcom, Inc. Sec. Litig.*, 02 CIV. 3288 (DLC),
   2005 WL 3577135 (S.D.N.Y. Dec. 30, 2005) ........................................................ 15

*Zients v. Lamorte*,
   459 F.2d 628 (2d Cir 1972)........................................................................................ 15

**Rules**

Federal Rule of Civil Procedure 23 ............................................................................ 4

Federal Rule of Civil Procedure 23(e) ........................................................................ 1

Pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs, through Class Co-Lead Counsel, respectfully submit this memorandum in support of their motion to authorize distribution of the Round 1 and Round 2 settlement funds to claimants who made qualifying purchases of freight forwarding services ("Authorized Claimants") and to amend the Plan of Allocation to allow for $25 minimum payments to those qualified claimants whose *pro rata* award was less than $25.  As explained below, the claims administrator, Epiq Systems, in consultation with Class Co-Lead Counsel has diligently processed claims and verified each claimant's eligibility.  There was significant participation in the claims process by Class Members: 11,526 claims were submitted for Round 1 and 3,745 additional claims were submitted for Round 2, and 12,131 claims have been recommended for approval (either fully or partially) for Rounds 1 and 2.  Those claims will be paid promptly upon the Court's approval of the plan of distribution presented in this motion, and subject to the Court's rulings on any objections that may be made to the proposed awards, as described in more detail below.  Finally, as discussed in Section VI, because a reserve fund has been established to address any potentially successful objections to the recommended plan of distribution, Class Co-Lead Counsel asks that the Court authorize the prompt distribution now of proceeds to all authorized claims to which no objection is made.

## I.      Factual Background

The Court has granted final approval of settlements with all Defendants in this case, grouped in three rounds.  "Round 1" Defendants are: (1) Schenker Deutsche Bahn AG, Schenker AG, Schenker, Inc., Bax Global Inc. and DB Schenker (collectively "Schenker"); (2) Vantec Corporation and Vantec World Transport (USA), Inc.; (3) EGL, Inc. and EGL Eagle Global Logistics, LP, Inc.; (4) Expeditors International of Washington, Inc.; (5) Nishi-Nippon Railroad

Co., Ltd.; (6) United Aircargo Consolidators, Inc. ("UAC"); (7) Kuehne + Nagel International and Kuehne + Nagel, Inc.; (8) Morrison Express Logistics Pte. Ltd (Singapore) and Morrison Express Corporation (U.S.A.); (9) UTi Worldwide, Inc.; and (10) ABX Logistics Worldwide NV/SA.

"Round 2" Defendants are: (1) SDV Logistique Internationale; (2) Panalpina World Transport (Holding) Ltd. and Panalpina, Inc.; (3) Geodis S.A. and Geodis Wilson USA, Inc.; (4) DSV A/S; DSV Solutions Holding A/S; and DSV Air & Sea Ltd.; (5) Jet Speed Logistics, Ltd., also known as Jet Speed Air Cargo Forwarders (HK), Ltd; Jet Speed Logistics (USA), LLC; and Jet-Speed Air Cargo Forwarders, Inc. (USA) (6) Toll Global Forwarding (USA), Inc. and Baltrans Logistics, Inc. (collectively "Toll"); (7) Agility Holdings, Inc.; Agility Logistics Corp.; Geologistics Corp.; and Geologistics International Management (Bermuda) Limited (collectively "Agility"); (8) United Parcel Service, Inc. and UPS Supply Chain Solutions, Inc. (collectively "UPS"); (9) Dachser GmbH & Co., KG, doing business as Dachser Intelligent Logistics, and Dachser Transport of America, Inc.; (10) Hankyu Hanshin Express Holding Corporation; Hankyu Hanshin Express Co., Ltd.; Hanshin Air Cargo USA, Inc.; Japan Aircargo Forwarders Association; Kintetsu World Express, Inc.; Kintetsu World Express (U.S.A.) Inc.; "K" Line Logistics, Ltd.; "K" Line Logistics (U.S.A.), Inc.; MOL Logistics (Japan) Co., Ltd.; MOL Logistics (U.S.A.) Inc.; Nippon Express Co., Ltd.; Nippon Express USA, Inc.; Nissin Corporation; Nissin International Transport U.S.A., Inc.; Yamato Global Logistics Japan Co., Ltd.; Yamato Transport U.S.A. Inc.; Yusen Air & Sea Service Co., Ltd.; and Yusen Air & Sea Service (U.S.A.), Inc. (collectively "the Japanese Defendants"); and (11) Deutsche Post AG; Danzas Corporation, doing business as DHL Global Forwarding; DHL Express (USA) Inc.; DHL Global Forwarding Japan K.K.; DHL Japan Inc.; Exel Global Logistics, Inc.; and Air Express

