**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PRECISION ASSOCIATES, INC.; ANYTHING GOES LLC d/b/a MAIL BOXES ETC., and JCK INDUSTRIES, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>PANALPINA WORLD TRANSPORT (HOLDING) LTD., *et al.*,<br><br>Defendants. | Case No.: 08-CV-00042 (BMC) (PK)<br><br>**DECLARATION OF MICHAEL R. O'CONNOR IN SUPPORT OF PLAINTIFFS' MOTION FOR DISTRIBUTION OF RESIDUAL SETTLEMENT FUNDS** |

I, MICHAEL R. O'CONNOR, ESQ., hereby declare and state as follows:

1. I am a Vice President at Epiq Class Actions & Claims Solutions, Inc. ("Epiq") and a licensed attorney in Oregon. Prior to joining Epiq in 2010, I was an owner at the Garvey Schubert Barer law firm (n/k/a "Foster Garvey") in Portland, Oregon, and was engaged in private practice for 13 years. I received my Juris Doctorate from the University of Oregon Law School in 1997 and my Bachelor of Arts degree from Yale University in 1994. I have first-hand knowledge of, and am competent to testify, regarding the matters stated herein.

2. I previously submitted: (a) the January 28, 2019 Declaration of Michael R. O'Connor Esq. in which I described in detail Epiq's administration of claims made in this case; and (b) the July 14, 2021 Declaration of Michael R. O'Connor in Support of Plaintiffs' Motion for Second Distribution of Settlement Funds. Both Declarations are incorporated herein by reference, but I will begin summarizing the results of each distribution on the following pages.

3. As approved by this Court, and consistent with the Plan of Allocation, Epiq conducted an initial distribution of the Net Settlement Fund to eligible claimants (the "Initial

1

Distribution") on May 24, 2019. A total of 12,422 claimants were sent payments via check or wire totaling $318,002,145.60.[1]

4. As occurs in every administration, mailing addresses provided by claimants at the time of claim filing are sometimes no longer valid when checks are mailed. Consistent with Epiq's best practices and industry standards, Epiq made diligent efforts to locate new mailing addresses for such claimants and send them new checks and/or wire them settlement awards.

5. As also occurs in every administration, there are always some checks that are not returned to Epiq as undeliverable, but for whatever reason, claimants do not negotiate. In this case, Epiq exceeded best practices and normal industry standards to reach out to such claimants to politely encourage them to negotiate their awards. We followed up with phone calls and email and on occasion, asked Class Counsel to reach out to claimants who were unresponsive to us.

6. At that time, and as stated in my prior Declaration, in all my years at Epiq, I had never observed a more robust, coordinated effort to ensure successful claimants received their awards (but see paragraphs 9-11, *supra*).

7. As a result of the extraordinary follow-up efforts made by Epiq and Class Counsel, $315,259,978.24, or 99.1% of the amount distributed in the Initial Distribution was negotiated by, or successfully wired to claimants. I am not aware of an administration with such a high percentage of funds received, which is consistent with my observation that our claimant outreach efforts were remarkable.

8. As approved by this Court, and consistent with the Plan of Allocation, Epiq commenced a supplemental distribution of the remaining Net Settlement Fund to eligible claimants

---

[1] Claimant China Chamber of International Commerce's claim was also distributed one distribution on May 22, 2020. The amount of that payment was $4,900,000.

2

(the "Supplemental Distribution") on September 11, 2020.  A total of 5,184 claimants were sent payments via check or wire totaling $27,031,489.95. This sum included unclaimed payments from the Initial Distribution, reserve monies held back in connection with the Initial Distribution for unexpected contingencies and a reserve set aside for the since-resolved China Chamber of International Commerce's formerly disputed claim.  No reserves were held in connection with the Supplemental Distribution.

9. Supplemental distributions also always encounter the same issues described previously in paragraphs 4 and 5:  awards that are returned as undeliverable and awards that are not negotiated.  Once again, Epiq went above and beyond ordinary best practices and industry standards to seek people out, updating addresses when available and sending out hundreds of emails to claimants to help them get their awards.

10. At Epiq, we also established a "SWAT Team" of sorts to specifically identify and reach out to claimants with un-negotiated awards over $1,000.  I lead this team, which included truly extraordinary efforts to get in touch with claimants.  The class in this case consisted primarily of business entities—often very large business entities—which over the many years of the administration have experienced turnover in their organizations.  This meant that the person who filed a claim on behalf of a particular entity was often no longer with the company by the time of the Supplemental Distribution.  This made contacting people quite difficult.

11. Our "SWAT Team" performed Google searches of these claimants and reached out by email, phone, LinkedIn messaging, and in some cases by traditional mail to multiple officers within the organization (e.g. the Chief Legal Officer/General Counsel and/or Chief Financial Officer and/or Chief Executive Officer) to try to get them to negotiate their awards.  And, just as we did with the Initial Distribution, we sometimes asked Class Counsel to assist us with claimants

who were unresponsive to Epiq. These calls and efforts led to many dead ends, but resulted in over $600,000 additional award dollars being negotiated by, or wired to claimants.