International USA, Inc. (collectively "DHL"), for the Japanese severed claims only (the "DHL Japanese agreement").

"Round 3" Defendants are: (1) DHL, for non-severed claims only (the "DHL Non-Severed agreement") and (2) Hellmann Worldwide Logistics GmbH & Co. KG; Hellmann Worldwide Logistics Ltd. Hong Kong; and Hellmann Worldwide Logistics, Inc..

In this motion, Co-Lead Counsel seek the Court's approval to distribute Round 1 and Round 2 settlement proceeds to Authorized Claimants. The deadline to submit claims to recover from the Round 3 settlements was April 3, 2017. In addition, there remains a relatively small amount of payments to be made by certain Round 1 and 2 Defendants whose settlement agreements allow payment over time. For those reasons, Class Counsel will separately move to disburse Round 3 settlement funds and any remaining settlement funds for Rounds 1 and 2.

As Judge Gleeson noted in approving the Round 1 settlements, "This litigation is irrefutably complex." ECF No. 866, at 30; *see also* ECF No. 1330, at 16 (reaffirming complexity of litigation in approving Round 2 settlements). Plaintiffs alleged eleven different conspiracies against 28 groups of corporate defendants (many with multiple subsidiaries), with a class period spanning ten years and a class comprising many thousands of members ranging from very small to very large purchasers. The complexity of the case, the number of claimants and the range of their affected purchases, the fact that purchase data was often incomplete and difficult to retrieve, and the need to fairly allocate the settlement funds to Class Members impacted by the various conspiracies, all informed the plan of allocation, the claim form, and the claims process.

Epiq, with advice and supervision of Class Co-Lead Counsel, engaged in an extensive and thorough claims administration process with respect to the Round 1 and 2 settlements. That administration process is now complete, and the Round 1 and 2 settlement funds are ready to be

distributed to eligible claimants.  *See* Declaration of Kevin L. Skenandore, dated July 28, 2017 ("Skenandore Decl.").

Federal Rule of Civil Procedure 23 provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  "[T]he district court has broad supervisory powers with respect to the administration and allocation of settlement funds."  *In re Holocaust Victim Assets Litig.*, 424 F.3d 158, 165 (2d Cir. 2005) (internal quotation and citation omitted).  "When a court acts as fiduciary for a settling class, it pursues the 'goal [ ] of expedient settlement distribution.'"  *In re Citigroup Inc. Sec. Litig.*, No. 07 CIV. 9901 SHS, 2014 WL 2445714, at *2 (S.D.N.Y. May 30, 2014) (quoting *In re Orthopedic Bone Screw Prod. Liab. Litig.,* 246 F.3d 315, 321 (3d Cir. 2001)).  Courts in this district have held that, "as a matter of judicial administration and fairness to all parties, [certain] concern[s] for protecting class members must give way to finality."  *In re Crazy Eddie Sec. Litig.*, 906 F. Supp. 840, 846 (E.D.N.Y. 1995).  *See also Blank v. Jacobs*, No. 03-CV-2111 JS WDW, 2013 WL 1310503, at *5 (E.D.N.Y. Mar. 27, 2013) ("there must eventually be some finality to these inquiries").

**II.    Claims Administration Process**

Epiq began the claims process after a robust notice program. Plaintiffs' notice program provided for: (1) individual direct mail notice to potential Class Members whose identity was derived from Defendants' transactional data, (2) publication notice (i.e., paid media), based on expert demographic studies, in various magazines, newspapers, trade journals and websites throughout the world in several foreign languages, (3) an "earned media" publication campaign designed to reach 18,783 worldwide media outlets and an additional 5,600 websites, and (4) a settlement website dedicated to providing Class Members with detailed information regarding

4

the case.  ECF No. 596-1; ECF No. 666 (approving first round notice); ECF No. 1229 (approving second round notice).