12. It might be helpful to the Court if I provide one example of the type of work this effort entailed. One claimant was a fashion company based in Europe. Officers were not easily identified on the company's website or in various public online filings we could find (we sometimes resorted to looking at quarterly reports by publicly traded entities to try to determine a contact we might be able to reach out to). There were no phone numbers for any officers or listed email addresses anywhere in the public domain. Calls to the corporate information line went nowhere. There did not appear to be any company contacts on LinkedIn, but we did find a listing for the company's former General Counsel who had since left the company for a new job.

13. There was no contact information available for him on his LinkedIn profile, but other various Google searches identified a lawyer with a large firm in Washington, DC for which this former General Counsel performed a client video testimonial. We reached out to that lawyer, who reached out to his former client, who reached out to the new General Counsel at the company, who then reached out to me to set up payment. Getting just this one claimant paid was a circuitous, labor-intensive endeavor on which I spent more than six hours over the course of a couple weeks.

14. Though the claimant described in paragraphs 12 and 13 was among the more complicated claimants to get paid, many of the claims in this category (un-negotiated Supplemental Distribution checks) were foreign entities around the world, with a concentration in China and Europe. And while each one may not have required this much effort, Epiq personnel (including myself) routinely spent up to half a day's worth of work trying to locate the right person at each relevant claimant's organization.

15. Ordinarily, this sort of approach would be cost-prohibitive and impractical for a settlement administration. However, after administering this case for many years, and in close consultation with Class Counsel, we made the decision to pursue extraordinary outreach efforts, which demonstrably and materially improved the total paid to claimants. Because of a previously agreed-to overall fee discount with Class Counsel, described in my most recent declaration, we performed this work without any expectation of payment, demonstrating our very best, good-faith efforts to make this administration as successful as possible.

16. To the extent I described our efforts in the Initial Distribution as the most robust and coordinated I have observed in my now 11+ years with Epiq, our efforts in the Supplemental Distribution exceeded those of even the Initial Distribution. More than 99.3% of the funds distributed in the Supplemental Distribution were successfully negotiated or wired to claimants. In total, when combining the sums distributed and successfully negotiated/wired in both distributions, more than 99.9% of the monies distributed went into the hands of deserving claimants—a fantastic result by any measure, made more remarkable by the complexities of this administration (e.g., many foreign claimants, the length of the administration, the complexities of the claims filed and materials received, etc.).

17. As the administration winds down, it is worth noting a few additional high-level statistics:

    a. Over the course of this administration, Epiq sent 9,085,875 pieces of mail; received 69,202 total documents from class members, and processed 18,944 paper and online claims over three separate notice campaigns.

    b. In addition to the two primary distributions, we conducted 34 additional check/wire reissue runs to help claimants get paid—again resulting in over

       99.9% of all Net Settlement Fund amounts getting into the hands of claimants.

   c. This administration first came to Epiq in late 2011.  During that time we have answered 15,505 incoming class member phone calls and responded to 9,694 incoming emails, in addition to the notice mailings, claims-related mailings and check mailings previously described.

  18. Despite the extraordinary efforts described herein, there is a residual balance of unclaimed funds in the Qualified Settlement Fund account totaling $185,142.32 (the "QSF").  Residuals occur in every administration, and as a percentage of the amount distributed, this one is small.  The Settlement Agreement does not specify how these residual funds should be allocated.

  19. After consultations with Class Counsel, and if this Court so approves, Class Counsel and Epiq have agreed that paying Epiq the residual funds is fair, just and reasonable.  As described in my most recent Declaration, Epiq previously discounted our prior fees many hundreds of thousands of dollars at a time when money not spent on Epiq would go to the Class.  That is no longer the case, as all money that could reasonably have been distributed to class members has been sent, with highly successful results.

  20. In addition, at the time of Epiq's fee discount, it was not certain that a second distribution would be needed or how much that distribution would cost.  Epiq incurred more than $154,957.49 in unbilled fees and costs associated with the second distribution, which does not include more than an estimated 100 hours I expended in connection with the second distribution and winding down this case.  My typical billing rate is $345/hour.

  21. Fees and expenses related to the Supplemental Distribution include but are not limited to:  answering class member phone calls to our toll-free line in six languages, maintaining

and updating an interactive voice recording on our toll-free line with answers to class member questions in six languages, responding to correspondence from class members (email and written) in six languages, maintaining and updating an administration website in six languages, data analyst time to perform calculations for the Supplemental Distribution, bank account management (including reconciliation of the QSF bank account, issuing wire payments to claimants as requested and monitoring check negotiation activity), preparing tax returns for the QSF, printing and postage costs (including letters and checks) project management hourly time to oversee all aspects of the administration in addition to direct and frequent communications with Class Counsel and the extensive, labor-intensive efforts to reach claimants who did not initially negotiate their awards. More than 1,400 billable hours were expended by Epiq personnel in connection with the Supplemental Distribution.

22. Paying Epiq the residual balance does not adversely affect class member payments in any way. Moreover, there is no designated recipient of the residual named in the Court-approved Settlement Agreement and conducting a third distribution would not be cost effective given the required administrative fees, which would include but not be limited to running new calculations, issuing new payments (including print, postage, address research costs and bank wiring fees), providing class members support services (including a call center and email support in multiple languages), bank reconciliation and fraud prevention efforts, complying with check reissue requests and project management time.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 13th day of July 2022, in the District of Columbia.

_____
Michael O'Connor