Epiq performed several administrative tasks including: disseminating mail notice; receiving and processing claims and requests for exclusion; responding to class member inquiries; establishing and maintaining a settlement website; conferring with Class Co-Lead Counsel; and performing such other duties as may be directed by the Court or Class Co-Lead Counsel.  *See* Skenandore Decl. at ¶ 4.  Epiq also conducted the administrative tasks associated with collecting claim forms from claimants, evaluating and auditing those claim forms, sending follow up or deficiency letters to claimants and ultimately calculating the appropriate allocated amount for each qualified claimant.  *See id*.  The claims review and audit process was complex and thorough, and involved numerous meetings with Class Co-Lead Counsel to ensure claims were paid fairly and efficiently.

### III.    Claim Form Deadline and Documentation

The deadline for filing timely claims for Round 1 settlements was August 24, 2015.[1]  *Id.* at ¶ 5.  After the Round 1 filing deadline Epiq continued to receive Round 1 claims.  Epiq continued to accept late-filed claims submitted by September 24, 2015 and recommends accepting those claims to allow the most number of class members to have eligible claims.  *Id.* Any late-filed Round 1 claims received after September 24, 2015 will be considered as timely filed Round 2 claims.

The deadline for filing timely claims for Round 2 settlements was March 31, 2016.  *Id.* Epiq continued to accept late-filed claims submitted between April 1, 2016 and May 31, 2016.

---

[1] Given the necessary complexity of the claim form and the effort required to obtain corroborating purchase data, the Round 1 claim filing deadline was extended twice with court approval.  ECF No. 929 (extending the filing deadline from November 22, 2013 to August 22, 2014); ECF No. 1093 (extending the filing deadline from August 22, 2014 to August 24, 2015).

*Id.* Epiq recommends accepting any late-filed Round 2 claims that were received by May 31, 2016 to allow the most number of class members to have eligible claims. *Id.* Any late-filed Round 2 claims received after May 31, 2016 will be considered as timely filed Round 3 claims.

The total amount now sought to be distributed is funded by settlements from nine different surcharge conspiracies, one regional conspiracy, and one overarching conspiracy. Although there was substantial overlap among Defendants in the several surcharge conspiracies, only one Defendant was alleged to have participated in all conspiracies. Some surcharge conspiracies were route specific (*e.g.* Japan to US), others were limited to air or ocean shipments only. Further, some surcharges conspiracies involved a flat fee whereas others were based upon weight.

Therefore, in order to ensure that claimants who were injured by these conspiracies received a *pro rata* allocation of settlement funds based upon the conspiracies that caused them injury, and consistent with the Court-approved Plan of Allocation (ECF No. 855; ECF No. 866; ECF No. 1307; ECF No. 1330), the claim form requested data consistent with how each surcharge conspiracy was implemented by Defendants. The claim form required each claimant to answer various questions, each correlating with a specific conspiracy and corresponding surcharge-related settlement pot. For example, Schedule B requested the dollar amounts of purchases, the currency, freight forwarder and origins/destinations of the purchases of affected freight forwarding services, for claims against the Worldwide Freight Forwarding Services pot. Skenandore Decl. at ¶ 7. Schedule B also used shipping data provided in response to the Schedule to determine eligibility for a *pro rata* distribution from the NES settlement surcharge pot. Questions 1A, 1B, 1C, 2A, 2B, 2C, 3A, and 3B of the claim form requested data used as proxies in determining payouts from the various other surcharge pots as detailed in the Plan of

Allocation.  *Id.*  Because claimants submitted claim forms in various foreign currencies, foreign currencies were converted to USD using the average exchange rate throughout the class period, based on data purchased from a third-party vendor, XE.  *Id.* at ¶ 11.  Lastly, Epiq also made adjustments where a Round 2 or 3 claim form was filed in time for Round 1 eligibility or a Round 1 claim form was filed during the Round 2 filing period to account for differences in class periods reflected on those forms and ensure the submissions were treated equally.  *Id.* at ¶ 30. Because the claim form for Round 1 claims requested information for a longer class period, when Round 1 claim forms were calculated for payments as part of the Round 2 distribution, these claim forms were adjusted to take into account the differing class periods.  *Id.*  The differing class periods were as a result of differing release periods in the settlements.

Consistent with the Plan of Allocation, 10% of each Defendant's settlement funds were allocated to the Worldwide Freight Forwarding Services pot.  As set forth in the Plan of Allocation, the remaining 90% of each Defendant's settlement funds were allocated to the surcharge-specific pots associated with those surcharges in which that Defendant was alleged to have participated.  *See* Skenandore Decl., Exhibit S.  Epiq then calculated a *pro rata* distribution from each surcharge pot, based on each Authorized Claimant's demonstrated purchase of freight forwarding services associated with a particular surcharge.

Thus, the total amount any claimant will receive will not correspond directly to its total purchases of freight forwarding services.  Instead, claimants' proposed awards were determined by which surcharges they paid and, therefore, the harm they suffered.  For example, the largest surcharge pot was for the Security Surcharge conspiracy, where disbursements are calculated *pro rata* based on the total weights of *air* shipments into and out of the United States.  Thus, if a claimant only purchased **ocean** freight forwarding services, it would not be entitled to any

recovery from the Security Surcharge pot because it was not harmed by the Security Surcharge conspiracy.

In addition, it is important to note that the "claim amount" does not equal the actual or estimated overcharges Class Members paid.  The "claim amount" is the total *purchase amount* (total dollars spent, weight, shipments, dollars spent on a particular route) for freight forwarding services, not the total *surcharge amount*.  Surcharges were a small subset of the total purchase amount.  Because surcharges were not consistently itemized in claimants' invoices or other purchase documents, the claim amount is used instead as a proxy to determine the amount of surcharges class members paid.  *See* Skenandore Decl. ¶¶ 7-8.  The overcharges, i.e. damages, class members suffered were on the surcharges, not on the total claim amount.  *Id.* at ¶ 8.  Thus, the amounts class members ultimately receive will be in proportion to the surcharges paid, and necessarily will be a significantly lower percentage of the total claim amount.  *Id.*

Although claimants were not required to submit documentation supporting their claimed freight forwarding services purchases with their claim forms, the claim form instructed each claimant to save all relevant documents supporting their claim in case the claims administrator requested this information at a later date.  As discussed below, the claims administrator requested supporting documentation from certain claimants as part of its audit process.

**IV.    Deficiency Review and Audit Process**

Epiq received a total of 11,526 claims for Round 1.  Skenandore Decl. at ¶ 9.  All claims received in Round 1 were automatically considered for payment in the subsequent rounds (i.e., a claimant who filed a claim in Round 1 did not need to file another claim to participate in Rounds 2 or 3).  *Id.*  In addition to the Round 1 claims, Epiq received an additional 3,745 claim forms for Round 2, resulting in a combined total of 15,271 claims considered in Round 2.  *See id.*

Epiq then reviewed the claims and identified claims that were deficient because they failed to provide the required information. *Id.* at ¶ 13. Epiq mailed or otherwise communicated with claimants any identified deficiencies and provided them an opportunity to cure such deficiencies, including an extension of time to respond beyond the initial 30-day response period. *Id.* Epiq also included an NES surcharge letter to certain claimants with the deficiency mailing, to ensure all eligible claimants had an opportunity to receive a disbursement from the NES pot.[2] *Id.* at ¶ 14.

Following the deficiency letter mailing, claimants that still had "uncured deficiencies," meaning the claimant had either not responded to the deficiency letter or had not provided information that was sufficient to cure some or all of the deficiency, were given until May 15, 2017 to cure those deficiencies, before Epiq was required to freeze adjustments so that distributions could be calculated. *See id.* at ¶ 30. The claims with uncured deficiencies were divided into "non-fatal deficiencies" and "fatal deficiencies." Non-fatal deficiencies were not wholly unpayable, but instead resulted in a reduction to the value of the claim. *Id.* at ¶ 15. Awards for claims with non-fatal deficiencies were calculated based only upon the payable portion of the claim. *Id.* at ¶ 15. Non-fatal uncured deficiencies include claims with some: (1) missing dates; (2) missing origins or destinations; (3) dates outside the class period; (4) transactions with non-defendant freight forwarders; (5) missing freight forwarders; (6) Schedule B corrupt or unreadable; or (7) no Schedule B provided. *Id.* Claims with non-fatal uncured deficiencies were sent a letter explaining how their claims were valued based upon their uncured fatal deficiencies.

---

[2] Each claimant's share of NES damages was determined from the total amount of purchases from the UK to the US in Schedule B. *See* Skenandore Decl., Exhibit E (Plan of Allocation). The NES letter sought more detail on the routes of claimants' shipments listed on Schedule B.

Claims with non-cured fatal deficiencies were denied, and were sent a denial letter concurrent with the filing of this motion. *See id* at ¶ 16. Uncured fatal deficiencies include: (1) all shipment dates claimed were outside the class period; (2) none of the freight forwarding services were purchased from Defendants; (3) no listed purchase amounts; (4) no valid currencies; (5) no purchase dates were listed, and therefore, it was impossible to determine whether the purchases occurred during the class period; (6) no origins or destinations for shipments were provided, making it impossible to determine whether they fit into the class definition; (7) inadequate proof of authority was provided[3]; (8) the claim form was unsigned[4]; or (9) the claim was identified as fraudulent or unreliable through Epiq's audit processes described in more detail below. *Id.*

In addition to the deficiency review, Epiq engaged in an extensive auditing process. For instance, Epiq identified claimants with multiple claims or conflicting claims and reached out to those claimants to determine which claim form was the operative claim. *Id.* at ¶¶ 17-18. If claimants did not respond, consistent with the instructions provided in the audit letter, the last-filed claim form was considered the operative claim. Epiq also engaged in a comprehensive reliability audit, and mailed thousands of letters requesting that claimants provide affidavits in support of their claims and, where necessary, provide additional documentation in support of their claims. *Id.* at ¶¶ 19-20.

Epiq eliminated ineligible "express" shipments (aka small shipments or parcel post), by mailing letters to claimants who utilized UPS or DHL (the two primary express service providers

---

[3] Numerous third-party filers submitted claims on behalf of Class Members. These third-party filers were required to show they had actual authority to file on behalf of the Class Members.
[4] The claim form required claimants to sign and certify under penalty of perjury that, among other things, the information provided in the Claim Form was accurate and complete to the best of the claimant's knowledge and the claimant was a member of the Settlement Class and had not otherwise settled these claims or submitted duplicative claims.

among the Defendants) seeking verification that their purchases, or at least a certain identifiable portion thereof, were for freight forwarding services and not express shipments. *Id.* at ¶ 21.

In addition, because there was a difference in question 2A (Security Surcharge) on the claim forms used in Rounds 1 and Round 2, Epiq mailed Round 2 and 3 claimants requesting certain additional information regarding question 2A where necessary in order to ensure claimants were treated the same whether they filed a claim form in Rounds 1 or 2. *Id.* at ¶ 22.

Lastly, Epiq engaged in extensive outreach and manual auditing of the largest claims for each surcharge pot. *Id.* at ¶ 23. Epiq identified the largest responses to each question on the claim form and reached out to each of those claimants. Based on this review, Epiq requested detailed underlying claims data and/or additional proof of the veracity of these claimed amounts. *Id.* Epiq also studied the claimant data to identify any claims whose response to one of the questions on the claim form seemed disproportionate to the claimed freight forwarding purchases on the remainder of the claim form. As part of this audit, Epiq requested back-up documentation to support all such claims. *Id*.

## V.     Proposed Distribution of Settlement Fund

The Net Settlement Funds for Rounds 1 and 2 is $261,901,207.26. *Id.*, Exhibit S. The Round 1 and 2 Defendants have paid $372,600,678.14 in Gross Settlement Funds to date. On December 27, 2013, the Court award $16,853,536.73 in attorney's fees and $613,385.84 in expenses, representing 15% of the Round 1 settlements. *See* ECF No. 984 (reconsidering original fee order). On November 10, 2015, the Court awarded $42,246,681.08 in attorney's fees and $4,046,323.05 in expenses, representing 25% of Round 2 settlements. ECF No. 1330. On November 7, 2016, the Court awarded an additional $29,443,654.19 in attorneys' fees and $1,757,081.72 in expenses related to settlement Rounds 1-3. ECF No. 1396. Of this amount,

$18,803,554.83 in attorney's fees and $1,026,352.90 in expenses were deducted from Rounds 1

and 2 funds.  The Court also authorized the payment of service awards to the Named Plaintiffs;

$791,704.44 was deducted from the Round 1 and 2 settlement funds for the payment of those

awards.  *See* ECF No. 1397.  Certain settlement agreements authorized payments related to class

notice and, pursuant to these provisions, $8,859,045.96 was paid to Kinsella and Epiq.  The

Gross Settlement Funds were further reduced to account for certain bank fees and other

administrative expenses. Class Co-Lead Counsel has also withheld $2,091,116.92 in settlement

funds to account for unpaid claims administration expenses and other expenses related to the

finalizing claims administration and distributing settlement funds pending Court approval of this

motion. Class Co-Lead Counsel also has withheld $594,035.95 in certain attorney's fees which

were previously awarded by the Court for settlement funds received after the last attorneys' fee

award.[5]  In addition, funds were reserved to cover any successful objections to Co-Lead

Counsel's recommended denials or reductions.

After a thorough review and complex administration process, Epiq has submitted award

calculations to Class Co-Lead Counsel for approval.  Skenandore Decl. at ¶ 24.  Based on Epiq's

extensive analysis, auditing and processing, Class Co-Lead Counsel recommends issuing

payments to 10,463 Authorized Claimants who filed complete claim forms for Rounds 1 and 2.

*Id.*  Class Co-Lead Counsel recommends denying or issuing $0 payments to 3,137 claims in their

entirety from Round 1 and 2.  *Id.* at ¶¶ 27-28.  Class Co-Lead Counsel recommends issuing

partial payment to 1,668 incomplete claims from Rounds 1 and 2.  *Id.* at ¶ 25.  Class Co-Lead

---

[5] Class Counsel will file a separate motion requesting Court approval for expenses related to the claims administration process.  Any settlement funds reserved in excess of claims administration expenses will be distributed to the class in a subsequent distribution.

Counsel also recommends allowing late Claims for Round 1 filed on or before September 24, 2015, and late Claims for Round 2 filed on or before May 31, 2016.  *Id.* at ¶ 5.

The distribution will be made pursuant to the chart attached as Exhibit Q to the Skenandore Declaration, which includes information about each claimant's purchases, identifying claimants by numbers as opposed to names for purposes of confidentiality, and Epiq's recommended *pro rata* distribution to each claimant per surcharge settlement pot as determined according to the Plan of Allocation as modified.

If the Court approves the distribution, Epiq will mail distribution checks to Authorized Claimants.  *Id.* at ¶ 29.  Authorized Claimants will have 90 days to cash the checks before the checks will be voided.  *Id.* at ¶ 34.  Any unclaimed funds will be distributed to qualifying claimants in subsequent distributions.

**VI.    Process for Claimants to Object to a Denial or to the Award Amount**

Concurrent with this filing, all claimants were mailed a letter informing them of the status of their claim and recommended award.  *Id.* at ¶ 29.  The letter also advised all claimants that they may object to Class Co-Lead Counsel's recommendation to this Court by filing an objection directly with this Court, and to Class Co-Lead Counsel.  *Id.,* Exhibit R.  Claimants must file and serve Class Co-Lead counsel with any objections within 30 days from the date of this filing, Class Co-Lead Counsel will have 14 days after this deadline to respond to any objections.[6]  *See id.*  Class Co-Lead Counsel will also post on the claims administration website a copy of this motion for distribution and the instructions for filing an objection.

Claimants in a denied or invalid status who would otherwise be eligible for an award in Rounds 1 and/or 2 have been included in *pro rata* calculations for Rounds 1 and 2, and those

---

[6] Because 30 days from the date of this filing falls on a Sunday, objections will be due no later than Monday, August 28, 2017 and Class Co-Lead Counsel shall respond to any objections no later than September 11, 2017.

amounts have been reserved pending any successful objection to Class Co-Lead Counsel's recommended denial or reduction. *Id.* at ¶ 29.  Claimants who successfully object and have their claim revived or increased will receive payment for their respective *pro rata* award from the reserve. *Id.* at ¶ 35.  Funds reserved for claimants who do not object and have their determination overturned will be distributed *pro rata* to qualified Round 1 and Round 2 claimants in a subsequent distribution.  *Id.*

The fact that a reserve fund has been created for objections will allow distribution now to Authorized Claimants regardless of how any objections are resolved. If the Court overturns Class Co-Lead Counsel's recommended denial or reduction of any claim, funds have been reserved to pay those claims.  Because there is going to be another distribution in this case in any event (of the Round 3 settlement proceeds and additional settlement funds received in connection with the Round 1 and 2 settlements), establishing this reserve fund for resolution of any objections by Round 1 and 2 claimants strikes an equitable balance between preserving the rights of claimants who object to the denial or reduction of their claim on the one hand, and the rights of Authorized Claimants whose claims have been approved and who are entitled to receive their proceeds as soon as possible.

## VII.    The Plan of Allocation Should be Amended to Include a Minimum $25 Award for All Qualified Claimants

Epiq, in consultation with Class Co-Lead Counsel, recommends all qualified claimants whose *pro rata* distribution would be $25 or less receive a minimum $25 award.  *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 1:06-md-1775, ECF No. 1668-1, at 6 (E.D.N.Y. April 16, 2012) (including a $5 per round minimum provision).

Courts in the Second Circuit have approved both altered and supplemental plans of allocation.  A court may *change* a plan of allocation of a settlement fund up until the point the

14

fund is actually distributed.  *See Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir 1972) (holding

that "[u]ntil the fund created by the settlement is actually distributed, the court retains its

traditional equity powers."); *see also In Re "Agent Orange" Prod. Liability Litig.*, 689

F.Supp.1250, 1261-63 (E.D.N.Y. 1998) (allowing for late claims and permitting opt-outs to opt

back in which had the effect of diluting the Class members); *In re Platinum and Palladium*

*Commodities Litig.*, 10 Civ. 3617 (WHP), 2014 WL 3500655, at *3  (S.D.N.Y. July 15, 2014)

(involving plan of allocation that was "subject to revision by this court"); *In re Amaranth*

*Natural Gas Commodities Litig.*, 07 Civ. 6377 (SAS), ECF No. 413 ¶ 6 (S.D.N.Y. May 23,

2012) (modifying final judgment to reflect plan of allocation); *In re Worldcom, Inc. Sec. Litig.*,

02 CIV. 3288 (DLC), 2005 WL 3577135, at *1 (S.D.N.Y. Dec. 30, 2005) (supplemental plan of

allocation approved over objections that certain class members would then not share in

settlement proceeds).

  Class Co-Lead Counsel's initial investigation suggested that large corporations made up

the greatest number of customers who utilized freight forwarders and were the Class Members

that suffered the greatest impact.  In addition, Defendants in certain settlements required the

settlement funds to be allocated to certain routes in which they primarily participated.  For

example, the Japanese Defendants required 90% of their settlement funds to be allocated to

Japan to United States shippers, leaving only 10% to be allocated to the Worldwide Freight

Forwarding Services pot.  *E.g.* Nishi-Nippon Settlement Agreement, ECF 590-2, at 23-24.  In

fact, once claims were submitted, thousands of class members elected to participate in the

settlement, ranging from individuals with small purchases to multinational corporations with

multi-billion dollar claims.  Many of these smaller claimants' freight forwarding purchases only

qualified for payment from the Worldwide Freight Forwarding Services pot, which accounted for only 10% of the total settlement funds.

After Epiq made its final *pro rata* calculations, Class Co-Lead Counsel learned that thousands of qualified claimants would receive an amount so small (in many cases less than one dollar) that it would not be economical to process their award and issue them a check. Because of the time and expense qualified claimants expended participating in the claims process, Class Co-Lead Counsel believe all qualified claimants should receive a minimum award of $25. Changing the Plan of Allocation to provide a $25 minimum to 6,452 qualified class members will cost the Net Settlement Fund approximately $130,000, a very tiny fraction (0.05%) of the total Round 1 and 2 Net Settlement Fund distribution of $261,901,207.26.[7]  *See* Skenandore Decl., Exhibit Q.  The proposed awards to qualified claimants who are scheduled to receive awards greater than $25 will not have their Round 1 and 2 *pro rata* awards calculations changed as the result of adding this minimum distribution provision.  Rather, any necessary adjustments will be made in future distributions.[8]

Accordingly, Class Co-Lead Counsel moves to amend the Plan of Allocation to include a $25 minimum provision.  *See* Declaration of Daniel C. Hedlund, dated July 28, 2017 ("Hedlund Decl."), Exhibit 1 (a proposed Amended Plan of Allocation with a redlined change to add in this minimum award).  Concurrent with the filing of this motion, Epiq posted this motion and a summary of Class Co-Lead Counsel's request that the Plan of Allocation be amended to allow

---

[7] Class Co-Lead Counsel recommends that any qualified claimant who receives a $25 minimum payment should not receive any future payment from any additional Round 1, Round 2 or Round 3 disbursements, unless the total *pro rata* award calculation from this disbursement and the future disbursements amounted to over $25.  If the total *pro rata* calculations from all disbursements is over $25, then those qualified claimants would receive their actual *pro rata* award, minus the $25 award unless the administrative expense of issuing such a payment exceeds the actual award.  For qualified Round 3 claimants who did not file claims in Rounds 1 and 2, and who have *pro rata* awards under $25, Class Co-Lead Counsel will recommend issuing a $25 minimum award.

[8] As discussed above, because funds have been set aside in a reserve, these minimum payments can be made now allowing all qualified claimants to receive an award as part of this distribution.

for a minimum payment of $25 for all qualifying claimants on the settlement website.  Epiq has

also provided direct mail notice to all claimants of their award and Class Co-Lead Counsel's

request to issue a $25 minimum award to certain qualified claimants.

## VIII.   Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court authorize

distribution of the Net Settlement Fund to Authorized Claimants and the amendment of the Plan

of Allocation.


Dated: July 28, 2017                                          Respectfully Submitted,

                                                             /s/ Daniel C. Hedlund

                                                             Daniel E. Gustafson
                                                             Daniel C. Hedlund
                                                             Michelle J. Looby
                                                             Joshua J. Rissman
                                                             GUSTAFSON GLUEK PLLC
                                                             Canadian Pacific Plaza
                                                             120 South 6th Street, Suite 2600
                                                             Minneapolis MN  55402
                                                             Telephone: (612) 333-8844
                                                             Facsimile: (612) 339-6622
                                                             Email: dgustafson@gustafsongluek.com
                                                                    dhedlund@gustafsongluek.com
                                                                    mlooby@gustafsongluek.com
                                                                    jrissman@gustafsongluek.com


                                                             Steven N. Williams
                                                             Adam J. Zapala
                                                             COTCHETT, PITRE & McCARTHY, LLP.
                                                             San Francisco Airport Office Center
                                                             840 Malcolm Road, Ste. 200
                                                             Burlingame, CA 94010
                                                             Telephone: (650) 697-6000
                                                             Facsimile: (650) 697-0577
                                                             Email: swilliams@cpmlegal.com
                                                                    azapala@cpmlegal.com

W. Joseph Bruckner
Heidi M. Silton
LOCKRIDGE GRINDAL
NAUEN P.L.L.P.
1000 Washington Avenue South, Suite 2200
Minneapolis MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
Email: wjbruckner@locklaw.com
       hmsilton@locklaw.com


Christopher Lovell
Benjamin M. Jaccarino
LOVELL STEWART HALEBIAN
JACOBSON LLP
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4775
E-mail:clovell@lshllp.com
       bjaccarino@lshllp.com


*Counsel for Plaintiffs and Interim Class Co-Lead Counsel*

18